Samuel A. Schwartz, Esq.
Nevada Bar No. 10985
saschwartz@nvfirm.com
Gabrielle A. Hamm, Esq.
Nevada Bar No. 11588
ghamm@nvfirm.com
SCHWARTZ LAW, PLLC
601 East Bridger Avenue
Las Vegas, NV 89101
Telephone: 702.385.5544
Facsimile: 702.442.9887

*Proposed Attorneys for the Debtors*

# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| In re: | Case No.: 23-15619-hlb |
| RAWHIDE MINING LLC, | Chapter 11 |
| Debtor. | *Proposed Joint Administration with*: |
| | In re Rawhide Acquisition Holding LLC, Case No. 23-15620-hlb |
| Affects All Debtors ☒ | |
| Affects Rawhide Mining LLC ☐ | Hearing Date:  OST REQUESTED |
| Affects Rawhide Acquisition Holding LLC ☐ | Hearing Time:  OST REQUESTED |

**EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS: (I) AUTHORIZING DEBTORS TO OBTAIN POST-PETITION SENIOR SECURED, SUPERPRIORITY FINANCING; (II) GRANTING LIENS AND SUPERPRIORITY CLAIMS; (III) MODIFYING THE AUTOMATIC STAY; (IV) SCHEDULING INTERIM AND FINAL HEARINGS; AND (V) GRANTING RELATED RELIEF**

Rawhide Mining LLC ("**Rawhide**") and Rawhide Acquisition Holding LLC ("**Holding**" and, together with Rawhide, the "**Debtors**"), the debtors and debtors-in-possession in the above-captioned Chapter 11 cases (the "**Chapter 11 Cases**"),[1] by and through their proposed counsel of record, Schwartz Law, PLLC, hereby file this motion (the "**Motion**") for entry of an interim order (the

---

[1]     Unless otherwise indicated, all chapter and section references are to the Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "**Bankruptcy Code**"). All references to a "**Chapter**" or "**Section**" shall be to the Bankruptcy Code. "**Bankruptcy Rule**" references are to the Federal Rules of Bankruptcy Procedure Rules 1001-9037. "**Local Rule**" or "**LR**" references are to the Local Rules of Bankruptcy Practice of the United States Bankruptcy Court, District of Nevada.

"**Interim DIP Order**") and a final order (the "**Final DIP Order**" and, collectively with the Interim DIP Order, the "**DIP Orders**") pursuant to sections 105, 362, 363, 364, 503, and 507 of the Bankruptcy Code, Rules 2002, 4001 and 9014 of the Bankruptcy Rules, and Rules 2002, 4001, 6004, 9006 and 9014 of the Local Rules: (a) authorizing the Debtors to, among other things: (i) obtain senior secured postpetition financing (the "**DIP Facility**") from De Jong Capital, LLC, a Delaware limited liability company ("**De Jong Capital**" or the "**DIP Lender**"); (ii) grant the DIP Lender superpriority administrative claims; (iii) grant the DIP Lender first priority senior liens on its unencumbered property; and (iv) grant the DIP Lender priming liens on its encumbered property; and (b) granting related relief.

Debtors seek authorization for the DIP Facility in order to provide funding and liquidity for the operation of its business and to fund the expenses of the Debtors' Chapter 11 Cases, in accordance with that certain budget (the "**Budget**"), attached hereto as **Exhibit 1**.[2] A copy of the *Debtor-In-Possession Loan Agreement* (the "**DIP Facility Agreement**")[3] is attached as **Exhibit 2** hereto.

In compliance with Bankruptcy Rule 4001(c)(1)(B), the Debtors provide the following additional information regarding the proposed DIP Facility. Nothing in the following summary alters or amends the terms of the DIP Facility Agreement, or the Interim DIP Order, or the Final DIP Order, and to the extent of any conflict between the following summary and the DIP Facility Agreement, the Interim DIP Order or the Final DIP Order, the DIP Facility Agreement, the Interim DIP Order or the Final DIP Order, as applicable, shall control:

---

[2] The Budget attached hereto as <u>Exhibit 1</u> has preliminary approval, but is still subject to final DIP Lender approval.

[3] Capitalized terms used, but not defined, herein shall have the meanings ascribed to them in the DIP Facility Agreement.

| CITATION TO DIP FACILITY AGREEMENT/ INTERIM DIP ORDER/ FINAL DIP ORDER[4] | MATERIAL PROVISIONS OF DIP FACILITY |
|---|---|
| DIP Facility Agreement, § 1.1 ("Interest Rate"; "Default Rate"); | **Interest Rate**: 16% per annum PIK simple interest on a quarterly basis.<br><br>**Default Rate**: Applicable Federal Rate at the time of the Event of Default plus 5%. |
| DIP Facility Agreement, § 1.1 ("Maturity Date"); | **Maturity**: May 31, 2024. |
| DIP Facility Agreement, § 7.1;<br><br>Interim DIP Order ¶ 9;<br><br>Final DIP Order ¶ 9. | **Events of Default**: Events of Default include the following:<br><br>(a) the failure of the Debtor to perform, in any respect, any of the terms, provisions, conditions, covenants, or obligations under the Interim DIP Order or the Final DIP Order;<br><br>(b) the Debtors seek any modification or extension of the Interim DIP Order or the Final DIP Order without the consent of the DIP Lender;<br><br>(c) any application is filed by the Debtors for the approval of (or an order is entered by the Court approving) any claim arising under section 507(b) of the Bankruptcy Code or otherwise, or any lien in the Chapter 11 Case, which is *pari passu* with or senior to the DIP Obligations or the DIP Liens;<br><br>(d) the (i) commencement of any action by the Debtors or (ii) support by the Debtors of the commencement of any action by any other party-in-interest with standing against any of the DIP Lender to subordinate or avoid any liens made in connection with the DIP Documents or to avoid any obligations incurred in connection with the DIP Documents;<br><br>(e) any order shall be entered granting relief from the stay arising under section 362 of the Bankruptcy Code to the holder or holders of any security interest, lien or right of setoff to permit foreclosure (or the granting of a deed in lieu of foreclosure or similar instrument), possession, set-off or any similar remedy with respect to any Collateral;<br><br>(f) the Debtors shall assert in any pleading filed in any court that any material provision of this Interim DIP Order or the Final DIP Order is not valid and binding for any reason; or |

