# EXHIBIT 2

# EXHIBIT 2

SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION (DIP) LOAN AGREEMENT

by and between

De Jong Capital LLC, as the Lender,

and

Rawhide Acquisition Holding LLC, a Delaware limited liability company, and Rawhide Mining LLC, a Delaware limited liability company, as the Borrower and Borrower in possession

Dated:

December 25, 2023

153257877.1

TABLE OF CONTENTS

SECTION I DEFINITIONS .............................................................................................................. 6

    1.1.   Definitions ............................................................................................................. 6

    1.2.   Rules of Interpretation. ...................................................................................... 14

SECTION II LOAN .......................................................................................................................... 14

    2.1.   Loan. .................................................................................................................... 14

    2.2.   Note ..................................................................................................................... 15

    2.3.   Notice and Manner of Borrowing. ..................................................................... 15

    2.4.   Interest Rate and Payments. ............................................................................... 15

    2.5.   Fees. .................................................................................................................... 16

    2.6.   Payments ............................................................................................................. 16

    2.7.   Method and Allocation of Payments .................................................................. 17

    2.8.   Computation of Interest and Fees; Due Date ..................................................... 17

    2.9.   Super Priority Nature of Obligations and Lender's Liens. ................................. 17

    2.10.  Payment of Obligations ...................................................................................... 18

    2.11.  No Discharge; Survival of Claims ..................................................................... 18

    2.12.  Waiver of any Priming Rights ............................................................................ 18

    2.13.  Joint and Several Liability of Borrower Parties ................................................. 18

    2.14.  Loan to Survive Bankruptcy of Borrower .......................................................... 20

    2.15.  Right to Credit Bid. ............................................................................................. 21

SECTION III LOAN CONDITIONS ............................................................................................... 21

    3.1.   Conditions Precedent to Initial Disbursement ................................................... 21

    3.2.   Conditions Precedent to All Disbursements. ...................................................... 22

SECTION IV REPRESENTATIONS AND WARRANTIES ......................................................... 23

    4.1.   No Material Adverse Effect. ............................................................................... 23

    4.2.   Reorganization Matters. ...................................................................................... 23

    4.3.   Corporate Authority; No Conflicts ..................................................................... 24

    4.4.   Existence; Compliance with Laws. ..................................................................... 24

    4.5.   Valid Obligations ................................................................................................ 24

    4.6.   Consents or Approvals. ....................................................................................... 24

    4.7.   Ownership of Property; Liens. ............................................................................ 24

    4.8.   Litigation ............................................................................................................. 25

    4.9.   Indebtedness. ....................................................................................................... 25

    4.10.  Taxes. .................................................................................................................. 25

    4.11.  Employees ........................................................................................................... 25

| | | | |
|---|---|---|---|
| | 4.12. | Investment Company Act | 25 |
| 4.13. | Disclosure. | | 25 |
| | 4.14. | SECTION V AFFIRMATIVE COVENANTS | 25 |
| | 5.1. | Financial Statements | 26 |
| | 5.2. | Conduct of Business | 26 |
| | 5.3. | Maintenance and Insurance | 26 |
| | 5.4. | Taxes. | 27 |
| | 5.5. | Inspection. | 27 |
| | 5.6. | Maintenance of Books and Records. | 27 |
| | 5.7. | Use of Proceeds. | 27 |
| | 5.8. | Further Assurances. | 27 |
| | 5.9. | Notification Requirements | 27 |
| | 5.10. | Intentionally omitted | 28 |
| | 5.11. | Environmental Compliance | 28 |
| | 5.12. | Loss or Destruction of Collateral | 28 |
| | 5.13. | Pledge of Subsidiary Equity. | 28 |
| | 5.14. | Milestones. | 29 |
| | 5.15. | Pleadings and Orders. | 29 |

SECTION VI NEGATIVE COVENANTS ......... 30

| | | | |
|---|---|---|---|
| | 6.1. | Indebtedness. | 30 |
| | 6.2. | Contingent Liabilities | 30 |
| | 6.3. | Liens. | 30 |
| | 6.4. | Merger; Sale or Lease of Assets; Liquidation; Settlement of Litigation | 31 |
| | 6.5. | Subsidiaries. | 31 |
| | 6.6. | Restricted Payments | 31 |
| | 6.7. | Investments; Purchases of Assets. | 32 |
| | 6.8. | Transactions with Affiliates | 32 |
| | 6.9. | Anti-Terrorism | 32 |
| | 6.10. | Chapter 11 Claims | 32 |

SECTION VII DEFAULTS ......... 33

| | | | |
|---|---|---|---|
| | 7.1. | Events of Default | 33 |
| | 7.2. | Remedies | 35 |

SECTION VIII GENERAL ......... 36

| | | | |
|---|---|---|---|
| | 8.1. | Notices. | 37 |
| | 8.2. | Expenses | 38 |
| | 8.3. | Indemnification. | 38 |

8.4.    Survival; Joint and Several .................................................................................................. 39

8.5.    No Waivers. ........................................................................................................................ 39

8.6.    Amendments. ...................................................................................................................... 39

8.7.    Set-Off .............................................................................................................................. 39

8.8.    Assignment; Participation .................................................................................................. 39

8.9.    Binding Effect of Agreement ............................................................................................. 39

8.10.    Lost Note. .......................................................................................................................... 39

8.11.    Captions; Counterparts ...................................................................................................... 39

8.12.    Entire Agreement ............................................................................................................... 39

8.13.    Waiver of Jury Trial. .......................................................................................................... 39

8.14.    Governing Law; Jurisdiction; Venue .................................................................................. 40

8.15.    Severability. ....................................................................................................................... 40

8.16.    Counterparts ...................................................................................................................... 40

153257877.1

<u>SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION LOAN AGREEMENT</u>

THIS SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION LOAN AGREEMENT (this "<u>Agreement</u>") dated as of December 25, 2023 (the "<u>Effective Date</u>"), is entered into by and among, on the one hand:

A.      De Jong Capital, LLC, a Delaware limited liability company (the "<u>Lender</u>"); and, on the other hand,

B.      Rawhide Acquisition Holding LLC, a Delaware limited liability company ("<u>Holding</u>"), and Rawhide Mining LLC, a Delaware limited liability company ("<u>Mining</u>" and together with Holding, the "<u>Borrowers</u>").

Each of the Lender and the Borrowers are sometimes hereinafter referred to individually as a "<u>Party</u>" and, collectively, as the "<u>Parties</u>."

RECITALS

WHEREAS, pursuant to the terms of this Agreement, the Borrowers have requested that the Lender provide a senior secured, super-priority loan facility (the "<u>Loan</u>") to the Borrowers of up to the Total Loan Amount to fund Mining's ongoing business operations and costs associated with the Loan and the Chapter 11 Cases, in connection with the Borrowers each filing voluntary petitions for reorganization under Chapter 11, 11 U.S.C. 101 et seq. (the "<u>Bankruptcy Code</u>"), with the United States Bankruptcy Court for the District of Nevada (the "<u>Bankruptcy Court</u>"), Case Nos. 23-15619-hlb and 23-165620-hlb (together, the "<u>Chapter 11 Case</u>" or "<u>Chapter 11 Cases</u>") after which the Borrowers will continue to operate their businesses and manage their properties as debtors and debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, the Lender is willing to make the Loan to the Borrowers upon the terms and conditions set forth herein;

WHEREAS, the Borrowers have agreed to secure the Obligations by granting to the Lender a security interest in and lien upon all of their existing and after-acquired personal and real property, except for Excluded Property (as defined below);

WHEREAS, the Borrowers believe that the Loan will facilitate the administration of the Chapter 11 Cases to the mutual advantage of the Borrowers;

WHEREAS, each of the Borrowers acknowledges that it will receive substantial direct and indirect benefits by reason of the making of and the Loan to the Borrowers as provided in this Agreement; and

WHEREAS, the Lender's willingness to make the Loan to the Borrowers, and to administer the Collateral of the Borrowers therefor, on a combined basis as more fully set forth in this Agreement, is done solely as an accommodation to the Borrowers, at the Borrowers' request and in furtherance of the Borrowers' mutual and collective enterprise.

NOW, THEREFORE, in consideration of the foregoing premises and for other good and valuable consideration as set forth herein, the receipt and adequacy of which are hereby acknowledged, the Parties agree as follows:

153257877.1

SECTION I

DEFINITIONS

1.1.    <u>Definitions</u>.  Capitalized terms used in this Agreement and in the other Loan Documents or in any certificate, report or other document made or delivered pursuant to this Agreement (unless otherwise defined herein or therein) have the following meanings:

"<u>Accounts Receivable and Accounts</u>" means: (i) all rights of the Borrowers to payment of a monetary obligation (A) for property that has been or is to be sold, leased, licensed, assigned, or otherwise disposed of, (B) for services rendered or to be rendered, or (C) for a secondary obligation incurred or to be incurred; (ii) all sums of money and other Proceeds due or becoming due thereon, all notes, bills, drafts, acceptances, instruments, documents and other debts, obligations and liabilities, in whatever form, owing to either Borrower with respect thereto, all guarantees and security therefor, and the Borrowers' rights pertaining to and interest in such property, including the right of stoppage in transit, replevin or reclamation; all chattel paper; (iii) all amounts due from Affiliates of either Borrower; (iv) all insurance proceeds; (v) all other rights and claims to the payment of money, under contracts or otherwise; and (vi) all other property constituting "accounts" as such term is defined in the UCC. Accounts Receivable and Accounts do not include Excluded Property.

"<u>Affiliate</u>" means, with reference to any Person, (i) any director, officer or employee of that Person, (ii) any other Person controlling, controlled by or under direct or indirect common control of that Person, (iii) any other Person directly or indirectly holding 5% or more of any class of the capital stock or other equity interests (including options, warrants, convertible securities and similar rights) of that Person and (iv) any other Person 5% or more of any class of whose capital stock or other equity interests (including options, warrants, convertible securities and similar rights) is held directly or indirectly by that Person.  Notwithstanding anything to the contrary contained herein, the Lender will not be deemed an Affiliate of any of the Borrowers.

"<u>Agreement</u>" has the meaning ascribed thereto in the preamble of this Agreement as the same may be supplemented, amended or restated and in effect from time to time.

"<u>Avoidance Actions</u>" means claims and causes of action available to the Borrowers and their bankruptcy estate through the exercise of the powers granted by sections 541-553 of the Bankruptcy Code.

"<u>Bankruptcy Code</u>" has the meaning ascribed thereto in the recitals to this Agreement.

"<u>Bankruptcy Court</u>" has the meaning ascribed thereto in the recitals to this Agreement.

"<u>Bankruptcy Rules</u>" means the Federal Rules of Bankruptcy Procedure, as the same may from time to time be in effect and applicable to the Chapter 11 Cases.

"<u>Bankruptcy Schedules</u>" means each Borrower's schedules and statements filed in the Chapter 11 Cases.

"<u>Bidding Procedures Motion</u>" means a motion seeking approval of sale and bidding procedures, and the scheduling of an auction proposing a sale of substantially all of the Borrowers' assets to the Lender through

a credit bid.

"Bidding Procedures Order" means an order of the Bankruptcy Court granting the Bidding Procedures Motion.

"Blocked Person" has the meaning ascribed to it in Section 6.10.

"Borrowers" has the meaning ascribed to it in the recitals to this Agreement.

"Bridge Loan Obligations" means that certain Promissory Note issued by the Lender to the Debtors in the principal amount of $175,000.

"Budget" means Mining's 13-week budget attached to the Interim DIP Order as an exhibit, setting forth in reasonable detail the receipts and disbursements of Mining on a weekly basis from the Petition Date through and including a date that is 13 weeks thereafter, as such budget may be amended or modified from time to time by Mining provided that the Lender has provided prior written consent to any such amendment or modification.

"Business Day" means any day of a calendar year on which national banking institutions in Las Vegas, Nevada, are open to the public for conducting business and are not required or authorized to close.

"Capital Expenditures" means, without duplication, any expenditure by Mining for fixed or capital assets, leasehold improvements, capital leases, installment purchases of machinery and equipment, acquisitions of real estate and other similar expenditures including (i) in the case of a purchase, the entire purchase price, whether or not paid during the fiscal period in question, (ii) in the case of a capital lease, the capitalized amount (as determined under GAAP) of the obligations under such lease to pay rent and other amounts, and (iii) expenditures in any construction in progress account of Mining.

"Carve-Out" means the term "Carve-Out" in the Final DIP Order, or, prior to the entry of the Final DIP Order, the Interim DIP Order.

"Carve-Out Expenses" means (a) allowed, accrued, but unpaid professional fees of the Borrowers and one official committee of creditors consistent with and not in excess of the amounts included in the Budget which have been incurred prior to the occurrence and declaration of an Event of Default; (b) allowed, accrued but unpaid professional fees and expenses incurred by the Borrowers and any official committee of creditors appointed consistent with the Budget, which are incurred after the declaration of an Event of Default (that is not cured or waived in writing by the Lender) in an aggregate amount not to exceed $100,000; and (c) fees payable to the United States Trustee pursuant to 28 U.S.C. 1930 and to the clerk of the Court.  Notwithstanding anything to the contrary contained herein, the Carve-Out Expenses do not include: (i) any other claims that are or may be senior or *pari passu* with any of the Carve-Out Expenses; (ii) any fees or expenses of a Chapter 7 trustee; (iii) any fees or disbursements arising after the conversion of a Chapter 11 case to a Chapter 7 case; (iv) any fees or disbursements related to the investigation of, preparation for or commencement, or prosecution of any litigation, proceedings or adverse action against, or challenge to the rights, validity and/or the first priority status of liens and secured claims of the Lender; or (v) any fees or disbursements related to any challenge or obligation to the debt or collateral positions of the Lender or hindering or delaying the Lender's enforcement or realization upon the Collateral once an Event of Default has occurred and is continuing (if challenged, as determined by the Bankruptcy Court).

"Cash Collateral" has the meaning ascribed thereto in Section 363 of the Bankruptcy Code.

"Cash Collateral Account" means a deposit account or securities account in the name of either

Borrower pursuant to which (i) in the case of a deposit account, the applicable depositary bank agrees to comply with instructions from the Lender directing the disposition or transfer of funds from time to time credited to such deposit account, without further consent of or direction from the applicable Party or any other Person, and (ii) in the case of a securities account, the applicable securities intermediary agrees to comply with entitlement orders originated by the Lender, and all other requests or instructions from the Lender regarding disposition, transfer, redemption and/or delivery of securities and other cash and property contained therein, without further consent or direction from the Borrower or any other Person, in each case, pursuant to a Deposit Account Control Agreement or a securities account control agreement, as the case may be, in form and substance reasonably satisfactory to the Lender.

"Change in Control" means (a) any "person" or "group" (within the meaning of Sections 13(d) and 14(d) of the United States Securities and Exchange Act of 1934, as amended), becomes the beneficial owner (as defined in Rule 13d-3 under such Exchange Act), directly or indirectly, of 50%, or more, of the voting interests of a Borrower, or (b) a majority of the members of the Board of Directors do not constitute continuing directors who serve in such capacity as of the Effective Date.

"Chapter 11 Case" has the meaning ascribed thereto in the recitals to this Agreement.

"Chapter 11 Case Milestones" means, with respect to a Plan of Reorganization, (i) the filing thereof by the Borrower by no later than May 31, 2024, providing for the repayment of all Obligations in full, and (ii) the entry of an Order by the Bankruptcy Court by no later than June 30, 2024, confirming the Plan of Reorganization;

"Chapter 11 Sale Milestones" means the following milestones, to be accomplished by the dates set forth below (or such later date as may be agreed by the Lender and for the avoidance of doubt, absent the consent of the Lender, the failure of the Borrowers to comply with any of the Milestones shall constitute an immediate Event of Default and permit the Lender on behalf of itself to exercise its rights and remedies provided for in the Interim Order and this Agreement: (a) if a bond forfeiture has occurred by the State of Nevada Bureau of Land Management, it can be cured such that the surety bond provisions provide enough protections to the Borrowers and any claim to the surety bond by the State of Nevada BLC after the Petition Date is stayed or a satisfactory replacement bond is provided, (b) no later than ten (10) business days after the Petition Date, the Bankruptcy Court shall have entered the Interim Order; (c) No later than twelve (12) business days after the Petition Date, the Borrowers shall have filed a motion seeking bid procedures for the sale of the operations under a share purchase agreement with the DIP Lender as the stalking horse bidder with customary stalking horse protections (the "Acquired Assets"); (d) No later than thirty (30) calendar days after the Petition Date, the Bankruptcy Court shall have entered the Final Order; (e) the Borrowers shall establish a date that is no later than seventy-five (75) calendar days after the Petition Date as the deadline for the submission of binding bids with respect to the assets and operations; (f) no later than ninety (90) calendar days after the Petition Date, the Borrowers shall commence an auction for the Acquired Assets, in accordance with the bid procedures; provided that if there is no higher or better offer submitted in comparison to the stalking horse bid(s), no auction shall be held; (g) no later than one hundred (100) calendar days after the Petition Date, the Bankruptcy Court shall have entered an order (which shall be in form and substance acceptable to the Lender approving the winning bid resulting from the sale of the Acquired Assets); and (h) consummation of the sale of the Acquired Assets shall occur no later than the date that is one hundred ten (110) calendar days after the Petition Date.

"Closing" means the funding of any Loan hereunder.

"Closing Date" means the first date on which funds are advanced pursuant to an acceptable Interim DIP Order of the Bankruptcy Court approving the Loan and all conditions set forth in Section 3.1 and Section 3.2 are either waived or satisfied.

153257877.1

"Code" means the Internal Revenue Code of 1986 and the rules and regulations thereunder, collectively, as the same may from time to time be supplemented or amended and remain in effect.

"Collateral" means all property and interests in property and proceeds thereof now owned or hereafter acquired by either Borrower in or upon which a Lien is granted or purported to be granted pursuant to any Loan Document or the Orders, but excluding Excluded Property.

"Committee" has the meaning ascribed thereto in Section 7.2(c).

"Default" means an Event of Default or any event or condition that, but for the requirement that time elapse or notice be given, or both, would constitute an Event of Default.

"Default Rate" means the Applicable Federal Rate at the time of the Event of Default plus 5%.

"Deposit Account Control Agreement" means a pledge and security agreement, dated as of even date herewith, made by and among the Borrowers, the applicable Person including financial institutions and cash handling companies utilized or contracted by the Borrowers in respect of their cash, in favor of the Lender, as the same may be amended, restated or otherwise modified from time to time, substantially in the form of Exhibit D to this Agreement, in respect of Cash Collateral, to include, without limitation, cash in transit, cash in machines, deposited cash and cash on hand.

"DIP Superpriority Claim" has the meaning ascribed thereto in Section 1.1(b).

"Disclosure Schedules" means the disclosure schedules of the Borrowers provided as Exhibit F to this Agreement in respect of the representations and warranties of the Borrowers set forth in Section 4, or the disclosures set forth in the Borrowers schedules and statements filed in the Chapter 11 Cases.

"Drawdown Date" means the Business Day on which (i) the First Installment Payment is made and/or (ii) the Second Installment Payment is made.

"Effective Date" has the meaning ascribed thereto in the preamble to this Agreement.

"Environmental Laws" means any and all applicable federal, state and local environmental, health or safety statutes, laws, regulations, rules and ordinances (whether now existing or hereafter enacted or promulgated), and all applicable judicial, administrative and regulatory decrees, judgments and orders, including common law rulings and determinations, relating to injury to, or the protection of, real or personal property or human health or the environment, including, without limitation, all requirements pertaining to reporting, licensing, permitting, investigation, remediation and removal of emissions, discharges, releases or threatened releases of Hazardous Materials into the environment or relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of such Hazardous Materials.

"Event of Default" means any event described in Section 7.1.

"Excluded Property" means (i) all Avoidance Actions and their proceeds, but only until entry of the Final DIP Order, after which such Avoidance Actions and proceeds shall cease to be Excluded Property (and will then constitute Collateral) and (ii) all machinery and equipment surrendered by Borrower to creditors that have existing liens on such machinery and equipment.

"Final DIP Order" means the order of the Bankruptcy Court entered in the Chapter 11 Case of the Borrower after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures as approved by the

Bankruptcy Court which order must be satisfactory in form and substance to the Lender, and from which no appeal or motion to reconsider has been timely filed, or if timely filed, such appeal or motion to reconsider has been dismissed or denied unless the Lender waives such requirement, together with all extensions, modifications and amendments thereto, in form and substance satisfactory to the Lender, which, among other matters but not by way of limitation, authorizes the Borrower to obtain credit, incur (or guaranty) Indebtedness, grant Liens under this Agreement and the other Loan Documents, as the case may be, and provides for the super priority of the Lender's claims.

"First Loan Installment" means a maximum amount of US$175,000.

"GAAP" means generally accepted accounting principles, consistently applied, consistently applied in accordance with the audited financial statements of the Borrowers.

"Hazardous Material" means any substance (i) the presence of which requires or may hereafter require notification, investigation, removal or remediation under any Environmental Law; (ii) which is or becomes defined as a "hazardous waste", "hazardous material" or "hazardous substance" or "pollutant" or "contaminant" under any present or future Environmental Law or amendments thereto including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. Section 9601 et seq.) and any applicable local statutes and the regulations promulgated thereunder; (iii) which is toxic, explosive, corrosive, flammable, infectious, radioactive, carcinogenic, mutagenic or otherwise hazardous and which is or becomes regulated pursuant to any Environmental Law by any governmental authority, agency, department, commission, board, agency or instrumentality of the United States, any state of the United States, or any political subdivision thereof; or (iv) without limitation, which contains gasoline, diesel fuel or other petroleum products, asbestos or polychlorinated biphenyls.

