Samuel A. Schwartz, Esq.
Nevada Bar No. 10985
saschwartz@nvfirm.com
Gabrielle A. Hamm, Esq.
Nevada Bar No. 11588
ghamm@nvfirm.com
SCHWARTZ LAW, PLLC
601 East Bridger Avenue
Las Vegas, NV 89101
Telephone: 702.385.5544
Facsimile: 702.442.9887

*Proposed Attorneys for Debtors*

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| In re: | Case No. 23-15619-HLB |
| RAWHIDE MINING, LLC, | Chapter 11 |
| Debtor. | *Jointly administered with*: |
| Affects All Debtors ☒ | Rawhide Acquisition Holding, LLC Case No. 23-15620-HLB |
| Affects Rawhide Mining LLC ☐ | |
| Affects Rawhide Acquisition Holding LLC ☐ | |

## OMNIBUS DECLARATION OF MARCEAU SCHLUMBERGER IN SUPPORT OF DEBTORS' PETITIONS, FIRST DAY MOTIONS, AND RELATED RELIEF

I, Marceau Schlumberger, declare under penalty of perjury as follows:

1.  I am over the age of 18 and mentally competent.

2.  I am the manager of Rawhide Mining LLC ("**Rawhide**") and Rawhide Acquisition Holding LLC ("**Holding**" and, together with Rawhide, the "**Debtors**"), debtors and debtors-in-possession in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), and managing partner and founder of Coral Reef Capital LLC, which holds approximately 29.7% of the membership interests in Holding.

1

3.      In that capacity, I am familiar with the Debtors' daily business, operational, and financial affairs. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge of the Debtors' operations and finances, information learned from my review of relevant documents, and information supplied to me by other members of the Debtors' management and the Debtors' business and legal advisors. If called upon to testify as to the content of this Declaration, I could and would do so.

4.      I make this declaration in support of the Debtors' voluntary Chapter 11 petitions (the "**Petitions**") and the following motions (collectively, the "**First Day Motions**"):[1]

a.      Motion for Order Directing Joint Administration of Chapter 11 Cases [ECF No. 3 in Case No. 23-15619-hlb, ECF No. 4 in Case No. 23-15620-hlb] (the "**Joint Administration Motion**");

b.      Motion for entry of an Order Granting the Debtors Additional Time within which to file Schedules and Statements [ECF No. 4 in Case No. 23-15619-hlb, ECF No. 5 in Case No. 23-15620-hlb] (the "**Schedules Extension Motion**");

c.      Motion Under 11 U.S.C. §§ 105(a) and 362(a) to (I) Enforce the Automatic Stay and (II) Extend the Automatic Stay Under § 105(a) [ECF No. 10 in Case No. 23-15619-hlb, ECF No. 10 in Case No. 23-15620-hlb] (the "**Stay Enforcement Motion**");

d.      Emergency Motion for Entry of an Order (I) Authorizing Continued use of Existing Bank Account and Honoring Certain Pre-Petition Obligations related thereto, (II) Authorizing Continued Use of Business Forms, and (III) Granting Related Relief [ECF No. 18 in Case No. 23-15619-hlb] (the "**Bank Account Motion**");

e.      Motion for an Order (I) Prohibiting Utilities from Altering, Refusing or Discontinuing Services on Account of Pre-Petition Claims, (II) Deeming Utility Providers Adequately Assured of Future Performance, and (III) Establishing Procedures for Determining Requests for Additional Adequate Assurance of Payment [ECF No. 16 in Case No. 23-15619-hlb] (the "**Utilities Motion**"); and

f.      Emergency Motion for Order (I) Authorizing the Debtor to Pay Prepetition Employee Wages, Salaries, Employee Benefit Contributions, Reimbursable Business Expenses, and Related Obligations and (II) Directing Financial

---

[1]      Unless otherwise indicated, all capitalized terms not defined herein have the meanings ascribed to them in the relevant First Day Motion.

2

Institutions to Honor and Process Transfers related to such Obligations [ECF No. 17 in Case No. 23-15619-hlb] ("the **Employee Wages Motion**"); and

g.     Emergency Motion for Interim and Final Orders: (I) Authorizing Debtors to Obtain Post-Petition Senior Secured, Superpriority Financing; (II) Granting Liens and Superpriority Claims; (III) Modifying the Automatic Stay; (IV) Scheduling Interim and Final Hearings; and (V) Granting Related Relief [ECF No. 22 in Case No. 23-15619-hlb, ECF No. 19 in Case No. 23-15620-hlb] (the "**DIP Financing Motion**").

5.     The Debtors filed their voluntary petitions for relief under Chapter 11 of the Bankruptcy Code on December 20, 2023 (the "**Petition Date**"), thereby commencing the Chapter 11 Cases.

6.     The Debtors continue to operate as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

7.     To date, the Office of the United States Trustee for Region 17 (the "**UST**"), which includes the District of Nevada, has not appointed a committee of unsecured creditors in either of the Debtors' Chapter 11 Cases.

8.     No case trustee or examiner has been appointed by the UST, and the Court has not entered an order directing the appointment of an estate officer, in these Chapter 11 Cases.

## BACKGROUND

9.     Rawhide, formerly known as Kennecott Rawhide Mining Company LLC, has owned and operated an open pit heap leach gold and silver mine located at forty-five (45) miles northeast of Hawthorne, Nevada in northern Mineral County, Nevada (the "**Denton-Rawhide Mine**") since 2010.

10.     Holding is the sole member of Rawhide.

11.     Rawhide's property primarily consists of mining claims on public land administered by the United States Department of the Interior Bureau of Land Management (the "**BLM**") and private land, including 394 unpatented lode mining claims covering approximately 7,850 acres, 92 unpatented mill site mining claims covering approximately 450 acres, and several thousand acres of land owned or controlled by Rawhide.

12.     The Denton-Rawhide Mine has been in operation since 1990 and was continuously

profitable for 32 years. The Denton-Rawhide Mine employs approximately 150 people when fully operational.

13.    Rawhide and Rawhide subsidiaries, as Borrowers, Holding, as Parent, Silverview Credit Partners, LP ("**Silverview**"), formerly known as Silverpeak Credit Partners, LP, as administrative agent and collateral agent for itself and the several financial institutions or entities from time to time party thereto (together with Silverview, the "**Prepetition Lenders**") are parties to that certain *Loan and Security Agreement* dated January 3, 2019 (as amended, the "**Prepetition Loan Agreement**"), pursuant to which the Prepetition Lenders provided a term loan in the original principal amount of $18,100,000.00, accruing interest at the non-default rate of fifteen and one half percent (15.5%) per annum (the "**Prepetition Loan**"). A true and correct copy of the Prepetition Loan Agreement is attached hereto as **Exhibit 1**.

14.    The Fee Letter accompanying the Prepetition Loan Agreement and the Supplemental Amendment to Fee Letter, dated as of April 6, 2020, are attached hereto as **Exhibits 2** and **3**, respectively.

15.    The Prepetition Loan Agreement was amended by (i) that certain Amendment No. 1 to Loan and Security Agreement, dated as of October 31, 2019, (ii) that certain Amendment No. 2 to Loan and Security Agreement, dated as of March 12, 2021, (iii) that certain Third Amendment to Loan and Security Agreement, dated as of February 20, 2023, pursuant to which the aggregate original principal amount of the Prepetition Loan increased to $18,450,000 and EMX USA Services Corp. ("**Equity Lender**") made a term loan to the Borrowers in the aggregate original principal amount of $150,000.

16.    Pursuant to the Prepetition Loan Agreement, the Prepetition Loan is secured by substantially all assets of Rawhide and its subsidiaries, including Accounts, Chattel Paper, Commodity Contracts, Deposit Accounts, Documents, Equipment, Fixtures, General Intangibles, Goods, Instruments, Intellectual Property, Inventory, Investment Property, Letter of Credit Rights and Supporting Obligations, Commercial Tort Claims, and the proceeds and products of the foregoing, along with a pledge of Holding's equity in Rawhide pursuant to that certain *Pledge and Security Agreement* dated as of January 3, 2019 (the "**Equity Pledge Agreement**"), between

Holding, as pledgor, and Silverview (collectively, the "**Prepetition Collateral**"). Attached hereto as **Exhibit 4** is a true and correct copy of the Equity Pledge Agreement. The Prepetition Loan Agreement, Fee Letter, Equity Pledge Agreement, Board Observer Rights Agreement, Initial Account Control Agreement, Power of Attorney, the Warrants, UCC Financing Statements, Notes, and other documents executed in connection with the Prepetition Loan Agreement and obligations thereunder (the "**Prepetition Obligations**"), together with all amendments or supplements thereto, will be referred to as the "**Prepetition Loan Documents**").

17.     Silverview delivered a reservation of rights letter on March 17, 2022, and a notice of acceleration on March 24, 2022 (the "**Notice of Acceleration**"). Pursuant to the Notice of Acceleration, Silverview asserted that the Prepetition Obligations were immediately due and payable, including, from and after March 15, 2022, default interest pursuant to section 21.3 of the Prepetition Loan Agreement) and demanded immediate payment in the amount of $15,813.577.68.

18.     On July 19, 2022, the Prepetition Lenders, the Borrowers, and Holding entered into that certain Forbearance Agreement (the "**2022 Forbearance Agreement**"), pursuant to which the Prepetition Lenders agreed to forbear temporarily from exercising any default related rights and remedies under the Prepetition Loan Documents. The 2022 Forbearance Agreement terminated as of December 31, 2022.

19.     In January of 2023, northern Nevada experienced a 500-year weather event resulting in catastrophic flash floods. The flooding caused equipment failures and more than a billion gallons of water that brought the Denton-Rawhide Mine ponds to the brink of overflowing, resulting in the dilution of the grade of gold and silver and thus, reduced return on processing of gold and silver. In February of 2023, the Denton-Rawhide Mine lost power for approximately 23 hours due to a failure of NV Energy's infrastructure, and Rawhide's backup generators failed, leaving Rawhide unable to mitigate the consequences of the flooding.

20.     On or about March 6, 2023, the Equity Lender advanced $600,000.00 to Rawhide pursuant to the terms of a Secured Promissory Note to prevent a shut-down or other significant disruption to business operations (the "**New Equity Holder Loan**"). Attached hereto as **Exhibit 5** is a true and correct copy of the Secured Promissory Note together with the Fourth Amendment to

Loan and Security Agreement by and between the Borrowers, Holding, the Prepetition Lenders, and the Equity Lender, dated as of March 6, 2023 (the "**Fourth Amendment**"). Pursuant to the Fourth Amendment, the Prepetition Lenders agreed, among other things, to permit the Borrowers to grant the Equity Lender a security interest in certain equipment (the "**Eligible Equity Holder Note Equipment**") and that the incurrence of indebtedness to the Equity Lender, the granting of a security interest in the Eligible Equity Holder Note Equipment to the Equity Lender, and any subsequent sale of the Eligible Equity Holder Note Equipment and payment of principal and interest under the Secured Promissory Note with the sale proceeds of such Eligible Equity Holder Note Equipment being paid to the Equity Lender would not constitute a Default or Event of Default under the Prepetition Loan Agreement. On the sale of Eligible Equity Holder Note Equipment, the Equity lender was repaid approximately $450,000.00.

21.    Rawhide filed a business interruption claim with its insurer, Zurich, arising from the power outage. On August 31, 2023, Rawhide received approximately $1.3 million in partial satisfaction of its claim. The next day, however, Silverview swept Rawhide's account at U.S. Bank, N.A., leaving Rawhide without working capital with which to operate or mitigate its environmental exposure.

22.    On September 15, 2023, the Prepetition Lenders, the Borrowers, and Holding entered into that certain Forbearance Agreement (the "**2023 Forbearance Agreement**"), pursuant to which the Prepetition Lenders agreed to forbear temporarily from exercising any default related rights and remedies under the Prepetition Loan Documents. A true and correct copy of the 2023 Forbearance Agreement is attached hereto as **Exhibit 6**. As set forth in the 2023 Forbearance Agreement, the Borrowers acknowledged indebtedness to the Prepetition Lenders in the amount of no less than $20,517,613.39 as of September 11, 2023.

23.    Argonaut Insurance Company ("**Argo**"), the surety on Surface Management Surety Bond Number SUR0008068 (the "**Bond**") naming Rawhide, as principal, and the United States of America, as obligee, in the amount of $14,927,566 in connection with Rawhide's reclamation obligations related to the Denton-Rawhide Mine and Mine Denton-Rawhide Mine Plan of Operations under the Surface Mining Control and Reclamation Act of 1977, federal regulations

found at 43 C.F.R. 3802 and 3809, and related state laws. The obligations of Rawhide and the indemnitors under the Bond are secured by the Debtors' cash collateral in possession and control of Argo in the amount of $8,554,957.24 as of December 11, 2023.

24.    On September 20, 2023, the BLM made demand upon Argo (the "**September 2023 Demand**") under the Bond for Rawhide's alleged failure to comply with certain notices of noncompliance referenced in the September 2023 Demand, including providing an increase in bond coverage through the posting of a cash bond in the amount of $3,412,885 ("**Proposed Cash Bond**") to supplement the existing Bond amount.

## FIRST DAY MOTIONS

**A.    Joint Administration.**

25.    In order to administer their Chapter 11 Cases optimally and efficiently, the Debtors each filed a Joint Administration Motion seeking entry of an order directing procedural consolidation and joint administration of their Chapter 11 Cases pursuant to Sections 101(2) and 105(a) of the Bankruptcy Code, Bankruptcy Rule 1015(b), and LR 1015, with Rawhide's Chapter 11 Case denominated the lead case.

26.    Holding holds 100% of the membership interests in Rawhide. The Debtors are "affiliates" as that term is defined under the Bankruptcy Code as a result of their common ownership.

27.    In order to optimally and efficiently administer the Chapter 11 Cases, the Debtors seek entry of an order directing procedural consolidation and joint administration of the Chapter 11 Cases pursuant to Section 101(2) and 105(a); Bankruptcy Rule 1015(b); and Local Rule 1015, with Rawhide's case (Case No. 23-15619-HLB), denominated as the lead case.

28.    Joint administration is appropriate here because Debtors are financially interdependent. Holding, as the Parent, is a co-obligor on the Prepetition Loan.

29.    The Debtors anticipate that most motions, applications, and hearings will affect both Debtors, and joint administration will promote the economical and efficient administration of the cases and reduce the cost of administration of the Chapter 11 Cases, including the cost of serving notices.

30.     The Debtors are seeking joint administration only for procedural purposes and are not presently requesting the Chapter 11 Cases be substantively consolidated. Joint administration, therefore, will not impair any creditors' right to recover from the assets of a particular debtor, or otherwise adversely affect any creditor or other party in interest. Rather, joint administration will relieve Debtors and the Court of the burden of duplicative filings, simplify case administration, and benefit creditors by reducing the costs of administration.

**B.     Schedules Extension Motion.**

31.     The Debtors have each filed a Schedules Extension Motion seeking the entry of an order extending the time within which the Debtors are required to file their schedules of assets and liabilities, lists of equity holders, schedules of executory contracts and unexpired leases and statements of financial affairs (collectively, the "**Schedules and Statements**") by thirty (30) days.

32.     The Debtors filed their Petitions in these Chapter 11 Cases on December 20, 2023, in order to prevent the forfeiture of a surety bond that is critical to Rawhide's ability to operate its business. The Petitions provided limited pertinent information necessary to commence the Chapter 11 Cases, but the Debtors have not been able to compile all of the pertinent documents and financial information necessary to complete the Schedules and Statements. The Debtors' professionals are working diligently with the Debtors to gather the finalize the Schedules and Statements.

33.     Due to the emergency nature of the case, the fourteen (14) day automatic extension of time to file the Schedules provided by Bankruptcy Rule 1007(c), will not be sufficient to permit completion of the Schedules and Statements. Accordingly, the Debtors require additional time to assemble the information necessary to complete the Schedules and Statements.

34.     At this juncture, the Debtors estimate that thirty (30) additional days from the initial deadline of January 3, 2024, or to February 2, 2024, will provide sufficient time to prepare and file the Schedules and Statements. As a result, the Debtors request that the Court grant such an extension to file all Schedules and Statements not previously filed pursuant to Bankruptcy 1007(b) and (c), without prejudice to the Debtors' right to seek any further extensions from the Court or to seek waivers with respect to the filing of certain Schedules and Statements.

**C.      Stay Enforcement Motion**

35.      The Debtors filed the Stay Enforcement Motion seeking entry of an order enforcing the automatic stay and extending the stay to Argo. The Debtors filed the Stay Enforcement Motion to ensure that the Bond is not forfeited and Argo .

36.      As noted above, the BLM made demand under the Bond for Rawhide's alleged failure to comply with certain notices of noncompliance, including a demand to increase the Bond coverage by $3,412,885. In the September 2023 Demand, the BLM demanded Argo (i) require Rawhide to begin certain specified work within 30 days and continue to work diligently to completion; (ii) directly enter into a contract such that the specified work will begin within 30 days and continue diligently to completion, (iii) authorize the BLM to act as Argo's agent to contract and oversee the performance of the specified work; OR (iv) submit the penal sum of $14,927,566 – the full amount of the bond.

37.      On December 12, 2023, Argo sent a letter entitled "Demand for Collateral" to Rawhide and the indemnitors under that certain General Indemnity Agreement dated July 21, 2015, as modified by that certain Modification to General Indemnity Agreement dated October 18, 2016, as modified by that certain Modification to General Indemnity Agreement dated October 19, 2016 (collectively, the "**Indemnity Agreement**"), demanding additional collateral security in an amount not less than $6,372,608.76, on top of the $8,554,957.24 in cash collateral Argo holds to secure the Bond.

38.      The Debtors understand that Argo sent a check to BLM for the full amount of the Bond, or $14,927,566, but that the check was not cashed prior to the Petition Date.

39.      By the Stay Enforcement Motion, the Debtors seek to maintain the status quo by preventing the BLM from continuing its collection efforts (including by cashing the check from Argo) and preventing Argo from exercising its asserted lien rights against the cash collateral. Maintenance of the Bond is essential to Rawhide's ability to operate its business, generate revenue for the benefit of its estate and its creditors, and successfully reorganize.

**D.      DIP Financing Motion.**

40.      The Debtors filed the DIP Financing Motion seeking authorization to obtain DIP Financing on an interim and final basis pursuant to the terms set forth in the DIP Loan Agreement, the Budget, and the interim and final orders attached thereto.

41.      An immediate need exists for Debtors to obtain funds in order to continue operations and to administer and preserve the value of their Chapter 11 Estates. Operationally, the Debtors require financing to ensure uninterrupted payment of expenses for the operation of their businesses, including mining operations, payroll, office lease payments, insurance, equipment maintenance and repair, and other general and administrative expenses. The Debtors also need to pay expenses associated with the Bankruptcy Case, including professional fees and expenses and United States Trustee fees.

42.      To preserve its going-concern value, ensure a smooth transition into its Chapter 11 Case, and afford the Debtors an opportunity to successfully reorganize, it is critical that the Debtors assure their suppliers, vendors, and employees that they will be paid for post-petition services. These assurances will be vital to the Debtors' efforts to persuade vendors to continue shipping goods and providing services on customary trade credit. The Debtors must sustain operations, purchase new inventory and provide assurances to Rawhide's customers that it will be able to deliver products and services during this Chapter 11 Cases.

43.      The Debtors do not have sufficient available sources of working capital and financing to operate their business in the ordinary course without the debtor-in-possession financing set forth above. Most significantly, approval of the DIP Financing on an interim basis pursuant to the Budget is necessary to induce the Debtors' vendors to continue providing necessary goods and services during the Chapter 11 Cases by providing them assurance that the Debtors will have sufficient working capital to continue operations. Absent such assurances, many vendors will not continue to do business with the Debtors. In short, absent approval of the DIP Financing on an emergency basis, the Debtors will likely be forced to cease operations, jeopardizing their reorganization.

44.     Absent immediate access to such funds, the Debtors' operations and value of their estates will be detrimentally impacted because, among other things, they will be unable to pay ongoing operating expenses and critical vendors may refuse to provide necessary goods and services. Accordingly, timely approval of the Interim DIP Order is critical to preserving the value of the Debtors' estates.

45.     For over a year, the Debtors have been seeking financing from any party willing to lend. In fact, the Debtors and their advisors reached out to more than 200 prospective lenders and/or investors. In the end, the Debtors received only one (1) offer for financing, the DIP Facility from the DIP Lender, which provides a workable fee structure, workable bankruptcy milestones, and a collateral package and covenants that align with the Debtors' business. Further, the DIP Lender has expertise in the mining space, which will facilitate working with the Debtors and agreements regarding the Budget. As of the date of this Declaration, I also understand the DIP Lender approved the Budget on a final basis.

46.     As noted above, prior to and during the process of negotiating the terms of the DIP Facility, the Debtors attempted to identify other sources of post-petition financing to determine whether they could obtain debtor in possession financing on better terms. Given their current financial condition, financing arrangements and capital structure, however, the Debtors have been unable to obtain financing on more favorable terms than those provided in the DIP Facility Agreement.

47.     In sum, the Debtors have made a concerted, good-faith effort to obtain credit on the most favorable terms that are available. The required financing was not available on an unsecured or junior lien basis, and the terms of the DIP Facility were, on the whole, the most favorable terms available to the Debtors.

48.     The Debtors submit that, given the extensive (and unsuccessful) efforts made to seek attractive alternatives, it has demonstrated that post-petition financing is not available on a more favorable basis.

49.     As explained above, denial of the Debtors' requested relief will cause immediate and irreparable harm to the Debtors and their Estates. The DIP Facility is necessary to permit the

orderly resumption of the Debtors' business operations, minimize the disruption of the business during the Chapter 11 Cases, and preserve and maximize the value of the Debtors' Estates. Absent access to the DIP Facility, the Debtors will be unable to pay their ongoing obligations, operate their business, or generate revenue. The Debtors' access to the DIP Facility will ensure that the "going concern" value of Debtors' assets are preserved, a value that the Debtors believe is greater than the value which would be realized from a piecemeal liquidation of those assets if Debtors are unable to operate.

50.    The infusion of priming and super-priority post-petition financing allows the Debtors to operate and restructure their business plan to provide for additional operating revenue. The Debtors submit that this will not only maintain the value of the Debtors' collateral value but will increase it. The DIP Financing is essential to instilling the Debtors' various stakeholders, including customers, employees, vendors, and other key constituencies, with confidence in the Debtors' ability to reorganize. Without the DIP Financing, the Debtors would likely be forced into liquidation, resulting in a significant decline in the value of the Prepetition Collateral. The liquidation value of the Debtors' assets if less than the value of the business as a going concern. By contrast, the DIP Financing allows the Debtors to generate revenue through operations, which will result in an increase in the going-concern value of the Debtor's business and the value of the Prepetition Lenders' liens.

51.    The Debtors anticipate running a competitive sale process to maximize value during the Chapter 11 cases, in which the value of the Prepetition Collateral will increased, such that the Prepetition Lenders' equity cushion will be maintained and likely enhanced. The Debtors believe the Prepetition Lenders will be protected by the sale process and the DIP Financing.

52.    The Debtors believe that it is fair, reasonable and necessary to enter into the DIP Financing. In addition to representing the best terms presently available to the Debtors, the DIP Financing is also in the best interests of the Debtors' estates. The DIP Financing preserves the going concern value of the Debtors' assets and allows the Debtors to continue their operations and keep employees employed. The DIP Financing therefore is plainly in the best interests of Debtors' estates. Without the DIP Facility, Debtors would not be able to fund operations until the Debtors

can secure sufficient funding to proceed with a plan of reorganization. Instead, Debtors would be faced with the potential for administrative insolvency followed by a liquidation. Given the choice between these two alternatives, Debtors prudently negotiated the DIP Facility with the DIP Lender to ensure that the Debtors would have the time needed to secure the funding necessary to bring the Bankruptcy Case to a successful conclusion. In sum, the Court should approve the Debtors' decision to enter into the DIP Facility as an exercise of sound business judgment.

**E.      Bank Account Motion**

53.      Rawhide filed the Bank Account Motion seeking authority to (i) continue using its existing bank account, (ii) to honor certain fee and service charge obligations related to the Debtor's use of such bank account, and (iii) to continue using existing pre-petition business forms, including checks and wire/ACH transfer forms, and related relief.

54.      Prior to the Petition Date, Rawhide managed cash receipts and disbursements, including payroll, through its business checking account, Account No. *9211 (the "**Existing Account**") at Northwest Bank (the "**Bank**"), a subsidiary of Northwest Bancshares, Inc. Rawhide routinely deposits, withdraws, and otherwise transfers funds to and from the Existing Account. Rawhide accurately recorded collections, transfers, and disbursements as they were made.

55.      Rawhide is in the process of opening a new Existing Accounts designated as debtor in possession accounts ("**DIP Accounts**") pursuant to the *United States Trustee Chapter 11 Operating and Reporting Guidelines for Debtor in Possession* (the "**Guidelines**") adopted by the United States Trustee for Region 17 (the "**UST**").

56.      Opening DIP Accounts can be a lengthy process, however, and as described in the Employee Wages Motion, Rawhide's current payroll cycle will end on December 29, 2023. Further, because Rawhide utilizes a third-party payroll processor, QTS Payroll Services, Inc., the amounts due for the Employee Obligations must be transferred prior to the day employees are paid.

57.      Accordingly, out of an abundance of caution, Rawhide has requested that its Existing Account be designated a DIP Account and that Rawhide be authorized to continue using the Existing Account as a DIP Account. It would cause significant disruption to Rawhide's business

1   and reorganization effort if Rawhide is unable to use the Existing Account to satisfy the Employee

2   Obligations before the DIP Accounts are established.

3       58.    Rawhide also requested that the Bank be authorized and directed to: (1) continue

4   servicing and administering the Existing Account as an account of Rawhide, as debtor-in-

5   possession, without interruption and in the usual and ordinary course, and accepting and processing

6   deposits into the Existing Account, in whatever form received; and (2) accept and honor all

7   representations from Rawhide as to which checks, drafts, automated clearing house transfers, or

8   other electronic funds transfers should be honored or dishonored consistent with any order(s) of

9   this Court, whether the checks, drafts, automated clearing house transfers, or other electronic funds

10  transfers are dated prior to, on, or subsequent to the Petition Date, and whether or not the Bank

11  believes the payment is or is not authorized by any order(s) of the Court.

12      59.    Further, Rawhide requests that the Bank be prohibited from offsetting, freezing, or

13  otherwise impeding the use or transfer of, or access to, any funds deposited by the Debtors in the

14  Existing Account before or after the Petition Date on account of or by reason of any claim (as

15  defined in Section 101(5) of the Bankruptcy Code) of the Bank against the Debtors that arose before

16  the Petition Date, and any checks, drafts, automated clearing house transfers, and other electronic

17  funds transfers drawn or ordered by the Debtors on the Existing Account subsequent to the Petition

18  Date should be timely honored by the Bank notwithstanding any claim the Bank may hold against

19  Rawhide.

20      60.    Finally, to effectuate the remainder of the relief requested herein, the Debtors also

21  request that they be authorized to continue to use the existing check stock and wire/ACH payment

22  forms, without alteration. If the Debtors are not permitted to maintain and utilize their existing

23  business forms, the resultant prejudice is likely to include significant disruption to their ordinary

24  financial affairs and business operations and delay in the administration of their estates.

25      61.    The Debtors will maintain their books and records relating to the Existing Account

26  to the same extent the books and records were maintained before the Petition Date. In this way, all

27  transfers and transactions will be properly documented, and accurate balances will be maintained.

28  As a result, Rawhide will be able to accurately document and record the transactions occurring

through the Existing Account for the benefit of all parties in interest. Based on the foregoing, Rawhide believes that maintenance of the Existing Account is in the best interests of its estate, and all creditors and parties in interest.

62.    The Debtors believe the Existing Account is in a financially stable banking institution with appropriate government-guaranteed deposit protection insurance through The Federal Deposit Insurance Corporation ("**FDIC**"). The Debtors submit that because the deposits are FDIC-insured, the Existing Account complies with Section 345(b) of the Bankruptcy Code.

63.    By preserving business continuity and avoiding disruption and delay in Rawhide's operations, all parties in interest, including Rawhide's employees, vendors, and customers, will be best served.

**F.    Utilities Motion**

64.    Rawhide filed its Utilities Motion seeking entry of an order: entry of an order (i) prohibiting its utility service providers from altering, refusing, or discontinuing services, (ii) deeming the utility service providers adequately assured of future performance by post-petition financing, and (iii) establishing procedures for determining requests by the utility service providers for additional adequate assurance of payment.

65.    In the ordinary course of operating the Denton-Rawhide Mine, Rawhide incurs utility expenses (within the meaning of Section 366 of the Bankruptcy Code) for electricity (NV Energy), propane (AmeriGas), and data connectivity (SkyFiber Networks). On average, Rawhide incurs approximately $167,000.00 per month in utility costs.

66.    As of the Petition Date, Rawhide is past due on its utility obligations. Rawhide is seeking approval of the DIP Financing, however, which, together with cash flow from operations, Rawhide anticipates will be sufficient to pay all administrative expenses, including post-petition utility costs, on a current and ongoing basis.

67.    Uninterrupted utility services are essential to Rawhide's operation of the Denton-Rawhide Mine and, therefore, to the Debtors' ability to generate revenue and maximize the value of their assets. Because electricity, propane, and data connectivity for mining equipment are necessary for the extraction and processing of gold, any interruption of utility services, even for a

1    brief period of time, would effectively shut down operations. It is therefore critical that utility

2    services continue uninterrupted during these Chapter 11 Cases and the relief requested in the

3    Utilities Motion should be approved as soon as possible.

4           68.    Although Rawhide anticipates that the DIP Financing and cash flow from operations

5    will be sufficient to allow it to satisfy all administrative expenses, including post-petition utility

6    bills, on a current and ongoing basis, Rawhide recognizes that certain Utilities may not be satisfied

7    without further assurances. Rawhide submits that the proposed Procedures outlined in the Motion

8    provide a fair, reasonable, and orderly mechanism for the Utilities to seek additional adequate

9    assurance while temporarily maintaining the status quo for the Debtors. The proposed Procedures

10    preserve the status quo and ensure continued utility services, while providing a prompt forum for

11    the resolution of any dispute as to adequate assurance.

12           69.    Under the circumstances of this case, the Debtors believe that future cash flow and

13    the proposed DIP Financing constitute adequate assurance of payment. The Debtors also have a

14    powerful incentive to stay current on utility obligations because operation of the Denton-Rawhide

15    Mine depends on the utility services.

16           70.    If the Procedures are not approved, the Debtors could be forced to enter into

17    separate, time-consuming negotiations with their Utilities during the critical first weeks of the

18    Chapter 11 Cases and, if the Debtors could not reach early agreements with each Utility, file

19    motions seeking expedited determinations as to adequate assurance or risk service termination.

20    Moreover, the Debtors could be blindsided by a Utility unilaterally deciding that it is not adequately

21    protected and discontinuing service or making an exorbitant demand for payment to continue

22    service. Discontinuation of a utility service would effectively prevent the Debtors from operating.

23    **G.**    **Employee Wages Motion**

24           71.    Rawhide filed its Employee Wages Motion seeking entry of an order (i) authorizing,

25    but not directing, Rawhide to pay employee wages, salaries, and compensation, employee benefits,

26    and related obligations, and (ii) authorizing and directing all banks to honor checks and automatic

27    transfers for payment of such obligations.

28

72.     As of the Petition Date, Rawhide had a reduced staff of seven (7) direct employees and two (2) contract employees (collectively, the "**Employees**") working in the ordinary course of its business, whose continued service is vital to ongoing operations and the Debtors' reorganization effort.

73.     As of the Petition Date, the Employees were owed or had accrued in their favor various sums for wages, salaries, commissions, paid time off, employee benefit contributions, and business expense reimbursements all incurred in the ordinary course of Rawhide's business (collectively, the "**Employee Obligations**"). Rawhide seeks authorization to pay all these Employee Obligations in the ordinary course of business.

74.     Rawhide pays its direct Employees on a bi-monthly payroll cycle. The last payroll cycle ended on December 15, 2023. The next payroll cycle will end on December 29, 2023, and the net total paid to Employees will be approximately $20,924.04, of which $5,978.30 accrued as of the Petition Date. The contract employees are paid separately and owed approximately $33,000.00 as of the Petition Date. The total gross amount of Employee wages, salaries, and commissions outstanding through the Petition Date was approximately $53,924.04 (the "**Employee Wage Obligations**").[2] Rawhide seeks authority to pay the Employee Wage Obligations for the pre-petition period, not to exceed the $15,150.00 cap for each Employee.

75.     Rawhide is required by law to withhold from Employee wages and salaries amounts related to federal and state income taxes, as well as social security and Medicare taxes and to remit the same to the appropriate taxing authorities. To the extent that Rawhide has deducted funds from the Employees' paychecks sufficient to pay prepetition taxes, withholding taxes and FICA contributions attributable to the Employee Wage Obligations, which are due but have not been paid to any governmental entity, Rawhide seeks authorization to continue to deduct these funds and pay them to such governmental entities in the ordinary course of business. In addition, Rawhide is required to make matching payments from its own funds on account of social security and Medicare taxes, and to pay, based on a percentage of gross payroll (and subject to state-imposed limits),

---

[2]     A detailed payroll report and spreadsheet of all of the foregoing sums identifying the applicable employee and specific amount per Employee will be shared with the Office of the United States Trustee.

additional amounts to the taxing authorities for state and federal unemployment insurance, among other things. Rawhide seeks authorization to continue to pay or turn over these funds to the applicable governmental authorities in the ordinary course of business. The total estimated amount of Employee-related taxes which will have accrued, but remain unpaid, as of the Petition Date is approximately $1,624.19.

76.     In the ordinary course of its business, Rawhide also accrues amounts for contributions to health and benefit programs pertaining to services rendered by the Employees, which benefits include health plans (*i.e.* medical, dental, vision) and a 401(k) plan. These contributions (the "**Employee Benefit Contributions**") are an integral part of the compensation to which the Employees are entitled. Rawhide pays approximately $9,090.99 per month for its Employee Benefit Contributions. Rawhide seeks authorization to continue to pay such Employee Benefit Contributions in the ordinary course of business, not to exceed the cap imposed by Section 507(a)(5) of the Bankruptcy Code. The Employees also have accrued personal time off ("**PTO**") of approximately 865.19 hours, totaling approximately $47,561.79. Rawhide seeks to honor the Employees' PTO in the ordinary course of business.

77.     In the ordinary course of their employment, certain authorized Employees have used their own personal credit cards or expended their own personal funds on behalf of and for the benefit of Debtor (the "**Reimbursable Business Expenses**"). The Chapter 11 Cases were filed during the Debtors' normal reimbursement cycle for Reimbursable Business Expenses. Accordingly, the Employees incurred Reimbursable Business Expenses in anticipation of receiving their standard reimbursements in accordance with the Debtors' policies, but as of the Petition Date, such Reimbursable Business Expenses remain unreimbursed. The total amount of Reimbursable Business Expenses that have not been reimbursed as of the Petition Date is approximately $457.14. Accordingly, the Debtors seek authorization to pay such Reimbursable Business Expenses in the ordinary course of business and in accordance with their stated policies.

78.     Finally, under the laws of the State of Nevada, Rawhide is required to maintain workers' compensation insurance to provide their Employees with coverage for claims arising from or related to their employment with the Debtor. Rawhide currently maintains an annual workers'

1  compensation policy (the "**Workers' Comp Policy**") pursuant to which it provides workers'

2  compensation insurance coverage for employer liability. The current term of the Workers' Comp

3  Policy runs through January 15, 2024, and costs $1,716.55 per month. Accordingly, Rawhide seeks

4  authority to maintain its Workers' Comp Policy in accordance with applicable law post-petition

5  and to pay the current premium installment in the ordinary course of business.

6       79.    If Rawhide is unable to take the necessary steps to ensure that the Employee

7  Obligations are paid, there is a significant risk that Employees will resign and that those Employees

8  that do remain will be discontented and demoralized. As such, continued payment of Employee

9  Obligations is essential to maintain positive relations between Rawhide and its Employees, as well

10  as to comply with applicable State law. If the relief requested herein is not granted, the success of

11  the Debtors' operations and reorganization will be placed in substantial jeopardy and Rawhide will

12  be in violation of various State laws. Thus, the relief requested herein is in the best interests of the

13  Debtors' estates, thesir creditors, and all parties in interest.

14       80.    Rawhide's Employee Obligations to be paid to or for the benefit of each of the

15  Employees pursuant to the Employee Wages Motion will not exceed the $15,150.00 per-employee

16  cap.

17       I declare under penalty of perjury of the laws of the United States that these facts are true

18  to the best of my knowledge and belief.

19       Dated: December 26, 2023.

20

21                      /s/ *Marceau Schlumberger*
                    MARCEAU SCHLUMBERGER

22

23

24

25

26

27

28

# EXHIBIT 1

# EXHIBIT 1

EXECUTION COPY

# LOAN AND SECURITY AGREEMENT

by and among

**RAWHIDE MINING LLC**

and

**THE RAWHIDE SUBSIDIARIES FROM TIME TO TIME PARTY HERETO**

as Borrowers

**RAWHIDE ACQUISITION HOLDING LLC**

as Parent

**THE SEVERAL FINANCIAL INSTITUTIONS OR ENTITIES FROM TIME TO TIME PARTY HERETO**

as Lenders

and

**SILVERPEAK CREDIT PARTNERS, LP**

as Agent

Dated as of January 3, 2019

# TABLE OF CONTENTS

## ARTICLE 1
## DEFINITIONS AND USAGE

Section 1.1     Definitions ................................................................................................................ 1

Account Control Agreements ...............................................................1

Accrual Period .....................................................................................1

Accrued Management Fee Distributions ..............................................2

Administration Fee ..............................................................................2

Advance ...............................................................................................2

Affiliate ...............................................................................................2

Agent ...................................................................................................2

Agreement............................................................................................2

Amortization Date ...............................................................................2

Annual Cap ..........................................................................................2

Annual Surplus.....................................................................................2

Anti-Corruption Laws..........................................................................2

Anti-Terrorism Laws ...........................................................................2

Assignee...............................................................................................2

Audited Financial Statements..............................................................2

Bankruptcy Code .................................................................................2

Blocked Person ....................................................................................3

Board ...................................................................................................3

Board Observer Rights Agreement......................................................3

Borrower ..............................................................................................3

Borrower Real Property........................................................................3

Borrower Taxable Income ...................................................................3

Borrower Tax Partners .........................................................................3

Business Day........................................................................................3

Capitalized Leases...............................................................................3

Cash Equivalents.................................................................................3

Certificated Vehicle ............................................................................4

CFC......................................................................................................4

Change in Control ...............................................................................5

Change in Law.....................................................................................5

Claims .................................................................................................5

Closing Date ........................................................................................5

Closing Costs.......................................................................................5

Code.....................................................................................................5

Collateral .............................................................................................5

Compliance Certificate ........................................................................5

Confidential Information ......................................................................5

Consolidated Cash Balance .................................................................6

Consolidated Cash Interest Coverage Ratio ........................................6

Consolidated EBITDA.........................................................................6

Consolidated Interest Expense.............................................................6

Consolidated Net Income .....................................................................6

Contingent Obligation .........................................................................6

Contractual Obligation ........................................................................6

Copyright License ...................................................................................................6
Copyrights...............................................................................................................6
Default ....................................................................................................................6
Deposit Accounts....................................................................................................6
Disposition .............................................................................................................7
Dispose ...................................................................................................................7
Environmental Laws ..............................................................................................7
Environmental Liability .........................................................................................7
Environmental Permits ..........................................................................................7
Equity Cure Amount ..............................................................................................7
Equity Cure Contributions .....................................................................................7
Equity Cure Deadline .............................................................................................7
Equity Cure Notice ................................................................................................7
Equity Cure Notice Deadline .................................................................................7
Equity Cure Right ..................................................................................................8
Equity Interests......................................................................................................8
Equity Pledge Agreement ......................................................................................8
ERISA.....................................................................................................................8
ERISA Affiliate ......................................................................................................8
ERISA Event...........................................................................................................8
Event of Default .....................................................................................................8
Excluded Account ..................................................................................................8
Excluded Assets .....................................................................................................9
Excluded Cash Collateral Assets ...........................................................................9
Excluded Indebtedness...........................................................................................9
Excluded Taxes ......................................................................................................10
Existing Royalties ..................................................................................................10
FATCA ...................................................................................................................10
Fee Letter ...............................................................................................................10
Financial Covenant Breach ....................................................................................10
Financial Covenants...............................................................................................10
Financial Statements ..............................................................................................10
Fiscal Quarter .........................................................................................................10
Fiscal Year .............................................................................................................11
GAAP......................................................................................................................11
Governmental Authority ........................................................................................11
Hazardous Materials...............................................................................................11
Indebtedness ...........................................................................................................11
Indemnified Person ................................................................................................11
Indemnified Taxes ..................................................................................................11
Initial Account Control Agreement........................................................................11
Insolvency Proceeding ...........................................................................................12
Intellectual Property...............................................................................................12
Interest Rate ...........................................................................................................12
Investment...............................................................................................................12
Joinder Agreement .................................................................................................12
Lender.....................................................................................................................12
Letter of Interest ....................................................................................................12
License ....................................................................................................................12
Lien .........................................................................................................................12

*Loan and Security Agreement*

Loan ........................................................................................................................... 12
Loan Documents ........................................................................................................ 12
Master Agreement ..................................................................................................... 12
Material Adverse Effect ............................................................................................. 13
Maturity Date ............................................................................................................. 13
Maximum Rate ........................................................................................................... 13
Mining Royalties ........................................................................................................ 13
Month ........................................................................................................................ 13
Moody's ..................................................................................................................... 13
Multiemployer Plan ................................................................................................... 13
Note ........................................................................................................................... 13
NVDMV ...................................................................................................................... 13
OFAC .......................................................................................................................... 13
OFAC Lists .................................................................................................................. 13
Origination Fee .......................................................................................................... 13
Organizational Documents ........................................................................................ 13
Other Connection Taxes ............................................................................................ 14
Other Related Person ................................................................................................ 14
Other Taxes ............................................................................................................... 14
Parent ........................................................................................................................ 14
Parent LLC Agreement .............................................................................................. 14
Parent Management Committee ............................................................................... 14
Participant ................................................................................................................. 14
Participant Register ................................................................................................... 14
Party .......................................................................................................................... 14
Parties ........................................................................................................................ 14
Patent License ........................................................................................................... 14
Patents ....................................................................................................................... 14
Payment Date ............................................................................................................ 15
Payment Date Statement .......................................................................................... 15
Permitted Equipment-Backed Indebtedness ............................................................ 15
Permitted Indebtedness ............................................................................................ 15
Permitted Investment ............................................................................................... 16
Permitted Liens ......................................................................................................... 17
Permitted Royalties ................................................................................................... 19
Permitted Swap Contract .......................................................................................... 20
Person ........................................................................................................................ 20
Plan ............................................................................................................................ 20
Post-Closing Reef Fees .............................................................................................. 21
Power of Attorney ..................................................................................................... 21
Pre-Closing Reef Fees ................................................................................................ 21
Prepayment Charge ................................................................................................... 21
PTO ............................................................................................................................. 21
Publicity Materials .................................................................................................... 21
Rawhide Entity .......................................................................................................... 21
Rawhide Entities ........................................................................................................ 21
Rawhide Mine ............................................................................................................ 21
Rawhide Mining ......................................................................................................... 21
Rawhide Mining Business .......................................................................................... 21
Rawhide Mining Equipment ...................................................................................... 21

*Loan and Security Agreement*

Rawhide Mining LLC Agreement ......................................................................... 21
Rawhide-Related Persons ................................................................................ 21
Rawhide-Related Person ................................................................................. 21
Rawhide Subsidiary ...................................................................................... 22
Real Property ........................................................................................... 22
Receivables ............................................................................................. 22
Reclamation Obligations ................................................................................. 22
Reef Capital ............................................................................................ 22
Reef Capital Group ...................................................................................... 22
Reef Default ............................................................................................ 22
Reef Expense Amounts .................................................................................... 22
Reef Indemnified Party .................................................................................. 22
Reef Indemnity Amounts .................................................................................. 22
Reef Management Agreement ............................................................................... 22
Reef Management Fee ..................................................................................... 23
Reef Person ............................................................................................. 23
Reef Portfolio Company .................................................................................. 23
Register ................................................................................................ 23
Related Parties ......................................................................................... 23
Release ................................................................................................. 23
Required Lenders ........................................................................................ 23
Resignation Effective Date .............................................................................. 23
Restricted Distribution ................................................................................. 23
Restricted Transfer ..................................................................................... 24
Rights to Payment ....................................................................................... 24
Royalties ............................................................................................... 24
S&P ..................................................................................................... 24
Sanctioned Country ...................................................................................... 24
Sanctioned Person ....................................................................................... 24
Sanctions ............................................................................................... 25
Scheduled Maturity Date ................................................................................. 25
Secured Obligations ..................................................................................... 25
Secured Parties ......................................................................................... 25
Secured Party ........................................................................................... 25
Silverpeak .............................................................................................. 25
Solvent ................................................................................................. 25
State ................................................................................................... 25
Subordinated Indebtedness ............................................................................... 25
Subordination Agreement ................................................................................. 25
Subsidiary .............................................................................................. 26
Swap Contract ........................................................................................... 26
Swap Obligations ........................................................................................ 26
Taxes ................................................................................................... 26
Total Leverage Ratio .................................................................................... 26
Total Net Debt .......................................................................................... 26
Trademark License ....................................................................................... 26
Trademarks .............................................................................................. 26
UCC ..................................................................................................... 27
United States ........................................................................................... 27
USD ..................................................................................................... 27

*Loan and Security Agreement*

U.S. Person ............................................................................................................ 27
Warrant ................................................................................................................. 27
Western Exploration ............................................................................................. 27
Wholly-Owned ...................................................................................................... 27
Withholding Agent ................................................................................................ 27

Section 1.2    Usage ........................................................................................................ 27
(a)    Accounting and UCC Terms .................................................................... 27
(b)    Section References, Etc. ......................................................................... 27
(c)    Inclusion ................................................................................................. 27
(d)    Non-Exclusive Disjunction ...................................................................... 28
(e)    Hereof, Herein and Hereunder ............................................................... 28
(f)    Asset and Property ................................................................................. 28
(g)    Word Forms ............................................................................................ 28

## ARTICLE 2
## THE LOAN

Section 2.1    The Loan .................................................................................................... 28
(a)    The Loan ................................................................................................. 28
(b)    Interest ................................................................................................... 28
(c)    Principal ................................................................................................. 28
(d)    Payments ................................................................................................ 28

Section 2.2    Maximum Interest ..................................................................................... 29
Section 2.3    Default Interest ......................................................................................... 29
Section 2.4    Prepayment ............................................................................................... 30
(a)    Optional Repayment .............................................................................. 30
(b)    Repayment Upon Change in Control ...................................................... 30
(c)    Prepayment Charge ................................................................................ 30
(i)     Obligation to Pay Prepayment Charge ....................................... 30
(ii)    Amount of Prepayment Charge .................................................. 30
(iii)   Acknowledgements Regarding Prepayment Charge ................... 31
(d)    Repayment From Disposition Proceeds .................................................. 31
Section 2.5    Notes ......................................................................................................... 31
Section 2.6    Pro Rata Treatment ................................................................................... 31
Section 2.7    Reserve Requirements; Increased Costs .................................................... 32
Section 2.8    Taxes ......................................................................................................... 33
Section 2.9    Duty to Mitigate ........................................................................................ 35
Section 2.10   Warrants .................................................................................................... 36

## ARTICLE 3
## SECURITY INTEREST

Section 3.1    Grant of Security Interest .......................................................................... 37
Section 3.2    Delivery of Collateral ................................................................................. 37
Section 3.3    Borrowers Remain Liable ........................................................................... 38
Section 3.4    Taxes ......................................................................................................... 38

*Loan and Security Agreement*

Section 3.5    Further Assurances; Financing Statements ........................................................ 38
    (a)    Further Assurances ........................................................................................ 38
    (b)    Specific Obligations ...................................................................................... 38
        (i)    Fixtures, Etc. ...................................................................................... 38
        (ii)    Certificated Vehicles .......................................................................... 38
        (iii)    Initial Account Control Agreement ................................................... 39
        (iv)    EM Gold Certificate .......................................................................... 39
    (c)    Authorization to File Financing Statements ................................................ 39
    (d)    Additional Information .................................................................................. 39

## ARTICLE 4
## CONDITIONS PRECEDENT TO LOAN

Section 4.1    Required Documents ...................................................................................... 40
    (a)    Loan Documents, Etc. ................................................................................... 40
    (b)    Organizational Documents ............................................................................ 40
    (c)    Good Standing Certificates ........................................................................... 40
    (d)    Secretary's Certificates ................................................................................. 40
    (e)    Officer's Certificates .................................................................................... 41
    (f)    Financial Statements ..................................................................................... 41
    (g)    Insurance ....................................................................................................... 41
    (h)    Legal Opinions .............................................................................................. 41
        (i)    Pepper Hamilton LLP ......................................................................... 41
        (ii)    Holley Driggs ..................................................................................... 41
    (i)    KYC, AML, Etc. ........................................................................................... 41
    (j)    Other Documents ........................................................................................... 41
Section 4.2    Payment of Fees and Expenses .................................................................... 41
Section 4.3    Compliance ................................................................................................... 41
Section 4.4    No Default ..................................................................................................... 42
Section 4.5    Post-Closing Obligations ............................................................................. 42
    (a)    Certain Extensions of Time .......................................................................... 42
        (i)    Certificated Vehicles .......................................................................... 42
        (ii)    Initial Account Control Agreement ................................................... 42
        (iii)    EM Gold Certificate .......................................................................... 42
    (b)    Consequences of Failure ............................................................................... 43

## ARTICLE 5
## REPRESENTATIONS AND WARRANTIES

Section 5.1    Organization, Etc. ......................................................................................... 43
Section 5.2    Collateral ....................................................................................................... 43
Section 5.3    Commercial Tort Claims ............................................................................... 43
Section 5.4    Consents ........................................................................................................ 43
Section 5.5    Governmental Authorization; Other Consents ............................................. 44
Section 5.6    Financial Statements; No Material Adverse Effect ....................................... 44
    (a)    Audited Financial Statements ....................................................................... 44
    (b)    Unaudited Financial Statements ................................................................... 44

*Loan and Security Agreement*

(c)   No Material Adverse Effect ................................................................................ 44

Section 5.7   Actions Before Governmental Authorities ........................................................ 44

Section 5.8   Litigation ........................................................................................................ 44

Section 5.9   Laws, Etc. ....................................................................................................... 45

(a)   No Violation, Etc. .......................................................................................... 45

(b)   Investment Company Act, Margin Regulations, Etc. .................................... 45

(c)   Sanctions ....................................................................................................... 45

Section 5.10   Information Correct and Current .................................................................... 46

Section 5.11   Tax Matters .................................................................................................... 46

Section 5.12   Real Property ................................................................................................. 46

Section 5.13   Royalties ........................................................................................................ 46

Section 5.14   Certificated Vehicles ...................................................................................... 46

Section 5.15   Intellectual Property ....................................................................................... 47

Section 5.16   Environmental Matters ................................................................................... 47

Section 5.17   Financial Accounts ......................................................................................... 48

Section 5.18   Employee Loans ............................................................................................. 48

Section 5.19   Capitalization, Affiliates, Etc. ........................................................................ 48

Section 5.20   Solvency ........................................................................................................ 48

Section 5.21   ERISA ............................................................................................................ 48

## ARTICLE 6
## INSURANCE; INDEMNIFICATION

Section 6.1   Coverage ........................................................................................................ 48

Section 6.2   Certificates ..................................................................................................... 49

Section 6.3   Indemnity ....................................................................................................... 49

## ARTICLE 7
## AFFIRMATIVE COVENANTS

Section 7.1   Financial Covenants ........................................................................................ 50

(a)   Total Leverage Ratio ..................................................................................... 50

(b)   Consolidated Cash Interest Coverage Ratio .................................................. 50

(c)   Liquidity ........................................................................................................ 51

(d)   Certain Definitions ........................................................................................ 51

(i)   Consolidated Cash Balance ............................................................... 51

(ii)   Consolidated Cash Interest Coverage Ratio ...................................... 51

(iii)   Consolidated EBITDA ....................................................................... 51

(iv)   Consolidated Interest Expense ........................................................... 52

(v)   Consolidated Net Income ................................................................... 52

(vi)   Excluded Indebtedness ...................................................................... 52

(vii)   Total Leverage Ratio .......................................................................... 52

(viii)   Total Net Debt ................................................................................... 53

Section 7.2   Reporting ........................................................................................................ 53

(a)   Unaudited Financial Statements ..................................................................... 53

*Loan and Security Agreement*

(b)    Annual Audited Financial Statements ........................................................ 53
(c)    Compliance Certificate ........................................................................... 54
(d)    Monthly Mine Production Report ............................................................. 54
(e)    Financial Plan ....................................................................................... 54
(f)    Swaps .................................................................................................. 54
    (i)    Swap Contracts ............................................................................ 54
    (ii)    Position Reporting ......................................................................... 54
(g)    Required Filings .................................................................................... 54
(h)    Additional Reports ................................................................................ 54
(i)    Certain AML Events .............................................................................. 55

Section 7.3    Fiscal Years .................................................................................... 55

Section 7.4    Notices ......................................................................................... 55

Section 7.5    Preservation of Existence, Etc. .......................................................... 55

Section 7.6    Maintenance of Properties ................................................................ 55

Section 7.7    Payment of Obligations .................................................................... 56

Section 7.8    Inspection Rights ............................................................................ 56

Section 7.9    Further Assurances .......................................................................... 56
(a)    Generally ............................................................................................. 56
(b)    Pledge of Equity Interests ..................................................................... 56
(c)    Authorization ....................................................................................... 57

Section 7.10    Collateral ..................................................................................... 57

Section 7.11    Commercial Tort Claims .................................................................. 57

Section 7.12    Taxes .......................................................................................... 57

Section 7.13    Deposit Accounts ........................................................................... 57

Section 7.14    Ownership and Subsidiaries .............................................................. 58
(a)    Joinder of Subsidiaries .......................................................................... 58
(b)    No CFCs .............................................................................................. 58
(c)    Ownership of Rawhide Mining ................................................................ 58
(d)    Rawhide Subsidiaries ............................................................................ 58

Section 7.15    Use of Proceeds ............................................................................ 58

Section 7.16    Compliance with Laws .................................................................... 58

Section 7.17    Environmental Matters .................................................................... 59

Section 7.18    Intellectual Property ...................................................................... 59

Section 7.19    Books and Records ......................................................................... 60

Section 7.20    Transactions with Affiliates or Other Related Persons .......................... 60

Section 7.21    Material Contracts .......................................................................... 60

Section 7.22    Royalties ...................................................................................... 60
(a)    Grant of Royalties ................................................................................. 60
(b)    Obligation to Notify Agent ..................................................................... 60
(c)    Modification of Royalties ........................................................................ 60
    (i)    Existing Royalties .......................................................................... 60
    (ii)    Other Permitted Royalties ............................................................... 61

*Loan and Security Agreement*

# ARTICLE 8
## NEGATIVE COVENANTS

Section 8.1    Restricted Transfers ................................................................................................. 61
    (a)    General Restriction .......................................................................................... 61
    (b)    Restricted Distributions ................................................................................... 61
        (i)    No Default ................................................................................... 61
        (ii)    Leverage ................................................................................... 61
    (c)    Tax Distributions .............................................................................................. 61
        (i)    Annual Limit ............................................................................... 62
        (ii)    Liquidity ..................................................................................... 62
        (iii)    Adjustments ............................................................................. 62
    (d)    Accrued Management Fee Distributions ......................................................... 62
    (e)    Reimbursement and Indemnification of Reef Capital Group ........................... 63
    (f)    Intercompany Distributions ............................................................................. 63
    (g)    Certain Payments to Officers and Directors .................................................... 63

Section 8.2    Additional Indebtedness ....................................................................................... 63

Section 8.3    Liens ...................................................................................................................... 63

Section 8.4    Swap Obligations ................................................................................................. 63

Section 8.5    Dispositions .......................................................................................................... 64

Section 8.6    Fundamental Changes .......................................................................................... 64
    (a)    General Restriction .......................................................................................... 64
    (b)    Permitted Fundamental Changes .................................................................... 64

Section 8.7    Accounting Policies .............................................................................................. 65

Section 8.8    Investments .......................................................................................................... 65

Section 8.9    ERISA .................................................................................................................... 65

Section 8.10    Certain Restrictive Agreements .......................................................................... 65

Section 8.11    Corporate Changes .............................................................................................. 65

Section 8.12    Conduct of Business ............................................................................................ 65

# ARTICLE 9
## EVENTS OF DEFAULT

Section 9.1    Events of Default .................................................................................................. 66
    (a)    Failure to Pay .................................................................................................. 66
    (b)    Breach of Certain Covenants .......................................................................... 66
    (c)    Breach of Agreement ...................................................................................... 66
    (d)    Representations ............................................................................................... 66
    (e)    Insolvency ....................................................................................................... 67
    (f)    Cessation of Business ..................................................................................... 67
    (g)    Attachments; Judgments ................................................................................. 67
    (h)    Other Obligations ............................................................................................ 67
    (i)    Change in Control ............................................................................................ 68

Section 9.2    Equity Cure ........................................................................................................... 68
    (a)    Equity Cure Right ............................................................................................ 68
    (b)    Determination of Equity Cure Amount ............................................................ 68

*Loan and Security Agreement*

(c)   Conditions to Equity Cure ..................................................................................... 69
    (i)   Equity Cure Contributions ...................................................................... 69
    (ii)  No Other Default .................................................................................... 69
    (iii) Notice to Agent; Commitments .............................................................. 69
(d)  Limitations on Exercise of Equity Cure Right ........................................................ 69
(e)  Suspension of Remedies Pending Equity Cure ..................................................... 69
(f)   Effect of Equity Cure Limited ................................................................................ 70

## ARTICLE 10
### REMEDIES

Section 10.1   General ............................................................................................................. 70

Section 10.2   Collection; Foreclosure ...................................................................................... 70

Section 10.3   No Waiver .......................................................................................................... 71

Section 10.4   Cumulative Remedies ........................................................................................ 71

Section 10.5   Power of Attorney ............................................................................................. 71
    (a)  Appointment ......................................................................................... 71
    (b)  Delivery of Power of Attorney ............................................................... 72

## ARTICLE 11
### MISCELLANEOUS

Section 11.1   Severability ....................................................................................................... 72

Section 11.2   Notices .............................................................................................................. 73

Section 11.3   Entire Agreement; Amendments ....................................................................... 73
    (a)  Entire Agreement .................................................................................. 73
    (b)  Amendments and Waivers ..................................................................... 74

Section 11.4   No Strict Construction ....................................................................................... 74

Section 11.5   No Waiver .......................................................................................................... 74

Section 11.6   Survival ............................................................................................................. 75

Section 11.7   Successors and Assigns ..................................................................................... 75

Section 11.8   Governing Law ................................................................................................... 75

Section 11.9   Consent to Jurisdiction and Venue .................................................................... 76

Section 11.10  Mutual Waiver of Jury Trial / Judicial Reference ............................................... 76

Section 11.11  Fees and Expenses ............................................................................................ 77
    (a)  Closing ................................................................................................... 77
    (b)  Post-Closing .......................................................................................... 77

Section 11.12  Confidentiality .................................................................................................. 77

Section 11.13  Assignment of Rights ........................................................................................ 78
    (a)  Assignment ........................................................................................... 78
    (b)  Register ................................................................................................. 79
    (c)  Registered Form .................................................................................... 79

Section 11.14  Participations ................................................................................................... 79
    (a)  Generally ............................................................................................... 79
    (b)  Participation Agreements ...................................................................... 79

*Loan and Security Agreement*

(c)    Benefit of Certain Provisions ..................................................................... 79

(a)    Participant Register ..................................................................................... 80

Section 11.15  Revival of Secured Obligations ................................................................ 80

Section 11.16  Counterparts ............................................................................................ 80

Section 11.17  No Third-Party Beneficiaries .................................................................... 80

Section 11.18  Agency ..................................................................................................... 81

Section 11.19  Certain ERISA Matters ............................................................................. 83

Section 11.20  Publicity ................................................................................................... 85

Section 11.21  Joint and Several Liability; Rawhide Mining as Agent for Borrowers ............................... 85

# EXHIBITS

Exhibit A          Form of Note

Exhibit B          Borrower Information

Exhibit C          Deposit Accounts and Investment Accounts

Exhibit D          Form of Compliance Certificate

Exhibit E          Form of Mine Production Report

Exhibit F          Form of Joinder Agreement

Exhibit G          Form of Power of Attorney

Exhibit H          Form of Initial Account Control Agreement

# ANNEXES

Annex I            Existing Permitted Indebtedness

Annex II           Existing Permitted Investments

Annex III          Rawhide Mining Subsidiaries

# SCHEDULES

Schedule 2.1    Advance Amounts; Wire Instructions

Schedule 5.3    Commercial Tort Claims

Schedule 5.12   Real Property

Schedule 5.13   Existing Royalties

Schedule 5.14   Certificated Vehicles

Schedule 5.15   Intellectual Property

Schedule 5.16   Environmental Matters

Schedule 5.19   Capitalization and Affiliates

Schedule 7.21   Material Contracts

*Loan and Security Agreement*

# LOAN AND SECURITY AGREEMENT

This **LOAN AND SECURITY AGREEMENT**, dated as of January 3, 2019 (as amended, restated, supplemented or otherwise modified from time to time, this "**Agreement**"), is entered into by and among:

(a)  (1)  **RAWHIDE MINING LLC**, a Delaware limited liability company ("**Rawhide Mining**"); and

(2)  the **RAWHIDE SUBSIDIARIES FROM TIME TO TIME PARTY TO THIS AGREEMENT** (such additional Rawhide Subsidiaries, together with Rawhide Mining, collectively, the "**Borrowers**," and each, a "**Borrower**");

(b)  **RAWHIDE ACQUISITION HOLDING LLC**, a Delaware limited liability company (the "**Parent**," and, together with the Borrowers, collectively, the "**Rawhide Entities**," and each, a "**Rawhide Entity**");

(c)  the **SEVERAL FINANCIAL INSTITUTIONS OR ENTITIES FROM TIME TO TIME PARTY TO THIS AGREEMENT AS LENDERS** (the "**Lenders**"); and

(d)  **SILVERPEAK CREDIT PARTNERS, LP**, a Delaware limited partnership ("**Silverpeak**"), in its capacity as administrative agent and collateral agent for itself and the Lenders (together with its successors and assigns, in such capacity, the "**Agent**," and, together with the Rawhide Entities and the Lenders, the "**Parties**," and each, a "**Party**").

## PRELIMINARY STATEMENTS

1.  The Borrowers have requested that the Lenders make a term loan to them in an aggregate principal amount of **USD 18,100,000** (the "**Loan**").

2.  The Lenders are willing to make the Loan on the terms and conditions set forth in this Agreement.

**NOW**, **THEREFORE**, in consideration of the foregoing premises, the Parties, intending to be legally bound, hereby agree as follows:

## ARTICLE 1
## DEFINITIONS AND USAGE

**Section 1.1**    **Definitions**.    Unless otherwise defined herein, the following capitalized terms shall have the following meanings:

"**Account Control Agreements**" means, collectively, (a) the Initial Account Control Agreement and (b) any other account control agreements from time to time entered into pursuant to **clause (b)** of **Section 7.13** (*Deposit Accounts*) below.

"**Accrual Period**" means, with respect to any Payment Date, the period from and including the preceding Payment Date (or the Closing Date, in the case of the first such period) to and including the day preceding such current Payment Date.

"**Accrued Management Fee Distributions**" has the meaning specified in **Section 8.1(d)** (*Accrued Management Fee Distributions*) below.

"**Administration Fee**" shall have the meaning specified in the Fee Letter.

"**Advance**" means, with respect to any Lender, the portion of the Loan held by such Lender.

"**Affiliate**" means any Person that directly or indirectly controls, is controlled by, or is under common control with the Person in question, and "**Affiliated**" has a meaning correlative to the foregoing.    As used in this definition, the term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract or otherwise.

"**Agent**" has the meaning specified in the preamble to this Agreement.

"**Agreement**" has the meaning specified in the preamble hereto.

"**Amortization Date**" means:

(a)    March 15, 2020;

(b)    March 15, 2021; and

(c)    March 15, 2022

(or, if any such date shall not be a Business Day, the immediately following Business Day).

"**Annual Cap**" has the meaning specified in **Section 8.1(d)(ii)** below.

"**Annual Surplus**" has the meaning specified in **Section 8.1(d)(ii)** below.

"**Anti-Corruption Laws**" means all laws, rules, and regulations of any jurisdiction applicable to any Borrower or any of its Affiliates from time to time concerning or relating to bribery or corruption, including without limitation the United States Foreign Corrupt Practices Act of 1977, as amended, the UK Bribery Act 2010 and other similar legislation in any other jurisdictions.

"**Anti-Terrorism Laws**" means any laws, rules, regulations or orders relating to terrorism or money laundering, including without limitation Executive Order No. 13224 (effective September 24, 2001), the USA PATRIOT Act, the laws comprising or implementing the Bank Secrecy Act, and the laws administered by OFAC.

"**Assignee**" has the meaning specified in **Section 11.13(a)** (*Assignment*) below.

"**Audited Financial Statements**" means, for any Fiscal Year, the most recent audited consolidated balance sheet of the Borrowers and the related consolidated statements of income or operations, shareholders' equity and cash flows for such Fiscal Year.

"**Bankruptcy Code**" means the United States Bankruptcy Code, 11 U.S.C. §101, *et seq*.

*Loan and Security Agreement*

"**Blocked Person**"  (a) listed in the annex to, or is otherwise subject to the provisions of, Executive Order No. 13224; (b) a Person owned or controlled by, or acting for or on behalf of, any Person that is listed in the annex to, or is otherwise subject to the provisions of, Executive Order No. 13224; (c) a Person with which any Lender is prohibited from dealing or otherwise engaging in any transaction by any Anti-Terrorism Law; (d) a Person that commits, threatens or conspires to commit or supports "terrorism" as defined in Executive Order No. 13224; or  (e) a Person that is named a "specially designated national" or "blocked person" on the most current list published by OFAC or other similar list.

"**Board**" means, with respect to any Person, its Board of Managers, Board of Directors or other governing body.

"**Board Observer Rights Agreement**" means the Board Observer Rights Agreement, dated as of January 3, 2019, among the Parent, Rawhide Mining and the Agent.

"**Borrower**" has the meaning specified in the preamble to this Agreement.

"**Borrower Real Property**" means any Real Property that is owned, leased, used or operated by any Borrower or in which any Borrower has any mining rights, concessions, permits or licenses.

"**Borrower Taxable Income**" has the meaning specified in **Section 8.1(c)(i)** (*Annual Limit*) below.

"**Borrower Tax Partners**" means the Person or Persons from time to time constituting the direct or indirect partners (or the equivalent) of the Borrowers (or the Parent), for U.S. federal, State or local (or any applicable non-U.S.) income tax purposes, by virtue of holding (directly or through one or more intermediate pass-through holding entities) Equity Interests of the Parent.

"**Business Day**" means any day other than Saturday, Sunday and any other day on which banking institutions in the State of New York are authorized to be closed for business.

"**Capitalized Leases**" means all leases that have been or are required to be, in accordance with GAAP, recorded as capitalized leases; **provided**, **however**, **that**, for all purposes of this Agreement and the calculations made hereunder  (a) the amount of obligations under any Capitalized Lease shall be the amount thereof accounted for as a liability on a balance sheet in accordance with GAAP and  (b) GAAP will be deemed to treat leases in a manner consistent with its current treatment under generally accepted accounting principles as of the Closing Date, notwithstanding any modifications or interpretive changes thereto that may occur thereafter.

"**Cash Equivalents**" means:

(a)    direct obligations of, and obligations fully guaranteed by, the United States or any agency or instrumentality thereof the obligations of which are backed by the full faith and credit of the United States;

(b)    demand deposits, time deposits, bankers' acceptances or certificates of deposit, in each case denominated in USD, of any depository institution or trust company (i) that is incorporated under the laws of the United States or any State or any United States branch of a foreign bank, (ii) that is subject to supervision and examination by federal or State

*Loan and Security Agreement*

banking or depository institution authorities, (iii) having capital, surplus and undivided profits aggregating at least **USD 100,000,000**, and (iv) at the time of such investment (or contractual commitment to invest), whose commercial paper or other short-term unsecured debt obligations (other than such obligations the rating of which is based on the credit of a Person other than such depository institution or trust company) are currently rated by both (A) S&P, which rating shall not be lower than "A-1," and (B) Moody's, which rating shall not be lower than "P-1";

(c)    USD-denominated repurchase obligations, in each case having a term of not more than **ten** days, with respect to any security that is a direct obligation of, or fully guaranteed by, the United States or any agency or instrumentality thereof the obligations of which are backed by the full faith and credit of the United States, entered into with a depository institution or trust company (acting as principal) that satisfies the criteria set forth in **paragraph (b)** of this definition;

(d)    USD-denominated short-term corporate securities (bearing interest coupon payments or purchased at a discount) issued by any corporation incorporated under the laws of the United States or any State; **provided**, **however**, **that**, (i) such investment (A) shall not have an 'r' highlighter affixed to its rating by S&P or Moody's, and (B) shall, by its terms, provide for a predetermined, fixed dollar amount of principal due at maturity that cannot vary or change, and (ii) at the time of the investment, the short-term unsecured debt obligations of such corporation (other than such obligations the rating of which is based on the credit of a Person other than such corporation) are currently rated by both (A) S&P, which rating shall not be lower than "A-1," and (B) Moody's, which rating shall not be lower than "P-1";

(e)    USD-denominated commercial paper that is currently rated by both (i) S&P, which rating shall not be lower than " A-1," and (ii) Moody's, which rating shall not be lower than " P-1"; **provided**, **however**, **that**, such investment (A) shall not have an 'r' highlighter affixed to its rating by S&P or Moody's, and (B) shall, by its terms, provide for a predetermined, fixed dollar amount of principal due at maturity that cannot vary or change; and

(f)    investments in money market funds which are (i) registered under the Investment Company Act of 1940, as amended, (ii) currently rated by both (A) S&P, which rating shall not be lower than "AAAm," and (B) Moody's, which rating shall not be lower than "Aaa-mf";

**provided**, **however**, **that**, no such investment shall have a term longer than **90** days from the date that such investment is acquired by the applicable Borrower.

"**Certificated Vehicle**" means any vehicle that is of a type as to which ownership is represented by a certificate of title or similar document (whether or not such certificate of title is actually in the possession of the Borrowers).

"**CFC**" means any Person, if either:

(a)    such Person is a "controlled foreign corporation" as defined in Section 957(a) of the Code; or

*Loan and Security Agreement*

(b)    substantially all of the assets of such Person consist of Equity Interests in one or more other CFCs.

"**Change in Control**" means  (a) the Borrowers' lease, license, sale or other disposition of all or substantially all of their collective assets,  (b) any transaction following which the Parent shall cease to be the direct, legal and beneficial owner of **100.00%** of the outstanding Equity Interests of Rawhide Mining, in violation of **Section 7.14(c)** (*Ownership of Rawhide Mining*) below,  (c) the acquisition by any person, or two or more persons acting in concert, other than members of the Parent, of beneficial ownership (within the meaning of Rule 13d-3 under the Securities Exchange Act of 1934) of the outstanding equity interests of the Parent, if, after giving effect to such acquisition such person or persons own(s) over **50.00%** percent of such outstanding equity interests,  (d) a merger or consolidation of Rawhide Mining following which the members of the Parent will not beneficially own at least **50.00%** of the outstanding equity interests in the surviving entity,  (e) Marceau Schlumberger shall cease to be a member of the Parent Management Committee with active involvement in extraordinary and strategic matters and decisions with respect to the Borrowers or  (f) any transaction following which Marceau Schlumberger, Reef Capital and Reef Capital Group, taken as a whole, would cease to own (beneficially and of record), directly or indirectly, at least **15.00%** of the outstanding equity interests of the Parent.

"**Change in Law**" means  (a) the adoption of any law, rule or regulation after the date of this Agreement,  (b) any change in any law, rule or regulation or in the interpretation or application thereof by any Governmental Authority after the date of this Agreement or  (c) compliance by any Lender (or, for purposes of **Section 2.7** (*Reserve Requirements; Increased Costs*) below, by any lending office of such Lender or by such Lender's holding company, if any) with any request, guideline or directive (whether or not having the force of law) of any Governmental Authority made or issued after the date of this Agreement; **provided**, that, notwithstanding anything herein to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and  (ii) all requests, rules, guidelines or directives promulgated by the Account Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law," regardless of the date enacted, adopted or issued.

"**Claims**" has the meaning specified in **Section 11.10(a)** below.

"**Closing Date**" means the date of this Agreement.

"**Closing Costs**" has the meaning specified in **Section 11.11(a)** (*Closing*) below.

"**Code**" means the Internal Revenue Code of 1986, as amended from time to time.

"**Collateral**" means the property described in **Section 3.1** (*Grant of Security Interest*) below.

"**Compliance Certificate**" has the meaning specified in **Section 7.2(c)** (*Compliance Certificate*) below.

"**Confidential Information**" has the meaning specified in **Section 11.12** (*Confidentiality*) below.

"**Consolidated Cash Balance**" has the meaning specified in **Section 7.1(d)(i)** (*Consolidated Cash Balance*) below.

"**Consolidated Cash Interest Coverage Ratio**" has the meaning specified in **Section 7.1(d)(ii)** (*Consolidated Cash Interest Coverage Ratio*) below.

"**Consolidated EBITDA**" has the meaning specified in **Section 7.1(d)(iii)** (*Consolidated EBITDA*) below.

"**Consolidated Interest Expense**" has the meaning specified in **Section 7.1(d)(iv)** (*Consolidated Interest Expense*) below.

"**Consolidated Net Income**" has the meaning specified in **Section 7.1(d)(v)** (*Consolidated Net Income*) below.

"**Contingent Obligation**" means, as applied to any Person, (a) any direct or indirect liability, contingent or otherwise, of that Person with respect to (i) any Indebtedness of another Person, including any such Indebtedness directly or indirectly guaranteed, endorsed, co-made or sold with recourse by that Person, or in respect of which that Person is otherwise directly or indirectly liable, **OR** (ii) any obligations with respect to undrawn letters of credit, corporate credit cards or merchant services issued for the account of that Person, **OR** (b) any Swap Obligation (other than an agreement described in **clause (a)** of the definition of "Permitted Swap Contract"); **provided**, **however**, **that**, the term "Contingent Obligation" shall not include endorsements for collection or deposit in the ordinary course of the Rawhide Mining Business.   The amount of any Contingent Obligation shall be deemed to be equal to (i) the stated or determined amount of the primary obligation in respect of which such Contingent Obligation is made, **OR** (ii) if not stated or determinable, equal to the maximum reasonably anticipated liability in respect thereof as determined by such Person in good faith, **OR** (iii) in the case of any Swap Obligation, as calculated daily on a mark-to-market basis in accordance with GAAP; **provided**, **however**, **that**, such amount shall not in any event exceed the maximum amount of the obligations under the guarantee or other support arrangement.

"**Contractual Obligation**" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"**Copyright License**" means any written agreement granting any right to use any Copyright now owned or hereafter acquired by any Borrower or in which any Borrower now holds or hereafter acquires any interest.

"**Copyrights**" means all copyrights, whether registered or unregistered, held pursuant to the laws of the United States, any State or any other country.

"**Default**" means any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would be an Event of Default.

"**Deposit Accounts**" means any "deposit accounts," as such term is defined in the UCC, and includes any checking account, savings account, or certificate of deposit.

*Loan and Security Agreement*

"**Disposition**" or "**Dispose**" means the sale, transfer, license, lease or other disposition of any property by any Borrower (other than to another Borrower), including, without limitation:

(a)    any sale and leaseback transaction;

(b)    any issuance of Equity Interests by a Rawhide Subsidiary (other than to a Borrower); and

(c)    any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith;

**it** **being** **understood**, **however**, **that**, without limiting the effect of **Section 8.2** (*Additional Indebtedness*) or **8.3** (*Liens*) below, neither the grant of a Permitted Lien, nor a transfer of Excluded Assets subject thereto in connection with the repayment or refinancing of Permitted Indebtedness to which such Permitted Lien relates, or an exercise of creditors' remedies in connection with a Borrower default on the Permitted Indebtedness secured thereby, shall constitute a Disposition, for purposes of this Agreement.

"**Environmental Laws**" means all Federal, State, local and foreign laws (including common law), treaties, regulations, rules, ordinances, codes, decrees, judgments, directives, orders (including consent orders) and agreements, in each case relating to protection of the environment, natural resources, human health and safety or the presence, release of, or exposure to, Hazardous Materials, or the generation, manufacture, processing, distribution, use, treatment, storage, transport, recycling or handling of, or the arrangement for such activities with respect to, Hazardous Materials.

"**Environmental Liability**" means all liabilities, obligations, damages, losses, claims, actions, suits, judgments, orders, fines, penalties, fees, expenses and costs (including administrative oversight costs, natural resource damages and remediation costs), whether contingent or otherwise, arising out of or relating to (a) compliance or non-compliance with any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the release of any Hazardous Materials or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"**Environmental Permits**" means all permits, licenses, authorizations, certificates, approvals or registrations required by any Governmental Authority under any Environmental Laws.

"**Equity Cure Amount**" has the meaning specified in **Section 9.2(a)** (*Equity Cure Right*) below.

"**Equity Cure Contributions**" has the meaning specified in **Section 9.2(a)** (*Equity Cure Right*) below.

"**Equity Cure Deadline**" has the meaning specified in **Section 9.2(a)** (*Equity Cure Right*) below.

"**Equity Cure Notice**" has the meaning specified in **Section 9.2(c)(iii)** (*Notice to Agent; Commitments*) below.

"**Equity Cure Notice Deadline**" has the meaning specified in **Section 9.2(c)(iii)** (*Notice to Agent; Commitments*) below.

"**Equity Cure Right**" has the meaning specified in **Section 9.2(a)** (*Equity Cure Right*) below.

"**Equity Interests**" means, with respect to any Person, the capital stock, partnership or limited liability company interest, or other equity securities or equity ownership interests of such Person.

"**Equity Pledge Agreement**" means the Pledge and Security Agreement, dated as of January 3, 2019, between the Parent, as pledgor, and the Agent.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations promulgated thereunder.

"**ERISA Affiliate**" means any corporation or trade or business that is a member of any group of organizations (a) described in Section 414(b) or (c) of the Code of which any Rawhide Entity is a member and (b) solely for purposes of potential liability under Section 302(c)(11) of ERISA and Section 412(c)(11) of the Code and the lien created under Section 302(f) of ERISA and Section 412(n) of the Code, described in Section 414(m) or (o) of the Code of which any Rawhide Entity is a member.

"**ERISA Event**" means (a) any "reportable event", as defined in Section 4043 of ERISA or the regulations issued thereunder, with respect to a Plan (other than an event for which the 30-day notice period is waived), (b) the existence with respect to any Plan of an "accumulated funding deficiency" (as defined in Section 412 of the Code or Section 302 of ERISA), whether or not waived, (c) the filing pursuant to Section 412(d) of the Code or Section 303(d) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan, (d) the incurrence by any Borrower or any ERISA Affiliate of any liability under Title IV of ERISA with respect to the termination of any Plan or the withdrawal or partial withdrawal of any Borrower or any ERISA Affiliate from any Plan or Multiemployer Plan, (e) the receipt by any Borrower or any ERISA Affiliate from the Pension Benefit Guaranty Corporation or a plan administrator of any notice relating to the intention to terminate any Plan or Plans or to appoint a trustee to administer any Plan, (f) the adoption of any amendment to a Plan that would require the provision of security pursuant to Section 401(a)(29) of the Code or Section 307 of ERISA, (g) the receipt by any Borrower or any ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan from any Borrower or any ERISA Affiliate of any notice, concerning the imposition of withdrawal liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent or in reorganization, within the meaning of Title IV of ERISA, or (h) the occurrence of a "prohibited transaction" with respect to which any Borrower or any of the Subsidiaries is a "disqualified person" (within the meaning of Section 4975 of the Code) or with respect to which any Borrower or any of its Subsidiaries could otherwise be liable.

"**Event of Default**" has the meaning specified in **Article 9** (*Events of Default*) below.

"**Excluded Account**" means any Deposit Account (a) used exclusively for payroll, payroll taxes, and other employee wage and benefit payments with a balance no greater than such payroll, payroll taxes and other employee wage and benefit payments obligations that are to be paid within any two-week period, (b) constituting a "zero balance" Deposit Account or (c) exclusively holding Excluded Cash Collateral Assets.

"**Excluded Assets**" means, at any time:

(a)    any property in which any Rawhide Entity now or hereafter has rights, to the extent that the grant by such Borrower of a security interest in such property is prohibited (i) under the effective terms of the governing document applicable thereto, without the consent of one or more parties thereto (other than the Agent and the Lenders), but only for so long as such consent has not been obtained, or (ii) by applicable law;

(b)    any property that is subject to, or secures, Permitted Equipment-Backed Indebtedness, Capitalized Leases or purchase-money obligations, and cash securing letter-of-credit reimbursement obligations, in each case to the extent that such Permitted Equipment-Backed Indebtedness, Capitalized Leases, purchase-money obligations, or letters of credit are permitted under this Agreement (including, to the extent constituting collateral for such obligations, any and all proceeds of the foregoing, including insurance proceeds and any property or obligations received when such property or proceeds are sold, collected, dealt with, exchanged or otherwise disposed of);

(c)    any property that has been sold to a Person who is not a Rawhide Entity in compliance with this Agreement;

(d)    other assets, to the extent that the Agent determines, in its reasonable judgment, as evidenced by its consent in writing delivered to the Borrowers, that the collateral value thereof is insufficient to justify the cost, difficulty, time or administrative burden of obtaining a Lien thereon (**provided**, **however**, **that**, the Agent shall not deliver any consent pursuant to this **paragraph (d)** without the prior written approval of the Required Lenders);

(e)    any application for registration of a Trademark filed with the PTO on an intent-to-use basis, until such time (if any) as a statement of use or amendment to allege use is accepted by the PTO, at which time such Trademark shall automatically become part of the Collateral and subject to the security interest granted under **Section 3.1** (*Grant of Security Interest*) below;

(f)    any Excluded Accounts; and

(g)    any property, to the extent that such grant of a security interest (i) is prohibited by any Governmental Authority or (ii)(A) requires the consent of any Governmental Authority and (B) such consent has not been obtained.

For the avoidance of doubt, any and all Proceeds of Excluded Assets, to the extent that such Proceeds are themselves Excluded Assets, shall be Excluded Assets and shall not be Collateral.

"**Excluded Cash Collateral Assets**" means cash collateral accounts maintained by the Company to post required cash collateral, (a) to secure Reclamation Obligations or (b) to post required cash collateral to secure Permitted Swap Contracts.

"**Excluded Indebtedness**" has the meaning specified in **Section 7.1(d)(vi)** (*Excluded Indebtedness*) below.

"**Excluded Taxes**" means any of the following Taxes imposed on or with respect to the Agent or any Lender, or required to be withheld or deducted from a payment to the Agent or any Lender:

(a)    Taxes imposed on (or measured by) net income, franchise Taxes and branch profits Taxes, in each case, (i) imposed as a result of such Agent or Lender being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or a political subdivision thereof) or (ii) that are Other Connection Taxes;

(b)    in the case of a Lender (other than an assignee pursuant to a request by a Borrower under **Section 2.9(a)** below), any U.S. federal withholding Tax that is imposed on amounts payable to or for the account of such Lender with respect to an applicable Advance at the time such Lender becomes a party to this Agreement (or designates a new lending office), except to the extent that such Lender (or its assignor, if any) was entitled, at the time of designation of a new lending office (or assignment), to receive additional amounts from a Borrower with respect to such withholding Tax pursuant to **Section 2.8** (*Taxes*) below;

(c)    Taxes attributable to the Agent's or such Lender's failure to comply with **Section 2.8(f)** below; and

(d)    any United States federal withholding Taxes imposed under FATCA.

"**Existing Royalties**" has the meaning specified in **Section 5.13** (*Royalties*) below.

"**FATCA**" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any law, regulations, or other official guidance enacted relating to an applicable intergovernmental agreement between a non-U.S. jurisdiction and the United States with respect thereto, and any agreements entered into pursuant to Section 1471(b)(1) of the Code.

"**Fee Letter**" means the Fee Letter, dated as of January 3, 2019, among Rawhide Mining, the Parent and the Agent, as amended, restated, supplemented or otherwise modified from time to time.

"**Financial Covenant Breach**" has the meaning specified in **Section 9.2(a)** (*Equity Cure Right*) below.

"**Financial Covenants**" means the covenants set forth in **Section 7.1(a)** (*Total Leverage Ratio*), **7.1(b)** (*Consolidated Cash Interest Coverage Ratio*) and **7.1(c)** (*Liquidity*) below.

"**Financial Statements**" has the meaning specified in **Section 7.2** (*Reporting*) below (it being understood that references to "most recent Financial Statements," or words to similar effect, shall mean (a) the Financial Statements relating to the quarterly or annual period most recently ended, (b) the Audited Financial Statements for such period, if the same are available and (c) otherwise, to the unaudited Financial Statements for such period).

"**Fiscal Quarter**" means a fiscal quarter of the Borrowers.

"**Fiscal Year**" means a fiscal year of the Borrowers.

"**GAAP**" means generally accepted accounting principles in the United States, as in effect from time to time; **provided**, **however**, **that**, any obligations of a Person under a lease (whether existing now or entered into in the future) that is not (or would not be) a capital lease obligation under GAAP as in effect as of the date of this Agreement shall not be treated as a capital lease obligation solely as a result of the adoption of changes in GAAP.

"**Governmental Authority**" means the government of the United States or any other nation, or of any political subdivision thereof, whether State or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"**Hazardous Materials**" means (a) any petroleum products or byproducts and all other hydrocarbons, coal ash, radon gas, asbestos, urea formaldehyde foam insulation, polychlorinated biphenyls, chlorofluorocarbons and all other ozone-depleting substances and (b) any chemical, material, substance or waste that is prohibited, limited or regulated by or pursuant to any Environmental Law.

"**Indebtedness**" means all of the following (without duplication):

(a)    all indebtedness for borrowed money or the deferred purchase price of property or services (excluding (x) trade payables and accounts payable, in each case for goods delivered to, or services performed for, the Borrowers pursuant to the Rawhide Mining Business, and (y) Indebtedness incurred as a result of endorsing negotiable instruments, and guaranties in respect thereof, in the ordinary course of the Rawhide Mining Business), including reimbursement and other obligations with respect to surety bonds and letters of credit;

(b)    all obligations evidenced by notes, bonds, debentures or similar instruments;

(c)    all Capitalized Lease obligations; and

(d)    all Contingent Obligations.

"**Indemnified Person**" has the meaning give to it in **Section 6.3** (*Indemnity*) below.

"**Indemnified Taxes**" means  (a) Taxes other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any Borrower under any Loan Document, and  (b) to the extent not otherwise described in **clause (a)** of this definition, Other Taxes.

"**Initial Account Control Agreement**" means an Account Control Agreement, among Rawhide Mining, the Agent and U.S. Bank National Association, a national banking association, with respect to the Deposit Account identified in **Item (1)** of **Exhibit C** (*Deposit Accounts and Investment Accounts*) to this Agreement, in the form attached as **Exhibit H** (*Form of Initial Account Control Agreement*), or in such other form as the Agent may have approved in writing (such approval not to be unreasonably withheld, conditioned or delayed).

*Loan and Security Agreement*

"**Insolvency Proceeding**" is any proceeding by or against any Person under the United States Bankruptcy Code, or any other bankruptcy or insolvency law, including assignments for the benefit of creditors, compositions, extensions generally with its creditors, or proceedings seeking reorganization, arrangement, or other similar relief.

"**Intellectual Property**" means (a) all of the Copyrights, Trademarks, Patents, Licenses, trade secrets, inventions and mask works of any Borrower, (b) the Borrowers' applications therefor, and reissues, extensions, or renewals thereof, and (c) the Borrowers' goodwill associated with any of the foregoing, together with the Borrowers' rights to sue for past, present and future infringement of the foregoing and the goodwill associated therewith.

"**Interest Rate**" means, for any day, the *per annum* rate of interest specified as the "Interest Rate" in the Fee Letter.

"**Investment**" means, with respect to any Person, any beneficial ownership (including stock, partnership or limited liability company interests) of or in any other Person, or any loan, advance or capital contribution to any other Person or the acquisition of any material assets of any other Person.

"**Joinder Agreement**" means for each Rawhide Subsidiary, a completed and executed Joinder Agreement in substantially the form attached as **Exhibit F** (*Form of Joinder Agreement*) to this Agreement.

"**Lender**" has the meaning specified in the preamble to this Agreement.

"**Letter of Interest**" means the Letter of Interest, dated October 16, 2018, between Silverpeak and Rawhide Mining.

"**License**" means any Copyright License, Patent License, Trademark License or other license of rights or interests.

"**Lien**" means any mortgage, deed of trust, pledge, hypothecation, assignment for security, security interest, encumbrance, levy, lien or charge of any kind, whether voluntarily incurred or arising by operation of law or otherwise, against any property, any conditional sale or other title retention agreement, and any lease in the nature of a security interest.

"**Loan**" means the loan made under this Agreement.

"**Loan Documents**" means  (a) this Agreement,  (b) the Board Observer Rights Agreement,  (c) the (d) the Equity Pledge Agreement,  (e) the Fee Letter,  (f) the Initial Account Control Agreement,  (g) the Power of Attorney,  (h) the Warrants,  (i) all UCC Financing Statements,  (j) the Notes (if any),  (k) any other Account Control Agreements  (l) any Joinder Agreements,  (m) any Subordination Agreements and (n) any other documents executed in connection with the Secured Obligations or the transactions contemplated hereby, as the same may from time to time be amended, modified, supplemented or restated.

"**Master Agreement**" means (a) any form of master agreement published by the International Swaps and Derivatives Association, Inc.,  (b) any International Foreign Exchange Master Agreement, or any  (c) any other master agreement.

"**Material Adverse Effect**" means a material adverse effect upon:

(a)    the business, operations, properties, assets or financial condition of the Borrowers and their Subsidiaries taken as a whole; **OR**

(b)    the ability of the Borrowers to perform or pay the Secured Obligations in accordance with the terms of the Loan Documents, or the ability of the Agent or the Lenders to enforce any of their rights or remedies with respect to the Secured Obligations; **OR**

(c)    the Collateral or the Agent's Liens on the Collateral or the priority of such Liens;

**provided**, **however**, **that**, in no event shall a drop in gold prices or the consequences thereof constitute a Material Adverse Effect.

"**Maturity Date**" means the earlier to occur of  (a) the Scheduled Maturity Date and  (b) the date that the Loan and other Secured Obligations hereunder are declared due and payable following the occurrence of an Event of Default pursuant to **Article 10** (*Remedies*) below.

"**Maximum Rate**" has the meaning specified in **Section 2.2** (*Maximum Interest*) below.

"**Mining Royalties**" means royalties of a type (and at a percentage) which are reasonably consistent with market practices in the mining industry and granted in connection with the acquisition or lease of mining rights and properties or mining production associated therewith.

"**Month**" means a calendar month.

"**Moody's**" means Moody's Investors Service, Inc., and any successor thereto.

"**Multiemployer Plan**" means a multiemployer plan defined as such in Section 3(37) of ERISA to which contributions have been, or were required to have been, made by any Borrower or any of their ERISA Affiliates during the five-year period ending on the date of this Agreement and which is covered by Title IV of ERISA.

"**Note**" means a Secured Term Promissory Note in substantially the form of **Exhibit A** (*Form of Note*) to this Agreement.

"**NVDMV**" has the meaning specified in **Section 3.5(b)(ii)** (*Certificated Vehicles*) below.

"**OFAC**" is the U.S. Department of Treasury Office of Foreign Assets Control.

"**OFAC Lists**" are, collectively, the Specially Designated Nationals and Blocked Persons List maintained by OFAC pursuant to Executive Order No. 13224, 66 Fed. Reg. 49079 (Sept. 25, 2001) or any other list of terrorists or other restricted Persons maintained pursuant to any of the rules and regulations of OFAC or pursuant to any other applicable Executive Orders.

"**Origination Fee**" has the meaning specified in the Fee Letter.

"**Organizational Documents**" means, with respect to any Person, its certificate of incorporation, articles of incorporation, certificate of formation, certificate of registration, trust certificate, by-laws,

*Loan and Security Agreement*

partnership agreement, limited liability company agreement, memorandum and articles of association, operating agreement, trust agreement, management agreement or other similar or equivalent organizational, charter or constitutional agreement or arrangement.

"**Other Connection Taxes**" means, with respect to the Agent or any Lender, Taxes imposed as a result of a present or former connection between the Agent or such Lender and the jurisdiction imposing such Tax (other than connections arising solely from the Agent or such Lender having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, or engaged in any other transaction pursuant to or enforced any Loan Document or sold or assigned an interest in any Loan or Loan Document).

"**Other Related Person**" means, with respect to any Person who is an individual, any other Person related by blood or marriage to such Person.

"**Other Taxes**" means any and all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes arising from any payment made under any Loan Document or from the execution, delivery, performance, assignment, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to **Section 2.9(a)** below).

"**Parent**" has the meaning specified in the preamble to this Agreement.

"**Parent LLC Agreement**" means the Third Amended and Restated Limited Liability Company Agreement, dated as of July 27, 2017, of the Parent.

"**Parent Management Committee**" means the "Management Committee" (as defined in **Article 4** (*Management of Company*) of the Parent LLC Agreement) of the Parent, or any successor thereto or replacement thereof.

"**Participant**" has the meaning specified in **Section 11.14(a)** (*Generally*) below.

"**Participant Register**" has the meaning specified in **Section 11.14(a)** (*Participant Register*) below.

"**Party**" and "**Parties**" have the respective meanings specified in the preamble to this Agreement.

"**Patent License**" means any written agreement granting any right with respect to any invention on which a Patent is in existence or a Patent application is pending, in which agreement any Borrower now holds or hereafter acquires any interest.

"**Patents**" means all letters patent of, or rights corresponding thereto, in the United States or in any other country, all registrations and recordings thereof, and all applications for letters patent of, or rights corresponding thereto, in the United States or any other country.   For the avoidance of doubt, the term "Patents" does not include mining or mineral patents.

"**Payment Date**" means:

(a)    March 15, June 15, September 15 and December 15 of each year, commencing in March 2019; and

(b)    the Maturity Date

(or, if any such date shall not be a Business Day, the immediately following Business Day).

"**Payment Date Statement**" has the meaning specified in **Section 2.1(d)** (*Payments*) below.

"**Permitted Equipment-Backed Indebtedness**" means Indebtedness of any Borrower (including, without limitation, Capitalized Leases and purchased money Indebtedness), but only if, and to the extent, that, at any time:

(a)    such Indebtedness is secured by Rawhide Mining Equipment; and

(b)    the original principal amount of such Indebtedness does not exceed the aggregate purchase price of the Rawhide Mining Equipment securing such Indebtedness;

**it being understood that** Indebtedness, with an aggregate principal amount not exceeding, at any time outstanding, **USD 3,400,000**, incurred by Rawhide Mining under the Security Agreement and Promissory Note, dated (or to be dated) on or around January 4, 2019, between Caterpillar Financial Services Corporation and Rawhide Mining, in the form executed, and in effect, on the Closing Date, shall constitute Permitted Equipment-Backed Indebtedness.

"**Permitted Indebtedness**" means, with respect to any Borrower, any of the following:

(a)    the Secured Obligations;

(b)    Indebtedness existing on the Closing Date which is disclosed in **Annex I** (*Existing Permitted Indebtedness*) to this Agreement, having an outstanding principal balance not exceeding (i) individually, the *Closing Date Balance* specified opposite such Indebtedness in such **Annex I**, or  (ii) in the aggregate, for all Borrowers, **USD 269,725**;

(c)    reimbursement obligations in connection with trade letters of credit entered into in the ordinary course of the Rawhide Mining Business and cash management services (including credit cards, debit cards and other similar instruments) issued on behalf of any Borrower;

(d)    Permitted Equipment-Backed Indebtedness (**provided**, that the outstanding principal balance of the Indebtedness of all Borrowers, in the aggregate, pursuant to this **clause (d)**, shall not exceed, at any one time, **USD 10,000,000**);

(e)    Indebtedness under bonds securing Reclamation Obligations;

(f)    intercompany Indebtedness, consisting, solely and exclusively, of obligations to (and for the benefit of) one or more other Borrowers (which Indebtedness shall not have been pledged, assigned or otherwise transferred to any Person other than a Borrower);

*Loan and Security Agreement*

(g)     Permitted Swap Contracts;

(h)     extensions, refinancings and renewals of any items of Permitted Indebtedness; **provided** that the principal amount is not increased (except to the extent of any fees, costs and expenses associated with such refinancing) or the terms modified to impose materially more burdensome terms upon the Borrowers;

(i)     Indebtedness not otherwise provided for under the foregoing **clauses (a)** through **(h)** of this definition (**provided**, that the outstanding principal balance of the Indebtedness of all Borrowers, in the aggregate, pursuant to this **clause (i)** shall not exceed, at any one time, **USD 250,000**).

"**Permitted Investment**" means, with respect to any Borrower, any of the following:

(a)     an Investment by such Borrower existing on the Closing Date and disclosed in **Annex II** (*Existing Permitted Investments*) to this Agreement;

(b)     an Investment in Cash Equivalents;

(c)     Investments consisting of capital expenditures that are reasonably necessary in order for such Borrower to continue conducting the Rawhide Mining Business, in the ordinary course;

(d)     an Investment by such Borrower in any other Borrower (other than Western Exploration, which is addressed in **clause (j)** of this definition) that was in existence, and was a Wholly-Owned Subsidiary of Rawhide Mining, prior to both  (1) such Investment or  (2) any related transactions or events;

(e)     (1) Investments consisting of  (A) lease, utility or other similar deposits, or  (B) extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary court of business and  (2) Investments received in satisfaction or partial satisfaction thereof from account debtors or in Insolvency Proceedings or upon the settlement of debts;

(f)     bank deposits and securities accounts maintained in accordance with the terms of this Agreement and the other Loan Documents;

(g)     Investments received as the non-cash portion of consideration for Dispositions permitted under **Section 8.5** (*Dispositions*) below;

(h)     loans and advances made to officers, directors and employees and representatives of a Rawhide Entity in the ordinary course of the Rawhide Mining Business (**provided**, that the aggregate amount of the Investments pursuant to this **clause (h)** by all Borrowers, in the aggregate, outstanding at any one time does not exceed **USD 50,000**);

(i)     Investments not otherwise provided for under the foregoing **clauses (a)** through **(h)**, or under **clause (j)**, of this definition (**provided**, that the aggregate amount of the Investments

made pursuant to this **clause (i)** by all Borrowers, in the aggregate, outstanding at any one time does not exceed **USD 250,000**); and

(j)    Investments in the Equity Interests of Western Exploration, **provided** that the amount of the Investments made pursuant to this **clause (j)** by all Borrowers, in the aggregate, during any calendar year, shall not exceed the sum of:

    (1)    the amount specified opposite such calendar year under the heading *Maximum Annual Investment Amount*, in the table below; **PLUS**

    (2)    in the case of the calendar year ending December 31, 2019, or any calendar year thereafter, a carryover of prior unused *Maximum Annual Investment Amounts*, as determined by summing, for each prior calendar year (from and after the calendar year ended, December 31, 2018), the difference of:

        (A)    the *Maximum Annual Investment Amount* specified opposite such prior calendar year in the table below; **MINUS**

        (B)    the amount of the Investments in the Equity Interests of Western Exploration made pursuant to this **clause (j)** by all Borrowers, in the aggregate, during such prior calendar year.

| Calendar Year Ending | Maximum Annual Investment Amount |
|---|---|
| December 31, 2018 | **USD 1,000,000** |
| December 31, 2019 | **USD 1,500,000** |
| Each calendar year thereafter | **USD 2,000,000** |

For the avoidance of doubt, (x) Investments in Western Exploration, if and to the extent existing and fully-funded on the Closing Date and disclosed on **Annex II** (*Existing Permitted Investments*) to this Agreement, shall be treated as Permitted Investments, without regard to the limitations in the foregoing **clause (j)** of this definition, and shall not otherwise be taken into account in determining compliance with the limitations set forth in such **clause (j)**, and (y) Investments in Western Exploration that are funded on or after the Closing Date shall be subject to the limitations set forth in **clause (j)** of this definition, but shall not be subject to the limitations set forth in the proviso to **clause (a)** of this definition.

"**Permitted Liens**" means any and all of the following:

(a)    Liens in favor of the Agent or the Lenders with respect to the Secured Obligations;

(b)    Liens securing Indebtedness permitted under **clause (b)** of the definition of Permitted Indebtedness;

(c)    Liens for taxes, fees, assessments or other governmental charges or levies, either not delinquent or being contested in good faith by appropriate proceedings, **provided** that the Borrowers maintains adequate reserves therefor in accordance with GAAP;

(d)    Liens securing claims or demands of materialmen, artisans, mechanics, carriers, warehousemen, landlords and other like Persons arising in the ordinary course of the Rawhide Mining Business and imposed without action of such parties, **provided** that the payment thereof is not yet required;

(e)    Liens arising from judgments, decrees or attachments in circumstances which do not constitute an Event of Default hereunder;

(f)    the following deposits, but only to the extent that such deposits are made and maintained, and such Liens arise, in the ordinary course of the Rawhide Mining Business:

   (i)    deposits under worker's compensation, unemployment insurance, social security and other similar laws;

   (ii)    deposits made to secure:

      (A)    the performance of bids, tenders or contracts (other than for the repayment of borrowed money);

      (B)    indemnity, performance or other similar bonds for the performance of bids, tenders or contracts (other than for the repayment of borrowed money);

      (C)    statutory obligations (other than Liens arising under ERISA or environmental Liens);

      (D)    surety or appeal bonds;

      (E)    indemnity, performance or other similar bonds or deposits with merchant banks, but solely  (1) for the purpose of bill paying and expense management services and  (2) to the extent that the Lien on such deposits in favor of any such merchant bank does not exceed, at any time, the aggregate amount of the total billings being processed at such time by any such merchant bank, in all cases, as part of the ordinary course of the Rawhide Mining Business;

**(g)**    Liens securing Indebtedness permitted by **clause (d)** of the definition of Permitted Indebtedness;

**(h)**    Liens incurred in connection with Subordinated Indebtedness permitted pursuant to **Section 8.2** (*Additional Indebtedness*) below;

(i)    leasehold interests in leases or subleases and licenses granted in the ordinary course of the Rawhide Mining Business and not interfering in any material respect with the business of the licensor;

(j)    Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of custom duties that are promptly paid on or before the date they become due;

*Loan and Security Agreement*

(k)     Liens on insurance proceeds securing the payment of financed insurance premiums that are promptly paid on or before the date they become due (provided that such Liens extend only to such insurance proceeds and not to any other property or assets);

(l)     statutory and common law rights of set-off and other similar rights as to deposits of cash and securities in favor of banks, other depository institutions and brokerage firms;

(m)    easements, zoning restrictions, rights-of-way and similar encumbrances on Real Property imposed by law or arising in the ordinary course of the Rawhide Mining Business so long as they do not materially impair the value or marketability of the related property;

(n)     Liens representing or securing Permitted Royalties;

(o)     (i) Liens on Cash Equivalents securing obligations permitted under the definition of Permitted Indebtedness and  (ii) security deposits in connection with Real Property leases, the combination of **(o)(i)** and **(o)(ii)** in an aggregate amount not to exceed **USD 300,000** at any time;

(p)     sales, transfers or other dispositions of assets permitted by **Section 8.5** (*Dispositions*) below and, in connection therewith, customary rights and restrictions contained in agreements relating to such transactions pending the completion thereof or during the term thereof, and any option or other agreement to sell, transfer, license, sublicense, lease, sublease or dispose of an asset permitted by **Section 8.5** (*Dispositions*) below, in each case, such terms being agreed to and such transactions entered into in the ordinary course of the Rawhide Mining Business;

(q)     deposits to secure the performance of bids, trade contracts, leases, statutory obligations, surety, reclamation and appeal bonds, performance bonds or letters of credit, leases or deferred purchase price of equipment, trade credit, endorsement of checks, and completion guarantees and other obligations of a like nature, in each case incurred in the ordinary course of the Rawhide Mining Business;

(r)     Liens on Excluded Assets;

(s)     Liens securing Permitted Swap Contracts;

(t)     Liens incurred in connection with the extension, renewal or refinancing of the Indebtedness secured by Liens of the type described in **clauses (b)** through **(s)** of this definition; **provided**, that any extension, renewal or replacement Lien shall be limited to the property encumbered by the existing Lien and the principal amount of the Indebtedness being extended, renewed or refinanced (as may have been reduced by any payment thereon) does not increase.

"**Permitted Royalties**" means:

(a)     the Existing Royalties (as defined in **Section 5.13** (*Royalties*) below), as in effect on the Closing Date, or as amended, or otherwise modified, from time to time in accordance with **Section 7.22** (*Royalties*) below;

*Loan and Security Agreement*

(b)    Mining Royalties that are granted by the Borrowers, on or after the Closing Date, to (and for the benefit of) any Person (other than a Rawhide-Related Person) in respect of any rights, properties or assets of the Borrowers; **provided**, **however**, **that**, no such Mining Royalty shall constitute a Permitted Royalty, pursuant to this **paragraph (b)**, unless:

    (i)    written notice of the grant of such Royalty (accompanied by a true and complete copies of the agreements and other documents pursuant to which such Royalty and any related Liens are granted) shall have been delivered to the Agent on or prior to the date of such grant;

    (ii)    in the case of a Royalty in respect of (or involving the grant of a Lien on) any property, right or asset that was owned, held or acquired by any Borrower prior to the Closing Date (other than a Royalty granted, or to be granted, in connection with the acquisition of rights appurtenant to the Borrowers' existing Real Property), the Agent and the Required Lenders shall have provided their prior written consent to such Royalty (**it being understood that** no such consent, under this **paragraph (b)(ii)**, shall be unreasonably withheld or delayed); and

    (iii)    no Default or Event of Default shall have occurred, and be continuing, at the time that such Royalty is granted; and

(c)    any other Royalties granted by the Borrowers, from time to time, on or after the Closing Date, with the prior written consent of the Agent and the Required Lenders (**it being understood that** the Agent and the Required Lenders shall be entitled to grant or withhold any such consent, under this **paragraph (c)**, in their sole and absolute discretion).

"**Permitted Swap Contract**" means:

(a)    an agreement for the forward sale of gold or silver (or both)  (i) that is  (A) entered into by a Borrower in the ordinary course of the Rawhide Mining Business and  (B) payable only upon delivery and  (ii) under which no Borrower has posted, provided or conveyed, or is (or will be) required to post, provide or convey any collateral or Lien, other than mark-to-market incremental cash margin in an amount not exceeding, at any time,  (A) the value of the gold or silver (or both) to be delivered, as determined based upon the then-current quoted spot price (or prices), **MINUS**  (B) the purchase price to be paid upon delivery; or

(b)    a commodity hedge agreement entered into on terms, and with counterparties, reasonably acceptable to the Agent, as evidenced by its written approval (following an opportunity to review the final form of such agreement).

"**Person**" means any natural person, sole proprietorship, partnership, joint venture, trust, estate, unincorporated organization, association, corporation, limited liability company, institution, or other legal entity or organization or any government.

"**Plan**" means an employee benefit or other plan  (a) established or maintained by any Borrower or any ERISA Affiliate during the five year period ended prior to the date of this Agreement or to which any Borrower or any ERISA Affiliate thereof makes, is obligated to make or has, within the five-year

*Loan and Security Agreement*

period ended prior to the date of this Agreement, been required to make contributions and (b) that is covered by Title IV of ERISA, other than a Multiemployer Plan.

"**Post-Closing Reef Fees**" has the meaning specified in **Section 8.1(d)(ii)** below.

"**Power of Attorney**" has the meaning specified in **Section 10.5(b)** (*Delivery of Power of Attorney*) below.

"**Pre-Closing Reef Fees**" has the meaning specified in **Section 8.1(d)(i)** below.

"**Prepayment Charge**" has the meaning specified in **Section 2.4(c)(i)** (*Obligation to Pay Prepayment Charge*) below.

"**PTO**" means the U.S. Patent and Trademark Office.

"**Publicity Materials**" has the meaning specified in **Section 11.20** (*Publicity*) below.

"**Rawhide Entity**" and "**Rawhide Entities**" have the respective meanings specified in the preamble to this Agreement.

"**Rawhide Mine**" means the mining and heap leach operations and property of the respective Borrowers located on the Real Property in Mineral County, Nevada, as presently constituted and as the same may be developed or expanded from time to time (including any Fixtures on such Real Property), and any replacements, improvements, substitutions and modifications thereof, together with all easements, rights-of-way, rights, titles or interests of every kind and description which any Borrower has rights to, or otherwise owns or controls, in relation to, or required in connection with, such operations, properties and claims.

"**Rawhide Mining**" has the meaning specified in the preamble to this Agreement.

"**Rawhide Mining Business**" means (a) the business of gold mining (and, if applicable, silver mining, and the processing of gold, silver or both) conducted by the Borrowers in Mineral County, Nevada, and (b) activities relating thereto (including, without limitation, the hedging and sale of commodities derived from therefrom), in each case as conducted on the date of this Agreement (as it may be expanded, from time to time, in connection with the further development and expansion of the Rawhide Mine implemented in a manner permitted hereunder).

"**Rawhide Mining Equipment**" means Equipment that is (a) owned or leased by any Borrower and (b) is used in the ordinary course of the Rawhide Mining Business, together with all substitutions, replacements, additions, attachments, and accessions thereto.

"**Rawhide Mining LLC Agreement**" means the Second Amended and Restated Limited Liability Company Agreement, dated as of March 2, 2012, of Rawhide Mining.

"**Rawhide-Related Persons**" means, collectively, all of (and "**Rawhide-Related Person**" means any of):

(a)     the Rawhide Entities;

(b)    (i) Reef Capital, Reef Capital Group and Marceau Schlumberger (any of the Persons identified in this **clause (b)(i)**, a "**Reef Person**") and  (ii) an Affiliate of any Reef Person (**but excluding**, **however**, from this **clause (b)(ii)**, any Reef Portfolio Company; and

(c)    the officers, directors and managers (or the equivalent), if applicable, of each of the Persons identified in **paragraphs (a)** and **(b)** of this definition.

"**Rawhide Subsidiary**" means any direct or indirect Subsidiary of Rawhide Mining.

"**Real Property**" means, collectively, all right, title and interest (including any leasehold, mineral or other estate) in and to any and all parcels of or interests in real property owned or leased by any Person, whether by lease, license, concession, permit or other means, together with, in each case, all easements, hereditaments and appurtenances relating thereto, all improvements and appurtenant fixtures and equipment, all general intangibles and contract rights and other property and rights incidental to the ownership, lease or operation thereof.

"**Receivables**" means  (a) all of the Borrowers' Accounts, Instruments, Documents, Chattel Paper, Supporting Obligations, letters of credit, proceeds of any letter of credit, and Letter of Credit Rights, and (b) all customer lists, software, and business records related thereto.

"**Reclamation Obligations**" means, with respect to any Person, all mine closure, asset retirement and environmental reclamation obligations of such Person, whether matured, real or contingent, on a consolidated basis at such time.

"**Reef Capital**" means Coral Reef Capital LLC, a Delaware limited liability company.

"**Reef Capital Group**" means Coral Reef Capital Group, LLC, a Delaware limited liability company.

"**Reef Default**" means an "Event of Default" (as defined in **Section 6(b)** of the Reef Management Agreement).

"**Reef Expense Amounts**" means any amounts from time to time due and payable by the Parent, pursuant to **Section 3(b)** of the Reef Management Agreement, for the reimbursement of reasonable out-of-pocket expenses incurred by Reef Capital Group.

"**Reef Indemnified Party**" means any "Consultant Party" (as defined in **Section 5(a)** of the Reef Management Agreement).

"**Reef Indemnity Amounts**" means any amounts from time to time due and payable by the Parent to any Reef Indemnified Party pursuant to the Parent's indemnity obligations under **Section 5** of the Reef Management Agreement.

"**Reef Management Agreement**" means the Consulting Services Agreement, dated as of June 25, 2010, between Reef Capital Group and the Parent, as in effect on the date hereof, or as amended from time to time, with prior written notice (accompanied by a true and complete copy of such amendment) to the Agent, in a manner that is not adverse to the Agent or the Lenders.

*Loan and Security Agreement*

"**Reef Management Fee**" means the "Consulting Services Fee" payable by the Parent to Reef Capital Group under **Section 3(a)** of the Reef Management Agreement.

"**Reef Person**" has the meaning specified in **paragraph (b)** of the definition of "Rawhide-Related Persons" above.

"**Reef Portfolio Company**" means any Person (other than a Rawhide Entity) that is owned by, or otherwise Affiliated with, one or more Reef Persons, but is  (a) either (i)(A) actively engaged in providing goods or services to customers that are not Affiliated with any Reef Person, as an enterprise that is separate and apart from the other businesses and activities of such Reef Persons, and  (B) managed by its own board of directors (or board of managers), separate from any Reef Person, or  (ii) a subsidiary of a Person described in the foregoing **clause (a)(i)** of this definition and  (b) neither  (i) an investment fund managed by, or otherwise involved in, or comprising a part of, the investment activities of any Reef Person or the decisions relating thereto (other than by virtue of conducting and managing its own separate business in the nature described in the foregoing **clause (a)(i)(A)** of this definition, directly or through its subsidiaries), nor  (ii) involved in the management or activities of any Rawhide Entity.

"**Register**" has the meaning specified in **Section 11.13(b)** (*Register*) below.

"**Related Parties**" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, trustees, administrators, managers, advisors and representatives of such Person and of such Person's Affiliates.

"**Release**" means any release, spill, emission, leaking, pumping, pouring, emitting, emptying, escape, injection, deposit, disposal, discharge, dispersal, dumping, leaching or migration of Hazardous Materials in the indoor or outdoor environment, including the movement of Hazardous Materials through or in the air, soil, surface water, ground water or property, in each case, in breach of Environmental Laws or Environmental Permits.

"**Required Lenders**" means at any time, the holders of more than **66-2/3%** of the sum of the aggregate unpaid principal amount of the Loan then outstanding.

"**Resignation Effective Date**" shall have the meaning set forth therefor in **Section 11.18(i)** below.

"**Restricted Distribution**" means:

(a)    any dividend or other distribution (whether in cash, securities or other property) with respect to, or otherwise relating to, any Equity Interest of Rawhide Mining; or

(b)    any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of:

   (i)    the purchase, redemption, retirement, defeasance, acquisition, cancellation or termination of any such Equity Interest; or

   (ii)    any return of capital to holders of Rawhide Mining's equity interests (or the equivalent Persons thereof).

23

"**Restricted Transfer**" means:

(a)    a Restricted Distribution;

(b)    (i) the conversion of any convertible securities of any Borrower into other securities or (ii) the payment of cash in lieu of fractional shares upon any such conversion;

(c)    any payment by a Borrower of management fees, profit participations, or any similar or economically-equivalent amounts, to any Rawhide-Related Person (other than a Borrower) (**but**, **excluding**, **however**, from this **paragraph (c)**, for the avoidance of doubt, amounts paid to employees of the Borrowers, as compensation for their services in such capacity, in the ordinary course of the Rawhide Mining Business);

(d)    (i) a loan by any Borrower to  (A) any Rawhide-Related Person (other than a Borrower) or (B) any employee of any Rawhide-Related Person or  (ii) a guaranty by any Borrower of the payment of any such loan granted by a third party (**but**, **excluding**, **however**, from this **paragraph (d)**, loans and advances constituting Permitted Investments, pursuant to **paragraph (h)** of the definition thereof, subject to the limitations set forth in the proviso to such **paragraph (h)**);

(e)    any waiver, release or forgiveness of Indebtedness owed to any Borrower by (i) any Rawhide-Related Person (other than a Borrower) or (ii) any employee of any Rawhide-Related Person (unless, in the case of this **clause (e)(ii)**, (A) such Indebtedness is a loan to an employee of one or more of the Borrowers that constitutes a Permitted Investment pursuant to **paragraph (h)** of the definition thereof, subject to the limitations set forth in the proviso to such **paragraph (h)**, and  (B) such waiver, release or forgiveness is granted in the ordinary course of the Rawhide Mining Business); or

(f)    any payment of principal (or the equivalent) of, on, under or in connection with any Subordinated Indebtedness of any Borrower.

"**Rights to Payment**" has the meaning specified in **Section 3.1** (*Grant of Security Interest*) below.

"**Royalties**" means any and all royalties, profit sharing arrangements or similar rights of any Person (a) relating to (i) any Borrower Real Property, (ii) any other property, asset or right of any Borrower or  (iii) production relating to any of the foregoing or  (b) involving the grant of a Lien on any property, asset or right of any any Borrower.

"**S&P**" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., and any successor thereto.

"**Sanctioned Country**" means, at any time, a country or territory which is the subject or target of any Sanctions.

"**Sanctioned Person**" means, at any time,  (a) any Person listed in any Sanctions-related list of designated Persons maintained by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, or by the United Nations Security Council, the European Union

or any EU member state, (b) any Person operating, organized or resident in a Sanctioned Country or (c) any Person controlled by any such Person.

"**Sanctions**" means economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, or (b) the United Nations Security Council, the European Union or Her Majesty's Treasury of the United Kingdom.

"**Scheduled Maturity Date**" means January 3, 2023.

"**Secured Obligations**" means the Borrowers' obligations to the Secured Parties under this Agreement and the other Loan Documents (other than the Warrants), including any obligation to pay any amount now owing or later arising.

"**Secured Parties**" means, collectively, the Lenders and the Agent, and "**Secured Party**" means any of the foregoing.

"**Silverpeak**" has the meaning specified in the preamble to this Agreement.

"**Solvent**" means, as to any Person as of any date of determination, that on such date (a) the fair value of the property of such Person is greater than the total amount of liabilities, including contingent liabilities, of such Person, (b) the present fair saleable value of such Person is not less than the amount that will be required to pay the probable liability of such Person on its debts as they become absolute and matured, (c) such Person does not intend to, and does not believe that it will, incur debts or liabilities beyond such Person's ability to pay such debts and liabilities as they mature and (d) such Person is not engaged in a business or a transaction, and is not about to engage in a business or a transaction, for which such Person's property would constitute an unreasonably small capital.  The amount of any contingent liability at any time shall be computed as the amount that, in light of all of the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability.

"**State**" means (a) any state or commonwealth of the United States and (b) the District of Columbia.

"**Subordinated Indebtedness**" means unsecured Indebtedness that (a) is subordinated to the Secured Obligations in all respects, (b) under which no principal payments (or payments, however denominated, having an equivalent economic effect) will become due on or prior to the Scheduled Maturity Date, and (c) is subject to a Subordination Agreement that is in such form as the Agent may have approved in writing (which approval may be granted or withheld in the sole and absolute discretion of the Agent).

"**Subordination Agreement**" means any subordination agreement or other intercreditor agreement entered into by the Agent with respect to Subordinated Indebtedness pursuant to **Section 8.2** (*Additional Indebtedness*) below.

"**Subsidiary**" means an entity, whether corporate, partnership, limited liability company, joint venture or otherwise, in which a Borrower directly or indirectly owns or controls more than **50.00%** of the outstanding voting securities, including each entity listed on **Annex III** (*Rawhide Mining Subsidiaries*) to this Agreement.

"**Swap Contract**" means:

(a)     (i) any rate swap transaction, rate hedge, basis swap, credit derivative transaction, forward rate transaction, commodity swap, commodity option, commodity hedge, forward commodity contract, equity or equity index swap or option, bond or bond price or bond index swap or option or forward bond or forward bond price or forward bond index transaction, interest rate option, forward foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option, currency hedge, spot contract (including any option to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, (ii) any other similar transaction (or transaction having a similar economic effect) or (iii) any combination of any of the foregoing;

(b)     any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or are governed by, any Master Agreement (including, as to any such transaction, any rights, obligations and liabilities arising in respect of such transaction under such Master Agreement; and

(c)     any other agreement, contract, or transaction that constitutes a "swap" within the meaning of Section 1a(47) of the U.S. Commodity Exchange Act (7 U.S.C. § 1 *et seq.*).

"**Swap Obligations**" means, with respect to any Person, any obligation or liability (whether direct or indirect, and whether contingent or otherwise) of such Person to pay or perform under any Swap Contract.

"**Taxes**" means any and all present or future taxes, levies, imposts, duties, deductions, charges or withholdings imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"**Total Leverage Ratio**" has the meaning specified in **Section 7.1(d)(vii)** (*Total Leverage Ratio*) below.

"**Total Net Debt**" has the meaning specified in **Section 7.1(d)(viii)** (*Total Net Debt*) below.

"**Trademark License**" means any written agreement granting any right to use any Trademark, now owned or hereafter acquired by any Borrower or in which any Borrower now holds or hereafter acquires any interest.

"**Trademarks**" means all trademarks (registered, unregistered, common-law or otherwise) and any applications in connection therewith, including registrations, recordings and applications in the United States Patent and Trademark Office or in any similar office or agency of the United States, any State, any other country or any political subdivision thereof.

"**UCC**" means the Uniform Commercial Code as the same is, from time to time, in effect in the State of New York; **provided** that, in the event that, by reason of mandatory provisions of law, any or all of the attachment, perfection or priority of, or remedies with respect to, the Agent's Lien on any Collateral is governed by the Uniform Commercial Code as the same is, from time to time, in effect in a jurisdiction other than the State of New York, then the term "UCC" shall mean the Uniform Commercial Code as in effect, from time to time, in such other jurisdiction solely for purposes of the provisions thereof relating to such attachment, perfection, priority or remedies and for purposes of definitions related to such provisions.

"**United States**" means the United States of America.

"**USD**" means United States Dollars.

"**U.S. Person**" means a Person that is a "United States person" as defined in Section 7701(a)(30) of the Code.

"**Warrant**" means any warrant or warrant agreement issued or entered into in connection with the Loan, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"**Western Exploration**" means Western Exploration LLC, a Nevada limited liability company.

"**Wholly-Owned**" means, as to a Subsidiary of a Person, a Subsidiary of such Person all of the outstanding Equity Interests of which are owned, beneficially and of record, by such Person or by one or more Wholly-Owned Subsidiaries of such Person.

"**Withholding Agent**" means any Borrower and the Agent.

**Section 1.2**     **Usage.**   The following rules of construction and usage are applicable to this Agreement unless a contrary intention appears:

(a)     *Accounting and UCC Terms.*   All accounting terms used but not defined herein (including, without limitation, "**trade payables**" and "**accounts payable**") shall be construed in accordance with GAAP.   All terms used but not defined herein (including, without limitation, "**Accounts**," "**Chattel Paper**," "**Commercial Tort Claims**," "**Commodity Contracts**," "**Documents**," "**Equipment**," "**Fixtures**," "**General Intangibles**," "**Goods**," "**Instruments**," "**Inventory**," "**Investment Property**," "**Letter of Credit Rights**," "**Proceeds**," and "**Supporting Obligations**") shall, if defined in the UCC and used in Article 8 or 9 thereof, have the meanings assigned to such terms under the UCC for the purposes of Article 8 or 9, as applicable, thereof.

(b)     *Section References, Etc.*   References to an "Article," "Section," "Annex," "Exhibit" or "Schedule," or to another subdivision or attachment, shall be deemed to refer to an article, section, annex, exhibit, schedule or other subdivision of, or attachment to, this Agreement.

(c)     *Inclusion.*   The word "including" means "including without limitation," and the rule of *ejusdem generis* shall not be applicable to limit any provision.

(d)  ___Non-Exclusive Disjunction___.   The word "or" is not exclusive (meaning that "*X* or *Y*" should be understood to mean "*X* or *Y* (or both *X* and *Y*)").

(e)  ___Hereof, Herein and Hereunder___.   The word "herein," "hereof" and "hereunder," or a word of similar import, shall be construed to refer to the entirety of this Agreement, and not to any particular provision of this Agreement, and includes all annexes, exhibits, schedules and other attachments to this Agreement.

(f)  ___Asset and Property___.   The words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

(g)  ___Word Forms___.   The definitions contained in this Agreement shall apply equally to the singular and plural forms of the terms defined, and, whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.

# ARTICLE 2
# THE LOAN

### Section 2.1      ___The Loan___.

(a)  ___The Loan___.   Subject to the terms and conditions of this Agreement, the Lenders will severally (and not jointly) make a Loan to the Borrowers in an aggregate amount equal to **USD 18,100,000**, allocated among the Lenders as set forth on **Schedule 2.1** (*Advance Amounts; Wire Instructions*) to this Agreement, on the Closing Date.

(b)  ___Interest___.   The principal balance of the Loan shall bear interest thereon from the Closing Date at the Interest Rate, with interest computed daily based on the actual number of days elapsed, payable on each Payment Date in an amount accrued during the preceding Accrual Period and not previously paid.

(c)  ___Principal___.   The Borrowers, jointly and severally, promise to repay a portion of the outstanding Loan principal balance on each Amortization Date in the following amounts:

First Amortization Date (March 2020)........................**USD 1,350,000**

Second Amortization Date (March 2021)...................**USD 2,250,000**

Third Amortization Date (March 2022) ......................**USD 3,150,000**

The entire remaining Loan principal balance, and all accrued but unpaid interest thereon and all other Secured Obligations hereunder, shall be due and payable on the Maturity Date.

(d)  ___Payments___.   No later than 10:00 a.m. New York City time on each Payment Date, the Agent shall provide a statement (each, a "**Payment Date Statement**") to Rawhide Mining and each of the Lenders setting forth the interest, principal and other amounts due to each Lender on such Payment Date, which Payment Date Statement shall be final, and binding upon the Lenders, absent manifest error.   Rawhide Mining shall be entitled to rely on each such Payment Date Statement, and no Default

or Event of Default shall be deemed to occur as a result of Rawhide Mining's failure to make any payment or portion thereof due on the related Payment Date, so long as payments are timely made in accordance with the provisions of such Payment Date Statement.   The Borrowers shall make each payment (including principal of or interest on any Loan or any fees or other amounts) hereunder and under any other Loan Document not later than **2:00 p.m.**, New York City time, on the date when due in immediately available Dollars, without setoff, defense or counterclaim. Each such payment shall be made to the Agent or applicable Lender by wire transfer to the account for the Agent or such Lender, as applicable, specified in **Schedule 2.1** (*Advance Amounts; Wire Instructions*) to this Agreement, or such other account or address specified by the Agent or the applicable Lender by notice to the Borrowers and the Agent, and shall be deemed received only when actually received by the Agent or the Lender, as applicable, in New York, New York at such account and address. The Borrowers agree to make payments with respect to the Advance of any Lender directly to such Lender.   Nevertheless, the Agent shall promptly distribute to each Lender any payments received by the Agent on behalf of such Lender. Except as otherwise expressly provided herein, whenever any payment (including principal of or interest on the Loan or any fees or other amounts) hereunder or under any other Loan Document shall become due, or otherwise would occur, on a day that is not a Business Day, such payment may be made on the next succeeding Business Day, and such extension of time shall in such case be included in the computation of interest or fees, if applicable.   The Borrowers shall make all payments under this Agreement without setoff, recoupment or deduction and regardless of any counterclaim or defense.

Section 2.2 **Maximum Interest**.   Notwithstanding any provision in this Agreement or any other Loan Document, it is the parties' intent not to contract for, charge or receive interest at a rate that is greater than the maximum rate permissible by law that a court of competent jurisdiction shall deem applicable hereto (which under the laws of the State of New York shall be deemed to be the laws relating to permissible rates of interest on commercial loans) (the "**Maximum Rate**").   If a court of competent jurisdiction shall finally determine that the Borrowers have actually paid to the Lenders an amount of interest in excess of the amount that would have been payable if all of the Secured Obligations had at all times borne interest at the Maximum Rate, then such excess interest actually paid by the Borrowers shall be applied as follows:

FIRST:   to the payment of the Secured Obligations consisting of the outstanding principal amount of the Advances;

SECOND:   after all such principal is repaid, to the payment of the Lenders' accrued interest, costs, expenses, professional fees and any other Secured Obligations; and

THIRD:   after all Secured Obligations are repaid, the excess (if any) shall be refunded to the Borrowers.

Section 2.3 **Default Interest**.   Upon the occurrence and during the continuation of an Event of Default hereunder, all Secured Obligations, including principal, interest, compounded interest, and professional fees, shall bear interest at a rate *per annum* equal to the Interest Rate PLUS **two** percent per annum.   In the event that any interest or other amount is not paid when due hereunder, such delinquent interest or other amount shall bear interest thereon at the Interest Rate PLUS **two** percent *per annum* until paid.

**Section 2.4** **Prepayment**.

(a) ***Optional Repayment***.  In addition to the mandatory repayments of the Loan required under **Section 2.1(c)** (*Principal*) above, the Borrowers may, at their option, upon at least **30** days' prior written notice to the Agent, repay all or any portion of the principal balance of the Loan; **provided**, that such repayment is accompanied by a payment of all and all accrued and unpaid interest on the amount so prepaid, together with any applicable Prepayment Charge.

(b) ***Repayment Upon Change in Control***.  The Borrowers, jointly and severally, promise to repay the outstanding amount of all principal and accrued interest through the repayment date and the Prepayment Charge upon the occurrence of a Change in Control.

(c) ***Prepayment Charge***.

(i) *Obligation to Pay Prepayment Charge*.  The Borrowers, jointly and severally, promise to pay to the Lenders a prepayment charge (the "**Prepayment Charge**"), in the amount specified in **Section 2.4(c)(ii)** (*Amount of Prepayment Charge*) below, on any day, occurring prior to the **second** anniversary of the Closing Date, on which all, or any portion, of the principal amount of the Loan is repaid, or required to be made, as applicable, pursuant to any of (A) **Section 2.4(a)** (*Optional Repayment*) above,  (B) **Section 2.4(b)** (*Repayment Upon Change in Control*) above, or  (C) **Section 2.4(d)** (*Repayment From Disposition Proceeds*) below, in each case whether or not such repayment occurs, or requirement to repay arises, as applicable, prior to, during or after the pendency of any Insolvency Proceeding, and without regard to any automatic acceleration of the Secured Obligations that occurs upon the commencement of any Insolvency Proceeding under **Section 10.1** (*General*) below, which automatic acceleration the Parties agree shall be deemed to have not occurred for purposes of determining whether a Prepayment Charge is due and payable hereunder.

(ii) *Amount of Prepayment Charge*.  The amount of the Prepayment Charge (if any) that is due, pursuant to **Section 2.4(c)(i)** (*Obligation to Pay Prepayment Charge*) above, with respect to a repayment (or obligation to repay) of all or any portion of the Loan, shall be equal to the following percentage of the amount being repaid (or required to be repaid):

(A) if such repayment is made, or required to be made, as applicable, prior to the Payment Date occurring in March 2019, **31.000%**;

(B) if such repayment is made, or required to be made, as applicable, on or after the Payment Date occurring in March 2019, but prior to the Payment Date occurring in June 2019, **27.125%**;

(C) if such repayment is made, or required to be made, as applicable, on or after the Payment Date occurring in June 2019, but prior to the Payment Date occurring in September 2019, **23.250%**;

(D) if such repayment is made, or required to be made, as applicable, on or after the Payment Date occurring in September 2019, but prior to the Payment Date occurring in December 2019, **19.375%**;

(E)    if such repayment is made, or required to be made, as applicable, on or after the Payment Date occurring in December 2019, prior to the Payment Date occurring in March 2020, **15.500%**;

(F)    if such repayment is made, or required to be made, as applicable, on or after the Payment Date occurring in March 2020, but prior to the Payment Date occurring in June 2020, **11.625%**;

(G)    if such repayment is made, or required to be made, as applicable, on or after the Payment Date occurring in June 2020, but prior to the Payment Date occurring in September 2020, **7.750%**; or

(H)    if such repayment is made, or required to be made, as applicable, on or after the Payment Date occurring in September 2020, but prior to the Payment Date occurring in December 2020, **3.875%**.

(iii)    *Acknowledgements Regarding Prepayment Charge.*    Each Borrower agrees and acknowledges that:

(A)    no Prepayment Charge that becomes due and payable under this Agreement shall constitute unmatured interest, whether under Section 502(b)(3) of the Bankruptcy Code or otherwise; and

(B)    the Prepayment Charge has been reasonably calculated to ensure that each Lender receives the benefit of its bargain under the terms of this Agreement, in view of the difficulties and impracticality of determining actual damages resulting from an early repayment of the Loan.

(d)    ***Repayment From Disposition Proceeds.***    Promptly upon receipt thereof, the proceeds of any Disposition other than in the ordinary course of the Rawhide Mining Business shall be applied to prepayment of the Loan; **provided**, that, so long as no Event of Default has occurred and is continuing, the Borrowers may, upon notice to the Agent, reinvest the proceeds from such Disposition in the Rawhide Mining Business within **180** days after such Disposition.    Such requirement shall be in addition to any mandatory prepayment in full in connection with a Change in Control without the consent of the Agent as restricted pursuant to **Sections 8.11** (*Corporate Changes*) and **9.1(i)** (*Change in Control*) below, and any restriction on any Disposition of the Borrowers' assets pursuant to **Sections 8.1** (*Restricted Transfers*) and **8.5** (*Dispositions*) below.

Section 2.5    **Notes.**    If so requested by any Lender, by written notice to the Borrowers, the Borrowers, jointly and severally, promise to execute and deliver to such Lender (or, if applicable and if so specified in such notice, to any Person who is an assignee of such Lender pursuant to **Section 11.13** (*Assignment of Rights*) below), promptly after the Borrowers' receipt of such notice, a Note or Notes to evidence such Lender's Advance.

Section 2.6    **Pro Rata Treatment.**    Each payment (including prepayment) on account of interest or any fee payable to the Lenders and any reduction in the principal balance of the Loan shall be

made *pro rata* according to the respective outstanding amounts of the Advances of the relevant Lenders.

### Section 2.7    Reserve Requirements; Increased Costs.

(a)    Notwithstanding any other provision of this Agreement, if any Change in Law shall:

    (i)    impose, modify or deem applicable any reserve, special deposit or similar requirement against assets of, deposits with or for the account of or credit extended by any Lender;

    (ii)    impose on the Agent or any Lender any Taxes (other than Indemnified Taxes and Excluded Taxes) on its loans, loan principal, advances or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

    (iii)    impose on any Lender any other condition (other than Taxes) affecting this Agreement or the Advance made by such Lender or any participation therein,

and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any Advance or increase the cost to any Lender of purchasing or maintaining a participation therein or to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or otherwise) by an amount deemed by such Lender to be material, then the Borrowers, jointly and severally, promise to pay to such Lender, upon demand, such additional amount or amounts as will compensate such Lender for such additional costs incurred or reduction suffered.

(b)    If any Lender shall have determined that any Change in Law regarding capital adequacy has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement or the Advance made by such Lender pursuant hereto to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy) by an amount deemed by such Lender to be material, then from time to time the Borrowers, jointly and severally, promise to pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c)    A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as applicable, as specified in **Section 2.7(a)** or **(b)** above shall be delivered to the Borrowers and shall be conclusive absent manifest error.   The Borrowers, jointly and severally, promise to pay to such Lender the amount shown as due on any such certificate delivered by it within **10** days after its receipt of the same.

(d)    Failure or delay on the part of any Lender to demand compensation for any increased costs or reduction in amounts received or receivable or reduction in return on capital shall not constitute a waiver of such Lender's right to demand such compensation; **provided**, **however**, **that**, the Borrowers shall not be under any obligation to compensate any Lender under **Section 2.7(a)** or **(b)** above with respect to increased costs or reductions with respect to any period prior to the date that is **120** days prior to such request; and **provided**, **further**, **however**, **that**, the foregoing limitation shall not apply to

any increased costs or reductions arising out of the retroactive application of any Change in Law within such **120**-day period.   The protection of this **Section 2.7** shall be available to each Lender regardless of any possible contention of the invalidity or inapplicability of the Change in Law that shall have occurred or been imposed.

### Section 2.8       Taxes.

(a)       Any and all payments by or on account of any obligation of any Borrower hereunder or under any other Loan Document shall be made free and clear of and without deduction or withholding for any Taxes, except as required by applicable law; **provided** that, if any applicable law (as determined in the good faith discretion of the applicable Withholding Agent) requires the deduction or withholding of any Taxes from such payments, then  (i) in the case of Indemnified Taxes, the sum payable by such Borrower shall be increased as necessary so that after making all required deductions or withholdings (including deductions or withholdings applicable to additional sums payable under this **Section 2.8(a)**) the Agent and each Lender (as the case may be) receives an amount equal to the sum it would have received had no such deductions or withholdings been made,  (ii) the applicable Withholding Agent shall make (or cause to be made) such deductions or withholdings, and  (iii) the applicable Withholding Agent shall timely pay the full amount so deducted or withheld to the relevant Governmental Authority in accordance with applicable law.

(b)       In addition, the Borrowers, jointly and severally, promise to pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law or, at the option of the Agent, timely reimburse it for the payment of any Other Taxes.

(c)       The Borrowers, jointly and severally, promise to indemnify the Agent and each Lender within **10** days after written demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this **Section 2.8(c)**) payable or paid by the Agent or such Lender, as the case may be, or required to be withheld or deducted from a payment to the Agent or such Lender and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.   A certificate as to the amount of such payment or liability delivered to the Borrowers by a Lender, or by the Agent, on behalf of itself or a Lender, shall be conclusive absent manifest error.

(d)       Each Lender shall severally indemnify the Agent, within **10** days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that any Borrower has not already indemnified the Agent for such Indemnified Taxes, and without limiting the obligation of the Borrowers to do so),  (ii) any Taxes attributable to such Lender's failure to comply with the provisions of **Section 11.14(a)** (*Participant Register*) below relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.   A certificate as to the amount of such payment or liability delivered to any Lender by the Agent shall be conclusive absent manifest error.   Each Lender hereby authorizes the Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan

Document or otherwise payable by the Agent to such Lender from any other source against any amount due to the Agent under this **Section 2.8(d)**.

(e)     As soon as practicable after any payment of Indemnified Taxes or Other Taxes by any Borrower to a Governmental Authority, the Borrowers shall deliver to the Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Agent.

(f)     Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments under this Agreement shall deliver to the Borrowers and the Agent, at the time or times reasonably requested by the Borrowers or the Agent, such properly completed and executed documentation reasonably requested by the Borrowers or the Agent as will permit such payments to be made without withholding or at a reduced rate. In addition, any Lender, if reasonably requested by the Borrowers or the Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrowers or the Agent as will enable the Borrowers or the Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements. Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in the remainder of this **Section 2.8(f)**) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.   Without limiting the generality of the foregoing, (i) any Lender that is a U.S. Person shall deliver to the Borrowers and the Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrowers or the Agent) executed copies of U.S. Internal Revenue Service Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding Tax and (ii) any Lender that is not a U.S. Person shall, to the extent that it is legally entitled to do so, deliver to the Borrowers and the Agent, on or prior to the date on which such Lender becomes Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrowers and the Agent), executed copies of the appropriate U.S. Internal Revenue Service Form W-8 (and supporting documentation, as applicable).    If a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrowers and the Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrowers or the Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrowers or the Agent as may be necessary for the Borrowers and the Agent to comply with their obligations under FATCA and to determine that such Lender has complied with its obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of the preceding sentence, "FATCA" shall include any amendments made to FATCA after the date of this Agreement.   Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrowers and the Agent in writing of its legal inability to do so.

*Loan and Security Agreement*

(g)      If any Party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this **Section 2.8** (including by the payment of additional amounts pursuant to this **Section 2.8**), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this **Section 2.8** with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund).   Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this **Section 2.8(g)** (**PLUS** any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority.   Notwithstanding anything to the contrary in this **Section 2.8(g)**, in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this **Section 2.8(g)** the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This paragraph shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(h)      Each Party's obligations under this **Section 2.8** shall survive (i) the resignation or replacement of the Agent, (ii) any assignment of rights by, or the replacement of, any Lender, and (iii) the repayment, satisfaction or discharge of all obligations under any Loan Document.

### Section 2.9      **Duty to Mitigate**.

(a)      In the event (i) any Lender delivers a certificate requesting compensation pursuant to **Section 2.7** (*Reserve Requirements; Increased Costs*) above or  (ii) the Borrowers are required to pay any Indemnified Taxes or additional amounts to any Lender or any Governmental Authority on account of any Lender pursuant to **Section 2.8** (*Taxes*) above, then, in each case, the Borrowers may, at their sole expense and effort, upon notice to such Lender and the Agent, require such Lender to transfer and assign, without recourse (in accordance with and subject to the restrictions contained in **Sections 11.7** (*Successors and Assigns*) and **11.13** (*Assignment of Rights*) below), all of its interests, rights (other than its then-existing rights to payments pursuant to **Section 2.7** (*Reserve Requirements; Increased Costs*) or **2.8** (*Taxes*) above) and obligations under this Agreement to an eligible Assignee (which assignee may be another Lender, if a Lender accepts such assignment); **provided**, **however**, **that**, (x) such assignment shall not conflict with any law, rule or regulation or order of any court or other Governmental Authority having jurisdiction, (y) the Borrowers shall have received the prior written consent of the Agent, which consent shall not unreasonably be withheld or delayed, and (z) the Borrowers or such assignee shall have paid to the affected Lender in immediately available funds an amount equal to the sum of the principal of and interest accrued to the date of such payment on the outstanding Advance of such Lender **PLUS** all fees and other amounts accrued for the account of such Lender hereunder with respect thereto (including any amounts under **Section 2.7** (*Reserve Requirements; Increased Costs*) above); and **provided  further**, **however**, **that**, if prior to any such transfer and assignment the circumstances or event that resulted in such Lender's claim for compensation under **Section 2.7** (*Reserve Requirements;*

*Increased Costs*) above or the amounts paid pursuant to **Section 2.8** (*Taxes*) above, as the case may be, cease to cause such Lender to suffer increased costs or reductions in amounts received or receivable or reduction in return on capital, or cease to result in amounts being payable under **Section 2.8** (*Taxes*) above, as the case may be (including as a result of any action taken by such Lender pursuant to **Section 2.9(b)** below), or if such Lender shall waive its right to claim further compensation under **Section 2.7** (*Reserve Requirements; Increased Costs*) above in respect of such circumstances or event or shall waive its right to further payments under **Section 2.8** (*Taxes*) above in respect of such circumstances or event, then such Lender shall not thereafter be required to make any such transfer and assignment hereunder.

(b)    If (i) any Lender shall request compensation under **Section 2.7** (*Reserve Requirements; Increased Costs*) above or (ii) the Borrowers are required to pay any Indemnified Taxes or additional amounts to any Lender or any Governmental Authority on account of any Lender pursuant to **Section 2.8** (*Taxes*) above, then such Lender shall use reasonable efforts (which shall not require such Lender to incur an unreimbursed loss or unreimbursed cost or expense or otherwise take any action inconsistent with its internal policies or legal or regulatory restrictions or suffer any disadvantage or burden deemed by it to be significant) (x) to file any certificate or document reasonably requested in writing by the Borrowers or (y) to assign its rights and delegate and transfer its obligations hereunder to another of its offices, branches or affiliates, if such filing or assignment would reduce its claims for compensation under **Section 2.7** (*Reserve Requirements; Increased Costs*) above or would reduce amounts payable pursuant to **Section 2.8** (*Taxes*) above, as the case may be, in the future.   The Borrowers, jointly and severally, promise to pay all reasonable costs and expenses incurred by any Lender in connection with any such filing or assignment, delegation and transfer.

### Section 2.10    Warrants.

(a)    On the terms and subject to the conditions hereof, on the Closing Date, the Parent shall issue to each Lender a Warrant for the right to purchase interests in the Parent.   The Warrants are issued in connection with the Loan, and, together with the Loan, constitute investment units within the meaning of Section 1273(c)(2) of the Code.

(b)    In accordance with Sections 1273(c)(2)(A) and 1273(b)(2) of the Code, the issue price of the investment unit is the amount of the Loan to the Borrowers.   The Borrowers and the Lenders have considered all facts relevant to a determination of the fair market value of each of the Loan and the Warrants being issued in connection with this Agreement, and have used their respective reasonable best efforts to determine such fair market values.   Allocating that issue price between the Loan and the Warrant in proportion to their respective fair market values, as required by Section 1273(c)(2)(B) of the Code and Treasury Regulation 1.1273-2(h)(1), results in the Warrant having an aggregate issue price of **USD 880,000** and the Loan having an issue price of **USD 16,541,250**.   Neither the Borrowers nor the Lenders shall take any position in their U.S. federal, State or local Tax returns that is inconsistent with the foregoing, unless otherwise required by a Tax authority or court.   The Borrowers shall provide each Lender with any information necessary for such Lender to report its income from this transaction properly.

*Loan and Security Agreement*

# ARTICLE 3
# SECURITY INTEREST

**Section 3.1**    **Grant of Security Interest.**  As security for the prompt and complete payment when due (whether on Payment Dates, on the Maturity Date or otherwise) of all the Secured Obligations, each Borrower grants to the Agent, for the benefit of the Secured Parties, a security interest in all of such Borrower's right, title, and interest in, to and under all of the Borrower's personal property and other assets (in each case, other than Excluded Assets), including, without limitation, the following (to the extent not constituting Excluded Assets), in each case, whether now owned or hereafter acquired (collectively, the "**Collateral**"):

(i)    all Accounts, Chattel Paper, Commodity Contracts, Deposit Accounts, Documents, Equipment, Fixtures, General Intangibles, Goods, Instruments, Intellectual Property, Inventory, Investment Property, Letter of Credit Rights and Supporting Obligations;

(ii)    all Commercial Tort Claims (including, without limitation, all of the Commercial Tort Claims identified in **Schedule 5.3** (*Commercial Tort Claims*) to this Agreement, as such **Schedule 5.3** may be amended from time to time pursuant to **Section 7.11** (*Commercial Tort Claims*) below);

(iii)    all Intellectual Property (including, without limitation, all of the Intellectual Property identified on **Schedule 5.15** (*Intellectual Property*) to this Agreement, as such **Schedule 5.15** may be amended from time to time pursuant to **Section 7.9** (*Further Assurances*) below);

(iv)    without duplication of, or limiting the generality of, **clauses (i)** through **(iii)** above:

(A)    all cash, Cash Equivalents, Investments, Equity Interests and Receivables; and

(B)    the Rawhide Mine; and

(C)    all books and records pertaining to the Collateral; and

(v)    the extent not otherwise included, all Proceeds and products of any and all of the foregoing;

**it** **being** **understood**, **however**, that the foregoing grant, pursuant to this **Section 3.1**, shall not be construed as limiting the right of the Borrowers to grant Permitted Liens, subject to, and in accordance with, the other provisions of this Agreement.

**Section 3.2**    **Delivery of Collateral.**  All certificates or instruments representing or evidencing Collateral (other than Collateral that is subject to Permitted Liens) shall be delivered to and held by the Agent pursuant to this Agreement, shall be in suitable form for transfer by delivery or shall be accompanied by duly executed instruments of transfer or assignment in blank, all in form and substance reasonably satisfactory to the Agent and, to the extent not constituting an assignment, shall be irrevocable powers of attorney coupled with an interest.   Upon the occurrence of an Event of Default, the Agent shall have the right, at any time and without notice to the Borrowers or any Secured

Party, to transfer to or to register in the name of the Agent or any of its nominees any or all of the Collateral.

**Section 3.3**    **Borrowers Remain Liable.**    Notwithstanding anything in this Agreement to the contrary, (a) each Borrower that is party thereto shall remain liable under any contracts and agreements included in the Collateral to perform all of its duties and obligations thereunder to the same extent as if this Agreement had not been executed, (b) the exercise by the Agent as agent of the Lenders or by the Agent as agent of the Secured Parties of any of its rights under this Agreement shall not release any Borrower from any of its duties or obligations under any contracts or agreements included in the Collateral, (c) the Agent, as agent of the Secured Parties, shall not have any obligation or liability under any contracts and agreements included in the Collateral by reason of this Agreement, and (d) neither the Agent nor any of the Lenders shall be obligated to perform any of the obligations or duties of any Borrower under any contract or agreement included in the Collateral or to take any action to collect or enforce any claim for payment assigned under this Agreement.

**Section 3.4**    **Taxes.**    The Borrowers, jointly and severally, promise to pay, and to hold the Agent and the Lenders harmless from, any and all liabilities with respect to, or resulting from any delay in paying, any and all excise, sales, property or other similar Taxes (excluding, for the avoidance of doubt, Excluded Taxes) that may be payable or determined to be payable with respect to any of the Collateral or this Agreement.

**Section 3.5**    **Further Assurances; Financing Statements.**

(a)    ***Further Assurances.***    Each Borrower agrees that, at any time and from time to time, it shall at the expense of the Borrowers promptly authorize, execute and deliver, as applicable, all further instruments and documents and take all further action that may be necessary or desirable or that the Agent may reasonably request to maintain the perfection of the Agent's security interest in the Collateral.    Without limiting the generality of the foregoing, each Borrower shall authorize, execute and file, as applicable, such financing or continuation statements, or amendments thereto, and such other instruments or notices as may be necessary or desirable or that the Agent may request to perfect the assignments and security interests granted by this Agreement.

(b)    ***Specific Obligations.***    Without limiting the generality of **Section 3.5(b)(ii)** (*Certificated Vehicles*) below, the Borrowers shall, on or prior to the Closing Date (or within such other period as may be expressly otherwise provided in **Section 4.5** (*Post-Closing Obligations*) below):

(i)    *Fixtures, Etc.*    With respect to fixtures and as-extracted Collateral, authorize, execute and file and record a financing statement in the county where such fixtures and as-extracted Collateral is located to perfect the Agent's security interest therein, in accordance with Nevada Revised Statutes Chapter 104.9501(a)(1), 104.9502(3), 104.9502(2) and 104.9501(1)(b) or any other applicable laws.

(ii)    *Certificated Vehicles*.    Provide the Agent with fully-executed certificates of title for any Certificated Vehicle owned by any Borrower, listing the Agent's name and address as the first lienholder thereon, duly recorded with the Nevada Department of Motor Vehicles ("**NVDMV**"), or other relevant authority, in a manner necessary

and sufficient to perfect the Agent's Lien on such Certificated Vehicle, in accordance with Nevada Revised Statutes Chapter 482.428, or any other applicable law, rule or regulation; **_provided_**, **_however_**, **_that_** the obligations of the Borrowers under this **Section 3.5(b)(ii)** shall not apply as to:

    (A)    any of the **three** Certificated Vehicles (consisting of the vehicles with VINs 1FMFU18L6VLA30270, 1FT7W2B68EEA22249 and 1FD8W3H68BEA03886) as to which "LOST" is specified in the column headed _Title_ in **Schedule 5.14** (_Certificated Vehicles_) to this Agreement, if and for so long as no replacement certificate of title shall have been issued to the relevant Borrower with respect to such Certificated Vehicle; or

    (B)    any Certificated Vehicles that constitute (and for so long as they remain) Excluded Assets.

    (iii)    _Initial Account Control Agreement_.    Enter into the Initial Account Control Agreement and deliver to the Agent a true, correct, complete and fully-executed copy thereof.

    (iv)    _EM Gold Certificate_.    Deliver, or cause to be delivered, to the Agent the original certificate or certificates representing the shares of EmGold referred to in **Annex II** (_Existing Permitted Investments_) to this Agreement, accompanied by executed transfer powers, in blank, in a form reasonably satisfactory to the Agent.

    (c)    **_Authorization to File Financing Statements_.**    Each Borrower, and each Lender, hereby severally authorizes the Agent to file one or more financing or continuation statements, and amendments thereto, relating to all or any part of the Collateral without the signature of any Borrower or Secured Party where permitted by law.    A photographic or other reproduction of this Agreement or any financing statement covering the Collateral or any part thereof shall be sufficient as a financing statement where permitted by law.    The Agent will promptly send to the Borrowers any financing or continuation statements thereto which it files without the signature of any Borrower.    The Agent will promptly send the Borrowers or the Secured Parties, as the case may be, the filing or recordation information with respect thereto.

    (d)    **_Additional Information_.**    Each Borrower shall furnish to the Agent, from time to time, such statements and schedules further identifying and describing the Collateral and such other reports in connection with the Collateral as the Agent may reasonably request, all in reasonable detail.

# ARTICLE 4
# CONDITIONS PRECEDENT TO LOAN

The obligations of the Lenders to make the Loan hereunder are subject to the satisfaction by the Borrowers of the following conditions:

**Section 4.1    Required Documents.**    On or prior to the Closing Date, the Borrowers shall have delivered to the Agent and Lenders the following, all in form and substance reasonably satisfactory to the Agent:

(a)    *Loan Documents, Etc.*    Executed copies of:

    (i)    the documents referred to in **clauses (a)** through **(h)** of the definition of Loan Documents in **Section 1.1** (*Definitions*) above; and

    (ii)    all other documents and instruments reasonably required by the Agent to effectuate the transactions contemplated hereby or to create and perfect the Liens of the Agent with respect to all Collateral, including without limitation:

        (A)    copies of all filings to be made under the UCC, in form for filing;

        (B)    copies of all filings to be made with respect to Real Property, in form for filing; and

        (C)    the certificates (if any) representing any and all Equity Interests in, to or under which any Borrower holds any legal or beneficial right, title or interest, together with powers, in a form reasonably satisfactory to the Agent, executed in blank by the registered owner thereof.

(b)    *Organizational Documents.*    Copies of the Organizational Documents of each Rawhide Entity, as amended or amended and restated through the Closing Date, certified, as applicable, by the Secretary of State of its respective State of organization.

(c)    *Good Standing Certificates.*    (i) A certificate of good standing for each Rawhide Entity from the Secretary of State of its State of organization and (ii) similar certificates from all other jurisdictions in which any Borrower does business and where the failure to be qualified could be reasonably expected to have a Material Adverse Effect.

(d)    *Secretary's Certificates.*    A certificate of the secretary of each Rawhide Entity as to (i) an attached copy of resolutions of such entity's board of directors (or, for any limited liability company, comparable documentation) evidencing approval of (A) the Loan and other transactions evidenced by the Loan Documents; and  (B) with respect to the Parent, the Warrants and transactions evidenced thereby; (ii) an attached copy of the by-laws (or, where applicable, limited liability company operating agreement) of such entity, as amended or amended and restated through the Closing Date, and  (iii) incumbency and signatures of officers of such Rawhide Entity who executed any of the Loan Documents.

(e) *__Officer's Certificates__*.    One or more certificates of officers of the Rawhide Entities as to:

(i)    the accuracy of the representations and warranties set forth in **Article 5** (*Representations and Warranties*) below;

(ii)    compliance with the covenants set forth in **Section 7.1** (*Financial Covenants*) below (both immediately prior to, and after giving effect to, the execution and delivery of the Loan Documents, the making of the Loan pursuant to **Section 2.1(a)** (*The Loan*) above and the other transactions contemplated to occur on the Closing Date; and

(iii)    the satisfaction of the conditions set forth in this **Article 4**.

(f) *__Financial Statements__*.    (i) The Audited Financial Statements of the Borrowers for the Fiscal Year ended December 31, 2017 and (ii) the unaudited Financial Statements of the Rawhide Entities for the Fiscal Quarter ended September 30, 2018.

(g) *__Insurance__*.    All certificates of insurance and copies of insurance policies required hereunder.

(h) *__Legal Opinions__*.

(i)    *Pepper Hamilton LLP*.    One or more legal opinions of Pepper Hamilton LLP, special counsel to the Rawhide Entities, as to (A) corporate authority, (B) due authorization, execution, delivery and enforceability of the Loan Documents, (C) no conflicts with law, court orders, Organizational Documents or listed material contracts, (D) validity and perfection of the Agent's security interest in the Collateral and (E) valid issuance of the Warrants.

(ii)    *Holley Driggs*.    A legal opinion of Holley, Driggs, Walch, Fine, Puzey, Stein & Thompson, special Nevada counsel to the Rawhide Entities, as to (A) Real Property matters and (B) titled assets that are included in the Collateral.

(i) *__KYC, AML, Etc.__*    Upon the reasonable request of the Agent or any Lender made at least **ten** days prior to the Closing Date, the documentation and other information so requested in connection with applicable "know your customer" and anti-money-laundering rules and regulations, including the PATRIOT Act, in each case at least **three** Business Days prior to the Closing Date.

(j) *__Other Documents__*.    Such other documents as the Agent may reasonably request.

**Section 4.2    Payment of Fees and Expenses**.    The Agent shall have received the Origination Fee and reimbursement of the Agent's and the Lenders' current expenses reimbursable pursuant to this Agreement and the Fee Letter, which amounts may be deducted from the amount advanced in respect of the Loan on the Closing Date.

**Section 4.3    Compliance**.    All representations and warranties set forth in **Article 5** (*Representations and Warranties*) below shall be true and correct in all material respects as of the Closing Date (or, to the extent that such representations and warranties speak as of an earlier date, such earlier date), and the Borrowers shall be in compliance with all the terms and provisions set forth herein

and in each other Loan Document on its part to be observed or performed on or before the Closing Date.

**Section 4.4** **No Default.** As of the Closing Date, (a) no fact or condition exists that could (or could, with the passage of time, the giving of notice, or both) constitute an Event of Default and (b) no event that has had or could reasonably be expected to have a Material Adverse Effect has occurred and is continuing.

**Section 4.5** **Post-Closing Obligations.**

(a) **_Certain Extensions of Time._** The Agent and the Lenders agree to the following limited extensions of time for performance of certain of the Borrowers' obligations under **Section 3.5(b)** (*Specific Obligations*) above:

(i) *Certificated Vehicles.* The Borrowers shall have up to **60** days following the Closing Date to comply with their obligations to record the Agent's Lien under **Section 3.5(b)(ii)** (*Certificated Vehicles*) above, **provided** that the Borrowers shall have submitted to the NVDMV, or other relevant authority, a duly-endored certificate of title, application and any other documentation, with respect to each Certificated Vehicle owned by any Borrower (other than a Certificated Vehicle subject to an exclusion under **Section 3.5(b)(ii)(A)** or **3.5(b)(ii)(B)** above), sufficient to effect the recordation of the Agent's Lien thereon, within **ten** Business Days following the Closing Date, and shall continue to use commercially-reasonable efforts to cause the recordation and delivery required under such **Section 3.5(b)(ii)** to be made as soon as reasonably practicable following the Closing Date.

(ii) *Initial Account Control Agreement.* The Borrowers shall have up to **10** Business Days following the Closing Date to comply with their obligation under **Section 3.5(b)(iii)** (*Initial Account Control Agreement*) above, **provided** that the Borrowers shall continue to use commercially-reasonable efforts to cause the Initial Account Control Agreement to be executed, and delivered to the Agent, as soon as reasonably practicable following the Closing Date.

(iii) *EM Gold Certificate.* The Borrowers shall have up to **30** days following the Closing Date to comply with their obligation under **Section 3.5(b)(iv)** (*EM Gold Certificate*) above, **provided** that the Borrowers shall continue to use commercially-reasonable efforts to cause the certificate or certificates representing the EmGold shares to be delivered to the Agent, along with the requisite transfer powers, as soon as reasonably practicable following the Closing Date.

(b)    *__Consequences of Failure__*.    A failure by the Borrowers to comply to timely comply with their obligations under __Section 3.5(b)__ (*Specific Obligations*) above, as modified under __Section 4.5(a)__ (*Certain Extensions of Time*) above (except as the time periods for compliance may have been extended in writing by the Agent, in its reasonable discretion), shall constitute an immediate Event of Default (to which the grace period set forth in __Section 9.1(c)__ (*Breach of Agreement*) below shall not apply).

# ARTICLE 5
# REPRESENTATIONS AND WARRANTIES

To and for the benefit of the Secured Parties, each Rawhide Entity hereby represents and warrants (which representations and warranties shall survive the execution and delivery of this Agreement), as of the Closing Date, as follows:

**Section 5.1    __Organization, Etc.__.** (a)(i) each of Rawhide Mining and the Parent is a limited liability company duly formed, legally existing and in good standing under the laws of the State of Delaware, (ii) each other Borrower is duly formed, legally existing and in good standing under the laws of its jurisdiction of organization, (b) each Rawhide Entity (i) has all requisite power and authority and all requisite governmental licenses, authorizations, consents and approvals to (A) own or lease its assets and carry on its business and (B) execute, deliver and perform its obligations under the Loan Documents to which it is a party, and (ii) is duly qualified as a foreign entity, and is licensed and in good standing, in all jurisdictions in which (A) the nature of its business or location of its properties require such qualification or licensing, or (B) the failure to be qualified or licensed could reasonably be expected to have a Material Adverse Effect, and (c) as of the date hereof, the present name, former names (if any), locations, place of formation, tax identification number, organizational identification number and other information, with respect to each Rawhide Entity, are correctly set forth in __Exhibit B__ (*Borrower Information*).

**Section 5.2    __Collateral__.** Each Borrower (a) owns its interest in the Collateral free of all Liens (except for (i) Permitted Liens and (ii) with respect to Real Property, (A) subject to (1) the paramount title of the United States to unpatented mineral claims and (2) matters that do not materially interfere with the current, intended or proposed use of such Real Property) and (b) has the power and authority to grant to the Agent a Lien in the Collateral as security for the Secured Obligations.

**Section 5.3    __Commercial Tort Claims__.** No Borrower holds any Commercial Tort Claims other than those identified in __Schedule 5.3__ (*Commercial Tort Claims*) to this Agreement.

**Section 5.4    __Consents__.** (a) Each Rawhide Entity's execution, delivery and performance of this Agreement, and all other Loan Documents to which it is a party, (i) have been duly authorized by all necessary limited liability company, corporate or other action of such Rawhide Entity, (ii) will not result in the creation or imposition of any Lien upon the Collateral, other than Permitted Liens and the Liens created by this Agreement and the other Loan Documents, (iii) do not violate any provisions of (A) such Rawhide Entity's Organizational Documents, (B) any law, regulation, order, injunction, judgment, decree or writ to which such Rawhide Entity is subject or (C) any material contract or material agreement or require the consent or approval of any other Person which has not already been obtained, except (in the case of the foregoing __clauses (a)(iii)(A)__, __(a)(iii)(B)__ and __(a)(iii)(C)__) where such violation could not

*Loan and Security Agreement*

reasonably be expected to result in a Material Adverse Effect, and (b) the individual or individuals executing the Loan Documents on behalf of the Rawhide Entities are duly authorized to do so.

**Section 5.5** **Governmental Authorization; Other Consents.** No approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with the execution, delivery or performance by, or enforcement against, any Rawhide Entity of this Agreement or any other Loan Document, except for (a) such approvals, consents, exemptions, authorizations, actions or notices that have been duly obtained, taken or made and in full force and effect, or (b) where the failure to obtain such approvals, consents, exemptions, authorizations or take such actions could not reasonably be expected to result in a Material Adverse Effect.

**Section 5.6** **Financial Statements; No Material Adverse Effect.**

(a) ***Audited Financial Statements.*** The Audited Financial Statements for the Fiscal Year ended December 31, 2017 were prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein, and do or will fairly present in all material respects the financial condition of the Borrowers as of the date thereof and their results of operations and cash flows for the period covered thereby in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein.

(b) ***Unaudited Financial Statements.*** The unaudited consolidated balance sheet of the Borrowers and the related consolidated statements of income or operations, shareholders' equity and cash flows for the month ended on November 30, 2018 were prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein, and do or will fairly present in all material respects the financial condition of the Borrowers as of the date thereof and their results of operations and cash flows for the period covered thereby, subject to the absence of notes and to normal year-end audit adjustments.

(c) ***No Material Adverse Effect.*** No event that has had or could reasonably be expected to have a Material Adverse Effect has occurred since December 31, 2017. No Rawhide Entity is aware of any event likely to occur that is reasonably expected to result in a Material Adverse Effect.

**Section 5.7** **Actions Before Governmental Authorities.** There are no actions, suits or proceedings at law or in equity or by or before any Governmental Authority now pending or, to the knowledge of any Rawhide Entity, threatened in writing against or affecting any Rawhide Entity or its properties, that is reasonably expected to result in a Material Adverse Effect.

**Section 5.8** **Litigation.** There are no actions, suits, proceedings, claims, disputes or investigations pending or, to the knowledge of any Rawhide Entity, threatened, at law, in equity, in arbitration or before any Governmental Authority, by or against any Rawhide Entity, or against any of their properties or revenues, that (a) could reasonably be expected to be adversely determined, and, if so determined, either individually or in the aggregate could reasonably be expected to have a Material Adverse Effect or (b) purport to affect or pertain to this Agreement or any other Loan Document or any of the transactions contemplated hereby.

*Loan and Security Agreement*

**Section 5.9**     **Laws, Etc.**

(a)     ***No Violation, Etc.***    No Rawhide Entity is  (i) in violation of any law, rule or regulation, or in default with respect to any judgment, writ, injunction or decree of any Governmental Authority, where such violation or default is reasonably expected to result in a Material Adverse Effect or  (ii) in default in any manner under any provision of any agreement or instrument evidencing material Indebtedness, or any other material agreement to which it is a party or by which it is bound.

(b)     ***Investment Company Act, Margin Regulations, Etc.***    (i) No Rawhide Entity is an "investment company" or a company "controlled" by an "investment company" under the Investment Company Act of 1940, as amended, (ii)(A) no Rawhide Entity is engaged as one of its important activities in extending credit for "margin stock" (under Regulations X, T and U of the Federal Reserve Board of Governors), and  (B) not more than **25.00%** of the value of the assets of the Rawhide Entities, on a consolidated basis, consists of such margin stock, (iii) each Rawhide Entity has complied in all material respects with the Federal Fair Labor Standards Act, (iv) no Rawhide Entity is a "holding company" or an "affiliate" of a "holding company" or a "subsidiary company" of a "holding company" as each term is defined and used in the Public Utility Holding Company Act of 2005,  (v) the properties and assets of the Rawhide Entities have not been used by any Rawhide Entity (or, to the knowledge of any Rawhide Entity, by previous Persons), in disposing, producing, storing, treating, or transporting any hazardous substance, other than in material compliance with applicable laws, and  (vi) each Rawhide Entity has obtained all consents, approvals and authorizations of, made all declarations or filings with, and given all notices to, all Governmental Authorities that are necessary to continue their respective businesses as currently conducted.

(c)     ***Sanctions.***

(i)     No Rawhide Entity or Affiliate thereof, or any of their respective agents acting or benefiting in any capacity in connection with the transactions contemplated by this Agreement, is (A) in violation of any Anti-Terrorism Law, (B) engaging in or conspiring to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law, or  (C) a Blocked Person.

(ii)    No Rawhide Entity or Affiliate thereof, or any of their respective agents acting or benefiting in any capacity in connection with the transactions contemplated by this Agreement, (A) conducts any business or engages in making or receiving any contribution of funds, goods or services to or for the benefit of any Blocked Person, or  (B) deals in, or otherwise engages in any transaction relating to, any property or interest in property blocked pursuant to Executive Order No. 13224, any similar executive order or other Anti-Terrorism Law.

(iii)   None of the funds to be provided under this Agreement will be used, directly or indirectly,  (A) for any activities in violation of any applicable anti-money laundering, economic sanctions and anti-bribery laws and regulations laws and regulations or (B) for any payment to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official

capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended.

**Section 5.10     Information Correct and Current.**    No information, report, financial statement, exhibit or schedule furnished, by, or on behalf of, any Rawhide Entity to the Agent in connection with any Loan Document or included therein or delivered pursuant thereto contained, or, when taken as a whole, contains or will contain any material misstatement of fact or, when taken together with all other such information or documents, omitted, omits or will omit to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were, are or will be made, not materially misleading at the time such statement was made or deemed made. Additionally, any and all financial or business projections provided by, or on behalf of, any Rawhide Entity to the Agent, whether prior to, on or after the Closing Date, shall be  (i) provided in good faith and based on the most current data and information available to the Rawhide-Related Persons, and  (ii) the most current of such projections provided to the Parent Management Committee (it being understood for purposes of this **Section 5.10** only that such projections are subject to significant uncertainties and contingencies, many of which are beyond the control of the Rawhide Entities, that no assurance is given that any particular projections will be realized, and that actual results may differ from the projected results).

**Section 5.11     Tax Matters.**    Except for those being contested in good faith with adequate reserves under GAAP,  (a) each Borrower has filed all U.S. federal and other material State, local and non-U.S. Tax returns that it is required to file,  (b) each Borrower has duly paid or fully reserved for all Taxes or installments thereof (including any interest or penalties) as and when due, which have or may become due, and  (c) each Borrower has paid or fully reserved for any Tax assessment received by such Borrower, if any (including any Taxes being contested in good faith and by appropriate proceedings).

**Section 5.12     Real Property.**    (a) **Schedule 5.12** (*Real Property*) sets forth a complete and correct listing of all Borrower Real Property, and  (b) the Borrowers have good record and marketable title in fee simple to, or valid leasehold interests in, all Real Property used in the ordinary course of the Rawhide Mining Business, except for such defects in title that, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

**Section 5.13     Royalties.**    (a) **Schedule 5.13** (*Existing Royalties*) sets forth a complete and correct listing of all Royalties material to the Rawhide Mining Business (the "**Existing Royalties**"),  (b) the Borrowers have delivered to the Agent true, correct and complete copies of all material agreements or other documents relating to the Existing Royalties, and  (c) except as identified in such **Schedule 5.13** there are no other material agreements, documents or understandings with respect to any Royalty of any type or kind whatsoever (other than a Royalty in a nominal or *de minimis* amount).

**Section 5.14     Certificated Vehicles.**    (a) **Schedule 5.14** (*Certificated Vehicles*) sets forth a complete listing of the Certificated Vehicles of the Borrowers and  (b) the certificates of title with respect to the **three** vehicles as to which "LOST" is specified in the column headed *Title* in such **Schedule 5.14** have been lost or destroyed.

**Section 5.15    Intellectual Property**.    **Schedule 5.15** (*Intellectual Property*) sets forth all of the Intellectual Property of the Borrowers that is material to the Rawhide Mining Business.    The Borrowers are the sole owner of, or otherwise has the right to use, the Intellectual Property of the Borrowers that is material to the Rawhide Mining Business (as currently conducted and proposed to be conducted).

**Section 5.16    Environmental Matters**.

(a)    Except as set forth in **Schedule 5.16** (*Environmental Matters*):

  (i)    the Borrower Real Property is free of the presence of any Hazardous Materials except for such presence (A) that could not reasonably be expected to adversely impact the value or marketability of such Real Property for the current and intended uses of the exploration and mining of gold and silver, (B) that is not in material breach of Environmental Laws or any Environmental Permit, and (C) that would not result in Environmental Liabilities of the Borrowers (other than Reclamation Obligations) that could reasonably be expected to exceed, individually or in the aggregate, **USD 250,000**;

  (ii)    no Borrower has caused or suffered to occur any material Release of Hazardous Materials on, at, in, under, above, to, from or about any of the Borrower Real Property;

  (iii)    the Borrowers are, and have been in material compliance with, all Environmental Laws;

  (iv)    the Borrowers have obtained, and are in material compliance with, all Environmental Permits required by Environmental Laws for the operations of their respective businesses as presently conducted or as proposed to be conducted, and all such Environmental Permits are valid, uncontested and in good standing;

  (v)    no Borrower is aware of any facts, circumstances or conditions, including any Releases of Hazardous Materials, that are likely to result in any Environmental Liabilities of the Borrowers (other than Reclamation Obligations) that could reasonably be expected to exceed, individually or in the aggregate, **USD 250,000**;

  (vi)    to the best of the Borrowers' knowledge, after due inquiry, there is no litigation arising under or related to any Environmental Laws, Environmental Permits or Hazardous Materials;

  (vii)    no Borrower has knowledge of, nor has any Borrower received notice of, any actual, pending or threatened investigations, claims, orders, suits, actions or proceedings regarding the breach of any Environmental Laws or the provisions of any Environmental Permits; and

  (viii)    the Borrowers have provided to the Agent copies of all existing environmental reports, reviews and site assessments and all written information pertaining to

actual or potential Environmental Liabilities, in each case relating to any Borrower or Subsidiary, which is in the possession of the Borrowers and their Subsidiaries or of which the Borrowers and their Subsidiaries have knowledge.

(b)    Each Borrower hereby acknowledges and agrees that the neither the Agent nor any Lender (i) is now, and has ever been, in control of any of the Real Property or any Borrower's or Subsidiary's affairs, and  (ii) has the capacity through the provisions of the Loan Documents or otherwise to influence any Borrower's or Subsidiary's conduct with respect to the ownership, operation or management of any of the Borrower Real Property or compliance with Environmental Laws or Environmental Permits (other than as may occur as a result of an exercise of remedies by the Agent during the continuance of an Event of Default).

Section 5.17    **Financial Accounts**.    **Exhibit C** (*Deposit Accounts and Investment Accounts*) is a true, correct and complete list of  (a) all banks and other financial institutions at which any Borrower maintains Deposit Accounts and  (b) all institutions at which any Borrower maintains an account holding Investment Property, and such **Exhibit C** correctly identifies the name, address and telephone number of each bank or other institution, the name in which the account is held, a description of the purpose of the account, and the complete account number therefor.

Section 5.18    **Employee Loans**.    Other than to the extent constituting Permitted Investments, no Borrower has any outstanding loan to any employee, officer or director of any Borrower, nor has any Borrower guaranteed the payment of any loan made to an employee, officer or director of any Borrower by a third party.

Section 5.19    **Capitalization, Affiliates, Etc.**

(a)    Rawhide Mining's capitalization as of the Closing Date is set forth in **Schedule 5.19** (*Capitalization and Affiliates*) to this Agreement.

(b)    Except as set forth in **Schedule 5.19** (*Capitalization and Affiliates*) to this Agreement, no Borrower owns any Equity Interests or securities of any Person, other than Cash Equivalents.

Section 5.20    **Solvency**.    Each Rawhide Entity is Solvent.

Section 5.21    **ERISA**.    No Rawhide Entity or ERISA Affiliate maintains, makes contributions to, or has any obligations with respect to any Plan or Multiemployer Plan.   No Rawhide Entity is a "benefit plan investor" as defined in section 3(42) of ERISA.

# ARTICLE 6
## INSURANCE; INDEMNIFICATION

Section 6.1    **Coverage**.    The Borrowers shall cause to be carried and maintained commercial general liability insurance, on an occurrence form, against risks customarily insured against in the Borrowers' line of business. Such risks shall include the risks of bodily injury, including death, property damage, personal injury, advertising injury, and contractual liability per the terms of the indemnification agreement found in **Section 6.3** (*Indemnity*) below.   The Borrowers must maintain a

minimum of **USD 2,000,000** of commercial general liability insurance for each occurrence (which coverage may be provided in part by an umbrella policy so long as the primary commercial general liability insurance is in an amount per occurrence at least equal to the greater of **USD 1,000,000** and any threshold amount before the umbrella coverage is applicable). The Borrowers currently maintain, and, jointly and severally, promise to maintain, a minimum of **USD 2,000,000** of directors' and officers' insurance for each occurrence and **USD 5,000,000** in the aggregate.    So long as there are any Secured Obligations (other than inchoate indemnity obligations) outstanding, the Borrowers shall also cause to be carried and maintained insurance upon the Collateral, insuring against all risks of physical loss or damage howsoever caused, in an amount not less than the full replacement cost of the Collateral; **provided** that such insurance may be subject to standard exceptions and deductibles.

**Section 6.2    Certificates.**    Borrowers shall deliver to the Agent certificates of insurance that evidence the Borrowers' compliance with their insurance obligations in **Section 6.1** (*Coverage*) above and the obligations contained in this **Section 6.2**.    The Borrowers' insurance certificate shall identify the Agent is an additional insured for commercial general liability, a loss payee for all risk property damage insurance, subject to the insurer's approval, and a loss payee for property insurance and additional insured for liability insurance for any future insurance that the Borrowers may acquire from such insurer.    Attached to the certificates of insurance will be additional insured endorsements for liability and lender's loss payable endorsements for all risk property damage insurance.    All certificates of insurance will provide for a minimum of **30** days' advance written notice to the Agent of cancellation (other than cancellation for non-payment of premiums, for which **10** days' advance written notice shall be sufficient) or any other change adverse to the Agent's interests.    Any failure of the Agent to scrutinize such insurance certificates for compliance is not a waiver of any of the Agent's rights, all of which are reserved.    The Borrowers shall provide the Agent with copies of each insurance policy, and, upon entering or amending any insurance policy required hereunder, the Borrowers shall provide the Agent with copies of such policies and shall promptly deliver to the Agent updated insurance certificates with respect to such policies.    Notwithstanding the foregoing part of this **Section 6.2**, the requirements under this **Section 6.2** shall not apply to any property insurance policy, if, and to the extent that, and for so long as,  (i) such property insurance covers Excluded Assets and  (ii) the terms of any Permitted Indebtedness secured by a Permitted Lien on such Excluded Assets would prevent, prohibit or render impracticable compliance with the terms of this **Section 6.2**, as to the coverage of such Excluded Assets under such policy.

**Section 6.3    Indemnity.**    The Borrowers, jointly and severally, promise to indemnify and hold the Agent, the Lenders and their officers, directors, employees, agents, in-house attorneys, representatives and   equity holders (each, an "**Indemnified Person**") harmless from and against any and all claims, costs, expenses, damages and liabilities (including such claims, costs, expenses, damages and liabilities based on liability in tort, including strict liability in tort), including reasonable out-of-pocket attorneys' fees and disbursements and other reasonable out-of-pocket costs of investigation or defense (including those incurred upon any appeal) (collectively, "**Liabilities**"), that may be instituted or asserted against or incurred by such Indemnified Person as the result of credit having been extended, suspended or terminated under this Agreement and the other Loan Documents or the administration of such credit, or in connection with or arising out of the transactions contemplated hereunder and thereunder, or any actions or failures to act in connection therewith, or arising out of the disposition or utilization of the Collateral, excluding in all cases Liabilities to the extent resulting solely from  (a) any

Indemnified Person's gross negligence, willful misconduct or material breach of its obligations under any Loan Document or  (b) from disputes, claims, demands, actions, judgments or suits not arising from any act or omission by any Borrower or Affiliate thereof brought by an indemnified person against any other indemnified person (other than disputes, claims, demands, actions, judgments or suits involving claims against the Agent in its capacity as such).    In no event shall the Borrowers or any Indemnified Person be liable on any theory of liability for any special, indirect, consequential or punitive damages (including any loss of profits, business or anticipated savings).    This **Section 6.3** shall survive the repayment of indebtedness under, and otherwise shall survive the expiration or other termination of, this Agreement. This **Section 6.3** shall not apply with respect to Taxes other than any Taxes that represent Liabilities arising from any non-Tax claim.

<div align="center">

# ARTICLE 7
## AFFIRMATIVE COVENANTS

</div>

**Section 7.1**    **Financial Covenants**.

(a)    ***Total Leverage Ratio.***    The Borrowers shall not permit the Total Leverage Ratio, as of the end of any of the 12-Month periods specified in the table immediately below, to be greater than the ratio set forth opposite such date, under the heading *Maximum Total Leverage Ratio*, in the table immediately below.

| 12-Month Period Ending | Maximum Total Leverage Ratio |
|---|---|
| March 31, 2020 | **4.00:1.00** |
| March 31, 2021 | **3.00:1.00** |
| March 31, 2022 and March 31 of each succeeding calendar year | **2.50:1.00** |

(b)    ***Consolidated Cash Interest Coverage Ratio.***    The Borrowers shall not permit the Consolidated Cash Interest Coverage Ratio, as of the end of any of the 12-Month periods specified in the table immediately below, to be less than the ratio set forth opposite such period, under the heading *Maximum Consolidated Cash Interest Coverage Ratio*, in the table immediately below.

| 12-Month Period Ending | Maximum Consolidated Cash Interest Coverage Ratio |
|---|---|
| March 31, 2020 | **1.50:1.00** |
| March 31, 2021 | **1.75:1.00** |
| March 31, 2022 and each 12-month period thereafter | **2.00:1:00** |

*Loan and Security Agreement*

(c)    _**Liquidity.**_    The Borrowers shall not permit the Consolidated Cash Balance, as of any of the dates specified in the table immediately below, to be less than the amount set forth opposite such date, under the heading _Minimum Consolidated Cash Balance_, in the table immediately below.

| As of | Minimum Consolidated Cash Balance |
|---|---|
| June 30, 2020 ..................................................................... | **USD 2,000,000** |
| December 31, 2020 .............................................................. | **USD 2,500,000** |
| June 30, 2021 ..................................................................... | **USD 3,500,000** |
| December 31, 2021 .............................................................. | **USD 4,000,000** |
| June 30, 2022, and every December 31 and June 30 occurring thereafter ...................................... | **USD 5,000,000** |

(d)    _**Certain Definitions.**_    As used in this **Section 7.1** and elsewhere in this Agreement:

(i)    _Consolidated Cash Balance_.    "**Consolidated Cash Balance**" means the total amount of all unrestricted cash and Cash Equivalents of the Borrowers.

(ii)    _Consolidated Cash Interest Coverage Ratio_.    "**Consolidated Cash Interest Coverage Ratio**" means, with respect to any Fiscal Year, the ratio of:

(A)    Consolidated EBITDA; **TO**

(B)    Consolidated Interest Expense.

(iii)    _Consolidated EBITDA_.    "**Consolidated EBITDA**" means, with respect to any Fiscal Year or Fiscal Quarter, as applicable:

(A)    Consolidated Net Income for such period; **PLUS**

(B)    without duplication, and to the extent deducted in determining Consolidated Net Income for such period, the sum of  (1) interest expense **PLUS** (2) provision for taxes based on income **PLUS** (3) depreciation expense **PLUS** (4) amortization expense **PLUS** (5) unusual or non-recurring charges, expenses or losses (**provided**, **however**, **that**, the cumulative aggregate amount of the unusual or non-recurring charges, expenses or losses that are added back, pursuant to this **clause (B)(5)**, during (and with respect to) any 12-Month period, in determining Consolidated EBITDA, shall not exceed **10.00%** of Consolidated Net Income with respect to such 12-Month period (as determined, for the avoidance of doubt, without taking into account any exercise of the Equity Cure Right pursuant to **Section 9.2(a)** (_Equity Cure Right_) below)), **PLUS** (6) other non-cash charges, expenses or losses (excluding any such non-cash charge to the extent it represents an accrual or reserve for potential cash charge in any future period or amortization of a prepaid cash charge that was paid in a prior period) **PLUS** (7) the amount of any Reef Management Fees that are payable to Reef Capital Group, to the extent accrued and included in the calculation of Consolidated Net Income, not to

exceed **USD 300,000**, in the aggregate, during any Fiscal Year, PLUS (8) unrealized gains and losses in respect of Permitted Swap Contracts PLUS (9) the amount of fees, costs and expenses that are covered by insurance or indemnity; MINUS

(C) to the extent included in determining Consolidated Net Income for such period, the sum of (1) unusual or non-recurring gains and non-cash income PLUS (2) any other noncash income or gains increasing Consolidated Net Income for such period (excluding any such non-cash gain to the extent it represents the reversal of an accrual or reserve for potential cash charge in any prior period) PLUS (3) any gains realized from the disposition of property outside of the ordinary course of business, all as determined on a consolidated basis.

(iv) *Consolidated Interest Expense*. "**Consolidated Interest Expense**" means, for any period, total interest expense (including that attributable to Capitalized Leases) net of total interest income of the Borrowers on a consolidated basis for such period with respect to all outstanding Indebtedness of the Borrowers.

(v) *Consolidated Net Income*. "**Consolidated Net Income**" means, for any period, the consolidated net income (or loss) of the Borrowers on a consolidated basis; **provided**, that there shall be excluded from Consolidated Net Income:

(A) any income (or loss) of Western Exploration;

(B) the income (or deficit) of any Person accrued prior to the date it becomes a Borrower or is merged into or consolidated with any Borrower; and

(C) the income (or deficit) of any Person (other than a Borrower) in which any Borrower has an ownership interest, except to the extent that any such income is actually received by a Borrower in the form of dividends or similar distributions.

(vi) *Excluded Indebtedness*. "**Excluded Indebtedness**" means trade credit, accounts payable, performance bonds, deposits and advances from customs and indebtedness as a result of endorsing negotiable instruments and guaranties in respect thereof entered into in the ordinary course of the Rawhide Mining Business.

(vii) *Total Leverage Ratio*. "**Total Leverage Ratio**" means, with respect to any Fiscal Year or Fiscal Quarter, as applicable, the ratio of:

(A) Total Net Debt; **TO**

(B) Consolidated EBITDA.

*Loan and Security Agreement*

(viii)    *Total Net Debt*.    "**Total Net Debt**" means, at any time:

(A)    the aggregate principal amount of all:

(1)    Indebtedness of any Borrower for borrowed money (other than Excluded Indebtedness) outstanding on such date, in an amount that would be reflected on a balance sheet prepared as of such date on a consolidated basis in accordance with GAAP (but excluding the effects of any discounting of Indebtedness resulting from the application of purchase accounting);

(2)    purchase-money indebtedness; and

(3)    debt obligations evidenced by promissory notes, bonds, debentures, loan agreements or similar instruments, and debt obligations evidenced by promissory notes, bonds, debentures, loan agreements or similar instruments;

MINUS

(B)    the total amount of all unrestricted cash and Cash Equivalents on the consolidated balance sheet of the Borrowers;

**provided**, **however**, **that**, Indebtedness permitted by **paragraph (d)** or **(e)** of the definition of Permitted Indebtedness, and Reclamation Obligations, shall not be taken into account in determining the amount under **paragraph (A)** of this definition.

Section 7.2    **Reporting**.    The Borrowers shall furnish to the Agent the following financial statements, reports and other documents (the "**Financial Statements**"), at the times, and in the manner, specified below:

(a)    *Unaudited Financial Statements*.    As soon as practicable (and in no event later than **45** days) after the end of the first three Fiscal Quarters of each Fiscal Year, and as soon as practicable (and in no event later than **60** days) after the end of the last Fiscal Quarter of each Fiscal Year, year-to-date financial statements of Rawhide Mining and its Subsidiaries (prepared on a consolidated basis) as of the end of such Fiscal Quarter or Fiscal Year, as the case may be, including balance sheet and related statements of income and cash flows, accompanied by a report detailing any material contingencies (including the commencement of any material litigation by or against any Borrower) or any other occurrence that could reasonably be expected to have a Material Adverse Effect, and certified by Rawhide Mining's Chief Executive Officer or Chief Financial Officer to the effect that they have been prepared in accordance with GAAP (subject, as to interim statements, to lack of footnotes and year-end adjustments).

(b)    *Annual Audited Financial Statements*.    As soon as practicable (and in no event later than **120** days) after the end of each Fiscal Year, commencing with the Fiscal Year ending December 31, 2018, unqualified (other than any qualification resulting from any upcoming payment in full of the Loan) Audited Financial Statements of Rawhide Mining and its Subsidiaries, as of the end of such Fiscal Year (prepared on a consolidated basis), including balance sheet and related statements of income and cash

flows, and setting forth in comparative form the corresponding figures for the preceding Fiscal Year, certified by a firm of independent certified public accountants selected by Rawhide Mining and reasonably acceptable to the Agent, accompanied by any management report from such accountants.

(c)    ***Compliance Certificate***.    Contemporaneously with each delivery of financial statements pursuant to **Section 7.2(a)** (*Unaudited Financial Statements*) above, commencing with such financial statements for the Fiscal Quarter ending December 31, 2020, a certificate (each, a "**Compliance Certificate**") in the form of **Exhibit D** (*Form of Compliance Certificate*) to this Agreement.

(d)    ***Monthly Mine Production Report***.    On the **tenth** Business Day of each Month (commencing in January 2019), a Monthly Mine Production Report in the form of **Exhibit E** (*Form of Mine Production Report*) to this Agreement.

(e)    ***Financial Plan***.    On or prior to the **90th** day of each Fiscal Year, a consolidated plan and financial forecast for such Fiscal Year, prepared on a monthly or quarterly basis, and otherwise in form and substance reasonably acceptable to the Agent, which shall include, *inter alia*:

(i)    a forecasted consolidated balance sheet and forecasted consolidated statements of income and cash flows of the Borrowers for such Fiscal Year; and

(ii)    a forecasted consolidated statements of income and cash flows of the Borrowers for each month or each Fiscal Quarter, as applicable, of such Fiscal Year.

(f)    ***Swaps***.

(i)    *Swap Contracts*.    Within **two** Business Days following the execution thereof, true and complete copies of any Swap Contract, or amendment thereto, entered into by, or with respect to, any Borrower.

(ii)    *Position Reporting*.    By not later than the **tenth** Business Day after the last day of the first and third Fiscal Quarter of each Fiscal Year, a report with regard to the Swap Obligations of the Borrowers, in such form, and containing such information, as may be reasonably requested by the Agent.

(g)    ***Required Filings***.    Promptly after the sending or filing thereof, as the case may be, copies of (i) any proxy statements, financial statements or reports that any Rawhide Entity has made available to holders of debt or the Parent's equity securities in respect of the Borrowers and (ii) any regular, periodic and special reports or registration statements that any Rawhide Entity files, in respect of the Borrowers, with (A) the Securities and Exchange Commission, (B) any Governmental Authority that may be substituted therefor, or (C) any national securities exchange.

(h)    ***Additional Reports***.    Promptly following request therefor, copies of any detailed audit reports, management letters or recommendations submitted to the board of directors (or the audit committee of the board of directors) of any Borrower by independent accountants in connection with the accounts or books of any Borrower or any Subsidiary, or any audit of any of them as the Agent or any Lender (through the Agent) may from time to time reasonably request.

(i)     ***Certain AML Events.***    Immediate notice if any Rawhide Entity has knowledge that any Rawhide Entity, or any Affiliate of any Rawhide Entity, is listed on the OFAC Lists or  (i) is convicted on, (ii) pleads *nolo contendere* to,  (iii) is indicted on, or  (iv) is arraigned and held over on charges involving money laundering or predicate crimes to money laundering.

**Section 7.3      Fiscal Years.**    The fiscal year of the Borrowers shall end on December 31.

**Section 7.4      Notices.**    The Rawhide Entities shall promptly notify the Agent and each Lender upon acquiring notice or knowledge of:

(a)     the occurrence of any Default or Event of Default;

(b)     the filing or commencement of any action, suit, investigation or proceeding by or before any arbitrator or Governmental Authority against or affecting any Rawhide Entity, including pursuant to any applicable Environmental Laws, that could reasonably be expected to be adversely determined, and, if so determined, could reasonably be expected to have a Material Adverse Effect;

(c)     the occurrence of any ERISA Event that, either individually or together with any other ERISA Events, could reasonably be expected to have a Material Adverse Effect;

(d)     notice of any action arising under any Environmental Law or of any noncompliance by any Rawhide Entity with any Environmental Law or any permit, approval, license or other authorization required thereunder that, if adversely determined, could reasonably be expected to have a Material Adverse Effect;

(e)     any material change in accounting or financial reporting practices by any Rawhide Entity, except in accordance with GAAP; and

(f)     any other matter or development that has had or could reasonably be expected to have a Material Adverse Effect.

**Section 7.5      Preservation of Existence, Etc.**    Each Rawhide Entity shall (and shall cause each other Rawhide Entity to), (a) preserve, renew and maintain in full force and effect its legal existence and good standing under the laws of the jurisdiction of its organization (except as expressly permitted under **Section 8.6(b)** (*Permitted Fundamental Changes*) below),  (b) take all reasonable action to maintain all rights, licenses, permits, privileges and franchises necessary or desirable in the normal conduct of its business, except to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect, and (c) preserve or renew all of its registered patents, trademarks, trade names and service marks, the non-preservation of which could reasonably be expected to have a Material Adverse Effect.

**Section 7.6      Maintenance of Properties.**    Each Rawhide Entity shall (and shall cause each other Rawhide Entity to),  (a) maintain, preserve and protect all of its properties and equipment necessary in the operation of its business in good working order and condition (ordinary wear and tear excepted) and  (b) make all necessary repairs thereto and renewals and replacements thereof, except (in the case of the foregoing **clauses (a)** and **(b)**) to the extent that the failure to do so could not reasonably be expected to have a Material Adverse Effect.

Section 7.7    **Payment of Obligations**.  Each Rawhide Entity shall (and shall cause each other Rawhide Entity to) pay, discharge or otherwise satisfy as the same shall become due and payable, all of its obligations and liabilities, including Tax liabilities, unless the same are being contested in good faith by appropriate proceedings diligently conducted and adequate reserves in accordance with GAAP are being maintained by such Rawhide Entity, except to the extent that the failure to do so could not reasonably be expected to have a Material Adverse Effect.

Section 7.8    **Inspection Rights**.  Each Rawhide Entity shall (and shall cause each other Rawhide Entity to) permit any representative that the Agent or any Lender authorizes, including its attorneys and accountants, during normal business hours and upon not less than **two** Business Days' notice, to inspect the Collateral and examine and make copies and abstracts of the books of account and records of the Rawhide Entities, and to discuss its affairs, finances and accounts with directors, officers, and independent public accountants, all at reasonable times and upon reasonable notice during normal business hours; **provided**, **however**, **that**, so long as no Event of Default has occurred and is continuing, such examinations shall be limited to no more often than **twice** per Fiscal Year.   In addition, any such representative shall have the right to meet with management and officers of the Rawhide Entities to discuss such books of account and records.

Section 7.9    **Further Assurances**.

(a)    _**Generally**_.  Each Rawhide Entity shall (and shall cause each other Rawhide Entity to):

(i)    prepare, execute, deliver and file, upon the reasonable request of the Agent, any financing statements, security agreements, collateral assignments, notices, control agreements, certificates of title, real property filings, filings with the U.S. Patent and Trademark Office or U.S. Copyright Office, stock certificates and accompanying stock powers or other documents to perfect or give the highest priority to the Agent's Lien on the Collateral (in each case, other than with respect to Excluded Assets, and subject to Permitted Liens);

(ii)    from time to time procure any instruments or documents as may be reasonably requested by the Agent, and take all further action that may be necessary, or that the Agent may reasonably request, to perfect and protect the Liens granted hereby and thereby (in each case, other than with respect to Excluded Assets, and subject to Permitted Liens); and

(iii)    protect and defend the Borrowers' title to the Collateral and the Agent's Lien thereon against all Persons claiming any interest adverse to any Borrower or the Agent other than Permitted Liens.

(b)    _**Pledge of Equity Interests**_.   Without limiting the generality of **Section 7.9(a)** (_Generally_) above, the applicable Borrower or Borrowers shall, within **15** days following the formation or acquisition of a Rawhide Subsidiary, enter into a pledge and security agreement, or the equivalent, in favor of, and in form and substance reasonably satisfactory to, the Agent, with respect to the Equity Interests of such Rawhide Subsidiary, which agreement shall grant to the Agent the rights set forth in the Equity Pledge Agreement, or the equivalent thereof, as applicable, _mutatis mutandis_, to such Equity Interests.

(c)    _**Authorization**_.    Each Borrower hereby authorizes the Agent (or its designee) to execute and deliver on behalf of such Borrower and to file such financing statements (including an indication that the financing statement covers "all assets or all personal property" of such Borrower in accordance with Section 9-504 of the UCC), collateral assignments, notices, control agreements, security agreements and other documents without the signature of such Borrower either in the Agent's name or in the name of the Agent as agent and attorney-in-fact for such Borrower.

**Section 7.10    Collateral.**    Each Borrower shall at all times keep the Collateral free and clear from any legal process or Liens whatsoever (except for Permitted Liens), and shall give the Agent prompt written notice of any legal process affecting the Collateral or any Liens thereon, provided however, that the Collateral may be subject to Permitted Liens.    No Borrower shall enter into or suffer to exist or become effective any agreement that prohibits or limits the right or ability of any Borrower to create, incur, assume or suffer to exist any Lien (in each case, other than with respect to Excluded Assets, and subject to Permitted Liens) upon any of its property or assets, whether now owned or hereafter acquired.    Each Borrower shall protect and defend its title to its assets from and against all Persons claiming any interest adverse to any Borrower (in each case, other than with respect to Excluded Assets, and subject to Permitted Liens), and the Borrowers shall give the Agent prompt written notice of any legal process affecting any Borrower's material assets.

**Section 7.11    Commercial Tort Claims.**    If any Borrower shall at any time hold or acquire a Commercial Tort Claim, the Rawhide Entities shall promptly (and in any event within **30** days following any Rawhide Entity obtaining knowledge thereof) notify the Agent in a writing signed by such Borrower and containing the details thereof, which writing shall be deemed to supplement **Schedule 5.3** (_Commercial Tort Claims_) to this Agreement.

**Section 7.12    Taxes.**    The Borrowers, jointly and severally, promise to pay when due all U.S. federal and other material Taxes, fees or other charges of any nature whatsoever (together with any related interest or penalties) now or hereafter imposed or assessed against any Borrower, the Agent, the Lenders or the Collateral or upon any Borrower's ownership, possession, use, operation or disposition thereof or upon any Borrower's rents, receipts or earnings arising therefrom.    The Borrowers shall file, on or before the due date therefor, all personal property tax returns in respect of the Collateral.    Notwithstanding the foregoing, the Borrowers may contest, in good faith and by appropriate proceedings, taxes for which the Borrowers maintain adequate reserves therefor in accordance with GAAP (and the same shall not be deemed to constitute a violation of this **Section 7.12** (_Taxes_) above).

**Section 7.13    Deposit Accounts.**    Except with respect to any Excluded Assets, no Borrower shall maintain any Deposit Account, or any account holding Investment Property, other than an account as to which  (a) the Agent shall have received prior written notice, setting forth the information included in **Exhibit C** (_Deposit Accounts and Investment Accounts_) to this Agreement (which notice shall be deemed to supplement such **Exhibit C**), and  (b) the Agent, the Borrower and the institution at which such account is established and maintained shall have entered into an account control agreement in form and substance satisfactory to the Agent.    To the extent that any such account control agreement grants to the Agent or the Lenders authorization to give instructions with respect to any Deposit Accounts or other account of any Rawhide Entity, the Agent and Lenders hereby agree that neither the

Agent, nor any Lender, shall exercise such authority unless, at the time of such exercise, an Event of Default shall have occurred and be continuing.

### Section 7.14    Ownership and Subsidiaries.

(a)    *Joinder of Subsidiaries*.    The Borrowers shall notify the Agent of each Rawhide Subsidiary formed or acquired subsequent to the Closing Date and, within **15** days of formation or acquisition, shall cause such Rawhide Subsidiary to execute and deliver to the Agent a Joinder Agreement.

(b)    *No CFCs*.    At no time shall any Borrower cause or permit:

(i)    any Borrower to form, or acquire any Equity Interests in, a CFC; or

(ii)    any Rawhide Subsidiary to constitute a CFC.

(c)    *Ownership of Rawhide Mining*.    Parent shall remain, at all times, the direct, legal and beneficial owner of **100.00%** of the outstanding Equity Interests of Rawhide Mining.

(d)    *Rawhide Subsidiaries*.    (i) At no time shall any Rawhide Subsidiary be formed, acquired or permitted to exist, unless it is a Wholly-Owned Subsidiary of Rawhide Mining, and  (ii) each Rawhide Subsidiary shall remain, at all times, a Wholly-Owned Subsidiary of Rawhide Mining.

### Section 7.15    Use of Proceeds.    Each Borrower agrees that  (a) the proceeds of the Loan shall be used solely  (i) to pay related fees and expenses in connection with this Agreement and  (ii) for working capital and general corporate purposes, and  (b) the proceeds of the Loan will not be used in violation of Anti-Corruption Laws or applicable Sanctions.

### Section 7.16    Compliance with Laws.

(a)    Each Borrower shall maintain, and shall cause its Subsidiaries to maintain, compliance in all material respects with all applicable laws, rules or regulations (including any law, rule or regulation with respect to the making or brokering of loans or financial accommodations), and shall, or cause its Subsidiaries to, obtain and maintain all required governmental authorizations, approvals, licenses, franchises, permits or registrations reasonably necessary in connection with the conduct of the Rawhide Mining Business, except where the failure to maintain any foreign qualification in any State could not reasonably be expected to have a Material Adverse Effect.

(b)    No Borrower or Subsidiary shall, nor shall any Borrower or any Subsidiary permit any Affiliate to,  (i) directly or indirectly, knowingly enter into any documents, instruments, agreements or contracts with any Person listed on the  OFAC Lists, (ii) conduct any business or engage in any transaction or dealing with any Blocked Person, including, without limitation, the making or receiving of any contribution of funds, goods or services to or for the benefit of any Blocked Person,  (iii) deal in, or otherwise engage in any transaction relating to, any property or interests in property blocked pursuant to Executive Order No. 13224 or any similar executive order or other Anti-Terrorism Law, or  (iv) engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or

avoiding, or attempts to violate, any of the prohibitions set forth in Executive Order No. 13224 or other Anti-Terrorism Law.

(c)    (i) The Rawhide Entities have implemented and maintain in effect policies and procedures designed to ensure compliance by the Rawhide Entities, their respective Affiliates and the directors, officers, employees and agents of the foregoing with Anti-Corruption Laws and applicable Sanctions, and (ii) the Rawhide Entities, and, to the knowledge of the Rawhide Entities, their respective officers and employees, are in compliance with Anti-Corruption Laws and applicable Sanctions in all material respects.

(d)    None of the Borrowers, any of its Subsidiaries or any of their respective directors, officers or employees, or to the knowledge of the Borrowers, any agent for the Borrowers or its Subsidiaries that will act in any capacity in connection with or benefit from the credit facility established hereby, is a Sanctioned Person. None of the Loan, use of proceeds or other transaction contemplated by this Agreement will violate Anti-Corruption Laws or applicable Sanctions.

**Section 7.17    Environmental Matters**.    Except to the extent that the failure to do so could not reasonably be expected to have a Material Adverse Effect, each Rawhide Entity shall (and shall cause each other Rawhide Entity to) (a) comply, in all material respects, with all Environmental Laws, (b) obtain, maintain in full force and effect and comply (in all material respects) with any permits, licenses or approvals required for the facilities or operations of the Rawhide Mining Business or any Rawhide Entity, and (c) conduct and complete any investigation, study, sampling or testing, and undertake any corrective, cleanup, removal, response, remedial or other action required by Environmental Law to identify, report, remove and clean up all Hazardous Materials present or released at, on, in, under or from any of the facilities or Real Property of any Rawhide Entity.

**Section 7.18    Intellectual Property**.

(a)    Each Rawhide Entity shall (i) reasonably protect, defend and maintain the validity and enforceability of its Intellectual Property, (ii) promptly advise the Agent in writing of material infringements of its Intellectual Property and (iii) not allow any Intellectual Property material to the Rawhide Mining Business to be abandoned, forfeited or dedicated to the public without the Agent's prior written consent (such consent not to be unreasonably withheld).

(b)    If any Borrower (i) obtains any Patent, registered Trademark, registered Copyright, registered mask work, or any pending application for any of the foregoing, whether as owner, licensee or otherwise, or (ii) applies for any Patent or the registration of any Trademark, then such Borrower shall, within **30** days thereof, provide written notice thereof to the Agent and shall execute such intellectual property security agreements and other documents and take such other actions as the Agent may request in its good faith business judgment to perfect and maintain a first priority perfected security interest in favor of the Agent in such property.

(c)    If any Borrower decides to register any Copyrights or mask works in the United States Copyright Office, such Borrower shall (i) provide the Agent with at least **30** days prior written notice of such Borrower's intent to register such Copyrights or mask works together with a copy of the application it intends to file with the United States Copyright Office (excluding exhibits thereto), (ii) execute an

intellectual property security agreement and such other documents and take such other actions as the Agent may request in its good faith business judgment to perfect and maintain a first priority perfected security interest in favor of the Agent in the Copyrights or mask works intended to be registered with the United States Copyright Office and (iii) record such intellectual property security agreement with the United States Copyright Office contemporaneously with filing the Copyright or mask work application(s) with the United States Copyright Office.

(d)     Each Borrower shall promptly provide to the Agent copies of all applications that it files for Patents or for the registration of Trademarks, Copyrights or mask works, together with evidence of the recording of the intellectual property security agreement required for the Agent to perfect and maintain a first priority perfected security interest in such property (which shall be held as Confidential information until the applications that it files for Patents or for the Registration of Trademarks, Copyrights or mask works become publicly available).

**Section 7.19    Books and Records.**   Each Rawhide Entity shall (and shall cause each other Rawhide Entity to) maintain proper books of record and account, in which full, true and correct entries in conformity with GAAP consistently applied shall be made of all financial transactions and matters involving the assets and business of such Rawhide Entity.

**Section 7.20    Transactions with Affiliates or Other Related Persons.**   No Borrower shall itself, or permit any of its Subsidiaries to, directly or indirectly, enter into or permit to exist any transaction of any kind with any Affiliate of any Borrower or Subsidiary thereof or any Other Related Person with respect thereto on terms that are less favorable to such Borrower or such Subsidiary, as the case may be, than those that might be obtained in an arm's length transaction from a Person who is not an Affiliate of such Borrower or such Subsidiary or an Other Related Person with respect thereto.

**Section 7.21    Material Contracts.**   All material contracts of the Borrowers are identified on **Schedule 7.21** (*Material Contracts*).   Except as to any restrictions described in such **Schedule 7.21**, no material contract of any Borrower prohibits the pledge, encumbrance or assignment thereof by such Borrower.

**Section 7.22    Royalties.**

(a)     ***Grant of Royalties.***   No Royalty (other than Permitted Royalty) shall be granted, or otherwise exist, at any time.

(b)     ***Obligation to Notify Agent.***   On or prior to the grant, amendment or modification of any Royalty or Lien relating thereto, the Rawhide Entities shall deliver, or cause to be delivered, to the Agent, written notice thereof (accompanied by a true and complete copies of the agreements and other documents pursuant to which such Royalty, and any related Liens, are to granted, amended or modified).

(c)     ***Modification of Royalties.***

(i)     *Existing Royalties.*   No term or provision of any Existing Royalty or Lien relating thereto (or of any agreement or document identified, or required to be identified, in **Schedule 5.13** (*Existing Royalties*) that relates to any Existing Royalty), shall be amended or modified (nor shall any Lien

relating thereto be granted), at any time on or after the Closing Date, except with the prior written consent of the Agent (such consent not to be unreasonably withheld or delayed).

(ii)    *Other Permitted Royalties*.    No term or provision of any Permitted Royalty that was granted on or prior to Closing Date (other than a Permitted Royalty the grant of which did not require the Agent's consent under **paragraph (b)(ii)** or **(c)** of the definition thereof) shall be amended or modified, at any time, without the prior written consent of the Agent and the Required Lenders, **it being understood that**:

(A)    in the case of a Permitted Royalty granted to any Rawhide-Related Person, the Agent and the Required Lenders shall be entitled to grant or withhold any such consent in their sole and absolute discretion; and

(B)    in the case of any other Permitted Royalty, such consent shall not be unreasonably withheld or delayed.

# ARTICLE 8
# NEGATIVE COVENANTS

### Section 8.1    Restricted Transfers.

(a)    ***General Restriction***.    Except as expressly permitted under **Section 8.1(b)** (*Restricted Distributions*), **8.1(c)** (*Tax Distributions*), **8.1(d)** (*Accrued Management Fee Distributions*), **8.1(e)** (*Reimbursement and Indemnification of Reef Capital Group*), **8.1(f)** (*Intercompany Distributions*) and **8.1(g)** (*Certain Payments to Officers and Directors*) below, no Borrower shall make, or permit to be made, and the Parent shall not permit any Borrower to make, any Restricted Transfer.

(b)    ***Restricted Distributions***.    Notwithstanding **Section 8.1(a)** (*General Restriction*) above, Rawhide Mining may make Restricted Transfers, in the form of dividends or distributions to the holders of its Equity Interests; **provided**, **that**:

(i)    *No Default*.    Both immediately prior to, and after giving effect to, any such Restricted Transfer, no Default or Event of Default shall have occurred and be continuing; and

(ii)    *Leverage*.    At the time that such Restricted Transfer is made, the ratio of:

| Total Net Debt | **TO** | Consolidated EBITDA for the most recent **12**-month period reported in the Borrowers' quarterly or annual Financial Statements |
|---|---|---|

is less than **2.00:1.00**.

(c)    ***Tax Distributions***.    Notwithstanding **Section 8.1(a)** (*General Restriction*) above, and without regard to the limitations in **clauses (i)** (*No Default*) and **(ii)** (*Leverage*) of **Section 8.1(b)** (*Restricted Distributions*) above, Rawhide Mining may make Restricted Transfers, in the form of dividends or distributions to the Parent, to fund amounts currently payable to any U.S. federal, State or

local (or any applicable non-U.S.) taxing authority in respect of the income tax liability of the direct or indirect holders of the Rawhide Entities' Equity Interests which arises from, or is attributable to, the income or activities of the Rawhide Entities (any such Restricted Distribution, a "**Tax Distribution**"); **provided**, **however**, **that**:

(i)     *Annual Limit*.   The aggregate amount of such Tax Distributions made during, or with respect to, any Fiscal Quarter or Fiscal Year shall not exceed **50.00%** of the Borrowers' estimated aggregate taxable income for such Fiscal Quarter or Fiscal Year, as the case may be (with respect to any such period, "**Borrower Taxable Income**");

(ii)     *Liquidity*.   No Tax Distribution shall be made unless both immediately prior to, and after giving effect to, such Tax Distribution, the Consolidated Cash Balance would not be less than **USD 2,000,000**; and

(iii)     *Adjustments*.   In the event that the Borrower Taxable Income used in determining the amount of the Tax Distributions made in respect of any Fiscal Quarter or Fiscal Year shall be subsequently adjusted (or prove to have been incorrect), then the amount of such adjustment (or discrepancy) shall be applied to adjust the maximum amount of the Tax Distributions that may be made for the immediately subsequent period (or periods) until such adjustment shall have been applied in full.

(d)     ***Accrued Management Fee Distributions***.   Notwithstanding **Section 8.1(a)** (*General Restriction*) above, Rawhide Mining may make Restricted Transfers (in addition to those permitted under **Sections 8.1(b)** (*Restricted Distributions*) and **8.1(c)** (*Tax Distributions*) above) to fund the payment to Reef Capital Group of any unpaid Reef Management Fees owed from time to time to Reef Capital Group (any such Restricted Transfers, "**Accrued Management Fee Distributions**"), **subject**, **however**, to the following conditions:

(i)     With respect to any accrued and unpaid Reef Management Fees for the period ending on December 31, 2018 (which the Parties acknowledge and agree shall be equal to, and shall not exceed, **USD 1,100,000**) (the "**Pre-Closing Reef Fees**"), up to **USD 800,000** of such Pre-Closing Reef Fees may be paid by the Borrowers at any time, including upon the closing of the transactions contemplated by this Agreement, and **USD 300,000** of such Pre-Closing Reef Fees may only be paid on and after the date on which the Financial Statements and Compliance Certificate with respect to the Fiscal Quarter ended June 30, 2020 shall have been delivered;

(ii)     with respect to any accrued and unpaid Reef Management Fees for periods ending after December 31, 2018 (the "**Post-Closing Reef Fees**"), the aggregate amount of Accrued Management Fee Distributions on account of such Post-Closing Reef Fees shall not exceed **USD 300,000** during any calendar year (the "**Annual Cap**"), PLUS, to the extent that the amount of any Accrued Management Fee Distributions made in any prior calendar year(s) was less than the Annual Cap in such prior calendar year(s) (such amount(s) being referred to herein as the "**Annual Surplus**"), such Annual Surplus may be carried over into subsequent calendar year(s) to increase the Annual Cap in such subsequent calendar year(s) by the amount of the Annual Surplus; and

*Loan and Security Agreement*

(iii)     Notwithstanding anything to the contrary elsewhere in this **Section 8.1(d)**, in no event shall an Accrued Management Fee Distribution be made unless, both immediately prior to, and after giving effect to, such Accrued Management Fee Distribution, no Default or Event of Default shall have occurred and be continuing.

(e)     ***Reimbursement and Indemnification of Reef Capital Group.***   Rawhide Mining may, at any time, make Restricted Transfers to fund Reef Indemnity Amounts and Reef Expense Amounts from time to time payable by the Parent under the Reef Management Agreement.

(f)     ***Intercompany Distributions.***   Any Borrower may make Restricted Transfers to any other Borrower.

(g)     ***Certain Payments to Officers and Directors.***   Subject, for the avoidance of doubt, to the rights of the Secured Parties under **Article 10** (*Remedies*) below, but without regard to the restrictions and limitations set forth in the foregoing provisions of this **Section 8.1**, the Borrowers may, at any time (including, without limitation, during the continuance of a Default or Event of Default) make payments to officers and directors of the Rawhide Entities for reimbursement of reasonable out-of-pocket expenses, and for any indemnification obligations, owed to such officers and directors, in such capacities (other than any such indemnification obligations that are owed by the Parent to its officers or directors, except to the extent that such indemnification obligations arise out of the businesses and activities of the Borrowers or the conduct of the Rawhide Mining Business).

Section 8.2     **Additional Indebtedness.**   No Borrower shall create, incur, assume, guarantee or be or remain liable with respect to any Indebtedness (other than Permitted Indebtedness), unless:

(i)     no Default or Event of Default shall have occurred and be continuing;

(ii)     such Indebtedness constitutes Subordinated Indebtedness; and

(iii)     after adjusting Total Net Debt *pro forma* to reflect such additional Indebtedness, the ratio of:

> Total Net Debt   **TO**   Consolidated EBITDA for the most recent **12**-month period reported in the Borrowers' quarterly or annual Financial Statements

would be less than **3.50:1.00**.

Section 8.3     **Liens.**   No Borrower shall create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired, other than Permitted Liens.

Section 8.4     **Swap Obligations.**   No Borrower shall enter into any Swap Contract other than (or incur any Swap Obligations other than pursuant to) a Permitted Swap Contract.

*Loan and Security Agreement*

**Section 8.5**    **Dispositions.**   No Borrower shall make, or enter into any agreement to make, any Disposition, except:

(a)    Dispositions of worn-out, obsolete or surplus Equipment, whether now owned or hereafter acquired, at fair market value in the ordinary course of the Rawhide Mining Business;

(b)    Sales, transfers or other Dispositions of Inventory in the ordinary course of the Rawhide Mining Business;

(c)    Dispositions of Equipment or Real Property to the extent that (i) such property is exchanged for credit against the purchase price of similar replacement property or (ii) reasonably promptly (but in no event later than **180** days) after the receipt of the proceeds of any such Disposition, the Borrowers shall have applied (or entered into one or more binding agreements to apply) such proceeds to the purchase price of replacement property;

(d)    Dispositions to another Borrower;

(e)    Dispositions permitted by **Section 8.6** (*Fundamental Changes*) below;

(f)    The discount, write-off or Disposition of accounts receivable overdue by more than **90** days or the sale of any such accounts receivable for the purpose of collection to any collection agency, in each case in the ordinary course of the Rawhide Mining Business;

(g)    Restricted Transfers permitted by **Section 8.1** (*Restricted Transfers*) above; and

(h)    Dispositions not otherwise permitted under this **Section 8.5** (**provided** that the aggregate book value of all property Disposed of pursuant to this **paragraph (h)** in any Fiscal Year shall not exceed **USD 500,000**).

**Section 8.6**    **Fundamental Changes.**

(a)    ***General Restriction.***   Except as otherwise expressly provided in **Section 8.6(b)** (*Permitted Fundamental Changes*) below, no Rawhide Entity shall (i) merge, dissolve, liquidate, consolidate with or into any other Person or (ii) Dispose of (whether in one transaction or in a series of transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to or in favor of any other Person.

(b)    ***Permitted Fundamental Changes.***   Notwithstanding **Section 8.6(a)** (*General Restriction*) above (but subject to the other provisions of this Agreement), provided that no Default or Event of Default shall have occurred and be continuing or would result from such transaction:

    (i)    any Rawhide Subsidiary may:

        (A)    merge or consolidate with, or liquidate or dissolve into, Rawhide Mining or another Rawhide Subsidiary; or

        (B)    merge or consolidate with, or Dispose of its assets to, any other Person, solely to effect Dispositions permitted by **paragraph (a)**, **(b)**, **(c)**, **(f)**, **(g)** or **(h)** of **Section 8.5** (*Dispositions*) above; and

(ii)        any Borrower may Dispose of its assets to another Borrower.

**Section 8.7        Accounting Policies.**  No Rawhide Entity shall (without the prior written consent of the Agent), make any change in its  (a) accounting policies or reporting practices, except as required by GAAP, or  (b) fiscal years or fiscal quarters.

**Section 8.8        Investments.**  No Borrower shall, directly or indirectly, acquire, own or make any Investment other than a Permitted Investment.

**Section 8.9        ERISA.**  No Rawhide Entity or ERISA Affiliate shall have any liability under, or with respect to, Title IV of ERISA.

**Section 8.10        Certain Restrictive Agreements.**  No Borrower shall enter into any Contractual Obligation (other than this Agreement or any other Loan Document) that, directly or indirectly,  (a) limits the ability of  (i) any Subsidiary to pay dividends to any Borrower or to otherwise transfer property to any Borrower,  (ii) any Subsidiary to guarantee Indebtedness of the any Borrower or (iii) any Borrower or any Subsidiary to create, incur, assume or suffer to exist Liens (other than Permitted Liens) on property of such Person (other than Excluded Assets) to secure the Secured Obligations; or  (b) requires the grant of a Lien to secure an obligation of such Person if a Lien is granted to secure the Secured Obligations.

**Section 8.11        Corporate Changes.**

(a)        No Rawhide Entity shall change its corporate name, legal form or jurisdiction of formation without **25** days' prior written notice to the Agent.

(b)        No Rawhide Entity shall relocate its chief executive office or its principal place of business unless (i) it provides written notice to the Agent as promptly or practical thereafter and (ii) such relocation shall be within the continental United States.

(c)        No Borrower shall relocate any item of Collateral (other than (v) the relocation of Inventory to and from refineries or other to processors in the ordinary course of the Rawhide Mining Business, (w) with respect to Permitted Liens on Collateral or Collateral on which there is a Permitted Lien, (x) sales of Inventory in the ordinary course of the Rawhide Mining Business, (y) relocations of Rawhide Mining Equipment having an aggregate value of up to **USD 500,000**, and (z) relocations of Collateral from a location described on **Exhibit B** (*Borrower Information*) to another location described on such **Exhibit B**) unless  (i) it provides written notice as promptly or practical thereafter to the Agent, (ii) if immediately prior to relocation the Collateral is in the United States, such relocation is within the continental United States, and  (iii) if such relocation is to a third party bailee, and such Collateral has a value, individually or in the aggregate, in excess of **USD 250,000**, it has delivered a bailee agreement in form and substance reasonably acceptable to the Agent.

**Section 8.12        Conduct of Business.**  (a) No Borrower shall engage in any business other than the Rawhide Mining Business and (b) no part of the Rawhide Mining Business (including any expansion thereof) shall be conducted other than through a Borrower.

*Loan and Security Agreement*

# ARTICLE 9
# EVENTS OF DEFAULT

**Section 9.1      Events of Default**.    The occurrence of any one or more of the following events shall be an "**Event of Default**":

(a)      ***Failure to Pay***.    Any Borrower fails to pay any amount due under this Agreement or any other Loan Document on the due date for such payment; **provided**, **however**, **that**, an Event of Default shall not occur on account of a failure to pay due solely to an administrative or operational error of the Agent, the Lenders or such Borrower's bank if such Borrower (i) had the funds to make such payment when due and (ii) makes such payment not later than the close of business (New York time) on (A) in the case of an error on the part of such Borrower's bank, the **third** Business Day following the day on which any Borrower acquires knowledge of such failure to pay, or (B) in the case of an error on the part of the Agent or the Lenders, the later to occur of (1) the **third** Business Day following the day on which any Borrower acquires knowledge of such failure and (2) the Business Day immediately following the day on which such error shall have been resolved, with notice to the Borrowers, in a manner sufficient to allow such payment to be made; **OR**

(b)      ***Breach of Certain Covenants***.    Any Borrower fails to observe, or otherwise breaches, any of the covenants and agreements set forth in:

    (i)      **Article 6** (*Insurance; Indemnification*) or **8** (*Negative Covenants*) above;

    (ii)      **Section 7.1** (*Financial Covenants*) above (subject to **Section 9.2** (*Equity Cure*) below);

    (iii)      **Section 7.2** (*Reporting*) above;

    (iv)      **clause (a)** of **7.5** (*Preservation of Existence, Etc.*) above;

    (v)      **Section 7.10** (*Collateral*) above; or

    (vi)      **Section 7.14** (*Ownership and Subsidiaries*) above; **OR**

(c)      ***Breach of Agreement***.    Any Rawhide Entity breaches or defaults in the performance of any covenant or Secured Obligation under this Agreement or any other Loan Document (other than a covenant or agreement that is (x) set forth in **Section 9.1(b)** (*Breach of Certain Covenants*) above or (y) otherwise specifically addressed by an Event of Default other than this **Section 9.1(c)**), and such default continues for more than **15** days after the earlier of the date on which (i) the Agent or the Lenders has given notice of such default to the Borrowers, and (ii) any Rawhide Entity has actual knowledge of such default; **OR**

(d)      ***Representations***.    Any representation or warranty made by any Rawhide Entity in any Loan Document shall have been false or misleading in any material respect when made or when deemed made; **OR**

*Loan and Security Agreement*

(e)     _**Insolvency.**_

    (i)     Any Rawhide Entity shall  (A) make an assignment for the benefit of creditors,  (B) be unable to pay its debts as they become due or shall become insolvent, (C) file a voluntary petition in bankruptcy,  (D) file any petition, answer, or document seeking for itself any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any present or future statute, law or regulation pertinent to such circumstances, or (E) seek or consent to or acquiesce in the appointment of any trustee, receiver, or liquidator of such Rawhide Entity or of all or any substantial part of the assets or property of such Rawhide Entity; **OR**

    (ii)     Any Rawhide Entity, or its directors or majority shareholders (or the equivalent), shall take any action initiating any of the actions described in **clauses (i)(A)** through **(i)(E)** of this **Section 9.1(e)**; **OR**

    (iii)     (A) **45** days shall have expired after the commencement of an involuntary action against any Rawhide Entity seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any present or future statute, law or regulation, without such action being dismissed or all orders or proceedings thereunder affecting the operations or the business of such Rawhide Entity being stayed; **OR** (B) a stay of any such order or proceedings shall thereafter be set aside and the action setting it aside shall not be timely appealed; **OR** (C) any Rawhide Entity shall file any answer admitting or not contesting the material allegations of a petition filed against such Rawhide Entity in any such proceedings; or (D) the court in which such proceedings are pending shall enter a decree or order granting the relief sought in any such proceedings; **OR**

    (iv)     **45** days shall have expired after the appointment, without the consent or acquiescence of such Rawhide Entity, of any trustee, receiver or liquidator of such Rawhide Entity or of all or any substantial part of the properties of such Rawhide Entity without such appointment being vacated; **OR**

(f)     _**Cessation of Business.**_     The Borrowers shall  permanently cease  conducting the Rawhide Mining Business; **OR**

(g)     _**Attachments: Judgments.**_     (i) Any portion of any Borrower's assets is attached or seized, or a levy is filed against any such assets, or a judgment (or judgments) is (or are) entered for the payment of money (not covered by independent third-party insurance or third-party indemnity as to which liability has not been rejected by such insurance carrier or other third party), individually or in the aggregate, of at least **USD 500,000**, and such judgment remains unsatisfied, unvacated or unstayed for a period of **45** days after the entry thereof, **OR** (ii) any Borrower is enjoined or in any way prevented by court order from conducting any part of its business; **OR**

(h)     _**Other Obligations.**_     Any Borrower shall fail to  (i) make any payment when due (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) in respect of any Indebtedness (other than Indebtedness under the Loan Documents) having an aggregate principal amount of more than **USD 500,000**, in each case beyond the applicable grace period with respect

thereto, if any, **OR** (ii) observe or perform any other agreement or condition relating to any such Indebtedness or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event occurs, the effect of which default or other event is to cause, or to permit the holder or holders or beneficiary or beneficiaries of such Indebtedness (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required, such Indebtedness to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity; **provided**, **however**, **that**, (A) this **Section 9.1(h)** shall not apply to secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness, if such sale or transfer is permitted hereunder and under the documents providing for such Indebtedness and such Indebtedness is repaid when required under the documents providing for such documents and (B) the events described in the foregoing **clauses (i)** and **(ii)** of this **Section 9.1(h)** shall not give rise to any Default or Event of Default if the nonpayment or nonperformance, as applicable, is the result of a dispute being contested in good faith by appropriate proceedings; **OR**

(i)    ***Change in Control***.    A Change in Control shall occur without the prior consent of the Agent.

### Section 9.2    Equity Cure.

(a)    ***Equity Cure Right***.    In the event that the Borrowers shall fail to comply with one or more of the Financial Covenants with respect to any 12-Month period (in the case of **Section 7.1(a)** (*Total Leverage Ratio*) or **(b)** (*Consolidated Cash Interest Coverage Ratio*) above) or measurement date (in the case of **Section 7.1(c)** (*Liquidity*) above (any such failure, a "**Financial Covenant Breach**"), then, until the **15**[th] calendar day after delivery of the Financial Statements and Compliance Certificate with respect to such 12-Month period or measurement date (the "**Equity Cure Deadline**"), Parent shall have the right (subject to the other provisions of this **Section 9.2**) to cure such Financial Covenant Breach (the "**Equity Cure Right**"), by receiving cash equity contributions ("**Equity Cure Contributions**") funded by one or more holders of Equity Interests of the Parent with proceeds of common equity in an aggregate amount equal to, but not greater than, the amount that would be necessary and sufficient, when applied in the manner described in **Section 9.2(b)** (*Determination of Equity Cure Amount*) below, and otherwise on terms and conditions reasonably acceptable to the Agent and the Required Lenders, to cure such Financial Covenant Breach (the "**Equity Cure Amount**").

(b)    ***Determination of Equity Cure Amount***.    Solely for purposes of determining the Equity Cure Amount, pursuant to **Section 9.2(a)** (*Equity Cure Right*) above, with respect to any Financial Covenant Breach and the related 12-Month period or measurement date:

(i)    Consolidated EBITDA as of the end of and for the relevant 12-Month period (or for the period to, but excluding, the next succeeding measurement date, as applicable) shall be deemed to have been increased by the aggregate amount of such Equity Cure Contributions; and

(ii)    the Consolidated Cash Balance as of the relevant measurement date (or for the period to, but excluding, the next succeeding measurement date, as applicable) shall give effect to the proceeds of such Equity Cure Contributions.

(c)    ***Conditions to Equity Cure***.    No exercise (or purported exercise) of the Equity Cure Right pursuant to this **Section 9.2** shall be effective unless:

(i)    *Equity Cure Contributions*.    On or prior to the Equity Cure Deadline, (A) The Equity Cure Contributions shall have been made, (B) the proceeds thereof (in an aggregate amount equal to the Equity Cure Amount) shall have been deposited into a Deposit Account of one or more of the Borrowers which is not an Excluded Account, and (C) the Agent shall have received evidence reasonably satisfactory to it that such deposit shall have been made;

(ii)    *No Other Default*.    No Default or Event of Default shall have occurred and be continuing (other than a Default or Event of Default arising from the Financial Covenant Breach to be cured); and

(iii)    *Notice to Agent; Commitments*.    By not later than the **fifth** Business Day following the date on which the Financial Statements and Compliance Certificate relating to the applicable 12-Month period or measurement date, as the case may be, are required to be delivered pursuant to **Section 7.2** (*Reporting*) above (the "**Equity Cure Notice Deadline**"), the Borrowers shall have delivered to the Agent notice in writing (an "**Equity Cure Notice**") of its intention to exercise its Equity Cure Right with respect to such 12-Month period or measurement date (which determination and notice shall be irrevocable), accompanied by:

(A)    a statement of the Equity Cure Amount and a reasonably-detailed calculation thereof; and

(B)    binding and irrevocable commitments to make such Equity Cure Contributions (in an aggregate amount equal to the Equity Cure Amount), on or prior to the Equity Cure Deadline, from one or more holders of Equity Interests of the Parent.

(d)    ***Limitations on Exercise of Equity Cure Right***.    Notwithstanding anything herein to the contrary, in no event shall the Borrowers be permitted to exercise the Equity Cure Right under this **Section 9.2**:

(i)    more than **five** times, in the aggregate, during the term of this Agreement; or

(ii)    more than **twice** during any period of **five** consecutive Fiscal Quarters.

(e)    ***Suspension of Remedies Pending Equity Cure***.    Notwithstanding anything in **Section 10** (*Remedies*) below to the contrary, solely as to any Financial Covenant Breach as to which the Equity Cure Right is capable of being exercised in a manner consistent with **Section 9.2(d)** (*Limitations on Exercise of Equity Cure Right*) above and the other provisions of this **Section 9.2**, neither the Agent nor any Lender

may exercise any rights or remedies under such **Section 10** (or any default-related rights or remedies under any other Loan Document), on the basis of such Financial Covenant Breach, during the period prior to the Equity Cure Notice Deadline and, if an Equity Cure Notice, together with the other documents referred to in **clauses (A)** and **(B)** of **Section 9.2(c)(iii)** (*Notice to Agent; Commitments*) above, shall have been delivered in accordance with such **Section 9.2(c)(iii)**, thereafter, unless and until (i)(A) the Equity Cure Deadline shall have passed, and  (B) such Financial Covenant Breach shall not have been cured pursuant to the foregoing provisions of this **Section 9.2**, or  (ii) an Event of Default (other than an Event of Default arising from such Financial Covenant Breach) shall have occurred and be continuing.

(f)    ***Effect of Equity Cure Limited.***    Equity Cure Contributions received by the Borrowers in accordance with **Section 9.2(c)** (*Conditions to Equity Cure*) above shall be added to the Consolidated EBITDA or Consolidated Cash Balance (or both), as the case may be, for the 12-Month period or measurement date, as the case may be, to which the applicable Financial Covenant Breach relates. Such Equity Cure Contributions shall be used solely for the purpose of recalculating compliance with the Financial Covenants which are the subject of such Financial Covenant Breach and shall be disregarded in calculating Consolidated EBITDA, and in any other calculation, for all other purposes (including, without limitation, any determination pursuant to **Section 8.1(b)(ii)** (*Leverage*) or **8.1(c)(ii)** (*Liquidity*) above, with respect to any Restricted Distribution, or pursuant to **Section 8.2** (*Additional Indebtedness*) above, with respect to any Indebtedness) under this Agreement or under any other Loan Document.

# ARTICLE 10
# REMEDIES

**Section 10.1    General.**    Upon and during the continuance of any one or more Events of Default,  (a) the Agent may (and, at the direction of the Required Lenders, shall) accelerate and demand payment of all or any part of the Secured Obligations together with a Prepayment Charge and declare them to be immediately due and payable (provided, that upon the occurrence of an Event of Default of the type described in **Section 9.1(e)** (*Insolvency*) above, all of the Secured Obligations shall automatically be accelerated and made due and payable, in each case without any further notice or act),  (b) the Agent may, at its option, sign and file in any Borrower's name any and all collateral assignments, notices, control agreements (except with respect to Excluded Assets), security agreements and other documents it deems necessary or appropriate to perfect or protect the repayment of the Secured Obligations, and (c) the Agent may notify any of the Borrowers' account debtors to make payment directly to the Agent, compromise the amount of any such account on the Borrowers' behalf and endorse the Agent's name without recourse on any such payment for deposit directly to the Agent's account.   The Agent may (and, at the direction of the Required Lenders, shall) exercise all rights and remedies with respect to the Collateral under the Loan Documents or otherwise available to it under the UCC and other applicable law, including the right to release, hold, sell, lease, liquidate, collect, realize upon, or otherwise dispose of all or any part of the Collateral and the right to occupy, utilize, process and commingle the Collateral. All the Agent's rights and remedies shall be cumulative and not exclusive.

**Section 10.2    Collection; Foreclosure.**    Upon the occurrence and during the continuance of any Event of Default, the Agent may (and, at the direction of the Required Lenders, shall), at any time, or from time to time, apply, collect, liquidate, sell in one or more sales, lease or otherwise dispose of,

any or all of the Collateral, in its then condition or following any commercially reasonable preparation or processing, in such order as the Agent may elect.   Any such sale may be made either at public or private sale at its place of business or elsewhere.    Each Borrower agrees that any such public or private sale may occur upon **10** calendar days' prior written notice to the Borrowers.   The Agent may require the Borrowers to assemble the Collateral and make it available to the Agent at a place designated by the Agent that is reasonably convenient to the Agent and the Borrowers.   The proceeds of any sale, disposition or other realization upon all or any part of the Collateral shall be applied by the Agent in the following order of priorities:

> FIRST: to the Agent and the Lenders in an amount sufficient to pay in full the Agent's and the Lenders' reasonable costs and professionals' and advisors' fees and expenses as described in **Section 11.11** (*Fees and Expenses*) below;

> SECOND: to the Lenders in an amount equal to the then unpaid amount of the Secured Obligations (including principal, interest, and the Default Rate interest), in such order and priority as the Agent may choose in its sole discretion; and

> THIRD: after the full and final payment in Cash Equivalents of all of the Secured Obligations (other than inchoate obligations), to any creditor holding a junior Lien on the Collateral, or to the Borrowers or their representatives or as a court of competent jurisdiction may direct.

The Agent shall be deemed to have acted reasonably in the custody, preservation and disposition of any of the Collateral if it complies with the obligations of a secured party under the UCC.

**Section 10.3     No Waiver**.   The Agent shall be under no obligation to marshal any of the Collateral for the benefit of any Borrower or any other Person, and each Borrower expressly waives all rights, if any, to require the Agent to marshal any Collateral.

**Section 10.4     Cumulative Remedies**.   The rights, powers and remedies of the Agent hereunder shall be in addition to all rights, powers and remedies given by statute or rule of law and are cumulative. The exercise of any one or more of the rights, powers and remedies provided herein shall not be construed as a waiver of or election of remedies with respect to any other rights, powers and remedies of the Agent.

**Section 10.5     Power of Attorney**.

(a)     *Appointment*.   Each Borrower hereby constitutes and appoints the Agent (and all officers, employees or agents designated by the Agent) as its true and lawful attorney in fact (with full power of substitution) in its name, place and stead and at its expense, in connection with the enforcement of the rights and remedies provided for in this **Article 10**, including to (i) give any necessary receipts or acquittance for amounts collected or received hereunder,  (ii) make all necessary transfers of the Collateral in connection with any sale or other disposition made pursuant hereto, (iii) execute and deliver for value all necessary or appropriate bills of sale, assignments and other instruments in connection with any such sale or other disposition, such Borrower thereby ratifying and confirming all that such attorney (or any substitute) shall lawfully do hereunder and pursuant hereto

and  (iv) sign any agreements, orders or other documents in connection with, or pursuant to, any Loan Document.    Nevertheless, if so requested by the Agent, directly or through a purchaser of any of the Collateral, each Borrower shall ratify and confirm any such sale or other disposition that is made in accordance with this **Article 10** by executing and delivering to the Agent or such purchaser all proper bills of sale, assignments, releases and other instruments as may be reasonably designated in any such request.    The power of attorney granted pursuant to this **Section 10.5(a)** shall be coupled with an interest.

(b)    ***Delivery of Power of Attorney.***    On or prior to the Closing Date, each Borrower shall duly execute and deliver, to and in favor of the Agent, a power of attorney in the form attached as **Exhibit G** (*Form of Power of Attorney*) to this Agreement (the "**Power of Attorney**").

# ARTICLE 11
# MISCELLANEOUS

**Section 11.1**    **Severability.**    Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under such law, such provision shall be ineffective only to the extent and duration of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

*Loan and Security Agreement*

**Section 11.2**    **Notices**.    Except as otherwise provided herein, any notice, demand, request, consent, approval, declaration, service of process or other communication (including the delivery of Financial Statements) that is required, contemplated, or permitted under the Loan Documents or with respect to the subject matter hereof shall be in writing, and shall be deemed to have been validly served, given, delivered, and received upon the earlier of (i) the day of transmission by electronic mail or hand delivery or delivery by an overnight express service or overnight mail delivery service and (ii) the **third** calendar day after deposit in the United States mails, with proper first class postage prepaid, in each case addressed to the party to be notified as follows:

*If to the Agent:*

**Silverpeak Credit Partners, LP**
40 West 57th Street - 29th Floor
New York, NY 10019
Email:        trading@Silverpeak.com
Telephone:  +1 212 716 2000

*If to any Rawhide Entity:*

*Addressed to such Rawhide Entity at:*

143 Keddie St.
Fallon, NV 89406
Attention:   Don Deines
Email:        don.deines@rawhidemine.com
Telephone: +1 775 945 1015 (x 108)

*with a copy (which copy shall not constitute notice) to:*

**Coral Reef Capital LLC**
45 Rockefeller Center, Suite 2300
New York, NY 10111
Attention:   Marceau Schlumberger
Email:        marceau@coralreefcap.com
Telephone:  +1 646 599 9677
*or*
Attention:   John Rogers
Email:        john@coralreefcap.com
Telephone:  +1 646 973 1574

*If to the Lenders:*

**Silverpeak Credit Opportunities AIV LP**
c/o Silverpeak Credit Partners, LP
40 West 57th Street - 29th Floor
New York, NY 10019
Email:        trading@Silverpeak.com
Telephone:  +1 212 716 2000

*and*

**CEOF Holdings LP**
c/o Corbin Capital Partners, L.P.
590 Madison Avenue, 31st Floor
New York, New York 10022
Attention:   General Counsel
Email:        fof-ops@corbincapital.com
Telephone:  +1 212 634 7373
Facsimile:   +1 212 634 7399

or to such other address as each party may designate for itself by like notice.

**Section 11.3**    **Entire Agreement; Amendments**.

(a)    ***Entire Agreement***.    This Agreement and the other Loan Documents constitute the entire agreement and understanding of the parties hereto in respect of the subject matter hereof and thereof, and supersede and replace in their entirety any prior proposals, term sheets, non-disclosure or

confidentiality agreements, letters, negotiations or other documents or agreements, whether written or oral, with respect to the subject matter hereof or thereof (including the Letter of Interest and the Term Sheet attached as **Exhibit A** (*Term Sheet*) thereto).

(b) ***Amendments and Waivers.***    Neither this Agreement, any other Loan Document, nor any terms hereof or thereof may be amended, supplemented or modified except in accordance with the provisions of this **Section 11.3(b)**.    The Required Lenders and the Borrowers party to the relevant Loan Document may, or, with the written consent of the Required Lenders, the Agent and the Borrowers party to the relevant Loan Document may, from time to time, (i) enter into written amendments, supplements or modifications hereto and to the other Loan Documents for the purpose of adding any provisions to this Agreement or the other Loan Documents or changing in any manner the rights of the Lenders or of the Borrowers hereunder or thereunder or (ii) waive, or consent to, on such terms and conditions as the Required Lenders or the Agent, as the case may be, may specify in such instrument, any of the requirements of this Agreement or the other Loan Documents (or any deviations therefrom, with respect to any waiver or consent) or any default or Event of Default and its consequences; **provided**, **however**, **that**, no such waiver and no such amendment, supplement or modification shall (A) forgive the principal amount or extend the Scheduled Maturity Date of the Loan, extend the scheduled date of any amortization payment in respect of the Loan, or reduce the stated rate of any interest or fee payable hereunder), in each case without the written consent of each Lender directly affected thereby, (B) eliminate or reduce the voting rights of any Lender under this **Section 11.3(b)** without the written consent of such Lender, (C) reduce any percentage specified in the definition of Required Lenders, consent to the assignment or transfer by any Borrower of any of its rights and obligations under this Agreement and the other Loan Documents, release all or substantially all of the Collateral or release any Borrower from its obligations under the Loan Documents, in each case without the written consent of all Lenders, (D) amend **Section 2.6** (*Pro Rata Treatment*) above without the consent of each Lender or (E) amend, modify or waive any provision of **Section 11.18** (*Agency*) below without the written consent of the Agent.    Any such waiver or consent, and any such amendment, supplement or modification, shall apply equally to each Lender and shall be binding upon the Borrowers, the Lenders, the Agent and all future holders of the Loan (or any portion thereof).

**Section 11.4    No Strict Construction.**    The Parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provisions of this Agreement.

**Section 11.5    No Waiver.**    The powers conferred upon the Agent and the Lenders by this Agreement are solely to protect its rights hereunder and under the other Loan Documents and its interest in the Collateral and shall not impose any duty upon the Agent or the Lenders to exercise any such powers. No omission or delay by the Agent or the Lenders at any time to enforce any right or remedy reserved to it, or to require performance of any of the terms, covenants or provisions hereof by the Borrowers at any time designated, shall be a waiver of any such right or remedy to which the Agent or the Lenders are entitled, nor shall it in any way affect the right of the Agent or the Lenders to enforce such provisions thereafter.

*Loan and Security Agreement*

**Section 11.6**    __Survival__.    All agreements, representations and warranties contained in this Agreement and the other Loan Documents or in any document delivered pursuant hereto or thereto shall be for the benefit of the Agent and the Lenders and shall survive the execution and delivery of this Agreement.    **Section 6.3** (*Indemnity*) above and **Section 11.15** (*Revival of Secured Obligations*) below shall survive the termination of this Agreement.

**Section 11.7**    __Successors and Assigns__.

(a)    The provisions of this Agreement and the other Loan Documents shall inure to the benefit of and be binding on the Borrowers and their permitted successors and assigns (if any).

(b)    No Borrower shall assign its obligations under this Agreement or any of the other Loan Documents without the express prior written consent of the Agent and the Required Lenders, and any such attempted assignment shall be null and void *ab initio* and of no effect.

(c)    Each Lender may  (i) assign or otherwise transfer its rights hereunder and under the other Loan Documents; __provided__, __however__, __that__, as long as no Event of Default has occurred and is continuing, no Lender may assign or otherwise transfer its rights hereunder or under the Loan Documents to any Person without the prior written consent of the Borrowers (such consent not to be unreasonably withheld, conditioned or delayed), it being acknowledged that, in all cases, any transfer to an Affiliate of any Lender or the Agent shall be allowed without the consent of the Borrowers and (ii) subject to, and in accordance with, **Section 11.14** (*Participations*) below, and with the consent of the Borrowers (such consent not to be unreasonably withheld, conditioned or delayed), sell participation interests in the Loan (and such Lender's related rights under this Agreement) to any Person (other than a Borrower or an Affiliate thereof).

(d)    Without limiting, in any respect, the rights of the Agent under **Section 11.18(i)** below, the Agent may, with notice to Rawhide Mining and the prior written consent of the Required Lenders, assign or otherwise transfer its rights and obligations as the administrative agent and collateral agent hereunder and under the other Loan Documents, and all of such rights and obligations as the administrative agent and collateral agent shall inure to the benefit of the Agent's successors and assigns; __provided__, that as long as no Event of Default has occurred and is continuing, the Agent may so assign its rights and obligations to a Person other than an Affiliate thereof only with the consent of Rawhide Mining, such consent not to be unreasonably withheld, conditioned or delayed.

**Section 11.8**    __Governing Law__.    This Agreement and the other Loan Documents have been negotiated and delivered to the Agent and the Lenders in the State of New York, and shall have been accepted by the Agent and the Lenders in the State of New York.    Payment to the Agent and the Lenders by the Borrowers of the Secured Obligations is due in the State of New York.    **THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS (OTHER THAN AS EXPRESSLY SET FORTH IN OTHER LOAN DOCUMENTS) SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK, EXCLUDING CONFLICTS OF LAWS PRINCIPLES THAT WOULD CAUSE APPLICATION OF LAWS OF ANY OTHER JURISDICTION.**

*Loan and Security Agreement*

### Section 11.9    Consent to Jurisdiction and Venue.

(a)    Each Borrower hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of any New York State court or Federal court of the United States sitting in New York City, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement or the other Loan Documents, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such Federal court.    Each Party agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.    Nothing in this Agreement shall affect any right that the Agent or any Lender may otherwise have to bring any action or proceeding relating to this Agreement or the other Loan Documents against any Borrower or its properties in the courts of any jurisdiction.

(b)    Each Borrower hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or the other Loan Documents in any New York State or Federal court.    Each Party irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(c)    Each Party irrevocably consents to service of process in the manner provided for notices in **Section 11.2** (*Notices*) above.    Nothing in this Agreement will affect the right of any Party to serve process in any other manner permitted by law.

### Section 11.10    Mutual Waiver of Jury Trial / Judicial Reference.

(a)    Because disputes arising in connection with complex financial transactions are most quickly and economically resolved by an experienced and expert Person and the Parties wish applicable State and federal laws to apply (rather than arbitration rules), the Parties desire that their disputes be resolved by a judge applying such applicable laws.    **EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS, INCLUDING WITHOUT LIMITATION ANY CAUSE OF ACTION, CLAIM, CROSS-CLAIM, COUNTERCLAIM, THIRD PARTY CLAIM OR ANY OTHER CLAIM (COLLECTIVELY, "CLAIMS") ASSERTED BY ANY BORROWER AGAINST THE AGENT, THE LENDERS OR THEIR RESPECTIVE ASSIGNEES OR BY THE AGENT, THE LENDERS OR THEIR RESPECTIVE ASSIGNEES AGAINST ANY BORROWER.    EACH PARTY (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 11.10.**

(b)    This waiver extends to all such Claims, including Claims that involve Persons other than the Agent, the Borrowers and the Lenders; Claims that arise out of or are in any way connected to the relationship among the Borrowers, the Agent and the Lenders; and any Claims for damages, breach of contract, tort, specific performance, or any equitable or legal relief of any kind, arising out of this Agreement or any other Loan Document.

### Section 11.11    Fees and Expenses.

(a)    *Closing.*    The Borrowers, jointly and severally, promise to pay the Agent's and the Lenders' reasonable out-of-pocket fees and expenses (including reasonable out-of-pocket fees and expenses of counsel and any consultants) incurred in connection with the (i) negotiating, structuring, documenting and entering into the arrangements described herein and (ii) performing due diligence with respect to the Company, its relevant affiliates and their respective businesses and assets (all of the foregoing, "**Closing Costs**"); **provided**, **however**, **that**, Agent's and Lender's reimbursement for Closing Costs pursuant to this **Section 11.11(a)** shall not exceed **USD 400,000** in the aggregate.  Fees and expenses payable pursuant to this **Section 11.11(a)** shall first be applied against the **USD 125,000** deposit previously paid pursuant to **Section 1(a)** (*Deposit*) of the Letter of Interest, until such amount has been reduced to zero (any additional or remaining amounts being payable in cash).

(b)    *Post-Closing.*    In addition, the Borrowers, jointly and severally, promise to, promise to pay any and all reasonable out-of-pocket fees and expenses incurred by the Agent and the Lenders after the Closing Date (to the extent such fees and expenses are not Closing Costs covered by **Section 11.11(a)** (*Closing*) above) in connection with, or related to, (i) the Loan, (ii) the administration, collection, or enforcement of the Loan, (iii) the amendment or modification of the Loan Documents; (iv) any waiver, consent, release, or termination under the Loan Documents; (v) the protection, preservation, audit, field exam, sale, lease, liquidation, or disposition of Collateral or the exercise of remedies with respect to the Collateral; (vi) any legal, litigation, administrative, arbitration, or out of court proceeding in connection with or related to any Borrower or the Collateral, and any appeal or review thereof; and (vii) any bankruptcy, restructuring, reorganization, assignment for the benefit of creditors, workout, foreclosure, or other action related to any Borrower, the Collateral, the Loan Documents, including representing the Agent or the Lenders in any adversary proceeding or contested matter commenced or continued by or on behalf of any Borrower's estate, and any appeal or review thereof.

### Section 11.12    Confidentiality.    The Agent and the Lenders acknowledge that certain items of Collateral and information provided to the Agent and the Lenders by the Borrowers are confidential and proprietary information of the Borrowers, and unless such information (x) is marked as non-confidential at the time of disclosure, or (y) would not reasonably be understood to be confidential (the "**Confidential Information**"); **provided**, **however**, **that**, all information received pursuant to **Section 7.8** (*Inspection Rights*) above shall be deemed to be Confidential Information.   Accordingly, the Agent and the Lenders agree that any Confidential Information it may obtain in the course of acquiring, administering, or perfecting the Loan or Agent's security interest in the Collateral, including obtained pursuant to a Loan Document, shall not be disclosed to any other Person or entity in any manner whatsoever, in whole or in part, without the prior written consent of the Borrowers, except that the Agent and the Lenders may each disclose any such information:

(a)     to its own partners, agents, trustees, administrators, managers, service providers, directors, officers, employees, accountants, counsel and other professional advisors and to its Affiliates, equity owners and investors if the Agent or any such Lender in its sole discretion determines that any such party should have access to such information in connection with such party's responsibilities in connection with the Loan or this Agreement or its own governing documents; provided that such recipient of such Confidential Information either (i) agrees to be bound by the confidentiality provisions of this paragraph or (ii) is otherwise subject to confidentiality restrictions that reasonably protect against the disclosure of Confidential Information;

(b)     if such information is generally available to the public other than in violation of this Agreement or through an improper disclosure;

(c)     if required in any report, statement or testimony submitted to any Governmental Authority having or claiming to have jurisdiction over the Agent or any such Lender, and the Agent shall have notified the Borrowers in advance of such disclosure;

(d)     if required in response to any summons or subpoena or in connection with any litigation, to the extent permitted or deemed advisable by the Agent's or any such Lender's counsel, and the Agent shall have notified the Borrowers in advance of such disclosure;

(e)     to comply with any legal requirement or law applicable to the Agent or any such Lender, and the Agent shall have notified the Borrowers in advance of such disclosure;

(f)     to the extent reasonably necessary in connection with the exercise of any right or remedy under any Loan Document, including the Agent's sale, lease, or other disposition of Collateral after default;

(g)     to any participant or assignee of the Agent or any such Lender or any prospective such participant or assignee (**provided** that such participant or assignee or prospective participant or assignee agrees in writing to be bound by this **Section 11.12** prior to disclosure); or

(h)     otherwise with the prior consent of the Borrowers;

**provided**, **however**, **that**, that any disclosure made in violation of this Agreement shall not affect the obligations of any Borrower or any guarantor under this Agreement or the other Loan Documents.   The Agent's and the Lenders' obligations under this **Section 11.12** shall supersede all of their respective obligations under any nondisclosure agreement with any Borrower, Reef Capital or any Affiliate of the foregoing existing prior to the Closing Date.

### Section 11.13   Assignment of Rights.

(a)     ***Assignment.***   Each Borrower acknowledges and understands that the Agent or the Lenders may, subject to **Section 11.7** (*Successors and Assigns*) above, sell and assign all or part of its interest hereunder and under the Loan Documents to any Person or entity (an "**Assignee**").   After such assignment the term "the Agent" or "the Lenders" as used in the Loan Documents shall mean and include such Assignee, and such Assignee shall be vested with all rights, powers and remedies of the

Agent and the Lenders hereunder with respect to the interest so assigned.   No such assignment by the Agent or the Lenders shall relieve any Borrower of any of its obligations hereunder.

(b)   ***Register***.   The Agent, acting for this purpose as an agent of the Borrowers, shall maintain at one of its offices records of the name and address of, and the commitments of and the principal amount (and stated interest) of the Loan owing to, each Lender from time to time (the "**Register**"). The entries in the Register shall be conclusive, absent manifest error.   The Register shall be available for inspection by the Borrowers or any Lender (but only with respect to any entry relating to such Lender's commitments or Advances) at any reasonable time and from time to time upon reasonable prior notice.   No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this **Section 11.13(b)**.

(c)   ***Registered Form***.   This **Section 11.13**, and **Section 11.14** (*Participations*) below, shall be construed so that the Loan is, at all times, maintained in "registered form," within the meaning of sections 163(f), 871(h)(2) and 881(c)(2) of the Code and any related regulations (and any successor provisions).

## Section 11.14   Participations.

(a)   ***Generally***.   To the extent that any Lender sells participations to any Person (each, a "**Participant**") in accordance with **clause (ii)** of **Section 11.7(c)** above,  (i) such Lender's obligations under this Agreement shall remain unchanged,  (ii) such Lender shall remain solely responsible to the other Parties for the performance of such obligations, and  (iii) the Borrowers, the Agent and Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.

(b)   ***Participation Agreements***.   Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; **provided**, **however**, **that**, such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver in the nature described in **clauses (A)** through **(E)** of the proviso to **Section 11.3(b)** (*Amendments and Waivers*) above.

(c)   ***Benefit of Certain Provisions***.   Each Rawhide Entity agrees that each participant shall be entitled to the benefits of **Sections 2.7** (*Reserve Requirements; Increased Costs*) and **2.8** (*Taxes*) above (subject to the requirements and limitations therein, including the requirements under **Section 2.8(f)** above (it being understood that the documentation required under such **Section 2.8(f)** shall be delivered to the participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to **Sections 11.7** (*Successors and Assigns*) and **11.13** (*Assignment of Rights*) above, **provided** that such Participant (i) agrees to be subject to the provisions of **Section 2.9** (*Duty to Mitigate*) above as if it were an assignee under **Sections 11.7** (*Successors and Assigns*) and **11.13** (*Assignment of Rights*) above; and (ii) shall not be entitled to receive any greater payment under **Sections 2.7** (*Reserve Requirements; Increased Costs*) and **2.8** (*Taxes*) above, with respect to any participation, than the participating Lender would have been entitled to receive, except to the extent that such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation.   Any Lender that sells a participation in the Loan (or

any portion thereof) shall, at the Borrowers' request and expense, use reasonable efforts to cooperate with the Borrower to effectuate the provisions of **Section 2.9(a)** above with respect to the Participant (or proposed Participant) under such participation.

(a)    ***Participant Register.***    Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrowers, maintain a register on which it enters the name and address of each participant and the principal amounts (and stated interest) of each participant's interest in the Loan or other obligations under this Agreement or any other Loan Document (the "**Participant Register**"); **provided**, that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any participant or any information relating to a participant's interest in the Loan) to any Person except to the extent that such disclosure is necessary to establish that such Loan is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.   For the avoidance of doubt, the Agent (in its capacity as Agent) shall have no responsibility for maintaining any Participant Register.

**Section 11.15    Revival of Secured Obligations.**    This Agreement and the Loan Documents shall remain in full force and effect and continue to be effective if any petition is filed by or against any Borrower for liquidation or reorganization, if any Borrower becomes insolvent or makes an assignment for the benefit of creditors, if a receiver or trustee is appointed for all or any significant part of any Borrower's assets, or if any payment or transfer of Collateral is recovered from the Agent or the Lenders. The Loan Documents and the Secured Obligations and Collateral security shall continue to be effective, or shall be revived or reinstated, as the case may be, if at any time payment and performance of the Secured Obligations or any transfer of Collateral to the Agent, or any part thereof is rescinded, avoided or avoidable, reduced in amount, or must otherwise be restored or returned by, or is recovered from, the Agent, the Lenders or by any obligee of the Secured Obligations, whether as a "voidable preference," "fraudulent conveyance," or otherwise, all as though such payment, performance, or transfer of Collateral had not been made. In the event that any payment, or any part thereof, is rescinded, reduced, avoided, avoidable, restored, returned, or recovered, the Loan Documents and the Secured Obligations shall be deemed, without any further action or documentation, to have been revived and reinstated except to the extent of the full, final, and indefeasible payment to the Agent or the Lenders in cash.

**Section 11.16    Counterparts.**    This Agreement, and any amendments, waivers, consents or supplements hereto, may be executed in any number of counterparts, and by different parties hereto in separate counterparts, each of which when so delivered shall be deemed an original, but all of which counterparts shall constitute but one and the same instrument.

**Section 11.17    No Third-Party Beneficiaries.**    No provisions of the Loan Documents are intended, nor will be interpreted, to provide or create any third-party beneficiary rights or any other rights of any kind in any Person other than the Agent, the Lenders and the Borrowers unless specifically provided otherwise herein, and, except as otherwise so provided, all provisions of the Loan Documents will be personal and solely among the Agent, the Lenders and the Borrowers.

### Section 11.18   Agency.

(a)    The Lenders hereby irrevocably appoint Silverpeak Credit Partners, LP to act on their behalf as the Agent hereunder and under the other Loan Documents and authorize the Agent to take such actions on their behalf and to exercise such powers as are delegated to the Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto.

(b)    The Lenders agree to indemnify the Agent in its capacity as such (to the extent not reimbursed by the Borrowers and without limiting the obligation of the Borrowers to do so), according to its respective Advance percentages (based upon the total outstanding Advances) in effect on the date on which indemnification is sought under this **Section 11.18**, from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever that may at any time be imposed on, incurred by or asserted against the Agent in any way relating to or arising out of, this Agreement, any of the other Loan Documents or any documents contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby or any action taken or omitted by the Agent under or in connection with any of the foregoing, in each case, except to the extent such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements result from the Agent's own gross negligence or willful misconduct.   The agreements in this **Section 11.18** shall survive the payment of the Loan and all other amounts payable hereunder.

(c)    The Person serving as the Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Agent and the term "Lender" shall, unless otherwise expressly indicated or unless the context otherwise requires, include each such Person serving as the Agent hereunder in its individual capacity.

(d)    The Agent shall have no duties or obligations except those expressly set forth herein and in the other Loan Documents. Without limiting the generality of the foregoing, the Agent shall not:

　　　　(i)    be subject to any fiduciary or other implied duties, regardless of whether any default or any Event of Default has occurred and is continuing;

　　　　(ii)    have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Agent is required to exercise as directed in writing by the Lenders; **provided** that the Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Agent to liability or that is contrary to any Loan Document or applicable law; and

　　　　(iii)    except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and the Agent shall not be liable for the failure to disclose, any information relating to any Borrower or Affiliate thereof that is communicated to or obtained by any Person serving as the Agent or any of its Affiliates in any capacity.

(e)    The Agent shall not be liable for any action taken or not taken by it  (i) with the consent or at the request of the Lenders or as the Agent shall believe in good faith shall be necessary, under the circumstances or  (ii) in the absence of its own gross negligence or willful misconduct.

*Loan and Security Agreement*

(f)     The Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any default or Event of Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document or (v) the satisfaction of any condition set forth in **Article 4** (*Conditions Precedent to Loan*) above or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Agent.

(g)     The Agent may rely, and shall be fully protected in acting, or refraining to act, upon, any resolution, statement, certificate, instrument, opinion, report, notice, request, consent, order, bond or other paper or document that it has no reason to believe to be other than genuine and to have been signed or presented by the proper party or parties or, in the case of cables, telecopies and telexes, to have been sent by the proper party or parties. In the absence of its gross negligence or willful misconduct, the Agent may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon any certificates or opinions furnished to the Agent and conforming to the requirements of this Agreement or any of the other Loan Documents.   The Agent may consult with counsel, and any opinion or legal advice of such counsel shall be full and complete authorization and protection in respect of any action taken, not taken or suffered by the Agent hereunder or under any Loan Documents in accordance therewith. The Agent shall have the right at any time to seek instructions concerning the administration of the Collateral from any court of competent jurisdiction. The Agent shall not be under any obligation to exercise any of the rights or powers granted to the Agent by this Agreement and the other Loan Documents at the request or direction of the Lenders unless the Agent shall have been provided by the Lenders with adequate security and indemnity against the costs, expenses and liabilities that may be incurred by it in compliance with such request or direction.

(h)     Each Lender acknowledges that it has, independently and without reliance upon the Agent or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.   Each Lender also acknowledges that it will, independently and without reliance upon the Agent or any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.   Without limiting the foregoing, the Agent shall, within a reasonable period following receipt thereof, furnish to each Lender any and all Financial Statements, period reports and other written documents required to be delivered on specified dates, or at regular intervals, by any Rawhide Entity to the Agent pursuant to the requirements set forth in this Agreement or any other Loan Document.

(i)     The Agent may, at any time, give notice of its resignation to the Lenders and the Borrowers. Upon receipt of any such notice of resignation, the Required Lenders shall have the right, in consultation with the Borrowers, to appoint a successor, which (except as may be otherwise agreed by the Required Lenders and the Borrowers) shall be a bank with an office in New York, New York, or an Affiliate of any such bank with an office in New York, New York.   If no such successor shall have been so appointed by

the Required Lenders and shall have accepted such appointment within **30** days after the retiring Agent gives notice of its resignation (or such earlier day as shall be agreed by the Required Lenders) (as may be extended in accordance with this section, the "**Resignation Effective Date**"), then the retiring Agent may (but shall not be obligated to), upon consultation with, and **five** Business Days' written notice to, the Lenders and the Borrowers, appoint a successor Agent meeting the qualifications set forth above unless the Required Lenders (acting in consultation with the Borrowers) object in writing to such appointment within such **five**-Business Day notice period, in which case the Resignation Effective Date shall automatically be extended until the first Business Day on which the Required Lenders (acting in consultation with the Borrowers) either appoint a successor Agent or fail to object to the Agent's appointment of a successor Agent (or such earlier date as may be designated by the Agent, upon not less than **10** days' prior written notice to the Lenders and the Borrowers).  With effect from the Resignation Effective Date, (i) the retiring Agent shall be discharged from its duties and obligations under this Agreement and the other Loan Documents and  (ii) except for any accrued and unpaid fees, expenses or indemnity payments owed to the retiring Agent, all payments, communications and determinations provided to be made by, to or through the Agent shall instead be made by or to each Lender directly, until such time, if any, as the Required Lenders appoint a successor Agent as provided for above.   Upon the acceptance of a successor's appointment as Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring Agent (other than any rights to indemnity payments owed to the retiring Agent), and the retiring Agent shall be discharged from all of its duties and obligations under this Agreement and the other Loan Documents.   The fees payable by the Borrowers to a successor Agent shall be the same as those payable to its predecessor unless otherwise mutually agreed between the Borrowers and such successor.   After the retiring or removed Agent's resignation or removal under this Agreement and the other Loan Documents, the provisions of this **Section 11.18** shall continue in effect for the benefit of such retiring or removed Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while such retiring or removed Agent was acting as Agent.    For the avoidance of doubt, the provisions of this **Section 11.18(i)** shall not apply with respect to, or limit, the right of the Agent to transfer its rights and obligations, in such capacity, to an Affiliate of the Agent, in the manner permitted under **Section 11.7** (*Successors and Assigns*) above.

(j)     As consideration for its services hereunder, the Agent shall be entitled to receive the Administration Fee, payable as provided in the Fee Letter.

### Section 11.19   Certain ERISA Matters.

(a)     Each Lender (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Agent and its Affiliates, and not, for the avoidance of doubt, to or for the benefit of any Borrower or Affiliate thereof, that at least one of the following is and will be true:

(i)     such Lender is not using "plan assets" (within the meaning of 29 CFR § 2510.3-101, as modified by Section 3(42) of ERISA) of one or more Plans in connection with the Loan;

(ii)    the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to such Lender's entrance into, participation in, administration of and performance of the Loan and this Agreement;

(iii)    (A) such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the Loan and this Agreement, (C) the entrance into, participation in, administration of and performance of the Loan and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14 and (D) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Loan and this Agreement; or

(iv)    such other representation, warranty and covenant as may be agreed in writing between the Agent, in its sole discretion, and such Lender.

(b)    In addition, unless **paragraph (i)** of **Section 11.19(a)** above is true with respect to a Lender, or such Lender has not provided another representation, warranty and covenant as provided in sub-**paragraph (iv)** of such **Section 11.19(a)**, such Lender further (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (x) covenants, from the date such Person became a Lender party hereto to the date such Lender ceases being a Lender party hereto, for the benefit of, the Agent and its Affiliates (and not, for the avoidance of doubt, to or for the benefit of the any Borrower or Affiliate thereof) that:

(i)    none of the Agent or any of its Affiliates is a fiduciary with respect to the assets of such Lender (including in connection with the reservation or exercise of any rights by the Agent under this Agreement, any Loan Document or any documents related to hereto or thereto);

(ii)    the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Loan and this Agreement is independent (within the meaning of 29 CFR § 2510.3-21) and is a bank, an insurance carrier, an investment adviser, a broker-dealer or other person that holds, or has under management or control, total assets of at least **USD 50,000,000**, in each case as described in 29 CFR § 2510.3-21(c)(1)(i)(A)-(E);

(iii)    the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Loan

*Loan and Security Agreement*

and this Agreement is capable of evaluating investment risks independently, both in general and with regard to particular transactions and investment strategies (including in respect of the Secured Obligations);

(iv)     the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Loan and this Agreement is a fiduciary under ERISA or the Code, or both, with respect to the Loan and this Agreement and is responsible for exercising independent judgment in evaluating the transactions hereunder; and

(v)     no fee or other compensation is being paid directly to the Agent or any of its Affiliates for investment advice (as opposed to other services) in connection with the Loan or this Agreement.

(c)     The Agent hereby informs the Lenders that each such Person is not undertaking to provide impartial investment advice, or to give advice in a fiduciary capacity, in connection with the transactions contemplated hereby, and that such Person has a financial interest in the transactions contemplated hereby in that such Person or an Affiliate thereof (i) may receive interest or other payments with respect to the Loan and this Agreement, (ii) may recognize a gain if it extended the Loan for an amount less than the amount being paid for an interest in the Loan by such Lender or (iii) may receive fees or other payments in connection with the transactions contemplated hereby, the Loan Documents or otherwise, including structuring fees, commitment fees, arrangement fees, facility fees, upfront fees, underwriting fees, ticking fees, agency fees, administrative agent or collateral agent fees, utilization fees, minimum usage fees, letter of credit fees, fronting fees, deal-away or alternate transaction fees, amendment fees, processing fees, term out premiums, banker's acceptance fees, breakage or other early termination fees or fees similar to the foregoing.

**Section 11.20    Publicity.**    None of the parties hereto nor any of its respective member businesses and Affiliates shall, without the other parties' prior written consent, publicize or use  (a) the other party's name (including a brief description of the relationship among the parties hereto), logo or hyperlink to such other parties' web site, separately or together, in written and oral presentations, advertising, promotional and marketing materials, client lists, public relations materials or on its web site (together, the "**Publicity Materials**");  (b) the names of officers of such other parties in the Publicity Materials; and  (c) such other parties' name, trademarks, service marks in any news or press release concerning such party; **provided**, **however**, **that**, notwithstanding anything to the contrary herein, no such consent shall be required  (i) to the extent necessary to comply with the requests of any regulators, legal requirements or laws applicable to such party, pursuant to any listing agreement with any national securities exchange (so long as such party provides prior notice to the other party hereto to the extent reasonably practicable) and  (ii) to comply with **Section 11.12** (*Confidentiality*) above.

**Section 11.21    Joint and Several Liability; Rawhide Mining as Agent for Borrowers.**
The Borrowers shall be jointly and severally liable for all obligations of the Borrowers (or any Borrower). Each Borrower hereby irrevocably appoints Rawhide Mining as its representative and agent for all purposes of this Agreement, with full authority to bind such Borrower in full, and the Agent and Lenders shall be entitled to rely on all actions, authorizations and consents by Rawhide Mining (including without limitation execution of any amendments hereto or to any other Loan Document) as binding upon each

such Borrower, and any notice to, or other communication with, any Borrower shall be sufficiently delivered and made if delivered or made to Rawhide Mining.   Any reference to "Borrowers" in any representation, covenant or other provision of this Agreement shall be deemed to be a representation, covenant or other provision applicable to each Borrower, or of the Borrowers, taken as a whole, as the context requires.

**[SIGNATURE PAGES FOLLOW]**

**IN WITNESS WHEREOF**, the Borrowers, the Agent and the Lenders have duly executed and delivered this Loan and Security Agreement as of the day and year first above written.

**RAWHIDE MINING LLC**
As a Borrower

By: _____

      Name:    Donald M. Deines
      Title:     President & Chief Executive Officer

**RAWHIDE ACQUISITION HOLDING LLC**
As Parent

By: _____

       Name:    Donald M. Deines
       Title:     President & Chief Executive Officer

**SILVERPEAK CREDIT OPPORTUNITIES AIV LP**
As a Lender

By:    Silverpeak Credit Opportunities Cayman GP LP, its
       General Partner

      By:    SP CO GP Ltd, its General Partner

            By:    _____

                Name:    Vaibhav Kumar
                Title:    Portfolio Manager

**CEOF HOLDINGS LP**
As a Lender

By:    Corbin Capital Partners, L.P., its investment manager

By:    _____

Name:    Daniel Friedman
Title:    General Counsel

**SILVERPEAK CREDIT PARTNERS, LP**
As Agent

By: _____

    Name:   Vaibhav Kumar
    Title:    Portfolio Manager

EXHIBIT A

## Form of Note

## RAWHIDE MINING LLC

## SECURED TERM PROMISSORY NOTE

**THIS NOTE CONTAINS ORIGINAL ISSUE DISCOUNT, AS DEFINED IN SECTION 1273 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED.   PLEASE CONTACT DON DEINES, PRESIDENT AND CHIEF EXECUTIVE OFFICER OF THE BORROWER, AT PHONE NUMBER (775) 945-1015, EXT. 108, FOR THE ISSUE DATE OF THE NOTE, THE ORIGINAL ISSUE DISCOUNT IN THE NOTE AND THE YIELD TO MATURITY.**

**USD** _____                                                Closing Date:   January 3, 2019

                                                                          Scheduled Maturity Date:   January 3, 2023

          **FOR VALUE RECEIVED**, **RAWHIDE MINING LLC**, a Delaware limited liability company [and _____, a _____] [(the "**Borrower**")] [(collectively, the "**Borrowers**," and each, a "**Borrower**")], hereby [jointly and severally] promise[s] to pay to _____, a _____ (the "**Lender**"), at _____*<Address>*_____ or such other place of payment as the Lender, as the holder of this Secured Term Promissory Note (this "**Promissory Note**") may specify from time to time in writing, in lawful money of the United States of America, the principal amount of _____ **UNITED STATES DOLLARS** (**USD** _____), or such other principal amount as the Lender has advanced to the Borrower[s], together with interest, at the Interest Rate specified in the Fee Letter referred to in the Loan Agreement, computed daily based on the actual number of days elapsed, payable on each Payment Date in an amount accrued during the preceding Accrual Period and not previously paid, as set forth in **Section 2.1(b)** (*Interest*) of the Loan Agreement.

          This Promissory Note is a Note referred to in, and is executed and delivered in connection with, that certain Loan and Security Agreement, dated as of January 3, 2019 (as amended, restated, supplemented or otherwise modified from time to time, in accordance with its terms, the "**Loan Agreement**"), by and among the Borrower[s], the other "Rawhide Subsidiaries" from time to time party thereto, Rawhide Acquisition Holding LLC, a Delaware limited liability company, the several financial institutions or entities from time to time party thereto, as "Lenders" thereunder, and Silverpeak Credit Partners, LP, a Delaware limited partnership, as "Agent" thereunder (the "**Agent**"), and is entitled to the benefit and security of the Loan Agreement and the other Loan Documents (as defined in the Loan Agreement), to which reference is made for a statement of all of the terms and conditions thereof.   In the event of a conflict between the terms set forth in this Promissory Note, and the terms set forth in the Loan Agreement, the terms set forth in the Loan Agreement shall prevail.   All payments shall be made in accordance with the Loan Agreement.   All terms defined in the Loan Agreement shall have the same definitions when used herein, unless otherwise defined herein.   An Event of Default under the Loan Agreement shall constitute a default under this Promissory Note.

[The][Each] Borrower waives presentment and demand for payment, notice of dishonor, protest and notice of protest under the UCC or any applicable law.   The Borrower[s] agree[s] to make all payments under this Promissory Note without setoff, recoupment or deduction and regardless of any counterclaim or defense.   This Promissory Note has been negotiated and delivered to the Lender, and is payable, in the State of New York.   This Promissory Note shall be governed by and construed and enforced in accordance with, the laws of the State of New York, excluding any conflicts of law rules or principles that would cause the application of the laws of any other jurisdiction.

**[SIGNATURE PAGE FOLLOWS]**

**IN WITNESS WHEREOF**, the [the][each] Borrower has caused this Promissory Note to be duly executed by an authorized person.

<div style="margin-left:40%">

**RAWHIDE MINING LLC**
As a Borrower

By: _____
      Name:
      Title:


**[_____*<BORROWER NAME>*_____**
As a Borrower

By: _____
      Name:
      Title:        ]

</div>

**EXHIBIT B**

## Borrower Information

1.  The Borrower represents and warrants to the Agent that the Borrower's current name and organizational status as of the Closing Date is as follows:

      Name:     Rawhide Mining LLC

      Type of organization:     Limited Liability Company

      State of organization:     Delaware

      Organization file number:  2193564

      The Borrower's fiscal year ends on December 31

      The Borrower's federal employer tax identification number is: 52-1626623

2.  The Borrower represents and warrants to the Agent that for five years prior to the Closing Date, the Borrower has not done business under any other name or organization or form.

3.  The Borrower represents and warrants to the Agent that its chief executive office is located at:

   143 Keddie St
   Fallon, NV 89406

EXHIBIT C

## Deposit Accounts and Investment Accounts

| | Institution Name and Address and Telephone Number | Account Number | Purpose of Account | Name of Account Owner |
|---|---|---|---|---|
| (1) | US Bank National Association 2197 Vasey Road Fallon, NV 89406-7870 (775) 428-0680 (877) 428-8070 | ■■■6498 | Checking - General | Rawhide Mining LLC |
| (2) | US Bank National Association 2197 Vasey Road Fallon, NV 89406-7870 (775) 428-0680 (877) 428-8070 | ■■■1829 | Checking - Payroll | Rawhide Mining LLC |
| (3) | Texas Capital Bank N.A. 2350 Lakeside Blvd., Suite 800 Richardson, TX 75082 | ■■■2246 | Cash collateral for performance bond | Rawhide Mining LLC |

EXHIBIT D

## Form of Compliance Certificate

Silverpeak Credit Partners, LP (as the "**Agent**")
40 West 57th Street - 29th Floor
New York, NY 10019

      Reference is made to that certain Loan and Security Agreement, dated as of January 3, 2019 (as amended, restated, supplemented or otherwise modified from time to time, the "**Loan Agreement**"), among Rawhide Mining LLC, a Delaware limited liability company ("**Rawhide Mining**"), the Rawhide Subsidiaries from time to time party thereto (such Rawhide Subsidiaries, collectively, and together with Rawhide Mining, the "**Borrowers**," and each, a "**Borrower**"), Rawhide Acquisition Holding LLC, a Delaware limited liability company, the several financial institutions or entities from time to time party thereto as lenders (collectively, the "**Lenders**") and Silverpeak Credit Partners, LP, as the "Agent" for the Lenders thereunder (the "**Agent**").   Capitalized terms used but not defined herein have the meanings specified in the Loan Agreement.

      The undersigned is an Officer of Rawhide Mining, knowledgeable of all of the Borrower's financial matters, and is authorized to provide certification of information regarding the Borrower; hereby certifies, in such capacity, that in accordance with the terms and conditions of the Loan Agreement, the Borrower is in compliance for the period ending [●] of all covenants, conditions and terms and hereby reaffirms that all representations and warranties contained therein are true and correct on and as of the date of this Compliance Certificate with the same effect as though made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date, after giving effect in all cases to any standard(s) of materiality contained in the Loan Agreement as to such representations and warranties.   Attached are the required documents supporting the above certification.   The undersigned further certifies that these are prepared in accordance with GAAP (except for the absence of footnotes with respect to unaudited financial statement and subject to normal year-end adjustments) and are consistent from one period to the next except as explained below.

| REPORTING REQUIREMENT | REQUIRED | CHECK IF ATTACHED |
|---|---|---|
| Quarterly Unaudited Financial Statements | Quarterly within 45 days | |
| Annual Unaudited Financial Statements | FYE within 60 days | |
| Audited Financial Statements | FYE within 120 days | |

      The undersigned hereby also confirms [there has been no change in the depository accounts or securities accounts owned by the Borrower or its Subsidiaries from those previously disclosed to the Agent] [the below disclosed accounts represent all depository accounts and securities accounts presently open in the name of the Borrower or the Borrower's Subsidiaries, as applicable].

| | | Depository AC # | Financial Institution | Account Type (Depository / Securities) | Last Month Ending Account Balance | Purpose of Account |
|---|---|---|---|---|---|---|
| Rawhide Mining Name/Address: | | | | | | |
| | 1 | | | | | |
| | 2 | | | | | |
| | 3 | | | | | |
| | 4 | | | | | |
| | 5 | | | | | |
| | 6 | | | | | |
| | 7 | | | | | |
| | | | | | | |
| THE OTHER BORROWER ENTITIES: Name/Address | | | | | | |
| | 1 | | | | | |
| | 2 | | | | | |
| | 3 | | | | | |
| | 4 | | | | | |
| | 5 | | | | | |
| | 6 | | | | | |
| | 7 | | | | | |
| | | | | | | |

*Loan and Security Agreement*
*Form of Compliance Certificate*

Very Truly Yours,

Rawhide Mining LLC

By: _____

Name: _____

Its: _____

EXHIBIT E

## Form of Mine Production Report

**Rawhide Mining LLC**
**Monthly Production Report**
**February 2019**

| | Month | | YTD | |
|---|---|---|---|---|
| | **Actual** | **Budget** | **Actual** | **Budget** |
| Gold Equivalent Ounces to Press | 1,607 | 1,607 | 2,698 | 2,698 |
| Gold Equivalent Ounces Shipped | 1,400 | 1,400 | 2,950 | 2,950 |
| | | | | |
| Ore Tons Mined (wet) | 151,903 | 151,903 | 259,060 | 259,060 |
| Waste Tons Mined | 200,918 | 200,918 | 200,918 | 200,918 |
| Total Tons Mined | 352,821 | 352,821 | 581,517 | 581,517 |
| | | | | |
| Tons Crushed and Stacked (dry) | 141,513 | 141,513 | 241,340 | 241,340 |
| Gold Equivalent Ounces Placed | 2,337 | 2,337 | 4,101 | 4,101 |
| | | | | |
| Personnel on payroll (end of month) | 63 | 63 | | |

No health, safety or environmental incidents during January 2012.

*Loan and Security Agreement*
*Form of Mine Production Report*

**EXHIBIT F**

## Form of Joinder Agreement

This **JOINDER AGREEMENT** (the "**Joinder Agreement**") is made and dated as of [●], and is entered into by and between [●], a [●] (the "**Subsidiary**"), and **SILVERPEAK CREDIT PARTNERS, LP**, a Delaware limited partnership, as Agent (the "**Agent**").

### Preliminary Statements

A.    Rawhide Mining LLC ("**Rawhide Mining**") and its Rawhide Subsidiaries from time to time parties thereto, as borrowers (collectively, the "**Borrowers**"), and Rawhide Acquisition Holding LLC have entered into that certain Loan and Security Agreement dated January 3, 2019, with the several financial institutions or entities from time to time party thereto as lender (the "**Lenders**") and the Agent, as such agreement may be amended (the "**Loan Agreement**"), together with the other agreements executed and delivered in connection therewith.

B.    The Subsidiary acknowledges and agrees that it will benefit both directly and indirectly from the Borrower's execution of the Loan Agreement and the other agreements executed and delivered in connection therewith.

**NOW**, **THEREFORE**, the Subsidiary and the Agent agree as follows:

1.    The recitals set forth above are incorporated into and made part of this Joinder Agreement. Capitalized terms used but not defined in this Joinder Agreement have the meanings specified in the Loan Agreement.

2.    By signing this Joinder Agreement, the Subsidiary shall be bound by the terms and conditions of the Loan Agreement as a Borrower (as defined in the Loan Agreement) under the Loan Agreement (and, collectively with the other Borrowers, as the Borrower), *mutatis mutandis*; **provided**, **however**, **that**, (a) with respect to (i) **clause (a)** of **Section 5.1** (*Organization, Etc.*) of the Loan Agreement, the Subsidiary represents that it is an entity duly organized, legally existing and in good standing under the laws of [●], (b) neither the Agent nor the Lenders shall have any duties, responsibilities or obligations to the Subsidiary arising under or related to the Loan Agreement or the other Loan Documents, (c) if the Subsidiary is covered by Rawhide Mining's insurance, the Subsidiary shall not be required to maintain separate insurance or separately comply with the provisions of **Section 6.1** (*Coverage*) or **6.2** (*Certificates*) of the Loan Agreement, and (d) for so long as the Borrower otherwise satisfies the requirements of **Section 7.2** (*Reporting*) of the Loan Agreement, as to such Subsidiary, on a consolidated basis, the Subsidiary shall not be obligated to provide the Agent with separate Financial Statements.

3.    To the extent that the Agent or the Lenders have any duties, responsibilities or obligations arising under or related to the Loan Agreement or the other Loan Documents, the Agent shall interact with Rawhide Mining, in its capacity as agent for the benefit of the Borrower Entities pursuant to

**Section 11.21** (*Joint and Several Liability; Rawhide Mining as Agent for Borrowers*) of the Loan Agreement, including, without limitation, as to:

(a)    the Agent's providing notice to the Borrower in accordance with the Loan Agreement or as otherwise agreed among the Borrower, the Agent and the Lenders shall be deemed provided to the Subsidiary;

(b)    a Lender's providing an Advance to Rawhide Mining shall be deemed an Advance to the Subsidiary; and

(c)    the Subsidiary shall have no right to make any demand on any Lender.

4.    The Subsidiary agrees not to certificate its Equity Interests without the Agent's prior written consent, which consent may be conditioned on the delivery of such Equity Interests to the Agent in order to perfect the Agent's security interest in such Equity Interests.

5.    The Subsidiary acknowledges that it benefits, both directly and indirectly, from the Loan Agreement, and hereby waives, for itself and on behalf on any and all successors in interest (including without limitation any assignee for the benefit of creditors, receiver, bankruptcy trustee or itself as debtor-in-possession under any bankruptcy proceeding) to the fullest extent provided by law, any and all claims, rights or defenses to the enforcement of this Joinder Agreement on the basis that  (a) it failed to receive adequate consideration for the execution and delivery of this Joinder Agreement or (b) its obligations under this Joinder Agreement are avoidable as a fraudulent conveyance.

6.    As security for the prompt, complete and indefeasible payment when due (whether on the payment dates or otherwise) of all the Secured Obligations, the Subsidiary grants to the Agent (for the benefit of the Secured Parties) a security interest in all of the Subsidiary's right, title, and interest in and to the Collateral.

**[SIGNATURE PAGES FOLLOW]**

[SIGNATURE PAGE TO JOINDER AGREEMENT]

SUBSIDIARY:

_____.

By:
Name:
Title:

Address:


Telephone: _____
email: _____

AGENT:


Silverpeak Credit Partners, LP

By:_____
Name:_____
Title: _____

Address:

*Loan and Security Agreement*
*Form of Joinder Agreement*

EXHIBIT G

## Form of Power of Attorney

## POWER OF ATTORNEY

*<Date>*

This **POWER OF ATTORNEY** is executed and delivered by _____*<Grantor Name>*_____, a _____ (the "**Grantor**"), to **SILVERPEAK CREDIT PARTNERS, LP**, a Delaware limited partnership, and its successors and assigns, as the "Agent" (in such capacity, the "**Agent**") under the Loan and Security Agreement, dated as of January 3, 2019 (as amended, restated, supplemented or otherwise modified from time to time, the "**Loan and Security Agreement**"), among Rawhide Mining LLC, a Delaware limited liability company ("**Rawhide Mining**"), the other "Rawhide Subsidiaries" from time to time party thereto (such Rawhide Subsidiaries, collectively, and together with Rawhide Mining, the "**Borrowers**," and each, a "**Borrower**"), the several financial institutions or entities from time to time party thereto, as "Lenders" thereunder, and the Agent.   The Grantor is a Borrower under the Loan and Security Agreement.   Capitalized terms used but not defined herein shall have the meanings assigned to such terms under the Loan and Security Agreement.

No person to whom this Power of Attorney is presented, as authority for the Agent to take any action or actions contemplated hereby, shall inquire into or seek confirmation from the Grantor or any other Person as to the authority of the Agent to take any action described below, or as to the existence of or fulfillment of any condition to this Power of Attorney, which is intended to grant to the Agent unconditionally the authority to take and perform the actions contemplated herein, and the Grantor irrevocably waives any right to commence any suit or action, in law or equity, against any person or entity that acts in reliance upon or acknowledges the authority granted under this Power of Attorney. The Power of Attorney granted hereby is coupled with an interest and may not be revoked or canceled by the Grantor until all obligations of the Grantor under the Loan Documents have been indefeasibly paid in full and the Agent has provided its written consent thereto (which consent shall not be unreasonably withheld or delayed).

The Grantor hereby irrevocably constitutes and appoints the Agent (and its officers, employees, agents or designees) as the Grantor's true and lawful attorney in fact (with full power of substitution), in its name, place and stead, and at its expense, in connection with the enforcement of the rights and remedies provided for in **Article 10** (*Remedies*) of the Loan and Security Agreement and the other rights and remedies afforded to the Agent and the other Secured Parties under the Loan Documents following an "Event of Default" under the Loan and Security Agreement, with full irrevocable power and authority, in the Grantor's place and stead, at the Grantor's expense, and in the Grantor's name or in the Agent's own name, from time to time in the Agent's discretion, to take any and all appropriate actions, and to execute and deliver any and all documents and instruments that may be necessary or desirable to exercise the rights of the Grantor under the Collateral and the Loan Documents, and, without limiting the generality of the foregoing, hereby grants to Agent the power and right, on its behalf, without notice to or assent by it, to  (i) give any necessary receipts or acquittance for amounts collected or received

hereunder, (ii) make all necessary transfers of the Collateral in connection with any sale or other disposition made pursuant to such **Article 10**, (iii) execute and deliver for value all necessary or appropriate bills of sale, assignments and other instruments in connection with any such sale or other disposition, the Grantor thereby ratifying and confirming all that the Agent, or its officers, employees, agents, designees or substitutes shall lawfully do under this Power of Attorney and pursuant hereto and (iv) sign any agreements, orders or other documents in connection with, or pursuant to, any Loan Document, all as fully and effectively as the Grantor might do.   The Grantor hereby ratifies, to the extent permitted by law, all that said attorneys shall lawfully do or cause to be done by virtue hereof.

**[SIGNATURE PAGE FOLLOWS]**

**IN WITNESS WHEREOF**, this Power of Attorney is executed by the Grantor, and the Grantor has caused its seal to be affixed as of the date first written above.

<div align="center">

_____***&lt;GRANTOR NAME&gt;***_____
As Grantor

</div>

By: _____

Name: _____*&lt;Signatory Name&gt;*_____

Title: _____*&lt;Signatory Title&gt;*_____

STATE OF _____      )
                              )
COUNTY OF _____       )

On this _____ day of _____, _____, before me, the undersigned, a Notary Public in and for said state, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the person, or the entity upon behalf of which the person acted, executed the instrument.

_____
Notary Public

*Loan and Security Agreement*
*Form of Power of Attorney*

**EXHIBIT H**

## Form of Initial Account Control Agreement

*(Please see attached)*



## ACCOUNT CONTROL AGREEMENT

This ACCOUNT CONTROL AGREEMENT (this "Agreement") is dated as of _____, 2019, and entered into by and among RAWHIDE MINING LLC ("Company"), SILVERPEAK CREDIT PARTNERS, LP, as agent for the Lenders under the Loan Agreement identified below (together with its successors and assigns, in such capacity, "Agent") and U.S. BANK NATIONAL ASSOCIATION ("Depositary Bank").

WHEREAS, pursuant to the Loan and Security Agreement, dated as of January 3, 2019 (as amended, restated, supplemented or otherwise modified from time to time, the "Loan Agreement"), among Company, the "Rawhide Subsidiaries" from time to time party thereto, Rawhide Acquisition Holding LLC, the "Lenders" from time to time party thereto (collectively, the "Lenders") and Agent, the Lenders have agreed to provide a term loan to Company, subject to the terms and conditions set forth therein; and

WHEREAS, in order to secure the obligations of Company to the Lenders and Agent under the Loan Agreement and certain related documents, Company has granted to Agent a security interest in, *inter alia*, the Deposit Account referred to herein, all sums now or hereafter on deposit in or payable or withdrawable therefrom and all proceeds of the foregoing.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Company, Agent and Depositary Bank agree as follows:

1.      **Deposit Account**.      Pursuant to certain agreements between Company and Agent, Company has granted to Agent a security interest in all rights of Company with respect to account number ██████6498 (such account, together with all substitutions and replacements therefor, the "Deposit Account") located at Depositary Bank and subject to the terms of the Deposit Agreements (as hereinafter defined).  The terms and conditions of this Account Control Agreement (this "Agreement") are in addition to any deposit account agreements and other related agreements that Company has with Depositary Bank, including without limitation all agreements concerning banking products and services, treasury management documentation, account booklets containing the terms and conditions of the Deposit Account, signature cards, fee schedules, disclosures, specification sheets and change of terms notices (collectively, the "Deposit Agreements").  The provisions of this Agreement shall supersede the provisions of the Deposit Agreements only to the extent the provisions herein are inconsistent with the Deposit Agreements, and in all other respects, the Deposit Agreements shall remain in full force and effect.  All items deposited into the Deposit Account shall be processed according to the provisions of the Deposit Agreements, as amended by this Agreement.  The Deposit Account shall be maintained at all times as a deposit account (within the meaning of the New York Uniform Commercial Code).

2.      **Security Interest**.  Company has granted to Agent a security interest in, among other property, the Deposit Account and all credits or proceeds thereto and all monies, checks and other instruments held or deposited therein (all of which shall be included in the definition of the "Deposit Account").  Company represents and warrants that it has the legal right to pledge the Deposit Account to Agent, that the funds in the Deposit Account are not held for the benefit of a third party, and that that there are no perfected liens or encumbrances with respect to the Deposit Account.  Company covenants with Agent that it shall not enter into any acknowledgment or agreement that gives any other person or entity except Agent control over, or any other security interest, lien or title in, the Deposit Account.

3.      **Control**.  In order to provide Agent with control over the Deposit Account, Company agrees that Depositary Bank shall comply with any and all orders, notices, requests and other instructions originated by Agent directing disposition of the funds in the Deposit Account without any further consent from Company, even if such instructions are contrary to any of Company's instructions or demands or result in

Depositary Bank dishonoring items which may be presented for payment.  Company agrees that instructions from Agent may include the giving of stop payment orders for any items presented to the Deposit Account, instructions to transfer funds to or for the benefit of Agent or any other person or entity, and instructions to close the Deposit Account.

4.    **Access to Deposit Account**.   The Deposit Account shall be under the control of Agent; provided, that unless and until Depositary Bank receives Agent's written notice that Company's access to the funds in the Deposit Account is terminated, Depositary Bank shall honor Company's instructions, notices and directions with respect to the transfer or withdrawal of funds from the Deposit Account, including paying or transferring the funds to Company or any other person or entity.  Notwithstanding the preceding sentence, Depositary Bank shall at all times retain the sum of $5,000.00 to cover any Fees, Returned Items and Overdrafts (as those terms are defined below).

Upon receipt of a written notice from Agent instructing Depositary Bank to terminate Company's access to funds in the Deposit Account, Depositary Bank shall transfer all  funds (subject to Depositary Bank's funds availability policy) in the Deposit Account to a designated account in accordance with Agent's written instructions.  Agent shall promptly contact Depositary Bank to confirm Depositary Bank's receipt of   Agent's written instructions.  Any written notice sent pursuant to this Section 4 and confirmed to have been received after Depositary Bank's business hours shall not be deemed sent until the next business day.  Depositary Bank shall have a reasonable time to act on Agents' written notice.

The Depository Bank has not entered into any other agreement with any person or entity (other than the Company) permitting such person to direct dispositions from the Deposit Account.

5.    **Subordination by Depositary Bank**.  Company and Depositary Bank acknowledge notice of and recognize Agent's continuing security interest in the Deposit Account and in all items deposited in the Deposit Account and in the proceeds thereof.  Depositary Bank hereby waives, and subordinates to the indefeasible payment, performance and satisfaction of Company's obligations under the Loan Agreement and the other "Loan Documents" referred to therein, any statutory, contractual or other right, claim, offset, lien, security interest or encumbrance resulting from any transaction which involves the Deposit Account. Notwithstanding the preceding sentence, nothing herein constitutes a waiver of, and Depositary Bank expressly reserves all of its present and future rights with respect to: (i) fees and expenses ("Fees") related to the Deposit Account;  (ii) any checks, ACH entries, wire transfers, merchant card transactions, or other paper or electronic items which were deposited or credited to the Deposit Account that are returned, reversed, refunded, adjusted or charged back for insufficient funds or for any other reason ("Returned Items"); (iii)  obligations and liabilities connected with the Deposit Account that arise out of any treasury management services provided by Depositary Bank, its subsidiaries or affiliates, including but not limited to, ACH, merchant card, zero balance account, sweeps, controlled disbursement or payroll ("Overdrafts").   Depositary Bank may charge the Deposit Account or other accounts of Company maintained at Depositary Bank to cover Fees, Returned Items or Overdrafts.  If there are insufficient funds in the Deposit Account or any of Company's other accounts to cover the Fees, Returned Items and Overdrafts, Company agrees to immediately reimburse Depositary Bank for the amount of such shortfall. If Company fails to pay the amount demanded by Depositary Bank within nine (9) days, Agent agrees to reimburse Depositary Bank within nine (9) days of demand thereof by Depositary Bank for any Returned Items and Overdrafts to the extent (i) Agent received payment in respect thereof pursuant to Section 4 and (ii) such demand is received within thirty (30) days of Depositary Bank's receipt of such Returned Item or such Overdraft having been processed by Depositary Bank.

6.    **Indemnity**.  Company agrees to defend, indemnify and hold Depositary Bank and its directors, officers, employees, attorneys, successors and assigns (collectively "Depositary Bank") harmless from and against any and all claims, losses, liabilities, costs, damages and expenses, including, without limitation, reasonable legal and accounting fees (collectively, "Claims"), arising out of or in any way related to this Agreement, excepting only liability arising out of Depositary Bank's gross negligence or willful misconduct.  Without regard to Company's indemnification obligations to Depositary Bank, Agent agrees to defend, indemnify hold Depositary Bank harmless from and against any and all Claims arising out of Depositary Bank's compliance with Agent's instructions.  Agent's obligations to Depositary Bank hereunder shall in no way operate to release Company from its obligations to Agent and shall not impair

any rights or remedies of Agent to collect any such amounts from Company.  IN NO EVENT WILL DEPOSITARY BANK BE LIABLE FOR ANY INDIRECT DAMAGES, LOST PROFITS, SPECIAL, PUNITIVE, OR CONSEQUENTIAL DAMAGES WHICH ARISE OUT OF OR IN CONNECTION WITH THE SERVICES CONTEMPLATED BY THIS AGREEMENT EVEN IF DEPOSITARY BANK HAS BEEN INFORMED OF THE POSSIBILITY OF SUCH DAMAGES.

7.      **Depositary's Bank's Responsibility**.  The duties of Depositary Bank are strictly limited to those set forth in this Agreement and Depositary Bank is not acting as a fiduciary for any party hereto. Depositary Bank shall be protected in relying on any form of instruction, notice, or other communication purporting to be from an authorized representative of Agent which Depositary Bank, in good faith, believes to be genuine and what it purports to be.  Depositary Bank shall have no duty to inquire as to the genuineness, validity, or enforceability of any such instruction, notice or communication even if Company notifies Depositary Bank that Agent is not legally entitled to originate any such instruction, notice or communication.  The Deposit Account and all actions and undertakings by Depositary Bank shall be subject to all rules and regulations relating to the Deposit Account and to applicable law.  If requested by Agent, Company authorizes Depositary Bank to provide to Agent a copy of the Deposit Account statement.

8.      **Termination**.  This Agreement shall not be terminable by Company so long as any obligations of Company to Agent are outstanding and unpaid.  This Agreement may be terminated by Depositary Bank upon sixty (60) days' prior written notice to all parties; provided, however that Depositary Bank may terminate this Agreement upon ten (10) days' prior written notice in the event Agent fails to make payments to Depositary Bank in accordance with Section 5 above and the Agent fails to remedy such failure by the end of such ten (10)-day period.  This Agreement may be terminated by Agent in a writing sent to Depositary Bank in which Agent releases Depositary Bank from any further obligation to comply with instructions originated by Agent with respect to the Deposit Account.  Any available funds remaining in the Deposit Account upon termination or deposited in thereafter shall be transferred in accordance with the provisions of Section 4 above after deduction for any amounts otherwise reimbursable to Depositary Bank as provided hereunder.  Termination shall not affect the rights and obligations of any party hereto with respect to any period prior to such termination.

9.      **Legal Process and Insolvency**.  In the event Depositary Bank receives any form of legal process concerning the Deposit Account, including, without limitation, court orders, levies, garnishments, attachments, and writs of execution, or in the event Depositary Bank learns of any insolvency proceeding concerning Company, including, without limitation, bankruptcy, receivership, and assignment for the benefit of creditors, Depositary Bank will respond to such legal process or knowledge of insolvency in the normal course or as required by law.

10.     **Governing Law**.  This Agreement shall be governed by and construed in accordance with the laws of the State of New York.  For purposes of Section 9-304 of the Uniform Commercial Code, the State of New York shall be deemed to be the jurisdiction of Depositary Bank.

11.     **Notices**.  Except as otherwise provided in this Agreement, all notices and other communications required under this Agreement shall be in writing and may be personally served or sent by facsimile, overnight courier, or registered/certified United States Mail, and shall be deemed given when delivered in person, or received by facsimile, courier or United States Mail at the address specified below.  Any party may change its address for notices hereunder by notice to all other parties given in accordance with this Section 11.

|  |  |  |
|---|---|---|
| Company: | Rawhide Mining LLC | |
| | 143 Keddie St. | |
| | Fallon, NV 89406 | |
| | Attention: | Don Deines |
| | Email: | don.deines@rawhidemine.com |
| | Telephone: | +1 775 945 1015 (x 108) |

Agent:                    Silverpeak Credit Partners, LP
                          40 West 57th Street - 29th Floor
                          New York, NY 10019
                          Email:       trading@Silverpeak.com
                          Telephone:   +1 212 716 2000

Depositary Bank:          U.S. Bank National Association

                          _____

                          Attn:_____
                          Facsimile:_____
                          Telephone:_____

12.    **Miscellaneous**.   This Agreement shall bind and benefit the parties and their respective successors and assigns.  This Agreement may be amended only with the prior written consent of all parties hereto.  None of the terms of this Agreement may be waived except as Depositary Bank may consent thereto in writing.  No delay on the part of Depositary Bank in exercising any right, power or privilege hereunder shall operate as a waiver hereof, nor shall any single or partial exercise of any right, power or privilege hereunder preclude other or further exercise thereof or the exercise of any right, power or privilege.  The rights and remedies specified herein are cumulative and are not exclusive of any rights or remedies which Depositary Bank would otherwise have.

13.    **Counterparts**.  This Agreement may be executed in any number of counterparts and by the different parties hereto in separate counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument.  Any counterpart delivered by facsimile, PDF, or other electronic means shall have the same import and effect as original counterparts and shall be valid, enforceable and binding for the purposes of this Agreement.

14.    **Jury Trial Waiver**.  COMPANY, AGENT AND DEPOSITARY BANK EACH HEREBY WAIVES ALL RIGHTS TO TRIAL BY JURY IN ANY JUDICIAL PROCEEDING ARISING OUT OF, OR RELATING TO, THIS AGREEMENT OR SERVICES RENDERED IN CONNECTION WITH THIS AGREEMENT.

RAWHIDE MINING LLC
COMPANY

By: _____
Name: _____
Title: _____

SILVERPEAK CREDIT PARTNERS, LP
AGENT

By: _____
Name: _____
Title: _____

U.S. BANK NATIONAL ASSOCIATION
DEPOSITARY BANK

By: _____
Name: _____
Title: _____

Exhibit H-5

**ANNEX I**

## Existing Permitted Indebtedness

|  |  | Closing Date Balance |
|---|---|---|
| 1. | Toyota Financial Services auto loans secured by (i) 2017 Toyota Van and (ii) Toyota Tundra ............................................................................ | USD 38,442 |
| 2. | Kimball Equipment Co. equipment loan......................................................... | USD 231,283 |
| | **TOTAL:** | **USD 269,725** |

**ANNEX II**

## Existing Permitted Investments

Rawhide Mining owns **1,734,285.7** shares of common stock in Emgold Mining Corporation, a British Columbia company ("**EmGold**"), which, as of the Closing Date,  (i) represent approximately **5.60%** of the undiluted shares of EmGold and  (ii) have an aggregate fair market value of approximately **USD 84,349**.

**ANNEX III**

## Rawhide Mining Subsidiaries

None.

**SCHEDULE 2.1**

### Advance Amounts; Wire Instructions

---

#### Advance Amounts

| Lender | Advance Amount |
| --- | --- |
| Silverpeak Credit Opportunities AIV LP | USD 10,055,500 |
| CEOF Holdings LP | USD 8,044,500 |

#### Wire Instructions

*(To be separately provided)*

*Loan and Security Agreement*
*Advance Amounts; Wire Instructions*

**SCHEDULE 5.3**

## Commercial Tort Claims

None.

SCHEDULE 5.12

## Real Property

1.    **Owned Fee Property**

See Exhibit A-1 attached hereto and incorporated herein by this reference.

2.    **Owned Unpatented Mining Claims**

| Claim Name | BLM Serial No. | Claim Name | BLM Serial No. |
|---|---|---|---|
| COORS # 5A | NMC97384 | DZ No.20 | NMC1010401 |
| COORS # 6A | NMC97385 | DZ No.21 | NMC1010402 |
| COORS # 7A | NMC97386 | DZ No.22 | NMC1010403 |
| COORS # 16A | NMC97395 | DZ No.23 | NMC1010404 |
| COORS # 23A | NMC97402 | DZ No.24 | NMC986592 |
| COORS # 24A | NMC97403 | DZ No.25 | NMC986593 |
| DIVIDE No. 5FA | NMC645684 | DZ No.26 | NMC986595 |
| DIVIDE 5B | NMC645670 | DZ No.27 | NMC986596 |
| DZ No.1 | NMC881619 | DZ No.28 | NMC986597 |
| DZ No.2 | NMC881620 | DZ No.29 | NMC986598 |
| DZ No.3 | NMC881621 | DZ No.30 | NMC986599 |
| DZ No.4 | NMC986594 | DZ No.31 | NMC986600 |
| DZ No.5 | NMC986577 | DZ No.32 | NMC986601 |
| DZ No.6 | NMC986578 | DZ No.33 | NMC986602 |
| DZ No.7 | NMC986579 | DZ No.34 | NMC986603 |
| DZ No.8 | NMC986580 | DZ No.35 | NMC986604 |
| DZ No.9 | NMC986581 | DZ No.36 | NMC986605 |
| DZ No.10 | NMC986582 | DZ No.37 | NMC986606 |
| DZ No.11 | NMC986583 | DZ No.38 | NMC986607 |
| DZ No.12 | NMC986584 | DZ No.39 | NMC986608 |
| DZ No.13 | NMC986585 | ENTITY # 1A | NMC570416 |
| DZ No.14 | NMC986586 | HILL # 22A | NMC97410 |
| DZ No.15 | NMC986587 | KDK # 5A | NMC824128 |
| DZ No.16 | NMC986588 | KDK # 6A | NMC824129 |
| DZ No.17 | NMC986589 | KDK # 7A | NMC824130 |
| DZ No.18 | NMC986590 | KDK # 10 | NMC824133 |
| DZ No.19 | NMC986591 | KDK # 11 | NMC824134 |

| Claim Name | BLM Serial No. | Claim Name | BLM Serial No. |
|---|---|---|---|
| KDK # 12 | NMC824135 | RH # 345 | NMC574088 |
| KDK # 13 | NMC824136 | RH # 346 | NMC574089 |
| KDK # 14 | NMC824137 | RH # 347 | NMC364963 |
| KDK # 15 | NMC824138 | RH # 348 | NMC364964 |
| KDK # 16 | NMC824139 | RH # 446 | NMC365041 |
| KDK # 17 | NMC824140 | SRG # 29A | NMC819914 |
| KDK # 18 | NMC824141 | SRG # 31A | NMC819915 |
| KDK # 19 | NMC824142 | SRG # 41A | NMC819922 |
| KDK # 20 | NMC824143 | SRG # 43A | NMC819923 |
| KDK # 21 | NMC824144 | SRG # 45A | NMC819924 |
| KDK # 22 | NMC824145 | SRG # 47A | NMC819925 |
| KDK # 23 | NMC824146 | SRG # 49A | NMC819926 |
| KDK # 24 | NMC824147 | SRG # 51A | NMC819927 |
| KDK # 25 | NMC824148 | SRG # 53A | NMC819928 |
| KDK # 27 | NMC824150 | SRG # 55A | NMC819929 |
| KDK # 37 | NMC824160 | SRG # 57A | NMC819930 |
| KDK # 38 | NMC824161 | SRG # 58 | NMC819931 |
| KDK # 39 | NMC824162 | SRG # 59 | NMC819932 |
| KDK # 40 | NMC824163 | SRG # 60 | NMC819933 |
| KDK # 41 | NMC824164 | SRG # 61 | NMC819934 |
| KDK # 42 | NMC824165 | SRG # 75 | NMC819948 |
| KDK # 43 | NMC824166 | SRG # 76 | NMC819949 |
| KDK # 44 | NMC824167 | SRG # 77 | NMC819950 |
| KDK # 45 | NMC824168 | SRG # 78 | NMC819951 |
| NUC # 1A | NMC908354 | SRG # 79 | NMC819952 |
| NUC # 2A | NMC908355 | WS # 11A | NMC337870 |
| NUC # 3A | NMC908356 | WS # 13A | NMC337872 |
| NUC # 4A | NMC908357 | WS # 15A | NMC337874 |
| RH # 222 | NMC248811 | WS # 17A | NMC337876 |
| RH # 223 | NMC248812 | WS # 19A | NMC337878 |
| RH # 224 | NMC248813 | WS # 71A | NMC337928 |
| RH # 225 | NMC248814 | WS # 73A | NMC337929 |
| RH # 341A | NMC364957 | WS # 74A | NMC337930 |
| RH # 342A | NMC364958 | WS # 75A | NMC337931 |
| RH # 343A | NMC364959 | WS # 76A | NMC337932 |
| RH # 344 | NMC574087 | SOB 1 | NMC1061306 |

| Claim Name | BLM Serial No. | Claim Name | BLM Serial No. |
|---|---|---|---|
| SOB 2 | NMC1061307 | Roundup #9 | NMC1103895 |
| SOB 3 | NMC1061308 | Roundup #10 | NMC1103896 |
| SOB 4 | NMC1061309 | Roundup #11 | NMC1103897 |
| SOB 5 | NMC1061310 | Roundup Frac #1 | NMC1103898 |
| SOB 6 | NMC1061311 | Roundup Frac #2 | NMC1103899 |
| SOB 7 | NMC1061312 | Roundup Frac #3 | NMC1103900 |
| SOB 8 | NMC1061313 | Roundup Frac #4 | NMC1103901 |
| SOB 9 | NMC1061314 | LPB #1 | NMC1109954 |
| SOB 10 | NMC1061315 | MS 70 | NMC570419 |
| SOB 11 | NMC1061316 | MS 71 | NMC570420 |
| SOB 12 | NMC1061317 | MS 72 | NMC570421 |
| SOB 13 | NMC1061318 | MS 73 | NMC570422 |
| SOB 14 | NMC1061319 | MS 74 | NMC570423 |
| SOB 15 | NMC1061320 | MS 75 | NMC570424 |
| SOB 16 | NMC1061321 | MS 76 | NMC570425 |
| SOB 17 | NMC1061322 | MS 77 | NMC570426 |
| SOB 18 | NMC1061323 | MS 78 | NMC570427 |
| SOB 19 | NMC1061324 | MS 79 | NMC570428 |
| SOB 20 | NMC1061325 | MS 80 | NMC570429 |
| SOB 21 | NMC1061326 | MS 81 | NMC570430 |
| SOB 22 | NMC1061327 | MS 82 | NMC570431 |
| SOB 23 | NMC1061328 | MS 83 | NMC570432 |
| SOB 24 | NMC1061329 | MS 84 | NMC570433 |
| SOB 25 | NMC1061330 | MS 85 | NMC570434 |
| SOB 26 | NMC1061331 | MS 86 | NMC570435 |
| SOB 27 | NMC1061332 | MS 87 | NMC570436 |
| SOB 28 | NMC1061333 | MS 88 | NMC570437 |
| Lariat Claim No 1 | NMC 1069327 | MS 89 | NMC570438 |
| Roundup #1 | NMC1103887 | MS 90 | NMC570439 |
| Roundup #2 | NMC1103888 | MS 91 | NMC570440 |
| Roundup #3 | NMC1103889 | MS 92 | NMC570441 |
| Roundup #4 | NMC1103890 | MS 93 | NMC570442 |
| Roundup #5 | NMC1103891 | MS 94 | NMC570443 |
| Roundup #6 | NMC1103892 | MS 95 | NMC570444 |
| Roundup #7 | NMC1103893 | MS 96 | NMC570445 |
| Roundup #8 | NMC1103894 | MS 97 | NMC570446 |

*Loan and Security Agreement*
*Real Property*

| Claim Name | BLM Serial No. | Claim Name | BLM Serial No. |
|---|---|---|---|
| MS 98 | NMC570447 | MS 134 | NMC570483 |
| MS 99 | NMC570448 | MS 135 | NMC570484 |
| MS 100 | NMC570449 | MS 136 | NMC570485 |
| MS 101 | NMC570450 | MS 137 | NMC570486 |
| MS 102 | NMC570451 | MS 138 | NMC570487 |
| MS 103 | NMC570452 | MS 139 | NMC570488 |
| MS 104 | NMC570453 | MS 140 | NMC570489 |
| MS 105 | NMC570454 | MS 141 | NMC570490 |
| MS 106 | NMC570455 | MS 142 | NMC570491 |
| MS 107 | NMC570456 | MS 143 | NMC570492 |
| MS 108 | NMC570457 | MS 144 | NMC570493 |
| MS 109 | NMC570458 | MS 145 | NMC570494 |
| MS 110 | NMC570459 | MS 146 | NMC570495 |
| MS 111 | NMC570460 | MS 147 | NMC570496 |
| MS 112 | NMC570461 | MS 148 | NMC570497 |
| MS 113 | NMC570462 | MS 149 | NMC570498 |
| MS 114 | NMC570463 | MS 150 | NMC570499 |
| MS 115 | NMC570464 | MS 152 | NMC570501 |
| MS 116 | NMC570465 | MS 153 | NMC570502 |
| MS 117 | NMC570466 | MS 154 | NMC570503 |
| MS 118 | NMC570467 | MS 155 | NMC570504 |
| MS 119 | NMC570468 | MS 156 | NMC570505 |
| MS 120 | NMC570469 | MS 157 | NMC570506 |
| MS 121 | NMC570470 | MS 158 | NMC570507 |
| MS 122 | NMC570471 | MS 159 | NMC570508 |
| MS 123 | NMC570472 | MS 175 | NMC570524 |
| MS 124 | NMC570473 | MS 176 | NMC570525 |
| MS 125 | NMC570474 | MS 177 | NMC570526 |
| MS 126 | NMC570475 | RH #194 | NMC248783 |
| MS 127 | NMC570476 | RH NO 195A | NMC248784 |
| MS 128 | NMC570477 | RH #196 | NMC248785 |
| MS 129 | NMC570478 | RH #198 | NMC248787 |
| MS 130 | NMC570479 | RH NO 197BA | NMC645682 |
| MS 131 | NMC570480 | HIM #1 | NMC709944 |
| MS 132 | NMC570481 | HIM #2 | NMC709945 |
| MS 133 | NMC570482 | HIM #7 | NMC709950 |

*Loan and Security Agreement*
*Real Property*

| Claim Name | BLM Serial No. | Claim Name | BLM Serial No. |
|---|---|---|---|
| HIM #8 | NMC709951 | BLACK EAGLE 10 | NMC825678 |
| HIM #9 | NMC709952 | RE 1 | NMC832165 |
| HIM #10 | NMC709953 | RE 2 | NMC832166 |
| HIM #13 | NMC709956 | RE 3 | NMC832167 |
| HIM #14 | NMC709957 | RE 4 | NMC832168 |
| HIM #15 | NMC709958 | RE 5 | NMC832169 |
| HIM #16 | NMC709959 | RE 6 | NMC832170 |
| HIM #19 | NMC709962 | RE 7 | NMC832171 |
| HIM #21 | NMC709964 | REGENT 12 | NMC860858 |
| ME #1A | NMC709978 | REGENT 13 | NMC860859 |
| ME #2A | NMC709979 | REGENT 14 | NMC860860 |
| ME #3A | NMC709980 | REGENT 15 | NMC860861 |
| ME #4A | NMC709981 | REGENT 16 | NMC860862 |
| ME #5A | NMC709982 | REGENT 17 | NMC860863 |
| ME #6A | NMC709983 | REGENT 18 | NMC860864 |
| ME #7A | NMC709984 | REGENT 19 | NMC860865 |
| ME #8A | NMC709985 | REGENT 20 | NMC860866 |
| REGENT 1 | NMC712871 | REGENT 21 | NMC860867 |
| REGENT 2 | NMC712872 | REGENT 22 | NMC860868 |
| REGENT 3 | NMC712873 | REGENT 23 | NMC860869 |
| REGENT 4 | NMC712874 | REGENT 24 | NMC860870 |
| REGENT 5 | NMC712875 | REGENT 25 | NMC860871 |
| REGENT 6 | NMC712876 | REGENT 26 | NMC860872 |
| REGENT 7 | NMC712877 | REGENT 27 | NMC860873 |
| REGENT 8 | NMC712878 | REGENT 28 | NMC860874 |
| REGENT 9 | NMC712879 | REGENT 29 | NMC860875 |
| REGENT #15 | NMC717579 | Rfrac 3 | NMC897673 |
| DAWN NO 2A | NMC723713 | R #10 | NMC897687 |
| DAWN NO 3A | NMC723714 | R #11 | NMC897688 |
| DAWN NO 4 | NMC723715 | R #12 | NMC897689 |
| DAWN NO 13 | NMC723724 | R #13 | NMC897690 |
| DAWN NO 17 | NMC723728 | R #14 | NMC897691 |
| DAWN NO 18 | NMC729836 | R #15 | NMC897692 |
| BLACK EAGLE 7 | NMC825675 | R #16 | NMC897693 |
| BLACK EAGLE 8 | NMC825676 | R #17 | NMC897694 |
| BLACK EAGLE 9 | NMC825677 | R #18 | NMC897695 |

*Loan and Security Agreement*
*Real Property*

| Claim Name | BLM Serial No. | Claim Name | BLM Serial No. |
|---|---|---|---|
| R #19 | NMC897696 | RPT-104 | NMC1046482 |
| R #20 | NMC897697 | RPT-105 | NMC1046483 |
| R #21 | NMC897698 | RPT-106 | NMC1046484 |
| R #22A | NMC897699 | RPT-107 | NMC1046485 |
| R #23 | NMC897700 | RPT-112 | NMC1046490 |
| R #24 | NMC897701 | RPT-113 | NMC1046491 |
| R #25 | NMC897702 | RPT-114 | NMC1046492 |
| R #26 | NMC897703 | RPT-115 | NMC1046493 |
| R #27 | NMC897704 | RPT-116 | NMC1046494 |
| R #28 | NMC897705 | RPT-117 | NMC1046495 |
| R #29 | NMC897706 | RPT-118 | NMC1046496 |
| R #30 | NMC897707 | RPT-120 | NMC1046497 |
| R #31 | NMC897708 | RPT-122 | NMC1046498 |
| R #32 | NMC897709 | RPT-124 | NMC1046499 |
| RPT-21 | NMC1046399 | RPT-125 | NMC1046500 |
| RPT-23 | NMC1046401 | RPT-126 | NMC1046501 |
| RPT-24 | NMC1046402 | RPT-128 | NMC1046503 |
| RPT-26 | NMC1046404 | RPT-129 | NMC1046504 |
| RPT-27 | NMC1046405 | RPT-130 | NMC1046505 |
| RPT-76 | NMC1046454 | RPT-131 | NMC1046506 |
| RPT-78 | NMC1046456 | RPT-132 | NMC1046507 |
| RPT-80 | NMC1046458 | RPT-133 | NMC1046508 |
| RPT-82 | NMC1046460 | RPT-134 | NMC1046509 |
| RPT-84 | NMC1046462 | RPT-139 | NMC1046514 |
| RPT-86 | NMC1046464 | RPT-140 | NMC1046515 |
| RPT-88 | NMC1046466 | RPT-141 | NMC1046516 |
| RPT-90 | NMC1046468 | RPT-142 | NMC1046517 |
| RPT-92 | NMC1046470 | RPT-143 | NMC1046518 |
| RPT-94 | NMC1046472 | RPT-144 | NMC1046519 |
| RPT-95 | NMC1046473 | RPT-145 | NMC1046520 |
| RPT-96 | NMC1046474 | RPT-146 | NMC1046521 |
| RPT-97 | NMC1046475 | RPT-147 | NMC1046522 |
| RPT-98 | NMC1046476 | RPT-148 | NMC1046523 |
| RPT-99 | NMC1046477 | RPT-149 | NMC1046524 |
| RPT-102 | NMC1046480 | RPT-150 | NMC1046525 |
| RPT-103 | NMC1046481 | RPT-151 | NMC1046526 |

*Loan and Security Agreement*
*Real Property*

| Claim Name | BLM Serial No. | Claim Name | BLM Serial No. |
|---|---|---|---|
| RPT-152 | NMC1046527 | RPT-77 | NMC1046455 |
| RPT-153 | NMC1046528 | RPT-79 | NMC1046457 |
| RPT-154 | NMC1046529 | RPT-81 | NMC1046459 |
| RPT-155 | NMC1046530 | RPT-83 | NMC1046461 |
| RPT-156 | NMC1046531 | RPT-85 | NMC1046463 |
| RPT-108 | NMC1046486 | RPT-87 | NMC1046465 |
| RPT-109 | NMC1046487 | RPT-89 | NMC1046467 |
| RPT-110 | NMC1046488 | RPT-91 | NMC1046469 |
| RPT-111 | NMC1046489 | RPT-93 | NMC1046471 |
| RPT-135 | NMC1046510 | Valley Girl #1 | NMC1180303 |
| RPT-136 | NMC1046511 | Valley Girl #2 | NMC1180304 |
| RPT-137 | NMC1046512 | | |
| RPT-138 | NMC1046513 | | |

3.    **Leased Real Property**

(a)    ***Leased Fee Property***

See Exhibit B-1, attached hereto and incorporated herein by this reference.

*Loan and Security Agreement*
*Real Property*

**(b)**  *Leased Unpatented Mining Claims*

| Claim Name | BLM Serial No. | Claim Name | BLM Serial No. |
|---|---|---|---|
| THEM-1 | NMC709986 | BLACK EAGLE 12 | NMC1040713 |
| THEM-2 | NMC709987 | BLACK EAGLE 13 | NMC1040714 |
| HER-1 | NMC709988 | BLACK EAGLE 14 | NMC1040715 |
| HER-2 | NMC709989 | BLACK EAGLE 15 | NMC1040716 |
| HER-3 | NMC709990 | BLACK EAGLE 16 | NMC1040717 |
| HER-4 | NMC709991 | EMG #1 | NMC1180294 |
| HER-5 | NMC709992 | EMG #2 | NMC1180295 |
| HER-6 | NMC709993 | EMG #3 | NMC1180296 |
| HER-7 | NMC709994 | EMG #4 | NMC1180297 |
| HER-8 | NMC709995 | EMG #5 | NMC1180298 |
| HER-9 | NMC709996 | EMG #6 | NMC1180299 |
| HER-13 | NMC709997 | EMG #7 | NMC1180300 |
| HER-14 | NMC709998 | EMG #8 | NMC1180301 |
| HER-15 | NMC709999 | EMG #9 | NMC1180302 |
| HER-16 | NMC710000 | | |
| HER-17 | NMC710001 | | |
| HER-18 | NMC710002 | | |
| HER-19 | NMC710003 | | |
| HER-22 | NMC710004 | | |
| HER-25 | NMC710007 | | |
| HER B | NMC716510 | | |
| HER D | NMC716512 | | |
| HER E | NMC716513 | | |
| HER-26 | NMC716521 | | |
| HER-27 | NMC716522 | | |
| HER-28 | NMC716523 | | |
| HER-29 | NMC716524 | | |
| HER-30 | NMC716525 | | |
| HER-31 | NMC716526 | | |
| BLACK EAGLE-3 | NMC825671 | | |
| BLACK EAGLE-4 | NMC825672 | | |
| BLACK EAGLE-5 | NMC825673 | | |
| BLACK EAGLE-6 | NMC825674 | | |
| BLACK EAGLE 11 | NMC1040712 | | |

*Loan and Security Agreement*
*Real Property*

**SCHEDULE 5.13**

## Existing Royalties

1.   The Royalty granted pursuant to the **Schedule 2** of the Purchase Agreement, dated June 8, 2013, by and between Pilot Gold (USA) Inc. (n/k/a Liberty Gold Corp.) and Rawhide Mining.

2.   The Royalty granted pursuant to the Mining Lease, dated as of June 25, 2010, by and between Waste Solutions and Recycling LLC, a Delaware limited liability company, and Rawhide Mining.

3.   The Royalty granted pursuant to the Mineral Lease and Option Agreement, dated June 1, 2013, between EMGOLD (U.S.) Corporation, a Nevada corporation, and Rawhide Mining, as heretofore amended.

**SCHEDULE 5.14**

## Certificated Vehicles

| Equip # | Year | Make / Model / Details | VIN # | Title |
|---|---|---|---|---|
| ER01 | 1999 | HALCO ERT TRAILER | 46YCP132XX1058896 | |
| LV43 | 1994 | FORD F350 4X4 Flatbed | 1FDKF38MOREA19689 | |
| LV53 | 1994 | FORD F350 4X4 Flatbed | 2FTHF36HIRCA42909 | |
| LV59 | 1997 | FORD F250 4X4 | 3FTHF26H7VMA01273 | |
| LV62 | 1997 | FORD EXPEDITION | 1FMFU18L6VLA30270 | LOST |
| LV63 | 1997 | FORD F250 4X4 | 3FTHF26H3VMA01254 | |
| LV69 | 2001 | FORD F350 4X4 CREW CAB | 3FTSW31S31MA65321 | |
| LV70 | 2002 | FORD F250 4X4 Super CAB | 1FTNX21S52EC41779 | |
| LV71 | 2003 | FORD F150 4X4 SUPER CAB | 2FTPX18L83CA73208 | |
| LV72 | 2002 | CHEVY K2500HD 4X4 UTIL TRK | 1GCHK29182E257109 | |
| LV77 | 2004 | FORD F350 AMBULANCE | 1FDWF36P14EC14689 | |
| LV78 | 2011 | TOYOTA TUNDRA 4X4 DOUBLE CAB | 5TFUM5F16BX016409 | |
| LV80 | 2012 | TOYOTA TUNDRA 4X4 DOUBLE CAB | 5TFUY5F19CX235211 | |
| LV81 | 2012 | TOYOTA TUNDRA 4X4 CREW MAX | 5TFDY5F15CX235996 | |
| LV82 | 2013 | TOYOTA TUNDRA 4X4 CREW MAX | 5TFDW5F19DX276591 | |
| LV85 | 2013 | FORD F250 4X4 SINGLE CAB | 1FTBF2B63DEA50808 | |
| LV86 | 2013 | FORD F250 4X4 SINGLE CAB | 1FTBF2B65DEA50809 | |
| LV87 | 2006 | CHEVY K2500HD 4X4 UTIL TRK | 1GCHK24U86E124017 | |
| LV88 | 2013 | GMC SIERRA K3500 1 TON 4X4 TRUCK | 1GD322CG8DF185540 | |
| LV89 | 2013 | TOYOTA TUNDRA 4X4 DOUBLE CAB | 5TFUW5F18DX303246 | |
| LV92 | 2014 | TOYOTA TUNDRA 4X4 | 5TFUW5F16EX345514 | |
| LV93 | 2014 | FORD F250 CREW CAB 4X4 | 1FT7W2B68EEA22249 | LOST |
| LV94 | 2014 | TOYOTA TUNDRA SINGLE CAB 4X4 | 5TFPW5F15EX373995 | |
| LV95 | 2014 | TOYOTA TUNDRA SINGLE CAB 4X4 | 5TFPW5F10EX374374 | |
| LV96 | 2011 | FORD F350 CREW CAB 4X4 | 1FD8W3H68BEA03886 | LOST |
| LV97 | 2012 | GMC SIERRA K2500 3/4 TON 4X4 TRUCK | 1GT120CG6CF203886 | |
| LV98 | 2016 | TOYOTA TUNDRA 4X4 CREW MAX | 5TFDW5F19GX532829 | Financed |
| LV100 | 2017 | TOYOTA SIENNA XLE | 5TDYZ3DC2HS827537 | Financed |
| DT01 | 2012 | SNAKE RIVER DUMP TRAILER | 5PTBD1226C1016342 | |

*Loan and Security Agreement*
*Certificated Vehicles*

**SCHEDULE 5.15**

## Intellectual Property

None.

**SCHEDULE 5.16**

## Environmental Matters

4.   In 2008, Rawhide Mining experienced an accidental release of process solution from the leachpad.    A spill report was filed with the State of Nevada at that time.

5.   In 2015, Rawhide Mining experienced an accidental release of process solution from the leachpad.    A spill report was filed with the State of Nevada at that time.

**SCHEDULE 5.19**

## Capitalization and Affiliates

Rawhide Mining owns **1,734,285.7** shares of common stock in Emgold Mining Corporation, a British Columbia company ("**EmGold**"), which, as of the Closing Date, (i) represent approximately **5.60%** of the undiluted shares of EmGold and (ii) have an aggregate fair market value of approximately **USD 84,349**.

SCHEDULE 7.21

## Material Contracts

1.  Sodium Cyanide Purchase Agreement effective November 5, 2010 between Rawhide Mining LLC and Cyanco Company, LLC, as amended by (i) First Amendment dated October 14, 2015, (ii) Second Amendment dated March 14, 2018, and (iii) Third Amendment dated April 23, 2018

    *Restriction*:    Prior written consent required for an assignment of the agreement which consent shall not be unreasonably withheld

2.  Mining Lease, dated June 25, 2010, by and between Waste Solutions and Recycling LLC, a Delaware limited liability company and Kennecott Rawhide Mining Company LLC (n/k/a Rawhide Mining LLC), a Delaware limited liability company

    *Restriction*:    Prior written consent required for an assignment of the agreement; encumbrance is permitted

3.  Mineral Lease and Option Agreement, dated June 1, 2013, by and between Emgold (U.S.) Corporation, a Nevada corporation and Rawhide Mining LLC

    *Restriction*:    None

4.  Purchase Agreement dated January 8, 2013 by and between Pilot Gold (USA) Inc., a Delaware corporation and Rawhide Mining LLC

    *Restriction*:    None

5.  Security Agreement and Promissory Note, dated (or to be dated) on or around January 4, 2019, between Caterpillar Financial Services Corporation and Rawhide Mining

    *Restriction*:    Assignment of the agreement is prohibited

# EXHIBIT 2

# EXHIBIT 2

EXECUTION COPY

**Silverpeak Credit Partners, LP**
40 West 57th Street - 29th Floor
New York, NY 10019

# FEE LETTER

<u>**STRICTLY CONFIDENTIAL**</u>

January 3, 2019

**Rawhide Mining LLC**                    **Rawhide Acquisition Holding LLC**
143 Keddie St.                            143 Keddie St.
Fallon, NV 89406                          Fallon, NV 89406

**Re:  Rawhide Mining LLC**
*Loan and Security Agreement dated as of January 3, 2019*

Ladies and Gentlemen:

Reference is made to the Loan and Security Agreement, dated as of January 3, 2019 (as amended, restated, supplemented or otherwise modified from time to time, the "**Loan Agreement**"), among Rawhide Mining LLC, a Delaware limited liability company ("**Rawhide Mining**"), the other Rawhide Subsidiaries from time to time parties thereto (such Rawhide Subsidiaries, collectively, and together with Rawhide Mining, the "**Borrowers**," and each, a "**Borrower**"), Rawhide Acquisition Holding LLC, a Delaware limited liability company (the "**Parent**"), the several financial institutions or entities from time to time party thereto, as "Lenders" thereunder (collectively, the "**Lenders**"), and Silverpeak Credit Partners, LP, as "Agent" thereunder (together with its successors and assigns, in such capacity, the "**Agent**," and, together with the Borrowers, the "**Parties**," and each, a "**Party**").  This letter agreement is the "Fee Letter" referred to in the Loan Agreement and sets forth our understanding and agreement as to certain fees and pricing terms related thereto.

1.    <u>**Definitions and Usage**</u>.  Capitalized terms used but not defined in this letter agreement have the meanings assigned to such terms under the Loan Agreement.  The rules of construction and usage set forth in <u>**Section 1.2**</u> (*Usage*) of the Loan Agreement shall apply to this letter agreement unless a contrary intention appears.

2.    <u>**Interest Rate**</u>.  For all purposes of Loan Agreement and the other Loan Documents, "<u>**Interest Rate**</u>" means a *per annum* rate equal to <u>**15.50%**</u>.

3.    <u>**Origination Fee**</u>.  The Borrowers, jointly and severally, agree to pay to the Agent (for the benefit of the Lenders, allocated *pro rata*, according to the amounts of their respective Advances), on the Closing Date, an "<u>**Origination Fee**</u>" in the amount of <u>**USD 678,750**</u> (<u>**3.75%**</u> of <u>**USD 18,100,000**</u>).

4.    **Administration Fee**.  The Borrowers, jointly and severally, agree to pay to the Agent a fee (the "**Administration Fee**") of **USD 15,000** *per annum*, which the Agent may retain for its own account. The Administration Fee shall be payable to the Agent on each Payment Date in an amount equal to:

(a)    in the case of the **first** Payment Date, (i) **USD 15,000** MULTIPLIED BY (ii) the number of days elapsed during the period from (and including) the Closing Date to (but excluding) such Payment Date DIVIDED BY (iii) **364**; and

(b)    in any case of any other Payment Date, **USD 3,750** (one-quarter of **USD 15,000**).

5.    **Additional Agreements and Acknowledgments**.  Each Borrower further acknowledges and agrees that:

(a)    *No Implied Obligation*.  This letter agreement shall not constitute or give rise to any obligation to provide any financing where there is otherwise no such obligation.

(b)    *Fees Non-Refundable, Etc.*  (i) The Origination Fee shall be fully-earned and fully-accrued on the Closing Date, (ii) neither the Origination Fee nor the Administration Fee shall be refundable (in whole or in part) for any reason, and (iii) the Origination Fee and the Administration Fee (A) shall be in addition to, and not in lieu of, any other fee, cost or expense payable pursuant to the Loan Agreement and the other Loan Documents (including, without limitation, reimbursement of the Agent's and the Lenders' reasonable out-of-pocket fees and expenses pursuant to **Section 11.11** (*Fees and Expenses*) of the Loan Agreement), (B) shall not be subject to counterclaim or setoff for, or be otherwise affected by, any claim or dispute that any Borrower or Affiliate thereof may have and (C) shall be made without deduction for any taxes, levies, imposts, duties, deductions, charges or withholdings imposed by any national, state or local taxing authority (or will be grossed up by the Borrowers for such amounts).

(c)    *Condition Precedent; Net Funding*.  Pursuant to **Section 4.2** (*Payment of Fees and Expenses*) of the Loan Agreement:

(i)    the payment in full of the Origination Fee by the Borrowers on the Closing Date shall be a condition precedent to the obligation of Lenders to make the Loan under the Loan Agreement; and

(ii)    the amount of the Origination Fee may be deducted from the amount advanced in respect of the Loan on the Closing Date.

(d)    *Loan Document; Secured Obligations*.  For all purposes of the Loan Agreement and the other Loan Documents referred to therein, (i) this letter agreement is a "Loan Document," and (ii) the obligations of the Borrowers under this letter agreement (including, without limitation, its obligation to pay the Origination Fee and the Administration Fee, in full, when the same become due in accordance with the terms of this letter agreement) are "Secured Obligations."

(e)    *Non-Payment a Default*.  Subject to the proviso to **Section 9.1(a)** (*Failure to Pay*) of the Loan Agreement, a failure to pay the Origination Fee and the Administration Fee when due in accordance with the terms of this letter agreement shall constitute an "Event of Default" for all purposes of the Loan Agreement and the other Loan Documents.

*Fee Letter*

**6.** **No Other Consideration**.  It is acknowledged and understood that neither the Agent nor any Lender (nor any of their affiliates) is receiving (or will, at any time, receive) pecuniary compensation from the Borrowers with respect to the Loan (or any portion thereof), outside the terms contained in this letter agreement, the Loan Agreement and the other Loan Documents.  For the avoidance of doubt, this **Section 6** shall not apply with respect to any refinancing of the Loan.

**7.** **General Provisions**.

(a) ***Amendments and Waivers***.  This letter agreement may not be amended, nor any provision hereof waived or modified, except by an instrument in writing signed by the Borrowers, the Agent and the Lenders.

(b) ***Conflicts***.  In the event of any conflict or inconsistency between the provisions of this letter agreement and the provisions of the Loan Agreement, the provisions of this letter agreement shall govern and control.

(c) ***Counterparts***.  This letter agreement may be executed in any number of counterparts and by different Parties in separate counterparts, each of which when so executed shall be deemed to be an original and all of which when taken together shall constitute one and the same agreement.

(d) ***Joinder***.  Each Rawhide Subsidiary from time to time becoming a party to the Loan Agreement pursuant to a Joinder Agreement shall be deemed to become a party to this letter agreement and shall be bound by the terms and conditions hereof.

(e) ***Successors and Assigns***.  No Borrower may assign, transfer, pledge, participate or otherwise convey any of its rights or obligations under this letter agreement, and any actual or purported assignment, transfer, pledge, participation or other conveyance by any Borrower of any of its rights or obligations under this letter agreement shall be null and void *ab initio* and of no force or effect. This letter agreement shall inure to the benefit of the Lenders from time to time party to the Loan Agreement and the Agent.  The rights and obligations of the Lenders and the Agent under this letter agreement may be assigned, transferred, pledged, participated or otherwise conveyed to the same extent that the Lenders and the Agent may assign, transfer, pledge, participate or otherwise convey their respective rights and obligations under the Loan Agreement.

(f) ***Governing Law***.  **THIS LETTER AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REFERENCE TO ITS CONFLICTS OF LAW PROVISIONS (OTHER THAN SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW).**

(g) ***Integration***.  This letter agreement, taken together with the Loan Agreement and the other Loan Documents, contains the final and complete integration of all prior expressions by the Parties with respect to the subject matter hereof and shall constitute the entire agreement among the Parties with respect to the subject matter hereof, superseding all prior oral or written understandings.

(h) ***Severability***.  Each provision of this letter agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this letter agreement

*Fee Letter*

shall be prohibited by or be invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this letter agreement.

Please indicate your acceptance of this letter agreement by signing and returning the duplicate copy hereof, whereupon this letter agreement will constitute a binding agreement between the Parties.

**[SIGNATURE PAGES FOLLOW]**

4

*Fee Letter*

Very truly yours,

**SILVERPEAK CREDIT PARTNERS, LP**
As Agent

By: _____
    Name:  Vaibhav Kumar
    Title:   Portfolio Manager

*Acknowledged, accepted and agreed*
*as of the date first written above:*

**RAWHIDE MINING LLC**

By:  _____

     Name:   Donald M. Deines
     Title:    President & Chief Executive Officer

**RAWHIDE ACQUISITION HOLDING LLC**

By:  _____

     Name:   Donald M. Deines
     Title:    President & Chief Executive Officer

# EXHIBIT 3

# EXHIBIT 3

# SUPPLEMENTAL AMENDMENT
## TO
# FEE LETTER

This **AMENDMENT NO. 2 TO FEE LETTER**, dated as of April 6, 2020 (this "**Amendment**"), is entered into by and among:

(a)  **RAWHIDE MINING LLC**, a Delaware limited liability company ("**Rawhide Mining**," and, together with the "Rawhide Subsidiaries" from time to time party to the Loan and Security Agreement referred to in **paragraph 1** under *Preliminary* Statements below, the "**Borrowers**," and each, a "**Borrower**");

(b)  **RAWHIDE ACQUISITION HOLDING LLC**, a Delaware limited liability company (the "**Parent**");

(c)  (1)  **SILVERPEAK CREDIT OPPORTUNITIES AIV LP**, a Delaware limited partnership; and

   (2)  **CEOF HOLDINGS LP**, a Delaware limited partnership,

as the "Lenders" under the Loan and Security Agreement (collectively, and together with the other "Lenders" from time to time party to the Loan and Security Agreement, the "**Lenders**," and each, a "**Lender**"); and

(d)  **SILVERPEAK CREDIT PARTNERS, LP**, a Delaware limited partnership ("**Silverpeak**"), as "Agent" (together with its successors and assigns, in such capacity, the "**Agent**," and, together with the Borrowers, the Parent and the Lenders, collectively, the "**Parties**," and each, a "**Party**") under the Loan and Security Agreement.

# PRELIMINARY STATEMENTS

1.  The Parties are party to the Loan and Security Agreement, dated as of January 3, 2019 (the "**Loan and Security Agreement**," pursuant to which the Lenders have made a term loan to the Borrowers in the aggregate principal amount of **USD 18,100,000** (the "**Loan**"), on the terms set forth therein.

2.  The Agent, Rawhide Mining and the Parent are party to the Fee Letter, dated as of January 3, 2019, as amended by the Amendment NO. 1 to Loan and Security Agreement, dated December 16, 2019 (the "**Fee Letter**"), which sets forth certain fees and pricing terms to the Loan.

**NOW, THEREFORE**, in consideration of the premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.  **Definitions and Usage.**  Capitalized terms used but not defined under *Preliminary* Statements above, or in the operative provisions of this Amendment, have the meanings assigned to such terms under the Loan and Security Agreement.  The rules of construction and usage set forth in **Section 1.2** (*Usage*) of the Loan and Security Agreement shall apply to this Amendment unless a contrary intention appears.

2.    **Amendments to the Existing Fee Letter**. Effective as of the date hereof:

(a)    The Existing Fee Letter is hereby amended by replacing paragraph (a) of **Section 4A** (*Amendment Fee*) with the following paragraph:

> (a)    There shall be fully-earned and accrued, as of the "Effective Date" (as defined in Amendment No. 1, dated as of December 19, 2019, to the Loan Agreement), a fee (the "Amendment Fee"), owed by the Borrowers to the Lenders, in the amount of USD 675,000.  The Borrowers, jointly and severally, agree to pay to the Agent (for the benefit of the Lenders, allocated *pro rata*, according to the amounts of their respective Advances), at the time, and in the manner, set forth in Section 4A(b), (c) and (d) below.

3.    **Ratification**.  The Borrowers and the Parent (collectively, the "**Representing Parties**," and each, a "**Representing Party**") each hereby (a) acknowledges that each of the Loan Documents remains in full force and effect and is hereby ratified and reaffirmed, (b) ratifies and reaffirms all of its payment and performance obligations, contingent or otherwise, under each of the Loan Documents to which it is a party (after giving effect hereto), and (c) to the extent that such Representing Party has granted liens on or security interests in any of its property pursuant to any Loan Document as security for, or otherwise guaranteed the Secured Obligations, ratifies and reaffirms such guarantee and grant of security interests and liens and confirms and agrees that such security interests and liens hereafter secure all of the Secured Obligations, as amended hereby.

4.    **Representations and Warranties.**  Each Representing Party hereby represents and warrants (which representations and warranties shall survive the execution and delivery of this Amendment) to the Agent and each Lender, as of the Effective Date, as follows:

(a)    ***Power and Authority; Due Authorization.***  Such Representing Party (i) has all necessary power, authority and legal right to execute, deliver and carry out the terms of this Amendment and each of the other Loan Documents, and (ii) has duly authorized by all necessary corporate or other action (A) the execution and delivery of this Amendment and (B) the performance of its obligations under this Amendment and the Amended Agreements, on the terms and conditions herein and therein provided.

(b)    ***Due Execution.***  Such Representing Party has duly executed and delivered this Amendment and each other Loan Document to which it is a party.

(c)    ***Binding Obligation.***  This Amendment constitutes the legal, valid and binding obligation of such Representing Party, enforceable against such Representing Party in accordance with its terms, except as such enforceability may be limited by bankruptcy or insolvency laws, or by general principles of equity (whether considered in a suit at law or in equity).

(d)    ***No Consents or Approvals.***  No consent, approval, authorization or order of, or filing, registration or qualification with, any Governmental Authority is required in connection with the execution, delivery or performance by such Representing Party of this Amendment (other than such as has been met or obtained and are in full force and effect).

5. **Miscellaneous**.

(a)    ***Amended Terms***.  On and after the Effective Date, each reference to the Fee Letter in any Loan Document (other than this Amendment) shall be deemed to refer to such agreement, as amended by this Amendment.

(b)    ***Execution in Counterparts; Severability; Integration***.  This Amendment may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which when taken together shall constitute one and the same agreement.  Delivery of an executed counterpart of a signature page to this Amendment by facsimile or by e-mail in portable document format (.pdf) shall be effective as delivery of a manually executed counterpart of this Amendment.  In case any provision in or obligation under this Amendment shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.  This Amendment, taken together with the other Loan Documents, contains the final and complete integration of all prior expressions by the Parties with respect to the subject matter hereof and shall constitute the entire agreement among the Parties with respect to the subject matter hereof, superseding all prior oral or written understandings.

(c)    ***Governing Law; Consent to Jurisdiction; Waiver of Objection to Venue***.  THIS AMENDMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REFERENCE TO ITS CONFLICTS OF LAW PROVISIONS (OTHER THAN SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW).  EACH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE NON-EXCLUSIVE JURISDICTION OF THE SUPREME COURT OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY AND OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AMENDMENT, THE LOAN AND SECURITY AGREEMENT OR ANY OTHER LOAN DOCUMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH NEW YORK STATE OR, TO THE EXTENT PERMITTED BY LAW, IN SUCH FEDERAL, COURT.  EACH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT IT MAY LEGALLY AND EFFECTIVELY DO SO, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AMENDMENT, THE LOAN AND SECURITY AGREEMENT OR ANY OTHER LOAN DOCUMENT IN ANY COURT REFERRED TO IN THIS SECTION 9(C).  EACH PARTY HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

(d)    ***Waiver of Jury Trial***.  TO THE EXTENT PERMITTED BY APPLICABLE LAW, EACH PARTY WAIVES ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE ARISING OUT OF, CONNECTED WITH, RELATED TO, OR INCIDENTAL TO THIS THIS AMENDMENT, THE LOAN AND SECURITY AGREEMENT, ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.  INSTEAD, ANY SUCH DISPUTE RESOLVED IN COURT WILL BE RESOLVED IN A BENCH TRIAL WITHOUT A JURY.

*Amendment No. 2 to Fee Agreement*

(e)    ***Transaction Document, Etc.***  This Amendment shall constitute a "Loan Document" under the terms of the Loan and Security Agreement.

**[SIGNATURE PAGES FOLLOW]**

*Amendment No. 2 to Fee Agreement*

**IN WITNESS WHEREOF**, the Parties have caused this Amendment to be executed by their respective officers thereunto duly authorized, as of the date first above written.

**RAWHIDE MINING LLC**
As Borrower

By: _____

    Name:   Donald M. Deines
    Title:    President & Chief Executive Officer

**RAWHIDE ACQUISITION HOLDING LLC**
As Parent

By: _____

      Name:    Donald M. Deines
      Title:     President & Chief Executive Officer

# EXHIBIT 4

# EXHIBIT 4

# PLEDGE AND SECURITY AGREEMENT

This **PLEDGE AND SECURITY AGREEMENT** (as amended, restated, supplemented or otherwise modified from time to time, this "**Agreement**"), dated as of January 3, 2019, is entered into by and between (i) **RAWHIDE ACQUISITION HOLDING LLC**, a Delaware limited liability company (the "**Pledgor**"), and (ii) **SILVERPEAK CREDIT PARTNERS, LP**, acting in its capacity as the "Agent" (together with its successors and assigns, in such capacity, the "**Agent**," and, together with the Pledgor, the "**Parties**," and each, a "**Party**") under the Loan Agreement (as defined under *Preliminary Statements* below).  This is the "Equity Pledge Agreement" referred to in the Loan Agreement.

# PRELIMINARY STATEMENTS

1.      Pursuant to the Loan and Security Agreement, dated as of January 3, 2019 (as amended, restated, supplemented or otherwise modified from time to time, the "**Loan Agreement**"), among Rawhide Mining LLC, a Delaware limited liability company ("**Rawhide Mining**"), the other "Rawhide Subsidiaries" from time to time party thereto (together with Rawhide Mining, collectively, the "**Borrowers**," and each, a "**Borrower**"), the Pledgor, the "Lenders" from time to time party thereto (collectively, the "**Lenders**," and each, a "**Lender**") and the Agent, the Lenders have agreed to provide a term loan (the "**Loan**") to the Borrowers, subject to the terms and conditions set forth therein.

2.      It is a condition precedent to the effectiveness of the Loan Agreement and the obligation of the Lenders to make advances to the Borrowers under the Loan that, *inter alia*, the Pledgor shall have executed and delivered this Agreement, and the Lenders would be unwilling to enter into the Loan Agreement or make advances thereunder without the benefit of this Agreement.

**NOW, THEREFORE**, in consideration of the foregoing premises, to induce the Agent and the Lenders to enter into the Loan Agreement and the other Loan Documents and to enter into the transactions contemplated thereunder, the Pledgor, intending to be legally bound, hereby agrees with the Agent as follows:

# ARTICLE 1
# DEFINITIONS AND USAGE

**Section 1.1      Definitions.**  Whenever used in this Agreement, the following terms, unless the context otherwise requires, shall have the following meanings:

"**Adverse Claim**" means an "adverse claim" within the meaning of Article 8 of the UCC.

"**Collateral**" has the meaning specified in **Section 2.1(a)** (*Granting Clause*) below.

"**Rawhide Equity Interest Certificates**" has the meaning specified in **Section 2.1(a)(ii)** below.

"**Rawhide Equity Interests**" has the meaning specified in **Section 2.1(a)(i)** below.

"**Rawhide Mining LLC Agreement**" means the Second Amended and Restated Limited Liability Company Agreement, dated as of March 2, 2012, of Rawhide Mining, as amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Relevant Documents**" means, collectively, (a) the Rawhide Mining LLC Agreement, (b) all other Organizational Documents of Rawhide Mining and (c) any other agreements or documents relating to the Rawhide Equity Interests or any other Collateral, as any of the foregoing may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Representatives**" means, with respect to any Person, each of (and "**Representative**" means any of) its directors, employees, officers, partners and managers.

"**Secured Obligations**" has the meaning set forth in **Section 2.1(b)** (*Secured Obligations*) below.

"**Secured Parties**" means, collectively, the Agent and each Lender from time to time party to the Loan Agreement.

"**UCC**" means the Uniform Commercial Code as in effect, from time to time, in the State of New York; **provided**, **however**, **that**, if perfection or the effect of perfection or non-perfection or the priority of any security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, "UCC" means the Uniform Commercial Code as in effect from time to time in such other jurisdiction for purposes of the provisions of this Agreement relating to such perfection, effect of perfection or non-perfection or priority.

    **Section 1.2**    **Other Defined Terms.**  Any other capitalized terms used but not defined in this Agreement, have the meanings assigned to such terms under the Loan Agreement.

    **Section 1.3**    **Usage.**  The rules of construction and usage set forth in **Section 1.2** (*Usage*) of the Loan Agreement shall apply to this Agreement unless a contrary intention appears.

# ARTICLE 2
# SECURITY INTEREST

    **Section 2.1**    **Pledge and Grant of Security Interest.**

    (a)    *Granting Clause.*  The Pledgor hereby irrevocably grants, pledges and assigns a continuing first priority lien on, and security interest in, and, as a part of such grant, pledge and assignment, hereby assigns to the Agent as collateral security, all of the Pledgor's right, title and interest in, to and under the following property, whether now owned by Pledgor or hereafter acquired, whether now existing or hereafter coming into existence, and wherever located, all of the property described in the following **clauses (i)** through **(vi)** of this **Section 2.1(a)** (collectively, the "**Collateral**"):

        (i)    its **100.00%** membership interests (and any and all other Equity Interests) in Rawhide Mining (the "**Rawhide Equity Interests**");

*Equity Pledge Agreement*

(ii)    any certificate or other document of title (if any) from time to time representing, constituting or otherwise relating to the Rawhide Equity Interests, whether in existence on the date of this Agreement or coming into existence at any time thereafter (any of the foregoing, "**Rawhide Equity Interest Certificates**");

(iii)    all ownership interests, membership interests, shares, securities, moneys, instruments or property representing a dividend, a distribution or return of capital upon or in respect of the Rawhide Equity Interests, or otherwise received in exchange therefor, and any warrants, rights or options issued to the holders of, or otherwise in respect of, the Rawhide Equity Interests;

(iv)    all rights of the Pledgor under the Relevant Documents, or any other agreement or instrument relating to the Rawhide Equity Interests, including, without limitation, (A) all rights of the Pledgor to receive moneys or distributions with respect to the Rawhide Equity Interests due and to become due under or pursuant to the Relevant Documents, (B) all rights of the Pledgor to receive proceeds of any insurance, indemnity, warranty or guaranty with respect to the Rawhide Equity Interests, (C) all claims of the Pledgor for damages arising out of or for breach of or default under a Relevant Document, and (D) any right of the Pledgor to perform thereunder and to compel performance and otherwise exercise all rights and remedies thereunder;

(v)    to the extent related to any of the property of the Pledgor described in the foregoing **clauses (i)** through **(iv)** of this **Section 2.1(a)**, (A) all books, records correspondence, credit files, records, invoices and other papers and (B) all present and future claims, demands, causes and choses in action; and

(vi)    all proceeds (as defined in the UCC) of the property of the Pledgor described in the foregoing **clauses (i)** through **(v)** of this **Section 2.1(a)**.

(b)    ***Secured Obligations***.    The grant pursuant to this **Section 2.1** is made as continuing collateral security for all of the obligations described in the following **clauses (i)** and **(ii)** of this **Section 2.1(b)** (collectively, the "**Secured Obligations**"):

(i)    the prompt payment in full in cash when due, and not merely the collection, of all "Secured Obligations" (as defined in the Loan Agreement); and

(ii)    payment of any amount that arises, accrues or becomes due after the commencement of an Insolvency Proceeding by, or against, Rawhide Mining or the Pledgor, even if the obligation to make such payment does not accrue, or is not allowed or allowable, as a result of the automatic stay under Section 362 of the Bankruptcy Code or otherwise.

**Section 2.2    Security Agreement.**    This Agreement shall be deemed to constitute a security agreement under the UCC.

*Equity Pledge Agreement*

**Section 2.3** **Security Interest Absolute.** All rights of the Agent, the security interest granted under this Agreement, and all of the obligations of the Pledgor under this Agreement, shall be absolute and unconditional, irrespective of:

      (i)    any lack of validity or enforceability of the Loan Agreement or any other Loan Document;

      (ii)    any change in any term of all or any of the obligations of the Borrowers under the Loan Agreement or any other Loan Document, or any other amendment or waiver of or any consent to any departure from any provision of the Loan Agreement or any other Loan Document;

      (iii)    any failure by the Secured Parties to enforce the provisions of the Loan Documents (and the Secured Parties shall be under no obligation whatsoever to proceed against the Borrowers or any other Person prior to the exercise of its rights and remedies under this Agreement); or

      (iv)    any other circumstance that might otherwise constitute a defense available to, or a discharge of, the Borrowers (other than the full, final and indefeasible payment and performance of the Secured Obligations).

**Section 2.4** **Pledgor Remains Liable.** Notwithstanding anything to the contrary in this Agreement or any other Loan Document, (a) the Pledgor shall remain liable under the contracts and agreements included in the Collateral to the extent set forth therein to perform all of its duties and obligations thereunder to the same extent as if this Agreement had not been executed, (b) the exercise by the Agent of any of the rights under this Agreement shall not release the Pledgor from any of its duties or obligations under the contracts and agreements included in the Collateral and (c) no Secured Party shall have any obligation or liability under the contracts and agreements included in the Collateral by reason of this Agreement or any other Loan Document, nor shall any Secured Party be obligated to perform any of the obligations or duties of the Pledgor thereunder or to take any action to collect or enforce any claim for payment assigned hereunder.

# ARTICLE 3
# PERFECTION AND FURTHER ASSURANCES

**Section 3.1** **Protection of Security Interest.** The Pledgor agrees that from time to time, at its expense, it will promptly execute and deliver all instruments and documents, and take all actions, that may reasonably be necessary or desirable, or that the Agent may deem necessary or desirable, to (a) perfect, protect or more fully evidence the pledge of the Collateral to the Agent pursuant to **Section 2.1** (*Pledge and Grant of Security Interest*) above, and (b) enable the Agent and the Secured Parties to exercise and enforce their rights and remedies under this Agreement and the Collateral.

**Section 3.2**       **Obligation to File Financing Statements**.  Without limiting the generality of **Section 3.1** (*Protection of Security Interest*) above:

(a)      ***Closing Date Filings***.   On or prior to the Closing Date, the Pledgor shall have filed or caused to be filed a UCC-1 financing statement, naming the Pledgor as the "Debtor" and the Agent, for the benefit of the Secured Parties, as the "Secured Party," and describing the Collateral (or all property and assets of the Pledgor) as the collateral covered thereby, with the office of the Secretary of State of the State of Delaware.

(b)      ***Post-Closing Filing Obligations***.   From time to time after the Closing Date, the Pledgor shall file, or cause to be filed, such financing statements and continuation statements, in such manner and in such places as may be required by applicable law, or deemed reasonably necessary or desirable by the Agent, in order to effect, reflect, perfect, preserve, maintain and protect the security interests granted or purported to be granted by the Pledgor under this Agreement.

(c)      ***Delivery of Filed Copies***.  The Pledgor shall deliver (or cause to be delivered) to the Agent file-stamped copies of, or filing receipts for, any document filed by the Pledgor as required under this **Section 3.2**, as soon as available following such filing.

**Section 3.3**       **Participation in Actions**.  The Pledgor shall, from time to time at the request of the Agent, appear in and defend any action or proceeding that may affect the Pledgor's title to, or the Agent's security interest in, all or any part of the Collateral.

**Section 3.4**       **Authorization to File Financing Statements**.

(a)      ***Authorization***.  The Pledgor hereby authorizes the Agent and its Representatives to file all financing statements, continuation statements or other instrument required to be filed, naming the Pledgor as debtor that are necessary or advisable to perfect, make effective or continue the grant and pledge under **Section 2.1** (*Pledge and Grant of Security Interest*) above of this Agreement, and authorizes the Agent and its Representatives to take any such action without its signature.

(b)      ***All Assets Filings***.  Without limiting the generality of **Section 3.4(a)** (*Authorization*) above, the Pledgor expressly authorizes the Agent, if it so elects, to file financing statements describing the collateral covered thereby as "all of the Debtor's right, title and interest in and to all assets and rights of the Debtor, and all personal property of the Debtor, in each case wherever located and whether now owned or hereafter acquired or arising" or other words to that effect.

(c)      ***Authorization Not an Obligation***.   The rights provided to the Agent under this **Section 3.4** shall not create any duty or obligation on the part of the Agent or relieve the Pledgor of its obligations under **Section 3.1** (*Protection of Security Interest*) or **3.2** (*Obligation to File Financing Statements*) above.

**Section 3.5**       **Delivery of Collateral**.

(a)      ***Delivery of Certificates and Instruments***.  All certificates or instruments representing or evidencing the Collateral, if any, shall be delivered to and held by or on behalf of the Agent for the benefit of the Secured Parties pursuant to this Agreement and shall be in suitable form for transfer by

delivery or, as applicable, shall be accompanied by the Pledgor's endorsement, where necessary, and duly-executed instruments of transfer or assignment in blank, all in form and substance satisfactory to the Agent.

(b)    ***Equity Interest Certificates***.  Without limiting the generality of **Section 3.5(a)** (*Delivery of Certificates and Instruments*) above, or limiting, in any respect, the obligations of the Pledgor under **Section 4.2(b)** (*No Certificates*) below, on the Closing Date, and, for so long as any Secured Obligations remain outstanding (and without limiting the obligations of the Pledgor under **Section 4.2(b)** (*No Certificates*) below), by no later than the **second** Business Day following the creation of any Rawhide Equity Interest Certificate with respect to any Rawhide Equity Interests, the Pledgor shall deliver, or cause to be delivered, to the Agent:

(i)    the original of such Rawhide Equity Interest Certificate; and

(ii)    a blank, signed and undated equity interest power or transfer, as applicable, in form and substance satisfactory to the Agent.

### Section 3.6    **Certain Rights Following Event of Default**.

(a)    ***Exchange and Transfer***.  At all times after the Maturity Date (unless the full, final and indefeasible payment and performance of the Secured Obligations shall have occurred on such date), and at all times following the occurrence and during the continuation of an Event of Default, the Agent shall have the right to (i) exchange certificates or instruments representing or evidencing Collateral (including, without limitation, any Rawhide Equity Interest Certificates) for certificates or instruments of smaller or larger denominations and (ii) transfer to, or to register in the name of, the Agent or any of its nominees or transferees any or all of the Rawhide Equity Interests or any other Collateral.

(b)    ***Registered Owner***.  Immediately upon being so directed in writing by the Agent at any time after the Maturity Date (unless the full, final and indefeasible payment and performance of the Secured Obligations shall have occurred on such date) or following the occurrence and during the continuation of an Event of Default, the Pledgor shall (i) cause the Agent to be the registered owner of (A) all Rawhide Equity Interests and (B) any other Collateral that constitutes an "uncertificated security" (as defined in the UCC) and (ii) promptly execute and deliver all such proxies, dividend payment orders and other instruments as Agent may request in connection with the exercise of its rights, remedies and privileges under this Agreement.

# ARTICLE 4
# REPRESENTATIONS, WARRANTIES AND COVENANTS

### Section 4.1    **Representations and Warranties**.  The Pledgor represents and warrants (which representations and warranties shall survive the execution and delivery of this Agreement) to each Secured Party, as of the Closing Date, that:

(a)    ***Good Title, Etc.***  (i) The Pledgor (A) is the direct, legal, registered and beneficial owners of, and retains the exclusive power to exercise all voting and other control rights with respect to, all of the Rawhide Equity Interests, and (B) is the legal and beneficial owner of all other Collateral, (ii) other than

the grant and pledge to the Agent pursuant to **Section 2.1** (*Pledge and Grant of Security Interest*) above, none of the Collateral is subject, in whole or in part, to any (A) Lien, (B) Adverse Claim, (C) right of set-off, (D) agreement by the Pledgor to sell, assign, convey, transfer, lease, participate or dispose of any such Collateral or (E) prior sale, assignment, conveyance, transfer, lease, participation or disposition by the Pledgor, (iii) the Pledgor has not authorized the filing of, and is not aware of, any financing statement against the Pledgor that includes a description of collateral covering all or any portion of the Collateral other than any financing statements relating to the grant and pledge to the Agent pursuant to **Section 2.1** (*Pledge and Grant of Security Interest*) above, and (iv) the Pledgor is not aware of any judgment or tax lien filings against the Pledgor or any of its property or assets.

(b)    ***No Certificates***.  No Rawhide Equity Interest Certificates have been issued.

(c)    ***Organizational Documents***.  (i) True, correct and complete copies of the Rawhide Mining LLC Agreement and all other Organizational Documents of Rawhide Mining (including, in each case, any amendments, restatements, supplements, replacements, supersessions, terminations, waivers or other modifications thereto or thereof) have been provided to the Agent, (ii) the execution, delivery and performance of the Rawhide Mining LLC Agreement by the Pledgor has been duly authorized by all necessary limited liability company action on the part of the Pledgor, (iii) the Rawhide Mining LLC Agreement (A) is in full force and effect, (B) has been duly executed and delivered for good and valuable consideration by the Pledgor and (C) constitutes the legal, valid and binding obligation of the Pledgor, enforceable against the Pledgor in accordance with its terms, subject to bankruptcy, insolvency, and other limitations on creditors' rights generally and to equitable principles, (iv) the Pledgor, Rawhide Mining and their respective Affiliates are in compliance in all material respects with all representations, warranties, covenants, agreements, terms, conditions, restrictions and other provisions applicable to such Person under the Rawhide Mining LLC Agreement, and (v) neither the execution and delivery of the Rawhide Mining LLC Agreement by the Pledgor, nor the compliance with the representations, warranties, covenants, agreements, terms, conditions, restrictions and other provisions of the Rawhide Mining LLC Agreement by the Pledgor or by Rawhide Mining, (A) shall have conflicted with, or will conflict with, or shall have resulted in, or will result in, a breach of, the Organizational Documents of the Pledgor or Rawhide Mining, (B) shall have conflicted with, or will conflict with, any applicable law, (C) shall have resulted in, or will result in, (1) a breach or violation of any of the terms, conditions or provisions of any judgment or order, writ, injunction, decree or demand of any Governmental Authority applicable to the Pledgor or Rawhide Mining, as the case may be, or (2) the creation or imposition of any Lien or other encumbrance upon any of the assets of the Pledgor or Rawhide Mining, as the case may be, or (D) shall have violated or conflicted with, or will violate or conflict with, any contractual provisions of, or shall have caused, or will cause, an event of default under, any indenture, loan agreement, mortgage, contract or other material agreement to which the Pledgor or Rawhide Mining, as the case may be, is a party or by which it may be bound.

(d)    ***Location***.  As of the date of this Agreement, the chief executive office (for purposes of the UCC) and principal place of business of the Pledgor are located at 143 Keddie Street, Fallon, NV 89406.

(e)    ***Jurisdiction***.  The Pledgor is duly organized as a Delaware limited liability company and is not organized under the laws of any other jurisdiction.

*Equity Pledge Agreement*

(f)      ***Legal Name.*** The full legal name of the Pledgor is as typed on the signature page of this Agreement.  The Pledgor does not utilize any trade names or other names under which it currently conducts business.

(g)      ***Changes in Circumstances.***   Since the date of its formation, the Pledgor has not (i) changed its jurisdiction of formation, (ii) changed its name or (iii) become a "new debtor" (as defined in Section 9-102(a)(56) of the UCC).

(h)      ***Required Consents.***  Except as may be required in connection with the disposition of any portion of the Collateral by laws affecting the offering and sale of securities generally and such other actions, consents, notices or approvals of which the failure to obtain could not reasonably be expected to materially impair the rights and remedies of or the benefits available to the Agent and the other Secured Parties under this Agreement, no consent of any Person, and no license, permit, approval or authorization of, exemption by, notice or report to, or registration, filing (other than the filing of financing statements under the UCC in order to perfect a security interest in that portion of Collateral as to which the UCC requires such filing to be made in order to perfect a security interest therein) or declaration with any Governmental Authority is required in connection with (i) the execution, delivery or performance by, or enforceability against, the Pledgor of this Agreement, (ii) the perfection or maintenance of the grant and pledge pursuant to **Section 2.1** (*Pledge and Grant of Security Interest*) above (including the first-priority nature of the security interest created thereby) or (iii) the exercise by the Agent or any other Secured Party of the rights and remedies granted to it under this Agreement (including, without limitation, the voting and consensual rights provided for in **Section 5.2** (*Exercise of Rights Under Borrower Equity Assets*) below).

(i)      ***No Contractual Restrictions.***   Neither the grant and pledge pursuant to **Section 2.1** (*Pledge and Grant of Security Interest*) above nor the exercise by the Agent or any other Secured Party of its rights and remedies under this Agreement will violate any contractual restriction binding on or affecting the Pledgor or any of its property or assets (including, without limitation, the Rawhide Mining LLC Agreement).

(j)      ***Security Interest.***  (i) This Agreement creates a valid security interest in favor of the Agent in the Collateral, which security interest is prior to all other Liens and is enforceable as such as against creditors of and purchasers from Pledgor, (ii) upon the filing of a UCC financing statement describing the Collateral with the Secretary of State of the State of Delaware and, if applicable, the delivery of the Rawhide Equity Interest Certificate, and the related power or transfer, pursuant to **Section 3.5(b)** (*Equity Interest Certificates*) above, the Agent shall have a first priority perfected security interest in (A) the Rawhide Equity Interest Certificate, (B) all Rawhide Equity Interests, (C) all rights of the Pledgor or under the Rawhide Mining LLC Agreement and (D) if and to the extent that a security interest therein can be perfected by the filing of a financing statement under the UCC, all other Collateral and (iii) no other action is necessary to perfect the security interest of the Agent in the property and assets described in the foregoing clauses **(ii)(A)** through **(ii)(D)** of this **Section 4.1(j).**

**Section 4.2     Covenants.**  On and as of date of this Agreement, and at all times until the full, final and indefeasible payment and performance of the Secured Obligations:

(a)     ***Ownership of Collateral, Etc.***  (i) The Pledgor shall remain (A) the direct, legal, registered and beneficial owner of, and retain the exclusive power to exercise all voting and other control rights with respect to, all of the Rawhide Equity Interests, and (B) the legal and beneficial owners of all other Collateral, (ii) the Pledgor shall not sell, assign, convey, transfer, lease, participate or dispose of, or grant, create, incur or assume, or suffer, allow or permit to exist, any Lien, Adverse Claim or restriction on transferability in or on, any of its right, title or interest in, to or under any Collateral, and (iii) the Pledgor shall defend the right, title, and interest of the Pledgor, and of the Agent, for the benefit of the Secured Parties, in, to and under the Collateral against any and all such Liens, Adverse Claims and restrictions on transferability claiming through or under the Pledgor.

(b)     ***No Certificates.***  Except upon the prior written direction of the Agent, the Pledgor shall not, at any time, cause, direct or permit any Rawhide Equity Interest Certificates to be issued with respect to the Rawhide Equity Interests.

(c)     ***No Equity Issuance.***  The Pledgor shall not, at any time, cause, direct or permit any additional Rawhide Equity Interests to be issued.

(d)     ***Change of Identity, Etc.***  (i) The Pledgor shall not (A) change its name, identity, jurisdiction of organization or corporate structure in any manner that would or could render "seriously misleading" (within the meaning of Sections 9-506 and 9-507(c) of the UCC, or any similar or successor provision of the UCC) any financing statement or continuation statement filed pursuant to **Section 3.1** (*Protection of Security Interest*), **3.2** (*Obligation to File Financing Statements*) or **3.4** (*Authorization to File Financing Statements*) above that names the Pledgor as debtor or (B) relocate, re-domicile or otherwise change its jurisdiction of organization unless the Pledgor has given at least **30** days' written notice to the Agent and has taken all actions required under the UCC of each relevant jurisdiction in order to continue the first priority perfected security interest of the Agent in the Collateral.

(e)     ***Other Financing Statements.***  The Pledgor shall not file or authorize to be filed in any jurisdiction, any financing statement or like instrument with respect to the Collateral in which the Agent is not named as the sole secured party.

# ARTICLE 5
# REMEDIES

**Section 5.1     Remedies at Law.**  At all times on and after the Maturity Date (whether occurring pursuant to **Section 12.3** (*Acceleration*) of the Loan Agreement or at the Stated Maturity Date), and at all times following the occurrence and during the continuation of an Event of Default, unless the full, final and indefeasible payment and performance of the Secured Obligations shall have occurred, the Secured Parties shall have, in addition to all other rights and remedies under this Agreement, the Loan Agreement and the other Loan Documents, all other rights and remedies provided under the UCC of the applicable jurisdiction and other applicable laws, which rights shall be cumulative.

**Section 5.2**      **Exercise of Rights Under Borrower Equity Assets**.  Without limiting any other obligations of the Pledgor under this Agreement or any other Loan Document, the Pledgor confirms and agrees that, all times after the Maturity Date (unless the full, final and indefeasible payment and performance of the Secured Obligations shall have occurred on such date), and at all times following the occurrence and during the continuation of an Event of Default, the Agent (or any Representative or designee thereof), shall, at its option, and without the consent of the Pledgor, have the sole and exclusive right to exercise and enforce any and all voting, consensual and other rights and powers, and all other rights and remedies, of the Pledgor, under, or in respect of, the Rawhide Equity Interests, but without any obligation on the part of the Agent, the other Secured Parties or any of their respective Affiliates to perform any of the obligations of the Pledgor thereunder or with respect thereto, including, without limitation, (i) any voting, consent, corporate and other rights pertaining to the Rawhide Equity Interests at any meeting of equity holders or otherwise or in connection with any written consent of equity holders, and (ii) any right of conversion, exchange and subscription and any other right pertaining to the Rawhide Equity Interests as if it were the absolute owner thereof.

**Section 5.3**      **Liquidation of Collateral, Etc.**

(a)      At all times on and after the Maturity Date (whether occurring pursuant to **Section 12.3** (*Acceleration*) of the Loan Agreement or at the Stated Maturity Date), and at all times following the occurrence and during the continuation of an Event of Default, unless the full, final and indefeasible payment and performance of the Secured Obligations shall have occurred, the Agent, in addition to all other rights provided under this Agreement, the other Loan Documents and applicable law, shall have the right, in its own name and as agent for the Secured Parties, to immediately sell in a commercially reasonable manner, in a recognized market (if one exists) at such price or prices as the Agent may reasonably deem satisfactory, any or all of the Collateral and apply the proceeds thereof to the Secured Obligations.

(b)      The Parties recognize that it may not be possible to sell all of the Collateral on a particular Business Day, or in a transaction with the same purchaser, or in the same manner because the market for the assets constituting the Collateral may not be liquid.  Accordingly, the Agent may elect, in its sole and absolute discretion, the time and manner of liquidating any of the Collateral, and nothing contained in this Agreement or the other Loan Documents shall obligate the Agent to liquidate any of the Collateral on the Maturity Date or to liquidate all of the Collateral in the same manner or on the same Business Day.

(c)      At all times on and after the Maturity Date (whether occurring pursuant to **Section 12.3** (*Acceleration*) of the Loan Agreement or at the Stated Maturity Date), and at all times following the occurrence and during the continuation of an Event of Default, unless the full, final and indefeasible payment and performance of the Secured Obligations shall have occurred, the Agent and each Secured Party shall have, in addition to all the rights and remedies provided herein and provided by applicable federal, state, foreign, and local laws (including, without limitation, the rights and remedies of a secured party under the UCC of any applicable state, to the extent that the UCC is applicable, and the right to offset any mutual debt and claim), all rights and remedies available to the Agent or such Secured Party, as applicable, at law, in equity or under any other agreement between the Agent or such Secured Party, as applicable, and the Pledgor.

*Equity Pledge Agreement*

**Section 5.4** **Remedies Not Exclusive**.  Except as otherwise expressly provided in this Agreement or any other Loan Document, no remedy provided for by this Agreement or any other Loan Document shall be exclusive of any other remedy, each and every remedy shall be cumulative and in addition to any other remedy, and no delay or omission to exercise any right or remedy shall impair any such right or remedy or shall be deemed to be a waiver of any Event of Default.

# ARTICLE 6
# RIGHTS OF SECURED PARTIES

**Section 6.1** **Performance of Obligations; Advances by Agent**.

(a)    *Performance of Obligations*.  If the Pledgor shall have defaulted under, or failed to perform, observe or comply with, any of the representations, warranties, covenants, agreements, terms, conditions, restrictions and other provisions contained in this Agreement or any other Loan Document and applicable to the Pledgor, then, at any time (and from time to time), the Agent may (but shall not be obligated to), at its sole option and in its sole and absolute discretion, without notice to, or consent of, the Pledgor or any other Person, and in its own name or on behalf of the Pledgor, (i) in the case of a covenant, obligation or agreement, perform or cause to be performed the same, and (ii) take any and all other actions as the Agent may deem to be reasonably necessary or appropriate in order to correct such breach, default or failure, or the circumstances giving rise thereto.

(b)    *Advances by Agent*.  The Agent may expend such sums as the Agent may deem to be reasonably necessary or appropriate in the performance of any actions permitted to be taken by it under **Section 6.1(a)** (*Performance of Obligations*) above, including, without limitation, all expenditures that the Agent may make in connection with (i) taking any action on behalf of the Pledgor or Rawhide Mining under the Rawhide Mining LLC Agreement or otherwise in respect of the Borrower Equity Assets, (ii) the release of a Lien, (iii) defending against any Adverse Claim, (iv) the protection of the security granted under this Agreement or (v) compliance with applicable law in relation to any of the foregoing. All such sums and amounts so expended shall be repayable by the Pledgor promptly upon notice thereof and demand therefor, shall constitute additional Secured Obligations and shall bear interest from the date that said amounts are expended until the date that they are repaid by the Pledgor at the rate and in the manner set forth in **Section 2.7** (*Payments*) of the Loan Agreement.  The Agent may make any payment authorized under this **Section 6.1(b)** in accordance with any bill, statement or estimate, without inquiry into the accuracy of such bill, statement or estimate or into the validity of any tax assessment, sale, forfeiture, tax Lien, title or claim.

(c)    *Pledgor Remains Liable*.  No performance or other action by the Agent under **Section 6.1(a)** (*Performance of Obligations*) above, and no advance or expenditure by the Agent under **Section 6.1(b)** (*Advances by Agent*) above, shall relieve the Pledgor of any obligation, or result in any cure or waiver of any default or Event of Default, under the terms of this Agreement or any other Loan Documents.

*Equity Pledge Agreement*

### Section 6.2    Power of Attorney.

(a)    *__Grant__*.  In addition to other powers of attorney contained in this Agreement and the other Loan Documents, the Pledgor hereby designates and appoints the Agent, and each of its Representatives and nominees, as attorney-in-fact of the Pledgor, irrevocably and with power of substitution, and grants to the Agent, and to each of its Representatives and nominees, an irrevocable proxy, with authority to take any or all of the following actions:

(i)    to demand, collect, settle, compromise, adjust and give discharges and releases concerning the Collateral, all as the Agent may determine in respect of the Collateral;

(ii)    to commence and prosecute any actions at any court for the purposes of collecting any of the Collateral and enforcing any other right in respect thereof;

(iii)    to defend, settle, adjust or compromise any action, suit or proceeding brought and, in connection therewith, give such discharge or release as the Agent may deem appropriate in respect of the Collateral; **provided**, that the same does not impose any civil or criminal liability on the Pledgor or contain an admission of guilt on the part of the Pledgor;

(iv)    to pay or discharge taxes, Liens or other encumbrances levied or placed on or threatened against the Collateral;

(v)    to direct any parties liable for any payment under or with respect to any of the Collateral to make payment of any and all monies due and to become due thereunder directly to the Agent or as the Agent shall direct;

(vi)    to receive payment of and receipt for any and all monies, claims, and other amounts due and to become due at any time in respect of or arising out of any Collateral;

(vii)    to sign and endorse any drafts, assignments, notices and other documents relating to the Collateral;

(viii)    to execute and deliver and file all assignments, conveyances, statements, financing statements, continuation statements, pledge agreements, affidavits, notices and other agreements, instruments and documents that the Agent may determine necessary in order to perfect and maintain the security interests and Liens granted in this Agreement and in order to fully consummate all of the transactions contemplated herein;

(ix)    to (A) exercise the rights, powers, privileges and remedies of the Pledgor under the Rawhide Mining LLC Agreement (including, without limitation, those described in **Article 5** (*Remedies*) above) and (B) cause or direct the Borrowers to take any actions as may be consistent with this Agreement and the other Loan Documents; and

(x)    to do and perform all such other acts and things as the Agent may deem to be reasonably necessary, proper or advisable to enforce the Agent's rights with respect to the Collateral.

(b)    ___*Actions By Agent*___.  The Agent agrees that neither it nor any of its Representatives shall take any action under the power of attorney granted under **Section 6.2(a)** (*Grant*) above unless an Event of Default shall have occurred and be continuing.

(c)    ___*Irrevocability, Etc.*___  The power of attorney and irrevocable proxy granted under this **Section 6.2** is (i) a power coupled with an interest and shall be irrevocable at all times prior to the full, final and indefeasible payment and performance of the Secured Obligations and (ii) conferred on the Agent solely to (A) protect and preserve the Collateral, (B) realize upon its security interest in the Collateral and (C) otherwise exercise, preserve and protect the rights and interests of the Agent and Lenders under the Loan Documents.

(d)    ___*Ratification; No Fiduciary Duties*___.  The Pledgor hereby ratifies all that said attorneys-in-fact shall lawfully do or cause to be done by virtue of the power of attorney granted under this **Section 6.2**, in each case pursuant to the powers granted under this **Section 6.2**. The Pledgor hereby acknowledges and agrees that the Agent and its Representatives shall have no fiduciary duties to the Pledgor or any Borrower in acting pursuant to power of attorney granted under this **Section 6.2**, and the Pledgor hereby waives any claims or rights of a beneficiary of a fiduciary relationship under this Agreement.

Section 6.3    **Secured Parties Not Liable**.  None of the Agent, any other Secured Party or any of their respective Representatives (a) shall be (i) under any duty to exercise or withhold the exercise of any of the rights, powers, privileges and options expressly or implicitly granted to any Secured Party under this Agreement or any other Loan Document or (ii) liable for any failure to do so or any delay in doing so or (b) liable for any act or omission or for any error of judgment or any mistake of fact or law, whether its capacity as attorney-in-fact on behalf of the Pledgor or in its individual capacity (except for its, their or such Person's own gross negligence or willful misconduct, as finally determined by a court of competent jurisdiction, or, in the case of the Agent or any Secured Party, the breach of its obligations expressly set forth in this Agreement).

Section 6.4    **Agent's Duty of Care**.  Other than the exercise of reasonable care to ensure the safe custody of the Collateral while being held by the Agent under this Agreement, the Agent shall have no duty or liability to preserve rights pertaining thereto, it being understood and agreed that the Pledgor shall be responsible for preservation of all rights in the Collateral, and the Agent shall be relieved of all responsibility for Collateral upon surrendering it or tendering the surrender of it to the applicable Pledgor.  The Agent shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral in its possession if such Collateral is accorded treatment substantially equal to that which the Agent affords its own property, which shall be no less than the treatment employed by a reasonable and prudent agent in the industry, it being understood that the Agent shall have no responsibility for taking any necessary steps to preserve rights against any parties with respect to any Collateral.

*Equity Pledge Agreement*

# ARTICLE 7
# MISCELLANEOUS

### Section 7.1    Term and Termination.

(a)    *Continuing Agreement*.  This Agreement shall be a continuing agreement in every respect and shall remain in full force and effect at all times until it terminates pursuant to the terms of this **Section 7.1**.

(b)    *Termination and Release*.  (i) Subject to **Sections 7.1(c)** (*Survival*) and **7.1(d)** (*Continuation*) below, this Agreement, and the Agent's security interest in the Collateral, shall automatically terminate upon the full, final and indefeasible payment and performance of the Secured Obligations, and (ii) as soon as reasonably practicable thereafter, the Agent shall, at the expense of the Pledgor, (A) release all of the Liens and security interests granted under this Agreement, (B) deliver all UCC termination statements and other documents reasonably requested by the Pledgor evidencing such termination and (C) return to or at the direction of the Pledgor any instruments, Rawhide Equity Interest Certificates, other certificates, powers or transfers previously delivered to the Agent under **Section 3.5** (*Delivery of Collateral*) above and then remaining in the possession of the Agent.

(c)    *Survival*.  Notwithstanding **Section 7.1(b)** (*Termination and Release*) above, all releases provided under this Agreement, and all other provisions that by their terms expressly survive termination of this Agreement, shall be continuing and shall survive termination of this Agreement until the expiration of the applicable statute of limitations.

(d)    *Continuation*.  Notwithstanding **Section 7.1(b)(i)**, if, at any time, any payment in respect of all or any portion of the Secured Obligations is rescinded or must otherwise be restored or returned by any Secured Party as a preference, fraudulent conveyance or otherwise under any bankruptcy or other insolvency law, then (i) this Agreement shall continue to be effective, or shall be automatically reinstated, as the case may be, in each case as though such payment had not been made, and (ii) all out-of-pocket and documented costs and expenses (including, without limitation, any reasonable legal and advisor fees and disbursements) incurred by any Secured Party in defending and enforcing such reinstatement shall be deemed to be included as a part of the Secured Obligations.

### Section 7.2    Binding Effect; Assignment.  This Agreement shall be binding upon, and inure to the benefit of, the Parties and each of the other Secured Parties.  The Pledgor may not assign, transfer, pledge, participate or otherwise convey any of its obligations under this Agreement, and any actual or purported assignment, transfer, pledge, participation or other conveyance by the Pledgor of any of its rights or obligations under this Agreement shall be null and void *ab initio* and of no force or effect.  The rights and obligations of the Agent under this Agreement may be assigned, novated, transferred, pledged, participated or otherwise conveyed to the same extent that the Agent may assign, novate, transfer, pledge, participate or otherwise convey its respective rights under the Loan Agreement.  Each Secured Party (other than the Agent) shall constitute a third-party beneficiary of this Agreement.

*Equity Pledge Agreement*

**Section 7.3**    **Amendments**.  No amendment, waiver, or other modification of any provision of this Agreement shall be effective unless in writing and signed by the Agent (acting at the direction of the Required Lenders pursuant to the terms of the Loan Agreement) and the Pledgor.

**Section 7.4**    **Notices**.    All notices and other communications provided for under this Agreement shall, unless otherwise stated herein, be in writing and mailed, transmitted or delivered to the relevant Person at its address set forth in **Section 11.2** (*Notices*) of the Loan Agreement or at such other address as shall be designated by such Person in a written notice delivered in accordance with **Section 11.2** (*Notices*) of the Loan Agreement.  All such notices and communications shall be effective upon receipt, or in the case of an electronic transmission, upon confirmation of receipt thereof.

**Section 7.5**    **Loan Document: Final Agreement**.  This Agreement constitutes a "Loan Document," within the meaning of the Loan Agreement.  This Agreement, taken together with the other Loan Documents, represents the final, complete, and exclusive expression of the Parties and supersedes any and all prior oral or written agreements relating to the subject matter hereof.

**Section 7.6**    **Execution in Counterparts**.    This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.

**Section 7.7**    **Governing Law**.  **THIS AGREEMENT SHALL BE GOVERNED BY THE LAWS OF THE STATE OF NEW YORK WITHOUT GIVING EFFECT TO THE CONFLICT OF LAW PRINCIPLES THEREOF, EXCEPT FOR SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK.**

**Section 7.8**    **Submission to Jurisdiction**.    Each Party irrevocably and unconditionally submits to the non-exclusive jurisdiction of any United States Federal or New York State court sitting in Manhattan, and any appellate court from any such court, solely for the purpose of any suit, action or proceeding brought to enforce its obligations under, or relating in any way to, this Agreement.

**Section 7.9**    **Waiver of Immunity**.    To the extent that the Pledgor has or hereafter may acquire any immunity (sovereign or otherwise) from any legal action, suit or proceeding, from jurisdiction of any court or from set off or any legal process (whether service or notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise) with respect to itself or any of its property, the Pledgor hereby irrevocably waives and agrees not to plead or claim such immunity in respect of any action brought to enforce its obligations under, or relating in any way to, this Agreement.

**Section 7.10**    **Forum**.    **EACH PARTY HERETO IRREVOCABLY WAIVES, TO THE FULLEST EXTENT IT MAY EFFECTIVELY DO SO, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT AND ANY RIGHT OF JURISDICTION ON ACCOUNT OF ITS PLACE OF RESIDENCE OR DOMICILE AND IRREVOCABLY CONSENTS TO THE SERVICE OF ANY SUMMONS AND COMPLAINT AND ANY OTHER PROCESS BY THE MAILING OF COPIES OF SUCH PROCESS TO IT AT THE ADDRESS SPECIFIED FOR IT IN SECTION 11.2 (*NOTICES*) OF THE LOAN AGREEMENT (OR OTHERWISE IN ACCORDANCE WITH SECTION 7.4 (*NOTICES*) ABOVE).  THE PLEDGOR HEREBY AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE**

*Equity Pledge Agreement*

CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.  NOTHING IN THIS <u>SECTION 7.10</u> SHALL AFFECT THE RIGHT OF THE PLEDGOR, THE AGENT OR ANY OTHER SECURED PARTY TO SERVE LEGAL PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR AFFECT THE RIGHT OF THE PLEDGOR, THE AGENT OR ANY OTHER SECURED PARTY TO BRING ANY ACTION OR PROCEEDING AGAINST SUCH OTHER PARTY OR ITS PROPERTY IN THE COURTS OF OTHER JURISDICTIONS.

Section 7.11    <u>Waiver of Jury Trial</u>.  EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY INSTRUMENT OR DOCUMENT DELIVERED HEREUNDER.

Section 7.12    <u>Headings</u>.  The headings in this Agreement are for convenience of reference only and shall not affect the interpretation or construction of this Agreement.

Section 7.13    <u>Severability</u>.  Each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or be invalid under such law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

[SIGNATURE PAGE FOLLOWS]

*Equity Pledge Agreement*

**IN WITNESS WHEREOF**, the Parties have caused this Pledge and Security Agreement to be duly executed by their respective officers as of the day and year first above written.

**RAWHIDE ACQUISITION HOLDING LLC**
As Pledgor

By: _____

Name:    Donald M. Deines
Title:      President & Chief Executive Officer

**SILVERPEAK CREDIT PARTNERS, LP**
As Agent

By: _____

     Name:    Vaibhav Kumar
     Title:     Portfolio Manager

EXHIBIT A

## Form of Acknowledgment of Pledge

**Rawhide Mining LLC**
143 Keddie St.
Fallon, NV 89406

## ACKNOWLEDGMENT OF PLEDGE

January 3, 2019

**Silverpeak Credit Partners, LP**
40 West 57th Street - 29th Floor
New York, NY 10019

Ladies and Gentlemen:

Reference is made to the Pledge and Security Agreement, dated as of January 3, 2019 (the "**Equity Pledge Agreement**"), between Rawhide Acquisition Holding LLC, as the pledgor (the "**Pledgor**"), and Silverpeak Credit Partners, LP, as Agent under the Loan Agreement referred to therein (together with its successors and assigns, in such capacity, the "**Agent**").  Capitalized terms used but not defined herein have the meanings assigned to such terms under the Equity Pledge Agreement.

In connection with the pledge of the Collateral to the Agent by the Pledgor under the Equity Pledge Agreement, the undersigned, Rawhide Mining LLC, a Delaware limited liability company ("**Rawhide Mining**") hereby represents, warrants and agrees, to and for the benefit of the Agent and the Lenders, as follows:

(a)        In accordance with the Pledgor's instructions, Rawhide Mining has registered on its books and records your security interest in the Rawhide Equity Interests and other Collateral;

(b)        no other lien on such Rawhide Equity Interests or other Collateral is registered on the books and records of Rawhide Mining;

(c)        no Rawhide Equity Interest Certificates have been issued, or will be issued, at any time;

(d)        without limiting, in any respect, **paragraph (c)** above, Rawhide Mining shall deliver directly to you at your address set forth above, any and all instruments and certificates evidencing any right, option or warrant, and all new, additional or substituted securities issued to, or to be received by, the Pledgor by virtue of its ownership of the Rawhide Equity Interests issued by Rawhide Mining or upon exercise by the Pledgor of any option, warrant or right attached to such Rawhide Equity Interests;

(e)        The Rawhide Equity Interests constitute all of the membership interests in Rawhide Mining; there are no options or rights outstanding to acquire any interests in Rawhide Mining, and

Rawhide Mining will not issue any additional membership interests or securities without the prior written consent of the Agent;

(f)        Rawhide Mining has not entered into an agreement with any third party to act on such third party's instructions without further consent of the Pledgor with respect to the Rawhide Equity Interests; and agrees that it will not enter into any such agreement with any third party concerning any Rawhide Equity Interests;

(g)        After the occurrence, and during the continuation, of an Event of Default, Rawhide Mining shall pay directly to you any and all cash distributions which might be declared and payable (including any unpaid distributions accrued prior to the date hereof) on any of the Rawhide Equity Interests or any of the other Collateral issued by Rawhide Mining, and which but for the provisions of this letter would be paid to the Pledgor;

(h)        At any time upon and during the continuance of an Event of Default, and upon your exercise of applicable remedies pursuant to the Equity Pledge Agreement, upon your written instructions, Rawhide Mining shall register the transfer of such Rawhide Equity Interests to you or your nominee, as applicable;

(i)        The Rawhide Equity Interests have been duly authorized and validly issued and are not subject to, nor will Rawhide Mining at any time permit it to become subject to, any restrictions governing its issuance, transfer, ownership or control other than those currently set forth in the Rawhide Mining LLC Agreement; and

(j)        Rawhide Mining will comply with your instructions relating to the Rawhide Equity Interests without the need for further consent from the Pledgor provided such instructions are in accordance with the Loan Documents.

Rawhide Mining agrees that, if at any time you shall determine to exercise your right to sell all or any of the Collateral issued by Rawhide Mining, Rawhide Mining will, upon your request and at the Pledgor's expense:

(1)        provide you with such other information and projections as may be necessary or, in your opinion, advisable to enable you to effect the sale of such Collateral;

(2)        do or cause to be done all such other acts and things as may be necessary to make the sale of such Collateral or any part thereof valid and binding and in compliance with applicable law; and

(3)        do or cause to be done all such other acts and things as may be necessary to constitute you or your designees or transferees a member of Rawhide Mining.

You are hereby authorized, in connection with any sale of the Collateral issued by Rawhide Mining, to deliver or otherwise disclose to any prospective purchaser of such Collateral (i) any information and projections provided to you pursuant to **paragraph (1)** above and (ii) any other information in your possession relating to Rawhide Mining or such Collateral.

*Equity Pledge Agreement*
*Form of Acknowledgment of Pledge*

Very truly yours,

**RAWHIDE MINING LLC**

By: _____
     Name:
     Title:

*Equity Pledge Agreement*
*Form of Acknowledgment of Pledge*

# EXHIBIT 5

# EXHIBIT 5

*Execution Version*

# FOURTH AMENDMENT
## TO LOAN AND SECURITY AGREEMENT

**THIS FOURTH AMENDMENT TO LOAN AND SECURITY AGREEMENT** (this "**Amendment**") is entered into as of March 6, 2023, by and among (a) RAWHIDE MINING LLC, a Delaware limited liability company ("**Rawhide**"), (b) the other "Rawhide Subsidiaries" from time to time party thereto (such Rawhide Subsidiaries, collectively, and together with Rawhide, the "**Borrowers**"), (c) RAWHIDE ACQUISITION HOLDINGS LLC, a Delaware limited liability company (the "**Parent**" and, together with Borrower, individually and in their respective capacities under the Loan Documents (as defined herein), collectively, the "**Rawhide Entities**," and each, a "**Rawhide Entity**"), (c) SILVERVIEW CREDIT OPPORTUNITIES AIV LP ("**Silverview**") and CEOF HOLDINGS LP ("**CEOF**"), each, a "Lender", under the Loan Agreement (as defined herein) (collectively, the "**Existing Lenders**"), (d) EMX USA SERVICES CORP. (as the "**Equity Lender**" and a "**Lender**" immediately following the effectiveness of this Amendment (the "**Equity Lender**"), and (e) SILVERVIEW CREDIT PARTNERS, LP, as the "Agent" under Loan Agreement (together with its successors and assigns, in such capacity, the "**Agent**"; and the Agent, together with Silverview, collectively, the "**Silverview Parties**"; and the Silverview Parties, together with CEOF, collectively, the "**Lender Parties**" and each, a "**Lender Party**"; and the Lender Parties, together with the Equity Lender and the Rawhide Entities, collectively, the "**Parties**," and each, a "**Party**").

## RECITALS

**WHEREAS**, the Agent, Lender Parties and Rawhide Entities are party to the Loan Agreement, dated as of January 3, 2019 (as amended, supplemented, modified, or restated from time to time, including, without limitation, pursuant to this Amendment, the "**Loan Agreement**"), as amended by that certain Amendment No. 1 to Loan and Security Agreement, dated as of October 31, 2019, that certain Amendment No. 2 to Loan and Security Agreement, dated as of March 12, 2021, and that certain Third Amendment to Loan and Security Agreement, dated as of February 20, 2023, pursuant to which the Existing Lenders have made a term loan to the Borrowers in the aggregate original principal amount of USD 18,450,000 and the Equity Lender has made a term loan to the Borrowers in the aggregate original principal amount of USD 150,000, on the terms set forth therein.

**WHEREAS**, Parent and Agent entered into that certain Pledge and Security Agreement dated as of January 3, 2019.

**WHEREAS**, Borrowers and Agent entered into that certain Power of Attorney, dated as of January 3, 2019.

**WHEREAS**, pursuant to the Loan Agreement and the other Loan Documents (as defined in the Loan Agreement), the Existing Lenders made the Loan and have a first priority lien on and security interest in the Collateral (as defined in the Loan Agreement).

1

**WHEREAS**, the Agent delivered to the Borrowers that certain letter captioned Reservation of Rights, dated as of March 17, 2022.

**WHEREAS**, the Agent delivered to the Borrowers that certain Notice of Acceleration dated as of March 24, 2022 pursuant to which the Agent notified the Borrowers that all of the Secured Obligations are immediately due and payable (including, from and after March 15, 2022, default interest pursuant to section 21.3 of the Loan Agreement) and demanded immediate payment in the amount of $15,813,577.68.

**WHEREAS**, on July 19, 2022, Borrowers and the Lender Parties entered into that certain Forbearance Agreement pursuant to which, among other things, the Lender Parties agreed to temporarily forbear from exercising certain default-related rights and remedies against the Rawhide Entities and the Collateral.

**WHEREAS**, the "Forbearance Period" under, and as defined in, the Forbearance Agreement expired by its terms on December 31, 2022, and numerous Events of Default, including those defined as "Specified Defaults" in the Forbearance Agreement, have occurred and are continuing under the Loan Agreement as of the date hereof (all such existing Events of Default as of the date hereof, collectively, the "**Subject Defaults**").

**WHEREAS**, Borrowers have (i) informed the Lender Parties that they are in immediate need of additional funding of $600,000 to prevent a shut-down or other significant disruption to their business operations, and (ii) requested that the Equity Lender make a loan advance of $600,000 (the "**New Equity Holder Loan**") to the Borrowers pursuant to the terms of a Secured Promissory Note in the form attached hereto as **Exhibit A** (the "**Equity Holder Note**"), which promissory note provides for grant of a security interest in the Eligible Equity Holder Note Equipment (as defined herein).

**WHEREAS,** the Equity Lender is willing to make the New Equity Holder Loan to the Borrowers, provided that the Existing Lenders agree that (i) the New Equity Holder Loan be included under the definition of "Permitted Indebtedness" under the Loan Agreement, (ii) the security interest granted thereunder be included under the definition of "Permitted Liens" under the Loan Agreement, (iii) the Eligible Equity Holder Note Equipment be excluded from the definition of "Collateral" under the Loan Agreement, (iv) the incurrence of such indebtedness, the granting of a security interest in the Eligible Equity Holder Note Equipment to the Equity Lender, and any subsequent sale of the Eligible Equity Holder Note Equipment and payment of principal and interest under the Equity Holder Note with the sale proceeds of such Eligible Equity Holder Note Equipment shall not constitute a Default or Event of Default under the Loan Agreement.

**WHEREAS**, upon satisfaction of the conditions precedent to the effectiveness of this Amendment set forth below, and subject to the terms and conditions set forth herein, the Lender Parties and Rawhide Entities have agreed to amend the Loan Agreement in certain respects as set forth below.

**NOW, THEREFORE**, in consideration of the foregoing recitals, the covenants and agreements set forth herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties each agree as follows:

<div align="center">

**AGREEMENTS**

</div>

1.    **Definitions; Incorporation of Recitals**. All capitalized terms used in this Amendment but not otherwise defined herein have the meanings ascribed to such terms in the Loan Agreement. The Recitals set forth above constitute an integral part of this Amendment, evidencing the intent of the Parties, and describing the circumstances surrounding its execution.

2.    **Acknowledgements of Subject Defaults and No Waiver or Forbearance With Respect Thereto.**

a.    Each Borrower acknowledges and agrees that (i) the Subject Defaults constitute Events of Default under the Loan Agreement and the Subject Defaults are continuing as of the date hereof; and (ii) the Subject Defaults have not been cured as of the date hereof and are not subject to cure at any time after the date hereof.

b.    Each Borrower and other Rawhide Entities further acknowledges and agrees and hereby confirms that, except as expressly provided in this Amendment, the Lenders have no obligation to make Loans to Borrowers.

c.    Without limiting any rights under Section 2.3 of the Loan Agreement, each Borrower further acknowledges and agrees and hereby confirms that, in accordance with Section 2.3 of the Loan Agreement, from and after no later than March 15, 2022, interest on any and all unpaid principal of or interest on any Loan (including the Incremental Loan) or any fee or other amount payable under the Loan Documents accrued (or shall accrue) at the rate of Default Interest.

3.    **Acknowledgements.**

a.    Each Borrower hereby acknowledges and agrees that as of February 17, 2023, Borrowers are indebted to the Lenders under the Loan Agreement in the unpaid principal, interest, and fees in an amount no less than $18,272,280.05, plus all interest accrued and accruing thereon (including Default Interest rate), and all fees, costs, expenses and other charges now or hereafter payable by Borrowers to the Lenders on all Loans, without offset, defense, or counterclaim of any kind, nature or description whatsoever.

b.    Each Borrower and Parent expressly acknowledges and agrees that all Collateral, security interests, liens, pledges and mortgages granted to Agent or any Lender pursuant to the Loan Documents, or hereafter granted to any Lender Parties, extend to and cover all of the Secured Obligations, now existing or hereafter arising, including, without limitation, those arising in connection with the Loan Agreement and the other Loan Documents, upon the terms set forth in such agreements, all of which security interests, liens, pledges and mortgages are hereby ratified, reaffirmed, confirmed and approved.

4. **New Equity Holder Loan**. Existing Lenders hereby consent to the Borrowers' entry into the Equity Holder Note and grant of security interests in the Eligible Equity Holder Note Equipment in accordance with the terms of such Equity Holder Note (as in effect on the date hereof).

5. **Amendments to Loan Agreement**. Subject to the conditions precedent set forth in Section 8 of this Amendment, and in reliance upon the representations and warranties of the Loan Parties set forth in this Amendment, as of the Effective Date, the Loan Agreement is hereby amended as follows:

a. Section 1.1 of the Loan Agreement is hereby amended by adding the following clause (j) to the definition of "Permitted Indebtedness":

"(j) the Equity Holder Note."

b. Section 1.1 of the Loan Agreement is hereby amended by adding the following clause (u) to the definition of "Permitted Liens":

"(u) the Eligible Equity Holder Note Equipment Liens."

c. Section 1.1 of the Loan Agreement is hereby amended by restating the definition of "Collateral" in its entirety as follows:

"'Collateral' means the property described in **Section 3.1** (*Grant of Security Interest*) below, which shall not include the Eligible Equity Holder Note Equipment."

d. Section 1.1 of the Loan Agreement is hereby further amended by adding the following definitions thereto in proper alphabetical order:

"'Eligible Equity Holder Note Equipment" means the equipment described below.

| CO NO. | YEAR | MAKE | MODEL | SERIAL NUMBER | DESCRIPTION |
|--------|------|------|-------|---------------|-------------|
| HP-1 | 2006 | NORBERG/METSO | HP 400 | 123692 | STD CONE CRUSHER |
| HP-2 | 2008 | NORBERG/METSO | HP400 | 124038 | STD CONE CRUSHER |
| 225 #-s 1 | 2011 | Fisher Industries | 36"x225' Overland | 36-225-2653-611276 | Conveyor |
| 225 #-s 2 | 2011 | Fisher Industries | 36"x225' Overland | Not Readable | Conveyor |
| 225 #-s 3 | 2011 | Fisher Industries | 36"x225' Overland | 36-225-2745-612220 | Conveyor |
| 225 #-s 4 | 2011 | Fisher Industries | 36"x225' Overland | 36-225-2561-610184 | Conveyor |
| 225 #-s 5 | 2011 | Fisher Industries | 36"x225' Overland | 36-225-2562-610184 | Conveyor |
| 225 #-s 6 | 2011 | Fisher Industries | 36"x225' Overland | 36-225-2611-611046 | Conveyor |

| 225 #-s 7 | 2011 | Fisher Industries | 36"x225' Overland | 36-225-2613-611063 | Conveyor |
|---|---|---|---|---|---|
| 225 #-s 8 | 2011 | Fisher Industries | 36"x225' Overland | 36-225-2610-611046 | Conveyor |
| 225 #-s 9 | 2011 | Fisher Industries | 36"x225' Overland | 36-225-2609-611046 | Conveyor |
| 225 #-s 10 | 2011 | Fisher Industries | 36"x225' Overland | 36-225-2746-612220 | Conveyor |
| 225 #-s 11 | 2011 | Fisher Industries | 36"x225' Overland | 36-225-2614-611063 | Conveyor |
| Screen 1 | 2012 | CEDAR RAPIDS | 8X20 THREE DECK SCREEN | 1245-2-11-12 | SCREENING PLANT |
| SCREEN 2 | 2012 | CEDAR RAPIDS | 8X20 THREE SCREEN DECK | 1245-1-11-12 | SCREENING PLANT |

'Eligible Equity Holder Note Equipment Liens' means those certain liens granted on the Eligible Equity Holder Note Equipment by Rawhide Mining LLC securing indebtedness owed under the Equity Holder Note as of the Fourth Amendment Closing Date.

'Equity Holder Note' means that certain Secured Promissory Note dated as of March 6, 2023 issued by Rawhide Mining LLC in favor of EMX USA Services Corporation.

'Fourth Amendment Closing Date' means March 6, 2023."

e.    Section 2.4(d) of the Loan Agreement is hereby amended and restated in its entirety as follows:

"(d)    ***Repayment from Disposition Proceeds***.    Promptly    upon    receipt thereof, the proceeds of any Disposition other than in the ordinary course of the Rawhide Mining Business (other than Excepted Dispositions) shall be applied to prepayment of the Loan; provided, that with respect to any Disposition of the Eligible Equity Holder Note Equipment, Borrowers shall apply the net proceeds from any such sale toward the payment of amounts outstanding under the Equity Holder Note and may retain any amounts in excess of the amount required for such repayment for ordinary course working capital purposes.  Such requirement shall be in addition to any mandatory prepayment in full in connection with a Change in Control without the consent of the Agent as restricted pursuant to Sections 8.11 (Corporate Changes) and 9.1(i) (Change in Control) below, and any restriction on any Disposition of the Borrowers' assets pursuant to Sections 8.1 (Restricted Transfers) and 8.5 (Dispositions) below.  Existing Lenders and the Equity Lender will cooperate with Borrowers as appropriate regarding releases of liens relating to any Eligible Equity Holder Note Equipment sold.  Notwithstanding anything to the contrary in this Agreement, the Equity Holder Note may be repaid only from proceeds from the sale or other disposition of Eligible Equity Holder Note Equipment."

f.    Section 11.3(b) of the Loan Agreement is hereby amended by adding the following sentence at the end of the last sentence of such subsection:

5

"For the avoidance of doubt, the Equity Holder Note does not constitute part of the Loan and is not being advanced under this Agreement. The Equity Lender extending the Equity Holder Note shall not result in the Equity Lender or its Affiliates or Related Parties directly or indirectly obtaining any additional voting or consent rights (or any other rights) the Equity Lender or its Affiliates or Related Parties did not previously possess."

g.    Section 8.13 of the Loan Agreement is hereby amended and restated in its entirety as follows:

"**Section 8.13.    Dispositions in Excess of $10,000**. Other than with respect to the Disposition of any Eligible Equity Holder Note Equipment in accordance with Section 2.4(d) of this Agreement, no Rawhide Mining Entity shall consummate any Disposition of any asset unless (i) the amount of gross proceeds received by or for the benefit of the Rawhide Mining Entity is $10,000 or less and the asset is sold for fair market value as reasonably determined by such Rawhide Mining Entity, or (ii) such Rawhide Mining Entity (x) provides no less than five Business Days' notice to the Existing Lenders prior to any such Disposition, and (y) obtains the written consent of each Existing Lender prior to any such Disposition (any such Disposition described in the preceding clause (i) or (ii), an "**Excepted Disposition**"). Notwithstanding anything to the contrary in this Agreement, the failure of any Rawhide Mining Entity to comply with this Section 8.13 shall constitute an immediate Event of Default to which no grace or cure period will apply."

h.    Section 8 of the Loan Agreement is hereby amended by adding a new Section 8.14 as follows:

"**Section 8.14    Equity Holder Note**. Borrowers agree that: (i) the Equity Holder Note may not be amended, restated, or otherwise modified, directly or indirectly, without the prior written consent of Agent and Existing Lenders; (ii) no liens other than the Eligible Equity Holder Note Equipment Liens may be granted by Borrowers or any Rawhide Entity or obtained by Equity Lender in connection with or relating to the Equity Holder Note or any obligations due thereunder; (iii) no Borrower or Rawhide Entity other than Rawhide Mining LLC may guarantee or otherwise become an obligor with respect to obligations owed under the Equity Holder Note; and (iv) the Equity Holder Note shall be a non-recourse loan in which the only source of recovery under the Equity Holder Note is the Eligible Equity Holder Note Equipment."

6.    **Amendments to Other Loan Documents**. The other Loan Documents are hereby amended solely to the extent necessary to avoid a direct conflict between such other Loan Documents and the amendments to the Loan Agreement amendments set forth in Section 5 hereof.

7.    **No Waiver**. This Amendment does not constitute a waiver of any past, present or future violation, default or Event of Default under the Loan Agreement or any of the other Loan Documents (including any Subject Default), and shall not be deemed to be a waiver, limitation or

postponement of any of the Lender Parties' rights and remedies under the Loan Agreement, any of the Loan Documents or applicable law, all of which rights and remedies hereby expressly are reserved. In addition, the Lender Parties reserve their right to strictly enforce any and all covenants, conditions and provisions of the Loan Agreement and the other Loan Documents and to demand strict and absolute compliance with such covenants, conditions and provisions. Any waiver, amendment, forbearance or other deviation from the terms and conditions of the Loan Agreement or other Loan Documents shall only be valid and effective if memorialized in a written agreement duly executed by the Lender Parties.

8.  **Conditions Precedent**. This Amendment shall become effective and binding upon the Parties as of the date first written above when all of the following events and conditions shall have occurred (the "**Effective Date**") unless otherwise waived by the Lenders in writing:

a.  Lenders shall have received this Amendment duly executed by each Borrower and Parent, and such additional supporting documents and materials as the Lenders or Agent may reasonably request on or before the date hereof;

b.  the truth and accuracy of the representations and warranties contained in <u>Section 11</u> hereof;

c.  delivery to Lenders of officer's certificates of each of Borrowers' respective managers, directors, shareholders or members, as applicable, approving and authorizing the entry into this Amendment and the execution and delivery of such additional documents and the taking of such actions as is necessary for the Effective Date to occur; and

d.  Borrowers shall have received $600,000 of proceeds of the Equity Holder Note in immediately available funds.

9.  **Continued Effectiveness**. The Parties acknowledge and agree that the terms and provisions of this Amendment amend, add to and constitute a part of the Loan Agreement. Except as expressly modified and amended by the terms of this Amendment, all of the other terms and conditions of the Loan Agreement and all documents executed in connection therewith or referred to or incorporated therein, remain in full force and effect and are hereby ratified, reaffirmed, confirmed and approved.

10.  **Scope of Agreement.** Except as modified by this Amendment, the Loan Agreement and the Loan Documents shall continue in full force and effect in accordance with their terms. All references to the Loan Agreement, to the terms defined in the Loan Agreement, or to the Loan Documents in any note, document, letter, certificate, the Loan Agreement itself, the Loan Documents or any communication issued or made pursuant to or with respect to the Loan Agreement or Loan Documents, shall be deemed to refer to the Loan Agreement or such Loan Document.

11.  **Representations and Warranties**. To induce Lenders to execute this Amendment, each Borrower and Parent hereby represents and warrants to Lender Parties as follows:

a.      the representations and warranties made by such Borrower and Parent contained in the Loan Agreement, the other Loan Documents and all other documents related thereto, including all amendments thereto, are true and correct in all respects, except to the extent such representations or warranties relate to the Subject Defaults or expressly relate to an earlier date, in which case, such representations and warranties were true and correct in all respects as of such earlier date;

b.      such Borrower or Parent is duly organized, validly existing and in good standing under the laws of its state of organization  or incorporation;

c.      such Borrower or Parent has the power and authority to execute, deliver and perform its obligations  under this Amendment and all other documents related thereto;

d.      the execution, delivery and performance by such Borrower or Parent of this Amendment and all other documents related thereto have been duly authorized by all necessary corporate action;

e.      this Amendment and all other documents related thereto constitute the legal, valid and binding obligations of such Borrower or Parent, enforceable against such Borrower or Parent in accordance with their terms, except as enforceability may be limited by applicable bankruptcy, insolvency or similar laws affecting the enforcement of creditor's rights generally or by equitable principles  relating to enforceability;  and

f.      the recitals to this Amendment are true and correct in all material respects.

12.    **Release**.

a.      Each Borrower and Parent hereby acquits, and forever discharges Agent and the Existing Lenders and each and every past and present subsidiary, affiliate, stockholder, officer, director, agent, servant, employee, representative, and attorney of Agent and Lenders from any and all claims, causes of action, suits, debts, liens, obligations, liabilities, demands, losses, costs and expenses (including attorneys' fees) of any kind, character, or nature whatsoever, known or unknown, fixed or contingent, which such Borrower or Parent may have or claim to have now or which may hereafter arise out of or be connected with any act of commission or omission of Agent or Existing Lenders existing or occurring prior to the date of this Amendment or any instrument  executed  prior  to  the  date  of  this  Amendment  including,  without  limitation,  any claims, liabilities  or obligations  arising with respect to the Loan Documents and the Loans.

13.    **Costs and Expenses**. Each Borrower hereby reaffirms its agreement under the Loan Agreement to pay or reimburse Agent and each Existing Lender for all costs and expenses incurred  by  the  Lender  Parties  in  connection  with  the  Loan  Documents,  including  without limitation, all reasonable fees, charges, and disbursements of legal counsel and financial advisor. Without limiting the generality of the foregoing, Borrowers agree to pay all reasonable fees and disbursements  of  counsel  to  Agent  and  counsel  to  each  Existing  Lender  for  the  services performed  by such  counsel  in connection  with the  negotiation,  preparation,  execution  and delivery  of  this  Amendment  and  the  documents  and  instruments  incidental  hereto.  Borrowers hereby agree that Existing Lenders may, at any time or from time to time in their sole discretion and  without  further  authorization  by  Borrowers,  make  a  loan  to  Borrowers  under  the  Loan

Agreement, or apply the proceeds of any Loan, for the purpose of paying any such fees, disbursements, costs, and expenses.

14.    **Miscellaneous.**

a.    Counterparts; Signatures. This Amendment may be executed in one or more counterparts, all of which shall be taken to be one and the same instrument, for the same effect as if all Parties hereto had signed the same signature page. Receipt of an executed signature page to this Amendment by facsimile, PDF or other electronic transmission shall constitute effective delivery thereof. Electronic records of executed Loan Documents maintain by Lenders shall be deemed to be originals thereof.

b.    Successors. This Amendment shall be binding upon and inure to the benefit of Borrowers and their respective successors and assigns, and shall insure to the benefit of Lenders and their successors and permitted assigns, provided that that no Borrower shall not have the right to assign its rights or delegate its respective obligations under any Loan Document except with the express written consent of Lenders.

c.    Captions; Headings. Section captions and headings used in this Amendment are for convenience only and are not part of and shall not affect the construction of this Amendment.

d.    Notices. Except as expressly set forth herein, notices required under this Amendment will be in writing and will be transmitted in the manner and to the addresses required by the Loan Agreement, as amended by this Amendment, or to such other addresses as Lenders or Borrowers may specify from time to time in writing.

e.    Loan Document.  This Amendment shall constitute a "Loan Document" under the Loan Agreement.

f.    Conflicts. If there is an express conflict between the terms of this Amendment and the terms of the Loan Agreement and all other documents related thereto, or any document executed in connection therewith or referred to or incorporated therein, the terms of this Amendment shall govern and control.

g.    References. From and after the date of execution of this Amendment, any reference to the Loan Agreement contained in any notice, request, certificate or other instrument, document or agreement executed concurrently with or after the execution and delivery of this Amendment shall be deemed to include this Amendment unless the context shall otherwise require.

h.    Severability. The illegality or unenforceability of any provision of this Amendment or any instrument or agreement required hereunder shall not in any way affect or impair the legality or enforceability of the remaining provisions of this Amendment or any instrument or agreement required hereunder.

i.    Consent to Jurisdiction and Governing Law. **THIS AMENDMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REFERENCE TO ITS CONFLICTS OF LAW PROVISIONS**

(OTHER THAN SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW). EACH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE NONEXCLUSIVE JURISDICTION OF THE SUPREME COURT OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY AND OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AMENDMENT, THE LOAN AGREEMENT OR ANY OTHER LOAN DOCUMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH NEW YORK STATE, OR, TO THE EXTENT PERMITTED BY LAW, IN SUCH FEDERAL, COURT. EACH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT IT MAY LEGALLY AND EFFECTIVELY DO SO, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AMENDMENT, THE LOAN AGREEMENT OR ANY OTHER LOAN DOCUMENT IN ANY COURT REFERRED TO IN THIS SECTION 14(I).  EACH PARTY HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE  OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

    j.    <u>Waiver of Jury Trial</u>. TO THE EXTENT PERMITTED BY APPLICABLE LAW, EACH PARTY WAIVES ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE ARISING OUT OF, CONNECTED WITH, RELATED TO, OR INCIDENTAL TO THIS THIS AMENDMENT, THE LOAN AGREEMENT, ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY. INSTEAD, ANY SUCH DISPUTE RESOLVED IN COURT WILL BE RESOLVED IN A BENCH TRIAL WITHOUT A JURY.

*[Remainder of Page Intentionally Left Blank; Signature Pages Follow.]*

IN WITNESS WHEREOF, the Parties have duly executed this Amendment as of the date first written above.

**RAWHIDE MINING LLC**
As Borrower

By: *Marceau Schlumberger*
    36AB97BD2F9C44E...
Name:
Title:

**RAWHIDE ACQUISITION HOLDING LLC**
As Parent

By: *Marceau Schlumberger*
    36AB97BD2F9C44E...
Name:
Title:

**SILVERVIEW CREDIT OPPORTUNITIES AIV LP**
As a Lender

By: _____
Name:
Title:

**CEOF HOLDINGS LP**
As a Lender

By: _____
Name:
Title:

**SILVERVIEW CREDIT PARTNERS, LP**
As Agent

By: _____
Name:
Title:

**EMX USA SERVICES CORP.**
As Equity Lender

By: _____
Name:
Title:

*Signature Page to Fourth Amendment to Loan and Security Agreement*

IN WITNESS WHEREOF, the Parties have duly executed this Amendment as of the date first written above.

**RAWHIDE MINING LLC**
As Borrower

By: _____
Name:
Title:

**RAWHIDE ACQUISITION HOLDING LLC**
As Parent

By: _____
Name:
Title:

**SILVERVIEW CREDIT OPPORTUNITIES AIV LP**
As a Lender

By: _____
Name:
Title:

**CEOF HOLDINGS LP**
As a Lender                    By: Corbin Capital Partners, L.P., its
                               Investment Manager

By: _____
Name: Daniel Friedman
Title: General Counsel

**SILVERVIEW CREDIT PARTNERS, LP**
As Agent

By: _____
Name:
Title:

**EMX USA SERVICES CORP.**
As Equity Lender

By: _____
Name:
Title:

*Signature Page to Fourth Amendment to Loan and Security Agreement*

IN WITNESS WHEREOF, the Parties have duly executed this Amendment as of the date first written above.

**RAWHIDE MINING LLC**
As Borrower

By: _____
Name:
Title:

**RAWHIDE ACQUISITION HOLDING LLC**
As Parent

By: _____
Name:
Title:

**SILVERVIEW CREDIT OPPORTUNITIES AIV LP**
As a Lender

By: _____
Name:
Title:

**CEOF HOLDINGS LP**
As a Lender

By: _____
Name:
Title:

**SILVERVIEW CREDIT PARTNERS, LP**
As Agent

By: _____
Name:
Title:

**EMX USA SERVICES CORP.**
As Equity Lender

By: _____
Name:   David M. Cole
Title:    President & CEO

*Signature Page to Fourth Amendment to Loan and Security Agreement*

IN WITNESS WHEREOF, the Parties have duly executed this Amendment as of the date first written above.

**RAWHIDE MINING LLC**
As Borrower

By: _____
Name:
Title:

**RAWHIDE ACQUISITION HOLDING LLC**
As Parent

By: _____
Name:
Title:

**SILVERVIEW CREDIT OPPORTUNITIES AIV LP**
As a Lender

By: _____
Name:
Title:

**CEOF HOLDINGS LP**
As a Lender

By: _____
Name:
Title:

**SILVERVIEW CREDIT PARTNERS LP**
As Agent

By: _____
Name:    Garrett Yuan
Title:    Authorized Signatory

**EMX USA SERVICES CORP.**
As Equity Lender

By: _____
Name:
Title:

*Signature Page to Fourth Amendment to Loan and Security Agreement*

**EXHIBIT A**

*Execution Version*

**SECURED PROMISSORY NOTE**

US $600,000.00

FOR VALUE RECEIVED, and subject to the terms and conditions set forth herein, Rawhide Mining LLC, a Delaware limited liability company ("Rawhide"), and the other "Rawhide Subsidiaries" from time-to-time party to the Loan and Security Agreement dated January 3, 2019 by and between Rawhide, Rawhide Subsidiaries, Silverview Credit Opportunities AIV LP and CEOF Holdings LP ("CEOF"), and Silverview Credit Partners, LP (such Rawhide Subsidiaries, collectively, and together with Rawhide, the "Maker"), hereby unconditionally promises to pay to the order of EMX USA Services Corporation or its assigns (the "Noteholder," and together with the Maker, the "Parties"), the principal amount of $600,000.00 (the "Loan") as provided in this Secured Promissory Note (as the same may be amended, restated, supplemented, or otherwise modified from time to time in accordance with its terms, the "Note").

1) <u>Definitions</u>. Capitalized terms used herein shall have the meanings set forth in this Section 1.

"Advance" means the advance of US $600,000.00 made by Noteholder to Maker hereunder;

"Business Day" means any day which is neither a Saturday nor a Sunday nor a legal holiday on which banks are authorized or required to be closed in the State of Nevada.

"Collateral" means the equipment set forth in Schedule A of this Note.

"Dollars" and "$" means lawful currency of the United States of America.

"Event of Default" has the meaning set forth in Section 6.

"Maturity Date" means the date which is three (3) business days after the proceeds covering the full amount of the Loan and interest are received by Maker from the sale or disposition of the Collateral listed on **Schedule A** attached hereto.

"Person" means any individual, corporation, limited liability company, trust, joint venture, association, company, limited or general partnership, unincorporated organization, governmental authority, or other entity.

"Security Interest" means, with respect only to the Collateral and no other assets or interests of any Rawhide Entity, any security interest, assignment by way of security, mortgage, charge (whether fixed or floating), hypothec, lien, encumbrance, preference, priority or other security interest or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement), and any financing lease having substantially the same economic effect as any of the foregoing.

.
2) <u>Final Payment Date; Optional Prepayments</u>.

2.1. Final Payment Date. The aggregate unpaid principal amount of the Note, all accrued and unpaid interest, and all other amounts payable under this Note shall be due and payable on the Maturity Date unless otherwise provided herein. All payments of interest and principal shall be made in lawful money of the United States of America no later than 12:00PM on the date on which such payment is due

by cashier's check, certified check, or by wire transfer of immediately available funds to the Noteholder's account at a bank specified by the Noteholder in writing to the Maker from time to time.

2.2. Optional Prepayment. The Maker may prepay this Note in whole or in part at any time or from time to time without penalty or premium; provided, however, the Note may be prepaid or repaid only from proceeds from the sale or other disposition of the Collateral.

3) <u>Use of Proceeds</u>. The Maker covenants and agrees with the Noteholder that the proceeds of the Advance will be used by the Maker for (i) to avoid a business shut-down or other significant disruption to the continuity of its business operations, (ii) working capital purposes and general corporate expenses of the Maker, and for no other purpose whatsoever without the express written consent of the Noteholder.

4) <u>Security</u>. The Maker grants the Noteholder a Security Interest in the Collateral as security for the performance of its obligations hereunder. Maker shall repay the Loan and unpaid interest with all proceeds received from the sale or other disposition of the Collateral. Maker shall be entitled to use any proceeds in excess of the Loan amount as working capital.

5) <u>Interest</u>.

5.1. Interest Rate. Except as otherwise provided herein, the outstanding principal amount of the Loan made hereunder shall bear interest at a 6% interest rate compounded annually from the date the Loan was made until the Loan is paid in full, whether at maturity, upon acceleration, by prepayment, or otherwise.

5.2. Computation of Interest. All computations of interest shall be made on the basis of 365 or 366 days, as the case may be and the actual number of days elapsed. Interest shall accrue on the Loan on the day on which such Loan is made and shall not accrue on the Loan on the day on which it is paid.

5.3. Interest Rate Limitation. If at any time and for any reason whatsoever, the interest rate payable on the Loan shall exceed the maximum rate of interest permitted to be charged by the Noteholder to Maker under applicable Law, such interest rate shall be reduced automatically to the maximum rate of interest permitted to be charged under applicable Law.

6) <u>Events of Default</u>. The occurrence of any of the following shall constitute an Event of Default hereunder:

6.1. Failure to Pay. Maker fails to pay any principal amount of the Loan or interest when due and such failure continues for five (5) days after written notice to Maker.

6.2. Breach of Representations and Warranties. Any representation or warranty made by Maker to Noteholder in the Loan and Security Agreement is incorrect in any material respect on the date as of which such representation or warranty was made.

6.3. [Reserved].

6.4. Bankruptcy.

(a) The Maker commences any case, proceeding, or other action (i) under any existing or future law relating to bankruptcy, insolvency, reorganization, or other relief of debtors, seeking to have an order for relief entered with respect to it, or seeking to adjudicate it as bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition, or other relief with respect to it or its debts, or (ii) seeking appointment

2

of a receiver, trustee, custodian, conservator, or other similar official for it or for all or any substantial part of its assets, or the Maker makes a general assignment for the benefit of its creditors;

(b) There is commenced against the Maker any case, proceeding, or other action of a nature referred to in Section 6.4(a) which (i) results in the entry of an order for relief or any such adjudication or appointment or (ii) remains undismissed, undischarged, or unbonded for a period of thirty (30) days;

(c) There is commenced against the Maker any case, proceeding, or other action seeking issuance of a warrant of attachment, execution, or similar process against all or any substantial part of its assets which results in the entry of an order for any such relief which has not been vacated, discharged, or stayed or bonded pending appeal within thirty (30) days from the entry thereof; or

(d) the Maker takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the acts set forth in Section 6.4(a), Section 6.4(b), or Section 6.4(c).

7)     Non-Recourse.  No recourse shall be had against Maker for payment of principal or interest due under this Note, and Noteholder shall look solely to the Collateral as security for and collection of payment of principal or interest due under this Note.  In no event shall Maker be held personally liable for any payment of principal or interest due under this Note.  Noteholder shall not enforce the liability and obligation of Borrower to perform and observe the obligations contained in this Note by any action or proceeding wherein a money judgment shall be sought against Maker, including, without limitation, in the event the proceeds from the sale or other disposition of the Collateral are not sufficient to pay amounts owed under this Note in full.

8)     Presentment.    Maker and any signer, guarantor or endorser hereof waive presentment, notice of dishonor and protest, and assent to any extension of time with respect to any payment due under this Note, to any substitution or release of collateral and to the addition or release of any party.  Each signer and endorser hereof guarantees the payment of this Note according to its terms.  No waiver of any payment or any other right under this Note shall operate as a waiver of any other payment or right.  Maker and any signer, guarantor or endorser hereof shall pay all reasonable costs of collection, including Attorneys' fees, paid or incurred in enforcing this Note.

9)     Remedies.  The remedies provided in this Note shall be cumulative, and shall be in addition to any other rights or remedies now or hereafter provided by law or equity.  No delay, failure or omission by any holder of this Note, in respect of any default by Maker, to exercise any right or remedy shall constitute a waiver of the right to exercise the right or remedy upon any such default or subsequent default.

10) Governing Law; Jurisdiction.

9.1. This Note and any claim, controversy, dispute, or cause of action (whether in contract or tort or otherwise) based upon, arising out of, or relating to this Note, shall be governed by the laws of the State of Nevada, without regard to any conflict of law provisions thereof.

9.2. Maker hereby irrevocably and unconditionally (i) agrees that any legal action, suit, or proceeding arising out of or relating to this Note may be brought in the courts of the State of Nevada and (ii) submits to the exclusive jurisdiction of any such court in any such action, suit, or proceeding. Final judgment against the Maker in any action, suit, or proceeding shall be conclusive and may be enforced in any other jurisdiction by suit on the judgment.

9.3. Maker hereby irrevocably waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in any legal proceeding directly or indirectly relating to this Note whether based on contract, tort, or any other theory.

11) <u>Successors and Assigns</u>. This Note may be assigned, transferred, or negotiated by Noteholder to any Person, at any time, without the consent of Maker. The Maker may not assign or transfer this Note or any of its rights hereunder without the prior written consent of the Noteholder. This Note shall inure to the benefit of and be binding upon the parties and their permitted assigns.

**Maker:**

**Rawhide Mining LLC**

By: _Marceau Schlumberger_
DocuSigned by:
36AB97BD2F9C44E...
Name: _____
Title: _____

4

**Error! Unknown document property name.**

**SCHEDULE  A**

**COLLATERAL**

| CO NO. | YEAR | MAKE | MODEL | SERIAL NUMBER | DESCRIPTION |
|---|---|---|---|---|---|
| HP-1 | 2006 | NORBERG/METSO | HP 400 | 123692 | STD CONE CRUSHER |
| HP-2 | 2008 | NORBERG/METSO | HP400 | 124038 | STD CONE CRUSHER |
| 225 #-s 1 | 2011 | Fisher Industries | 36"x225' Overland | 36-225-2653-611276 | Conveyor |
| 225 #-s 2 | 2011 | Fisher Industries | 36"x225' Overland | Not Readable | Conveyor |
| 225 #-s 3 | 2011 | Fisher Industries | 36"x225' Overland | 36-225-2745-612220 | Conveyor |
| 225 #-s 4 | 2011 | Fisher Industries | 36"x225' Overland | 36-225-2561-610184 | Conveyor |
| 225 #-s 5 | 2011 | Fisher Industries | 36"x225' Overland | 36-225-2562-610184 | Conveyor |
| 225 #-s 6 | 2011 | Fisher Industries | 36"x225' Overland | 36-225-2611-611046 | Conveyor |
| 225 #-s 7 | 2011 | Fisher Industries | 36"x225' Overland | 36-225-2613-611063 | Conveyor |
| 225 #-s 8 | 2011 | Fisher Industries | 36"x225' Overland | 36-225-2610-611046 | Conveyor |
| 225 #-s 9 | 2011 | Fisher Industries | 36"x225' Overland | 36-225-2609-611046 | Conveyor |
| 225 #-s 10 | 2011 | Fisher Industries | 36"x225' Overland | 36-225-2746-612220 | Conveyor |
| 225 #-s 11 | 2011 | Fisher Industries | 36"x225' Overland | 36-225-2614-611063 | Conveyor |
| Screen 1 | 2012 | CEDAR RAPIDS | 8X20 THREE DECK SCREEN | 1245-2-11-12 | SCREENIN G PLANT |
| SCREEN 2 | 2012 | CEDAR RAPIDS | 8X20 THREE SCREEN DECK | 1245-1-11-12 | SCREENIN G PLANT |

# EXHIBIT 6

# EXHIBIT 6

<div align="right"><strong>EXECUTION VERSION</strong></div>

<div align="center"><strong><u>FORBEARANCE AGREEMENT</u></strong></div>

This FORBEARANCE AGREEMENT (the "<u>Forbearance Agreement</u>") is entered into as of September 15, 2023, among (a) RAWHIDE MINING LLC, a Delaware limited liability company ("<u>Rawhide</u>"), (b) the other "Rawhide Subsidiaries" from time to time party thereto (such Rawhide Subsidiaries, collectively, and together with Rawhide, the "<u>Borrowers</u>"), (c) RAWHIDE ACQUISITION HOLDINGS LLC, a Delaware limited liability company (the "<u>Parent</u>," and, together with Borrower, individually and in their respective capacities under the Loan Documents (as defined herein), collectively, the "<u>Rawhide Entities</u>," and each, a "<u>Rawhide Entity</u>"), (d) SILVERVIEW CREDIT OPPORTUNITIES AIV LP ("<u>Silverview</u>") and CEOF HOLDINGS LP ("<u>CEOF</u>"), each a "<u>Lender</u>" and collectively, "<u>Lenders</u>" under the Loan Agreement (as defined herein), (e) EMX USA SERVICES CORP. ("<u>Equity Lender</u>"), and (f) SILVERVIEW CREDIT PARTNERS, LP (f/k/a Silverpeak Credit Partners, LP) as the "Agent" under Loan Agreement (together with its successors and assigns, in such capacity, the "<u>Agent</u>"; and the Agent, together with Silverview, collectively, the "<u>Silverview Parties</u>"; and the Silverview Parties, together with CEOF and Equity Lender, collectively, the "<u>Lender Parties</u>," and each, a "<u>Lender Party</u>"; and the Lender Parties, together with the Rawhide Entities, collectively, the "<u>Parties</u>," and each, a "<u>Party</u>").

<div align="center"><strong><u>RECITALS</u></strong></div>

A.      WHEREAS, the Borrowers, the Parent, the Lenders, and the Agent entered into that certain Loan and Security Agreement, dated as of January 3, 2019, pursuant to which the Lenders agreed to provide certain extensions of credit, loans and other financial accommodations to the Borrowers (as amended, restated, supplemented or otherwise modified from time to time, the "<u>Loan Agreement</u>"), as amended by (i) that certain Amendment No. 1 to Loan and Security Agreement, dated as of October 31, 2019, (ii) that certain Amendment No. 2 to Loan and Security Agreement, dated as of March 12, 2021, (iii) that certain Third Amendment to Loan and Security Agreement, dated as of February 20, 2023, pursuant to which the existing Lenders made a term loan to the Borrowers in the aggregate original principal amount of $18,450,000 and the Equity Lender made a term loan to the Borrowers in the aggregate original principal amount of $150,000, on the terms set forth therein, and (iv) that certain Amendment No. 4 to the Loan and Security Agreement, dated as of March 6, 2023, pursuant to which the Equity Lender made the New Equity Holder Loan (as defined therein) in the aggregate original principal amount of $600,000, on the terms set forth therein;

B.      WHEREAS, pursuant to the Loan Agreement and the other Loan Documents (as defined in the Loan Agreement), the Lender Parties have a first priority lien on and security interest in the Collateral (as defined in the Loan Agreement);

C.      WHEREAS, the Agent delivered to the Borrower that certain letter captioned Reservation of Rights, dated as of March 17, 2022 (the "<u>Reservation of Rights Letter</u>");

D.      WHEREAS, the Agent delivered to the Borrower that certain notice of acceleration dated as of March 24, 2022 (the "<u>Notice of Acceleration</u>"), pursuant to which the Agent notified the Borrower that all of the Secured Obligations are immediately due and payable (including, from and after March 15, 2022, default interest pursuant to section 21.3 of the Loan Agreement) and demanded immediate payment in the amount of $15,813.577.68;

<div align="center">1</div>

E.      WHEREAS, on July 19, 2022, the Agent, the Lenders, and the Rawhide Parties entered into that certain Forbearance Agreement (the "2022 Forbearance Agreement"). Under the Forbearance Agreement, the Lenders agreed to forbear temporarily from exercising any default-related rights and remedies under the Loan Documents.

F.      WHEREAS, the 2022 Forbearance Agreement expired by its terms on December 31, 2022.

G.      WHEREAS, the Specified Defaults (as defined below) currently exist under the terms of the Loan Documents; and

H.      WHEREAS, the Rawhide Entities have requested that the Lender Parties forbear temporarily from exercising their default-related rights and remedies under the Loan Documents, and the Lender Parties are willing to do so under the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the promises herein contained, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by the Parties hereto, the Parties hereto hereby agree as follows:

1.      **Definitions**. Capitalized terms used in this Forbearance Agreement and not otherwise defined herein shall have the meanings ascribed to such terms in the Loan Agreement.

2.      **Incorporation of Recitals**. The recitals set forth above constitute an integral part of this Forbearance Agreement, evidencing the intent of the parties in executing this Forbearance Agreement, and describing the circumstances surrounding its execution. Accordingly, said recitals are, by express reference, made a part of the covenants hereof, and this Forbearance Agreement shall be construed in light thereof.

3.      **Acknowledgement of Obligations**. The Rawhide Entities hereby acknowledge and agree that: (a) the Borrowers are indebted to the Agent and Lenders in the amount of no less than $20,517,613.39 as of September 11, 2023, together with interest, fees (including, without limitation, reasonable attorneys' fees), costs, expenses and other charges now or hereafter payable by the Borrowers to the Agent and Lenders, without offset, recoupment, defense or counterclaim of any kind, nature or description whatsoever (the "Outstanding Amount"); (b) the Lender Parties have a valid and perfected senior lien on, and security interest in, the Collateral (as that term is defined in the Loan Agreement), and the Equity Lender has a valid and perfected senior lien on, and security interest in, the Eligible Equity Holder Note Equipment (as that term is defined in the Loan Agreement); (c) the Loan Documents are each valid and enforceable in accordance with their respective terms by the Lender Parties against the Borrowers without recoupment, offset, defense or counterclaim of any kind, nature or description whatsoever; (d) default interest is due and payable from and after March 15, 2022, and continues to accrue, including, without limitation, during the Forbearance Period (as defined below), notwithstanding anything to the contrary herein; and (e) except as modified by the Forbearance Agreement, the Loan Documents constitute the sole and entire agreement between the parties with respect to the Term Loan and the related Loan Documents or agreements, and there are no other oral or written covenants, promises, agreements or understandings regarding the Loan, the Secured Obligations, the Loan Agreement and the related Loan Documents or agreements.

4.      **Acknowledgment of Events of Default**. The Rawhide Entities hereby acknowledge and agree that (i) Events of Default under the Loan Documents have occurred and are continuing in respect of the failure of the Borrowers to make the cash payment of interest and principal due on March 15, 2022, the Borrowers' failure to pay the full amount of the Secured Obligations following acceleration of the Term Loan, and the Borrowers' failure to comply with the financial covenants set forth in section 7.1 of the Loan Agreement (collectively the "Specified Defaults"); (ii) the Specified Defaults are not subject to cure, and each entitles the Lender Parties to immediately exercise their rights and remedies under the Loan Documents; (iii) the Lender Parties have not waived, presently do not intend to waive, and may never waive, the Specified Defaults; and (iv) except as set forth herein, neither the terms of this Forbearance Agreement, nor the transactions contemplated hereby, shall be deemed to constitute any such waiver.

5.      **Forbearance**.

(a)      Forbearance. In reliance upon the representations, warranties and covenants of the Rawhide Entities contained in this Forbearance Agreement, and subject to the terms and the conditions of this Forbearance Agreement, the Lender Parties agree to forbear from exercising their default-related rights and remedies under the Loan Documents solely in respect of the Specified Defaults for the period (the "Forbearance Period") commencing on the date hereof and ending on the earliest to occur of: (i) 11:59 p.m. eastern time on October 2, 2023 (the "Outside Forbearance Expiration Date"); *provided, however*, the Outside Forbearance Expiration Date shall be extended to 11:59 p.m. eastern time on October 28, 2023 if, on or before October 2, 2023, the Rawhide Entities receive a letter of intent that contemplates a closing on or before 11:59 p.m. on October 26, 2023, and either (a) provides for the payment in full of the Secured Obligations in cash at closing or (b) is on terms otherwise acceptable to the Agent and Lenders in their sole and absolute discretion (the "Acceptable LOI"); (ii) the occurrence or existence of any breach of any representation, warranty, covenant or other agreement by the Rawhide Entities contained in this Forbearance Agreement without regard to any cure or grace period that may otherwise be applicable to such breach under the Loan Agreement (and notwithstanding anything to the contrary in the Loan Agreement); (iii) the occurrence of any Forbearance Event of Default (as defined below); or (iv) the occurrence or existence of any Default or Event of Default under the Loan Documents, other than any of the Specified Defaults. Strict performance of the terms of this Forbearance Agreement is required. Substantial performance of the terms of this Forbearance Agreement in good faith and without willful failure shall not be deemed sufficient performance. Strict performance shall be deemed the essence of this Forbearance Agreement and shall be deemed contracted for by the parties hereto. All breaches of this Agreement and all Forbearance Events of Defaults shall constitute additional immediate Events of Default under the Loan Agreement. Upon the expiration or termination of the Forbearance Period, the agreement of the Lender Parties to forbear shall automatically terminate and shall be of no force and effect, it being expressly agreed that the effect of such termination will be to permit the Lender Parties to immediately exercise any one or more of their default-related rights and remedies under the Loan Documents, without (x) notice to the Borrowers, (y) the passage of time, or (z) forbearance of any kind. Notwithstanding the foregoing, (i) each Loan Party shall comply with all limitations, restrictions or prohibitions that would otherwise be effective or applicable under the Loan Agreement or any of the other Loan Documents during the continuance of any Event of Default

(including any Specified Defaults), including, without limitation, any limitations, restrictions or prohibitions against taking or permitting to exist certain actions including incurring certain debt, making certain dispositions, making certain investments, paying management, consulting or other similar fees, paying any earn- outs in connection with, or making, Permitted Investments, Permitted Royalties or making certain distributions or other Restricted Distributions or Restricted Transfers pursuant to certain terms and conditions set forth in the Loan Documents (including sections 8.1-8.5 and 8.8 of the Loan Agreement).

(b)    No Waivers; Reservation of Rights.  The Lender Parties have not waived, are not by this Forbearance Agreement waiving, and have no intention of waiving, any Event of Default under one or more of the Loan Documents (including the Specified Defaults) which has occurred, or which may occur at any time on or after the date hereof. Further, the Lender Parties have not agreed to forbear with respect to any of their rights or remedies concerning any Default, Event of Default, or Forbearance Event of Default other than the Specified Defaults. Except as expressly set forth in this Forbearance Agreement, (i) the Lender Parties reserve the right, in their sole discretion, to exercise any or all of their rights and remedies under the Loan Documents as a result of any Default or Event of Default under any one or more of the Loan Documents, other than the Specified Defaults solely during the Forbearance Period; (ii) the Lender Parties have not waived any of such rights or remedies; and (iii) neither this Forbearance Agreement, nor any delay by the Agent or any of the Lender Parties in exercising any such rights or remedies, shall be construed as a waiver by the Agent or any Lender Party of any such rights or remedies.

6.    **Conditions of Effectiveness.** This Forbearance Agreement shall become effective at such time as all of the following conditions precedent have been satisfied as determined by the Agent and each Lender (such date, the "Effective Date"):

(a)    This Forbearance Agreement shall have been executed by the Borrowers, the Parent, and the Lender Parties, and such fully executed Forbearance Agreement shall have been delivered to the Agent.

(b)    The Rawhide Entities shall have retained a Chief Restructuring Officer acceptable to the Agent and Lenders ("CRO") during the Forbearance Period. The Rawhide Entities agree that the CRO, in its capacity as CRO, will operate independently of Lender Parties, and that employment of the CRO does not create any form of agency relationship, joint venture relationship, or partnership between Lender Parties and the CRO, or the Rawhide Entities and the Lender Parties.

(i)    The CRO shall oversee the Rawhide Entities' businesses and assets and shall negotiate and consummate a sale of all or substantially all of the Rawhide Entities' businesses and assets (the "Strategic Process") on terms acceptable to the Lender Parties.

(ii)    The CRO shall be authorized to sell non-essential Collateral (as that term is defined in the Loan Agreement), such as vehicles and other equipment, in CRO's reasonable business judgment prior to consummation of the Strategic Process,

EXECUTION VERSION

subject to the Lenders' approval in their sole and absolute discretion. The proceeds of such sales, net of any reasonable commissions and necessary closing costs, shall be paid to Agent and applied to the Outstanding Amount pursuant to the Loan Documents.

(iii)    Neither the Parent's board, nor any manager, management committee, or similar supervisory body or other person acting or purporting to act on behalf of any of the Rawhide Entities, may approve, suspend, or cancel the Strategic Process, nor any sale pursuant thereto, without CRO's prior written approval.

(iv)    CRO shall be involved in all aspects of the Strategic Process, including all substantive discussions and correspondence with any interested parties.

(v)    The Rawhide Entities, jointly and severally, promise to indemnify and hold the Agent, the Lenders, the Equity Lender, and their respective officers, directors, employees, agents, attorneys, representatives and equity holders (each, an "Indemnified Person") harmless from and against any and all claims, costs, expenses, damages and liabilities (including such claims, costs, expenses, damages and liabilities based on liability in tort, including strict liability in tort), including reasonable out-of-pocket attorneys' fees and disbursements and other reasonable out-of-pocket costs of investigation or defense (including those incurred upon any appeal) (collectively, "Liabilities"), that may be instituted or asserted against or incurred by such Indemnified Person as the result of (i) the Borrowers' retention of the CRO or (ii) any actions, inactions, or omissions by the CRO on behalf of the Rawhide Entities.

(c)    The Lenders shall have caused to be paid the $110,429.95 payoff amount for the premium financing for the Rawhide Entities' existing directors and officers liability insurance policy (the "D&O Insurance Payment").

(i)    Not as a condition of effectiveness of this Forbearance Agreement, but as a separate obligation hereunder, the Lenders agree that, subject to the Subsequent Insurance Payments Cap (as defined below), the Lenders shall cause to be paid the insurance premiums required from time to time to renew or extend the existing directors and officers liability insurance policy, or to obtain tail coverage, that provides coverage to the Managers (as defined below) through February 22, 2026 (the "Subsequent D&O Obligation").

(ii)    The Subsequent D&O Obligation shall be limited to payments by the Lenders of up to $250,000 in the aggregate (the "Subsequent Insurance Payments Cap"). For the avoidance of doubt, the Subsequent Insurance Payments Cap sets the aggregate maximum amount of the Subsequent D&O Obligation. The Lenders shall not be obligated to fund or cause to be paid any amounts in excess of the Subsequent Insurance Payments Cap, and nor shall the Lenders be required to fund or cause to be paid the maximum amount of Subsequent Insurance Payments Cap to the extent the insurance premiums necessary to obtain the coverage contemplated by the foregoing Section 6(c)(i) are less than $250,000 in the aggregate. To the extent the total amount of premiums required to obtain such coverage exceeds the Subsequent Insurance

Payments Cap, nothing herein shall preclude any of the Managers or any other party from paying the difference between the Subsequent Insurance Payments Cap and the total amount of such premiums. In the event none of the Managers or any third party timely pays such deficiency and, as a result of such unpaid deficiency, coverage is denied, canceled, or lapses prior to February 26, 2026, the Lenders will be deemed to have satisfied the Subsequent D&O Obligation and shall have no further obligations under this Section 6(c).

(iii)    The following current or former managers, directors, and/or officers of the Rawhide Entities are referred to herein collectively as the "Managers," and each a "Manager": Don Deines, Wayne Hubert, Stabro Kasaneva, Darcy Marud, Nicolas Schlumberger, Marceau Schlumberger, Jeffrey S. Stein, and Michael Winn.

(iv)    The Rawhide Entities hereby acknowledge and agree that the amounts paid for the D&O Insurance Payment and the Future D&O Obligation, and any other payments funded or made in connection with this Section 6(c), shall be considered additional protective advances under the Loan Documents and shall be added to the balance of the Outstanding Amount. The Rawhide Entities further acknowledge and agree that such payments do not create any form of agency relationship, joint venture relationship, or partnership between (i) the Agent or the Lenders, and (ii) any of the Borrowers, the Managers, or the Rawhide Parties, and that by making such payments, the Lenders are protecting their own interests as creditors of the Rawhide Parties.

7.      **Rawhide Entities' Covenants**. To induce the Lender Parties to enter into this Agreement, the Rawhide Entities hereby covenant and agree with the Lender Parties as follows:

(a)    On a monthly basis, beginning on the tenth business day of the first month following the Effective Date, and on a continuing basis no later than the twentieth business day of each following month, the Rawhide Entities shall provide the Agent with a reconciliation of monthly actual expenses versus monthly budgeted expenses. Such reconciliation shall be in form and substance satisfactory to the Agent and each Lender in their respective sole discretion.

(b)    On a bi-weekly basis, beginning on the first Monday following the Effective Date, and on a continuing basis no later than the Monday of each following week, the Rawhide Entities shall provide the following information to the Agent: (i) the prior week's cash payments and receipts; (ii) the current week's forecast of gold production and cash payments and receipts; (iii) a rolling two week cash flow forecast to be approved, in writing, in advance, by the Agent and each Lender (the "Two Week Budget"); (iv) a detailed accounting by vendor of any expenditures from the Working Capital Funding; (v) all site operational management reports made in the ordinary course of business; and (vi) a written account of the status of any and all correspondence, discussion, or negotiations with respect to any financing opportunities, or prospective purchasers or investors in connection with the Strategic Process including, but not limited to: (a) a list of entities contacted; (b) any response from those entities; (c) a list of entities that have executed non-disclosure agreements; (d) a list of entities that received a Sale Book and have access to the Data Room (as such terms are defined below); and (e) copies of

all documents related to the Strategic Process provided by any Loan Party or Investment Banker to any Person. Such reporting shall be in form and substance satisfactory to the Agent and each Lender in their respective sole discretion.

(c)     Without limiting any other provisions of the Loan Agreement or this Forbearance Agreement, the Rawhide Entities shall not make any payments or distributions of any kind to owners of equity in any of the Rawhide Entities or any creditors of any of the Rawhide Entities unless such payments are (i) consented to in writing by the Agent; or (ii) in respect of payments to creditors made in the ordinary course of business in accordance with the Two Week Budget then in effect. For the avoidance of doubt, in the event that a Two Week Budget is not approved by the Agent and each Lender, the prior Two Week Budget shall continue in full force and effect for the purposes of this section 7(c).

(d)     The Rawhide Entities shall promptly, and in any event no later than 24 hours following receipt, deliver to the Agent any and all offers, term sheets, indications of interest, letters of intent, other proposals and any definitive purchase documentation they receive, in each case in connection with the Strategic Process or any other sale, financing or other transaction involving the Loan Parties or their assets and/or businesses.

(e)     The Rawhide Entities shall fully cooperate with the CRO in connection with (i) a review of the operations and finances of the Rawhide Entities and (ii) the Strategic Process.

(f)     On a weekly basis, beginning on the first Wednesday following the Effective Date, and on a continuing basis no later than the Wednesday of each following week, the Rawhide Entities shall cause the CRO to host weekly calls or meetings with the Agent and the Lenders (and their counsel) to update the Agent and Lenders on the status of the Strategic Process.

(g)     The Rawhide Entities shall, and shall cause CRO to, (A) consult with the Agent and the Lenders regarding the Strategic Process at times and with detail requested by the Agent or any Lender (including, without limitation, communications outside the presence of any representatives of any Loan Party or any affiliate thereof); and (B) disclose fully and promptly to the Agent, Lenders and their respective advisors all material developments in with respect to the Strategic Process.

(h)     The Rawhide Entities shall comply with all covenants including reporting obligations set forth in the Loan Documents.

(i)     Notwithstanding the foregoing, nothing in this Forbearance Agreement constitutes or shall be deemed to constitute any consent by any Lender Party to any sale or any waiver of any of the rights and remedies of any Lender Party with respect thereto.

8.     **Representations and Warranties**. To induce the Lender Parties to enter into this Agreement, the Rawhide Entities hereby represent and warrant to the Lender Parties that:

(a)     <u>Organization</u>. Each Rawhide Entity is a limited liability company duly organized, existing and in good standing under the laws of the State of Delaware with full and adequate corporate power to carry on and conduct its business as presently conducted. Each Borrower is duly licensed or qualified in all foreign jurisdictions wherein the nature of its activities requires such qualification or licensing.

(b)     <u>Authorization; Due Execution</u>. The Rawhide Entities are duly authorized to execute and deliver this Forbearance Agreement and to perform their respective obligations hereunder. Each of the Rawhide Entities has duly executed and delivered this Forbearance Agreement and each other Loan Document to which they are a party.

(c)     <u>Validity and Binding Effect</u>. This Forbearance Agreement and the Loan Documents are legal, valid, and binding obligations of each Rawhide Entity, enforceable against each such Rawhide Entity in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, or other similar laws of general application affecting the enforcement of creditors' rights or by general principles of equity limiting the availability of equitable remedies.

(d)     <u>No Consents or Approvals</u>. No consent, approval, authorization, or order of, or filing, registration or qualification with, any Governmental Authority is required in connection with the execution, delivery or performance by such Rawhide Entity of this Forbearance Agreement (other than such as has been met or obtained and are in full force and effect).

(e)     <u>Confirmation of Representations in Loan Agreement</u>. Each of the representations and warranties set forth in Article 5 of the Loan Agreement is true and correct, in all respects, as though made on and as of the Effective Date.

(f)     <u>No Other Defaults</u>. No Default or Event of Default, other than the Specified Defaults, has occurred as of the Effective Date.

9.     **Events of Default**. The occurrence of any one or more of the following shall be an event of default ("<u>Forbearance Event of Default</u>") under this Forbearance Agreement:

(a)     Any Rawhide Entity fails to perform any covenant set forth in section 7 hereof.

(b)     Any reporting delivered by the Rawhide Entities shall contain a material misstatement of any of the information set forth therein.

(c)     Any representation or warranty set forth in section 8 hereof is untrue.

(d)     The occurrence of any Default or Event of Default, other than: (i) the Specified Events of Defaults; or (ii) any Default or Event of Default relating to section 7.1(c) of the Loan Agreement for the period measured as of October 2, 2023.

(e)     The failure of the Strategic Process to produce one or more prospective bidders for an acceptable transaction, as reasonably determined by the CRO, by October 2, 2023.

**EXECUTION VERSION**

      (f)      A sale consistent with the Acceptable LOI fails to close by October 26, 2023.

      (g)      The termination or resignation of the CRO.

      10.      **Release**. The Rawhide Entities hereby release, acquit, and forever discharge the Lender Parties and each and every past and present subsidiary, affiliate, officer, director, agent, servant, employee, representative, and attorney of the Lender Parties, from any and all claims, causes of action, suits, debts, liens, obligations, liabilities, demands, losses, defenses, costs and expenses (including attorneys' fees) of any kind, character, or nature whatsoever, known or unknown, fixed or contingent, which any of the Rawhide Entities may now have or claim to have now or which may hereafter arise out of or be connected with (a) any act of commission or omission of the Agent or Lender Parties occurring prior to the date of this Forbearance Agreement or (b) any instrument executed prior to the date of this Forbearance Agreement including, without limitation, any claims, liabilities or obligations relating to the Loan Documents.

      11.      **No Claim/No Defaults**. The Rawhide Entities each hereby expressly acknowledge and agree that that it currently possesses no claim or defense against any Lender Party nor any of their respective designees, affiliates, agents, employees, officers, directors, consultants, successors, assigns, and representatives (collectively, "Lender Related Parties," and each, a "Lender Related Party") in connection with the Loan Documents, including, but not limited to, set-off, estoppel, waiver, duress, impracticability, mistake, ambiguity, cancellation of instruments, rescission or excuse of performance. The Rawhide Entities each hereby expressly agree that they shall not assert (including, without limitation, by bringing any action, lawsuit or proceeding) any claims (including, without limitation, any "lender liability" claims) against any Lender Party or any of the Lender Related Parties based on, arising out of or in connection with this Forbearance Agreement. The Rawhide Entities each hereby acknowledge and agree that there are no defaults, events of defaults or breaches by any Lender Party under any of the Loan Documents, which now exist or, following notice and an opportunity to cure, will ripen into a default, event of default or breach by any Lender Party under any of the Loan Documents.

      12.      **Debtor/Creditor Relationship**. The relationship between the Rawhide Entities and the Lender Parties is solely that of a debtor and creditor, each as further set forth in the respective Loan Documents, and the Lender Parties do not have any fiduciary or other special relationship with the Rawhide Entities, and no term or condition of this Agreement or of the Loan Documents shall be construed so as to deem the relationship between the Rawhide Entities, on one hand, and the Lender Parties, on the other hand, to be other than that of Borrower or Parent (as applicable) and Lender and Agent, in each case, as further set forth in the Loan Documents. The Parties acknowledge and agree that the relationship between the Rawhide Entities and the Lender Parties arose entirely pursuant to and in accordance with the Loan Documents.

      13.      **Notices**. All notices required under this Forbearance Agreement shall be in writing and shall be transmitted in the manner and to the addresses required by the Loan Documents, and if to Agent or any of the Lenders, by email to agent@silverviewcredit.com with copy to Bryce Suzuki as counsel for the Lenders at bsuzuki@swlaw.com, or to such other addresses as the Agent, the Lenders, the Equity Lender, or the Rawhide Entities may specify from time to time in writing.

4881-9030-4126.7

**EXECUTION VERSION**

14.  **Opportunity to Consult with Attorney**. The Rawhide Entities hereby confirm that they have each had the opportunity to consult with an attorney of their choosing regarding the meaning, consequences, and effect of this Forbearance Agreement, and acknowledge that they understand the meaning, legal consequences, and effect of this Forbearance Agreement. The Rawhide Entities hereby confirm that they have entered into this Forbearance Agreement voluntarily, with full knowledge of its significance and that this Forbearance Agreement is in all respects complete and final.

15.  **Miscellaneous**.

(a)  The Borrowers hereby agree to pay all of the Agent's and Lenders' costs and expenses, including, without limitation, attorneys' and any consultants' fees and expenses, related to this Forbearance Agreement and any related transactions upon the earlier of: (i) the termination of this Forbearance Agreement and (ii) the closing of a sale consistent with an Acceptable LOI.

(b)  The Borrowers shall pay all of CRO's fees, costs, and expenses in accordance with the engagement letter between the Rawhide Entities and CRO.

(c)  This Forbearance Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which shall together constitute but one and the same document.

(d)  This Forbearance Agreement shall be binding on the Rawhide Entities and their respective representatives, successors and assigns, and shall inure to the benefit of the Lender Parties and their successors and assigns.

(e)  This Forbearance Agreement is made and entered into solely for the benefit of the Parties hereto. There are no third-party beneficiaries, express or implied, of this Forbearance Agreement. No provision of this Forbearance Agreement shall be deemed to confer any benefit, claim, remedy, liability, reimbursement, cause of action, nor any direct, indirect, or derivative right, nor any other rights, upon any other person other than the Parties hereto. Notwithstanding the foregoing, the Managers shall be deemed to be third-party beneficiaries only of Section 6(c)(i)-(ii) of this Forbearance Agreement.

(f)  Section captions and headings used in this Forbearance Agreement are for convenience only and are not part of, and shall not affect the construction of, this Forbearance Agreement.

(g)  This Forbearance Agreement is a contract made under and governed by the laws of the State of New York, without regard to conflict of laws principles. Whenever possible, each provision of this Forbearance Agreement shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Forbearance Agreement shall be prohibited by, or be invalid under such law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Forbearance Agreement.

(h)      Each Borrower hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of any New York State court or Federal court of the United States sitting in New York City, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Forbearance Agreement or the other Loan Documents, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such Federal court. Each Party agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Forbearance Agreement shall affect any right that the Agent or any Lender may otherwise have to bring any action or proceeding relating to this Agreement or the other Loan Documents against any Borrower or its properties in the courts of any jurisdiction.

(i)      Each Borrower hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Forbearance Agreement or the other Loan Documents in any New York State or Federal court. Each Party irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(j)      **EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS FORBEARANCE AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS, INCLUDING WITHOUT LIMITATION ANY CAUSE OF ACTION, CLAIM, CROSS-CLAIM, COUNTERCLAIM, THIRD PARTY CLAIM OR ANY OTHER CLAIM (COLLECTIVELY, "CLAIMS") ASSERTED BY ANY BORROWER AGAINST THE AGENT, THE LENDERS OR THEIR RESPECTIVE ASSIGNEES OR BY THE AGENT, THE LENDERS OR THEIR RESPECTIVE ASSIGNEES AGAINST ANY BORROWER. EACH PARTY (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.**

(k)      This Forbearance Agreement represents the complete agreement among the parties regarding the subject matter hereof and supersedes any prior or contemporaneous agreements or understandings, oral or written regarding said subject matter.

<div align="right">**EXECUTION VERSION**</div>

(l)     This Forbearance Agreement shall be construed without regard to any presumption or other rule requiring construction against the party that drafted, or caused to be drafted, the Forbearance Agreement.

(m)     All Parties acknowledge and agree that Agent shall, promptly following receipt, distribute to each Lender any and all information and documents received by Agent or its advisors from the Loan Parties or their advisors pursuant to this Agreement and the other Loan Documents.

(n)     The Rawhide Entities, as debtors, grantors, pledgors, guarantors, assignors, or in other similar capacities in which such parties grant liens or security interests in their properties or otherwise act as accommodation parties or guarantors, as the case may be, under the Loan Documents, hereby ratify and reaffirm all of their payment and performance obligations and obligations to indemnify, contingent or otherwise, under each of such Loan Documents to which it is a party, and ratify and reaffirm their grants of hypothecs, liens on or security interests in their properties pursuant to such Loan Documents to which they are a party, respectively, as security for the Obligations under or with respect to the Loan Agreement, and confirm and agree that such liens and security interests hereafter secure all of the Secured Obligations, including, without limitation, all additional Secured Obligations hereafter arising or incurred pursuant to or in connection with this Agreement, the Loan Agreement or any other Loan Document.

<div align="center">*     *     *</div>

<div align="center">**[SIGNATURE PAGES FOLLOW]**</div>

4881-9030-4126.7

**IN WITNESS WHEREOF**, this Agreement has been entered into as of the date first above written.

RAWHIDE ENTITIES:

RAWHIDE MINING LLC, a Delaware limited liability company

By: _____
Its: __ Marceau Schlumberger, Member __

RAWHIDE ACQUISITION HOLDINGS, LLC, a Delaware limited liability company

By: _____
Its: ___ Marceau Schlumberger, Member __

13

EXECUTION VERSION

**IN WITNESS WHEREOF**, this Agreement has been entered into as of the date first above written.

LENDERS:

SILVERVIEW CREDIT OPPORTUNITIES AIV LP, a Delaware Limited Partnership

By: _____
Its: Partner

CEOF HOLDINGS LP, a Delaware Limited Partnership

By: _____
Its:_____

EQUITY LENDER:

EMX USA SERVICES CORP.

By: _____
Its:_____

AGENT:

SILVERVIEW CREDIT PARTNERS LP, a Delaware Limited Partnership

By: _____
Its: Partner

14

<div align="right"><strong>EXECUTION VERSION</strong></div>

**IN WITNESS WHEREOF**, this Agreement has been entered into as of the date first above written.

LENDERS:                           SILVERVIEW CREDIT OPPORTUNITIES
                                   AIV LP, a Delaware Limited Partnership

                                   By: _____
                                   Its: _____


                                   CEOF HOLDINGS LP, a Delaware Limited
                                   Partnership
                                   By: Corbin Capital Partners, L.P., its Investment Manager

                                   By: _____
                                   Its: General Counsel


EQUITY LENDER:                     EMX USA SERVICES CORP.

                                   By: _____
                                   Its: _____


AGENT:                             SILVERVIEW CREDIT PARTNERS LP, a
                                   Delaware Limited Partnership

                                   By: _____
                                   Its: _____

**EXECUTION VERSION**

**IN WITNESS WHEREOF**, this Agreement has been entered into as of the date first above written.

LENDERS:

SILVERVIEW CREDIT OPPORTUNITIES AIV LP, a Delaware Limited Partnership

By: _____
Its:_____


CEOF HOLDINGS LP, a Delaware Limited Partnership

By: _____
Its:_____


EQUITY LENDER:

EMX USA SERVICES CORP.

By: _____
Its:___CFO, Douglas Reed_____


AGENT:

SILVERVIEW CREDIT PARTNERS LP, a Delaware Limited Partnership

By: _____
Its:_____

14