E-filed: December 27, 2023

Bryce Suzuki *(pro hac vice pending)*
(AZ Bar No. 022721)
Steven D. Jerome *(pro hac vice pending)*
(AZ Bar No. 018420)
Snell & Wilmer l.l.p.
1 East Washington Street, Suite 2700
Phoenix, AZ 85004
Telephone: (602) 382-6000
Facsimile: (602) 382-6070
E-Mail: bsuzuki@swlaw.com
sjerome@swlaw.com

Blakeley E. Griffith (NV Bar No. 12386)
Snell & Wilmer l.l.p.
3883 Howard Hughes Parkway, Suite 100
Las Vegas, NV 89169
Telephone:    (702) 784-5200
Facsimile: (702) 784-5252
E-Mail:  bgriffith@swlaw.com

*Attorneys for Silverview Credit Partners, LP,
as Agent for Lender Parties*

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| In Re: | Case No. 23-15619-hlb<br>Chapter 11 |
| RAWHIDE MINING LLC, | |
| Debtor. | **PRELIMINARY OBJECTION TO EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS: (I) AUTHORIZING DEBTORS TO OBTAIN POST-PETITION SENIOR, SECURED, SUPERPRIORITY FINANCING; (II) GRANTING LIENS AND SUPERPRIORITY CLAIMS; (III) MODIFYING THE AUTOMATIC STAY; (IV) SCHEDULING INTERIM AND FINAL HEARINGS; AND (V) GRANTING RELATED RELIEF** |
| | **Hearing Date: December 28, 2023** |
| | **Hearing Time: 10:30 a.m.** |
| | **Hearing Location:<br>United States Bankruptcy Court<br>C. Clifton Young Federal Building<br>300 Booth Street<br>Reno, Nevada 89509** |

4870-1831-0041

Silverview Credit Partners, LP f/k/a Silverpeak Credit Partners, LP), the administrative agent for certain lenders under that certain *Loan and Security Agreement*, as described in more detail below, ("Agent") party-in-interest in the above-captioned Chapter 11 bankruptcy cases[1] ("Bankruptcy Case") of Rawhide Mining, LLC ("Rawhide") and Rawhide Acquisition Holding, LLC ("Holding" together with Rawhide, the "Debtors"), hereby objects (the "Preliminary Objection")[2] to the *Emergency Motion for Interim and Final Orders: (I) Authorizing Debtors to Obtain Post-Petition Senior, Secured, Superpriority Financing; (II) Granting Liens and Superpriority Claims; (III) Modifying the Automatic Stay; (IV) Scheduling Interim and Final Hearings; and (V) Granting Related Relief* (the "Motion") [ECF No. 22]. This preliminary objection is supported by the papers on file with the Court, any argument that the Court may entertain, the following memorandum of points and authorities, and the *Declaration of Brian Rigert* (the "Rigert Dec.").

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.     INTRODUCTION**

In the Motion, the Debtors seek extraordinary relief and relief that is highly prejudicial to Lender Parties on extremely short notice. "[G]ranting post-petition financing on a priming basis is extraordinary and is allowed only as a last resort." *In re Packard Square LLC*, 574 B.R. 107, 116 (Bankr E.D. Mich. 2017) (quoting *In re YL West 87th Holdings I LLC*, 423 B.R. 421, 441 (Bankr. S.D.N.Y. 2010)). The Motion was filed on Christmas, two days before the deadline to object. The Debtors' declaration in support, was not only filed the next day (*i.e.*, December 26) and less than 24 hours before the deadline to object to the Motion, the declaration—in a few conclusory sentences—speculatively proclaims that granting the Motion, approving the proposed DIP loan, and priming the Lender Parties' pre-petition liens will miraculously create future value. Notably absent from the Motion and Schlumberger Declaration is any admissible and specific evidence to

---

[1] On December 20, 2023, the Debtors filed a *Motion for Order Directing Joint Administration of Chapter 11 Cases* [ECF No. 3] (the "Motion for Joint Administration").

[2] Given that the Motion was filed on the evening of December 25, 2023 and the objection deadline is December 27, 2023 at 5:00 p.m., Agent had two days to review and respond to the Motion. In light of this accelerated timing, Agent expressly reserves its rights to supplement this Preliminary Objection.

2

support the Debtors' brief, but wild conjecture of unspecified future value.

In fact, prior to filing bankruptcy, the Debtors had ceased active mining operations and the Bureau of Land Management ("BLM") had initiated reclamation activities with respect to the Mine. Pursuant to a forbearance agreement, the Debtors and Lender Parties had been cooperatively working on an orderly winddown and liquidation.

In November 2023, the Lender Parties and the Debtors began negotiating a potential out-of-court restructuring transactions with DeJong (defined below), the proposed DIP Lender, to allow DeJong to either acquire the equity in assets of the Debtors or the equity in Rawhide. Apparently unable to obtain the steep economic concessions through consensual negotiations, De Jong and the Debtors now seek to impose a diminished recovery upon the Lender Parties through the bankruptcy cases and the "emergency" Motion.