---

[4]    The proposed Interim DIP Order and Final DIP Order are attached hereto as **Exhibit 3** and **Exhibit 4**, respectively.  The summary of material provisions is provided for informational purposes only.  As noted above, in the event of any conflict between the summary and the terms of the Interim DIP Order, the Interim DIP Order (and thereafter the Final DIP Order) shall control.

| CITATION TO DIP FACILITY AGREEMENT/ INTERIM DIP ORDER/ FINAL DIP ORDER[4] | MATERIAL PROVISIONS OF DIP FACILITY |
|---|---|
| | (g) the occurrence of an "Event of Default" under the DIP Facility Agreement. |
| DIP Facility Agreement, § 2.9; Interim DIP Order, ¶ 7; Final DIP Order, ¶ 7. | **DIP Financing Liens**: The DIP Lender will have a super-priority, priming senior lien, pursuant to Bankruptcy Code section 364(d), against all assets of the Debtors, whether real or personal, including post-petition assets and, upon entry of the Final DIP Order, any and all avoidance actions and proceeds therefrom, subject only to the Carve-Out. |
| DIP Facility Agreement, § 2.9; Interim DIP Order, ¶ 6; Final DIP Order, ¶ 6. | **DIP Superpriority Claim**: The DIP Lender will have a super-priority administrative expense claim under Bankruptcy Code section 364(c)(1) for the amount of all obligations under the DIP Facility, subject only to the Carve-Out. |
| DIP Facility Agreement, §§ 1.1 ("Total Loan Amount"; "First Loan Installment"; "Second Loan Installment"), 2.1; Interim DIP Order, pg. 2; Final DIP Order, pg. 2. | **Commitment Amount**: A maximum commitment of up to *US$2,500,000* (the "**Total Loan Amount**") plus PIK interest, plus expenses, costs and attorneys' fees of the DIP Lender. Upon entry of the Interim DIP Order, a maximum of amount up to *US$960,000.00* would be available under the DIP Facility (the "**Initial Maximum Amount**"). Upon entry of the Final DIP Order, an additional maximum amount of up to *US$1,540,000* would be available under the DIP Facility. The Budget includes schedule of timing and amounts of the two projected disbursements to the Debtors under the DIP Facility. |
| DIP Facility Agreement, §§ 3.1 & 3.2 | **Borrowing Conditions**: Conditions would be customary for facilities of this type, including: |
| | (a) The filing by the Debtors of a motion seeking entry of the Interim DIP Order and the Final DIP Order, each in a form acceptable to the DIP Lender. |
| | (b) The Court's approval of the DIP Facility on an interim basis no later than ten (10) business days after the Petition Date and on a final basis no later than thirty (30) calendar days after the Petition Date; |
| | (c) DIP Orders would be subject to the Budget, which would provide only for the payment of necessary cash operating expenses of the Debtors, and not any intercompany payments or allocations, including with respect to professional fees and expenses except in accordance with the Budget; |
| | (d) Payment of the reasonable outstanding fees and expenses of the DIP Lender, including any fees and expenses of legal counsel and financial advisors to the DIP Lender, in connection with the DIP Facility; |
| | (e) Each disbursement under the DIP Facility would be consistent with |

| CITATION TO DIP FACILITY AGREEMENT/ INTERIM DIP ORDER/ FINAL DIP ORDER[4] | MATERIAL PROVISIONS OF DIP FACILITY |
|---|---|
| | the most recently delivered and approved version of the Budget, subject to any variances as permitted by the DIP Documents; |
| | (f) DIP Orders shall be acceptable to the DIP Lender and include provisions relating to the DIP Facility that are customary for facilities of this type and other provisions acceptable to the DIP Lender (with respect to adequate protection); |
| | (g) Execution and delivery of the DIP Documents and other customary loan documents in form and substance satisfactory to the DIP Lender; |
| | (h) No material adverse change would have occurred with respect to the operations, properties, or financial condition of the Debtors, taken as a whole, since the commencement of the Chapter 11 Cases; |
| | (i) Execution and delivery of full releases by the Debtors, their affiliates and its ultimate beneficial owners in respect of any claims against DIP Lender, and its and their affiliates, officers, directors, employees, agents and advisors, and vice versa, under or in connection with the DIP Facility, existing or arising at any time, in form and substance satisfactory to the DIP Lender. |
| DIP Facility Agreement, § 1.1 ("Carve-Out"; "Carve-Out Expenses"); Interim DIP Order, ¶ 13; Final DIP Order, ¶ 13. | **Carve-Out**: The DIP Lender's liens and administrative claims would be subject to the prior payment of the "Carve-Out," which means: (a) all fees required to paid by the Debtor to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930(a), (b) all fees due the Clerk of the Court, (c) the allowed fees and disbursements as may be awarded to the professionals of the Debtor and any official committee of creditors appointed pursuant to Bankruptcy Code section 1102(a) (the "**Estate Professionals**") from time to time pursuant to Bankruptcy Code § 330, in the aggregate amount set forth in the Budget and only to the extent such fees were incurred prior to an Event of Default but not yet paid, and (d) up to **US$100,000** in aggregate fees and expenses incurred by the Estate Professionals following an Event of Default. |
| *Types of Provisions Identified in Bankruptcy Rules 4001(c)(1)(B)(i) through (xi)* | |
| DIP Facility Agreement, §2.9; Interim DIP Order, ¶¶ 6-7; Final DIP Order, ¶¶ 6-7. | **(i)  Grant of priority/lien under 11 U.S.C. § 364(c) or (d)**: DIP Lender will have a super-priority administrative expense claim against the Debtors' bankruptcy estates, and a super-priority, priming senior lien pursuant to Bankruptcy Code section 364(d), against all assets of the Debtors, whether real or personal, including post-petition assets and, upon entry of the Final DIP Order, any and all avoidance actions |