"Indebtedness" means as applied to the Borrowers, without duplication, (i) all obligations for borrowed money and other extensions of credit, whether secured or unsecured, absolute or contingent, and whether or not evidenced by bonds, notes, debentures or other similar instruments, (ii) all obligations representing the deferred purchase price of property, other than accounts payable arising in the ordinary course of business, (iii) all obligations secured by any Lien on property owned or acquired by either Borrower, whether or not the obligations secured thereby has been assumed, (iv) that portion of all obligations arising under leases that is required to be capitalized on the consolidated balance sheet of the Borrowers, (v) all guarantees, (vi) all obligations, contingent or otherwise, with respect to the face amount of all letters of credit (whether or not drawn) and banker's acceptances issued for the account of or on behalf of the Borrowers, (vii) all obligations that are immediately due and payable out of the proceeds of or production from property now or hereafter owned or acquired by either of the Borrowers, (viii) obligations in respect of Interest Rate Contracts, and (ix) all other obligations which, in accordance with GAAP, would be included as a liability on the consolidated balance sheet of the Borrowers, but excluding anything in the nature of capital stock, capital surplus and retained earnings.

"Interest Rate" means 16% per annum PIK simple interest on a quarterly basis.

"Interest Rate Contracts" means interest rate swap agreements, interest rate collar agreements, options on any of the foregoing and any other agreements or arrangements designed to provide protection against fluctuations in interest rates.

"Interim DIP Order" means an Interim DIP Order entered or approved by the Bankruptcy Court (as the same may be amended, supplemented, or modified from time to time after entry thereof with the consent of the Lender in its sole discretion), with changes to such form as are satisfactory to the Lender, in its sole discretion, approving the Loan Documents, which must, among other things, (i) have been entered on such prior notice to such parties as may be satisfactory to the Lender in its sole discretion, (ii) authorize the extensions of credit in respect of the Loan in the amounts and on the terms set forth herein, (iii) grant the DIP Superpriority Claim status and other

153257877.1

x

collateral and liens referred to herein and in the other Loan Documents, and (iv) approve the payment by the Borrowers of the fees provided for in the Loan Documents.

"<u>Investment</u>" means as applied to each Borrower: (i) the purchase, acquisition or ownership of any share of capital stock, partnership or limited liability company interest, evidence of indebtedness or other equity security of any other Person; (ii) any loan, advance or extension of credit to, or contribution to the capital of, any other Person; (iii) any real estate held for sale or investment; (iv) any securities or commodities futures contracts held; (v) any other investment in any other Person (including any other Borrower); (vi) the making of any commitment or the acquisition of any option to make an Investment; or (vii) the entering into any material contract for the provision or purchase of services or products.

"<u>Lender</u>" has the meaning ascribed to it in the recitals to this Agreement.

"<u>Lien</u>" or "<u>Liens</u>" means any interest granted by a Person in any real or personal property, asset or other right owned or being purchased or acquired by such Person that secures payment or performance of any obligation, including, without limitation, any mortgage, pledge, security interest, lien, retained security title of a conditional vendor or other charge or encumbrance of any kind, whether arising by contract, as a matter of law, by judicial process or otherwise.

"<u>Loan</u>" has the meaning ascribed to it in the recitals to this Agreement.

"<u>Loan Documents</u>" means this Agreement, the Note, the Order and the Security Documents, together with any agreements, instruments or documents now or hereafter executed and delivered pursuant to or in connection with any of the foregoing.

"<u>Material Adverse Effect</u>" means (a) a material adverse change in the business, operations, results of operations, assets, liabilities, or financial condition of either Borrower, (b) a material impairment of either of the Borrowers' ability to perform its obligations under the Loan Documents to which it is a party or of the Lender's ability to enforce the Obligations or realize upon the Collateral, or (c) a material impairment of the validity, enforceability, attachment, perfection or priority of Lender's Liens with respect to the Collateral, provided, that the following will not be taken into account in determining whether there has been a Material Adverse Effect: (i) the commencement of the Chapter 11 Case; and (ii) any effect, change, event, circumstance or condition arising out of or attributable to (1) general economic conditions not solely related to the Borrowers or (2) affecting the securities or credit markets not solely related to the Borrowers.

"<u>Maturity Date</u>" means May 31, 2024.

"<u>Note</u>" means a single secured super-in-priority promissory note of even date herewith in favor of and payable to the Lender in a principal amount equal to the Total Loan Amount, substantially in the form of <u>Exhibit A</u> to this Agreement.

"<u>Note Record</u>" means an internal record, including a computer record, maintained by the Lender with respect to the outstanding principal and interest balance of the Loan.

"<u>Notice of Borrowing</u>" a written notice of the Borrower requesting the Lender to disburse funds constituting the Loan, including for the First Installment Payment and the Second Installment Payment, substantially in the form of Exhibit F to this Agreement.

"<u>Obligations</u>" means the aggregate outstanding principal balance of and interest (and premium, if any) on the Loan (including, without limitation, interest accruing at the then applicable rate provided herein after

the maturity of the Loan and interest accruing at the then applicable rate provided herein after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding, relating to the Borrowers, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding) and all other obligations of the Borrowers to the Lender of every kind and description under, pursuant to or in connection with the Loan Documents, direct or indirect, absolute or contingent, primary or secondary, due or to become due, now existing or hereafter arising, regardless of how they arise or by what agreement or instrument, if any, in each case whether on account of principal, interest, premium, fees, indemnities, costs, expenses or otherwise (including without limitation, all fees and disbursements of counsel that are required to be paid by the Borrowers pursuant to any of the Loan Documents), and including obligations to perform acts and refrain from taking action as well as obligations to pay money.

"Order" means, as applicable and as the context may require, either (i) the Final DIP Order, or (ii) the Interim DIP Order.

"Party" or "Parties" have the meanings ascribed thereto in the recitals to this Agreement.

"Permitted Liens" has the meaning ascribed to it in Section 6.3.

"Person" means any individual, corporation, partnership, limited liability company, trust, unincorporated association, business or other legal entity, and any government or governmental agency or political subdivision thereof.

"Petition Date" means December 20, 2023.

"PIK" means, for purposes of this Agreement, to accept payment-in-kind.

"Plan of Reorganization" means a plan of reorganization or plan of liquidation proposed by or for the Borrowers in the Chapter 11 Cases.

"Post-Petition" means the time period beginning immediately upon the filing of the applicable Chapter 11 Cases.

"Primed Liens" has the meaning ascribed thereto in Section 2.9(c).

"Priming Liens" has the meaning ascribed thereto in Section 2.9(c).

"Proceeds" means all proceeds of and all other profits, rentals and receipts, in whatever form, received or arising from any Collateral, including: (i) whatever is received or acquired upon the sale, lease, exchange, assignment, licensing or other disposition of any Collateral; (ii) whatever is received, collected on or distributed on account of any Collateral; (iii) all rights arising out of any Collateral; (iv) all claims arising out of, and any insurance payable by reason of, the loss, nonconformity, interference with the use of, defects or infringement of rights in, or damage to or destruction of, any Collateral; (v) any unearned premiums with respect to policies of insurance in respect of any Collateral; (vi) any condemnation or requisition payments with respect to any Collateral; (vii) all proceeds, judgments and collections resulting from any litigation, arbitration, mediation or other legal proceeding, including without limitation, and any other cash or property received by any Borrower in connection therewith, including without limitation any settlement thereof; and (viii) all other property constituting "proceeds" as such term is defined in the UCC; in each case whether now existing or hereafter arising, but in each case excluding, nevertheless, all of the legal and other professional fees and expenses payable by the Borrowers in connection with the generation of such Proceeds, including without limitation, all legal contingency fees and expenses so payable; provided that Proceeds will exclude any Excluded Property.

"Prohibited Transaction" means any "prohibited transaction" within the meaning of Section 4975 of the Code.

"Responsible Officer" means, with respect to a Borrower, the chief financial officer and any other officer designated by the chief financial officer to sign Notices of Borrowing.

"Remedies Notice Period" has the meaning ascribed thereto in Section 7.2(c).

"Restricted Payment" means any dividend, distribution, loan, advance, guaranty, extension of credit or other payment (whether in cash, securities or other property) to or for the benefit of any Person who holds an equity interest in either Borrower, whether or not such interest is evidenced by a security, and any other payment, whether in cash, securities or other property, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any capital stock of the Borrowers, whether now or hereafter outstanding, or of any options, warrants or similar rights to purchase such capital stock or any security convertible into or exchangeable for such capital stock.

"Second Loan Installment" means a maximum amount of US$2,325,000.

"Security Agreement" means a pledge and security agreement, dated as of even date herewith, made by the Borrowers in favor of the Lender, as the same may be amended, restated or otherwise modified from time to time, substantially in the form of Exhibit B to this Agreement.

"Security Documents" means the Security Agreement, the Trademark Security Agreement, and the Deposit Account Control Agreements, each in favor of the Lender to secure Obligations and dated of even date herewith, in each case as amended and/or restated and in effect from time to time, and any additional documents evidencing or perfecting the Lender's lien on the Collateral.

"Subsidiary" or "Subsidiaries" with respect to any Person, means: (i) any corporation, association, joint stock company, business trust, partnership, limited liability company or other similar organization of which 50% or more of the ordinary voting power for the election of a majority of the members of the board of directors or other governing body of such entity is held or controlled by such Person or a Subsidiary of such Person; or (ii) any other such organization the management of which is directly or indirectly controlled by such Person or a Subsidiary of such Person through the exercise of voting power or otherwise; or any joint venture, whether incorporated or not, in which such Person has a 50% or greater ownership interest.

"Termination Date" means, at the Lender's election, the earlier of (i) the Maturity Date or (ii), at the Lender's election, the date that is the earliest of: (a) the date on which the Lender provides, via facsimile or overnight mail, written notice to either Borrower, counsel for the Borrowers and counsel for any official committee of unsecured creditors of the occurrence of an Event of Default (as set forth herein and in the Borrower in possession credit facility); (b) the date of the acceleration of any outstanding extension of credit under the Borrower's DIP Facility; (c) the date of entry of an order confirming the Plan to which the Lender objects; (d) the effective date of a confirmed plan agreeable to the Lender in the Chapter 11 Cases; (e) the entry of an order converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code; (f) the entry of an order dismissing the Chapter 11 Cases; (g) the entry of an order appointing a chapter 11 trustee or examiner in the Chapter 11 Cases; and (h) the failure of the Borrowers to obtain entry of an Interim DIP Order or the Final DIP Order approving the DIP Facility, each of which must be in a form acceptable to the Lender.

"Termination Declaration" has the meaning ascribed thereto in Section 7.2(c).

"Total Loan Amount" means US$2,500,000 plus PIK interest, plus expenses, costs and reasonable attorneys' fees of the Lender.

"Trademark Security Agreement" means a pledge and security agreement regarding the Borrowers' trademarks, service marks, trade dress, logos and similar intellectual property rights, dated as of even date herewith, made by the Borrowers in favor of the Lender, as the same may be amended, restated or otherwise modified from time to time, substantially in the form of Exhibit C to this Agreement.

"UCC" means the Uniform Commercial Code as in effect from time to time in the State of Nevada; provided, however, that if by reason of mandatory provisions of law, any or all of the perfection or priority of the Lender's security interest in any item or portion of the Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of Nevada, the term "UCC" means the Uniform Commercial Code as in effect from time to time in such other jurisdiction for purposes of the provisions hereof relating to such perfection or priority and for purposes of definitions relating to such provision.

"Variance Report" has the meaning ascribed thereto in Section 5.1(a).

1.2.    Rules of Interpretation.

(a)    All terms of an accounting or financial character used herein but not defined herein have the meanings assigned thereto under GAAP, as in effect from time to time.

(b)    Except as otherwise specifically provided herein, reference to any document or agreement includes such document or agreement as amended, modified or supplemented and in effect from time to time in accordance with its terms and the terms of this Agreement.

(c)    The singular includes the plural and the plural includes the singular.  Whenever the context may require, any pronoun includes the corresponding masculine, feminine and neuter forms.

(d)    A reference to any Person includes its permitted successors and permitted assigns.

(e)    The words "include", "includes" and "including" are not limiting.

(f)    The words "herein", "hereof", "hereunder" and words of like import refer to this Agreement as a whole and not to any particular section or subdivision of this Agreement.

(g)    All terms not specifically defined herein or by GAAP that are defined in the UCC, have the meanings assigned to them in such UCC.

(h)    Any references herein to "cash" or "$" means fiat money issued by the U.S. government and denominated in U.S. dollars, provided that if any of the Borrowers holds fiat money issued and denominated in any currency other than U.S. dollars, such holdings are meant to be included, on an as-exchanged basis into U.S. dollars on the applicable date of reference, in any reference to "cash" herein.

SECTION II

LOAN

2.1.    Loan.

(a)    Upon the terms and subject to the conditions of this Agreement, and in reliance upon the

representations, warranties and covenants of the Borrowers herein, so long as no Event of Default then exists or this Agreement has not otherwise been terminated, cancelled or invalidated, the Lender agrees to make the Loan up to the Total Loan Amount to the Borrower at the Borrower's request, and the Borrower agrees to borrow up to the Total Loan Amount, provided that, unless otherwise agreed by the Lender in its sole and absolute discretion, the Obligations (after giving effect to all requested Loan) may not at any time exceed the Total Loan Amount, and, further provided, that the Total Loan Amount is subject to disbursement in two installments based on the conditions specified in this Agreement, disbursable as the First Loan Installment and the Second Installment, in all cases subject to the terms and conditions set forth in this Agreement.

(b)    The commitment of the Lender to make the Loan will automatically terminate at 5:00 p.m., Las Vegas, Nevada, time, on the Maturity Date.

(c)    Proceeds from the Loan will be used solely to pay expenses of the Borrower as set forth in the Budget as mutually agreed by the Lender and Borrower in writing, plus the fees and expenses of the Lender as contemplated hereunder, provided that actual expenditures for such Budget measured on a cumulative basis from the funding of the First Loan Installment may not exceed the Budget amount established for such cumulative period by 15% in the aggregate.

2.2.    Note.  The Loan will be evidenced by the Note, and will be secured by the Security Agreement, the Trademark Security Agreement, and Deposit Account Control Agreement.  The Borrowers irrevocably authorize the Lender to make or cause to be made, at or about the time of any Drawdown Date or at the time of receipt of any payment of principal on the Note, an appropriate notation on its Note Record reflecting (as the case may be) the making of such Loan or the receipt of such payment.  The outstanding amount of the Loan set forth on its Note Record will be prima facie evidence of the principal amount thereof owing and unpaid to the Lender, but the failure to record, or any error in so recording, any such amount on the Lender's Note Record will not limit or otherwise affect the obligations of the Borrower hereunder or under the Note to make payments of principal of or interest on the Note when due.

2.3.    Notice and Manner of Borrowing.  Whenever the Borrower desires to receive a disbursement of the Loan as contemplated hereunder, the Borrower shall provide the Lender with a Notice of Borrowing no later than 12:00 p.m. Las Vegas, Nevada, time on the date that is two (2) Business Days before the day on which the requested Loan is to be made.  Each Notice of Borrowing must specify the effective date and amount of the Loan requested. The Notice of Borrowing must also be accompanied by a separate compliance certificate executed and delivered by the Borrower as to the accuracy of the Borrower's representations and warranties set forth herein as of any Drawdown Date.  The Borrower may not submit, and the Lender is not obligated to accept, more than two Notices of Borrowing, one for each of the First Loan Installment and the Second Loan Installment.

2.4.    Interest Rate and Payments.

(a)    All amounts loaned to the Borrower hereunder will bear interest on the outstanding principal amount thereof at a rate per annum equal to the Interest Rate, running from the applicable Drawdown Date of any borrowing.

(b)    Notwithstanding the rates of interest specified in Section 2.4 or elsewhere in any Loan Document, effective immediately upon (i) the occurrence of any Event of Default specified in Section 7.1(a) or (ii) the delivery of a notice by the Lender to the Borrower during the continuance of any other Event of Default and, in each case, for as long as such Event of Default continues, and without further notice, motion or application to, hearing before, or order from the Bankruptcy Court, the principal balance of all Obligations (including any Obligation that bears interest by reference to the rate applicable to any other Obligation) then due and payable, will bear interest at the Default Rate.

153257877.1

(c)     All agreements between the Borrowers and the Lender are hereby expressly limited so that in no contingency or event whatsoever, whether by reason of acceleration of maturity of the Obligations or otherwise, will the amount paid or agreed to be paid to the Lender for the use or the forbearance of the Obligations exceed the maximum permissible under applicable law.  As used in this Section 2.4(c), the term "applicable law" means the law of State of Nevada in effect as of the Effective Date; provided, however, that in the event there is a change in the law which results in a higher permissible rate of interest, then the Loan Documents will be governed by such new law as of its effective date.  In this regard, it is expressly agreed that it is the intent of the Parties in the execution, delivery and acceptance of the Loan Documents to contract in strict compliance with the laws of the State of Nevada from time to time in effect.  If, under or from any circumstances whatsoever, fulfillment of any provision of any of the Loan Documents at the time of performance of such provision will be due, will involve transcending the limit of such validity prescribed by applicable law, then the obligation to be fulfilled will automatically be reduced to the limits of such validity, and if under or from circumstances whatsoever the Lender should ever receive as interest an amount which would exceed the highest lawful rate, such amount which would be excessive interest will be applied to the reduction of the principal balance of the Obligations and not to the payment of interest.  This provision will control every other provision of all of the Loan Documents.

2.5.     Fees.

(a)     The Borrowers shall pay to the Lender the following fees in connection with the Loan:

(i)     An origination fee equal to 4% of the Total Loan Amount;

(ii)     Upon entry of the Final DIP Order, a termination fee of 10% of the Total Loan Amount earned upon the earlier of the sale of substantially of the Borrowers' assets or confirmation of a chapter 11 plan to which the Lender objects;

(iii)     A structuring fee of 5% of the Total Loan Amount upon the Final DIP Order approving the DIP Facility to be capitalized under the DIP facility; and

(iv)     all reasonable fees and costs of the Lender's legal counsel and professional advisors incurred by the Lender in connection with the Loan and the Chapter 11 Case.

(b)     The Lender will have the discretion, but not the obligation, to PIK all fees and costs, which shall be repaid pursuant to the Plan or a sale in accordance with the Bidding Procedures Order, whichever occurs first.

(c)     The Borrower authorizes the Lender to charge to its Note Record with any interest, fees, charges, taxes and expenses provided for in this Agreement, the other Loan Documents or any other document executed or delivered in connection herewith or therewith.

2.6.     Payments.

(a)     Upon termination or maturity hereof, the Borrower shall pay in full the unpaid principal of all outstanding Loans, together with all unpaid interest thereon and all fees and other amounts due with respect thereto.

(b)     If at any time the Obligations exceed the Total Loan Amount, the Borrower shall immediately pay the amount of any such excess to the Lender for application to the Loan.

2.7.    <u>Method and Allocation of Payments</u>.

(a)    All payments by the Borrowers hereunder and under any of the other Loan Documents must be made in lawful money of the United States in immediately available funds and will be deemed to have been made only when made in compliance with this <u>Section 2.7</u>.  All such payments will be made without set-off or counterclaim and free and clear of and without deduction for any taxes, imposts, duties, charges, fees, deductions, withholdings, compulsory loans, restrictions or conditions of any nature now or hereafter imposed or levied by any jurisdiction or any political subdivision thereof or taxing or other authority therein unless such Party is compelled by law to make such deduction or withholding.  If any such obligation is imposed upon such Party with respect to any amount payable by it hereunder or under any of the other Loan Documents, the Borrowers will pay to the Lender such additional amount in U.S. Dollars as is necessary to enable the Lender to receive the same net amount which the Lender would have received on such due date had no such obligation been imposed upon the Borrowers.  The Borrowers will deliver promptly to the Lender certificates or other valid vouchers or other evidence of payment reasonably satisfactory to the Lender for all taxes or other charges deducted from or paid with respect to payments made by any Borrower hereunder or under such other Loan Document.  The Lender may, and the Borrowers hereby authorize the Lender to, debit the amount of any payment not made by such time to its Note Record.

(b)    All payments of principal and interest in respect of the Loan must be made to the Lender, by wire transfer of immediately available funds, to the account specified by the Lender in a separate writing delivered to the Borrowers, or at such other location as the Lender may from time to time designate in writing.

(c)    If the Obligations are declared immediately due and payable pursuant to <u>Section 7.2</u>, all funds received from or on behalf of the Borrowers (including as proceeds of Collateral) by the Lender will be applied in the following manner and order: (i) first, to the payment of any fees payable hereunder; (ii) second, to the payment of interest due on the Loan; (iii) third, to the payment of the outstanding principal balance of the Loan; and (iv) fourth, to the payment of any other Obligations.

2.8.    <u>Computation of Interest and Fees; Due Date</u>.  Interest and all fees payable hereunder will be computed daily on the basis of a year of 360 days and paid for the actual number of days for which due.  If the due date for any payment of principal is extended by operation of law, interest must be paid for such extended time.  If any payment required by this Agreement becomes due on a day that is not a Business Day such payment may be made on the next succeeding Business Day, and such extension will be included in computing interest and fees in connection with such payment.

2.9.    <u>Super Priority Nature of Obligations and Lender's Liens</u>.

(a)    The priority of Lender's Liens on the Collateral of the Borrowers will be set forth in the Final DIP Order and will be subject, as to priority, only to the Carve-Out Expenses.

(b)    All Obligations constitute allowed superpriority administrative expense claims of Lender in the Chapter 11 Cases pursuant to Section 364(c)(1) of the Bankruptcy Code (the "<u>DIP Superpriority Claim</u>").  As such, the Obligations will have priority over any and all other obligations, liabilities, and indebtedness against Borrowers, now existing or hereafter arising, of any kind whatsoever, including any and all administrative expenses or other claims of the kind specified in or arising under specified in, or ordered pursuant to, Sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726 (to the extent permitted by law), 1113, 1114 or any other provision of the Bankruptcy Code or otherwise, and will at all times be senior to the rights of the Borrowers, the Borrowers' estate and any successor trustee or estate representative in the Chapter 11 Case or any subsequent proceeding or case under the Bankruptcy Code, subject, however, as to priority, only to Carve-Out Expenses. The DIP Superpriority Claim will have recourse to and be payable from all pre-petition and post-petition

153257877.1

assets of the Borrowers, including, but not limited to, the Collateral.