## II.     FACTUAL BACKGROUND

### A.     The Loan

As recognized and acknowledged by the Debtor, on or about January 3, 2019, Rawhide, as borrower, and Holding as parent, executed a *Loan and Security Agreement* in favor of Silverview Credit Opportunities AIV LP (f/k/a Silverpeak Credit Opportunities AIV LP) and COEF Holdings LP (collectively, "Lenders") and Silverview Credit Partners LP as the Agent (collectively the "Lender Parties") whereby the Lender Parties agreed to provide certain extensions of credit, loans, and other financial accommodations to Rawhide, in the original principal amount of $18,100,000, plus all unpaid interest, fees, costs, and charges (the "Loan"). *See* Exhibit 1 to Rigert Decl.

On or about January 3, 2019, Rawhide, as "Grantor" executed that certain "Deed of Trust, Leasehold Deed of Trust, Assignment of Leases and Rents, Security Agreement, Fixture Filing and As-Extracted Collateral Filing" ("Deed of Trust") for the benefit of Lender Parties, to secure, among other things payment of all the indebtedness and performance of the obligations under the Loan Agreement. The Deed of Trust was recorded on January 3, 2019, in the Official Records of Mineral County, Nevada as Instrument No. 169965. Rigert Decl. at ¶ 1(a). The Deed of Trust relates to certain real and personal property described more specifically therein as the "Property"

3

which relates to a gold mine located in Hawthorne, Nevada (the "Mine"). *See* Exhibit 2 to Rigert Decl.

The Loan was subsequently amended by: (i) that certain Amendment No. 1 to Loan and Security Agreement, dated as of October 31, 2019, (ii) that certain Amendment No. 2 to Loan and Security Agreement, dated as of March 12, 2021, (iii) that certain Third Amendment to Loan and Security Agreement, dated as of February 20, 2023, pursuant to which the aggregate original principal amount of the Loan increased to $18,450,000 and EMX USA Services Corp. ("Equity Lender") made a term loan to the Debtors in the aggregate original principal amount of $150,000. *Id.* at ¶ 1(b).

As acknowledged by the Debtors, the Loan is secured by all assets of Rawhide and its subsidiaries, including, but not limited to, Accounts, Chattel Paper, Commodity Contracts, Deposit Accounts, Documents, Equipment, Fixtures, General Intangibles, Goods, Instruments, Intellectual Property, Inventory, Investment Property, Letter of Credit Rights and Supporting Obligations, Commercial Tort Claims, and the proceeds and products of the foregoing along with a pledge of Holding's equity in Rawhide pursuant to that certain Pledge and Security Agreement dated as of January 3, 2019. *Id.* at ¶ 1(c), Exhibit 3; *see* Schlumberger Decl. at p. 4, ¶ 16; Ex. 4.

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
(702) 784-5200

Lender Parties perfected the security interest in the Collateral by, among other things, recording: (i) that certain UCC Financing Statement dated as of January 7, 2019, with the Delaware Department of State as Initial Filing No. 20190127899 as to Rawhide, and (2) that certain UCC Financing Statement dated on or about January 7, 2019, with the Delaware Department of State as Initial Filing No. 20190127733 as to Holding (as amended, continued, and assigned, the "UCCs"). Rigert Decl. at 1(d), Exhibit 4.

**B. The Loan Defaults and Forbearance Agreements**

The Debtors defaulted under the Loan Documents by, among other things, failing to make the cash payment of interest and principal due on March 15, 2022. Upon default, Agent delivered to Debtors that certain notice of acceleration dated as of March 24, 2022 (the "Notice of Acceleration"), pursuant to which Agent notified the Debtors that its secured obligations are immediately due and payable (including, from and after March 15, 2022, default interest pursuant

1  to section 21.3 of the Loan Agreement) and demanded immediate payment in the amount of
2  $15,813.577.68. *Id.* at ¶ 6.

3  As set forth above, beginning in 2022, the Debtors began having cash flow problems and
4  could not service the Loan. *Id.* at ¶ 7. On July 19, 2022, the Lender Parties and the Debtors,
5  among others, entered into that certain Forbearance Agreement (the "<u>2022 Forbearance
6  Agreement</u>") wherein the Lender Parties agreed to forbear from exercising default-related rights
7  and remedies for a specified period of time to allow the Debtors to refinance the Loan or sell the
8  Mine. *Id.* at ¶ 8, Exhibit 5. Ultimately, the forbearance period under the 2022 Forbearance
9  Agreement expired and the Debtors were unable to obtain refinance the Loan or otherwise repay
10 the Loan. *Id.* at ¶ 9.