| CITATION TO DIP FACILITY AGREEMENT/ INTERIM DIP ORDER/ FINAL DIP ORDER[4] | MATERIAL PROVISIONS OF DIP FACILITY |
|---|---|
| | and proceeds therefrom, subject only to the Carve-Out. |
| N/A | **(iii) Determination re: pre-petition lien/claim**: None. |
| DIP Facility Agreement, § 7.2; Interim DIP Order, ¶ 11; Final DIP Order, ¶ 11. | **(iv) Waiver/modification of the automatic stay**: Any automatic stay otherwise applicable to the DIP Lender is modified so that five (5) business days after the Termination Declaration (as defined in the Interim DIP Order) (such five (5) business -day period, the "**Remedies Notice Period**") the DIP Lender shall be entitled to immediately exercise its rights and remedies in accordance with the DIP Documents and the Interim DIP Order or Final DIP Order, as the case may be, and shall be permitted to satisfy the DIP Obligations, the DIP Superpriority Claim and the DIP Liens in each case subject to the Carve-Out. During the Remedies Notice Period (A) the Debtors may use Cash Collateral solely to pay payroll and other expenses critical to keep the business of the Debtors operating in accordance with the Budget, and (B) the Debtors shall be entitled to seek an emergency hearing before the Court, within the Remedies Notice Period, for the purpose of contesting whether a Termination Event (as defined in the Interim DIP Order) has occurred and/or is not continuing. Unless the Court determines otherwise during the Remedies Notice Period, the automatic stay, as to the DIP Lender, shall automatically be terminated at the end of the Remedies Notice Period without further notice or order. Upon expiration of the Remedies Notice Period, the DIP Lender shall be permitted to exercise all remedies set forth herein and in the DIP Documents, and as otherwise available at law without further order of or application or motion to the Court. |
| DIP Facility Agreement, § 7.1; Interim DIP Order, ¶¶ 9, 17; Final DIP Order, ¶ 9, 17. | **(v) Waiver/modification of rights re: chapter 11 plan, cash collateral or post-petition financing**: Event of default for Debtors to seek approval of any claim/lien which is senior to or *pari passu* with the DIP Obligations/DIP Liens. |
| DIP Facility Agreement, §§ 1.1 ("Chapter 11 Case Milestones"; "Chapter 11 Sale Milestones"). | **(vi) Confirmation/disclosure statement deadlines**: The Debtors shall file a plan of reorganization (a "**Plan**") by no later than *May 31, 2024*, providing for payment of the DIP Obligations in full, and an order confirming the Plan shall be entered on or before *June 30, 2024*. Other Chapter 11 Case Milestones: <ul><li>if a forfeiture of Surface Management Surety Bond Number SUR0008068 has occurred, it can be cured such that the surety bond provisions provide enough protections to the Borrowers</li></ul> |

| CITATION TO DIP FACILITY AGREEMENT/ INTERIM DIP ORDER/ FINAL DIP ORDER[4] | MATERIAL PROVISIONS OF DIP FACILITY |
|---|---|
| | and any claim to the surety bond by the Bureau of Land Management after the Petition Date is stayed or a satisfactory replacement bond is provided;<br><br>• no later than ten (10) business days after the Petition Date, the Bankruptcy Court shall have entered the Interim Order<br><br>• no later than twelve (12) business days after the Petition Date, the Borrowers shall have filed a motion seeking bid procedures for the sale of the operations (the "**Acquired Assets**") under a share purchase agreement with the DIP Lender as the stalking horse bidder with customary stalking horse protections;<br><br>• no later than thirty (30) calendar days after the Petition Date, the Bankruptcy Court shall have entered the Final Order;<br><br>• the Debtors shall establish a date that is no later than seventy-five (75) calendar days after the Petition Date as the deadline for the submission of binding bids with respect to the Acquired Assets;<br><br>• no later than ninety (90) calendar days after the Petition Date, the Borrowers shall commence an auction for the Acquired Assets, in accordance with the bid procedures;<br><br>• no later than one hundred (100) calendar days after the Petition Date, the Bankruptcy Court shall have entered an order approving the winning bid resulting from the sale of the Acquired Assets; and<br><br>• consummation of the sale of the Acquired Assets shall occur no later than the date that is one hundred ten (110) calendar days after the Petition Date |
| N/A | **(vii) Wavier/modification of lien rights under non-bankruptcy law**: None. |
| N/A | **(viii) Release of estate cause of action**: None. |
| DIP Facility Agreement, § 8.3;<br><br>Interim DIP Order, ¶ 20;<br><br>Final DIP Order, ¶ 20. | **(ix) Indemnification**: Nothing in the Interim DIP Order, the DIP Documents, or any other documents related to the DIP Facility shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Lender any liability for any claims arising from the prepetition or postpetition activities of the Debtors in the operation of its business or maintenance of assets, or in connection with its restructuring and sale efforts. The Debtors shall indemnify the DIP Lender from and against all damages, losses, settlement payments, |