(c)    Subject only to the Carve-Out Expenses, the Obligations are secured by: (i) pursuant to Section 364(c)(2) of the Bankruptcy Code, a perfected first priority lien on all Collateral that is not subject to valid, perfected, and non-avoidable liens as of the Petition Date; and (ii) pursuant to section 364(d)(1) of the Bankruptcy Code, secured by a perfected first priority, senior priming lien on all the Collateral, senior to all other liens, claims, rights, interests or encumbrances, whether now existing or hereafter arising (the "Primed Liens") which will be primed by and made subject and subordinate to the perfected first priority senior Lien to be granted to the Lender (the "Priming Lien"), which Priming Lien also primes any liens granted after the Petition Date to provide adequate protection in respect of any of the Primed Liens. For the avoidance of doubt, notwithstanding anything to the contrary in this Agreement, the Priming Lien primes and is senior to the Primed Liens.

(d)    The priorities set forth above are subject, in each case, only to the Carve-Out Expenses. All of the liens and security interests described in this Section 2.9 will be effective and perfected as of the date that the Bankruptcy Court enters the Interim DIP Order, without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements, or other agreements or documents. Borrowers shall execute and deliver to the Lender (for recordation or filing, as appropriate) such mortgages and pledges (and other security instruments), and be authorized pursuant to the Orders to file such financing statements and other instruments and documents, as is advisable (as reasonably determined by the Lender) to evidence and secure the Obligations. The cost of such recordation and filing will be set forth in the Budget.

2.10.    Payment of Obligations.  Upon the Termination Date, the Lender will be entitled to immediate indefeasible payment in full in cash of such Obligations without further application to or order of the Bankruptcy Court.  Prior to an Event of Default, the Borrowers may access the Cash Collateral Account for payment of working capital, restructuring costs, or other purposes, consistent with this Agreement and the Budget.  The Lender agrees that it will not issue any instructions exercising dominion over the Cash Collateral Account except following the occurrence and during the continuance of an Event of Default.

2.11.    No Discharge; Survival of Claims.  The Borrowers agree that: (a) the Obligations hereunder will not be discharged by the entry of an order confirming a Plan of Reorganization, compromise or arrangement in any of the Chapter 11 Cases (notwithstanding the provisions of Section 1141(d)(4) of the Bankruptcy Code), unless such Plan of Reorganization is acceptable to the Lender in its reasonable discretion and provides for the assumption, on terms and conditions acceptable to the Lender in its reasonable discretion, of the Obligations of the Borrowers under the Loan Documents by the successor-in-interest to the Borrowers; and (b) the superpriority administrative claim granted to the Lender pursuant to the Final DIP Order and described in Section 2.9 and the Liens granted to the Lender pursuant to the Final DIP Order and described in Section 2.9 will not be affected in any manner by the entry of an order confirming a Plan of Reorganization in any Chapter 11 Case.

2.12.    Waiver of any Priming Rights. Upon the Closing Date, and on behalf of itself and its estate, and for so long as any Obligations will be outstanding, each Borrower hereby irrevocably waives any right (whether pursuant to Sections 364(c) or 364(d) of the Bankruptcy Code or otherwise) and agrees not to apply to the Bankruptcy Court seeking any right to grant or to confer any Lien of equal or greater priority than the Liens securing the Obligations.

2.13.    Joint and Several Liability of Borrowers.

(a)    Each Borrower is accepting joint and several liability hereunder and under the other Loan Documents in consideration of the financial accommodations to be provided by Lender under this Agreement, for the mutual benefit, directly and indirectly, of each such Party and in consideration of the undertakings of the other Borrower to accept joint and several liability for the Obligations.

153257877.1

(b)        Each Borrower, jointly and severally, hereby irrevocably and unconditionally accepts, not merely as a surety but also as a co-debtor, joint and several liability with the other Borrower, with respect to the payment and performance of all of the Obligations (including, without limitation, any Obligations arising under this Section 2.13), it being the intention of the Parties that all the Obligations are the joint and several obligations of each Borrower without preferences or distinction between them.

(c)        If and to the extent a Borrower fails to make any payment with respect to any of the Obligations as and when due or to perform any of the Obligations in accordance with the terms thereof, then in each such event the other Borrower will make such payment with respect to, or perform, such Obligation.

(d)        The Obligations of the Borrowers under the provisions of this Section 2.13 constitute the absolute and unconditional, full recourse Obligations of both Borrowers enforceable against each such Borrower to the full extent of its properties and assets, irrespective of the validity, regularity or enforceability of this Agreement or any other circumstances whatsoever.

(e)        Except as otherwise expressly provided in this Agreement, each Borrower hereby waives notice of acceptance of its joint and several liability, any Notice of Borrowing issued under or pursuant to this Agreement, notice of the occurrence of any Default, Event of Default, or of any demand for any payment under this Agreement, notice of any action at any time taken or omitted by Lender under or in respect of any of the Obligations, any requirement of diligence or to mitigate damages and, generally, to the extent permitted by applicable law, all demands, notices and other formalities of every kind in connection with this Agreement (except as otherwise provided in this Agreement). Each Borrower hereby assents to, and waives notice of, any extension or postponement of the time for the payment of any of the Obligations, the acceptance of any payment of any of the Obligations, the acceptance of any partial payment thereon, any waiver, consent or other action or acquiescence by Lender at any time or times in respect of any default by either Borrower in the performance or satisfaction of any term, covenant, condition or provision of this Agreement, any and all other indulgences whatsoever by Lender in respect of any of the Obligations, and the taking, addition, substitution or release, in whole or in part, at any time or times, of any security for any of the Obligations or the addition, substitution or release, in whole or in part, of either Borrower. Without limiting the generality of the foregoing, each Borrower assents to any other action or delay in acting or failure to act on the part of the Lender with respect to the failure by either Borrower to comply with any of its respective Obligations, including, without limitation, any failure strictly or diligently to assert any right or to pursue any remedy or to comply fully with applicable laws or regulations thereunder, which might, but for the provisions of this Section 2.13 afford grounds for terminating, discharging or relieving either Borrower, in whole or in part, from any of its Obligations under this Section 2.13, it being the intention of each Borrower that, so long as any of the Obligations hereunder remain unsatisfied, the Obligations of each Borrower under this Section 2.13 will not be discharged except by performance and then only to the extent of such performance. The Obligations of each Borrower under this Section 2.13 will not be diminished or rendered unenforceable by any winding up, reorganization, arrangement, liquidation, reconstruction or similar proceeding with respect to either Borrower or Lender. The joint and several liability of the Borrowers hereunder will continue in full force and effect notwithstanding any absorption, merger, amalgamation or any other change whatsoever in the name, constitution or place of formation of either of the Borrowers or the Lender.

(f)        Each Borrower represents and warrants to the Lender that such Borrower is currently informed of the financial condition of the other Borrower and of all other circumstances which a diligent inquiry would reveal and which bear upon the risk of nonpayment of the Obligations. Each Borrower further represents and warrants to Lender that it has read and understands the terms and conditions of the Loan Documents. Each Borrower hereby covenants that it will continue to keep informed of its financial condition, the financial condition of other guarantors, if any, and of all other circumstances which bear upon the risk of nonpayment or nonperformance of the Obligations.

(g)       Each Borrower waives all rights and defenses arising out of an election of remedies by Lender, even though that election of remedies, such as a nonjudicial foreclosure with respect to security for a guaranteed obligation, has destroyed the Lender's rights of subrogation and reimbursement against it.

(h)       The provisions of this Section 2.13 are made for the benefit of the Lender, and its successors and assigns, and may be enforced by the Lender or its successors and assigns from time to time against either or both of the Borrowers as often as occasion therefor may arise and without requirement on the part of the Lender, first to marshal any of its claims or to exercise any of its rights against the other Borrower or to exhaust any remedies available to it against the other Borrower or to resort to any other source or means of obtaining payment of any of the Obligations hereunder or to elect any other remedy; provided that the Lender agrees to enforce its rights against Collateral that is unencumbered by any lien in favor of another creditor before proceeding against Collateral that is encumbered by one or more liens in favor of other creditors.  The provisions of this Section 2.13 will remain in effect until all the Obligations are paid in full or otherwise fully satisfied.  If at any time, any payment, or any part thereof, made in respect of any of the Obligations, is rescinded or must otherwise be restored or returned by the Lender upon the insolvency, bankruptcy or reorganization of either Borrower, or otherwise, the provisions of this Section 2.13 will forthwith be reinstated in effect, as though such payment had not been made.

(i)       Each Borrower hereby agrees that it will not enforce any of its rights of contribution or subrogation against the other Borrower with respect to any liability incurred by it hereunder or under any of the other Loan Documents, any payments made by it to the Lender with respect to any of the Obligations or any collateral security therefor until such time as all of the Obligations have been paid in full in cash.  Any claim which either Borrower may have against the other Borrower with respect to any payments to the Lender hereunder or under any other Loan Documents are hereby expressly made subordinate and junior in right of payment, without limitation as to any increases in the Obligations arising hereunder or thereunder, to the prior payment in full in cash of the Obligations and, in the event of any insolvency, bankruptcy, receivership, liquidation, reorganization or other similar proceeding under the laws of any jurisdiction relating to either Borrower, its debts or its assets, whether voluntary or involuntary, all such Obligations must be paid in full in cash before any payment or distribution of any character, whether in cash, securities or other property, are made to the other Borrower therefor.

(j)       Each Borrower hereby agrees that, after the occurrence and during the continuance of any Default or Event of Default, the payment of any amounts due with respect to any Indebtedness owing by the Borrower to the other Borrower is hereby subordinated to the prior payment in full in cash of the Obligations.  Each Borrower hereby agrees that after the occurrence and during the continuance of any Default or Event of Default, it will not demand, sue for or otherwise attempt to collect any Indebtedness of the other Borrower owing to it until the Obligations must be paid in full in cash.  If, notwithstanding the foregoing sentence, either Borrower collects, enforces or receives any amounts in respect of such Indebtedness, such amounts shall be collected, enforced and received by it as trustee for the Lender, and such Party shall deliver any such amounts to the Lender for application to the Obligations in accordance with Section 2.7.

(k)       Each Borrower hereby agrees that Lender is and does not, and will not be deemed to (i) be in "control" of the operations of such Borrower, (ii) owe any fiduciary duty to either Borrower, their respective creditors, shareholders or estate(s), and (iii) acting as a "Responsible Person" or "Owner" or "Operator" with respect to the operation or management of the Borrowers (as such terms or similar terms are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601, et seq., as amended, or any similar federal or state statute).

2.14.   Loan to Survive Bankruptcy of Borrower. The Parties expressly acknowledge and agree that the Loan and all of the Liens, rights, and obligations of the Parties as provided for herein and in any of the other Loan Documents, are intended to and will expressly survive and remain enforceable after the consummation of a Plan of Reorganization of the Borrowers and/or the dismissal or conversion of the Chapter 11 Cases, unless and until the

outstanding Obligations have been satisfied in full.

2.15.    Right to Credit Bid.  Pursuant to Section 363(k) of the Bankruptcy Code, and subject to the Final DIP Order, the Lender will have the unqualified right to credit bid all or any portion of the outstanding Obligations in any sale of the Collateral under or pursuant to (i) Section 363 of the Bankruptcy Code, (ii) a plan of reorganization or plan of liquidation under section 1129 of the Bankruptcy Code, or (iii) a sale or disposition by a chapter 7 trustee for the Borrower under Section 725 of the Bankruptcy Code.

SECTION III

LOAN CONDITIONS

3.1.    Conditions Precedent to Initial Disbursement.  This Agreement will take effect upon, and the obligation of the Lender to make the First Installment Payment under the Loan are subject to, the satisfaction of the following conditions precedent:

(a)    The Lender will have received the following agreements, documents, certificates and opinions in form and substance satisfactory to the Lender and, where required, duly executed and delivered by the Parties and any other required Persons pursuant thereto:

(i)    this Agreement;

(ii)    the Note;

(iii)    the Security Documents;

(iv)    the Interim DIP Order and the Final DIP Order authorizing the execution and delivery of the Loan Documents and identifying the officer(s) authorized to execute, deliver and take all other actions required under this Agreement, and providing specimen signatures of such officers;

(v)    the certificate or articles of incorporation or organization of each Borrower and all amendments and supplements thereto, as filed in the office of the Secretary of State of its jurisdiction of incorporation, certified by said Secretary of State as being a true and correct copy thereof;

(vi)    the bylaws, shareholders agreements or operating agreements of each Borrower and all amendments and supplements thereto, certified by the secretary or manager of each such Party as being a true and correct copy thereof;

(vii)    a certificate of the Secretary of State of each of the Borrowers' jurisdiction of incorporation or organization as to legal existence and good standing of each such Borrower in such state;

(viii)    the Lender shall have entered into an agreement to acquire the debt of the holders of the Primed Liens;

(ix)    the Lender shall have entered into an agreement to acquire the shares of the Borrowers' shareholders; and

(x)    such other documents, instruments, and certificates and completion of such other matters, as the Lender may reasonably deem necessary or appropriate.

153257877.1

(b)    <u>Litigation</u>.  Other than in connection with the Chapter 11 Cases and as otherwise may be disclosed on the Bankruptcy Schedules, no litigation, arbitration, proceeding or investigation will be pending or threatened which questions the validity or legality of the transactions contemplated by any Loan Document or seeks a restraining order, injunction or damages in connection therewith, or which, in the reasonable judgment of the Lender, could adversely affect the transactions contemplated hereby or could have a Material Adverse Effect on the assets,  business or financial condition of the Borrower or the Lender.

(c)    <u>Recordings</u>.  All necessary filings and recordings against the Collateral will have been completed and the Lender's liens on the Collateral will have been perfected, as contemplated by the Security Documents.

(d)    <u>Interim DIP Order and Final DIP Order</u>.  Entry by the Bankruptcy Court of the Interim DIP Order, by no later than ten (10) business days after the Petition Date, in the form and substance satisfactory to the Lender, among other things, (i) approving the transactions contemplated hereby, (ii) granting a first priority perfected security interest in the Collateral, (iii) authorizing the Lender's Liens, and (iv) modifying the automatic stay to permit the creation and perfection of Lender's Liens, and entry by the Bankruptcy Court of the Final DIP Order, by no later than thirty (30) calendar days after the Petition Date, in form and substance satisfactory to Lender.

(e)    <u>Consents</u>.  Each Borrower will have received all consents and authorizations required pursuant to any material contracts with any other Person and will have obtained all permits of, and effected all notices to and filings with, any governmental authority, in each case, as may be necessary in connection with the consummation of the transactions contemplated in any Loan Document.

(f)    <u>Fees and Expenses</u>.  There will have been paid to the Lender all fees and all reimbursements of costs or expenses (including reasonable attorney's fees and expenses), in each case due and payable under any Loan Document.

3.2.    <u>Conditions Precedent to All Disbursements</u>.  The obligation of the Lender to make the Loan, including the First Installment Payment and the Second Installment Payment, is further subject to the following conditions:

(a)    receipt by the Lender of a Notice of Borrowing with respect to such Loan and all related documents required pursuant to <u>Section 2.3</u>;

(b)    the Loan will not exceed the limitations set forth in <u>Sections 2.1</u>;

(c)    the representations and warranties contained in <u>Section IV</u> will be true and accurate in all material respects on and as of the date of such Notice of Borrowing and on the effective date of the making of such Loan as though made at and as of each such date (except to the extent that such representations and warranties expressly relate to an earlier date);

(d)    no Default or Event of Default will have occurred and be continuing at the time of, and immediately after the making of, such requested Loan;

(e)    the Interim DIP Order and the Final DIP Order referred to in <u>Section 3.1</u> will remain in full force and effect;

(f)    the Loan requested will not cause the aggregate outstanding amount of the Loan to exceed the amount then authorized by the applicable Order, as the case may be, or any order modifying, reversing, staying or vacating such order will have been entered, or any appeal of such order will have been timely filed;

(g)    (i) the Bankruptcy Court will have entered the Final DIP Order on or before January 31, 2024], (ii) the Final DIP Order will not have been vacated, stayed, reversed, modified or amended without Lender's consent or will otherwise be in full force and effect, (iii) a motion for reconsideration of any such Order will not have been timely filed, or (iv) an appeal of any such Order will not have been timely filed and such order in any respect will not be the subject of a stay pending appeal;

(h)    no change will have occurred in any law or regulation or interpretation thereof that, in the opinion of counsel for the Lender, would make it illegal or against the policy of any governmental agency or authority for the Lender to make the Loan hereunder; and

(i)    the Lender will have been paid all reasonable fees and all reimbursements of reasonable costs or expenses (including attorney's fees and expenses), in each case due and payable under any Loan Document, not to exceed $300,000 in the aggregate for fees and expenses incurred in negotiating, implementing and monitoring the Loan.

The making of each Loan will be deemed to be a representation and warranty by each Borrower on the date of the making, continuation or conversion of such Loan as to the accuracy of the facts referred to in Section 3.2(c) and of the satisfaction of all of the conditions set forth in this Section 3.2.

SECTION IV

REPRESENTATIONS AND WARRANTIES

In order to induce the Lender to enter into this Agreement and to make Loan, each Borrower, jointly and severally, as of the Effective Date and each Drawdown Date, represents and warrants to the Lender that, except as specifically set forth in the Disclosure Schedules:

4.1.    No Material Adverse Effect.  There has not been a Material Adverse Effect with respect to either Borrower since the date of the latest financial statements submitted to the Lender on or before the Closing Date.

4.2.    Reorganization Matters.

(a)    The Chapter 11 Cases will have commenced no later than December 20, 2023, in accordance with applicable law and proper notice thereof and the proper notice for (i) the motion seeking approval of the Loan Documents and the Final DIP Order, and (ii) the Final DIP Order has been or will be entered no later January 31, 2024.  The Borrower will provide, on a timely basis as specified in the Final DIP Order, all notices required to be given to all parties specified in the Final DIP Order.

(b)    After the entry of the Final DIP Order, and pursuant to and to the extent permitted in the Final DIP Order, the Obligations will constitute allowed administrative expense claims in the Chapter 11 Cases having priority over all administrative expense claims and unsecured claims against the Borrower now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expense claims of the kind specified in Sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 726 (to the extent permitted by law), 1113, 1114 or any other provision of the Bankruptcy Code or otherwise, as provided under Section 364(c)(l) of the Bankruptcy Code, as (and subject to the limitations, including in respect of Carve-Out Expenses) set forth in Section 2.9.

(c)    After the entry of the Final DIP Order and pursuant to and to the extent provided in the Final DIP Order, the Obligations will be secured by a valid and perfected first priority Lien on all of the Collateral, as set forth in Section 2.9.

(d)      The Final DIP Order (with respect to the period on and after entry of the Final DIP Order), is in full force and effect has not been reversed, stayed, modified or amended.

(e)      Notwithstanding the provisions of Section 362 of the Bankruptcy Code, and subject to the applicable provisions of the Final DIP Order, upon the maturity (whether by acceleration or otherwise) of any of the Obligations, the Lender will be entitled to immediate payment of such Obligations.

(f)      In consideration of the agreement and covenants set forth herein, the Lender agrees the Plan of Reorganization shall contain general releases of the Borrowers' causes of action against their officers, directors, managers and shareholders.

4.3.    <u>Corporate Authority; No Conflicts</u>.  Subject to the approval of the Bankruptcy Court, the execution, delivery and performance of this Agreement and the other Loan Documents and the transactions contemplated hereby and thereby are within the power and authority of each of the Borrowers and have been authorized by all necessary corporate proceedings, and do not and will not (i) contravene any provision of the charter documents or by-laws of each of the Borrowers or any law, rule or regulation applicable to each of the Borrowers, (ii) contravene any provision of, or constitute an event of default or event that, but for the requirement that time elapse or notice be given, or both, would constitute an event of default under, any other agreement, instrument, order or undertaking binding on either Borrower, or (iii) result in or require the imposition of any Liens on any of the properties, assets or rights of either Borrower, except in favor of the Lender or its successors or assigns.

4.4.    <u>Existence; Compliance with Laws</u>.  Each Borrower (a) is duly organized, validly existing, and in good standing under the laws of the jurisdiction of its formation, (b) is duly qualified as a foreign corporation or other organization and in good standing under the laws of each jurisdiction where its ownership, lease, or operation of property or the conduct of its business requires such qualification except to the extent that the failure to qualify in such jurisdiction could not reasonably be expected to have a Material Adverse Effect, (c) has the power and authority, and the legal rights, to own or lease its properties and assets, and to carry on its business as now conducted and as proposed to be conducted, and (d) is in compliance with all requirements of applicable law except to the extent that the failure to comply therewith could not, in the aggregate, reasonably be expected to have a Material Adverse Effect.

4.5.    <u>Valid Obligations</u>.  Subject to the approval of the Bankruptcy Court, the Loan Documents and all of their respective terms and provisions are the legal, valid and binding obligations of each Borrower, enforceable in accordance with their respective terms except as limited by bankruptcy, insolvency, reorganization, moratorium or other laws affecting the enforcement of creditors' rights generally, and except as the remedy of specific performance or of injunctive relief is subject to the discretion of the court before which any proceeding therefor may be brought.  The Security Documents have effectively created in favor of the Lender legal, valid and enforceable security interests in the Collateral and such security interests are fully perfected first priority security interests.

4.6.    <u>Consents or Approvals</u>.  Except for the approval of the Bankruptcy Court, execution, delivery and performance of the Loan Documents and the transactions contemplated herein do not require any approval or consent of, or filing or registration with, any governmental or other agency or authority, or any other Person (including without limitation any lessor or lessee of any of the properties of either Borrower), except under or as contemplated by the Security Documents.

4.7.    <u>Ownership of Property; Liens</u>.  Each Borrower has fee simple title to, or a valid leasehold interest in, all its real property, and good title to, or a valid leasehold interest in, all its other property, and to the best of the Borrower's knowledge, none of such property is subject to any Liens other than as set forth in the Disclosure Schedules or the Bankruptcy Schedules. The Disclosure Schedules or the Bankruptcy Schedules, set forth a complete and accurate list of all real property, leases, and other property and assets owned by each Borrower, and

all Liens thereupon.

4.8.    <u>Litigation</u>.  As of the Effective Date, no action, suit, litigation, investigation, arbitration, mediation or other proceeding, including before any governmental authority, involving either Borrower is pending or, to the knowledge of the Borrowers, threatened against either Borrower, other than as set forth in the Disclosure Schedules or the Bankruptcy Schedules, which could adversely affect, threaten or otherwise impair the Lender's rights in and to, and each Borrower's obligations in respect of, the Collateral pursuant to the Loan Documents.