11 On September 15, 2023, the Lender Parties and the Debtors, among others, entered into
12 that certain Forbearance Agreement (the "<u>2023 Forbearance Agreement</u>") wherein the Lender
13 Parties again agreed to forbear from exercising default-related rights and remedies for a specified
14 period of time to allow the Debtors to refinance the Loan or sell the Mine. *Id.* at ¶ 10, Exhibit 6.
15 As a condition of effectiveness to the 2023 Forbearance Agreement, the Debtors agreed to retain
16 a Chief Restructuring Officer acceptable to the Lender Parties to, among other things, oversee the
17 Debtors' business and assets and negotiate and consummate a sale of all or substantially all of the
18 Debtors' assets on terms acceptable to the Lender Parties. *Id.* at ¶ 11. The Lender Parties agreed
19 to continue to provide funding for immediate cash needs, such as to paying employees and
20 maintaining insurance. *Id.* at ¶ 12. As set forth in the 2023 Forbearance Agreement, the Debtors
21 stipulated and agreed that the Debtors are indebted to the Lender Parties in the amount of no less
22 than $20,517,613, along with accruing interest, fees (including, without limitation, reasonable
23 attorneys' fees), costs as of September 11, 2023. *Id.* at ¶ 13.

C. **Mining Operations Ceased, the Appointment of Chief Restructuring Officer, and Negotiations with DeJong Capital LLC**

Upon information and belief, since approximately August 2023, the Debtor has not been conducting regular mining operation at the Mine and mining operations have essentially ceased. *Id.* at ¶ 14. Upon information and belief, once it was clear that the Mine had ceased operations,

5

4870-1831-0041

BLM initiated reclamation work at the Mine. *Id.* at ¶ 15. Shortly after September 15, 2023, the Debtors retained Eric Camm of Turning Point Strategic Advisors to act as Chief Restructuring Officer. *Id.* at ¶ 16. Starting in or about September 15, 2023, Eric Camm oversaw the Debtors' business and assets and engaged in negotiations to sell substantially all of the Debtors' assets. *Id.* at ¶ 17.

Beginning in November 2023, the Lender Parties and the Debtors have been negotiating a potential out-of-court restructuring transactions with DeJong Capital LLC ("DeJong") to allow DeJong to either acquire the equity in assets of the Debtors or the equity in Rawhide. *Id.* at ¶ 18. Despite numerous communications with the Debtors regarding the out-of-court restructuring, the Debtors did not discuss the proposed DIP loan or the filing of the Bankruptcy Cases with the Lender Parties. *Id.* at ¶ 19. Additionally, at no point did the Debtors ask the Lender Parties if they would be interested in providing DIP financing. *Id.* at ¶ 20. Similarly, at no point did DeJong discuss the proposed DIP loan or the Bankruptcy Cases with the Lender Parties. *Id.* at ¶ 21.

As of December 20, 2023, Debtors are indebted to the Lender Parties in the amount of no less than $19,680,043.82, along with accruing interest, fees (including, without limitation, reasonable attorneys' fees), costs, and expenses. *Id.* at ¶ 22. Based on the information known to the Lender Parties to date, the Lender Parties believe the current value of the Collateral is less than the current amount outstanding under the Loan. *Id.* at ¶ 22. At no point during the discussions with the Debtors or DeJong did the Debtors or DeJong take the position that the value of the Collateral exceeded the amount of debt owed to the Lender Parties. *Id.* at ¶ 23. In fact, during the negotiations, DeJong took the position that Lender Parties would be lucky to receive $5–10 million for the Collateral, and DeJong indicated that the maximum it would pay would be less than 50% of the face value of the Loan to the Lender Parties under any restructuring or refinancing proposal. *Id.* at ¶ 25.

Upon information and belief, the Debtors received and are holding an insurance check from Zurich Insurance in the approximate amount of $200,000 on account of the Debtors' business interruption claim. As such, the Debtors have funds to pay certain expenses and costs on an emergency basis without the need to approve the proposed facility on an expedited, interim

6

4870-1831-0041

basis. *Id.* at ¶ 26.

### D. The Bankruptcy Proceedings

On December 20, 2023, Debtors filed their barebones voluntary Chapter 11 petitions for relief, initiating Bankruptcy Case No. 23-15619-hlb and Bankruptcy Case No. 23-15620-hlb. ECF No.'s 1 in both cases. Also on December 20, 2023, Debtors their *Motion to Extend Deadline to File Schedules or Provide Required Information*, seeking to extend the deadline to file their statements and schedules by thirty days. ECF No. 4 at ¶ 11. On December 22, 2023, Debtors filed a variety of motions, including a motion to enforce the automatic stay, pay pre-petition wages, and to authorize the continued use of existing bank accounts. Debtors sought to have these various first day motions ("First Day Motions") heard on an expedited basis. ECF No's. 3,4, 10, 16, 17, and 18 in Case No. 23-15619.

On the evening of December 25, 2023, Debtors filed the instant DIP Motion and requested to have it heard at the same time as their other First Day Motions, providing less than two days' notice to creditors. ECF No. 22 in Case No. 23-15619 and ECF No. 19 in Case No. 23-15620. The DIP Motion seeks over $2.5 million in financing the form of a priming lien to "permit the orderly resumption of the Debtor's business operations. . .." Motion at ¶31 (emphasis added). On December 26, 2023, the Debtors filed the 236-page Declaration of Marceau Schlumberger in Support of Debtors' Petitions, First Day Motions, and Related Relief ("Schlumberger Decl."). ECF No. 30 in Case No. 23-15619.