| CITATION TO DIP FACILITY AGREEMENT/ INTERIM DIP ORDER/ FINAL DIP ORDER[4] | MATERIAL PROVISIONS OF DIP FACILITY |
|---|---|
| | obligations, liabilities, claims, suits, penalties, assessments, citations, directives, demands, judgments, actions or causes of action, (including, without limitation, reasonable fees and disbursements of attorneys, advisors and consultants) and all other liabilities whatsoever incurred, suffered, sustained or required to be paid by any such indemnified Person (except any of the foregoing which result from the gross negligence or willful misconduct of the indemnified Person), on account of or in relation to or any way in connection with the DIP Facility or DIP Documents. |
| DIP Facility Agreement, § 7.1(j); Interim DIP Order, ¶ 12; Final DIP Order, ¶ 12. | **(x) 506(c) waiver**: Subject only to and effective upon entry of the Final DIP Order and the Carve Out, no costs or expenses of administration of the Chapter 11 Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the Collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Lender. |
| DIP Facility Agreement, §§ 1.1 ("Avoidance Actions"; "Collateral"; "Excluded Property), 2.9; Interim DIP Order, ¶ 6; Final DIP Order, ¶ 6. | **(xi) Lien/claim on avoidance actions**: Upon entry of the Final DIP Order, DIP Lender shall have a super-priority administrative expense claim, pursuant to Bankruptcy Code section 364(c), and a super-priority, priming senior lien, pursuant to Bankruptcy Code section 364(d), against any and all avoidance actions and proceeds therefrom. |

This Motion is made and based upon the following memorandum of points and authorities, the *Omnibus Declaration of Marceau Schlumberger in Support of Debtors' Chapter 11 Petitions, First Day Motions, and Related Relief* (the "**First Day Declaration**"), filed concurrently herewith, the papers and pleadings on file with the Court in these Chapter 11 Cases, and any oral arguments the Court may entertain at the hearing on the Motion.

# POINTS AND AUTHORITIES

## JURISDICTION

1.      This Court has jurisdiction to consider and determine this matter pursuant to 28 U.S.C. §§ 157 and 1334 and Local Rule 1001(b)(1). This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b). Pursuant to LR 9014.2, the Debtors consent to entry of a final order or judgment by the bankruptcy judge if it is determined that the bankruptcy judge, absent consent of the parties, cannot enter final orders for judgment consistent with Article III of the U.S. Constitution.

2.      Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory bases for the relief requested herein are Bankruptcy Code sections 105, 361, 362, 363(c), 363(e), 364(c), 364(d)(1) and 364(e), Bankruptcy Rule 4001(c) and Local Rules 4001(b) and (c).

## FACTUAL BACKGROUND

**A.      General Background.**

4.      Rawhide is a Delaware foreign limited liability company that owns and operates a commercial gold mining operation located at forty-five (45) miles northeast of Hawthorne, Nevada (the "**Denton-Rawhide Mine**"). Holding is the sole member of Rawhide.

5.      On December 20, 2023 (the "**Petition Date**"), the Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, thereby commencing these Chapter 11 Cases.

6.      The Debtors are continuing in possession of their property and operating and managing their business, as debtors in possession, pursuant to Bankruptcy Code sections 1107 and 1108. *See generally* Docket.

7.      No request has been made for the appointment of a trustee or examiner, and no statutory committee has been appointed.

8.      The factual background relating to Debtors' commencement of the Chapter 11 Cases is set forth in detail in the First Day Declaration and is incorporated for all purposes herein by this reference.

**B.**     **Prepetition Financing.**

9.     Rawhide, as Borrower, Holding, as Parent, Silverview Credit Partners, LP ("**Silverview**"), formerly known as Silverpeak Credit Partners, LP, as administrative agent and collateral agent for itself and the several financial institutions or entities from time to time party thereto (together with Silverview, the "**Prepetition Lenders**") are parties to that certain *Loan and Security Agreement* dated January 3, 2019 (the "**Prepetition Loan Agreement**") in the original principal amount of $18,100,000.00 (the "**Prepetition Loan**").

10.     Pursuant to the Prepetition Loan Agreement, the Prepetition Loan is secured by substantially all assets of Rawhide and its subsidiaries, including Accounts, Chattel Paper, Commodity Contracts, Deposit Accounts, Documents, Equipment, Fixtures, General Intangibles, Goods, Instruments, Intellectual Property, Inventory, Investment Property, Letter of Credit Rights and Supporting Obligations, Commercial Tort Claims, and the proceeds and products of the foregoing, along with a pledge of Holding's equity in Rawhide pursuant to that certain *Pledge and Security Agreement* dated as of January 3, 2019 (the "**Equity Pledge Agreement**"), between Holding, as pledgor, and Silverview (collectively, the "**Prepetition Collateral**").

11.     Silverview terminated Rawhide's access to its deposit account at U.S. Bank, N.A. prior to the Petition Date, leaving Rawhide without working capital with which to operate. Argonaut Insurance Company ("**Argo**"), the surety on Surface Management Surety Bond Number SUR0008068 (the "**Bond**") naming Rawhide, as principal, and the United States of America, as obligee, in the amount of $14,927,566 in connection with Rawhide's reclamation obligations related to the Denton-Rawhide Mine and Mine Denton-Rawhide Mine Plan of Operations under the Surface Mining Control and Reclamation Act of 1977, federal regulations found at 43 C.F.R. 3802 and 3809, and related state laws. The obligations of Rawhide and the indemnitors under the Bond are secured by cash collateral in possession and control of Argo in the amount of $8,554,957.24 as of December 11, 2023.