4.9.    <u>Indebtedness</u>.  As of the Effective Date, to the best of the Borrowers' knowledge, neither Borrower has any Indebtedness and no Liens have been granted or secured as to, or otherwise encumber, any of their assets or properties, or any equity interest in such Party, and neither Borrower has pledged, assigned, transferred, mortgaged or hypothecated any of its assets or properties, the equity interests in such Party, or otherwise created or incurred any Liens on any of the foregoing, other than as set forth in the Disclosure Schedules or Bankruptcy Schedules.

4.10.    <u>Taxes</u>.  Other than as set forth in the Disclosure Schedules or Bankruptcy Schedules, each Borrower has filed all federal, state and other tax returns for ad valorem taxes that are required to be filed and has paid all ad valorem taxes shown thereon to be due, together with applicable interest and penalties, and all other taxes, fees, or other charges imposed on it or any of its property by any governmental authority (except those that are currently being contested in good faith by appropriate proceedings and with respect to which reserves in conformity with GAAP have been provided on the books of the relevant Party). No tax Lien has been filed, and, to the knowledge of the Borrowers, no claim is being asserted, with respect to any such tax, fee, or other charge which could adversely affect, threaten or otherwise impair the Lender's rights in and to, and each Borrower's obligations in respect of, the Collateral pursuant to the Loan Documents.  Neither Borrower is a party to any tax sharing agreement.

4.11.    <u>Employees</u>.  Except as, in the aggregate, could not reasonably be expected to have a Material Adverse Effect, (a) there are no strikes, lockouts, or other labor disputes pending or, to the knowledge of the Borrowers, threatened against either Borrower, (b) hours worked by and wages paid to employees of the Borrowers have not violated the Fair Labor Standards Act as amended and in effect or any other requirement of appliable law, and (c) all payments due in respect of employee health and welfare insurance from the Borrowers have been paid or properly accrued on its books.

4.12.    <u>Investment Company Act</u>.  Neither Borrower is subject to regulation under the Investment Company Act of 1940, as amended.

4.13.    <u>Disclosure</u>.  The Borrowers, including their Bankruptcy Schedules filed in the Chapter 11 Cases, have disclosed to the Lender all agreements, instruments, and corporate or other restrictions to which either of them is subject, and all other matters known to them, that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect. No statement or information contained in this Agreement, any other Loan Document, or any other document, certificate, or statement furnished by or on behalf of the Borrowers to the Lender, for use in connection with the transactions contemplated by this Agreement or the other Loan Documents, when taken as a whole, contained as of the date such statement, information, document, or certificate was so furnished, any untrue statement of a material fact or omitted to state a material fact necessary to make the statement contained herein or therein not misleading.

SECTION V

<u>AFFIRMATIVE COVENANTS</u>

The Borrowers covenant that so long as the Loan or other Obligation remains outstanding or the Lender has any obligation to make the Loan hereunder:

153257877.1

5.1.    <u>Financial Statements</u>. The Borrowers shall furnish to the Lender:

(a)    on the fifth Business Day of every other calendar week: (i) a rolling 13-week cash flow forecast of the cash receipts and cash disbursements of the Borrowers for the immediately following consecutive 13-weeks, set forth on a weekly basis and substantially in the form of the Budget modified accordingly; and (ii) variance reports comparing the actual cash receipts and cash disbursements for the preceding calendar week to the projected cash receipts and cash disbursements provided for such week in the most recently delivered projections, together with actual cumulate cash receipts and disbursements to the Budget (the "<u>Variance Report</u>");

(b)    on the last Business Day of every calendar week when a Variance Report is due (unless waived by the Lender in writing in advance), the Borrowers (including key management) shall host a weekly conference call for the Lender during which time the Borrowers will review the financial performance of the previous week and the Borrowers' financial condition;

(c)    promptly after the receipt thereof by the Borrowers, copies of any reports (including any so-called management letters) submitted to the Borrowers by independent public accountants in connection with any annual or interim review of the accounts of the Borrowers made by such accountants;

(d)    Accounts Receivable aging and other information in reasonable detail regarding the Accounts as the Lender may reasonably request; and

(e)    from time to time, such other data and information about the Borrowers as the Lender may reasonably request.

5.2.    <u>Conduct of Business</u>. Each Borrower will:

(a)    duly observe and comply in all material respects with all material contracts and with all laws, regulations, decrees, orders, judgments and valid requirements of any governmental authorities applicable to its corporate existence, rights and franchises, to the conduct of its business and to its property and assets (including without limitation all Environmental Laws), and shall maintain and keep in full force and effect and comply in all material respects with all licenses and permits necessary to the proper conduct of its business; and

(b)    maintain its lawful existence.

5.3.    <u>Maintenance and Insurance</u>.

(a)    Each Borrower shall maintain all of its assets and properties in good repair, working order and condition as required for the normal conduct of their business, subject to wear and tear, maintenance, repair and replacement, in the ordinary course of business.

(b)    Each Borrower shall at all times maintain liability and casualty insurance on its properties (including all Collateral) with financially sound and reputable insurers in such amounts and with such coverages, endorsements, deductibles and expiration dates as the officers of the Borrowers in the exercise of their reasonable judgment deem to be adequate, and as is reasonably satisfactory to the Lender. The Lender will be named as loss payee, additional insured and/or mortgagee under such insurance as the Lender requires from time to time, and the Borrowers shall provide to the Lender lender's loss payable endorsements in form and substance reasonably satisfactory to the Lender. In addition, the Lender must be given 30 days' advance notice of any cancellation of insurance. In the event of failure to provide and maintain insurance as herein provided, the Lender may, at its option and after notice to the Borrowers (to the extent practical in the circumstances), provide such insurance and charge the amount thereof to the Borrowers as additional proceeds under the Loan, which will be included in the Total Loan Amount. The Borrowers shall furnish to the Lender certificates or other evidence satisfactory to the Lender of

compliance with the foregoing insurance provisions. The Lender will not, by the fact of approving, disapproving or accepting any such insurance, incur any liability for the form or legal sufficiency of insurance contracts, solvency of insurance companies or payment of lawsuits, and the Borrowers hereby expressly assume full responsibility therefor and liability, if any, thereunder. In the event of any insured loss with respect to any Collateral, the insurance proceeds will be applied to the repair, restoration or replacement of the affected Collateral, with any excess proceeds to be applied to the payment of the Obligations.

5.4.    Taxes. The Borrowers shall pay or cause to be paid all taxes, assessments or governmental charges on or against them or their properties on or prior to the time when they become due, except for any tax, assessment or charge that is owing before the filing of the Chapter 11 Cases or is being contested in good faith by appropriate proceedings and with respect to which adequate reserves have been established and are being maintained in accordance with GAAP if no Lien is filed to secure such tax, assessment or charge.

5.5.    Inspection. The Borrowers will permit the Lender and its designees, at any reasonable time and at reasonable intervals of time, and upon reasonable notice (or if a Default has occurred and is continuing, at any time and without prior notice), to: (i) visit and inspect the properties of the Borrowers; (ii) examine and make copies of and take abstracts from the books and records of the Borrowers; and (iii) discuss the affairs, finances and accounts of the Borrowers with their appropriate officers, employees and independent accountants. Without limiting the generality of the foregoing, the Borrowers will permit periodic reviews (as determined by the Lender) of the books and records of the Borrowers to be carried out at the Borrowers' expense by the Lender or its authorized agents. The Borrowers shall also permit the Lender to arrange for verification of Collateral, under reasonable procedures, including directly with any third parties or by other methods.

5.6.    Maintenance of Books and Records. The Borrowers shall keep adequate books and records of account, in which true and complete entries will be made reflecting all of its business and financial transactions in accordance with GAAP and applicable law.

5.7.    Use of Proceeds.

   (a)    The Borrowers shall use the proceeds of Loan as set forth in Section 2.1(c); and

   (b)    Subject to entry of the Final DIP Order, the outstanding Bridge Loan Obligations will be converted (or rolled up) into the Loan such that, pending entry of the Final DIP Order, for each $1.00 drawn by the Borrowers under the Loan, $1 of the Bridge Loan Obligations shall roll up into the Loan and shall increase the amount of the Loan on a dollar-for-dollar basis.

5.8.    Further Assurances. At any time and from time to time the Borrower shall, and shall cause each of its Subsidiaries to, execute and deliver such further documents and take such further action as may reasonably be requested by the Lender to effect the purposes of the Loan Documents.

5.9.    Notification Requirements. The Borrower shall provide the Lender with written notice immediately upon the occurrence of any of the following events (other than in connection with the Chapter 11 Case), which written notice will state with reasonable particularity the facts and circumstances of the event for which such notice is being given:

   (a)    upon becoming aware of the existence of any condition or event that constitutes a Default or an Event of Default, which written notice thereof will specify the nature and duration thereof and the action being or proposed to be taken with respect thereto;

   (b)    upon becoming aware of any litigation or of any investigative proceedings by a governmental agency or authority commenced or threatened against the Borrowers of which they have notice, the

153257877.1

outcome of which is reasonably likely to have a Material Adverse Effect on the assets or business of the Borrowers, written notice thereof and the action being or proposed to be taken with respect thereto;

      (c)    upon becoming aware of any material event or occurrence that could have a Material Adverse Effect on the ability of the Borrowers to recover a monetary award in connection with such litigation; provided however, that the Borrower will not be required to make such disclosures to the extent that it results in a waiver of the attorney work product doctrine, the attorney-client confidential communication privilege or any similar doctrines or privileges that could adversely affect the Borrowers in connection with such litigation; and

      (d)    promptly after any occurrence or after becoming aware of any condition affecting the Borrowers which might have a Material Adverse Effect on the business, properties or condition of the Borrowers.

      5.10.   <u>Intentionally Omitted</u>.

      5.11.   <u>Environmental Compliance</u>.

      (a)    Each Borrower will comply in all material respects with all applicable Environmental Laws in all jurisdictions in which any of them operates now or in the future, and each Borrower will comply in all material respects with all such Environmental Laws that may in the future be applicable to the Borrower's business, properties and assets.

      (b)    If a Borrower (i) receives notice that any material violation of any Environmental Law may have been committed or is about to be committed by the Borrower, (ii) receives notice that any administrative or judicial complaint or order has been filed or is about to be filed against the Borrower alleging a material violation of any Environmental Law requiring the Borrower to take any action in connection with the release of Hazardous Materials into the environment, (iii) receives any notice from a federal, state or local government agency or private party alleging that the Borrower may be liable or responsible for any material amount of costs associated with a response to or cleanup of a release of Hazardous Materials into the environment or any damages caused thereby, (iv) becomes aware of any investigative proceedings by a governmental agency or authority commenced or threatened against the Borrower regarding any potential violation of Environmental Laws or any spill, release, discharge or disposal of any Hazardous Material, or (v) notifies any governmental agency or authority regarding any potential violation of Environmental Laws or any spill, release, discharge or disposal of any Hazardous Material by the Borrower, the Borrower shall promptly notify the Lender thereof (together with a copy of any such notice) and of any action being or proposed to be taken with respect thereto and thereafter shall continue to furnish to the Lender all further notices, demands, reports and other information regarding the foregoing.

      5.12.   <u>Loss or Destruction of Collateral</u>.  Each Borrower shall notify the Lender promptly of the occurrence at any time of the following events if the amount involved in connection with such events exceeds $100,000 in the aggregate: (i) any loss or depreciation in value of inventory resulting from events other than changes in the market price for such inventory and the amount of the loss or depreciation; or (ii) any impairment of value of the Accounts Receivable and Accounts that is reasonably likely to have a Material Adverse Effect.

      5.13.   <u>Pledge of Subsidiary Equity</u>.

      (a)    Not less than 30 days prior to any Person becoming a direct or indirect Subsidiary of either Borrower, organized under the laws of any political subdivision of the United States or any state thereof, of the Borrower, the Borrower shall notify the Lender thereof, and contemporaneously with any such Person becoming a Subsidiary, cause such Person to (i) become a Borrower by executing and delivering to the Lender a joinder agreement with respect to this Agreement, (ii) grant Liens upon all of its property to secure the Obligations by executing and delivering to the Lender a joinder to the Security Agreement, the Guaranty, and such other documents

153257877.1

as the Lender reasonably deems appropriate for such purpose, and (iii) deliver to the Lender documents of the types referred to in clauses (vi), (vii), (viii) and (ix) of <u>Section 3.1(a)</u>, all of the foregoing in form and substance reasonably satisfactory to the Lender.

(b)      The Borrower shall cause (i) one hundred percent (100%) of the issued and outstanding the capital stock or other equity interests of each direct and indirect Subsidiary thereof that is organized under the laws of any political subdivision of the United States or any state thereof, and (ii) sixty six percent (66%) of the issued and outstanding capital stock or other equity interests entitled to vote (within the meaning of Treas. Reg. Section 1.956-2(c)(2)) and one hundred percent (100%) of the issued and outstanding capital stock or other equity interests not entitled to vote (within the meaning of Treas. Reg. Section 1.956-2(c)(2)) in each other Subsidiary thereof, to be subject at all times to a first priority perfected Lien (subject only to Permitted Liens) in favor of the Lender, pursuant to the terms and conditions of the Security Documents; subject, however, to the right of each Subsidiary to adopt and implement stock option plans covering up to 10% of their capital stock or other equity.

5.14.    <u>Milestones</u>.

(a)      The Borrowers will use their commercial best efforts to undertake the Chapter 11 Case Milestones and promptly take the actions and perform such tasks as are contemplated thereunder or otherwise inferred therefrom.

(b)      In the event that the Borrowers do not timely achieve any of the Chapter 11 Case Milestones, the Borrowers will use their commercial best efforts to achieve the Chapter 11 Sale Milestones and will promptly take the actions contemplated thereunder or otherwise inferred therefrom.

5.15.    <u>Pleadings and Orders</u>.

(a)      The Borrowers shall deliver to the Lender copies of all pleadings, motions, applications, judicial or financial information, and other documents when filed by or on behalf of the Borrowers with the Bankruptcy Court or any court pleadings distributed to any official committee appointed in the Chapter 11 Cases; provided that any such pleadings that are (i) requests for relief under sections 363 or 365 of the Bankruptcy Code or (ii) directly related to the Loan Documents, bidding procedures, or any Plan of Reorganization, or any disclosure statement related thereto will be delivered in advance of the filing thereof to the extent reasonably practicable; and provided further that other than as stated in the previous proviso, the Borrowers will not be required to deliver any such pleading, motion, application, or judicial or financial information to the extent it is accessible to the Lender on the electronic docket maintained for the Chapter 11 Case; for clarify, this Section 5.16(a) does not require delivery of any sealed documents or unredacted versions of documents for which the Borrowers are seeking or intend to seek sealed treatment.

(b)      The Borrowers shall cause all proposed "first day" Orders, "second day" Orders, and all other Orders establishing procedures for administration of the Chapter 11 Case or approving significant transactions submitted to the Bankruptcy Court to be in accordance with and permitted by the terms of this Agreement and reasonably acceptable to the Lender in all respects.

(c)      The Borrowers will submit to the Lender the form of Orders for approval, which form and Order must be consistent with the terms of this Agreement in all respects and are reasonably acceptable to the Lender.

SECTION VI

NEGATIVE COVENANTS

The Borrowers covenant that so long as any Loan or other Obligation remains outstanding or the Lender has any obligation to make any Loan hereunder:

6.1.    Indebtedness. The Borrowers shall not create, incur, assume, guarantee or be or remain liable with respect to any Indebtedness other than Indebtedness existing on the filing date of the Chapter 11 Cases and the following:

(a)    Obligations;

(b)    Indebtedness existing as of the date of this Agreement and renewals and refinancings thereof, but not any increase in the principal amounts thereof;

(c)    Indebtedness for taxes, assessments or governmental charges to the extent that payment therefor at the time is not required to be made in accordance with Section 5.4;

(d)    current trade payables, liabilities, wages, salaries and other ordinary course obligations, including but not limited to purchases on open account for the purchase price of services, materials and supplies incurred by the Borrowers in the ordinary course of business (not as a result of borrowing), so long as all of such open account Indebtedness will be promptly paid and discharged when due or in conformity with customary trade terms and practices or when permitted by the Bankruptcy Court, except for any such open account Indebtedness which is being contested in good faith by the Borrowers, as to which adequate reserves required by GAAP have been established and are being maintained and as to which no Lien has been placed on any property of the Borrowers;

(e)    Indebtedness for Capital Expenditures and renewals and refinancings thereof, all as reasonably approved by the manager of secretary of the applicable Borrower; and

(f)    Guarantees permitted under Section 6.2.

6.2.    Contingent Liabilities.  Neither Borrower shall create, incur, assume, guarantee or be or remain liable with respect to any Guarantees other than (i) Guarantees existing on the date of this Agreement, (ii) Guarantees resulting from surety bonds or the endorsement of negotiable instruments for deposit or collection in the ordinary course of business.

6.3.    Liens.  Neither Borrower shall create, incur, assume or suffer to exist any Lien of any kind upon or with respect to any of their property or assets, or assign or otherwise convey any right to receive income, with or without recourse, except the following ("Permitted Liens"):

(a)    Liens in favor of the Lender to secure Obligations;

(b)    Liens existing as of the date of this Agreement or related to the Borrowers' surety bonds;

(c)    Liens securing Indebtedness for Capital Expenditures to the extent such Indebtedness is permitted by Section 6.1(e), provided that (i) each such Lien is given solely to secure the purchase price of the property acquired, does not extend to any other property and is given at the time of acquisition of the property, and (ii) the Indebtedness secured thereby does not exceed the lesser of the cost of such property or its fair market value at the time of acquisition;

153257877.1

(d)    liens for taxes, fees, assessments and other governmental charges to the extent that payment of the same may be postponed or is not required in accordance with the provisions of Section 5.4;

(e)    (i) landlords' and lessors' liens in respect of rent not in default (or being contested in good faith by appropriate proceedings diligently pursued) or liens in respect of pledges or deposits under workmen's compensation, unemployment insurance, social security laws, or similar legislation or in connection with appeal and similar bonds incidental to litigation; (ii) mechanics', warehouseman's, laborers' and materialmen's and similar liens, if the obligations secured by such liens are not then delinquent; (iii) liens securing the performance of bids, tenders, contracts (other than for the payment of money); (iv) and liens securing statutory obligations or surety, indemnity, performance, or other similar bonds incidental to the conduct of the Borrower's or any of its Subsidiaries' businesses in the ordinary course and that do not in the aggregate materially detract from the value of its property or materially impair the use thereof in the operation of its business;

(f)    judgment liens securing judgments that (i) are not fully covered by insurance, and (ii) will not have been in existence for a period longer than 10 days after the creation thereof or, if a stay of execution has been obtained, for a period longer than 10 days after the expiration of such stay;

(g)    rights of lessors under capital leases to the extent such capital leases are permitted hereunder;

(h)    easements, rights of way, restrictions and other similar charges or Liens relating to real property and not interfering in a material way with the ordinary conduct of the Borrower's business or that of any of its Subsidiaries; and

(i)    liens constituting a renewal, extension or replacement of any Permitted Lien.

6.4.    Merger; Sale or Lease of Assets; Liquidation; Settlement of Litigation.  Except pursuant to the Plan or the Bid Procedures Order, neither Borrower shall merge or consolidate into or with any other Person or liquidate or dissolve (other than any of the foregoing under which the Borrower is the surviving entity).  Except pursuant to the Plan or the Bid Procedures Order, neither Borrower shall sell, lease or otherwise dispose of any assets or properties, other than sale or disposal of inventory and obsolete or worn out equipment, in each case in the ordinary course of business and consistent with past practices.

6.5.    Subsidiaries.  Neither Borrower shall form any Subsidiaries on or after the Closing Date without complying with this Agreement.

6.6.    Restricted Payments.  Neither Borrower will pay, make, declare or authorize any Restricted Payment other than:

(a)    compensation paid to employees, officers and directors in the ordinary course of business and consistent with prudent business practices and travel and similar advances made in the ordinary course of business; and

(b)    dividends payable solely in membership interests.

6.7.    Investments; Purchases of Assets.  Neither Borrower shall make or maintain any Investments or purchase or otherwise acquire any material amount of assets other than:

(a)    Acquisitions and Capital Expenditures to the extent permitted by Section 6.1;

(b)      purchases of inventory in the ordinary course of business;

(c)      normal trade credit extended in the ordinary course of business and consistent with prudent business practice; and

(d)      advances to employees for business related expenses to be incurred in the ordinary course of business and consistent with past practices, provided that advances to any single employee may not exceed $15,000 in the aggregate.

6.8.    <u>Transactions with Affiliates</u>.  Neither Borrower will, directly or indirectly, enter into any purchase, sale, lease or other transaction with any Affiliate, except (i) transactions in the ordinary course of business on terms that are no less favorable to the Borrower than those which might be obtained at the time in a comparable arm's-length transaction with any Person who is not an Affiliate, and (ii) employment contracts with senior management of the Borrower entered into in the ordinary course of business and consistent with prudent business practices. Notwithstanding the foregoing, neither Borrower will, directly or indirectly, pay any management, consulting, overhead, indemnity, guarantee or other similar fee or charge to any Affiliate.

6.9.    <u>Anti-Terrorism</u>.  Neither Borrower will conduct, deal in or engage in or permit any Affiliate or Lender of such Borrower within its control to conduct, deal in or engage in any of the following activities: (i) conduct any business or engage in any transaction or dealing with any person blocked pursuant to Executive Order No. 13224 ("<u>Blocked Person</u>"), including the making or receiving any contribution of funds, goods or services to or for the benefit of any Blocked Person; (ii) deal in, or otherwise engage in any transaction relating to, any property or interests in property blocked pursuant to Executive Order No. 13224; or (iii) engage in on conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in Executive Order No. 13224 or the USA Patriot Act, Pub. Law 107-56.  The Borrowers shall deliver to the Lender any certification or other evidence requested from time to time by the Lender, in its sole, confirming the Borrowers' compliance with this Section 6.10.

6.10.   <u>Chapter 11 Claims</u>.