Other terms of the proposed loan include:

a. A total loan amount of $2.5 million, plus expenses, costs, and attorneys' fees of the DIP Lender. The Debtors further seek ***$960,000*** on an interim basis and presumably on two days' notice to creditors. ECF No. 19 at p. 4;

b. To give the DIP Lender a super-priority, priming senior lien against all assets of the Debtors, subject to a "Carve-Out" for the Estate Professionals, and

c. An interest rate of 16% and a default rate of the federal rate at the time of the event of default plus 5%.

### III. LEGAL ARGUMENT

### A. Expedited Relief on the Motion is Inappropriate.

7

4870-1831-0041

Debtors ask this Court to hear the Motion on an expedited basis without showing the exigency. The emergency related to the Motion, if there is one, is purely of Debtors' making. There does not appear to be a true emergency here. Indeed, the Debtors' own budget begins on January 15, 2024—almost three weeks from the December 28, 2023 hearing date. Moreover, the January 15, 2024 expenses appear contain line items to restart operations—not essential expenses to maintain the status quo. *See* Exhibit 1 to Motion. As set forth above, operations at the Mine have essentially ceased since August 2023. Rigert Decl. at ¶ 14. Prior to the filing, through a structured formula, payroll and related expenses were being funded through the use of the Lender Parties' cash collateral. As set forth above, the Lender Parties believe that there is an insurance check in the approximate amount of $210,000 that the Debtors received in mid-December 2023. Although the Lender Parties contend that the insurance check constitutes their cash collateral, the Lender Parties would consider consenting to the use of the insurance proceeds to pay certain immediate funding needs, such as payroll or insurance. Additionally, the Lender Parties may be willing to consider funding immediate cash needs to aid in a liquidation.

In addition to the fact that the Debtors' own budget begins on January 15, 2024, the Debtors did not afford creditors and other parties in interest sufficient time to evaluate the Motion and the relief sought therein. The Debtors filed the Motion on the evening of December 25, 2023. The Motion references a Schlumberger Decl. However, the Schlumberger Decl. was not filed until the evening of December 26, 2023—less than 24 hours before objections to the First Day Motions and objection to the instant Motion are due. The hearing to consider the Motion is set for December 28, 2023. This accelerated track is even more troubling because the Debtors have not clearly articulated any exigency to approve the first installment of the proposed loan in the amount of $960,000 on an interim basis. There is no reason to force the issue, as Debtors have done, through an emergency hearing on the Motion.

**B.**     **Debtors Have not Presented Sufficient Evidence to Approve the Motion**.

Generally, a trustee of debtor-in-possession may obtain post-petition financing outside of the ordinary course of business pursuant to three subsections of Section 364 of the Bankruptcy Code. Debtors are seeking financing pursuant to subsection 364(d) which provides:

8

4870-1831-0041

> (d)(1)  The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if –
>
> (A) the trustee is unable to obtain such credit otherwise; and
>
> (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.
>
> (2)  In any hearing under this subsection, the trustee has the burden of proof on the issue of adequate protection.

11 U.S.C. § 364(d).

The burden of proof is on the trustee or debtor-in-possession. *In re Sonora Desert Dairy, L.L.C.*, 2015 WL 65301, at *11 (9th Cir. B.A.P. Jan. 5, 2015). In order to satisfy that burden of proof the trustee or debtor-in-possession must establish by a preponderance of evidence, *see In re Packard Square LLC*, 574 B.R. 107, 116 (Bankr. E.D. Mich. 2017) (citing *Grogan v. Garner*, 498 U.S. 279, 286 (1991)), the following five elements.  <u>First</u>, that the proposed financing is an exercise of sound and reasonable business judgment. *In re DB Capital Holdings, LLC*, 454 B.R. 804, 822 (Bankr. D. Colo. 2011).  <u>Second</u>, alternative financing is not available on any other basis.  11 U.S.C. § 364(d)(1)(A); *DB Capital Holdings*, 454 B.R. at 822.  <u>Third</u>, that financing is in the best interest of the estate and its creditors. *DB Capital Holdings*, 454 B.R. at 822; *see also In re Phase-I Molecular Toxicology Inc.*, 285 B.R. 494, 495 (Bankr. D. N.M. 2002) (quoting *In re Western Pacific Airlines, Inc.*, 223 B.R. 567, 572 (Bankr. D. Colo. 1997)).  <u>Fourth</u>, no better offers, bids, or timely proposals are before the court. *DB Capital Holdings*, 454 B.R. at 822. <u>Fifth</u>, that the creditor holding the lien on the property of the estate on which such senior or equal lien is proposed to be granted is adequately protected.  11 U.S.C. §§ 364(d)(1)(B), (d)(2).