12.     On September 20, 2023, the Bureau of Land Management (the "**BLM**") made demand upon Argo (the "**September 2023 Demand**") under the Bond for Rawhide's alleged failure to comply with certain notices of noncompliance referenced in the September 2023 Demand, including

providing an increase in bond coverage through the posting of a cash bond in the amount of $3,412,885 ("**Proposed Cash Bond**") to supplement the existing Bond amount.

**C.**     <u>**Need For The DIP Facility.**</u>

13.     An immediate need exists for Debtors to obtain funds in order to continue operations and to administer and preserve the value of their Chapter 11 Estates. Operationally, the Debtors require financing to ensure uninterrupted payment of expenses for the operation of its businesses, including mining operations, payroll, office lease payments, insurance, equipment maintenance and repair, and other general and administrative expenses. The Debtors also need to pay expenses associated with the Bankruptcy Case, including professional fees and expenses and United States Trustee fees.

14.     To preserve its going-concern value, ensure a smooth transition into its Chapter 11 Case, and afford the Debtors an opportunity to successfully reorganize, it is critical that the Debtors assure their suppliers, vendors, and employees that they will be paid for postpetition services. These assurances will be vital to the Debtors' efforts to persuade vendors to continue shipping goods and providing services on customary trade credit. The Debtors must sustain operations, purchase new inventory and provide assurances to the Rawhide's customers that the Debtor will be able to deliver products and services during this Chapter 11 Cases.

15.     The Debtors do not have sufficient available sources of working capital and financing to operate their business in the ordinary course without the debtor-in-possession financing set forth above. Most significantly, approval of the DIP Financing on an interim basis pursuant to the Budget is necessary to induce the Debtors' vendors to continue providing necessary goods and services during the Chapter 11 Cases by providing them assurance that the Debtors will have sufficient working capital to continue operations. Absent such assurances, many vendors will not continue to do business with the Debtors. In short, absent approval of the DIP Financing on an emergency basis, the Debtors will likely be forced to cease operations, jeopardizing their reorganization.

16.     Absent immediate access to such funds, the Debtors' operations and value of their estates will be detrimentally impacted because, among other things, they will be unable to pay ongoing operating expenses and critical vendors may refuse to provide necessary goods and services.

Accordingly, timely approval of the Interim DIP Order is critical to preserving the value of the Debtors' estates.

**D.    Efforts To Obtain DIP Facility.**

17.    For over a year, the Debtors have been seeking financing from any party willing to lend. The Debtors chose the DIP Lender's offer of the DIP Facility as it provides a workable fee structure, workable bankruptcy milestones, and a collateral package and covenants that align with the Debtors' business. Further, the DIP Lender has expertise in the mining space, which will facilitate working with the Debtors and agreements regarding the Budget.

## RELIEF REQUESTED

18.    By this Motion, the Debtors seek authorization to obtain the DIP Facility from the DIP Lender under the terms of the DIP Facility Agreement.

19.    In order to keep the Debtors' business operational, the Debtors must be able to satisfy ongoing working capital needs and expenses of operations, and fund the costs of administering Debtors' estates, including fees assessed by the Office of the United States Trustee and the Clerk of Court and fees and expenses of estate professionals. The Debtors project that they will use the net DIP Facility proceeds for operational expenses that include mining operation expenses, funding necessary bond obligations, payroll, office lease payments, insurance, equipment maintenance and repair, and other general and administrative expenses. Accordingly, timely approval of the proposed DIP Facility is critical to preserving the going concern value of Debtors' Estates.

**LEGAL ARGUMENT**

**A.    The Debtors have Satisfied the Legal Requirements for Approval of the DIP Facility Under Sections 364(c) & (d) of the Bankruptcy Code.**

20.    The Debtors propose to obtain financing under the DIP Facility by providing the DIP Lender liens on its unencumbered assets (including Avoidance Actions upon entry of the Final DIP Order), and senior "priming" liens on any encumbered assets pursuant to section 364(d) of the Bankruptcy Code. In addition, the Debtors propose to provide the DIP Lender with a superpriority administrative claim pursuant to section 364(c) of the Bankruptcy Code, that can be satisfied from all assets (including Avoidance Actions upon entry of the Final DIP Order).

21.    The statutory requirement for obtaining postpetition credit with a superpriority administrative claim and/or secured by liens on unencumbered property is a finding, made after notice and a hearing, that the debtor-in-possession is "unable to obtain unsecured credit allowable under section 503(b)(1) of [the Bankruptcy Code] as an administrative expense." 11 U.S.C. § 364(c).[5]

22.    The statutory requirement for obtaining postpetition credit secured by a senior "priming lien" on encumbered property is a finding, made after notice and a hearing, that the debtor-in-possession is "unable to obtain such credit otherwise" and that "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior . . . lien is proposed to be granted." 11 U.S.C. § 364(d).[6]

---

[5]    Section 364(c) of the Bankruptcy Code provides that:

(c)    If the trustee [or debtor in possession] is unable to obtain unsecured credit allowable under § 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt –
   (1)    with priority over any and all administrative expenses of the kind specified in § 503(b) or 507(b) of this title;
   (2)    secured by a lien on property of the estate that is not otherwise subject to a lien; or secured by a junior lien on property of the estate that is subject to a lien;
   (3)    secured by a junior lien of property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

[6]    Section 364(d)(1) of the Bankruptcy Code provides that:

(d)(1)    The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if-
   (A)    the trustee is unable to obtain such credit otherwise; and

13

23.     Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code. Specifically, courts look to whether:

> (a) the debtor is unable to obtain unsecured credit under section 364(b), i.e., by allowing a lender only an administrative claim;
>
> (b) the credit transaction is necessary to preserve the assets of the estate; and
>
> (c) the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.