(a)      Except for the Carve-Out Expenses, the Borrowers will not incur, create, assume, suffer to exist or permit any other superpriority administrative claim which is *pari passu* with or senior to the claims of the Lender against the Borrowers in the Chapter 11 Case or in any other case; and

(b)      Unless the Lender has provided its prior written consent or all Obligations have been indefeasibly paid in full in cash to the Lender or its successors or assigns, the Borrowers may not seek, support or pursue any of the following relief:

(i)      the obtaining of credit or the incurring of Indebtedness that is secured by any security, mortgage, or collateral interest or other Lien on all or any portion of the Collateral and/or entitled to priority administrative status which is *pari passu* with or senior to those granted to the Lender, other than the Carve-Out Expenses; or

(ii)     the enforcement of any claimed junior security, mortgage, collateral interest or other junior Lien of any Person on all or any portion of the Collateral.

SECTION VII

<u>DEFAULTS</u>

7.1.    <u>Events of Default</u>.  There will be an Event of Default hereunder if any of the following events occurs:

(a)    Either Borrower fails to pay any principal of any Loan when due, or any interest, fees or other amounts owing under any Loan Document or in respect of any Obligation when the same becomes due and payable, whether at maturity or at any accelerated date of maturity or at any other date fixed for payment, and such failure with respect to any interest, fees or other amounts is not cured within five (5) days after notice of such default is provided by the Lender to the Borrowers;

(b)    Either Borrower fails to perform or comply with any term, covenant or agreement applicable to it and such failure is not cured within 20 days after Lender provides written notice of such failure to Borrowers or such non-performance; or

(c)    Either Borrower fails to perform or comply with any term, covenant or agreement applicable to them (other than as specified in <u>Section 8.1(a)</u> or <u>Section 8.1(b)</u> or in any other Loan Document) and such default continues for 20 days after notice of such default is provided by the Lender to the Borrowers; or any representation or warranty of the Borrowers made in this Agreement (including, without limitation, pursuant to <u>Section 4.1</u>) or any in other Loan Document or in any certificate, notice or other writing delivered hereunder or thereunder, proves to have been false in any material respect upon the date when made or deemed to have been made; or

(d)    there is a cessation of a substantial part of the business of either Borrower for a period which has a Materially Adverse effect on the Borrower's capacity to continue its business on a profitable basis, or the Borrower suffers the loss or revocation of any material license or permit now held or hereafter acquired which is necessary to the continued or lawful operation of its business, or the Borrower will be enjoined, restrained or in any other way prevented by a court, governmental or administrative order from conducting all or any material part of its business; or

(e)    other than in connection with the Chapter 11 Cases, a judgment or order for the payment of money is entered against either Borrower by any court, or a warrant of attachment or execution or similar process is issued or levied against property of either Borrower, that in the aggregate exceeds $100,000 in value, the payment of which is not fully covered by insurance in excess of any deductibles not exceeding $100,000 in the aggregate, and such judgment, order, warrant or process continues undischarged or unstayed for 30 days; or

(f)    any of the Loan Documents are canceled, terminated, revoked or rescinded other than in accordance with the express terms thereof or with the express prior written agreement, consent or approval of the Lender, or any action at law or in equity or other legal proceeding to cancel, revoke or rescind any Loan Document is commenced by or on behalf of either Borrower, or any court or other governmental or regulatory authority or agency of competent jurisdiction makes a determination that, or issues a judgment, order, decree or ruling to the effect that, any one or more of the Loan Documents is illegal, invalid or unenforceable in accordance with the terms thereof, or any Lien in favor of the Lender created under any of the Loan Documents at any time (other than by reason of the Lender relinquishing such Lien) ceases in any material respect to constitute a valid and, to the extent applicable, perfected Lien on any material portion of the Collateral; or

(g)    any Change in Control;

(h)    the occurrence of any event or occurrence which has a Material Adverse Effect;

(i)    the occurrence of any of the following in any Chapter 11 Cases:

(i)    the bringing of a motion by either Borrower, the execution of a written agreement by a Borrower, or the filing of any Plan of Reorganization or disclosure statement attendant thereto by a Borrower in any Chapter 11 Case: (A) to obtain additional financing under Section 364(c) or (d) of the Bankruptcy Code not otherwise permitted pursuant to this Agreement; (B) to grant any Lien other than Permitted Liens upon or affecting any Collateral; or (C) except as provided in the Final DIP Order, to use any Cash Collateral under Section 363(c) of the Bankruptcy Code without the prior written consent of the Lender; or

(ii)    the filing of any Plan of Reorganization or disclosure statement attendant thereto, or any direct or indirect amendment to such plan or disclosure statement, by either Borrower that provides that all Obligations are not indefeasibly paid in full in cash on or before the Maturity Date, or provides for the assumption, on terms and conditions not acceptable to the Lender of the Obligations and the Loan Documents by the successor-in-interest, if any, to such Borrower under such Plan of Reorganization; or the liens, rights and remedies granted to the Lender pursuant to or in connection with the Loan Documents and the Final DIP Order are modified, altered or impaired in any manner, or the entry of any Order terminating such Borrower's exclusive rights to file a Plan of Reorganization; or

(iii)    the entry of an Order in the Chapter 11 Cases confirming a plan or plans of reorganization that does not contain a provision for termination of the Commitment of the Lender to make Loan hereunder and the indefeasible repayment in full in cash of all of the Obligations under this Agreement on or before the effective date of such plan or plans, or a provision for the unconditional assumption, on terms and conditions acceptable to the Lender in its reasonable discretion, of all of the rights, benefits, obligations or duties of the Borrowers hereunder and under each other Loan Document, unless otherwise agreed to by the Lender; or

(iv)    the entry of an Order amending, supplementing, staying, vacating or otherwise modifying the Loan Documents or the Final DIP Order without the written consent of the Lender or the filing of a motion or other pleading seeking any of the foregoing or a motion for reconsideration with respect to the Final DIP Order; or

(v)    the Final DIP Order is not entered within thirty (30) calendar days of the Petition Date; or

(vi)    subject to entry of the Final DIP Order, the allowance of any claim or claims under Section 506(c) of the Bankruptcy Code or otherwise against the Lender or any of the Collateral, other than the Carve-Out Expenses; or

(vii)    the appointment of a permanent trustee in any Chapter 11 Case or the appointment of a receiver or an examiner in any Chapter 11 Case with expanded powers to operate or manage the financial affairs, the business, or reorganization of any Borrower; or the sale without the Lender's consent (which consent will not be unreasonably withheld), of all or substantially all of such Borrower's assets either through a sale under Section 363 of the Bankruptcy Code, through a confirmed Plan of Reorganization in the Chapter 11 Case, or otherwise that does not provide for indefeasible payment in full in cash of the Obligations and termination of the Lender's commitment to make Loan; or

(viii)    the entry of an Order by the Bankruptcy Court granting relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code (A) to allow any creditor (other than the Lender or its successors and assigns) to execute upon or enforce a Lien on any Collateral or (B) with respect to any Lien of or the granting of any Lien on any Collateral to any state or local environmental or regulatory

153257877.1

agency or authority, which in either case could have a Material Adverse Effect; or

(ix)    the conversion of the Chapter 11 Cases to a liquidation proceeding under Chapter 7 of the Bankruptcy Code; or

(x)    Other than in connection with the Chapter 11 Cases, the commencement of a suit, action or any other proceeding against the Lender and, as to any suit or action brought by any Person other than the Borrowers, the continuation thereof without dismissal for 30 days after service of process therefor on the Lender, that asserts or seeks by or on behalf of the Borrowers, any federal or state environmental protection or health and safety agency, any official committee in any Chapter 11 Case or any other party in interest in any of the Chapter 11 Case, a claim or any legal or equitable remedy that would be reasonably likely to (A) have the effect of subordinating any or all of the Obligations or Liens of the Lender under the Loan Documents to any other claim or (B) have a Material Adverse Effect on the rights and remedies of the Lender under any Loan Document or the collectability of all or any portion of the Obligations; or

(xi)    the entry of an Order in any Chapter 11 Case avoiding or excusing payment of any portion of the payments made on account of the Obligations owing under this Agreement or the other Loan Documents; or

(xii)    the failure of either Borrower to perform any of its obligations under the Final DIP Order or any other Order and failure to cure such default within five (5) business days after notice of such default is provided by the Lender to the Borrower; or

(xiii)    the entry of an Order in any of the Chapter 11 Case granting (A) any other super priority administrative claim other than as set forth in Section 2.9 or (B) Lien equal or superior to that granted to the Lender; or

(xiv)    the Borrowers propose any Plan of Reorganization that does not contemplate the repayment in full in cash of all Obligations, including attorneys' fees and costs of the Lender, on or prior to the Maturity Date or otherwise fails to meet the Chapter 11 Case Milestones or the Chapter 11 Sale Milestones; or

(xv)    the Borrower fails to maintain the Budget in excess of the permitted variances pursuant to Section 2.1(c).

7.2.    Remedies.  Upon the occurrence of an Event of Default, at any time thereafter while such Event of Default is continuing, all amounts of the Loan outstanding will bear interest at the Default Rate until paid in full and, at the option of the Lender and upon the Lender's declaration:

(a)    the obligation of the Lender to make any further Loan hereunder will terminate;

(b)    the unpaid principal amount of the Loan together with accrued interest, and all other Obligations, will become immediately due and payable without presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived; and

(c)    notwithstanding the provisions of section 362 of the Bankruptcy Code, but subject to the expiration of the Remedies Notice Period (as defined herein),  the DIP Lender, in its discretion, may declare (a) all DIP Obligations owing under the Loan Documents to be immediately due and payable, (b) the termination, reduction or restriction of any further commitment to extend credit to the Debtor to the extent any such commitment remains, (c) the termination of the DIP Financing and the Loan Documents as to any future liability or obligation of the DIP

Lender, but without affecting any of the DIP Liens or the DIP Obligations, (d) that the Carve-Out has been triggered through the delivery of written notice, (e) the termination, reduction or restriction on the ability of the Debtor to use Cash Collateral, and (f) the imposition of the default rate of interest set forth in the DIP Credit Agreement (any of the foregoing shall be referred to as a "Termination Declaration").  The Termination Declaration shall be given by electronic mail or facsimile (or other electronic means) to counsel for the Debtor, counsel for the official committee of unsecured creditors (if appointed) (the "Committee"), all affected secured creditors, and the U.S. Trustee and filed on docket of the Chapter 11 Case (and the earliest date any such Termination Declaration is made shall be referred to herein as the "Termination Declaration Date").  Any automatic stay otherwise applicable to the DIP Lender is hereby modified so that five (5) business days after the Termination Declaration Date (such five (5) business day period, the "Remedies Notice Period") the DIP Lender shall be entitled to immediately exercise its rights and remedies in accordance with the Loan Documents and/or the Interim DIP Order, as the case may be, and shall be permitted to satisfy the DIP Obligations, the DIP Superpriority Claim and the DIP Liens in each case subject to the Carve-Out Expenses. During the Remedies Notice Period (A) the Borrowers may use Cash Collateral solely to pay payroll and other expenses critical to keep the business of the Borrowers operating in accordance with the Budget, and (B) the Borrowers shall be entitled to seek an emergency hearing before the Court, within the Remedies Notice Period, for the purpose of contesting whether a Termination Event has occurred and/or is not continuing. Unless the Court determines otherwise during the Remedies Notice Period, the automatic stay, as to the DIP Lender, shall automatically be terminated at the end of the Remedies Notice Period without further notice or order. Upon expiration of the Remedies Notice Period, the DIP Lender shall be permitted to exercise all remedies set forth herein and in the Loan Documents, and as otherwise available at law without further order of or application or motion to the Court.

No remedy conferred upon the Lender in the Loan Documents is intended to be exclusive of any other remedy, and each and every remedy is cumulative and in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute or by any other provision of law.  Without limiting the generality of the foregoing or of any of the terms and provisions of any of the Security Documents, if and when the Lender exercises remedies under the Security Documents with respect to Collateral, the Lender shall enforce its rights against Collateral in which the Lender is the sole lienholder before enforcing its rights against its other Collateral.

SECTION VIII

GENERAL

8.1.    Notices.  Unless otherwise specified herein, all notices to any Party under this Agreement and the other Loan Documents, unless otherwise specified therein, must be in writing and will be deemed to have been given when delivered by hand, or when sent by electronic transmission, or on the first Business Day after delivery to any overnight delivery service, freight pre-paid, or 5 days after being sent by certified or registered mail, return receipt requested, postage pre-paid, and addressed to such Party at its address indicated below:

If to the Borrowers:

Rawhide Acquisition Holding LLC
143 Keddie Street
Fallon, Nevada 89406
Attn:  Marceau Schlumberger, Manager

153257877.1

with a copy to (which will not constitute notice):
Schwartz Law, PLLC
601 East Bridger Avenue
Las Vegas, Nevada 89101
Attn: Samuel A. Schwartz (saschwartz@nvfirm.com)


 If to the Lender:

1900 Saint James Place
Suite 125
Houston TX 77056
Attn:  Brent De Jong

with a copy to (which will not constitute notice):

Fox Rothschild LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
Attn: Brett A. Axelrod (baxelrod@foxrothschild.com)

or at any other address specified by such Party in writing from time to time at least 5 days' prior to the sending or transmission of the subject notice.

8.2.    Expenses.  Provided that the Closing occurs, the Borrowers hereby promise to reimburse the Lender on demand for all reasonable costs and expenses incurred or expended in connection with this Agreement and the other Loan Documents, including with the administration of this Agreement and the other Loan Documents after the Closing, or any amendment, modification, approval, consent or waiver hereof or thereof, and in connection with the enforcement of any Obligations, the exercise, preservation or enforcement of any rights, remedies or options of the Lender or the satisfaction of any Obligations, or in connection with any litigation, proceeding or dispute in any way related to the credit hereunder, including, without limitation, reasonable fees and disbursements of outside legal counsel, accounting, consulting, or other similar professional fees or expenses, any fees, charges or expenses relating to any inspections or examinations conducted in connection with the Loan or any Collateral, and all costs and expenses relating to any attempt to inspect, verify, protect, preserve, restore, collect, sell, liquidate or otherwise dispose of or realize upon any Collateral after a Default or an Event of Default, but in no event exceeding $300,000 in the aggregate.  The amount of all such costs and expenses, until paid, will bear interest at the Interest Rate and will be an Obligation secured by the Collateral.  The Borrowers will pay any taxes (including any interest and penalties in respect thereof), other than the Lender's corporate franchise, federal and state income taxes, payable on or with respect to the transactions contemplated by the Loan Documents.

8.3.    Indemnification.  Provided that the Closing occurs, the Borrowers shall jointly and severally indemnify and hold harmless the Lender, as well as its members, managers, shareholders, directors, officers, lenders, attorneys, representatives, agents, employees, insurers, reinsurers, subsidiaries and affiliates, from and against all damages, losses, settlement payments, obligations, liabilities, claims, suits, penalties, assessments, citations, directives, demands, judgments, actions or causes of action, whether statutorily created or under the common law, all reasonable costs and expenses (including, without limitation, reasonable fees and disbursements of attorneys, advisors and consultants) and all other liabilities whatsoever (including, without limitation, liabilities under Environmental Laws) which are at any time or times be incurred, suffered, sustained or required to be paid by any such indemnified Person (except any of the foregoing which result from the gross negligence or willful misconduct of the indemnified Person), on account of or in relation to or any way in connection with any of the arrangements

153257877.1

or transactions contemplated by, associated with or ancillary to this Agreement, the other Loan Documents or any other documents executed or delivered in connection herewith or therewith, all as the same may be amended from time to time. In any investigation, proceeding or litigation, or the preparation therefor, the Lender may select its own counsel and, in addition to the foregoing indemnity, the Borrowers, jointly and severally, agree to pay promptly the reasonable fees and expenses of such counsel (except in the case of the gross negligence or willful misconduct of the indemnified Person). In the event of the commencement of any such proceeding or litigation, the Borrowers will be entitled to participate in such proceeding or litigation with counsel of their choice at their own expense, provided that such counsel will be reasonably satisfactory to the Lender. The covenants of this <u>Section 8.3</u> will survive payment or satisfaction of payment of all amounts owing with respect to the Loan, the Note, any other Loan Document or any other Obligation.

8.4. <u>Survival; Joint and Several</u>. All covenants, agreements, representations and warranties made herein, in the other Loan Documents, and in any documents or other papers delivered by or on behalf of either Borrower pursuant hereto or thereto will be deemed to have been relied upon by the Lender, notwithstanding any investigation heretofore or hereafter made by any of them, and will survive the making by the Lender of the Loan as contemplated and the termination of the commitment of the Lender to make Loan hereunder, and will continue in full force and effect so long as any Obligation remains outstanding and unpaid or the Lender has any obligation to make the Loan. The provisions of <u>Section 8.2</u> and <u>Section 8.3</u> will continue in full force and effect after the payment in full of all Obligations. All statements contained in any certificate or other writing delivered by or on behalf of either Borrower pursuant hereto or the other Loan Documents or in connection with the transactions contemplated hereby constitute representations and warranties by both Borrowers hereunder.

8.5. <u>No Waivers</u>. No failure or delay by the Lender in exercising any right, power or privilege hereunder, under this Agreement or any other of the Loan Documents will operate as a waiver thereof; nor will any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege. No waiver will extend to or affect any Obligation not expressly waived or impair any right consequent thereon. No course of dealing or omission on the part of the Lender in exercising any right will operate as a waiver thereof or otherwise be prejudicial thereto. No notice to or demand upon either Borrower will entitle such Party to other or further notice or demand in similar or other circumstances. The rights and remedies this Agreement and the other Loan Documents are cumulative and not exclusive of any rights or remedies otherwise provided by agreement or law.

8.6. <u>Amendments</u>. Neither this Agreement nor the Note nor any other Loan Document nor any provision hereof or thereof may be amended, waived, discharged or terminated except by a written instrument signed by the Lender, and, in the case of any amendment, by each of the Lender and the Borrowers.

8.7. <u>Set-Off</u>. Regardless of the adequacy of any Collateral or other means of obtaining repayment of the Obligations, any deposits, balances or other sums credited by or due from the Lender to the Borrowers hereunder, and any property of either Borrower now or hereafter in the possession, custody, safekeeping or control of the Lender or in transit to the Lender may, at any time and from time to time, without notice to any other Party or compliance with any other condition precedent now or hereafter imposed by statute, rule of law, or otherwise (all of which are hereby expressly waived by the Borrowers) be set off, appropriated and applied by the Lender against any and all Obligations of any such Party in such manner as the Lender in its sole discretion may determine. ANY AND ALL RIGHTS TO REQUIRE THE LENDER TO EXERCISE ITS RIGHTS OR REMEDIES WITH RESPECT TO ANY OTHER COLLATERAL WHICH SECURES THE OBLIGATIONS, PRIOR TO EXERCISING ITS RIGHTS OF SETOFF WITH RESPECT TO SUCH DEPOSITS, BALANCES, OTHER SUMS AND PROPERTY OF ANY OF THE BORROWERS ARE HEREBY KNOWINGLY, VOLUNTARILY AND IRREVOCABLY WAIVED.

8.8. <u>Assignment; Participation</u>. This Agreement and the other Loan Documents are binding on and

inure to the benefit of each of the Parties and their respective successors and assigns, except as otherwise provided herein or therein.  The Lender may assign, transfer, hypothecate or otherwise convey all or a portion its rights, benefits, obligations or duties hereunder or under any of the other Loan Documents without the consent of the Borrowers, provided that the Lender provides written notice to the Borrowers of such assignment.  No Borrower may assign, transfer, hypothecate or otherwise convey its rights, benefits, obligations or duties, or otherwise delegate any duty, hereunder or under any of the other Loan Documents without the prior express written consent of the Lender, except that the Borrower may assign, transfer, hypothecate or otherwise convey its rights, benefits, obligations or duties hereunder or under any of the other Loan Documents pursuant to a Plan of Reorganization which is in form and substance acceptable to the Lender in its reasonable discretion and which provides for the unconditional assumption (on terms and conditions acceptable to the Lender in its reasonable discretion) of all of the rights, benefits, obligations or duties of the Borrower hereunder or under any of the other Loan Documents.  Any purported assignment, transfer, hypothecation or other conveyance by a Borrower without the prior express written consent of the Lender or otherwise in violation of this Agreement will be void.  The terms and provisions of this Agreement are for the purpose of defining the relative rights and obligations of each Borrower and the Lender with respect to the transactions contemplated hereby and no Person is or will be a third party beneficiary of any of the terms and provisions of this Agreement or any of the other Loan Documents.

8.9.    Binding Effect of Agreement.  This Agreement is binding upon and inures to the benefit of the Parties and their respective successors and assigns.

8.10.    Lost Note.  Upon receipt of an affidavit of an officer or equivalent agent of the Lender as to the loss, theft, destruction or mutilation of the Note or any of the Security Documents which is not a public record and, in the case of any such loss, theft, destruction or mutilation, upon cancellation of such Note or such Security Document, if available, the Borrowers will issue, in lieu thereof, a replacement Note or other Security Document in the same principal amount thereof and otherwise of like tenor.

8.11.    Captions; Counterparts.  The captions in this Agreement are for convenience of reference only and will not define or limit any term or provision hereof.

8.12.    Entire Agreement.  The Agreement, together with its preamble, recitals and Exhibits, which are fully incorporated herein, and the other Loan Documents, and any other documents executed in connection herewith or therewith as required hereunder or thereunder, express the entire understanding of the Parties with respect to the transactions contemplated hereby and supersede all prior and contemporaneous agreements of any kind with respect to the subject matter hereof.

8.13.    Waiver of Jury Trial.  EACH PARTY HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ITS RIGHT TO A JURY TRIAL WITH RESPECT TO ANY ACTION OR CLAIM ARISING OUT OF ANY DISPUTE IN CONNECTION WITH THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS, ANY RIGHTS OR OBLIGATIONS HEREUNDER OR THEREUNDER, THE PERFORMANCE OF SUCH RIGHTS AND OBLIGATIONS OR ANY COURSE OF CONDUCT, COURSE OF DEALINGS, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY, INCLUDING, WITHOUT LIMITATION, ANY COURSE OF CONDUCT, COURSE OF DEALINGS, STATEMENTS OR ACTIONS OF THE LENDER RELATING TO THE ADMINISTRATION OR ENFORCEMENT OF THE LOAN AND THE LOAN DOCUMENTS, AND AGREES THAT IT WILL NOT SEEK TO CONSOLIDATE ANY SUCH ACTION WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CAN NOT BE OR HAS NOT BEEN WAIVED.  EXCEPT AS PROHIBITED BY LAW, THE PARTIES HEREBY WAIVE ANY RIGHT IT MAY HAVE TO CLAIM OR RECOVER IN ANY LITIGATION REFERRED TO IN THE PRECEDING SENTENCE ANY SPECIAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES OR ANY DAMAGES OTHER THAN, OR IN ADDITION TO, ACTUAL DAMAGES.  EACH BORROWER (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF THE LENDER HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT THE LENDER WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE

THE FOREGOING WAIVERS, AND (B) ACKNOWLEDGES THAT THE LENDER HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS TO WHICH IT IS A PARTY BECAUSE OF, AMONG OTHER THINGS, EACH SUCH PARTY'S WAIVERS AND CERTIFICATIONS CONTAINED HEREIN.