Additionally, "[a]s a general principle, the Bankruptcy Code recognizes the primacy of pre-petition contractual liens and seeks to preserve the financial interests created thereby." *In re Mosello*, 195 B.R. 277, 287 (Bankr. S.D.N.Y. 1996). Granting a priming lien is universally considered an extraordinary remedy and should only be used as the "last resort." *See In re Matter of Qualitech Steel Corp.*, 276 F.3d 245, 248 (7th Cir. 2001). "Given the fact that super priority financing displaces liens on which creditors have relied in extending credit, a court that is asked

to authorize such financing must be particularly cautious when assessing whether the creditors so displaced are adequately protected." *In re Packard Square*, 574 B.R. at 117 (quoting *In re Mosello*, 295 B.R. 277, 292 (Bankr. S.D.N.Y. 1996)). As stated by the Fifth Circuit Court of Appeals, "a court that is asked to authorize such financing must be particularly cautions when assessing whether the creditors so displaced are adequately protected." *In re First South Savings Association*, 820 F.2d 700, 710 (5th Cir. 1987). Here, as set forth below, the Debtors cannot satisfy any of the five elements that are required to authorize the post-petition financing and the Motion should be denied.

        1.      <u>The Financing is not an Exercise of Sound Business Judgment as the Debtors Make No Attempt to Consider the Best Interests of Creditors</u>.

The Debtors assert that the Court should defer to the Debtors' business judgment but offer no evidentiary or other support for this position. The business judgment test, however, requires a debtor or trustee to demonstrate that the action will benefit unsecured creditors. *In re Chi-Feng Huang*, 23 B.R. 798, 800 (9th Cir. B.A.P. 1982); *In re Huff*, 81 B.R. 531, 537 (Bankr. D. Minn. 1988). Moreover, "[a] court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest." *In re Ames Department Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990). "If virtually all of the indebtedness runs to secured creditors, and there is no equity in the property which would benefit unsecured creditors, the invocation of Chapter 11 proceedings is an abuse of the Bankruptcy Court's jurisdiction." *In re FJD, Inc.*, 24 B.R. 138, 141 (Bankr. D. Nev. 1982). Courts should not blindly defer to a debtor's business judgment when considering approval of a debtor in possession's proposed actions.

Here, the Debtors do not provide any discussion of any benefit to unsecured creditors. Similarly, the Debtors provide no discussion, much less evidence, of the value of the Rawhide Mine or any other property, to support the proposition that entering the DIP Facility represents a "reasonable exercise of business judgment." Instead, the Debtors' support is their mere belief that operation of the mine *might* make the sale of the business more valuable in the future: "the

10

4870-1831-0041

Debtors' access to the DIP Facility will ensure that the 'going concern value' of the Debtors' assets are preserved, a value that the Debtors believe is greater than the value which would be realized from a piecemeal liquidation of those asses if Debtors are unable to operate." Motion at p. 15, ¶ 31. There are several problems with this statement. First, the Debtor's **belief** that the "going concern value" is greater than the liquidation value ***is unsupported by any admissible evidence or an actual valuation.*** Speculation is not a sound exercise of business judgment. For example, one court declined to defer to a debtor's business judgment and denied motions to assume unexpired leases due to the debtor's speculations regarding its ability to attract tenants and subleases where the debtor had a firm offer for a sublease but no binding commitment. *See, e.g., In re Trak Auto Corp*, 2002 WL 32129975 (Bankr. E.D. Va. 2002). This case is similar as Debtors are speculating that they can secure future financing and pursue a sale but have failed to present the court with any offers, letters of intent, binding commitments or purchase contracts in an amount sufficient to satisfy the current and proposed secured claims or even discuss the efforts of the Chief Restructuring Officer, Eric Camm, who pre-petition was running a sale process for the Debtors' business.

Second, Debtors' premise that the "going concern value" is greater than any liquidation value ignores that the Debtors have not been operating as a "going concern." The Mine has been shuttered for approximately four months and had very limited operations for over a year and a half prior. In fact, Debtors expressly acknowledge that they are seeking the "resumption of the Debtors' business operations. . . ." Motion at pg. 15, ¶ 31. It is not clear why the Debtors believe restarting operations would be more beneficial than a liquidation, as operations have ceased for a significant amount of time. Moreover, through the Forbearance Agreement and appointment of the Chief Restructuring Officer, Debtors and the Lender Parties had been working on an orderly liquidation prior to the Bankruptcy Case.

Finally, it is undisputed that the Lender Parties are owed almost $20 million, as acknowledged by the Debtors in the 2023 Forbearance Agreement and in the Schlumberger Declaration. Decl. at p. 6, ¶ 22. Based upon information presently available to it, Lender Parties presently believe that they are undersecured based upon both negotiations with the DIP Lender

and Debtors pre-petition and the work of the Chief Restructuring Officer while running the sale process. Placing a priming lien on the Property in front of the Lender Parties would only decrease the Lender Parties' potential recovery from its Collateral and increase any potential deficiency. Simply put, re-starting the business and obtaining a priming lien, appears to be a last-ditch effort by the Debtors and DIP Lender, to allow the DIP Lender to potentially acquire the Debtor through a credit bid, and for Debtors' equity to avoid personal liability related to bonding requirements with the BLM.[3] Debtors are attempting to shift all the risk of failure to the Lender Parties, which is not in the best interest of creditors nor an exercise of sound business judgment.

2. <u>Debtors Offer no Evidence of Efforts to Obtain Other Financing</u>.