*In re Ames Dept. Stores, Inc.*, 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990); *see also In re St. Mary Hospital*, 86 B.R. 393, 401-02 (Bankr. E.D. Pa. 1988); *In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987).

24.     Although courts examine similar factors to determine whether a debtor is entitled to financing under section 364(d) of the Bankruptcy Code, they look to whether the debtor was unable to obtain such financing on any other basis, and also to whether the existing lienholder either is adequately protected or consents to the priming lien. *See, e.g., In re Republic Airways Holdings Inc.*, No. 16-10429(SHL), 2016 WL 2616717, at *10-11 (Bankr. S.D.N.Y. May 4, 2016); *In re Ames Dep't Stores*, 115 B.R. at 37-39.

25.     Consistent with this authority, and for the reasons discussed below, the Debtors respectfully submit that the Court should approve the Debtors' decision to enter into the DIP Facility.

**1.     No Comparable Alternative To The DIP Facility Is Currently Available.**

26.     As noted above, prior to and during the process of negotiating the terms of the DIP Facility, the Debtors attempted to identify other sources of post-petition financing to determine whether they could obtain debtor in possession financing on better terms. Given their current financial condition, financing arrangements and capital structure, however, the Debtors have been unable to obtain financing on more favorable terms than those provided in the DIP Facility Agreement.

27.     In fact, the Debtors and their advisors reached out to more than 200 prospective lenders

---

> (B)    there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(1).

and/or investors prior to the Petition Date. In the end, the Debtors received only one (1) offer for financing, the DIP Facility from the DIP Lender.

28.     In sum, the Debtors have made a concerted, good-faith effort to obtain credit on the most favorable terms that are available. The required financing was not available on an unsecured or junior lien basis, and the terms of the DIP Facility were, on the whole, the most favorable terms available to the Debtors.

29.     Notably, section 364 "imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co., Inc.)*, 789 F.2d 1085, 1088 (4th Cir. 1986) (affirming DIP loan priming lien where trustee had unsuccessfully sought financing from "other financial institutions in the immediate geographic area"); *In re Reading Tube Indus.,* 72 B.R. 329, 332 (Bankr. E.D. Pa. 1987) ("Given the 'time is of the essence' nature of this type of financing, we would not require this or any debtor to contact a seemingly infinite number of possible lenders."); *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988) (authorizing DIP loan priming lien where debtor contacted three other lenders; observing that "it would be unrealistic and unnecessary to require Debtor to conduct such an exhaustive search for financing"), *aff'd*, 99 B.R. 117 (N.D. Ga. 1989); *In re Ames Dep't Stores*, 115 B.R. at 40 (authorizing DIP loan superpriority claim where debtor contacted four other lenders).

30.     The Debtors respectfully submit that, given the extensive (and unsuccessful) efforts made to seek attractive alternatives, it has demonstrated that post-petition financing is not available on a more favorable basis.

**2.      The DIP Facility Is Necessary To Protect The Debtors' Estates.**

31.     As explained above, denial of the Debtors' requested relief will cause immediate and irreparable harm to the Debtors and their Estates. The DIP Facility is necessary to permit the orderly resumption of the Debtors' business operations, minimize the disruption of the business during the Chapter 11 Cases, and preserve and maximize the value of the Debtors' Estates. Absent access to the DIP Facility, the Debtors will be unable to pay their ongoing obligations, operate their business, or generate revenue. The Debtors' access to the DIP Facility will ensure that the "going concern" value

of Debtors' assets are preserved, a value that the Debtors believe is greater than the value which would be realized from a piecemeal liquidation of those assets if Debtors are unable to operate.

### 3.    The Terms Of The DIP Facility Are Reasonable Under The Circumstances.

32.    The terms and conditions of the DIP Facility have been the subject of extensive negotiations conducted in good faith and at arm's length, and are fair and reasonable under the circumstances.

33.    Indeed, the terms of the DIP Facility Agreement are similar to those often included in complex financing arrangements and reflect the give and take that result from complex financing negotiations.

34.    Courts recognize that a debtor often must make significant concessions in exchange for financing. *See, e.g., In re Ellingsen MacLean Oil Co.*, 65 B.R. 358, 365 (Bankr. W.D. Mich. 1986) (chapter 11 postpetition financing is "fraught with dangers for creditors"), *aff'd*, 834 F.2d 599 (6th Cir. 1987). Accordingly, courts acknowledge that a debtor may need to "enter into a hard bargain with a creditor in order to acquire the needed funds to complete reorganization." *Id*. at 365.

35.    As part of that bargain, lenders often agree to subordinate or "carve-out" from their collateral funds to pay professionals. *See Harvis Trien & Beck, P.C. v. Federal Home Mortgage Corp. (In re Blackwood Assocs., L.P.)*, 187 B.R. 856, 860 (Bankr. E.D.N.Y. 1995) (court advised that if professionals really want to be paid they had best insist upon a "real carve out"); *In re Ames Dep't Stores*, 115 B.R. at 40 (noting practice of district to insist on carve-out for fees in order to preserve adversary system).

36.    As noted above, the DIP Facility Agreement provides for a Carve-Out and allows fees and expenses of professionals employed by the Debtors and by any official appointed committee to be paid current, subject to Court approval.

37.    The Events of Default and conditions to borrowing are customary in postpetition financings, as is the DIP Lender's ability to exercise remedies upon the occurrence of an Event of Default. Moreover, the DIP Facility contains realistic milestones in connection with the Plan or sale, which can be viewed as reasonable protections to secure repayment of the funds the DIP Lender is advancing. The DIP Lender does not unduly seek to control or restrict the Debtors' ability to prosecute

the Chapter 11 Cases.