8.14.    Governing Law; Jurisdiction; Venue.  THIS AGREEMENT AND EACH OF THE OTHER LOAN DOCUMENTS ARE CONTRACTS UNDER THE LAWS OF THE STATE OF NEVADA AND WILL FOR ALL PURPOSES BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEVADA (EXCLUDING THE LAWS APPLICABLE TO CONFLICTS OR CHOICE OF LAW WHICH WOULD RESULT IN THE APPLICATION OF THE SUBSTANTIVE LAWS OF ANY OTHER JURISDICTION).  DURING THE PENDENCY OF THE CHAPTER 11 CASE, EACH BORROWER HEREBY CONSENTS AND AGREES THAT THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION TO HEAR AND DETERMINE ANY CLAIMS OR DISPUTES BETWEEN THE PARTIES, THE LENDER PERTAINING TO THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS, AND TO HEAR ANY MATTER ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS; PROVIDED THAT THE PARTIES ACKNOWLEDGE THAT ANY APPEALS FROM THE BANKRUPTCY COURT MAY HAVE TO BE HEARD BY A COURT OTHER THAN THE BANKRUPTCY COURT; AND PROVIDED FURTHER THAT NOTHING IN THIS AGREEMENT SHALL BE DEEMED OR OPERATE TO PRECLUDE THE LENDER FROM BRINGING SUIT OR TAKING OTHER LEGAL ACTION IN ANY OTHER JURISDICTION TO REALIZE ON THE COLLATERAL OR ANY OTHER SECURITY FOR THE OBLIGATIONS, OR TO ENFORCE A JUDGMENT OR OTHER COURT ORDER IN FAVOR OF THE LENDER.  EACH PARTY EXPRESSLY SUBMITS AND CONSENTS IN ADVANCE TO SUCH JURISDICTION IN ANY ACTION OR SUIT COMMENCED IN ANY SUCH COURT, AND EACH PARTY HEREBY WAIVES ANY OBJECTION THAT SUCH PARTY MAY HAVE BASED UPON LACK OF PERSONAL JURISDICTION, IMPROPER VENUE OR FORUM NON CONVENIENS AND HEREBY CONSENTS TO THE GRANTING OF SUCH LEGAL OR EQUITABLE RELIEF AS IS DEEMED APPROPRIATE BY SUCH COURT.  UPON THE CLOSURE OF THE CHAPTER 11 CASE, EACH PARTY CONSENTS TO THE JURISDICTION OF ANY OF THE FEDERAL OR STATE COURTS LOCATED IN THE CITY OF LAS VEGAS IN THE STATE OF NEVADA IN CONNECTION WITH ANY SUIT TO ENFORCE THE RIGHTS OF THE LENDER UNDER THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS, AND CONSENTS TO SERVICE OF PROCESS IN ANY SUCH SUIT BEING MADE UPON SUCH PARTY BY MAIL AT SUCH PARTY'S ADDRESS AS SET FORTH IN AND IN ACCORDANCE WITH SECTION 8.1.  EACH PARTY IRREVOCABLY WAIVES ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUCH ACTION BROUGHT IN THE COURTS REFERRED TO IN THIS SECTION 8.14 AND IRREVOCABLY WAIVES AND AGREES NOT TO PLEAD OR CLAIM IN ANY SUCH ACTION THAT SUCH ACTION HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

8.15.    Severability.  The provisions of this Agreement are severable and if any one term or provision hereof will be held invalid or unenforceable in whole or in part in any jurisdiction, then such invalidity or unenforceability will affect only such term or provision, or applicable part thereof, in such jurisdiction, and will not in any manner affect such term or provision in any other jurisdiction, or any other term or provision of this Agreement in any jurisdiction.

8.16.    Counterparts.  This Agreement may be executed in counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.  Counterparts may be delivered via facsimile, electronic mail or other transmission method, and may bear signatures affixed through .pdf or other software including without limitation any electronic signature platform complying with the U.S. federal ESIGN Act of 2000 (e.g., www.docusign.com); any counterpart so delivered will be deemed to have been duly and validly executed and delivered and will be valid and effective for all purposes.

153257877.1

*[Signature Pages Follows]*

IN WITNESS WHEREOF, the undersigned Borrowers have duly executed this Agreement under seal as of the Effective Date.

<u>BORROWERS</u>

Rawhide Acquisition Holding LLC

By: _____

Name: _____

Title: _____

Rawhide Mining, LLC

By: _____

Name: _____

Title: _____

152932129.1

153257877.1

Signature Page to Senior Secured Super-Priority Debtor-in-Possession (DIP) Loan Agreement

IN WITNESS WHEREOF, the undersigned Lender has duly executed this Agreement under seal as of the Effective Date.

DE JONG CAPITAL LLC

By: _____
Name:  Brent De Jong
Title:  _____

152932129.1

153257877.1

Signature Page to Senior Secured Super-Priority Debtor-in-Possession  (DIP) Loan Agreement

| TABLE OF EXHIBITS | |
|---|---|
| Exhibit A | (FORM OF) SENIOR SECURED SUPER-IN-PRIORITY PROMISSORY NOTE |
| Exhibit B | (FORM OF) SECURITY AGREEMENT |
| Exhibit C | (FORM OF) TRADEMARK SECURITY AGREEMENT |
| Exhibit D | (FORM OF) DEPOSIT ACCOUNT CONTROL AGREEMENT |
| Exhibit E | (FORM OF) NOTICE OF BORROWING |
| Exhibit F | BORROWERS' DISCLOSURE SCHEDULE |

152932129.1

153257877.1

*Exhibit A to Loan Agreement: Form of Promissory Note*

SENIOR SECURED SUPER-PRIORITY PROMISSORY NOTE

US$2,325,000                                                                                    [***]

FOR VALUE RECEIVED, the undersigned (collectively, the "Borrowers") absolutely and unconditionally, jointly and severally, promise to pay to the order of De Jong Capital LLC, a Delaware limited liability company (the "Payee"), by wire transfer of immediately available funds to the account designated by the Payee in a separate writing, the principal amount of US$2,325,000, or if less, the aggregate unpaid principal amount of Loan owing to the Payee pursuant to that certain Senior Secured Super-Priority Debtor-in-Possession Loan Agreement of even date herewith, as amended or supplemented from time to time (the "Loan Agreement"), by and between the Borrowers and the Payee; and PIK interest on the principal balance hereof from time to time outstanding from the Effective Date through and including the date on which such principal amount is paid in full, at the times and at the rates provided in the Loan Agreement.

This Senior Secured Super-Priority Promissory Note (this "Note") is evidence of borrowings under, is subject to the terms and conditions of and has been issued by the Borrower in accordance with the terms of, the Loan Agreement, and is the Note referred to therein.  The Payee, and any holder hereof, is entitled to the benefits and subject to the conditions of the Loan Agreement and may enforce the agreements of the Borrowers contained therein, and any holder hereof may exercise the respective remedies provided for thereby or otherwise available in respect thereof, all in accordance with the respective terms thereof.  This Note is secured by the Security Documents described in the Loan Agreement.

All capitalized terms used in this Note and not otherwise defined herein shall have the same meanings herein as in the Loan Agreement.

If any Event of Default shall occur, the entire unpaid principal amount of this Note and all of the unpaid interest accrued thereon may become or be declared due and payable in the manner and with the effect provided in the Loan Agreement.

The Borrowers hereby waive presentment, demand, notice, protest and all other demands and notice in connection with the delivery, acceptance, performance, default or enforcement of this Note, assent to any extension or postponement of the time of payment or any other indulgence, to any substitution, exchange or release of collateral and to the addition or release of any other party primarily or secondarily liable.

This Note shall be deemed to take effect as a sealed instrument under the laws of the State of Nevada and for all purposes shall be construed in accordance with such laws (without regard to conflicts of laws rules).

*[Signature Page Follows]*

153257877.1

*Exhibit A to Loan Agreement: Form of Promissory Note*

*[Signature Page to Note]*

IN WITNESS WHEREOF, the Borrowers have caused this Note to be signed by its duly authorized officer as of the day and year first above written.

BORROWERS:

Rawhide Acquisition Holding LLC

By: _____
Name: _____
Title: _____

Rawhide Mining, LLC

By: _____
Name: _____
Title: _____

153257877.1

*Exhibit B to Loan Agreement: Form of Security Agreement*

## SECURITY AGREEMENT

THIS SECURITY AGREEMENT dated as of [***] (the "Effective Date") (as amended, supplemented or otherwise modified from time to time in accordance with the provisions hereof, this "Agreement"), is made by and among, on the one hand, Rawhide Acquisition Holding LLC, a Delaware limited liability company, and Rawhide Mining, LLC, a Delaware limited liability company (collectively, the "Borrowers"), and, on the other hand and in favor of, De Jong Capital LLC, a Delaware limited liability company (the "Secured Party"). Capitalized terms used but not otherwise defined herein have the meanings assigned to such terms in that certain Senior Secured Super-Priority Debtor-in-Possession Loan Agreement of even date herewith by and between the Secured Party and the Borrowers (as amended, supplemented or otherwise modified from time to time, the "Loan Agreement"). The Borrowers and the Secured Party are sometimes hereinafter individually referred to as a "Party" and, collectively, as the "Parties".

R E C I T A L S

WHEREAS, as of the Effective Date, the Secured Party may make loans to the Borrowers in an aggregate unpaid principal amount not exceeding US$2,325,000 (the "Loans"), as evidenced by the Loan Agreement; and

WHEREAS, this Agreement is given by the Borrowers in favor of the Secured Party to secure the payment and performance of all of the Secured Obligations.

NOW, THEREFORE, in consideration of the mutual covenants, terms and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.    Definitions.

(a)    Unless otherwise specified herein, all references to Sections and Schedules herein are to Sections and Schedules of this Agreement.

(b)    Unless otherwise defined herein, terms used herein that are defined in the UCC have the meanings assigned to them in the UCC. However, if a term is defined in Article 9 of the UCC differently than in another Article of the UCC, the term has the meaning specified in Article 9.

(c)    For purposes of this Agreement, the following terms have the following meanings:

"Agreement" has the meaning set forth in the preamble to this Agreement and includes any valid amendments hereto.

"Borrowers" has the meaning set forth in the preamble to this Agreement.

"Collateral" has the meaning set forth in Section 2.

"Committee" has the meaning set forth in Section 11(a).

"Control" means (i) with respect to any Deposit Account, "control," within the meaning of Section 9-104 of the UCC, (ii) with respect to any securities account, security entitlement, commodity contract or commodity account, control within the meaning of Section 9-106 of the UCC, (iii) with respect to any uncertificated security, control within the meaning of Section 8-106(c) of the UCC, (iv) with respect to any certificated security, control within the meaning of

Section 8-106(a) or (b) of the UCC, (v) with respect to any electronic chattel paper, control within the meaning of Section 9-105 of the UCC, (vi) with respect to letter-of-credit rights, control within the meaning of Section 9-107 of the UCC, (vii) with respect to any "transferable record" (as that term is defined in Section 201 of the Federal Electronic Signatures in Global and National Commerce Act or in Section 16 of the Uniform Electronic Transactions Act as in effect in any relevant jurisdiction), control within the meaning of Section 201 of the Federal Electronic Signatures in Global and National Commerce Act or in Section 16 of the Uniform Electronic Transactions Act as in effect in the jurisdiction relevant to such transferable record, and (viii) with respect to Money, insofar as not otherwise covered under clauses (i) through (vii), the possession or legal right to possess and exercise exclusive control with respect to such Money by way of exercise of power of attorney, right to assignment, escrow agreement, irrevocable letter of direction, physical possession or other right or power granted to the Secured Party by the Borrowers.

"Deposit Account Control Agreement" means an agreement substantially in the form contemplated under the Loan Agreement or such other form satisfactory to the Secured Party which establishes the Secured Party's Control with respect to any Deposit Account.

"Deposit Accounts" means, collectively, with respect to each Borrower, (i) all "deposit accounts" as such term is defined in the UCC and all accounts and sub-accounts relating to any of the foregoing accounts, and (ii) all cash, funds, checks, notes and instruments from time to time on deposit in any of the accounts or sub-accounts described in clause (i) of this definition.

"Effective Date" has the meaning set forth in the preamble to this Agreement.

"Event of Default" has the meaning set forth in the Loan Agreement.

"Excluded Property" has the meaning set forth in Section 2(a).

"First Priority" means, with respect to any lien and security interest purported to be created in any Collateral pursuant to this Agreement, such lien and security interest is the most senior lien to which such Collateral is subject (subject only to liens permitted under the Loan Agreement).

"Loan Agreement" has the meaning set forth in the preamble to this Agreement.

"Loans" has the meaning set forth in the recitals to this Agreement.

"Money" means money, cash, cryptocurrency and currency of any other kind whatsoever and regardless where located at any time.

"Party" and "Parties" have the meanings set forth in the preamble to this Agreement.

"Perfection Certificate" has the meaning set forth in Section 5(a).

"Proceeds" means "proceeds" as such term is defined in the Loan Agreement.

"Secured Obligations" has the meaning set forth in Section 3.

"Remedies Notice Period" has the meaning set forth in Section 11(a).

"Secured Party" has the meaning set forth in the preamble to this Agreement.

"Securities Collateral" has the meaning set forth in Section 2(a).

"Stay Notice Period" has the meaning set forth in the Section 11(a).

"Termination Declaration" has the meaning set forth in Section 11(a).

"UCC" means the Uniform Commercial Code as in effect from time to time in the State of Nevada or, when the laws of any other state govern the method or manner of the perfection or enforcement of any security interest in any of the Collateral, the Uniform Commercial Code as in effect from time to time in such state.

2.    Grant of Security Interest. As collateral security for the payment and performance in full of all the Secured Obligations of the Borrowers, each Borrower hereby pledges and grants to the Secured Party, and hereby creates a continuing First Priority lien and security interest in favor of the Secured Party in and to all of its right, title and interest in and to the following, wherever located, whether now existing or hereafter from time to time arising or acquired (collectively, the "Collateral"):

(a)    all fixtures and personal property of every kind and nature including all accounts (including health-care-insurance receivables), goods (including inventory and equipment), documents (including, if applicable, electronic documents), instruments, promissory notes, chattel paper (whether tangible or electronic), letters of credit, letter-of-credit rights (whether or not the letter of credit is evidenced by a writing), securities and all other investment property (the "Securities Collateral"), commercial tort claims described on Schedule 1 (as supplemented by any written notification given by the Borrower to the Secured Party pursuant to Section 4(e)), general intangibles (including all payment intangibles), Money, Deposit Accounts, and any other contract rights or rights to the payment of money, and intellectual property rights; and

(b)    all Proceeds and products of each of the foregoing, all books and records relating to the foregoing, all supporting obligations related thereto, and all accessions of and to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, and any and all Proceeds of any insurance, indemnity, warranty or guaranty payable to the Borrower from time to time with respect to any of the foregoing; but in each case of (a) and (b) specifically excluding the "Excluded Property" as defined in the Loan Agreement.

3.    Secured Obligations. The Collateral secures the due and prompt payment and performance of:

(a)    the obligations of the Borrowers from time to time arising under the Loan Agreement, this Agreement or otherwise with respect to the due and prompt payment of (i) the principal of and premium, if any, and interest on the Loans, when and as due, whether at maturity, by acceleration, upon one or more dates set for prepayment or otherwise, and (ii) all other monetary obligations, of the Borrowers under or in respect of the Loan Agreement and this Agreement; and

(b)    all other covenants, duties, debts, obligations and liabilities of any kind of the Borrowers under or in respect of the Loan Agreement, this Agreement or any other document made, delivered or given in connection with any of the foregoing, including Obligations as described in the Loan Agreement (all such obligations, covenants, duties, debts, liabilities, sums and expenses set forth in Section 3 and Obligations as described in the Loan Agreement being herein collectively called the "Secured Obligations").

4.    Perfection of Security Interest and Further Assurances.

(a)    Each Borrower shall, from time to time, as may be required by the Secured Party with respect to all Collateral, promptly take all actions as may be requested by the Secured Party to perfect the security interest of the Secured Party in the Collateral, including, without limitation, with respect to

all Collateral over which control may be obtained within the meaning of sections 8-106, 9-104, 9-105, 9-106 and 9-107 of the UCC, section 201 of the federal Electronic Signatures in Global and National Commerce Act and, as the case may be, section 16 of the Uniform Electronic Transactions Act, as applicable, the Borrowers shall promptly take all actions as may be requested from time to time by the Secured Party so that control of such Collateral is obtained and at all times held by the Secured Party. All of the foregoing will be at the sole cost and expense of the Borrowers.

(b)    Each Borrower hereby irrevocably authorizes the Secured Party at any time and from time to time to file in any relevant jurisdiction any financing statements and amendments thereto that contain the information required by Article 9 of the UCC of each applicable jurisdiction for the filing of any financing statement or amendment relating to the Collateral, including any financing or continuation statements or other documents for the purpose of perfecting, confirming, continuing, enforcing or protecting the security interest granted by the Borrower hereunder, without the signature of the Borrower where permitted by law, including the filing of a financing statement describing the Collateral as all assets now owned or hereafter acquired by the Borrower, or words of similar effect. The Borrowers agree to provide all information required by the Secured Party pursuant to this Section promptly to the Secured Party upon request.

(c)    Each Borrower hereby further authorizes the Secured Party to file with the United States Patent and Trademark Office and the United States Copyright Office (and any successor office and any similar office in any state of the United States or in any other country) this Agreement and other documents for the purpose of perfecting, confirming, continuing, enforcing or protecting the security interest granted by the Borrower hereunder, without the signature of the Borrower where permitted by law.

(d)    If either Borrower shall at any time hold or acquire any certificated securities, promissory notes, tangible chattel paper, negotiable documents or warehouse receipts relating to the Collateral, such Borrower shall immediately endorse, assign and deliver the same to the Secured Party, accompanied by such instruments of transfer or assignment duly executed in blank as the Secured Party may from time to time specify.

(e)    If either Borrower shall at any time hold or acquire a commercial tort claim, the Borrower shall (i) promptly notify the Secured Party in a writing signed by the Borrower of the particulars thereof and grant to the Secured Party in such writing a security interest therein and in the Proceeds thereof, all upon the terms of this Agreement, with such writing to be in form and substance satisfactory to the Secured Party and (ii) deliver to the Secured Party an updated Schedule 1.

(f)    If any Collateral is at any time in the possession of a bailee, the Borrowers shall promptly notify the Secured Party thereof and, at the Secured Party's request and option, shall promptly obtain an acknowledgment from the bailee, in form and substance satisfactory to the Secured Party, that the bailee holds such Collateral for the benefit of the Secured Party and the bailee agrees to comply, without further consent of the Borrowers, at any time with instructions of the Secured Party as to such Collateral.

(g)    Each Borrower agrees that at any time and from time to time, at the expense of the Borrower, the Borrower will promptly execute and deliver all further instruments and documents, obtain such agreements from third parties, and take all further action, that may be necessary or desirable, or that the Secured Party may request, in order to create and/or maintain the validity, perfection or priority of and protect any security interest granted or purported to be granted hereby or to cause the Secured Party to have Control of the Collateral or to enable the Secured Party to exercise and enforce its rights and remedies hereunder or under any other agreement with respect to any Collateral including, without limitation, in respect of Money that is not subject to a Deposit Control Account Agreement at any time, wherever located or as held.

(h)    Each Borrower shall keep the Collateral in good order and repair and will not use the

same in violation of law or any policy of insurance thereon. Each Borrower shall permit the Secured Party, or its designee, to inspect the Collateral at any reasonable time, wherever located.

(i)     Each Borrower represents and warrants that all certificates, agreements or instruments representing or evidencing the Securities Collateral in existence on the Effective Date have been delivered to the Borrower in suitable form for transfer by delivery or accompanied by duly executed undated instruments of transfer or assignment in blank and that (assuming continuing possession by the Secured Party of any such Securities Collateral) the Secured Party has a perfected First Priority security interest therein. Each Borrower hereby agrees that all certificates, agreements or instruments representing or evidencing the Securities Collateral acquired by such Borrower after the date hereof, shall promptly upon receipt thereof by such Borrower be held by or on behalf of and delivered to the Secured Party in suitable form for transfer by delivery or accompanied by duly executed undated instruments of transfer or assignment in blank, all in form and substance satisfactory to the Secured Party. The Secured Party shall have the right, at any time upon the occurrence and during the continuance of any Event of Default, to endorse, assign or otherwise transfer to or to register in the name of the Secured Party or any of its nominees or endorse for negotiation any or all of the Securities Collateral, without any indication that such Securities Collateral is subject to the security interest hereunder; provided, that after any such Event of Default has been waived in accordance with the provisions of the Loan Agreement and to the extent the Secured Party has exercised its rights under this sentence, the Secured Party shall, promptly after the reasonable request of the applicable Borrower(s), cause such Securities Collateral to be transferred to, or request that such Securities Collateral is registered in the name of, the applicable Borrower(s) to the extent it or its nominees holds an interest in such Securities Collateral at such time.