Debtors, to obtain post-petition financing that offers a priming lien, must present admissible evidence showing that they were unable to find more favorable financing. Debtors have presented no evidence of attempts to obtain financing on an unsecured, administrative priority, or junior secured status. Other than Debtors' conclusory statement that they "have been seeking financing from any party willing to lend," Debtors provide no information on who was contacted, what the result of each contact was, when contact was made, and any other terms Debtors were offered. *See* Motion at p. 12, ¶17. The passing claim that due to "their current financial condition, financing arrangements and capital structure," more favorable terms were not available does not meet the standard. *Id.*

The Lender Parties understand that Debtors need not contact every possible financing option, but there must be some evidence of a reasonable amount of inquiry. *See In re Tamarack Resort, LLC,* 2010 Bankr. LEXIS 3680, at *45-6 (Bankr. D. Id. October 19, 2010) (debtor-in-possession financing denied where debtor's allegation that it extensively investigated and explored financing options and could not otherwise obtain credit was "belied by the evidence"); *In re Crouse Group, Inc.*, 71 B.R. 544, 550 (Bankr. E.D. Pa. 1987) (holding that debtors were incapable of establishing that they were "unable to obtain" credit under Section 364 where,

---

[3] DeJong and the Debtors now seek to do what they could not do consensually outside of a bankruptcy court—restructure the Lender Parties' senior debt at a sufficiently discounted price that is acceptable to DeJong and force the issue with the Lender Parties through the instant Motion.

12

among other things, only one lending institution was approached). Soliciting financing from an adverse secured creditor does not satisfy the requirement to seek financing. *See Suntrust Bank v. Den-Mark Construction, Inc.*, 406 B.R. 683, 693 (E.D. N.C. 2009) (court cannot rely solely on unavailability of financing from existing lender). The lack of evidence on Debtors efforts requires that the Motion be denied. *Id*. at 692 (reversing financing order where the record does not clearly indicate that the debtor contacted other financing institutions in the immediate geographic area but to no avail); *see also In re Phase-I Molecular Toxicology Inc.*, 285 B.R. 494 (Bankr. D. N.M. 2002) (chapter 11 debtor would not be permitted to borrow on secured basis from creditor that was also debtor's largest shareholder, given complete lack of evidence that debtor had approached any other lender for financing, or that proposed financing would preserve assets of estate or be in best interests of creditors). And most notably, Debtors did not even ask the Lender Parties. Pre-petition, the Lender Parties were consenting to the use of cash collateral to fund Rawhide's limited operations. The Lender Parties would consider continuing to fund immediate funding needs post-petition if the Debtors had asked.

        3.       <u>The Proposed DIP Financing is not in the Best Interest of Creditors</u>.

The Debtors must establish that the DIP financing is the best interest of their creditors. *See In re Phase-I Molecular Toxicology*, 285 B.R. at 495. As already explained above, Debtors cannot make such a showing. Debtors are seeking permission to pledge their assets in return for taking on $2.5 million of superpriority debt to allow Debtors and its professionals to spend the money. There is no plan to use the money to increase the value of the Property, besides the conclusory statement that the Debtors believe the Property is worth more as a going concern. The Debtors do not even discuss unsecured creditors in their Motion, and the proposed financing is certainly not in the best interest of Lender Parties, secured creditors.

        4.       <u>Lender Parties are not Adequately Protected</u>.

"Given the fact that super priority financing displaces liens on which creditors have relied in extending credit, a court that is asked to authorize such financing must be particularly cautious when assessing whether the creditors so displaced are adequately protected." *In re First South Savings Association*, 820 F.2d 700, 710 (5th Cir. 1987). Adequate protection is generally offered

13

in three ways: (i) a cash payment or periodic payments; (ii) replacement liens; or (iii) providing other relief that offers the indubitable equivalent of the interest in the property. 11 U.S.C. § 361. Debtors have not offered the Lender Parties any payments or replacement liens. They have no funds to make payments and no other assets on which to grant replacement liens.

Accordingly, Debtors will need to rely on the indubitable equivalence standard to adequately protect the Lenders' interest. "To be the 'indubitable equivalent' of a secured creditor's interest in property, the proposed adequate protection must both compensate the secured creditor for the present value of that interest, and insure the safety of that interest." *In re Packard Square*, 574 B.R. at 118. Traditionally, superpriority liens are only awarded in situations where there is sufficient equity in the property to protect first-priority lienholders, in addition to a superpriority lienholder. Here, the Debtors have not even bothered to discuss the current value of the Lender Parties' Collateral and do not contend an equity cushion exists.

Instead, although not entirely clear, it seems the Debtors are arguing that by priming the Lender Parties' Collateral it will be able to increase the value of the collateral more than the amount of the DIP loan. Such speculative gambling is not permitted: "In general, courts have denied financing that included a priming lien where adequate protection relied on increased value in highly speculative circumstances, where time periods for value increase were tight, or where a debtor faced red tape or other hurdles." *In re Packard Square LLC*, 574 B.R. 107, 118 (Bankr. E.D. Mich. 2017) (*quoting In re Vander Vegt*, 499 B.R. 631, 638 (Bankr. N.D. Iowa 2013), *aff'd sub nom. First Sec. Bank & Tr. Co. v. Vegt*, 511 B.R. 567 (N.D. Iowa 2014).