38.    Therefore, the Court should approve the DIP Facility based on its fair and reasonable terms and find that the DIP Lender acted with the requisite good faith to be accorded the benefits of section 364(e) of the Bankruptcy Code.[7]

**4.    The Primed Secured Creditors Are Adequately Protected.**

39.    The proposed priming liens are authorized by the Bankruptcy Code, even absent consent from any prepetition lienholders. Bankruptcy Code § 364(d)(1)(B) requires the furnishing of adequate protection in favor of lien holders which assert an interest in collateral. Neither this nor any other Bankruptcy Code provision specifically defines the term "adequate protection." As discussed below, however, in the cash collateral section of this Motion, Bankruptcy Code § 361 provides that adequate protection is furnished to the extent the debtor's "use, sale, lease or grant results in a decrease in the value of such entity's interest in such property." 11 U.S.C. §§ 361(1), (2), (3) (emphasis added). Stated succinctly, adequate protection protects a secured creditor against a decrease in the value of its collateral. *See e.g., In re Planned System, Inc.,* 78 B.R. 852, 861-62 (Bankr. S.D. Ohio 1987). This standard applies equally with respect to a proposed "priming" financing under section 364(d)(1)(B). *See, e.g., In re Hubbard Power & Light*, 202 B.R. 680, 685 (Bankr. E.D.N.Y. 1996) ("The goal of adequate protection for purposes of the provision entitling a debtor to obtain financing secured by liens senior to all other interests is to safeguard the secured creditor from diminution in the value of its interests."); *In re Aqua Assoc.,* 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991); *In re Beker Ind. Corp.*, 58 B.R. 725, 741-42 (Bankr. S.D.N.Y. 1986).

40.    The Court has broad discretion to determine whether adequate protection is furnished. *See e.g., In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992). Whether the

---

[7]    Section 364(e) of the Bankruptcy Code provides that:

The reversal or modification on appeal of an authorization under this section to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

17

party entitled to such protection is over or undersecured is not dispositive of whether adequate

protection is furnished. As the court *in Aqua Assoc.,* 123 B.R. 192, noted:

> Therefore, we believe that, while the presence of an equity cushion should be a relevant factor, it should not be a determinative factor in any "adequate protection" analysis, and particularly one relating to § 364(d)(1)(B). The important question, in determination of whether the protection to a creditor's secured interest is adequate, is whether that interest, whatever it is, is being unjustifiably jeopardized.

*Id.* at 196 (approving priming financing where interest rate was 5% over prime and loan likely would

enhance value of estate). *Accord, In re Shenandoah Fed. Sav. & Loan Assoc. (In re Snowshoe Co.),*

789 F.2d 1085, 1087-90 (4ᵗʰ Cir. 1986).

41.    Courts have considered the preservation and enhancement of collateral to be a critical

component of adequate protection. In determining the sufficiency of adequate protection, courts

have considered "whether the value of the debtor's property will increase as a result of" the use of

the postpetition financing. *495 Cent. Park*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992). (priming

loan approved because it would improve collateral's value; "[t]his value will serve as adequate

protection . . . ."); *see also In re Campbell Sod, Inc.*, 378 B.R. 647, 650-51, 54 (Bankr. D. Kan.

2007) (approving a priming lien where use of the loan proceeds to purchase and develop sod crop

was more likely to increase than decrease the value of the collateral, and the company was likely to

fail without an infusion of capital); *In re Ledgemere Land Corp.*, 125 B.R. 58, 62 (Bankr. D. Mass.

1991) (priming loan approved when "the chance of a decline in the value of the property is more

than offset by the likelihood of enhancement in value due to the Debtor's construction and

marketing plans."); *In re Sky Valley, Inc.*, 100 B.R. 107, 114 (Bankr. N.D. Ga. 1988) ("an increase

in the value of the collateral . . . resulting from superpriority financing could result in adequate

protection.") (citation omitted), *aff'd*, 99 B.R. 117 (N.D. Ga. 1989).

42.    Here, the infusion of priming and superpriority post-petition financing allows the

Debtors to operate and restructure their business plan to provide for additional operating revenue.

The Debtors submit that this will not only maintain the value of the Debtors' collateral value but

will likely increase it. The DIP Financing is essential to instilling the Debtors' various stakeholders,

including customers, employees, vendors, and other key constituencies, with confidence in the

Debtors' ability to reorganize. Without the DIP Financing, the Debtors would likely be forced into liquidation, resulting in a significant decline in the value of the Prepetition Collateral. By contrast, the DIP Financing allows the Debtors to generate revenue through operations, which will result in an increase in the going-concern value of the Debtor's business and the value of the Prepetition Lenders' liens.

43.    In short, Debtors respectfully submit that the DIP Financing satisfies the Section 363(c) and Section 364(d) standards. As indicated above, no other source of funding on more attractive terms has been found or is available to the Debtors. The best credit available to the Debtors is the DIP Financing. Thus, the Debtors believe that it is fair, reasonable and necessary to enter into the DIP Financing. In addition to representing the best terms presently available to the Debtors, the DIP Financing is also in the best interests of the Debtors' estates. The DIP Financing preserves the going concern value of the Debtors' assets and allows the Debtors to continue their operations and keep employees employed. The DIP Financing therefore is plainly in the best interests of Debtors' estates.