(j)     Each Borrower represents and warrants that the Secured Party has a perfected First Priority security interest in all uncertificated Securities Collateral pledged by it hereunder that are in existence on the Effective Date. Each Borrower hereby agrees that if any of the Securities Collateral are at any time not evidenced by certificates of ownership, such Borrower will: (a) request the issuer thereof to either (i) register the Secured Party as the registered owner of such securities or (ii) agree in an authenticated record with such Borrower and the Secured Party that such issuer will comply with instructions with respect to such securities originated by the Secured Party without further consent of such Borrower, in form and substance satisfactory to the Secured Party; (b) upon request by the Secured Party, provide to the Secured Party an opinion of counsel, in form and substance satisfactory to the Secured Party, confirming such pledge and perfection thereof; and (c) if requested by the Secured Party, request the issuer of such Securities Collateral to cause such Securities Collateral to become certificated, and in the event such Securities Collateral become certificated, to deliver such Securities Collateral to the Secured Party.

(k)     As of the Effective Date, no Borrower has opened or maintains any Deposit Accounts other than the accounts listed in Schedule 1 and (ii) the Secured Party has a perfected First Priority security interest in each Deposit Account listed therein which security interest is perfected by Control. No Borrower shall hereafter establish and maintain any Deposit Account unless (A) the applicable Borrower has given the Secured Party at least 20 Business Days' prior written notice of its intention to establish such new Deposit Account with a depository bank, (B) the depository bank must be acceptable to the Secured Party and (C) unless the Secured Party agrees in writing that it is not required, such depository bank and such Borrower must have duly executed and delivered to the Secured Party a Deposit Account Control Agreement with respect to such Deposit Account.

5.     <u>Representations and Warranties</u>. Each Borrower represents and warrants as follows:

(a)     It has previously delivered to the Secured Party a certificate signed by the Borrower and entitled "Perfection Certificate" ("<u>Perfection Certificate</u>"), and that: (i) the Borrower's exact legal name is that indicated on the Perfection Certificate and on the signature page hereof; (ii) the Borrower is an organization of the type, and is organized in the jurisdiction, set forth in the Perfection Certificate; (iii) the Perfection Certificate accurately sets forth the Borrower's organizational identification number (or

accurately states that the Borrower has none), the Borrower's place of business (or, if more than one, its chief executive office), and its mailing address; (iv) all other information set forth on the Perfection Certificate relating to the Borrower is accurate and complete; and (v) there has been no change in any such information since the date on which the Perfection Certificate was signed by the Borrower.

(b)     All information set forth on the Perfection Certificate relating to the Collateral is accurate and complete and there has been no change in any such information since the date on which the Perfection Certificate was signed by the Borrower.

(c)     The Collateral consisting of securities have been duly authorized and validly issued, and are fully paid and non-assessable and subject to no options to purchase or similar rights. The Borrower holds no commercial tort claims except as set forth in the Disclosure Schedule to the Loan Agreement. None of the Collateral constitutes, or is the Proceeds of, (i) farm products, (ii) as-extracted collateral, (iii) manufactured homes, (iv) health-care-insurance receivables, (v) timber to be cut, (vi) aircraft, aircraft engines, satellites, ships or railroad rolling stock. None of the account debtors or other persons obligated on any of the Collateral is a governmental authority covered by the Federal Assignment of Claims Act or like federal, state or local statute or rule in respect of such Collateral. The Borrower has at all times operated its business in compliance with all applicable provisions of the federal Fair Labor Standards Act, as amended, and with all applicable provisions of federal, state and local statutes and ordinances dealing with the control, shipment, storage or disposal of hazardous materials or substances.

(d)     At the time the Collateral becomes subject to the lien and security interest created by this Agreement, the Borrower will be the sole, direct, legal and beneficial owner thereof, free and clear of any lien, security interest, encumbrance, claim, option or right of others except for the security interest created by this Agreement and other liens permitted by the Loan Agreement.

(e)     The pledge of the Collateral pursuant to this Agreement creates a valid and perfected First Priority security interest in the Collateral, securing the payment and performance when due of the Secured Obligations.

(f)     It has full power, authority and legal right to borrow the Loans and pledge the Collateral pursuant to this Agreement.

(g)     Each of this Agreement and the Loan Agreement has been duly authorized, executed and delivered by the Borrower and constitutes a legal, valid and binding obligation of the Borrower enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally and subject to equitable principles (regardless of whether enforcement is sought in equity or at law).

(h)     No authorization, approval, or other action by, and no notice to or filing with, any governmental authority or regulatory body is required for the borrowing of the Loans and the pledge by the Borrower of the Collateral pursuant to this Agreement or for the execution and delivery of the Loan Agreement and this Agreement by the Borrower or the performance by the Borrower of its obligations thereunder.

(i)     The execution and delivery of the Loan Agreement and this Agreement by the Borrower and the performance by the Borrower of its obligations thereunder, will not violate any provision of any applicable law or regulation or any order, judgment, writ, award or decree of any court, arbitrator or governmental authority, domestic or foreign, applicable to the Borrower or any of its property, or the organizational or governing documents of the Borrower or any agreement or instrument to which the Borrower is party or by which it or its property is bound.

(j)     The Borrower has taken all action required on its part for control (as defined in sections 8-106, 9-104, 9-105, 9-106 and 9-107 of the UCC, section 201 of the federal Electronic Signatures in

152932129.1

153257877.1

Global and National Commerce Act and, as the case may be, section 16 of the Uniform Electronic Transactions Act, as applicable and, for clarity, as defined as "Control" in this Agreement) to have been obtained by the Secured Party over all Collateral with respect to which such control may be obtained pursuant to the UCC. The Borrower will take all necessary and further action required, and will cooperate in good faith including using its commercial best efforts, to ensure that the Secured Party has control or possession of all or any part of the Collateral, promptly following the Effective Date, including, without limitation, executing and delivering any further documents, instruments and assurances required under any Deposit Account Control Agreement.

6.    Voting, Distributions and Receivables.

        (a)    The Secured Party agrees that unless an Event of Default has occurred and be continuing, the Borrowers may, to the extent the Borrowers have such right as a holder of the Collateral consisting of securities, other Equity Interests or indebtedness owed by any obligor, vote and give consents, ratifications and waivers with respect thereto, except to the extent that, in the Secured Party's reasonable judgment, any such vote, consent, ratification or waiver could materially detract from the value thereof as Collateral or which could be inconsistent with or result in any violation of any provision of the Loan Agreement or this Agreement, and from time to time, upon request from the Borrowers, the Secured Party shall deliver to the Borrowers suitable proxies so that the Borrowers may cast such votes, consents, ratifications and waivers.

        (b)    The Secured Party agrees that the Borrowers may, unless an Event of Default shall have occurred and be continuing, receive and retain all cash dividends and other distributions with respect to the Collateral consisting of securities, other Equity Interests or indebtedness owed by any obligor.

        (c)    If any Event of Default has occurred and be continuing, the Secured Party may, or at the request and option of the Secured Party the Borrowers shall, notify account debtors and other persons obligated on any of the Collateral of the security interest of the Secured Party in any account, chattel paper, general intangible, instrument or other Collateral and that payment thereof is to be made directly to the Secured Party.

7.    Covenants. The Borrowers covenant as follows:

        (a)    Each Borrower will not, without providing at least 30 days' prior written notice to the Secured Party, change its legal name, identity, type of organization, jurisdiction of organization, corporate structure, location of its chief executive office or its principal place of business or its organizational identification number. Each Borrower will, prior to any change described in the preceding sentence, take all actions requested by the Secured Party to maintain the perfection and priority of the Secured Party's security interest in the Collateral.

        (b)    The Collateral, to the extent not delivered to the Secured Party pursuant to Section 4, will be kept at those locations listed on the Perfection Certificate and the Borrowers will not remove the Collateral from such locations without providing at least 30 days' prior written notice to the Secured Party. The Borrowers will, prior to any change described in the preceding sentence, take all actions required by the Secured Party to maintain the perfection and priority of the Secured Party's security interest in the Collateral.

        (c)    The Borrowers will, at their own cost and expense, defend title to the Collateral and the First Priority lien and security interest of the Secured Party therein against the claim of any person claiming against or through the Borrowers and shall maintain and preserve such perfected First Priority security interest for so long as this Agreement will remain in effect.

        (d)    The Borrowers will not sell, offer to sell, dispose of, convey, assign or otherwise transfer, grant any option with respect to, restrict, or grant, create, permit or suffer to exist any mortgage,

pledge, lien, security interest, option, right of first offer, encumbrance or other restriction or limitation of any nature whatsoever on, any of the Collateral or any interest therein, except as set forth in the Disclosure Schedules (as defined in the Loan Agreement).

(e)    The Borrowers will keep the Collateral in good order and repair and will not use the same in violation of law or any policy of insurance thereon. The Borrowers will permit the Secured Party, or its designee, to inspect the Collateral at any reasonable time, wherever located.

(f)    The Borrowers will pay promptly when due all taxes, assessments, governmental charges, and levies upon the Collateral or incurred in connection with the use or operation of the Collateral, or incurred in connection with this Agreement, except as set forth in the Disclosure Schedules (as defined in the Loan Agreement).

(g)    The Borrowers will continue to operate their business in compliance with all applicable provisions of the federal Fair Labor Standards Act, as amended, and with all applicable provisions of federal, state and local statutes and ordinances dealing with the control, shipment, storage or disposal of hazardous materials or substances.

8.    <u>Secured Party Appointed Attorney-in-Fact</u>. Each Borrower hereby appoints the Secured Party the Borrower's attorney-in-fact, with full authority in the place and stead of the Borrower and in the name of the Borrower or otherwise, from time to time during the continuance of an Event of Default in the Secured Party's discretion to take any action and to execute any instrument which the Secured Party may deem necessary or advisable to accomplish the purposes of this Agreement (but the Secured Party will have no control over the Chapter 11 cases, will not be obligated to and will have no liability to the Borrower or any third party for failure to do so or take action). This appointment, being coupled with an interest, is irrevocable. The Borrower hereby ratifies all that said attorneys lawfully do or cause to be done by virtue hereof.

9.    <u>Secured Party May Perform</u>. If either Borrower fails to perform any obligation contained in this Agreement, and subject to Bankruptcy Court authority, the Secured Party may itself perform, or cause performance of, such obligation, and the expenses of the Secured Party incurred in connection therewith is payable by the Borrowers; provided that the Secured Party shall not be required to perform or discharge any obligation of the Borrowers.

10.    <u>Reasonable Care</u>. The Secured Party has no duty with respect to the care and preservation of the Collateral beyond the exercise of reasonable care. The Secured Party will be deemed to have exercised reasonable care in the custody and preservation of the Collateral in its possession if the Collateral is accorded treatment substantially equal to that which the Secured Party accords its own property, it being understood that the Secured Party will not have any responsibility for (a) ascertaining or taking action with respect to any claims, the nature or sufficiency of any payment or performance by any party under or pursuant to any agreement relating to the Collateral or other matters relative to any Collateral, whether or not the Secured Party has or is deemed to have knowledge of such matters, or (b) taking any necessary steps to preserve rights against any parties with respect to any Collateral. Nothing set forth in this Agreement, nor the exercise by the Secured Party of any of the rights and remedies hereunder, will relieve the Borrowers from the performance of any obligation on the Borrowers' part to be performed or observed in respect of any of the Collateral.

11.    <u>Remedies Upon Default</u>.

(a)    Upon the occurrence and during the continuation of an Event of Default and notwithstanding the provisions of section 362 of the Bankruptcy Code, but subject to the expiration of the Remedies Notice Period (as defined herein), the Lender, in its discretion, may declare (a) all Obligations owing under the Loan Documents to be immediately due and payable, (b) the termination, reduction or restriction of any further commitment to extend credit to the Borrowers to the extent any such commitment remains, (c) the termination of the Loan Documents as to any future liability or obligation of the Lender, but without affecting any of the Liens or the Obligations, (d) that the Carve-

Out has been triggered through the delivery of written notice, (e) the termination, reduction or restriction on the ability of the Debtor to use Cash Collateral, and (f) the imposition of the default rate of interest set forth in the Loan Agreement (any of the foregoing shall be referred to as a "Termination Declaration"). The Termination Declaration shall be given by electronic mail or facsimile (or other electronic means) to counsel to the Borrowers, counsel for the official committee of unsecured creditors (if appointed) (the "Committee"), all affected secured creditors, and the U.S. Trustee and filed on docket of the Chapter 11 Case (and the earliest date any such Termination Declaration is made shall be referred to herein as the "Termination Declaration Date"). Any automatic stay otherwise applicable to the Lender is hereby modified so that five (5) business days after the Termination Declaration Date (such five (5) business day period, the "Remedies Notice Period") the Lender shall be entitled to immediately exercise its rights and remedies in accordance with the Loan Documents and/or the Interim DIP Order, as the case may be, and shall be permitted to satisfy the Obligations, the Superpriority Claim and the Liens in each case subject to the Carve-Out (as defined in paragraph 11 below). During the Remedies Notice Period (A) the Borrowers may use Cash Collateral solely to pay payroll and other expenses critical to keep the business of the Borrowers operating in accordance with the Budget and the Carve Out, and (B) the Borrowers shall be entitled to seek an emergency hearing before the Court, within the Remedies Notice Period, for the purpose of contesting whether a Termination Event has occurred and/or is not continuing. Unless the Court determines otherwise during the Remedies Notice Period, the automatic stay, as to the Lender, shall automatically be terminated at the end of the Remedies Notice Period without further notice or order. Upon expiration of the Remedies Notice Period, the Lender shall be permitted to exercise all remedies set forth herein and in the Loan Documents, and as otherwise available at law without further order of or application or motion to the Court.

(b)     If notice prior to disposition of the Collateral or any portion thereof is necessary under applicable law, written notice mailed to the Borrowers at their notice address as provided in Section 15 at least 10 days prior to the date of such disposition will constitute reasonable notice, but notice given in any other reasonable manner will be sufficient. So long as the sale of the Collateral is made in a commercially reasonable manner, the Secured Party may sell such Collateral on such terms and to such purchaser(s) as the Secured Party in its absolute discretion may choose, without assuming any credit risk and without any obligation to advertise or give notice of any kind other than that necessary under applicable law. Without precluding any other methods of sale, the sale of the Collateral or any portion thereof must be made in a commercially reasonable manner if conducted in conformity with reasonable commercial practices of creditors disposing of similar property. At any sale of the Collateral, if permitted by applicable law, the Secured Party may be the purchaser, licensee, assignee or recipient of the Collateral or any part thereof and is entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold, assigned or licensed at such sale, to use and apply any of the Secured Obligations as a credit on account of the purchase price of the Collateral or any part thereof payable at such sale.

(c)     To the extent permitted by applicable law, the Borrowers waive all claims, damages and demands they may acquire against the Secured Party arising out of the exercise by it of any rights hereunder. The Borrowers hereby waive and release to the fullest extent permitted by law any right or equity of redemption with respect to the Collateral, whether before or after sale hereunder; provided that the Lender shall enforce its rights against Collateral in which the Lender is the sole lienholder before enforcing its rights against its other Collateral. At any such sale, unless prohibited by applicable law, the Secured Party or any custodian may bid for and purchase all or any part of the Collateral so sold free from any such right or equity of redemption. Neither the Secured Party nor any custodian will be liable for failure to collect or realize upon any or all of the Collateral or for any delay in so doing, nor will it have any obligation to take any action whatsoever with regard thereto. The Borrower agrees that it would not be commercially unreasonable for the Secured Party to dispose of the Collateral or any portion thereof by utilizing internet sites that provide for the auction of assets of the type included in the Collateral or that have the reasonable capability of doing so, or that match buyers and sellers of assets. The Secured Party will not be obligated to clean-up or otherwise prepare the Collateral for sale.

(d)      If any Event of Default has occurred and be continuing, all rights of the Borrowers to (i) exercise the voting and other consensual rights they would otherwise be entitled to exercise pursuant to Section 6(a) and (ii) receive the dividends and other distributions which they would otherwise be entitled to receive and retain pursuant to Section 6(b), will immediately cease, and all such rights will thereupon become vested in the Secured Party, which will have the sole right to exercise such voting and other consensual rights and receive and hold such dividends and other distributions as Collateral.

(e)      If any Event of Default has occurred and be continuing, any cash held by the Secured Party as Collateral and all cash Proceeds received by the Secured Party in respect of any sale of, collection from, or other realization upon all or any part of the Collateral will be applied in whole or in part by the Secured Party to the payment of expenses incurred by the Secured Party in connection with the foregoing or incidental to the care or safekeeping of any of the Collateral or in any way relating to the Collateral or the rights of the Secured Party hereunder, including reasonable attorneys' fees, and the balance of such Proceeds will be applied or set off against all or any part of the Secured Obligations in such order as the Secured Party elects. Any surplus of such cash or cash Proceeds held by the Secured Party and remaining after payment in full of all the Secured Obligations will be paid over to the Borrowers or to whomsoever may be lawfully entitled to receive such surplus. The Borrowers will remain liable for any deficiency if such cash and the cash Proceeds of any sale or other realization of the Collateral are insufficient to pay the Secured Obligations and the fees and other charges of any attorneys employed by the Secured Party to collect such deficiency.

(f)      If the Secured Party shall determine to exercise its rights to sell all or any of the Collateral pursuant to this Section, the Borrowers agree that, upon request of the Secured Party, the Borrowers will, at their own expense, do or cause to be done all such acts and things as may be necessary to make such sale of the Collateral or any part thereof valid and binding and in compliance with applicable law.

12.      No Waiver and Cumulative Remedies. The Secured Party shall not by any act (except by a written instrument pursuant to Section 14), delay, indulgence, omission or otherwise be deemed to have waived any right or remedy hereunder or to have acquiesced in any Default or Event of Default. All rights and remedies herein provided are cumulative and are not exclusive of any rights or remedies provided by law.

13.      Security Interest Absolute. The Borrowers hereby waive demand, notice, protest, notice of acceptance of this Agreement, notice of loans made, credit extended, Collateral received or delivered or other action taken in reliance hereon and all other demands and notices of any description. All rights of the Secured Party and liens and security interests hereunder, and all Secured Obligations of the Borrowers hereunder, are absolute and unconditional irrespective of:

(a)      any illegality or lack of validity or enforceability of any Secured Obligation or any related agreement or instrument;

(b)      any change in the time, place or manner of payment of, or in any other term of, the Secured Obligations, or any rescission, waiver, amendment or other modification of the Loan Agreement, this Agreement or any other agreement, including any increase in the Secured Obligations resulting from any extension of additional credit or otherwise;

(c)      any taking, exchange, substitution, release, impairment or non-perfection of any Collateral or any other collateral, or any taking, release, impairment, amendment, waiver or other modification of any guaranty, for all or any of the Secured Obligations;

(d)      any manner of sale, disposition or application of Proceeds of any Collateral or any other collateral or other assets to all or part of the Secured Obligations;

(e)      any default, failure or delay, willful or otherwise, in the performance of the Secured

152932129.1

153257877.1

Obligations;

        (f)      any defense, set-off or counterclaim (other than a defense of payment or performance) that may at any time be available to, or be asserted by, the Borrowers against the Secured Party; or

        (g)      any other circumstance (including, without limitation, any statute of limitations) or manner of administering the Loans or any existence of or reliance on any representation by the Secured Party that might vary the risk of the Borrowers or otherwise operate as a defense available to, or a legal or equitable discharge of, the Borrowers or any other grantor, guarantor or surety.

     14.    <u>Amendments</u>. None of the terms or provisions of this Agreement may be amended, modified, supplemented, terminated or waived, and no consent to any departure by the Borrowers therefrom will be effective unless the same is in writing and signed by the Secured Party and the Borrowers, and then such amendment, modification, supplement, waiver or consent will be effective only in the specific instance and for the specific purpose for which made or given.

     15.    <u>Addresses For Notices</u>. All notices and other communications provided for in this Agreement must be in writing and given in the manner and become effective as set forth in the Loan Agreement, and addressed to the respective Parties at their addresses as specified on the signature pages hereof or as to either Party at such other address as is designated by such Party in a written notice to each other Party.

     16.    <u>Continuing Security Interest; Further Actions</u>. This Agreement creates a continuing First Priority lien and security interest in the Collateral and will (a) subject to Section 17, remain in full force and effect until payment and performance in full of the Secured Obligations, (b) be binding upon each Borrower, its successors and assigns, and (c) inure to the benefit of the Secured Party and its successors, transferees and assigns; provided that each Borrower may not assign or otherwise transfer any of its rights or obligations under this Agreement without the prior written consent of the Secured Party. Without limiting the generality of the foregoing clause (c), any assignee of the Secured Party's interest in any agreement or document which includes all or any of the Secured Obligations, upon assignment in accordance with the Loan Agreement, will become vested with all the benefits granted to the Secured Party herein with respect to such Secured Obligations.

     17.    <u>Termination; Release</u>. On the date on which all Secured Obligations have been paid and performed in full, the Secured Party will, at the request of the Borrowers, (a) duly assign, transfer and deliver to or at the direction of the Borrowers (without recourse and without any representation or warranty) such of the Collateral as may then remain in the possession of the Secured Party, together with any monies at the time held by the Secured Party hereunder, and (b) execute and deliver to the Borrowers a proper instrument or instruments acknowledging the satisfaction and termination of this Agreement.

     18.    <u>Governing Law; Jurisdiction; Venue; Waiver of Jury Trial</u>. This Agreement and any claim, controversy, dispute or cause of action (whether in contract or tort or otherwise) based upon, arising out of or relating to this Agreement (except, as to the Loan Agreement, as expressly set forth therein) and the transactions contemplated hereby and thereby is governed by, and construed in accordance with, the laws of the State of Nevada. The other provisions of Section 8.13 and Section 8.14 of the Loan Agreement are incorporated herein, *mutatis mutandis*, as if set forth herein.

     19.    <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which will be deemed an original, but all of which together constitute one and the same instrument. Counterparts may be delivered via facsimile, electronic mail or other transmission method, and may bear signatures affixed through .pdf or other software including without limitation any electronic signature platform complying with the U.S. federal ESIGN Act of 2000 (e.g., www.docusign.com); any counterpart so delivered will be deemed to have been duly and validly executed and delivered and will be valid and effective for all purposes.

*[Signature Pages Follow]*

152932129.1

153257877.1

*[Signature Page of Borrowers to Security Agreement]*

IN WITNESS WHEREOF, each Borrower has duly executed and delivered this Agreement in the State of Nevada as of the Effective Date.