As discussed by the *Packard* Court, numerous cases confirm the need for courts to use great caution in granting a priming lien, where adequate protection is based on predictions of future value. *See In re YL West 87th Holdings I LLC,* 423 B.R. 421, 423, 443 (Bankr. S.D.N.Y. 2010) (court denied dip motion as "highly speculative" where debtor moved for authority to obtain debtor-in-possession financing secured by a senior lien that would prime the liens of two secured creditors, in order to construct and improve a multi-use development.); *Suntrust Bank v. Den–Mark Constr., Inc. (In re Den–Mark Constr., Inc.)*, 406 B.R. 683, 702 (E.D.N.C. 2009) ("Congress did not contemplate that a secured creditor could find its position eroded and, as

14

compensation for the erosion, be offered an opportunity to recoup dependent upon the success of a business with inherently risky prospects"); *In re Strug–Division LLC*, 380 B.R. 505, 512, 515 (Bankr. N.D. Ill. 2008) (court held that the debtors could not obtain a loan with a priming lien under § 364(d)(1), reasoning that debtors could not provide the secured creditor with the "indubitable equivalent" of its present interests and thus could not provide adequate protection, because "the 'equity cushion' would be small and therefore the risk of being primed would be entirely on [the secured creditor]"); *In re St. Petersburg Hotel Assocs., Ltd.*, 44 B.R. 944, 945–46 (Bankr. M.D. Fla. 1984) (court denied motion for post-petition financing because assumption asserted by the debtor were "mere expectations, many of which [were] highly speculative and unrealistic").

Here, the Debtors have not offered any evidence of adequate protection, other than their mere belief that re-starting the Mine will increase the value. They have not provided evidence of valuation, despite this being a significant factor in every case that they cite. Not only is their position highly speculative, but the Debtors also face significant "red tape" as they have been shut down for many months, they have a dispute with the BLM regarding the necessity for an increased bond requirement, and they do not even bother to provide any projections to demonstrate what the future income from operating the Mine could even be. Nor do they discuss, much less establish, that the sale price of the business would be sufficient to allow the Lender Parties to receive same distribution as it would have received absent the DIP loan financing.

Indeed, the very cases cited by the Debtors, cannot only be easily distinguished from the facts at hand, but support denying the Motion. In *In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992), the court allowed a priming lien over a secured creditor objection because *both* the debtor's and the secured lender's valuation experts believed that the proposed financing would increase the value of the property by more than the amount of the financing. In *In re Campbell Sod, Inc.*, 378 B.R. 647, 650-51, 54 (Bankr. D. Kan. 2007), the Court found that approval of a $200,000 exit facility was appropriate when the secured creditor was *substantially oversecured,* along with the possibility of increased future value based the financing. Similarly, in *In re Ledgemere Land Corp.*, 125 B.R. 58, 62 (Bankr. D. Mass.1991), the Court denied a

15

motion for relief from stay filed by the secured creditor, because construction was already underway on the property, leases had been signed, and the court made a factual finding that the completion of the construction would increase the value of the property by twice the amount that was borrowed. Finally, in *In re Sky Valley, Inc.*, 100 B.R. 107, 114 (Bankr. N.D. Ga. 1988), a priming lien was approved when the secured lender was *protected by an equity cushion of over $5.7 million*.

Simply put, the Debtors' silence regarding an equity cushion is telling. The Debtors have failed to provide any evidence that the Lender Parties are adequately protected and have cited no case law that would support allowing a priming lien under these bare assertions of increased value. The Motion should be denied.

### C. Courts have Denied Funding Requests to Support a Sale Process

At least two courts have denied request for funding to be secured by priming liens that is required to support a sale process because a sale process does not offer the subordinated creditor any adequate protection. *In re Swedeland Development Group, Inc.*, 16 F.3d 552, 566 (3d Cir. 1994); *In re Fontainebleau*, 434 B.R. 716 (Bankr. S.D. Fla. 2010). The Court should follow those courts and deny the Motion.

### D. The Motion Seeks a Surcharge by Another Name.

In order to surcharge a creditor, "the party seeking the surcharge must prove that its expenses were reasonable, necessary and provided a quantifiable benefit to the secured creditor." *In re Debbie Reynolds Hotel & Casino, Inc.*, 255 F.3d 1061, 1068 (9th Cir. 2001). This burden is "an onerous burden of proof" and any resulting surcharge is limited to the amount of the benefit which must be proven with specificity. *Id*. As stated by one court:

> In order to prevail on its claim against the holder of the secured claim, the trustee has the burden to establish that the costs and expenses were necessary to the preservation and disposition of the property, that they were reasonable and that they directly benefited the holder of the claim….
>
> It is the trustee's burden to show that a benefit to the creditor was directly attributable to his act as well as quantifying that benefit…. The cost must result in a direct primary benefit to the creditor; expenses which result in improvement in the position of the debtor but only indirectly benefit the creditor are not recoverable…. Thus, recovery is not permitted where the benefit derived from the actions of the trustee could have been obtained in

16

4870-1831-0041

the absence of his acts….