**5.    Debtors' Decision To Enter Into The DIP Facility Agreement Is Supported By Sound Business Judgment.**

44.    Bankruptcy courts consistently defer to a debtor's business judgment on most business decisions, including the decision to borrow money, unless such decision is arbitrary and capricious. *In re Republic Airways*, 2016 WL 2616717, at *11 ("In determining whether to authorize post-petition financing, bankruptcy courts will generally defer to the debtor's business judgment."). In fact, "[m]ore exacting scrutiny [of the debtor's business decisions] would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

45.    In particular, a bankruptcy court should defer to a debtor's reasonable business judgment regarding the need for funds, so long as the proposed financing agreement does not contain terms that either leverage the bankruptcy process or that benefit a third party rather than the bankruptcy estate. *See, e.g., In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994)

(noting that an interim loan, receivables facility and asset-based facility were approved because they "reflect[ed] sound and prudent business judgment . . . , [were] reasonable under the circumstances and in the best interest of [the debtor] and its creditors").

46.     As explained by the bankruptcy court in *In re Ames Dep't Stores*:

> [A] court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.

115 B.R. at 40.

## B.     The Court Should Schedule Interim and Final Hearings On This Motion Pursuant To Bankruptcy Rule 4001(c)(2).

Bankruptcy Rule 4001(c)(2) provides that a final hearing on a motion to obtain credit pursuant to Bankruptcy Code section 364 may be commenced not earlier than fourteen (14) days after service of the motion. Upon request, however, the Bankruptcy Court is empowered to conduct an expedited hearing on the motion and authorize the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

Pursuant to Bankruptcy Rule 4001(c)(2) and Local Rule 9006, Debtors request the Court conduct an expedited interim hearing on the Motion (the "**Interim Hearing**") and, after the entry of the Interim DIP Order, allow Debtors to enter the DIP Facility Documents, and Debtors to borrow funds in accordance therewith. Debtors have an urgent and immediate need for cash to fund chapter 11 administration expenses and operations, as set forth in the Budget. Debtors could not obtain financing on terms more favorable than presented herein, for the reasons set forth above. *See* Section IV.A.1 above. Debtors submit that the terms of the proposed DIP Facility are fair, reasonable and in the best interests of the Debtors' Estate. *See* Section IV.A.3 above. Therefore, entry of the Interim DIP Order is proper under Bankruptcy Rule 4001(c)(2).

Also pursuant to Bankruptcy Rule 4001(c)(2), Debtors requests that the Court schedule the final hearing on the Motion within 14 days, subject to availability on the Court's calendar. Obtaining certainty regarding Debtors' ability to use DIP Facility is a key step for Debtors to stabilize operations

as chapter 11 debtor in possession, which will then enable Debtors and their professionals to focus complete attention on the development and implementation of a plan of reorganization.

47.    Here, the Debtors' decision to enter into the DIP Facility represents a reasonable exercise of business judgment. Without the DIP Facility, Debtors would not be able to fund operations until the Debtors can secure sufficient funding to proceed with a plan of reorganization. Instead, Debtors would be faced with the potential for administrative insolvency followed by a liquidation. Given the choice between these two alternatives, Debtors prudently negotiated the DIP Facility with the DIP Lender to ensure that the Debtors would have the time needed to secure the funding necessary to bring the Bankruptcy Case to a successful conclusion. In sum, the Court should approve the Debtors' decision to enter into the DIP Facility as an exercise of sound business judgment.

**C.**    **The Court Should Modify the Automatic Stay and Waive Any Applicable Stay To The Effectiveness Of The Financing Order.**

48.    Debtors respectfully requests the Court to modify the automatic stay imposed by Bankruptcy Code section 362 to the extent necessary to implement and effectuate the terms and provisions of the Interim DIP Order and Final DIP Order.

49.    Debtors also requests the Court to waive any applicable stay (including under Bankruptcy Rules 4001 and 6004) with respect to the effectiveness and enforceability of the Interim DIP Order and Final DIP Order and provide for the immediate effectiveness of the Interim DIP Order and Final DIP Order.

**NOTICE**

50.    Notice of this Motion is being given by either electronic mail, U.S. Mail or the Court's ECF noticing to the following parties or their counsel: (a) the Office of the United States Trustee for the District of Nevada; (b) counsel to the DIP Lender; (c) the Debtors' prepetition secured lender and its counsel; (d) those creditors holding the twenty (20) largest unsecured claims; (e) those governmental agencies required to receive notice under Bankruptcy Rule 5003(e); and (e) all other parties requesting notice pursuant to Bankruptcy Rule 2002. In light of the nature of the relief requested, Debtors respectfully submit that no further notice is necessary.

## CONCLUSION

WHEREFORE, based upon the facts and authorities set forth above, in the Schlumberger Declaration, and all other papers, documents, or other evidence submitted in support of the Motion, Debtors respectfully request that the Court: (a) enter the Interim DIP Order, in substantially the form attached hereto as **Exhibit 3,** (i) granting the Motion on an interim basis, and (ii) authorizing Debtors to borrow under the terms of the DIP Facility on an interim basis; (b) schedule a final hearing on the Motion within 14 days; (c) in conjunction with the final hearing, (i) grant the Motion in its entirely and (ii) enter the Final DIP Order, in substantially the form attached hereto as **Exhibit 4,** authorizing Debtors to borrow on a final basis under the terms of the DIP Facility Agreement, including the grant of priming liens and a superpriority administrative claim as provided therein; and (d) grant Debtors such other relief as the Court deems necessary and appropriate.

DATED this 25th day of December, 2023.

**SCHWARTZ LAW, PLLC**

By: /s/ *Samuel A. Schwartz*
Samuel A. Schwartz, Esq.
Gabrielle A. Hamm, Esq.
601 East Bridger Avenue
Las Vegas, NV 89101

*Proposed Attorneys for the Debtors*