<u>BORROWERS</u>

Rawhide Acquisition Holding LLC

By: _____

Name: _____

Title: _____

Rawhide Mining, LLC

By: _____

Name: _____

Title: _____

152932129.1

153257877.1

58

IN WITNESS WHEREOF, the undersigned Secured Party has duly executed this Agreement under seal as of the Effective Date.

DE JONG CAPITAL LLC

By: _____
Name:  Brent De Jong
Title:  _____

152932129.1

153257877.1

*Exhibit C to Loan Agreement: Form of Trademark Security Agreement*

<u>TRADEMARK SECURITY AGREEMENT</u>

THIS TRADEMARK SECURITY AGREEMENT (this "<u>Trademark Security Agreement</u>"), dated as of [***] (the "<u>Effective Date</u>"), is made by and between Rawhide Acquisition Holding LLC, a Delaware limited liability company, and Rawhide Mining, LLC, a Delaware limited liability company agreement (collectively, the "<u>Grantors</u>") and De Jong Capital, a Delaware limited liability company (the "<u>Secured Party</u>"), in favor of the Secured Party pursuant to and as required under that certain Senior Secured Super-Priority Debtor-in-Possession Loan Agreement of even date herewith (the "<u>Loan Agreement</u>") by and among the Lender and the Grantors as borrower. Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Loan Agreement.

R E C I T A L S

WHEREAS, the Grantors have entered into the Loan Agreement with the Lender;

WHEREAS, it is a condition precedent to the making of any advances of the Loan proceeds by the Lender from time to time under the Loan Agreement and that certain Security Agreement of even date herewith (the "<u>Security Agreement</u>") made pursuant thereto, that the Grantors have executed and delivered this Trademark Security Agreement in favor of the Secured Party.

WHEREAS, under the terms of the Security Agreement, the Grantors have granted to the Lender a security interest in, among other property, certain intellectual property of the Grantors, and have agreed to execute and deliver this Trademark Security Agreement for recording with governmental authorities, including, but not limited to, the United States Patent and Trademark Office.

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

1.    <u>Grant of Security</u>. Each Grantor hereby pledges and grants to the Lender a security interest in and to all of the right, title, and interest of such Grantor in, to, and under the following (the "<u>Trademark Collateral</u>"):

(a)    the trademark registrations and applications set forth in <u>Schedule 1</u> attached to this Agreement and made a part hereof, together with the goodwill connected with the use of and symbolized thereby, and all extensions and renewals thereof;

(b)    all rights of any kind whatsoever of such Grantor accruing under any of the foregoing provided by applicable law of any jurisdiction, by international treaties and conventions, and otherwise throughout the world;

(c)    any and all royalties, fees, income, payments, and other proceeds now or hereafter due or payable with respect to any and all of the foregoing; and

(d)    any and all claims and causes of action, with respect to any of the foregoing, whether occurring before, on, or after the date hereof, including all rights to and claims for damages, restitution, and injunctive and other legal and equitable relief for past, present, and future infringement, dilution, misappropriation, violation, misuse, breach, or default, with the right, but no obligation, to sue for such legal and equitable relief and to collect, or otherwise recover, any such damages.

2.    <u>Recordation</u>. Each Grantor authorizes the Commissioner for Trademarks and any other government officials to record and register this Trademark Security Agreement upon request by the Lender.

3.      Loan Documents. This Trademark Security Agreement has been entered into pursuant to and in conjunction with the Security Agreement, which is hereby incorporated by reference. The provisions of the Security Agreement will supersede and control over any conflicting or inconsistent provision herein. The rights and remedies of the Lender with respect to the Trademark Collateral are as provided by the Loan Agreement, the Security Agreement, and related documents, and nothing in this Trademark Security Agreement will be deemed to limit such rights and remedies.

4.      Successors and Assigns. This Trademark Security Agreement will be binding on and will inure to the benefit of the parties hereto and their respective permitted successors and assigns.

5.      Governing Law; Jurisdiction; Venue; Waiver of Jury Trial. This Agreement and any claim, controversy, dispute or cause of action (whether in contract or tort or otherwise) based upon, arising out of or relating to this Agreement (except, as to the Loan Agreement, as expressly set forth therein) and the transactions contemplated hereby and thereby will be governed by, and construed in accordance with, the laws of the State of Nevada. The other provisions of Section 8.13 and Section 8.14 of the Loan Agreement are incorporated herein, *mutatis mutandis*, as if set forth herein.

6.      Counterparts. This Agreement may be executed in counterparts, each of which will be deemed an original, but all of which together constitute one and the same instrument. Counterparts may be delivered via facsimile, electronic mail or other transmission method, and may bear signatures affixed through .pdf or other software including without limitation any electronic signature platform complying with the U.S. federal ESIGN Act of 2000 (e.g., www.docusign.com); any counterpart so delivered will be deemed to have been duly and validly executed and delivered and will be valid and effective for all purposes.

*[Signature Pages Follow]*

*[Signature Page to Trademark Security Agreement]*

IN WITNESS WHEREOF, each of the undersigned parties have duly executed and delivered this Agreement in the State of Nevada as of the Effective Date.

<u>GRANTORS</u>

Rawhide Acquisition Holding LLC

By: _____

Name: _____

Title: _____

Rawhide Mining, LLC

By: _____

Name: _____

Title: _____

<u>SECURED PARTY</u>

DE JONG CAPITAL, LLC

By: _____

Name: Brent DeJong

Title: _____

SCHEDULE 1

TRADEMARKS

Trademark Registrations

| Mark | Jurisdiction | Registration Number | Registration Date | Record Owner |
|------|-------------|--------------------|--------------------|-------------|
|  |  |  |  |  |
|  |  |  |  |  |

Trademark Applications

| Mark | Jurisdiction | ITU Status | Application Number | Filing Date | Record Owner |
|------|-------------|-----------|--------------------|-------------|-------------|
|  |  |  |  |  |  |
|  |  |  |  |  |  |

*Exhibit D to Loan Agreement: Form of Deposit Account Control Agreement*

## DEPOSIT ACCOUNT CONTROL AGREEMENT

THIS DEPOSIT ACCOUNT CONTROL AGREEMENT (as amended, amended and restated, supplemented or otherwise modified from time to time, this "Agreement"), dated as of [****] (the "Effective Date"), by and between Rawhide Acquisition Holding LLC, a Delaware limited liability company, and Rawhide Mining, LLC, a Delaware limited liability company agreement (collectively, the "Grantors") and De Jong Capital, a Delaware limited liability company (the "Secured Party") and [____] (the "Depository Bank"), is delivered pursuant to Section 4(k) of that certain Security Agreement (as amended, amended and restated, supplemented or otherwise modified from time to time, the "Security Agreement"), dated of even date herewith by and between Grantors and the Secured Party. This Agreement is entered into by the parties hereto for the purpose of perfecting the security interests of the Secured Party granted by the Grantors in the Deposit Accounts described below. All references herein to the "UCC" means the Uniform Commercial Code as in effect from time to time in the State of Nevada. Capitalized terms used but not defined herein have the meanings assigned to such terms in the Security Agreement.

1.    Definitions. For purposes of this Agreement, the following terms not otherwise defined herein have the following meanings:

(a)    "Account Expenses" has the meaning assigned to such term in Section 15.

(b)    "Deposit Account" has the meaning assigned to such term in Section 2(b).

(c)    "Notice of Sole Control" has the meaning assigned to such term in Section 10(a).

2.    Representations; Covenants. The Depository Bank hereby confirms and agrees that:

(a)    The Depository Bank is engaged in the business of banking and is a "bank" as such term is defined in UCC §9-102(a)(8).

(b)    The Depository Bank has established for the Grantors and maintains the deposit account(s) listed in Schedule 1 annexed hereto in the ordinary course of the Depository Bank's business (such account(s), together with each such other deposit account maintained by the Grantor with the Depository Bank collectively, the "Deposit Accounts" and each a "Deposit Account"). The Grantors are the Depository Bank's customers with respect to the Deposit Accounts.

(c)    Each Deposit Account is a "deposit account" as such term is defined in UCC §9-102(a)(29).

(d)    Each Deposit Account will be maintained in the manner set forth herein until termination of this Agreement.

(e)    This Agreement is the valid and legally binding obligation of the Depository Bank.

(f)    The Depository Bank has not entered into any currently effective agreement with any person relating to any Deposit Account and/or any of the funds credited thereto under which the Depository Bank may be obligated to comply with instructions originated by a person other than the Grantors or the Secured Party. Until the termination of this Agreement, the Depository Bank will not enter into any agreement with any person relating to any Deposit Account and/or any of the funds credited thereto under which the Depository Bank may be obligated to comply with instructions originated by a person other than the Grantors or the Secured Party.

3.    Control. The Depository Bank shall comply with instructions originated by the Secured Party in accordance with this Agreement without the further consent of the Grantors or any person acting or purporting

to act for the Grantors, including directing disposition of the funds in any Deposit Account. The Depository Bank shall also comply with instructions directing the disposition of funds in each Deposit Account originated by the Grantors or their authorized representatives until such time as the Secured Party delivers a Notice of Sole Control pursuant to Section 10(a) to the Depository Bank. The Depository Bank shall comply with, and is fully entitled to rely upon, any instruction from the Secured Party, even if such instruction is contrary to any instruction that the Grantor may give or may have given to the Depository Bank or results in the dishonoring of items presented for payment from a Deposit Account.

4.    Subordination of Lien; Waiver of Set-Off.

(a)    The Depository Bank hereby agrees that any security interest in, lien on, or encumbrance, claim or (except as provided in the proviso to Section 4(b)) right of set-off against, any Deposit Account or any funds therein it now has or subsequently obtains will be subordinate to the security interest of the Secured Party in the Deposit Accounts and the funds therein or credited thereto.

(b)    The Depository Bank agrees not to exercise any present or future right of recoupment or set-off against any of the Deposit Accounts or to assert against any of the Deposit Accounts any present or future security interest, banker's lien or any other lien or claim (including claim for penalties) that the Depository Bank may at any time have against or in any of the Deposit Accounts or any funds therein; *provided*, however, that the Depository Bank may set off (i) all amounts due the Depository Bank in respect of its customary fees and expenses for the routine maintenance and operation of the Deposit Accounts, including overdraft fees, and (ii) the face amount of any checks or other items which have been credited to any Deposit Account but are subsequently returned unpaid because of uncollected or insufficient funds.

5.    Depository Bank's Responsibility.

(a)    The Depository Bank will not be liable to the Secured Party for complying with instructions from the Grantors concerning the Deposit Accounts that are received by the Depository Bank before the Depository Bank receives a Notice of Sole Control.

(b)    The Depository Bank will not be liable to the Grantors or the Secured Party for complying with a Notice of Sole Control or with instructions concerning any of the Deposit Accounts originated by the Secured Party, even if the Grantors notify the Depository Bank that the Secured Party is not legally entitled to issue such Notice of Sole Control or instructions, unless the Depository Bank takes the actions after it is served with an injunction, restraining order, or other legal process enjoining it from doing so, issued by a court of competent jurisdiction, and had a reasonable opportunity to act on the injunction, restraining order or other legal process.

(c)    This Agreement does not create any obligation of the Depository Bank except for those expressly set forth in this Agreement and Article 4 of the UCC. In particular, the Depository Bank need not investigate whether the Secured Party is entitled under the Secured Party's agreements with the Grantors to give instructions concerning any Deposit Account or a Notice of Sole Control. The Depository Bank may rely on notices and communications it believes to have been given by the appropriate party.

6.    Choice of Law; Waiver of Jury Trial.

(a)    Both this Agreement and the Deposit Accounts are governed by the laws of the State of Nevada. Regardless of any provision in any other agreement, for purposes of UCC §9-304(b)(1), Nevada will be deemed to be the Depository Bank's jurisdiction and each Deposit Account is governed by the laws of the State of Nevada. The Depository Bank and the Grantors may not change the law governing any Deposit Account without the Secured Party's prior written consent.

(b)    TO THE EXTENT PERMITTED BY APPLICABLE LAW, EACH PARTY WAIVES ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, CLAIM OR PROCEEDING (INCLUDING ANY COUNTERCLAIM) OF ANY TYPE ARISING OUT OF OR DIRECTLY OR

INDIRECTLY RELATING TO THIS AGREEMENT.

7.      <u>Conflict with Other Agreements</u>. As of the Effective Date, there are no other agreements entered into between the Depository Bank and the Grantors with respect to any Deposit Account or any funds credited thereto (other than standard and customary documentation with respect to the establishment and maintenance of such Deposit Account). The Depository Bank and the Grantors will not enter into any other agreement with respect to any Deposit Account unless the Secured Party has received prior written notice thereof. The Depository Bank and the Grantors have not and will not enter into any other agreement with respect to control of any of the Deposit Accounts or purporting to limit or condition the obligation of the Depository Bank to comply with any orders or instructions with respect to any Deposit Account as set forth in Section 3 without the prior written consent of the Secured Party acting in its sole discretion. In the event of any conflict with respect to control over any Deposit Account between this Agreement (or any portion hereof) and any other agreement now existing or hereafter entered into, the terms of this Agreement will prevail.

8.      <u>Account Statements</u>. As of the Effective Date, the Depository Bank has furnished to the Secured Party the most recent account statement issued by the Depository Bank with respect to each of the Deposit Accounts and the cash balances held therein. Each such statement accurately reflects the assets held in such Deposit Account as of the date thereof.

9.      <u>Notice of Adverse Claims</u>. Except for the claims and interests of the Secured Party and of the Grantors in the Deposit Accounts, the Depository Bank on the Effective Date does not know of any claim to, security interest in, lien on, or encumbrance against, any Deposit Account or any funds credited thereto and does not know of any claim that any person or entity other than the Secured Party has been given control (within the meaning of UCC §9-104) of any Deposit Account or any such funds. If the Depository Bank becomes aware that any person or entity is asserting any lien, encumbrance, security interest or adverse claim (including any writ, garnishment, judgment, warrant of attachment, execution or similar process or any claim of control) against any funds in any Deposit Account, the Depository Bank shall promptly notify the Secured Party and the Grantors thereof.

10.     <u>Maintenance of Deposit Accounts</u>. In addition to the obligations of the Depository Bank in Section 3, the Depository Bank agrees to maintain the Deposit Accounts as follows:

(a)      If at any time the Secured Party delivers to the Depository Bank a notice instructing the Depository Bank to terminate a Grantor's access to any Deposit Account (a "<u>Notice of Sole Control</u>"), the Depository Bank agrees that, after receipt of such notice, it will take all instructions with respect to such Deposit Account solely from the Secured Party, terminate all instructions and orders originated by the Grantors with respect to such Deposit Account or any funds therein, and cease taking instructions from the Grantors, including, without limitation, instructions for distribution or transfer of any funds in such Deposit Account.

(b)      If the Secured Party requests, the Depository Bank will provide the Secured Party, whether by internet access or otherwise, with a copy of each periodic account statement relating to each Deposit Account ordinarily furnished by the Depository Bank to the Grantors. The Grantors authorize the Depository Bank to provide the Secured Party, whether by internet access or otherwise, any other information concerning any Deposit Account that the Depository Bank may agree to provide to the Secured Party at the Secured Party's request.

(c)      The Depository Bank may not change the name or account number of any Deposit Account without the prior written consent of the Secured Party.

11.     <u>Binding Effect</u>. The terms of this Agreement will become effective when it has been executed by the Grantors, the Secured Party and the Depository Bank, and thereafter will be binding upon, and will inure to the benefit of, the parties hereto and their respective successors and permitted transferees.

12.     <u>Notices</u>. Any notice, request or other communication required or permitted to be given under this Agreement must be in writing and deemed to have been properly given when delivered in person, or when sent by facsimile or other electronic means and electronic confirmation of error free receipt is received or two

days after being sent by certified or registered United States mail, return receipt requested, postage prepaid, addressed to the party at the address set forth below.

> Grantor:
>
> [****]
>
>
> with a copy to (which will not constitute notice):
>
> Schwartz Law, PLLC
> 601 East Bridger Avenue
> Las Vegas, Nevada 89101
> Attn: Samuel A. Schwartz (saschwartz@nvfirm.com)
>
> Depository Bank:
>
> [_____]
> [_____]
> [_____]
> Attn: [_____]
>
> Secured Party:
>
> De Jong Capital LLC
>
> [****]
>
> Attn: Brent De Jong (bdejong@dejongcapital.com)
>
> with a copy to (which will not constitute notice):
>
> Fox Rothschild LLP
>
> 1980 Festival Plaza Drive, Suite
>
> 700 Las Vegas, Nevada 89135
>
> Attn: Brett A. Axelrod (baxelrod@foxrothschild.com);

or at any other address specified by such Party in writing from time to time at least 5 days' prior to the sending or transmission of the subject notice.

    13. <u>Termination</u>. Except as otherwise provided in this Section 13, this Agreement and the obligations of the Depository Bank hereunder will continue in effect until the security interests of the Secured Party in the Deposit Accounts and any and all funds therein have been terminated pursuant to the terms of the Security Agreement and the Secured Party has notified the Depository Bank of such termination in writing. This Agreement may be terminated by:

>        (a)        the Secured Party at any time by written notice to the other parties; or
>
>        (b)        the Depository Bank, at any time by written notice delivered to the Secured Party and the Grantors not less than 30 days prior to the effective termination date; *provided that*, before such termination, the Depository Bank and the Grantors will make arrangements to transfer the funds credited to each Deposit Account to, as specified by the Secured Party, either (i) another bank that has executed, together with the Grantors, a deposit account control agreement in favor of the Secured Party in respect of such property substantially in the form of this Agreement or otherwise in form and substance

satisfactory to the Secured Party, or (ii) the Secured Party; or

    (c)    the Grantors by written notice signed by the Grantors and the Secured Party, delivered to the Depository Bank not less than 30 days prior to the effective termination date.

    (d)    Neither the Grantors nor the Depository Bank will close any Deposit Account prior to termination of this Agreement.

    14.    <u>Survival</u>. Section 6 and Section 7 will survive termination of this Agreement.

    15.    <u>Fees and Expenses</u>. Unless and until a Notice of Sole Control has been issued by the Secured Party, the Depository Bank agrees to look solely to the Grantors for payment of any and all fees, costs, charges and expenses incurred or otherwise relating to the Deposit Accounts and services provided by the Depository Bank hereunder (collectively, the "<u>Account Expenses</u>"), and the Grantors agree to pay such Account Expenses to the Depository Bank on demand therefor. The Grantors acknowledge and agree that they are solely liable to the Depository Bank for all Account Expenses unless and until a Notice of Sole Control has been issued. After a Notice of Sole Control has been issued, the Secured Party is liable for all Account Expenses going forward, and the Depository Bank agrees to look solely to the Secured Party for payment of all Account Expenses.

    16.    <u>Severability</u>. If any term or provision set forth in this Agreement is held to be invalid or unenforceable by a court of competent jurisdiction, the remainder of this Agreement, other than those provisions held invalid or unenforceable, will be construed in all respects as if such invalid or unenforceable term or provision were omitted.

    17.    <u>Amendment; Construction</u>. No amendment to this Agreement will be binding on any party unless it is in writing and signed by all of the parties. Any provision of this Agreement benefiting a party may be waived only by a writing signed by that party. References to Sections and Schedules herein are references to the sections and schedules of this Agreement, unless otherwise expressly stated.

    18.    <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument. Counterparts may be delivered via facsimile, electronic mail or other transmission method, and may bear signatures affixed through .pdf or other software including without limitation any electronic signature platform complying with the U.S. federal ESIGN Act of 2000 (e.g., www.docusign.com); any counterpart so delivered will be deemed to have been duly and validly executed and delivered and will be valid and effective for all purposes.

*[SIGNATURE PAGES FOLLOW]*

*[Signature Page to Deposit Account Control Agreement]*

IN WITNESS WHEREOF, the parties hereto have executed this Agreement effective as of the Effective Date.

<u>GRANTORS</u>

Rawhide Acquisition Holding LLC

By: _____

  Name: _____

Title: _____

Rawhide Mining, LLC

By: _____

Name: _____

Title: _____

<u>SECURED PARTY</u>

DE JONG CAPITAL, LLC

By:_____

    Name: Brent DeJong

    Title: _____

<u>DEPOSITORY BANK</u>

[_____]

By:_____

    Name: _____

    Title: _____

153257877.1
11886976-5

SCHEDULE 1

Deposit Accounts

[_____]

*Exhibit E to Loan Agreement: Form of Notice of Borrowing*

<u>NOTICE OF BORROWING (FIRST LOAN INSTALLMENT)</u>

To:     De Jong Capital, LLC, Attn: Brent De Jong

Re:     Request dated as of [****] for Disbursement of First Loan Installment pursuant to that certain Senior Secured Super-Priority Debtor-in-Possession Loan Agreement dated as of December 25, 2023 (the "<u>Agreement</u>").

Ladies and Gentlemen:

      Pursuant to Section 2.3 of the Agreement the undersigned hereby requests the First Loan Installment constituting the Loan in the amount of US$2,500,000 to be disbursed to the Borrowers by no later than [***].  The representations and warranties in the Loan Agreement are true and correct in all material respects as of the date hereof, and no Default or Event of Default has occurred and is continuing or will result from disbursement of the Loan.

<u>BORROWERS</u>

Rawhide Acquisition Holding LLC


By: _____
Name: _____
Title: _____


Rawhide Mining, LLC


By: _____
Name: _____
Title: _____

152932129.1

153257877.1

NOTICE OF BORROWING (SECOND LOAN INSTALLMENT)

To:      De Jong Capital LLC; Attn. Brent De Jong

Re:      Request dated as of [***] for Disbursement of Second Loan Installment pursuant to that certain Senior Secured Super-Priority Debtor-in-Possession Loan Agreement dated as of December 25, 2023 (the "Agreement").

Ladies and Gentlemen:

Pursuant to Section 2.3 of the Agreement the undersigned hereby requests the Second Loan Installment constituting the Loan in the amount of US$2,500,000 to be disbursed to the Borrower by no later than [***]. The representations and warranties in the Loan Agreement are true and correct in all material respects as of the date hereof, and no Default or Event of Default has occurred and is continuing or will result from disbursement of the Loan.

BORROWERS:

Rawhide Acquisition Holding LLC

By: _____
Name: _____
Title: _____

Rawhide Mining, LLC

By: _____
Name: _____
Title: _____

152932129.1

153257877.1