*In re Iberica Manufacturing*, 180 B.R. 707, 712-13 (Bankr. D. Puerto Rico 1995). Thus, there must be a benefit to the secured creditor before there can be a surcharge. *In re North County Place, Ltd.*, 92 B.R. 437, 445 (Bankr. C.D. Cal. 1988). This burden of proof is intensely fact determinative which requires both a subjective and an objective assessment of the applicant's actions. *In re Cann & Saul Steel Co.*, 86 B.R. 413, 414 (Bankr. E.D. Pa. 1988).

It is well established that possible and/or hypothetical benefits do not suffice. *In re Pullman Construction Industries, Inc.*, 107 B.R. 909, 941 (Bankr. N.D. Ill. 1989). Furthermore, an allowance of a § 506(c) surcharge is not allowable if that surcharge would cost more than what the secured creditors could have paid to obtain the same results. *See In re Crutcher Concrete Construction*, 218 B.R. 376, 81 (Bankr. W.D. Ky. 1998) (holding that the trustee failed to prove that the secured creditor received "anything over and above that which it could have received without the trustee's intervention").

Here, the Debtors are obtaining a priming lien, in order to pay their professional fees. Moreover, they are also agreeing to a "carve-out" whereby the Professional Fees will be superior to the DIP Facility. Essentially, the Motion is really being used to accomplish a surcharge without having to establish a tangible benefit. If the Motion is approved, Debtors' professionals will stand to be paid over $800,000—which is approximately over 1/3 of the total DIP loan proceeds—from the DIP loan. *See* Motion, Exhibit 1.[4] The Lender Parties, however, will be left to answer for the repayment of the DIP loan if Debtors continue to be unable to produce a buyer that will pay enough to pay everyone off. This is disguised surcharge without having to establish quantifiable benefit to Lender Parties and should be denied.

**E.    Lender Parties' Reserves Section 507(b) Rights if the Motion is Approved**.

In the event the Court grants the Motion based on a conclusion that Lender Parties are adequately protected, Lender Parties reserve their rights under § 507(b) to assert a superpriority

---

[4] The Budget provides for payment of approximately $300,000 to "FA" which Agent presumes is "Financial Advisor."

claim against the Debtors' estates. Lender Parties further reserve their rights to seek disgorgement of any administrative expenses paid in either case.

### F.  The Form of the Order has a Myriad of Problems.

To the extent the Court is inclined to grant the Motion on an interim basis, the form of the Interim Order must be modified. *See* Ex. 3 to Motion. First, the proposed form of order contains numerous "factual" findings for which there is insufficient or no evidentiary support and/or are disputed facts. *See e.g.*, Motion at Exhibit 3. The Court should not permit such factual findings to be entered without holding an evidentiary hearing.

Second, the Court should not permit the automatic stay of the effectiveness of the Interim Order contained in FRBP 4001(b)(2) and 4001(c)(2) and the Local Bankruptcy Rules to be waived. *Id.* at § 4(f). In addition to filing the Motion on Christmas and seeking an initial hearing approximately 2 ½ days later, it appears that the Debtors are attempting to prevent any appellate review of the Interim Order.

Third, Section 8 of the Proposed Order, attempts to override section 507(b) of the Bankruptcy Code, which provides a secured creditor superpriority status for diminution in value. Section 8 of the Proposed Order attempts to side-step this provision of the Bankruptcy Code by asserting that the Lender Parties' claim is given Bankruptcy Code required superpriority status, but then subordinating it to DIP Claims and the Professional administrative claims. Moreover, with the Debtor failing to offer any evidence current value of the Collateral, or even alleging without evidence, and without the Court making any valuation determination, the ability of the parties and the Court to measure any potential diminution in value is dubious at best.

Finally, Section 25 of the Order authorizing the DIP Lender to credit bid must be deleted as it is not even discussed in the Motion. Lender Parties reserve their rights to make additional objections to the proposed Interim and Final Orders.

### IV.  CONCLUSION.

For the foregoing reasons, Lender Parties' respectfully requests that the Court deny the Motion and reserve all rights to supplement this Preliminary Objection prior to any final or additional hearing.

18

4870-1831-0041

RESPECTFULLY SUBMITTED this 27th day of December 2023.

                 SNELL & WILMER L.L.P.

                 */s/ Blakeley E. Griffith*
                 Bryce Suzuki *(pro hac vice pending)*
                 (AZ Bar No. 022721)
                 Steven D. Jerome *(pro hac vice pending)*
                 (AZ Bar No. 018420)
                 1 East Washington Street, Suite 2700
                 Phoenix, AZ 85004

                 Blakeley E. Griffith, Esq.
                 SNELL & WILMER L.L.P.
                 3883 Howard Hughes Parkway, Suite 1100
                 Las Vegas, Nevada 89169

                 *Attorneys for Silverview Credit Partners,*
                 *LP, as Agent for Lender Parties*

4870-1831-0041