# Exhibit 1

**EXECUTION COPY**

# LOAN AND SECURITY AGREEMENT

by and among

**RAWHIDE MINING LLC**

and

**THE RAWHIDE SUBSIDIARIES FROM TIME TO TIME PARTY HERETO**

as Borrowers

**RAWHIDE ACQUISITION HOLDING LLC**

as Parent

**THE SEVERAL FINANCIAL INSTITUTIONS OR ENTITIES FROM TIME TO TIME PARTY HERETO**

as Lenders

and

**SILVERPEAK CREDIT PARTNERS, LP**

as Agent

Dated as of January 3, 2019

# TABLE OF CONTENTS

## ARTICLE 1
## DEFINITIONS AND USAGE

Section 1.1    Definitions ................................................................................................... 1

     Account Control Agreements ...............................................................1

     Accrual Period ........................................................................................1

     Accrued Management Fee Distributions ...........................................2

     Administration Fee .................................................................................2

     Advance ...................................................................................................2

     Affiliate ...................................................................................................2

     Agent .......................................................................................................2

     Agreement...............................................................................................2

     Amortization Date .................................................................................2

     Annual Cap .............................................................................................2

     Annual Surplus.......................................................................................2

     Anti-Corruption Laws...........................................................................2

     Anti-Terrorism Laws ............................................................................2

     Assignee..................................................................................................2

     Audited Financial Statements..............................................................2

     Bankruptcy Code ...................................................................................2

     Blocked Person ......................................................................................3

     Board .......................................................................................................3

     Board Observer Rights Agreement.....................................................3

     Borrower .................................................................................................3

     Borrower Real Property........................................................................3

     Borrower Taxable Income ....................................................................3

     Borrower Tax Partners .........................................................................3

     Business Day ...........................................................................................3

     Capitalized Leases.................................................................................3

     Cash Equivalents....................................................................................3

     Certificated Vehicle .............................................................................4

     CFC..........................................................................................................4

     Change in Control .................................................................................5

     Change in Law........................................................................................5

     Claims .....................................................................................................5

     Closing Date...........................................................................................5

     Closing Costs..........................................................................................5

     Code........................................................................................................5

     Collateral ................................................................................................5

     Compliance Certificate .........................................................................5

     Confidential Information ......................................................................5

     Consolidated Cash Balance ..................................................................6

     Consolidated Cash Interest Coverage Ratio ......................................6

     Consolidated EBITDA...........................................................................6

     Consolidated Interest Expense.............................................................6

     Consolidated Net Income .....................................................................6

     Contingent Obligation ..........................................................................6

     Contractual Obligation .........................................................................6

Copyright License ....................................................................................................6

Copyrights.................................................................................................................6

Default ......................................................................................................................6

Deposit Accounts......................................................................................................6

Disposition................................................................................................................7

Dispose .....................................................................................................................7

Environmental Laws .................................................................................................7

Environmental Liability.............................................................................................7

Environmental Permits .............................................................................................7

Equity Cure Amount .................................................................................................7

Equity Cure Contributions ........................................................................................7

Equity Cure Deadline ................................................................................................7

Equity Cure Notice ....................................................................................................7

Equity Cure Notice Deadline .....................................................................................7

Equity Cure Right ......................................................................................................8

Equity Interests..........................................................................................................8

Equity Pledge Agreement ..........................................................................................8

ERISA.......................................................................................................................8

ERISA Affiliate .........................................................................................................8

ERISA Event..............................................................................................................8

Event of Default ........................................................................................................8

Excluded Account ......................................................................................................8

Excluded Assets ........................................................................................................9

Excluded Cash Collateral Assets ...............................................................................9

Excluded Indebtedness...............................................................................................9

Excluded Taxes .......................................................................................................10

Existing Royalties ....................................................................................................10

FATCA ....................................................................................................................10

Fee Letter ................................................................................................................10

Financial Covenant Breach ......................................................................................10

Financial Covenants.................................................................................................10

Financial Statements ................................................................................................10

Fiscal Quarter ..........................................................................................................10

Fiscal Year ..............................................................................................................11

GAAP.......................................................................................................................11

Governmental Authority ..........................................................................................11

Hazardous Materials ................................................................................................11

Indebtedness ............................................................................................................11

Indemnified Person ..................................................................................................11

Indemnified Taxes ...................................................................................................11

Initial Account Control Agreement...........................................................................11

Insolvency Proceeding .............................................................................................12

Intellectual Property.................................................................................................12

Interest Rate .............................................................................................................12

Investment................................................................................................................12

Joinder Agreement ...................................................................................................12

Lender......................................................................................................................12

Letter of Interest ......................................................................................................12

License .....................................................................................................................12

Lien ..........................................................................................................................12

ii

Loan ........................................................................................................... 12
Loan Documents ........................................................................................ 12
Master Agreement ..................................................................................... 12
Material Adverse Effect ............................................................................. 13
Maturity Date ............................................................................................ 13
Maximum Rate ........................................................................................... 13
Mining Royalties ........................................................................................ 13
Month ........................................................................................................ 13
Moody's ..................................................................................................... 13
Multiemployer Plan ................................................................................... 13
Note ........................................................................................................... 13
NVDMV ...................................................................................................... 13
OFAC .......................................................................................................... 13
OFAC Lists .................................................................................................. 13
Origination Fee .......................................................................................... 13
Organizational Documents ........................................................................ 13
Other Connection Taxes ............................................................................ 14
Other Related Person ................................................................................ 14
Other Taxes ............................................................................................... 14
Parent ........................................................................................................ 14
Parent LLC Agreement ............................................................................... 14
Parent Management Committee ................................................................ 14
Participant ................................................................................................. 14
Participant Register ................................................................................... 14
Party .......................................................................................................... 14
Parties ........................................................................................................ 14
Patent License ........................................................................................... 14
Patents ...................................................................................................... 14
Payment Date ............................................................................................ 15
Payment Date Statement .......................................................................... 15
Permitted Equipment-Backed Indebtedness ............................................. 15
Permitted Indebtedness ............................................................................ 15
Permitted Investment ............................................................................... 16
Permitted Liens ......................................................................................... 17
Permitted Royalties ................................................................................... 19
Permitted Swap Contract .......................................................................... 20
Person ....................................................................................................... 20
Plan ........................................................................................................... 20
Post-Closing Reef Fees .............................................................................. 21
Power of Attorney ..................................................................................... 21
Pre-Closing Reef Fees ................................................................................ 21
Prepayment Charge ................................................................................... 21
PTO ............................................................................................................ 21
Publicity Materials ..................................................................................... 21
Rawhide Entity .......................................................................................... 21
Rawhide Entities ........................................................................................ 21
Rawhide Mine ............................................................................................ 21
Rawhide Mining ......................................................................................... 21
Rawhide Mining Business .......................................................................... 21
Rawhide Mining Equipment ...................................................................... 21

*Loan and Security Agreement*

Rawhide Mining LLC Agreement ............................................................. 21
Rawhide-Related Persons ..................................................................... 21
Rawhide-Related Person ...................................................................... 21
Rawhide Subsidiary ........................................................................... 22
Real Property ................................................................................ 22
Receivables .................................................................................. 22
Reclamation Obligations ..................................................................... 22
Reef Capital ................................................................................. 22
Reef Capital Group ........................................................................... 22
Reef Default ................................................................................. 22
Reef Expense Amounts ......................................................................... 22
Reef Indemnified Party ....................................................................... 22
Reef Indemnity Amounts ....................................................................... 22
Reef Management Agreement .................................................................... 22
Reef Management Fee .......................................................................... 23
Reef Person .................................................................................. 23
Reef Portfolio Company ....................................................................... 23
Register ..................................................................................... 23
Related Parties .............................................................................. 23
Release ...................................................................................... 23
Required Lenders ............................................................................. 23
Resignation Effective Date ................................................................... 23
Restricted Distribution ...................................................................... 23
Restricted Transfer .......................................................................... 24
Rights to Payment ............................................................................ 24
Royalties .................................................................................... 24
S&P .......................................................................................... 24
Sanctioned Country ........................................................................... 24
Sanctioned Person ............................................................................ 24
Sanctions .................................................................................... 25
Scheduled Maturity Date ...................................................................... 25
Secured Obligations .......................................................................... 25
Secured Parties .............................................................................. 25
Secured Party ................................................................................ 25
Silverpeak ................................................................................... 25
Solvent ...................................................................................... 25
State ........................................................................................ 25
Subordinated Indebtedness .................................................................... 25
Subordination Agreement ...................................................................... 25
Subsidiary ................................................................................... 26
Swap Contract ................................................................................ 26
Swap Obligations ............................................................................. 26
Taxes ........................................................................................ 26
Total Leverage Ratio ......................................................................... 26
Total Net Debt ............................................................................... 26
Trademark License ............................................................................ 26
Trademarks ................................................................................... 26
UCC .......................................................................................... 27
United States ................................................................................ 27
USD .......................................................................................... 27

*Loan and Security Agreement*

|  | U.S. Person .................................................................................................. | 27 |
|  | Warrant ....................................................................................................... | 27 |
|  | Western Exploration .................................................................................... | 27 |
|  | Wholly-Owned.............................................................................................. | 27 |
|  | Withholding Agent ....................................................................................... | 27 |
| Section 1.2 | Usage .......................................................................................................... | 27 |
| (a) | Accounting and UCC Terms ........................................................................ | 27 |
| (b) | Section References, Etc. ............................................................................. | 27 |
| (c) | Inclusion ..................................................................................................... | 27 |
| (d) | Non-Exclusive Disjunction .......................................................................... | 28 |
| (e) | Hereof, Herein and Hereunder .................................................................. | 28 |
| (f) | Asset and Property ..................................................................................... | 28 |
| (g) | Word Forms ................................................................................................ | 28 |

**ARTICLE 2**
**THE LOAN**

| Section 2.1 | The Loan...................................................................................................... | 28 |
| (a) | The Loan ..................................................................................................... | 28 |
| (b) | Interest ....................................................................................................... | 28 |
| (c) | Principal ...................................................................................................... | 28 |
| (d) | Payments .................................................................................................... | 28 |
| Section 2.2 | Maximum Interest ...................................................................................... | 29 |
| Section 2.3 | Default Interest .......................................................................................... | 29 |
| Section 2.4 | Prepayment................................................................................................. | 30 |
| (a) | Optional Repayment ................................................................................... | 30 |
| (b) | Repayment Upon Change in Control .......................................................... | 30 |
| (c) | Prepayment Charge .................................................................................... | 30 |
| (i) | Obligation to Pay Prepayment Charge ............................................ | 30 |
| (ii) | Amount of Prepayment Charge ....................................................... | 30 |
| (iii) | Acknowledgements Regarding Prepayment Charge........................ | 31 |
| (d) | Repayment From Disposition Proceeds ..................................................... | 31 |
| Section 2.5 | Notes........................................................................................................... | 31 |
| Section 2.6 | Pro Rata Treatment.................................................................................... | 31 |
| Section 2.7 | Reserve Requirements; Increased Costs.................................................... | 32 |
| Section 2.8 | Taxes ........................................................................................................... | 33 |
| Section 2.9 | Duty to Mitigate......................................................................................... | 35 |
| Section 2.10 | Warrants ..................................................................................................... | 36 |

**ARTICLE 3**
**SECURITY INTEREST**

| Section 3.1 | Grant of Security Interest .......................................................................... | 37 |
| Section 3.2 | Delivery of Collateral ................................................................................. | 37 |
| Section 3.3 | Borrowers Remain Liable ........................................................................... | 38 |
| Section 3.4 | Taxes ........................................................................................................... | 38 |

*Loan and Security Agreement*

Section 3.5    Further Assurances; Financing Statements ............................................ 38
    (a)    Further Assurances ......................................................................... 38
    (b)    Specific Obligations ........................................................................ 38
        (i)    Fixtures, Etc. .................................................................. 38
        (ii)    Certificated Vehicles ...................................................... 38
        (iii)    Initial Account Control Agreement ............................... 39
        (iv)    EM Gold Certificate ....................................................... 39
    (c)    Authorization to File Financing Statements .................................... 39
    (d)    Additional Information ..................................................................... 39

## ARTICLE 4
## CONDITIONS PRECEDENT TO LOAN

Section 4.1    Required Documents ...................................................................... 40
    (a)    Loan Documents, Etc. ...................................................................... 40
    (b)    Organizational Documents ............................................................... 40
    (c)    Good Standing Certificates .............................................................. 40
    (d)    Secretary's Certificates ................................................................... 40
    (e)    Officer's Certificates ....................................................................... 41
    (f)    Financial Statements ....................................................................... 41
    (g)    Insurance ........................................................................................ 41
    (h)    Legal Opinions ................................................................................ 41
        (i)    Pepper Hamilton LLP ...................................................... 41
        (ii)    Holley Driggs ................................................................. 41
    (i)    KYC, AML, Etc. ............................................................................... 41
    (j)    Other Documents ............................................................................ 41
Section 4.2    Payment of Fees and Expenses ........................................................ 41
Section 4.3    Compliance ................................................................................... 41
Section 4.4    No Default ..................................................................................... 42
Section 4.5    Post-Closing Obligations ............................................................... 42
    (a)    Certain Extensions of Time ............................................................. 42
        (i)    Certificated Vehicles ...................................................... 42
        (ii)    Initial Account Control Agreement ............................... 42
        (iii)    EM Gold Certificate ....................................................... 42
    (b)    Consequences of Failure .................................................................. 43

## ARTICLE 5
## REPRESENTATIONS AND WARRANTIES

Section 5.1    Organization, Etc. .......................................................................... 43
Section 5.2    Collateral ....................................................................................... 43
Section 5.3    Commercial Tort Claims ................................................................ 43
Section 5.4    Consents ........................................................................................ 43
Section 5.5    Governmental Authorization; Other Consents ................................ 44
Section 5.6    Financial Statements; No Material Adverse Effect .......................... 44
    (a)    Audited Financial Statements .......................................................... 44
    (b)    Unaudited Financial Statements ...................................................... 44

*Loan and Security Agreement*

|  | (c) | No Material Adverse Effect | 44 |
| Section 5.7 | Actions Before Governmental Authorities | | 44 |
| Section 5.8 | Litigation | | 44 |
| Section 5.9 | Laws, Etc. | | 45 |
|  | (a) | No Violation, Etc. | 45 |
|  | (b) | Investment Company Act, Margin Regulations, Etc. | 45 |
|  | (c) | Sanctions | 45 |
| Section 5.10 | Information Correct and Current | | 46 |
| Section 5.11 | Tax Matters | | 46 |
| Section 5.12 | Real Property | | 46 |
| Section 5.13 | Royalties | | 46 |
| Section 5.14 | Certificated Vehicles | | 46 |
| Section 5.15 | Intellectual Property | | 47 |
| Section 5.16 | Environmental Matters | | 47 |
| Section 5.17 | Financial Accounts | | 48 |
| Section 5.18 | Employee Loans | | 48 |
| Section 5.19 | Capitalization, Affiliates, Etc. | | 48 |
| Section 5.20 | Solvency | | 48 |
| Section 5.21 | ERISA | | 48 |

**ARTICLE 6**
**INSURANCE; INDEMNIFICATION**

| Section 6.1 | Coverage | | 48 |
| Section 6.2 | Certificates | | 49 |
| Section 6.3 | Indemnity | | 49 |

**ARTICLE 7**
**AFFIRMATIVE COVENANTS**

| Section 7.1 | Financial Covenants | | 50 |
|  | (a) | Total Leverage Ratio | 50 |
|  | (b) | Consolidated Cash Interest Coverage Ratio | 50 |
|  | (c) | Liquidity | 51 |
|  | (d) | Certain Definitions | 51 |
|  |  | (i) Consolidated Cash Balance | 51 |
|  |  | (ii) Consolidated Cash Interest Coverage Ratio | 51 |
|  |  | (iii) Consolidated EBITDA | 51 |
|  |  | (iv) Consolidated Interest Expense | 52 |
|  |  | (v) Consolidated Net Income | 52 |
|  |  | (vi) Excluded Indebtedness | 52 |
|  |  | (vii) Total Leverage Ratio | 52 |
|  |  | (viii) Total Net Debt | 53 |
| Section 7.2 | Reporting | | 53 |
|  | (a) | Unaudited Financial Statements | 53 |

*Loan and Security Agreement*

(b)    Annual Audited Financial Statements ................................................ 53
(c)    Compliance Certificate ...................................................................... 54
(d)    Monthly Mine Production Report ...................................................... 54
(e)    Financial Plan.................................................................................... 54
(f)    Swaps................................................................................................ 54
     (i)    Swap Contracts.................................................................... 54
     (ii)    Position Reporting............................................................... 54
(g)    Required Filings ................................................................................ 54
(h)    Additional Reports............................................................................ 54
(i)    Certain AML Events .......................................................................... 55

Section 7.3    Fiscal Years ................................................................................................. 55

Section 7.4    Notices ........................................................................................................ 55

Section 7.5    Preservation of Existence, Etc..................................................................... 55

Section 7.6    Maintenance of Properties .......................................................................... 55

Section 7.7    Payment of Obligations ............................................................................... 56

Section 7.8    Inspection Rights ........................................................................................ 56

Section 7.9    Further Assurances ...................................................................................... 56
(a)    Generally .......................................................................................... 56
(b)    Pledge of Equity Interests ................................................................ 56
(c)    Authorization.................................................................................... 57

Section 7.10    Collateral ..................................................................................................... 57

Section 7.11    Commercial Tort Claims ............................................................................... 57

Section 7.12    Taxes ........................................................................................................... 57

Section 7.13    Deposit Accounts ......................................................................................... 57

Section 7.14    Ownership and Subsidiaries......................................................................... 58
(a)    Joinder of Subsidiaries...................................................................... 58
(b)    No CFCs ............................................................................................ 58
(c)    Ownership of Rawhide Mining .......................................................... 58
(d)    Rawhide Subsidiaries........................................................................ 58

Section 7.15    Use of Proceeds ........................................................................................... 58

Section 7.16    Compliance with Laws ................................................................................. 58

Section 7.17    Environmental Matters ................................................................................ 59

Section 7.18    Intellectual Property .................................................................................... 59

Section 7.19    Books and Records ....................................................................................... 60

Section 7.20    Transactions with Affiliates or Other Related Persons .................................. 60

Section 7.21    Material Contracts ....................................................................................... 60

Section 7.22    Royalties ...................................................................................................... 60
(a)    Grant of Royalties ............................................................................. 60
(b)    Obligation to Notify Agent................................................................ 60
(c)    Modification of Royalties .................................................................. 60
     (i)    Existing Royalties................................................................. 60
     (ii)    Other Permitted Royalties ................................................... 61

*Loan and Security Agreement*

# ARTICLE 8
# NEGATIVE COVENANTS

Section 8.1    Restricted Transfers ........................................................................................ 61
    (a)    General Restriction ..................................................................................... 61
    (b)    Restricted Distributions .............................................................................. 61
        (i)    No Default .................................................................................. 61
        (ii)    Leverage .................................................................................... 61
    (c)    Tax Distributions ........................................................................................ 61
        (i)    Annual Limit .............................................................................. 62
        (ii)    Liquidity ..................................................................................... 62
        (iii)    Adjustments .............................................................................. 62
    (d)    Accrued Management Fee Distributions ..................................................... 62
    (e)    Reimbursement and Indemnification of Reef Capital Group ...................... 63
    (f)    Intercompany Distributions ........................................................................ 63
    (g)    Certain Payments to Officers and Directors ............................................... 63
Section 8.2    Additional Indebtedness .................................................................................. 63
Section 8.3    Liens ................................................................................................................ 63
Section 8.4    Swap Obligations ............................................................................................ 63
Section 8.5    Dispositions ..................................................................................................... 64
Section 8.6    Fundamental Changes ..................................................................................... 64
    (a)    General Restriction ..................................................................................... 64
    (b)    Permitted Fundamental Changes ................................................................ 64
Section 8.7    Accounting Policies ......................................................................................... 65
Section 8.8    Investments ..................................................................................................... 65
Section 8.9    ERISA ............................................................................................................... 65
Section 8.10    Certain Restrictive Agreements ...................................................................... 65
Section 8.11    Corporate Changes ......................................................................................... 65
Section 8.12    Conduct of Business ........................................................................................ 65

# ARTICLE 9
# EVENTS OF DEFAULT

Section 9.1    Events of Default ............................................................................................. 66
    (a)    Failure to Pay .............................................................................................. 66
    (b)    Breach of Certain Covenants ...................................................................... 66
    (c)    Breach of Agreement .................................................................................. 66
    (d)    Representations ........................................................................................... 66
    (e)    Insolvency ................................................................................................... 67
    (f)    Cessation of Business .................................................................................. 67
    (g)    Attachments; Judgments ............................................................................ 67
    (h)    Other Obligations ....................................................................................... 67
    (i)    Change in Control ....................................................................................... 68
Section 9.2    Equity Cure ...................................................................................................... 68
    (a)    Equity Cure Right ........................................................................................ 68
    (b)    Determination of Equity Cure Amount ....................................................... 68

*Loan and Security Agreement*

(c) Conditions to Equity Cure ............................................................................... 69
    (i) Equity Cure Contributions .............................................................. 69
    (ii) No Other Default ............................................................................ 69
    (iii) Notice to Agent; Commitments ..................................................... 69
(d) Limitations on Exercise of Equity Cure Right .................................................. 69
(e) Suspension of Remedies Pending Equity Cure ................................................ 69
(f) Effect of Equity Cure Limited ......................................................................... 70

## ARTICLE 10
## REMEDIES

Section 10.1   General ..................................................................................................... 70

Section 10.2   Collection; Foreclosure ............................................................................. 70

Section 10.3   No Waiver ................................................................................................. 71

Section 10.4   Cumulative Remedies ............................................................................... 71

Section 10.5   Power of Attorney ..................................................................................... 71
    (a) Appointment ......................................................................................... 71
    (b) Delivery of Power of Attorney .............................................................. 72

## ARTICLE 11
## MISCELLANEOUS

Section 11.1   Severability .............................................................................................. 72

Section 11.2   Notices ...................................................................................................... 73

Section 11.3   Entire Agreement; Amendments ............................................................... 73
    (a) Entire Agreement .................................................................................. 73
    (b) Amendments and Waivers .................................................................... 74

Section 11.4   No Strict Construction .............................................................................. 74

Section 11.5   No Waiver ................................................................................................. 74

Section 11.6   Survival ..................................................................................................... 75

Section 11.7   Successors and Assigns ............................................................................. 75

Section 11.8   Governing Law .......................................................................................... 75

Section 11.9   Consent to Jurisdiction and Venue ........................................................... 76

Section 11.10 Mutual Waiver of Jury Trial / Judicial Reference .................................... 76

Section 11.11 Fees and Expenses .................................................................................. 77
    (a) Closing .................................................................................................. 77
    (b) Post-Closing .......................................................................................... 77

Section 11.12 Confidentiality ........................................................................................ 77

Section 11.13 Assignment of Rights ............................................................................... 78
    (a) Assignment ........................................................................................... 78
    (b) Register ................................................................................................. 79
    (c) Registered Form .................................................................................... 79

Section 11.14 Participations .......................................................................................... 79
    (a) Generally .............................................................................................. 79
    (b) Participation Agreements ...................................................................... 79

*Loan and Security Agreement*

(c)    Benefit of Certain Provisions ........................................................... 79

(a)    Participant Register ........................................................................ 80

Section 11.15  Revival of Secured Obligations ...................................................... 80

Section 11.16  Counterparts ................................................................................. 80

Section 11.17  No Third-Party Beneficiaries ......................................................... 80

Section 11.18  Agency .......................................................................................... 81

Section 11.19  Certain ERISA Matters .................................................................. 83

Section 11.20  Publicity ........................................................................................ 85

Section 11.21  Joint and Several Liability; Rawhide Mining as Agent for Borrowers .............................. 85

## EXHIBITS

Exhibit A          Form of Note

Exhibit B          Borrower Information

Exhibit C          Deposit Accounts and Investment Accounts

Exhibit D          Form of Compliance Certificate

Exhibit E          Form of Mine Production Report

Exhibit F          Form of Joinder Agreement

Exhibit G          Form of Power of Attorney

Exhibit H          Form of Initial Account Control Agreement

## ANNEXES

Annex I            Existing Permitted Indebtedness

Annex II           Existing Permitted Investments

Annex III          Rawhide Mining Subsidiaries

## SCHEDULES

Schedule 2.1    Advance Amounts; Wire Instructions

Schedule 5.3    Commercial Tort Claims

Schedule 5.12   Real Property

Schedule 5.13   Existing Royalties

Schedule 5.14   Certificated Vehicles

Schedule 5.15   Intellectual Property

Schedule 5.16   Environmental Matters

Schedule 5.19   Capitalization and Affiliates

Schedule 7.21   Material Contracts

*Loan and Security Agreement*

# LOAN AND SECURITY AGREEMENT

This **LOAN AND SECURITY AGREEMENT**, dated as of January 3, 2019 (as amended, restated, supplemented or otherwise modified from time to time, this "**Agreement**"), is entered into by and among:

(a)    (1)    **RAWHIDE MINING LLC**, a Delaware limited liability company ("**Rawhide Mining**"); and

(2)    the **RAWHIDE SUBSIDIARIES FROM TIME TO TIME PARTY TO THIS AGREEMENT** (such additional Rawhide Subsidiaries, together with Rawhide Mining, collectively, the "**Borrowers**," and each, a "**Borrower**");

(b)    **RAWHIDE ACQUISITION HOLDING LLC**, a Delaware limited liability company (the "**Parent**," and, together with the Borrowers, collectively, the "**Rawhide Entities**," and each, a "**Rawhide Entity**");

(c)    the **SEVERAL FINANCIAL INSTITUTIONS OR ENTITIES FROM TIME TO TIME PARTY TO THIS AGREEMENT AS LENDERS** (the "**Lenders**"); and

(d)    **SILVERPEAK CREDIT PARTNERS, LP**, a Delaware limited partnership ("**Silverpeak**"), in its capacity as administrative agent and collateral agent for itself and the Lenders (together with its successors and assigns, in such capacity, the "**Agent**," and, together with the Rawhide Entities and the Lenders, the "**Parties**," and each, a "**Party**").

## PRELIMINARY STATEMENTS

1.    The Borrowers have requested that the Lenders make a term loan to them in an aggregate principal amount of **USD 18,100,000** (the "**Loan**").

2.    The Lenders are willing to make the Loan on the terms and conditions set forth in this Agreement.

**NOW**, **THEREFORE**, in consideration of the foregoing premises, the Parties, intending to be legally bound, hereby agree as follows:

## ARTICLE 1
## DEFINITIONS AND USAGE

**Section 1.1**    **Definitions**.    Unless otherwise defined herein, the following capitalized terms shall have the following meanings:

"**Account Control Agreements**" means, collectively, (a) the Initial Account Control Agreement and (b) any other account control agreements from time to time entered into pursuant to **clause (b)** of **Section 7.13** (*Deposit Accounts*) below.

"**Accrual Period**" means, with respect to any Payment Date, the period from and including the preceding Payment Date (or the Closing Date, in the case of the first such period) to and including the day preceding such current Payment Date.

"**Accrued Management Fee Distributions**" has the meaning specified in **Section 8.1(d)** (*Accrued Management Fee Distributions*) below.

"**Administration Fee**" shall have the meaning specified in the Fee Letter.

"**Advance**" means, with respect to any Lender, the portion of the Loan held by such Lender.

"**Affiliate**" means any Person that directly or indirectly controls, is controlled by, or is under common control with the Person in question, and "**Affiliated**" has a meaning correlative to the foregoing.   As used in this definition, the term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract or otherwise.

"**Agent**" has the meaning specified in the preamble to this Agreement.

"**Agreement**" has the meaning specified in the preamble hereto.

"**Amortization Date**" means:

(a)    March 15, 2020;

(b)    March 15, 2021; and

(c)    March 15, 2022

(or, if any such date shall not be a Business Day, the immediately following Business Day).

"**Annual Cap**" has the meaning specified in **Section 8.1(d)(ii)** below.

"**Annual Surplus**" has the meaning specified in **Section 8.1(d)(ii)** below.

"**Anti-Corruption Laws**" means all laws, rules, and regulations of any jurisdiction applicable to any Borrower or any of its Affiliates from time to time concerning or relating to bribery or corruption, including without limitation the United States Foreign Corrupt Practices Act of 1977, as amended, the UK Bribery Act 2010 and other similar legislation in any other jurisdictions.

"**Anti-Terrorism Laws**" means any laws, rules, regulations or orders relating to terrorism or money laundering, including without limitation Executive Order No. 13224 (effective September 24, 2001), the USA PATRIOT Act, the laws comprising or implementing the Bank Secrecy Act, and the laws administered by OFAC.

"**Assignee**" has the meaning specified in **Section 11.13(a)** (*Assignment*) below.

"**Audited Financial Statements**" means, for any Fiscal Year, the most recent audited consolidated balance sheet of the Borrowers and the related consolidated statements of income or operations, shareholders' equity and cash flows for such Fiscal Year.

"**Bankruptcy Code**" means the United States Bankruptcy Code, 11 U.S.C. §101, *et seq*.

*Loan and Security Agreement*

"**Blocked Person**" means any Person:   (a) listed in the annex to, or is otherwise subject to the provisions of, Executive Order No. 13224; (b) a Person owned or controlled by, or acting for or on behalf of, any Person that is listed in the annex to, or is otherwise subject to the provisions of, Executive Order No. 13224;  (c) a Person with which any Lender is prohibited from dealing or otherwise engaging in any transaction by any Anti-Terrorism Law; (d) a Person that commits, threatens or conspires to commit or supports "terrorism" as defined in Executive Order No. 13224; or  (e) a Person that is named a "specially designated national" or "blocked person" on the most current list published by OFAC or other similar list.

"**Board**" means, with respect to any Person, its Board of Managers, Board of Directors or other governing body.

"**Board Observer Rights Agreement**" means the Board Observer Rights Agreement, dated as of January 3, 2019, among the Parent, Rawhide Mining and the Agent.

"**Borrower**" has the meaning specified in the preamble to this Agreement.

"**Borrower Real Property**" means any Real Property that is owned, leased, used or operated by any Borrower or in which any Borrower has any mining rights, concessions, permits or licenses.

"**Borrower Taxable Income**" has the meaning specified in **Section 8.1(c)(i)** (*Annual Limit*) below.

"**Borrower Tax Partners**" means the Person or Persons from time to time constituting the direct or indirect partners (or the equivalent) of the Borrowers (or the Parent), for U.S. federal, State or local (or any applicable non-U.S.) income tax purposes, by virtue of holding (directly or through one or more intermediate pass-through holding entities) Equity Interests of the Parent.

"**Business Day**" means any day other than Saturday, Sunday and any other day on which banking institutions in the State of New York are authorized to be closed for business.

"**Capitalized Leases**" means all leases that have been or are required to be, in accordance with GAAP, recorded as capitalized leases; **provided**, **however**, **that**, for all purposes of this Agreement and the calculations made hereunder  (a) the amount of obligations under any Capitalized Lease shall be the amount thereof accounted for as a liability on a balance sheet in accordance with GAAP and  (b) GAAP will be deemed to treat leases in a manner consistent with its current treatment under generally accepted accounting principles as of the Closing Date, notwithstanding any modifications or interpretive changes thereto that may occur thereafter.

"**Cash Equivalents**" means:

(a)     direct obligations of, and obligations fully guaranteed by, the United States or any agency or instrumentality thereof the obligations of which are backed by the full faith and credit of the United States;

(b)     demand deposits, time deposits, bankers' acceptances or certificates of deposit, in each case denominated in USD, of any depository institution or trust company (i) that is incorporated under the laws of the United States or any State or any United States branch of a foreign bank, (ii) that is subject to supervision and examination by federal or State

3                                                                    *Loan and Security Agreement*

banking or depository institution authorities, (iii) having capital, surplus and undivided profits aggregating at least **USD 100,000,000**, and (iv) at the time of such investment (or contractual commitment to invest), whose commercial paper or other short-term unsecured debt obligations (other than such obligations the rating of which is based on the credit of a Person other than such depository institution or trust company) are currently rated by both (A) S&P, which rating shall not be lower than "A-1," and (B) Moody's, which rating shall not be lower than "P-1";

(c)     USD-denominated repurchase obligations, in each case having a term of not more than **ten** days, with respect to any security that is a direct obligation of, or fully guaranteed by, the United States or any agency or instrumentality thereof the obligations of which are backed by the full faith and credit of the United States, entered into with a depository institution or trust company (acting as principal) that satisfies the criteria set forth in **paragraph (b)** of this definition;

(d)     USD-denominated short-term corporate securities (bearing interest coupon payments or purchased at a discount) issued by any corporation incorporated under the laws of the United States or any State; **provided**, **however**, **that**, (i) such investment (A) shall not have an 'r' highlighter affixed to its rating by S&P or Moody's, and (B) shall, by its terms, provide for a predetermined, fixed dollar amount of principal due at maturity that cannot vary or change, and (ii) at the time of the investment, the short-term unsecured debt obligations of such corporation (other than such obligations the rating of which is based on the credit of a Person other than such corporation) are currently rated by both (A) S&P, which rating shall not be lower than "A-1," and (B) Moody's, which rating shall not be lower than "P-1";

(e)     USD-denominated commercial paper that is currently rated by both (i) S&P, which rating shall not be lower than " A-1," and (ii) Moody's, which rating shall not be lower than " P-1"; **provided**, **however**, **that**, such investment (A) shall not have an 'r' highlighter affixed to its rating by S&P or Moody's, and (B) shall, by its terms, provide for a predetermined, fixed dollar amount of principal due at maturity that cannot vary or change; and

(f)     investments in money market funds which are (i) registered under the Investment Company Act of 1940, as amended, (ii) currently rated by both (A) S&P, which rating shall not be lower than "AAAm," and (B) Moody's, which rating shall not be lower than "Aaa-mf";

**provided**, **however**, **that**, no such investment shall have a term longer than **90** days from the date that such investment is acquired by the applicable Borrower.

"**Certificated Vehicle**" means any vehicle that is of a type as to which ownership is represented by a certificate of title or similar document (whether or not such certificate of title is actually in the possession of the Borrowers).

"**CFC**" means any Person, if either:

(a)     such Person is a "controlled foreign corporation" as defined in Section 957(a) of the Code; or

(b)      substantially all of the assets of such Person consist of Equity Interests in one or more other CFCs.

"**Change in Control**" means  (a) the Borrowers' lease, license, sale or other disposition of all or substantially all of their collective assets,  (b) any transaction following which the Parent shall cease to be the direct, legal and beneficial owner of **100.00%** of the outstanding Equity Interests of Rawhide Mining, in violation of **Section 7.14(c)** (*Ownership of Rawhide Mining*) below,  (c) the acquisition by any person, or two or more persons acting in concert, other than members of the Parent, of beneficial ownership (within the meaning of Rule 13d-3 under the Securities Exchange Act of 1934) of the outstanding equity interests of the Parent, if, after giving effect to such acquisition such person or persons own(s) over **50.00%** percent of such outstanding equity interests,  (d) a merger or consolidation of Rawhide Mining following which the members of the Parent will not beneficially own at least **50.00%** of the outstanding equity interests in the surviving entity,  (e) Marceau Schlumberger shall cease to be a member of the Parent Management Committee with active involvement in extraordinary and strategic matters and decisions with respect to the Borrowers or  (f) any transaction following which Marceau Schlumberger, Reef Capital and Reef Capital Group, taken as a whole, would cease to own (beneficially and of record), directly or indirectly, at least **15.00%** of the outstanding equity interests of the Parent.

"**Change in Law**" means  (a) the adoption of any law, rule or regulation after the date of this Agreement,  (b) any change in any law, rule or regulation or in the interpretation or application thereof by any Governmental Authority after the date of this Agreement or  (c) compliance by any Lender (or, for purposes of **Section 2.7** (*Reserve Requirements; Increased Costs*) below, by any lending office of such Lender or by such Lender's holding company, if any) with any request, guideline or directive (whether or not having the force of law) of any Governmental Authority made or issued after the date of this Agreement; **provided**, that, notwithstanding anything herein to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and  (ii) all requests, rules, guidelines or directives promulgated by the Account Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law," regardless of the date enacted, adopted or issued.

"**Claims**" has the meaning specified in **Section 11.10(a)** below.

"**Closing Date**" means the date of this Agreement.

"**Closing Costs**" has the meaning specified in **Section 11.11(a)** (*Closing*) below.

"**Code**" means the Internal Revenue Code of 1986, as amended from time to time.

"**Collateral**" means the property described in **Section 3.1** (*Grant of Security Interest*) below.

"**Compliance Certificate**" has the meaning specified in **Section 7.2(c)** (*Compliance Certificate*) below.

"**Confidential Information**" has the meaning specified in **Section 11.12** (*Confidentiality*) below.

*Loan and Security Agreement*

"**Consolidated Cash Balance**" has the meaning specified in **Section 7.1(d)(i)** (*Consolidated Cash Balance*) below.

"**Consolidated Cash Interest Coverage Ratio**" has the meaning specified in **Section 7.1(d)(ii)** (*Consolidated Cash Interest Coverage Ratio*) below.

"**Consolidated EBITDA**" has the meaning specified in **Section 7.1(d)(iii)** (*Consolidated EBITDA*) below.

"**Consolidated Interest Expense**" has the meaning specified in **Section 7.1(d)(iv)** (*Consolidated Interest Expense*) below.

"**Consolidated Net Income**" has the meaning specified in **Section 7.1(d)(v)** (*Consolidated Net Income*) below.

"**Contingent Obligation**" means, as applied to any Person, (a) any direct or indirect liability, contingent or otherwise, of that Person with respect to (i) any Indebtedness of another Person, including any such Indebtedness directly or indirectly guaranteed, endorsed, co-made or sold with recourse by that Person, or in respect of which that Person is otherwise directly or indirectly liable, **OR** (ii) any obligations with respect to undrawn letters of credit, corporate credit cards or merchant services issued for the account of that Person, **OR**  (b) any Swap Obligation (other than an agreement described in **clause (a)** of the definition of "Permitted Swap Contract"); **provided**, **however**, **that**, the term "Contingent Obligation" shall not include endorsements for collection or deposit in the ordinary course of the Rawhide Mining Business.   The amount of any Contingent Obligation shall be deemed to be equal to (i) the stated or determined amount of the primary obligation in respect of which such Contingent Obligation is made, **OR**  (ii) if not stated or determinable, equal to the maximum reasonably anticipated liability in respect thereof as determined by such Person in good faith, **OR**  (iii) in the case of any Swap Obligation, as calculated daily on a mark-to-market basis in accordance with GAAP; **provided**, **however**, **that**, such amount shall not in any event exceed the maximum amount of the obligations under the guarantee or other support arrangement.

"**Contractual Obligation**" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"**Copyright License**" means any written agreement granting any right to use any Copyright now owned or hereafter acquired by any Borrower or in which any Borrower now holds or hereafter acquires any interest.

"**Copyrights**" means all copyrights, whether registered or unregistered, held pursuant to the laws of the United States, any State or any other country.

"**Default**" means any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would be an Event of Default.

"**Deposit Accounts**" means any "deposit accounts," as such term is defined in the UCC, and includes any checking account, savings account, or certificate of deposit.

"**Disposition**" or "**Dispose**" means the sale, transfer, license, lease or other disposition of any property by any Borrower (other than to another Borrower), including, without limitation:

(a)    any sale and leaseback transaction;

(b)    any issuance of Equity Interests by a Rawhide Subsidiary (other than to a Borrower); and

(c)    any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith;

**it being understood, however, that,** without limiting the effect of **Section 8.2** (*Additional Indebtedness*) or **8.3** (*Liens*) below, neither the grant of a Permitted Lien, nor a transfer of Excluded Assets subject thereto in connection with the repayment or refinancing of Permitted Indebtedness to which such Permitted Lien relates, or an exercise of creditors' remedies in connection with a Borrower default on the Permitted Indebtedness secured thereby, shall constitute a Disposition, for purposes of this Agreement.

"**Environmental Laws**" means all Federal, State, local and foreign laws (including common law), treaties, regulations, rules, ordinances, codes, decrees, judgments, directives, orders (including consent orders) and agreements, in each case relating to protection of the environment, natural resources, human health and safety or the presence, release of, or exposure to, Hazardous Materials, or the generation, manufacture, processing, distribution, use, treatment, storage, transport, recycling or handling of, or the arrangement for such activities with respect to, Hazardous Materials.

"**Environmental Liability**" means all liabilities, obligations, damages, losses, claims, actions, suits, judgments, orders, fines, penalties, fees, expenses and costs (including administrative oversight costs, natural resource damages and remediation costs), whether contingent or otherwise, arising out of or relating to (a) compliance or non-compliance with any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the release of any Hazardous Materials or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"**Environmental Permits**" means all permits, licenses, authorizations, certificates, approvals or registrations required by any Governmental Authority under any Environmental Laws.

"**Equity Cure Amount**" has the meaning specified in **Section 9.2(a)** (*Equity Cure Right*) below.

"**Equity Cure Contributions**" has the meaning specified in **Section 9.2(a)** (*Equity Cure Right*) below.

"**Equity Cure Deadline**" has the meaning specified in **Section 9.2(a)** (*Equity Cure Right*) below.

"**Equity Cure Notice**" has the meaning specified in **Section 9.2(c)(iii)** (*Notice to Agent; Commitments*) below.

"**Equity Cure Notice Deadline**" has the meaning specified in **Section 9.2(c)(iii)** (*Notice to Agent; Commitments*) below.

*Loan and Security Agreement*

"**Equity Cure Right**" has the meaning specified in **Section 9.2(a)** (*Equity Cure Right*) below.

"**Equity Interests**" means, with respect to any Person, the capital stock, partnership or limited liability company interest, or other equity securities or equity ownership interests of such Person.

"**Equity Pledge Agreement**" means the Pledge and Security Agreement, dated as of January 3, 2019, between the Parent, as pledgor, and the Agent.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations promulgated thereunder.

"**ERISA Affiliate**" means any corporation or trade or business that is a member of any group of organizations (a) described in Section 414(b) or (c) of the Code of which any Rawhide Entity is a member and (b) solely for purposes of potential liability under Section 302(c)(11) of ERISA and Section 412(c)(11) of the Code and the lien created under Section 302(f) of ERISA and Section 412(n) of the Code, described in Section 414(m) or (o) of the Code of which any Rawhide Entity is a member.

"**ERISA Event**" means (a) any "reportable event", as defined in Section 4043 of ERISA or the regulations issued thereunder, with respect to a Plan (other than an event for which the 30-day notice period is waived), (b) the existence with respect to any Plan of an "accumulated funding deficiency" (as defined in Section 412 of the Code or Section 302 of ERISA), whether or not waived, (c) the filing pursuant to Section 412(d) of the Code or Section 303(d) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan, (d) the incurrence by any Borrower or any ERISA Affiliate of any liability under Title IV of ERISA with respect to the termination of any Plan or the withdrawal or partial withdrawal of any Borrower or any ERISA Affiliate from any Plan or Multiemployer Plan, (e) the receipt by any Borrower or any ERISA Affiliate from the Pension Benefit Guaranty Corporation or a plan administrator of any notice relating to the intention to terminate any Plan or Plans or to appoint a trustee to administer any Plan, (f) the adoption of any amendment to a Plan that would require the provision of security pursuant to Section 401(a)(29) of the Code or Section 307 of ERISA, (g) the receipt by any Borrower or any ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan from any Borrower or any ERISA Affiliate of any notice, concerning the imposition of withdrawal liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent or in reorganization, within the meaning of Title IV of ERISA, or (h) the occurrence of a "prohibited transaction" with respect to which any Borrower or any of the Subsidiaries is a "disqualified person" (within the meaning of Section 4975 of the Code) or with respect to which any Borrower or any of its Subsidiaries could otherwise be liable.

"**Event of Default**" has the meaning specified in **Article 9** (*Events of Default*) below.

"**Excluded Account**" means any Deposit Account (a) used exclusively for payroll, payroll taxes, and other employee wage and benefit payments with a balance no greater than such payroll, payroll taxes and other employee wage and benefit payments obligations that are to be paid within any two-week period, (b) constituting a "zero balance" Deposit Account or (c) exclusively holding Excluded Cash Collateral Assets.

*Loan and Security Agreement*

"**Excluded Assets**" means, at any time:

(a)     any property in which any Rawhide Entity now or hereafter has rights, to the extent that the grant by such Borrower of a security interest in such property is prohibited (i) under the effective terms of the governing document applicable thereto, without the consent of one or more parties thereto (other than the Agent and the Lenders), but only for so long as such consent has not been obtained, or (ii) by applicable law;

(b)     any property that is subject to, or secures, Permitted Equipment-Backed Indebtedness, Capitalized Leases or purchase-money obligations, and cash securing letter-of-credit reimbursement obligations, in each case to the extent that such Permitted Equipment-Backed Indebtedness, Capitalized Leases, purchase-money obligations, or letters of credit are permitted under this Agreement (including, to the extent constituting collateral for such obligations, any and all proceeds of the foregoing, including insurance proceeds and any property or obligations received when such property or proceeds are sold, collected, dealt with, exchanged or otherwise disposed of);

(c)     any property that has been sold to a Person who is not a Rawhide Entity in compliance with this Agreement;

(d)     other assets, to the extent that the Agent determines, in its reasonable judgment, as evidenced by its consent in writing delivered to the Borrowers, that the collateral value thereof is insufficient to justify the cost, difficulty, time or administrative burden of obtaining a Lien thereon (**provided**, **however**, **that**, the Agent shall not deliver any consent pursuant to this **paragraph (d)** without the prior written approval of the Required Lenders);

(e)     any application for registration of a Trademark filed with the PTO on an intent-to-use basis, until such time (if any) as a statement of use or amendment to allege use is accepted by the PTO, at which time such Trademark shall automatically become part of the Collateral and subject to the security interest granted under **Section 3.1** (*Grant of Security Interest*) below;

(f)     any Excluded Accounts; and

(g)     any property, to the extent that such grant of a security interest (i) is prohibited by any Governmental Authority or (ii)(A) requires the consent of any Governmental Authority and (B) such consent has not been obtained.

For the avoidance of doubt, any and all Proceeds of Excluded Assets, to the extent that such Proceeds are themselves Excluded Assets, shall be Excluded Assets and shall not be Collateral.

"**Excluded Cash Collateral Assets**" means cash collateral accounts maintained by the Company to post required cash collateral, (a) to secure Reclamation Obligations or (b) to post required cash collateral to secure Permitted Swap Contracts.

"**Excluded Indebtedness**" has the meaning specified in **Section 7.1(d)(vi)** (*Excluded Indebtedness*) below.

*Loan and Security Agreement*

"**Excluded Taxes**" means any of the following Taxes imposed on or with respect to the Agent or any Lender, or required to be withheld or deducted from a payment to the Agent or any Lender:

(a)     Taxes imposed on (or measured by) net income, franchise Taxes and branch profits Taxes, in each case, (i) imposed as a result of such Agent or Lender being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or a political subdivision thereof) or (ii) that are Other Connection Taxes;

(b)     in the case of a Lender (other than an assignee pursuant to a request by a Borrower under **Section 2.9(a)** below), any U.S. federal withholding Tax that is imposed on amounts payable to or for the account of such Lender with respect to an applicable Advance at the time such Lender becomes a party to this Agreement (or designates a new lending office), except to the extent that such Lender (or its assignor, if any) was entitled, at the time of designation of a new lending office (or assignment), to receive additional amounts from a Borrower with respect to such withholding Tax pursuant to **Section 2.8** (*Taxes*) below;

(c)     Taxes attributable to the Agent's or such Lender's failure to comply with **Section 2.8(f)** below; and

(d)     any United States federal withholding Taxes imposed under FATCA.

"**Existing Royalties**" has the meaning specified in **Section 5.13** (*Royalties*) below.

"**FATCA**" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any law, regulations, or other official guidance enacted relating to an applicable intergovernmental agreement between a non-U.S. jurisdiction and the United States with respect thereto, and any agreements entered into pursuant to Section 1471(b)(1) of the Code.

"**Fee Letter**" means the Fee Letter, dated as of January 3, 2019, among Rawhide Mining, the Parent and the Agent, as amended, restated, supplemented or otherwise modified from time to time.

"**Financial Covenant Breach**" has the meaning specified in **Section 9.2(a)** (*Equity Cure Right*) below.

"**Financial Covenants**" means the covenants set forth in **Section 7.1(a)** (*Total Leverage Ratio*), **7.1(b)** (*Consolidated Cash Interest Coverage Ratio*) and **7.1(c)** (*Liquidity*) below.

"**Financial Statements**" has the meaning specified in **Section 7.2** (*Reporting*) below (it being understood that references to "most recent Financial Statements," or words to similar effect, shall mean (a) the Financial Statements relating to the quarterly or annual period most recently ended, (b) the Audited Financial Statements for such period, if the same are available and (c) otherwise, to the unaudited Financial Statements for such period).

"**Fiscal Quarter**" means a fiscal quarter of the Borrowers.

*Loan and Security Agreement*

"**Fiscal Year**" means a fiscal year of the Borrowers.

"**GAAP**" means generally accepted accounting principles in the United States, as in effect from time to time; **provided**, **however**, **that**, any obligations of a Person under a lease (whether existing now or entered into in the future) that is not (or would not be) a capital lease obligation under GAAP as in effect as of the date of this Agreement shall not be treated as a capital lease obligation solely as a result of the adoption of changes in GAAP.

"**Governmental Authority**" means the government of the United States or any other nation, or of any political subdivision thereof, whether State or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"**Hazardous Materials**" means (a) any petroleum products or byproducts and all other hydrocarbons, coal ash, radon gas, asbestos, urea formaldehyde foam insulation, polychlorinated biphenyls, chlorofluorocarbons and all other ozone-depleting substances and (b) any chemical, material, substance or waste that is prohibited, limited or regulated by or pursuant to any Environmental Law.

"**Indebtedness**" means all of the following (without duplication):

(a)     all indebtedness for borrowed money or the deferred purchase price of property or services (excluding (x) trade payables and accounts payable, in each case for goods delivered to, or services performed for, the Borrowers pursuant to the Rawhide Mining Business, and (y) Indebtedness incurred as a result of endorsing negotiable instruments, and guaranties in respect thereof, in the ordinary course of the Rawhide Mining Business), including reimbursement and other obligations with respect to surety bonds and letters of credit;

(b)     all obligations evidenced by notes, bonds, debentures or similar instruments;

(c)     all Capitalized Lease obligations; and

(d)     all Contingent Obligations.

"**Indemnified Person**" has the meaning give to it in **Section 6.3** (*Indemnity*) below.

"**Indemnified Taxes**" means  (a) Taxes other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any Borrower under any Loan Document, and  (b) to the extent not otherwise described in **clause (a)** of this definition, Other Taxes.

"**Initial Account Control Agreement**" means an Account Control Agreement, among Rawhide Mining, the Agent and U.S. Bank National Association, a national banking association, with respect to the Deposit Account identified in **Item (1)** of **Exhibit C** (*Deposit Accounts and Investment Accounts*) to this Agreement, in the form attached as **Exhibit H** (*Form of Initial Account Control Agreement*), or in such other form as the Agent may have approved in writing (such approval not to be unreasonably withheld, conditioned or delayed).

*Loan and Security Agreement*

"**Insolvency Proceeding**" is any proceeding by or against any Person under the United States Bankruptcy Code, or any other bankruptcy or insolvency law, including assignments for the benefit of creditors, compositions, extensions generally with its creditors, or proceedings seeking reorganization, arrangement, or other similar relief.

"**Intellectual Property**" means (a) all of the Copyrights, Trademarks, Patents, Licenses, trade secrets, inventions and mask works of any Borrower, (b) the Borrowers' applications therefor, and reissues, extensions, or renewals thereof, and (c) the Borrowers' goodwill associated with any of the foregoing, together with the Borrowers' rights to sue for past, present and future infringement of the foregoing and the goodwill associated therewith.

"**Interest Rate**" means, for any day, the *per annum* rate of interest specified as the "Interest Rate" in the Fee Letter.

"**Investment**" means, with respect to any Person, any beneficial ownership (including stock, partnership or limited liability company interests) of or in any other Person, or any loan, advance or capital contribution to any other Person or the acquisition of any material assets of any other Person.

"**Joinder Agreement**" means for each Rawhide Subsidiary, a completed and executed Joinder Agreement in substantially the form attached as **Exhibit F** (*Form of Joinder Agreement*) to this Agreement.

"**Lender**" has the meaning specified in the preamble to this Agreement.

"**Letter of Interest**" means the Letter of Interest, dated October 16, 2018, between Silverpeak and Rawhide Mining.

"**License**" means any Copyright License, Patent License, Trademark License or other license of rights or interests.

"**Lien**" means any mortgage, deed of trust, pledge, hypothecation, assignment for security, security interest, encumbrance, levy, lien or charge of any kind, whether voluntarily incurred or arising by operation of law or otherwise, against any property, any conditional sale or other title retention agreement, and any lease in the nature of a security interest.

"**Loan**" means the loan made under this Agreement.

"**Loan Documents**" means (a) this Agreement, (b) the Board Observer Rights Agreement, (c) the (d) the Equity Pledge Agreement, (e) the Fee Letter, (f) the Initial Account Control Agreement, (g) the Power of Attorney, (h) the Warrants, (i) all UCC Financing Statements, (j) the Notes (if any), (k) any other Account Control Agreements (l) any Joinder Agreements, (m) any Subordination Agreements and (n) any other documents executed in connection with the Secured Obligations or the transactions contemplated hereby, as the same may from time to time be amended, modified, supplemented or restated.

"**Master Agreement**" means (a) any form of master agreement published by the International Swaps and Derivatives Association, Inc., (b) any International Foreign Exchange Master Agreement, or any (c) any other master agreement.

"**Material Adverse Effect**" means a material adverse effect upon:

(a)    the business, operations, properties, assets or financial condition of the Borrowers and their Subsidiaries taken as a whole; **OR**

(b)    the ability of the Borrowers to perform or pay the Secured Obligations in accordance with the terms of the Loan Documents, or the ability of the Agent or the Lenders to enforce any of their rights or remedies with respect to the Secured Obligations; **OR**

(c)    the Collateral or the Agent's Liens on the Collateral or the priority of such Liens;

**provided**, **however**, **that**, in no event shall a drop in gold prices or the consequences thereof constitute a Material Adverse Effect.

"**Maturity Date**" means the earlier to occur of  (a) the Scheduled Maturity Date and  (b) the date that the Loan and other Secured Obligations hereunder are declared due and payable following the occurrence of an Event of Default pursuant to **Article 10** (*Remedies*) below.

"**Maximum Rate**" has the meaning specified in **Section 2.2** (*Maximum Interest*) below.

"**Mining Royalties**" means royalties of a type (and at a percentage) which are reasonably consistent with market practices in the mining industry and granted in connection with the acquisition or lease of mining rights and properties or mining production associated therewith.

"**Month**" means a calendar month.

"**Moody's**" means Moody's Investors Service, Inc., and any successor thereto.

"**Multiemployer Plan**" means a multiemployer plan defined as such in Section 3(37) of ERISA to which contributions have been, or were required to have been, made by any Borrower or any of their ERISA Affiliates during the five-year period ending on the date of this Agreement and which is covered by Title IV of ERISA.

"**Note**" means a Secured Term Promissory Note in substantially the form of **Exhibit A** (*Form of Note*) to this Agreement.

"**NVDMV**" has the meaning specified in **Section 3.5(b)(ii)** (*Certificated Vehicles*) below.

"**OFAC**" is the U.S. Department of Treasury Office of Foreign Assets Control.

"**OFAC Lists**" are, collectively, the Specially Designated Nationals and Blocked Persons List maintained by OFAC pursuant to Executive Order No. 13224, 66 Fed. Reg. 49079 (Sept. 25, 2001) or any other list of terrorists or other restricted Persons maintained pursuant to any of the rules and regulations of OFAC or pursuant to any other applicable Executive Orders.

"**Origination Fee**" has the meaning specified in the Fee Letter.

"**Organizational Documents**" means, with respect to any Person, its certificate of incorporation, articles of incorporation, certificate of formation, certificate of registration, trust certificate, by-laws,

partnership agreement, limited liability company agreement, memorandum and articles of association, operating agreement, trust agreement, management agreement or other similar or equivalent organizational, charter or constitutional agreement or arrangement.

"**Other Connection Taxes**" means, with respect to the Agent or any Lender, Taxes imposed as a result of a present or former connection between the Agent or such Lender and the jurisdiction imposing such Tax (other than connections arising solely from the Agent or such Lender having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, or engaged in any other transaction pursuant to or enforced any Loan Document or sold or assigned an interest in any Loan or Loan Document).

"**Other Related Person**" means, with respect to any Person who is an individual, any other Person related by blood or marriage to such Person.

"**Other Taxes**" means any and all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes arising from any payment made under any Loan Document or from the execution, delivery, performance, assignment, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to **Section 2.9(a)** below).

"**Parent**" has the meaning specified in the preamble to this Agreement.

"**Parent LLC Agreement**" means the Third Amended and Restated Limited Liability Company Agreement, dated as of July 27, 2017, of the Parent.

"**Parent Management Committee**" means the "Management Committee" (as defined in **Article 4** (*Management of Company*) of the Parent LLC Agreement) of the Parent, or any successor thereto or replacement thereof.

"**Participant**" has the meaning specified in **Section 11.14(a)** (*Generally*) below.

"**Participant Register**" has the meaning specified in **Section 11.14(a)** (*Participant Register*) below.

"**Party**" and "**Parties**" have the respective meanings specified in the preamble to this Agreement.

"**Patent License**" means any written agreement granting any right with respect to any invention on which a Patent is in existence or a Patent application is pending, in which agreement any Borrower now holds or hereafter acquires any interest.

"**Patents**" means all letters patent of, or rights corresponding thereto, in the United States or in any other country, all registrations and recordings thereof, and all applications for letters patent of, or rights corresponding thereto, in the United States or any other country.   For the avoidance of doubt, the term "Patents" does not include mining or mineral patents.

*Loan and Security Agreement*

"**Payment Date**" means:

(a)   March 15, June 15, September 15 and December 15 of each year, commencing in March 2019; and

(b)   the Maturity Date

(or, if any such date shall not be a Business Day, the immediately following Business Day).

"**Payment Date Statement**" has the meaning specified in **Section 2.1(d)** (*Payments*) below.

"**Permitted Equipment-Backed Indebtedness**" means Indebtedness of any Borrower (including, without limitation, Capitalized Leases and purchased money Indebtedness), but only if, and to the extent, that, at any time:

(a)   such Indebtedness is secured by Rawhide Mining Equipment; and

(b)   the original principal amount of such Indebtedness does not exceed the aggregate purchase price of the Rawhide Mining Equipment securing such Indebtedness;

**it** **being** **understood** **that** Indebtedness, with an aggregate principal amount not exceeding, at any time outstanding, **USD 3,400,000**, incurred by Rawhide Mining under the Security Agreement and Promissory Note, dated (or to be dated) on or around January 4, 2019, between Caterpillar Financial Services Corporation and Rawhide Mining, in the form executed, and in effect, on the Closing Date, shall constitute Permitted Equipment-Backed Indebtedness.

"**Permitted Indebtedness**" means, with respect to any Borrower, any of the following:

(a)   the Secured Obligations;

(b)   Indebtedness existing on the Closing Date which is disclosed in **Annex I** (*Existing Permitted Indebtedness*) to this Agreement, having an outstanding principal balance not exceeding (i) individually, the *Closing Date Balance* specified opposite such Indebtedness in such **Annex I**, or  (ii) in the aggregate, for all Borrowers, **USD 269,725**;

(c)   reimbursement obligations in connection with trade letters of credit entered into in the ordinary course of the Rawhide Mining Business and cash management services (including credit cards, debit cards and other similar instruments) issued on behalf of any Borrower;

(d)   Permitted Equipment-Backed Indebtedness (**provided**, that the outstanding principal balance of the Indebtedness of all Borrowers, in the aggregate, pursuant to this **clause (d)**, shall not exceed, at any one time, **USD 10,000,000**);

(e)   Indebtedness under bonds securing Reclamation Obligations;

(f)   intercompany Indebtedness, consisting, solely and exclusively, of obligations to (and for the benefit of) one or more other Borrowers (which Indebtedness shall not have been pledged, assigned or otherwise transferred to any Person other than a Borrower);

(g)    Permitted Swap Contracts;

(h)    extensions, refinancings and renewals of any items of Permitted Indebtedness; **provided** that the principal amount is not increased (except to the extent of any fees, costs and expenses associated with such refinancing) or the terms modified to impose materially more burdensome terms upon the Borrowers;

(i)    Indebtedness not otherwise provided for under the foregoing **clauses (a)** through **(h)** of this definition (**provided**, that the outstanding principal balance of the Indebtedness of all Borrowers, in the aggregate, pursuant to this **clause (i)** shall not exceed, at any one time, **USD 250,000**).

"**Permitted Investment**" means, with respect to any Borrower, any of the following:

(a)    an Investment by such Borrower existing on the Closing Date and disclosed in **Annex II** (*Existing Permitted Investments*) to this Agreement;

(b)    an Investment in Cash Equivalents;

(c)    Investments consisting of capital expenditures that are reasonably necessary in order for such Borrower to continue conducting the Rawhide Mining Business, in the ordinary course;

(d)    an Investment by such Borrower in any other Borrower (other than Western Exploration, which is addressed in **clause (j)** of this definition) that was in existence, and was a Wholly-Owned Subsidiary of Rawhide Mining, prior to both (1) such Investment or (2) any related transactions or events;

(e)    (1) Investments consisting of (A) lease, utility or other similar deposits, or (B) extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary court of business and (2) Investments received in satisfaction or partial satisfaction thereof from account debtors or in Insolvency Proceedings or upon the settlement of debts;

(f)    bank deposits and securities accounts maintained in accordance with the terms of this Agreement and the other Loan Documents;

(g)    Investments received as the non-cash portion of consideration for Dispositions permitted under **Section 8.5** (*Dispositions*) below;

(h)    loans and advances made to officers, directors and employees and representatives of a Rawhide Entity in the ordinary course of the Rawhide Mining Business (**provided**, that the aggregate amount of the Investments pursuant to this **clause (h)** by all Borrowers, in the aggregate, outstanding at any one time does not exceed **USD 50,000**);

(i)    Investments not otherwise provided for under the foregoing **clauses (a)** through **(h)**, or under **clause (j)**, of this definition (**provided**, that the aggregate amount of the Investments

*Loan and Security Agreement*

made pursuant to this **clause (i)** by all Borrowers, in the aggregate, outstanding at any one time does not exceed **USD 250,000**); and

(j)  Investments in the Equity Interests of Western Exploration, **provided** that the amount of the Investments made pursuant to this **clause (j)** by all Borrowers, in the aggregate, during any calendar year, shall not exceed the sum of:

   (1)  the amount specified opposite such calendar year under the heading *Maximum Annual Investment Amount*, in the table below; PLUS

   (2)  in the case of the calendar year ending December 31, 2019, or any calendar year thereafter, a carryover of prior unused *Maximum Annual Investment Amounts*, as determined by summing, for each prior calendar year (from and after the calendar year ended, December 31, 2018), the difference of:

      (A)  the *Maximum Annual Investment Amount* specified opposite such prior calendar year in the table below; MINUS

      (B)  the amount of the Investments in the Equity Interests of Western Exploration made pursuant to this **clause (j)** by all Borrowers, in the aggregate, during such prior calendar year.

| Calendar Year Ending | Maximum Annual Investment Amount |
|---|---|
| December 31, 2018 | **USD 1,000,000** |
| December 31, 2019 | **USD 1,500,000** |
| Each calendar year thereafter | **USD 2,000,000** |

For the avoidance of doubt, (x) Investments in Western Exploration, if and to the extent existing and fully-funded on the Closing Date and disclosed in **Annex II** (*Existing Permitted Investments*) to this Agreement, shall be treated as Permitted Investments, without regard to the limitations in the foregoing **clause (j)** of this definition, and shall not otherwise be taken into account in determining compliance with the limitations set forth in such **clause (j)**, and (y) Investments in Western Exploration that are funded on or after the Closing Date shall be subject to the limitations set forth in **clause (j)** of this definition, but shall not be subject to the limitations set forth in the proviso to **clause (a)** of this definition.

"**Permitted Liens**" means any and all of the following:

(a)  Liens in favor of the Agent or the Lenders with respect to the Secured Obligations;

(b)  Liens securing Indebtedness permitted under **clause (b)** of the definition of Permitted Indebtedness;

(c)  Liens for taxes, fees, assessments or other governmental charges or levies, either not delinquent or being contested in good faith by appropriate proceedings, **provided** that the Borrowers maintains adequate reserves therefor in accordance with GAAP;

*Loan and Security Agreement*

(d)    Liens securing claims or demands of materialmen, artisans, mechanics, carriers, warehousemen, landlords and other like Persons arising in the ordinary course of the Rawhide Mining Business and imposed without action of such parties, **provided** that the payment thereof is not yet required;

(e)    Liens arising from judgments, decrees or attachments in circumstances which do not constitute an Event of Default hereunder;

(f)    the following deposits, but only to the extent that such deposits are made and maintained, and such Liens arise, in the ordinary course of the Rawhide Mining Business:

    (i)    deposits under worker's compensation, unemployment insurance, social security and other similar laws;

    (ii)    deposits made to secure:

        (A)    the performance of bids, tenders or contracts (other than for the repayment of borrowed money);

        (B)    indemnity, performance or other similar bonds for the performance of bids, tenders or contracts (other than for the repayment of borrowed money);

        (C)    statutory obligations (other than Liens arising under ERISA or environmental Liens);

        (D)    surety or appeal bonds;

        (E)    indemnity, performance or other similar bonds or deposits with merchant banks, but solely (1) for the purpose of bill paying and expense management services and (2) to the extent that the Lien on such deposits in favor of any such merchant bank does not exceed, at any time, the aggregate amount of the total billings being processed at such time by any such merchant bank, in all cases, as part of the ordinary course of the Rawhide Mining Business;

**(g)**    Liens securing Indebtedness permitted by **clause (d)** of the definition of Permitted Indebtedness;

**(h)**    Liens incurred in connection with Subordinated Indebtedness permitted pursuant to **Section 8.2** (*Additional Indebtedness*) below;

(i)    leasehold interests in leases or subleases and licenses granted in the ordinary course of the Rawhide Mining Business and not interfering in any material respect with the business of the licensor;

(j)    Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of custom duties that are promptly paid on or before the date they become due;

*Loan and Security Agreement*

(k)    Liens on insurance proceeds securing the payment of financed insurance premiums that are promptly paid on or before the date they become due (provided that such Liens extend only to such insurance proceeds and not to any other property or assets);

(l)    statutory and common law rights of set-off and other similar rights as to deposits of cash and securities in favor of banks, other depository institutions and brokerage firms;

(m)    easements, zoning restrictions, rights-of-way and similar encumbrances on Real Property imposed by law or arising in the ordinary course of the Rawhide Mining Business so long as they do not materially impair the value or marketability of the related property;

(n)    Liens representing or securing Permitted Royalties;

(o)    (i) Liens on Cash Equivalents securing obligations permitted under the definition of Permitted Indebtedness and  (ii) security deposits in connection with Real Property leases, the combination of **(o)(i)** and **(o)(ii)** in an aggregate amount not to exceed **USD 300,000** at any time;

(p)    sales, transfers or other dispositions of assets permitted by **Section 8.5** (*Dispositions*) below and, in connection therewith, customary rights and restrictions contained in agreements relating to such transactions pending the completion thereof or during the term thereof, and any option or other agreement to sell, transfer, license, sublicense, lease, sublease or dispose of an asset permitted by **Section 8.5** (*Dispositions*) below, in each case, such terms being agreed to and such transactions entered into in the ordinary course of the Rawhide Mining Business;

(q)    deposits to secure the performance of bids, trade contracts, leases, statutory obligations, surety, reclamation and appeal bonds, performance bonds or letters of credit, leases or deferred purchase price of equipment, trade credit, endorsement of checks, and completion guarantees and other obligations of a like nature, in each case incurred in the ordinary course of the Rawhide Mining Business;

(r)    Liens on Excluded Assets;

(s)    Liens securing Permitted Swap Contracts;

(t)    Liens incurred in connection with the extension, renewal or refinancing of the Indebtedness secured by Liens of the type described in **clauses (b)** through **(s)** of this definition; **provided**, that any extension, renewal or replacement Lien shall be limited to the property encumbered by the existing Lien and the principal amount of the Indebtedness being extended, renewed or refinanced (as may have been reduced by any payment thereon) does not increase.

"**Permitted Royalties**" means:

(a)    the Existing Royalties (as defined in **Section 5.13** (*Royalties*) below), as in effect on the Closing Date, or as amended, or otherwise modified, from time to time in accordance with **Section 7.22** (*Royalties*) below;

(b)     Mining Royalties that are granted by the Borrowers, on or after the Closing Date, to (and for the benefit of) any Person (other than a Rawhide-Related Person) in respect of any rights, properties or assets of the Borrowers; **provided**, **however**, **that**, no such Mining Royalty shall constitute a Permitted Royalty, pursuant to this **paragraph (b)**, unless:

   (i)     written notice of the grant of such Royalty (accompanied by a true and complete copies of the agreements and other documents pursuant to which such Royalty and any related Liens are granted) shall have been delivered to the Agent on or prior to the date of such grant;

   (ii)     in the case of a Royalty in respect of (or involving the grant of a Lien on) any property, right or asset that was owned, held or acquired by any Borrower prior to the Closing Date (other than a Royalty granted, or to be granted, in connection with the acquisition of rights appurtenant to the Borrowers' existing Real Property), the Agent and the Required Lenders shall have provided their prior written consent to such Royalty (**it being understood that** no such consent, under this **paragraph (b)(ii)**, shall be unreasonably withheld or delayed); and

   (iii)     no Default or Event of Default shall have occurred, and be continuing, at the time that such Royalty is granted; and

(c)     any other Royalties granted by the Borrowers, from time to time, on or after the Closing Date, with the prior written consent of the Agent and the Required Lenders (**it being understood that** the Agent and the Required Lenders shall be entitled to grant or withhold any such consent, under this **paragraph (c)**, in their sole and absolute discretion).

"**Permitted Swap Contract**" means:

(a)     an agreement for the forward sale of gold or silver (or both)  (i) that is  (A) entered into by a Borrower in the ordinary course of the Rawhide Mining Business and  (B) payable only upon delivery and  (ii) under which no Borrower has posted, provided or conveyed, or is (or will be) required to post, provide or convey any collateral or Lien, other than mark-to-market incremental cash margin in an amount not exceeding, at any time,  (A) the value of the gold or silver (or both) to be delivered, as determined based upon the then-current quoted spot price (or prices), **MINUS**  (B) the purchase price to be paid upon delivery; or

(b)     a commodity hedge agreement entered into on terms, and with counterparties, reasonably acceptable to the Agent, as evidenced by its written approval (following an opportunity to review the final form of such agreement).

"**Person**" means any natural person, sole proprietorship, partnership, joint venture, trust, estate, unincorporated organization, association, corporation, limited liability company, institution, or other legal entity or organization or any government.

"**Plan**" means an employee benefit or other plan  (a) established or maintained by any Borrower or any ERISA Affiliate during the five year period ended prior to the date of this Agreement or to which any Borrower or any ERISA Affiliate thereof makes, is obligated to make or has, within the five-year

period ended prior to the date of this Agreement, been required to make contributions and (b) that is covered by Title IV of ERISA, other than a Multiemployer Plan.

"**Post-Closing Reef Fees**" has the meaning specified in **Section 8.1(d)(ii)** below.

"**Power of Attorney**" has the meaning specified in **Section 10.5(b)** (*Delivery of Power of Attorney*) below.

"**Pre-Closing Reef Fees**" has the meaning specified in **Section 8.1(d)(i)** below.

"**Prepayment Charge**" has the meaning specified in **Section 2.4(c)(i)** (*Obligation to Pay Prepayment Charge*) below.

"**PTO**" means the U.S. Patent and Trademark Office.

"**Publicity Materials**" has the meaning specified in **Section 11.20** (*Publicity*) below.

"**Rawhide Entity**" and "**Rawhide Entities**" have the respective meanings specified in the preamble to this Agreement.

"**Rawhide Mine**" means the mining and heap leach operations and property of the respective Borrowers located on the Real Property in Mineral County, Nevada, as presently constituted and as the same may be developed or expanded from time to time (including any Fixtures on such Real Property), and any replacements, improvements, substitutions and modifications thereof, together with all easements, rights-of-way, rights, titles or interests of every kind and description which any Borrower has rights to, or otherwise owns or controls, in relation to, or required in connection with, such operations, properties and claims.

"**Rawhide Mining**" has the meaning specified in the preamble to this Agreement.

"**Rawhide Mining Business**" means (a) the business of gold mining (and, if applicable, silver mining, and the processing of gold, silver or both) conducted by the Borrowers in Mineral County, Nevada, and (b) activities relating thereto (including, without limitation, the hedging and sale of commodities derived from therefrom), in each case as conducted on the date of this Agreement (as it may be expanded, from time to time, in connection with the further development and expansion of the Rawhide Mine implemented in a manner permitted hereunder).

"**Rawhide Mining Equipment**" means Equipment that is (a) owned or leased by any Borrower and (b) is used in the ordinary course of the Rawhide Mining Business, together with all substitutions, replacements, additions, attachments, and accessions thereto.

"**Rawhide Mining LLC Agreement**" means the Second Amended and Restated Limited Liability Company Agreement, dated as of March 2, 2012, of Rawhide Mining.

"**Rawhide-Related Persons**" means, collectively, all of (and "**Rawhide-Related Person**" means any of):

(a)    the Rawhide Entities;

(b)      (i) Reef Capital, Reef Capital Group and Marceau Schlumberger (any of the Persons identified in this **clause (b)(i)**, a "**Reef Person**") and  (ii) an Affiliate of any Reef Person (**but excluding**, **however**, from this **clause (b)(ii)**, any Reef Portfolio Company; and

(c)      the officers, directors and managers (or the equivalent), if applicable, of each of the Persons identified in **paragraphs (a)** and **(b)** of this definition.

"**Rawhide Subsidiary**" means any direct or indirect Subsidiary of Rawhide Mining.

"**Real Property**" means, collectively, all right, title and interest (including any leasehold, mineral or other estate) in and to any and all parcels of or interests in real property owned or leased by any Person, whether by lease, license, concession, permit or other means, together with, in each case, all easements, hereditaments and appurtenances relating thereto, all improvements and appurtenant fixtures and equipment, all general intangibles and contract rights and other property and rights incidental to the ownership, lease or operation thereof.

"**Receivables**" means  (a) all of the Borrowers' Accounts, Instruments, Documents, Chattel Paper, Supporting Obligations, letters of credit, proceeds of any letter of credit, and Letter of Credit Rights, and (b) all customer lists, software, and business records related thereto.

"**Reclamation Obligations**" means, with respect to any Person, all mine closure, asset retirement and environmental reclamation obligations of such Person, whether matured, real or contingent, on a consolidated basis at such time.

"**Reef Capital**" means Coral Reef Capital LLC, a Delaware limited liability company.

"**Reef Capital Group**" means Coral Reef Capital Group, LLC, a Delaware limited liability company.

"**Reef Default**" means an "Event of Default" (as defined in **Section 6(b)** of the Reef Management Agreement).

"**Reef Expense Amounts**" means any amounts from time to time due and payable by the Parent, pursuant to **Section 3(b)** of the Reef Management Agreement, for the reimbursement of reasonable out-of-pocket expenses incurred by Reef Capital Group.

"**Reef Indemnified Party**" means any "Consultant Party" (as defined in **Section 5(a)** of the Reef Management Agreement).

"**Reef Indemnity Amounts**" means any amounts from time to time due and payable by the Parent to any Reef Indemnified Party pursuant to the Parent's indemnity obligations under **Section 5** of the Reef Management Agreement.

"**Reef Management Agreement**" means the Consulting Services Agreement, dated as of June 25, 2010, between Reef Capital Group and the Parent, as in effect on the date hereof, or as amended from time to time, with prior written notice (accompanied by a true and complete copy of such amendment) to the Agent, in a manner that is not adverse to the Agent or the Lenders.

"**Reef Management Fee**" means the "Consulting Services Fee" payable by the Parent to Reef Capital Group under **Section 3(a)** of the Reef Management Agreement.

"**Reef Person**" has the meaning specified in **paragraph (b)** of the definition of "Rawhide-Related Persons" above.

"**Reef Portfolio Company**" means any Person (other than a Rawhide Entity) that is owned by, or otherwise Affiliated with, one or more Reef Persons, but is  (a) either (i)(A) actively engaged in providing goods or services to customers that are not Affiliated with any Reef Person, as an enterprise that is separate and apart from the other businesses and activities of such Reef Persons, and  (B) managed by its own board of directors (or board of managers), separate from any Reef Person, or  (ii) a subsidiary of a Person described in the foregoing **clause (a)(i)** of this definition and  (b) neither  (i) an investment fund managed by, or otherwise involved in, or comprising a part of, the investment activities of any Reef Person or the decisions relating thereto (other than by virtue of conducting and managing its own separate business in the nature described in the foregoing **clause (a)(i)(A)** of this definition, directly or through its subsidiaries), nor  (ii) involved in the management or activities of any Rawhide Entity.

"**Register**" has the meaning specified in **Section 11.13(b)** (*Register*) below.

"**Related Parties**" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, trustees, administrators, managers, advisors and representatives of such Person and of such Person's Affiliates.

"**Release**" means any release, spill, emission, leaking, pumping, pouring, emitting, emptying, escape, injection, deposit, disposal, discharge, dispersal, dumping, leaching or migration of Hazardous Materials in the indoor or outdoor environment, including the movement of Hazardous Materials through or in the air, soil, surface water, ground water or property, in each case, in breach of Environmental Laws or Environmental Permits.

"**Required Lenders**" means at any time, the holders of more than **66-2/3%** of the sum of the aggregate unpaid principal amount of the Loan then outstanding.

"**Resignation Effective Date**" shall have the meaning set forth therefor in **Section 11.18(i)** below.

"**Restricted Distribution**" means:

(a)    any dividend or other distribution (whether in cash, securities or other property) with respect to, or otherwise relating to, any Equity Interest of Rawhide Mining; or

(b)    any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of:

   (i)    the purchase, redemption, retirement, defeasance, acquisition, cancellation or termination of any such Equity Interest; or

   (ii)    any return of capital to holders of Rawhide Mining's equity interests (or the equivalent Persons thereof).

*Loan and Security Agreement*

"**Restricted Transfer**" means:

(a)     a Restricted Distribution;

(b)     (i) the conversion of any convertible securities of any Borrower into other securities or (ii) the payment of cash in lieu of fractional shares upon any such conversion;

(c)     any payment by a Borrower of management fees, profit participations, or any similar or economically-equivalent amounts, to any Rawhide-Related Person (other than a Borrower) (**but**, **excluding**, **however**, from this **paragraph (c)**, for the avoidance of doubt, amounts paid to employees of the Borrowers, as compensation for their services in such capacity, in the ordinary course of the Rawhide Mining Business);

(d)     (i) a loan by any Borrower to  (A) any Rawhide-Related Person (other than a Borrower) or (B) any employee of any Rawhide-Related Person or  (ii) a guaranty by any Borrower of the payment of any such loan granted by a third party (**but**, **excluding**, **however**, from this **paragraph (d)**, loans and advances constituting Permitted Investments, pursuant to **paragraph (h)** of the definition thereof, subject to the limitations set forth in the proviso to such **paragraph (h)**);

(e)     any waiver, release or forgiveness of Indebtedness owed to any Borrower by (i) any Rawhide-Related Person (other than a Borrower) or (ii) any employee of any Rawhide-Related Person (unless, in the case of this **clause (e)(ii)**,  (A) such Indebtedness is a loan to an employee of one or more of the Borrowers that constitutes a Permitted Investment pursuant to **paragraph (h)** of the definition thereof, subject to the limitations set forth in the proviso to such **paragraph (h)**, and  (B) such waiver, release or forgiveness is granted in the ordinary course of the Rawhide Mining Business); or

(f)     any payment of principal (or the equivalent) of, on, under or in connection with any Subordinated Indebtedness of any Borrower.

"**Rights to Payment**" has the meaning specified in **Section 3.1** (*Grant of Security Interest*) below.

"**Royalties**" means any and all royalties, profit sharing arrangements or similar rights of any Person (a) relating to (i) any Borrower Real Property, (ii) any other property, asset or right of any Borrower or  (iii) production relating to any of the foregoing or  (b) involving the grant of a Lien on any property, asset or right of any any Borrower.

"**S&P**" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., and any successor thereto.

"**Sanctioned Country**" means, at any time, a country or territory which is the subject or target of any Sanctions.

"**Sanctioned Person**" means, at any time,  (a) any Person listed in any Sanctions-related list of designated Persons maintained by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, or by the United Nations Security Council, the European Union

*Loan and Security Agreement*

or any EU member state, (b) any Person operating, organized or resident in a Sanctioned Country or (c) any Person controlled by any such Person.

"**Sanctions**" means economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, or (b) the United Nations Security Council, the European Union or Her Majesty's Treasury of the United Kingdom.

"**Scheduled Maturity Date**" means January 3, 2023.

"**Secured Obligations**" means the Borrowers' obligations to the Secured Parties under this Agreement and the other Loan Documents (other than the Warrants), including any obligation to pay any amount now owing or later arising.

"**Secured Parties**" means, collectively, the Lenders and the Agent, and "**Secured Party**" means any of the foregoing.

"**Silverpeak**" has the meaning specified in the preamble to this Agreement.

"**Solvent**" means, as to any Person as of any date of determination, that on such date (a) the fair value of the property of such Person is greater than the total amount of liabilities, including contingent liabilities, of such Person, (b) the present fair saleable value of such Person is not less than the amount that will be required to pay the probable liability of such Person on its debts as they become absolute and matured, (c) such Person does not intend to, and does not believe that it will, incur debts or liabilities beyond such Person's ability to pay such debts and liabilities as they mature and (d) such Person is not engaged in a business or a transaction, and is not about to engage in a business or a transaction, for which such Person's property would constitute an unreasonably small capital.  The amount of any contingent liability at any time shall be computed as the amount that, in light of all of the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability.

"**State**" means (a) any state or commonwealth of the United States and (b) the District of Columbia.

"**Subordinated Indebtedness**" means unsecured Indebtedness that (a) is subordinated to the Secured Obligations in all respects, (b) under which no principal payments (or payments, however denominated, having an equivalent economic effect) will become due on or prior to the Scheduled Maturity Date, and (c) is subject to a Subordination Agreement that is in such form as the Agent may have approved in writing (which approval may be granted or withheld in the sole and absolute discretion of the Agent).

"**Subordination Agreement**" means any subordination agreement or other intercreditor agreement entered into by the Agent with respect to Subordinated Indebtedness pursuant to **Section 8.2** (*Additional Indebtedness*) below.

*Loan and Security Agreement*

"**Subsidiary**" means an entity, whether corporate, partnership, limited liability company, joint venture or otherwise, in which a Borrower directly or indirectly owns or controls more than **50.00%** of the outstanding voting securities, including each entity listed on **Annex III** (*Rawhide Mining Subsidiaries*) to this Agreement.

"**Swap Contract**" means:

(a)     (i) any rate swap transaction, rate hedge, basis swap, credit derivative transaction, forward rate transaction, commodity swap, commodity option, commodity hedge, forward commodity contract, equity or equity index swap or option, bond or bond price or bond index swap or option or forward bond or forward bond price or forward bond index transaction, interest rate option, forward foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option, currency hedge, spot contract (including any option to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement,  (ii) any other similar transaction (or transaction having a similar economic effect) or  (iii) any combination of any of the foregoing;

(b)     any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or are governed by, any Master Agreement (including, as to any such transaction, any rights, obligations and liabilities arising in respect of such transaction under such Master Agreement; and

(c)     any other agreement, contract, or transaction that constitutes a "swap" within the meaning of Section 1a(47) of the U.S. Commodity Exchange Act (7 U.S.C. § 1 *et seq.*).

"**Swap Obligations**" means, with respect to any Person, any obligation or liability (whether direct or indirect, and whether contingent or otherwise) of such Person to pay or perform under any Swap Contract.

"**Taxes**" means any and all present or future taxes, levies, imposts, duties, deductions, charges or withholdings imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"**Total Leverage Ratio**" has the meaning specified in **Section 7.1(d)(vii)** (*Total Leverage Ratio*) below.

"**Total Net Debt**" has the meaning specified in **Section 7.1(d)(viii)** (*Total Net Debt*) below.

"**Trademark License**" means any written agreement granting any right to use any Trademark, now owned or hereafter acquired by any Borrower or in which any Borrower now holds or hereafter acquires any interest.

"**Trademarks**" means all trademarks (registered, unregistered, common-law or otherwise) and any applications in connection therewith, including registrations, recordings and applications in the United States Patent and Trademark Office or in any similar office or agency of the United States, any State, any other country or any political subdivision thereof.

*Loan and Security Agreement*

"**UCC**" means the Uniform Commercial Code as the same is, from time to time, in effect in the State of New York; **provided** that, in the event that, by reason of mandatory provisions of law, any or all of the attachment, perfection or priority of, or remedies with respect to, the Agent's Lien on any Collateral is governed by the Uniform Commercial Code as the same is, from time to time, in effect in a jurisdiction other than the State of New York, then the term "UCC" shall mean the Uniform Commercial Code as in effect, from time to time, in such other jurisdiction solely for purposes of the provisions thereof relating to such attachment, perfection, priority or remedies and for purposes of definitions related to such provisions.

"**United States**" means the United States of America.

"**USD**" means United States Dollars.

"**U.S. Person**" means a Person that is a "United States person" as defined in Section 7701(a)(30) of the Code.

"**Warrant**" means any warrant or warrant agreement issued or entered into in connection with the Loan, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"**Western Exploration**" means Western Exploration LLC, a Nevada limited liability company.

"**Wholly-Owned**" means, as to a Subsidiary of a Person, a Subsidiary of such Person all of the outstanding Equity Interests of which are owned, beneficially and of record, by such Person or by one or more Wholly-Owned Subsidiaries of such Person.

"**Withholding Agent**" means any Borrower and the Agent.

**Section 1.2    Usage.**    The following rules of construction and usage are applicable to this Agreement unless a contrary intention appears:

(a)    *Accounting and UCC Terms.*    All accounting terms used but not defined herein (including, without limitation, "**trade payables**" and "**accounts payable**") shall be construed in accordance with GAAP.    All terms used but not defined herein (including, without limitation, "**Accounts**," "**Chattel Paper**," "**Commercial Tort Claims**," "**Commodity Contracts**," "**Documents**," "**Equipment**," "**Fixtures**," "**General Intangibles**," "**Goods**," "**Instruments**," "**Inventory**," "**Investment Property**," "**Letter of Credit Rights**," "**Proceeds**," and "**Supporting Obligations**") shall, if defined in the UCC and used in Article 8 or 9 thereof, have the meanings assigned to such terms under the UCC for the purposes of Article 8 or 9, as applicable, thereof.

(b)    *Section References, Etc.*    References to an "Article," "Section," "Annex," "Exhibit" or "Schedule," or to another subdivision or attachment, shall be deemed to refer to an article, section, annex, exhibit, schedule or other subdivision of, or attachment to, this Agreement.

(c)    *Inclusion.*    The word "including" means "including without limitation," and the rule of *ejusdem generis* shall not be applicable to limit any provision.

*Loan and Security Agreement*

(d)    ***Non-Exclusive Disjunction***.    The word "or" is not exclusive (meaning that "*X* or *Y*" should be understood to mean "*X* or *Y* (or both *X* and *Y*)").

(e)    ***Hereof, Herein and Hereunder***.    The word "herein," "hereof" and "hereunder," or a word of similar import, shall be construed to refer to the entirety of this Agreement, and not to any particular provision of this Agreement, and includes all annexes, exhibits, schedules and other attachments to this Agreement.

(f)    ***Asset and Property***.    The words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

(g)    ***Word Forms***.    The definitions contained in this Agreement shall apply equally to the singular and plural forms of the terms defined, and, whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.

# ARTICLE 2
# THE LOAN

### Section 2.1    <u>The Loan</u>.

(a)    ***The Loan***.    Subject to the terms and conditions of this Agreement, the Lenders will severally (and not jointly) make a Loan to the Borrowers in an aggregate amount equal to **USD 18,100,000**, allocated among the Lenders as set forth on **Schedule 2.1** (*Advance Amounts; Wire Instructions*) to this Agreement, on the Closing Date.

(b)    ***Interest***.    The principal balance of the Loan shall bear interest thereon from the Closing Date at the Interest Rate, with interest computed daily based on the actual number of days elapsed, payable on each Payment Date in an amount accrued during the preceding Accrual Period and not previously paid.

(c)    ***Principal***.    The Borrowers, jointly and severally, promise to repay a portion of the outstanding Loan principal balance on each Amortization Date in the following amounts:

First Amortization Date (March 2020)........................**USD 1,350,000**

Second Amortization Date (March 2021)...................**USD 2,250,000**

Third Amortization Date (March 2022) .....................**USD 3,150,000**

The entire remaining Loan principal balance, and all accrued but unpaid interest thereon and all other Secured Obligations hereunder, shall be due and payable on the Maturity Date.

(d)    ***Payments***.    No later than 10:00 a.m. New York City time on each Payment Date, the Agent shall provide a statement (each, a "**Payment Date Statement**") to Rawhide Mining and each of the Lenders setting forth the interest, principal and other amounts due to each Lender on such Payment Date, which Payment Date Statement shall be final, and binding upon the Lenders, absent manifest error.    Rawhide Mining shall be entitled to rely on each such Payment Date Statement, and no Default

or Event of Default shall be deemed to occur as a result of Rawhide Mining's failure to make any payment or portion thereof due on the related Payment Date, so long as payments are timely made in accordance with the provisions of such Payment Date Statement.   The Borrowers shall make each payment (including principal of or interest on any Loan or any fees or other amounts) hereunder and under any other Loan Document not later than **2:00 p.m.**, New York City time, on the date when due in immediately available Dollars, without setoff, defense or counterclaim. Each such payment shall be made to the Agent or applicable Lender by wire transfer to the account for the Agent or such Lender, as applicable, specified in **Schedule 2.1** (*Advance Amounts; Wire Instructions*) to this Agreement, or such other account or address specified by the Agent or the applicable Lender by notice to the Borrowers and the Agent, and shall be deemed received only when actually received by the Agent or the Lender, as applicable, in New York, New York at such account and address. The Borrowers agree to make payments with respect to the Advance of any Lender directly to such Lender.   Nevertheless, the Agent shall promptly distribute to each Lender any payments received by the Agent on behalf of such Lender. Except as otherwise expressly provided herein, whenever any payment (including principal of or interest on the Loan or any fees or other amounts) hereunder or under any other Loan Document shall become due, or otherwise would occur, on a day that is not a Business Day, such payment may be made on the next succeeding Business Day, and such extension of time shall in such case be included in the computation of interest or fees, if applicable.   The Borrowers shall make all payments under this Agreement without setoff, recoupment or deduction and regardless of any counterclaim or defense.

Section 2.2    **Maximum Interest**.   Notwithstanding any provision in this Agreement or any other Loan Document, it is the parties' intent not to contract for, charge or receive interest at a rate that is greater than the maximum rate permissible by law that a court of competent jurisdiction shall deem applicable hereto (which under the laws of the State of New York shall be deemed to be the laws relating to permissible rates of interest on commercial loans) (the "**Maximum Rate**").   If a court of competent jurisdiction shall finally determine that the Borrowers have actually paid to the Lenders an amount of interest in excess of the amount that would have been payable if all of the Secured Obligations had at all times borne interest at the Maximum Rate, then such excess interest actually paid by the Borrowers shall be applied as follows:

FIRST:      to the payment of the Secured Obligations consisting of the outstanding principal amount of the Advances;

SECOND:    after all such principal is repaid, to the payment of the Lenders' accrued interest, costs, expenses, professional fees and any other Secured Obligations; and

THIRD:     after all Secured Obligations are repaid, the excess (if any) shall be refunded to the Borrowers.

Section 2.3    **Default Interest**.   Upon the occurrence and during the continuation of an Event of Default hereunder, all Secured Obligations, including principal, interest, compounded interest, and professional fees, shall bear interest at a rate *per annum* equal to the Interest Rate PLUS **two** percent per annum.   In the event that any interest or other amount is not paid when due hereunder, such delinquent interest or other amount shall bear interest thereon at the Interest Rate PLUS **two** percent *per annum* until paid.

**Section 2.4**      **Prepayment.**

(a)      ***Optional Repayment.***   In addition to the mandatory repayments of the Loan required under **Section 2.1(c)** (*Principal*) above, the Borrowers may, at their option, upon at least **30** days' prior written notice to the Agent, repay all or any portion of the principal balance of the Loan; **provided**, that such repayment is accompanied by a payment of all and all accrued and unpaid interest on the amount so prepaid, together with any applicable Prepayment Charge.

(b)      ***Repayment Upon Change in Control.***   The Borrowers, jointly and severally, promise to repay the outstanding amount of all principal and accrued interest through the repayment date and the Prepayment Charge upon the occurrence of a Change in Control.

(c)      ***Prepayment Charge.***

(i)      *Obligation to Pay Prepayment Charge*.   The Borrowers, jointly and severally, promise to pay to the Lenders a prepayment charge (the "**Prepayment Charge**"), in the amount specified in **Section 2.4(c)(ii)** (*Amount of Prepayment Charge*) below, on any day, occurring prior to the **second** anniversary of the Closing Date, on which all, or any portion, of the principal amount of the Loan is repaid, or required to be made, as applicable, pursuant to any of (A) **Section 2.4(a)** (*Optional Repayment*) above,  (B) **Section 2.4(b)** (*Repayment Upon Change in Control*) above, or  (C) **Section 2.4(d)** (*Repayment From Disposition Proceeds*) below, in each case whether or not such repayment occurs, or requirement to repay arises, as applicable, prior to, during or after the pendency of any Insolvency Proceeding, and without regard to any automatic acceleration of the Secured Obligations that occurs upon the commencement of any Insolvency Proceeding under **Section 10.1** (*General*) below, which automatic acceleration the Parties agree shall be deemed to have not occurred for purposes of determining whether a Prepayment Charge is due and payable hereunder.

(ii)      *Amount of Prepayment Charge*.   The amount of the Prepayment Charge (if any) that is due, pursuant to **Section 2.4(c)(i)** (*Obligation to Pay Prepayment Charge*) above, with respect to a repayment (or obligation to repay) of all or any portion of the Loan, shall be equal to the following percentage of the amount being repaid (or required to be repaid):

(A)      if such repayment is made, or required to be made, as applicable, prior to the Payment Date occurring in March 2019, **31.000%**;

(B)      if such repayment is made, or required to be made, as applicable, on or after the Payment Date occurring in March 2019, but prior to the Payment Date occurring in June 2019, **27.125%**;

(C)      if such repayment is made, or required to be made, as applicable, on or after the Payment Date occurring in June 2019, but prior to the Payment Date occurring in September 2019, **23.250%**;

(D)      if such repayment is made, or required to be made, as applicable, on or after the Payment Date occurring in September 2019, but prior to the Payment Date occurring in December 2019, **19.375%**;

(E)    if such repayment is made, or required to be made, as applicable, on or after the Payment Date occurring in December 2019, prior to the Payment Date occurring in March 2020, **15.500%**;

(F)    if such repayment is made, or required to be made, as applicable, on or after the Payment Date occurring in March 2020, but prior to the Payment Date occurring in June 2020, **11.625%**;

(G)    if such repayment is made, or required to be made, as applicable, on or after the Payment Date occurring in June 2020, but prior to the Payment Date occurring in September 2020, **7.750%**; or

(H)    if such repayment is made, or required to be made, as applicable, on or after the Payment Date occurring in September 2020, but prior to the Payment Date occurring in December 2020, **3.875%**.

(iii)    *Acknowledgements Regarding Prepayment Charge*.    Each Borrower agrees and acknowledges that:

(A)    no Prepayment Charge that becomes due and payable under this Agreement shall constitute unmatured interest, whether under Section 502(b)(3) of the Bankruptcy Code or otherwise; and

(B)    the Prepayment Charge has been reasonably calculated to ensure that each Lender receives the benefit of its bargain under the terms of this Agreement, in view of the difficulties and impracticality of determining actual damages resulting from an early repayment of the Loan.

(d)    ***Repayment From Disposition Proceeds***.    Promptly upon receipt thereof, the proceeds of any Disposition other than in the ordinary course of the Rawhide Mining Business shall be applied to prepayment of the Loan; **provided**, that, so long as no Event of Default has occurred and is continuing, the Borrowers may, upon notice to the Agent, reinvest the proceeds from such Disposition in the Rawhide Mining Business within **180** days after such Disposition.    Such requirement shall be in addition to any mandatory prepayment in full in connection with a Change in Control without the consent of the Agent as restricted pursuant to **Sections 8.11** (*Corporate Changes*) and **9.1(i)** (*Change in Control*) below, and any restriction on any Disposition of the Borrowers' assets pursuant to **Sections 8.1** (*Restricted Transfers*) and **8.5** (*Dispositions*) below.

Section 2.5    **Notes.**    If so requested by any Lender, by written notice to the Borrowers, the Borrowers, jointly and severally, promise to execute and deliver to such Lender (or, if applicable and if so specified in such notice, to any Person who is an assignee of such Lender pursuant to **Section 11.13** (*Assignment of Rights*) below), promptly after the Borrowers' receipt of such notice, a Note or Notes to evidence such Lender's Advance.

Section 2.6    **Pro Rata Treatment.**    Each payment (including prepayment) on account of interest or any fee payable to the Lenders and any reduction in the principal balance of the Loan shall be

made *pro rata* according to the respective outstanding amounts of the Advances of the relevant Lenders.

### Section 2.7     Reserve Requirements; Increased Costs.

(a)     Notwithstanding any other provision of this Agreement, if any Change in Law shall:

   (i)     impose, modify or deem applicable any reserve, special deposit or similar requirement against assets of, deposits with or for the account of or credit extended by any Lender;

   (ii)     impose on the Agent or any Lender any Taxes (other than Indemnified Taxes and Excluded Taxes) on its loans, loan principal, advances or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

   (iii)     impose on any Lender any other condition (other than Taxes) affecting this Agreement or the Advance made by such Lender or any participation therein,

and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any Advance or increase the cost to any Lender of purchasing or maintaining a participation therein or to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or otherwise) by an amount deemed by such Lender to be material, then the Borrowers, jointly and severally, promise to pay to such Lender, upon demand, such additional amount or amounts as will compensate such Lender for such additional costs incurred or reduction suffered.

(b)     If any Lender shall have determined that any Change in Law regarding capital adequacy has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement or the Advance made by such Lender pursuant hereto to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy) by an amount deemed by such Lender to be material, then from time to time the Borrowers, jointly and severally, promise to pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c)     A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as applicable, as specified in **Section 2.7(a)** or **(b)** above shall be delivered to the Borrowers and shall be conclusive absent manifest error.   The Borrowers, jointly and severally, promise to pay to such Lender the amount shown as due on any such certificate delivered by it within **10** days after its receipt of the same.

(d)     Failure or delay on the part of any Lender to demand compensation for any increased costs or reduction in amounts received or receivable or reduction in return on capital shall not constitute a waiver of such Lender's right to demand such compensation; **provided**, **however**, **that**, the Borrowers shall not be under any obligation to compensate any Lender under **Section 2.7(a)** or **(b)** above with respect to increased costs or reductions with respect to any period prior to the date that is **120** days prior to such request; and **provided**, **further**, **however**, **that**, the foregoing limitation shall not apply to

any increased costs or reductions arising out of the retroactive application of any Change in Law within such **120**-day period.   The protection of this **Section 2.7** shall be available to each Lender regardless of any possible contention of the invalidity or inapplicability of the Change in Law that shall have occurred or been imposed.

### Section 2.8    Taxes.

(a)    Any and all payments by or on account of any obligation of any Borrower hereunder or under any other Loan Document shall be made free and clear of and without deduction or withholding for any Taxes, except as required by applicable law; **provided** that, if any applicable law (as determined in the good faith discretion of the applicable Withholding Agent) requires the deduction or withholding of any Taxes from such payments, then  (i) in the case of Indemnified Taxes, the sum payable by such Borrower shall be increased as necessary so that after making all required deductions or withholdings (including deductions or withholdings applicable to additional sums payable under this **Section 2.8(a)**) the Agent and each Lender (as the case may be) receives an amount equal to the sum it would have received had no such deductions or withholdings been made,  (ii) the applicable Withholding Agent shall make (or cause to be made) such deductions or withholdings, and  (iii) the applicable Withholding Agent shall timely pay the full amount so deducted or withheld to the relevant Governmental Authority in accordance with applicable law.

(b)    In addition, the Borrowers, jointly and severally, promise to pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law or, at the option of the Agent, timely reimburse it for the payment of any Other Taxes.

(c)    The Borrowers, jointly and severally, promise to indemnify the Agent and each Lender within **10** days after written demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this **Section 2.8(c)**) payable or paid by the Agent or such Lender, as the case may be, or required to be withheld or deducted from a payment to the Agent or such Lender and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.   A certificate as to the amount of such payment or liability delivered to the Borrowers by a Lender, or by the Agent, on behalf of itself or a Lender, shall be conclusive absent manifest error.

(d)    Each Lender shall severally indemnify the Agent, within **10** days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that any Borrower has not already indemnified the Agent for such Indemnified Taxes, and without limiting the obligation of the Borrowers to do so),  (ii) any Taxes attributable to such Lender's failure to comply with the provisions of **Section 11.14(a)** (*Participant Register*) below relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.   A certificate as to the amount of such payment or liability delivered to any Lender by the Agent shall be conclusive absent manifest error.   Each Lender hereby authorizes the Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan

*Loan and Security Agreement*

Document or otherwise payable by the Agent to such Lender from any other source against any amount due to the Agent under this **Section 2.8(d)**.

(e)    As soon as practicable after any payment of Indemnified Taxes or Other Taxes by any Borrower to a Governmental Authority, the Borrowers shall deliver to the Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Agent.

(f)    Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments under this Agreement shall deliver to the Borrowers and the Agent, at the time or times reasonably requested by the Borrowers or the Agent, such properly completed and executed documentation reasonably requested by the Borrowers or the Agent as will permit such payments to be made without withholding or at a reduced rate. In addition, any Lender, if reasonably requested by the Borrowers or the Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrowers or the Agent as will enable the Borrowers or the Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements. Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in the remainder of this **Section 2.8(f)**) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.   Without limiting the generality of the foregoing, (i) any Lender that is a U.S. Person shall deliver to the Borrowers and the Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrowers or the Agent) executed copies of U.S. Internal Revenue Service Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding Tax and (ii) any Lender that is not a U.S. Person shall, to the extent that it is legally entitled to do so, deliver to the Borrowers and the Agent, on or prior to the date on which such Lender becomes Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrowers and the Agent), executed copies of the appropriate U.S. Internal Revenue Service Form W-8 (and supporting documentation, as applicable).    If a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrowers and the Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrowers or the Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrowers or the Agent as may be necessary for the Borrowers and the Agent to comply with their obligations under FATCA and to determine that such Lender has complied with its obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of the preceding sentence, "FATCA" shall include any amendments made to FATCA after the date of this Agreement.   Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrowers and the Agent in writing of its legal inability to do so.

*Loan and Security Agreement*

(g)    If any Party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this **Section 2.8** (including by the payment of additional amounts pursuant to this **Section 2.8**), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this **Section 2.8** with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund).    Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this **Section 2.8(g)** (**PLUS** any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority.    Notwithstanding anything to the contrary in this **Section 2.8(g)**, in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this **Section 2.8(g)** the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This paragraph shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(h)    Each Party's obligations under this **Section 2.8** shall survive (i) the resignation or replacement of the Agent, (ii) any assignment of rights by, or the replacement of, any Lender, and (iii) the repayment, satisfaction or discharge of all obligations under any Loan Document.

### Section 2.9    **Duty to Mitigate**.

(a)    In the event (i) any Lender delivers a certificate requesting compensation pursuant to **Section 2.7** (*Reserve Requirements; Increased Costs*) above or  (ii) the Borrowers are required to pay any Indemnified Taxes or additional amounts to any Lender or any Governmental Authority on account of any Lender pursuant to **Section 2.8** (*Taxes*) above, then, in each case, the Borrowers may, at their sole expense and effort, upon notice to such Lender and the Agent, require such Lender to transfer and assign, without recourse (in accordance with and subject to the restrictions contained in **Sections 11.7** (*Successors and Assigns*) and **11.13** (*Assignment of Rights*) below), all of its interests, rights (other than its then-existing rights to payments pursuant to **Section 2.7** (*Reserve Requirements; Increased Costs*) or **2.8** (*Taxes*) above) and obligations under this Agreement to an eligible Assignee (which assignee may be another Lender, if a Lender accepts such assignment); **provided**, **however**, **that**, (x) such assignment shall not conflict with any law, rule or regulation or order of any court or other Governmental Authority having jurisdiction, (y) the Borrowers shall have received the prior written consent of the Agent, which consent shall not unreasonably be withheld or delayed, and (z) the Borrowers or such assignee shall have paid to the affected Lender in immediately available funds an amount equal to the sum of the principal of and interest accrued to the date of such payment on the outstanding Advance of such Lender **PLUS** all fees and other amounts accrued for the account of such Lender hereunder with respect thereto (including any amounts under **Section 2.7** (*Reserve Requirements; Increased Costs*) above); and **provided** **further**, **however**, **that**, if prior to any such transfer and assignment the circumstances or event that resulted in such Lender's claim for compensation under **Section 2.7** (*Reserve Requirements;*

*Increased Costs*) above or the amounts paid pursuant to **Section 2.8** (*Taxes*) above, as the case may be, cease to cause such Lender to suffer increased costs or reductions in amounts received or receivable or reduction in return on capital, or cease to result in amounts being payable under **Section 2.8** (*Taxes*) above, as the case may be (including as a result of any action taken by such Lender pursuant to **Section 2.9(b)** below), or if such Lender shall waive its right to claim further compensation under **Section 2.7** (*Reserve Requirements; Increased Costs*) above in respect of such circumstances or event or shall waive its right to further payments under **Section 2.8** (*Taxes*) above in respect of such circumstances or event, then such Lender shall not thereafter be required to make any such transfer and assignment hereunder.

(b)    If (i) any Lender shall request compensation under **Section 2.7** (*Reserve Requirements; Increased Costs*) above or (ii) the Borrowers are required to pay any Indemnified Taxes or additional amounts to any Lender or any Governmental Authority on account of any Lender pursuant to **Section 2.8** (*Taxes*) above, then such Lender shall use reasonable efforts (which shall not require such Lender to incur an unreimbursed loss or unreimbursed cost or expense or otherwise take any action inconsistent with its internal policies or legal or regulatory restrictions or suffer any disadvantage or burden deemed by it to be significant) (x) to file any certificate or document reasonably requested in writing by the Borrowers or (y) to assign its rights and delegate and transfer its obligations hereunder to another of its offices, branches or affiliates, if such filing or assignment would reduce its claims for compensation under **Section 2.7** (*Reserve Requirements; Increased Costs*) above or would reduce amounts payable pursuant to **Section 2.8** (*Taxes*) above, as the case may be, in the future.   The Borrowers, jointly and severally, promise to pay all reasonable costs and expenses incurred by any Lender in connection with any such filing or assignment, delegation and transfer.

### Section 2.10    Warrants.

(a)    On the terms and subject to the conditions hereof, on the Closing Date, the Parent shall issue to each Lender a Warrant for the right to purchase interests in the Parent.   The Warrants are issued in connection with the Loan, and, together with the Loan, constitute investment units within the meaning of Section 1273(c)(2) of the Code.

(b)    In accordance with Sections 1273(c)(2)(A) and 1273(b)(2) of the Code, the issue price of the investment unit is the amount of the Loan to the Borrowers.   The Borrowers and the Lenders have considered all facts relevant to a determination of the fair market value of each of the Loan and the Warrants being issued in connection with this Agreement, and have used their respective reasonable best efforts to determine such fair market values.    Allocating that issue price between the Loan and the Warrant in proportion to their respective fair market values, as required by Section 1273(c)(2)(B) of the Code and Treasury Regulation 1.1273-2(h)(1), results in the Warrant having an aggregate issue price of **USD 880,000** and the Loan having an issue price of **USD 16,541,250**.    Neither the Borrowers nor the Lenders shall take any position in their U.S. federal, State or local Tax returns that is inconsistent with the foregoing, unless otherwise required by a Tax authority or court.    The Borrowers shall provide each Lender with any information necessary for such Lender to report its income from this transaction properly.

*Loan and Security Agreement*

# ARTICLE 3
## SECURITY INTEREST

**Section 3.1**    **Grant of Security Interest.**  As security for the prompt and complete payment when due (whether on Payment Dates, on the Maturity Date or otherwise) of all the Secured Obligations, each Borrower grants to the Agent, for the benefit of the Secured Parties, a security interest in all of such Borrower's right, title, and interest in, to and under all of the Borrower's personal property and other assets (in each case, other than Excluded Assets), including, without limitation, the following (to the extent not constituting Excluded Assets), in each case, whether now owned or hereafter acquired (collectively, the "**Collateral**"):

(i)    all Accounts, Chattel Paper, Commodity Contracts, Deposit Accounts, Documents, Equipment, Fixtures, General Intangibles, Goods, Instruments, Intellectual Property, Inventory, Investment Property, Letter of Credit Rights and Supporting Obligations;

(ii)    all Commercial Tort Claims (including, without limitation, all of the Commercial Tort Claims identified in **Schedule 5.3** (*Commercial Tort Claims*) to this Agreement, as such **Schedule 5.3** may be amended from time to time pursuant to **Section 7.11** (*Commercial Tort Claims*) below);

(iii)    all Intellectual Property (including, without limitation, all of the Intellectual Property identified on **Schedule 5.15** (*Intellectual Property*) to this Agreement, as such **Schedule 5.15** may be amended from time to time pursuant to **Section 7.9** (*Further Assurances*) below);

(iv)    without duplication of, or limiting the generality of, **clauses (i)** through **(iii)** above:

(A)    all cash, Cash Equivalents, Investments, Equity Interests and Receivables; and

(B)    the Rawhide Mine; and

(C)    all books and records pertaining to the Collateral; and

(v)    the extent not otherwise included, all Proceeds and products of any and all of the foregoing;

**it** **being** **understood**, **however**, that the foregoing grant, pursuant to this **Section 3.1**, shall not be construed as limiting the right of the Borrowers to grant Permitted Liens, subject to, and in accordance with, the other provisions of this Agreement.

**Section 3.2**    **Delivery of Collateral.**  All certificates or instruments representing or evidencing Collateral (other than Collateral that is subject to Permitted Liens) shall be delivered to and held by the Agent pursuant to this Agreement, shall be in suitable form for transfer by delivery or shall be accompanied by duly executed instruments of transfer or assignment in blank, all in form and substance reasonably satisfactory to the Agent and, to the extent not constituting an assignment, shall be irrevocable powers of attorney coupled with an interest.   Upon the occurrence of an Event of Default, the Agent shall have the right, at any time and without notice to the Borrowers or any Secured

Party, to transfer to or to register in the name of the Agent or any of its nominees any or all of the Collateral.

**Section 3.3    Borrowers Remain Liable.**    Notwithstanding anything in this Agreement to the contrary, (a) each Borrower that is party thereto shall remain liable under any contracts and agreements included in the Collateral to perform all of its duties and obligations thereunder to the same extent as if this Agreement had not been executed, (b) the exercise by the Agent as agent of the Lenders or by the Agent as agent of the Secured Parties of any of its rights under this Agreement shall not release any Borrower from any of its duties or obligations under any contracts or agreements included in the Collateral,  (c) the Agent, as agent of the Secured Parties, shall not have any obligation or liability under any contracts and agreements included in the Collateral by reason of this Agreement, and (d) neither the Agent nor any of the Lenders shall be obligated to perform any of the obligations or duties of any Borrower under any contract or agreement included in the Collateral or to take any action to collect or enforce any claim for payment assigned under this Agreement.

**Section 3.4    Taxes.**    The Borrowers, jointly and severally, promise to pay, and to hold the Agent and the Lenders harmless from, any and all liabilities with respect to, or resulting from any delay in paying, any and all excise, sales, property or other similar Taxes (excluding, for the avoidance of doubt, Excluded Taxes) that may be payable or determined to be payable with respect to any of the Collateral or this Agreement.

**Section 3.5    Further Assurances; Financing Statements.**

(a)    *Further Assurances.*    Each Borrower agrees that, at any time and from time to time, it shall at the expense of the Borrowers promptly authorize, execute and deliver, as applicable, all further instruments and documents and take all further action that may be necessary or desirable or that the Agent may reasonably request to maintain the perfection of the Agent's security interest in the Collateral.   Without limiting the generality of the foregoing, each Borrower shall authorize, execute and file, as applicable, such financing or continuation statements, or amendments thereto, and such other instruments or notices as may be necessary or desirable or that the Agent may request to perfect the assignments and security interests granted by this Agreement.

(b)    *Specific Obligations.*    Without limiting the generality of **Section 3.5(b)(ii)** (*Certificated Vehicles*) below, the Borrowers shall, on or prior to the Closing Date (or within such other period as may be expressly otherwise provided in **Section 4.5** (*Post-Closing Obligations*) below):

(i)    *Fixtures, Etc.*    With respect to fixtures and as-extracted Collateral, authorize, execute and file and record a financing statement in the county where such fixtures and as-extracted Collateral is located to perfect the Agent's security interest therein, in accordance with Nevada Revised Statutes Chapter 104.9501(a)(1), 104.9502(3), 104.9502(2) and 104.9501(1)(b) or any other applicable laws.

(ii)    *Certificated Vehicles*.    Provide the Agent with fully-executed certificates of title for any Certificated Vehicle owned by any Borrower, listing the Agent's name and address as the first lienholder thereon, duly recorded with the Nevada Department of Motor Vehicles ("**NVDMV**"), or other relevant authority, in a manner necessary

and sufficient to perfect the Agent's Lien on such Certificated Vehicle, in accordance with Nevada Revised Statutes Chapter 482.428, or any other applicable law, rule or regulation; **provided**, **however**, **that** the obligations of the Borrowers under this **Section 3.5(b)(ii)** shall not apply as to:

(A)    any of the **three** Certificated Vehicles (consisting of the vehicles with VINs 1FMFU18L6VLA30270, 1FT7W2B68EEA22249 and 1FD8W3H68BEA03886) as to which "LOST" is specified in the column headed *Title* in **Schedule 5.14** (*Certificated Vehicles*) to this Agreement, if and for so long as no replacement certificate of title shall have been issued to the relevant Borrower with respect to such Certificated Vehicle; or

(B)    any Certificated Vehicles that constitute (and for so long as they remain) Excluded Assets.

(iii)    *Initial Account Control Agreement*.    Enter into the Initial Account Control Agreement and deliver to the Agent a true, correct, complete and fully-executed copy thereof.

(iv)    *EM Gold Certificate*.    Deliver, or cause to be delivered, to the Agent the original certificate or certificates representing the shares of EmGold referred to in **Annex II** (*Existing Permitted Investments*) to this Agreement, accompanied by executed transfer powers, in blank, in a form reasonably satisfactory to the Agent.

(c)    ***Authorization to File Financing Statements***.    Each Borrower, and each Lender, hereby severally authorizes the Agent to file one or more financing or continuation statements, and amendments thereto, relating to all or any part of the Collateral without the signature of any Borrower or Secured Party where permitted by law.    A photographic or other reproduction of this Agreement or any financing statement covering the Collateral or any part thereof shall be sufficient as a financing statement where permitted by law.    The Agent will promptly send to the Borrowers any financing or continuation statements thereto which it files without the signature of any Borrower.    The Agent will promptly send the Borrowers or the Secured Parties, as the case may be, the filing or recordation information with respect thereto.

(d)    ***Additional Information***.    Each Borrower shall furnish to the Agent, from time to time, such statements and schedules further identifying and describing the Collateral and such other reports in connection with the Collateral as the Agent may reasonably request, all in reasonable detail.

*Loan and Security Agreement*

# ARTICLE 4
# CONDITIONS PRECEDENT TO LOAN

The obligations of the Lenders to make the Loan hereunder are subject to the satisfaction by the Borrowers of the following conditions:

**Section 4.1**    **Required Documents**.    On or prior to the Closing Date, the Borrowers shall have delivered to the Agent and Lenders the following, all in form and substance reasonably satisfactory to the Agent:

(a)    ***Loan Documents, Etc.***    Executed copies of:

   (i)    the documents referred to in **clauses (a)** through **(h)** of the definition of Loan Documents in **Section 1.1** (*Definitions*) above; and

   (ii)    all other documents and instruments reasonably required by the Agent to effectuate the transactions contemplated hereby or to create and perfect the Liens of the Agent with respect to all Collateral, including without limitation:

      (A)    copies of all filings to be made under the UCC, in form for filing;

      (B)    copies of all filings to be made with respect to Real Property, in form for filing; and

      (C)    the certificates (if any) representing any and all Equity Interests in, to or under which any Borrower holds any legal or beneficial right, title or interest, together with powers, in a form reasonably satisfactory to the Agent, executed in blank by the registered owner thereof.

(b)    ***Organizational Documents***.    Copies of the Organizational Documents of each Rawhide Entity, as amended or amended and restated through the Closing Date, certified, as applicable, by the Secretary of State of its respective State of organization.

(c)    ***Good Standing Certificates***.    (i) A certificate of good standing for each Rawhide Entity from the Secretary of State of its State of organization and (ii) similar certificates from all other jurisdictions in which any Borrower does business and where the failure to be qualified could be reasonably expected to have a Material Adverse Effect.

(d)    ***Secretary's Certificates***.    A certificate of the secretary of each Rawhide Entity as to (i) an attached copy of resolutions of such entity's board of directors (or, for any limited liability company, comparable documentation) evidencing approval of (A) the Loan and other transactions evidenced by the Loan Documents; and  (B) with respect to the Parent, the Warrants and transactions evidenced thereby; (ii) an attached copy of the by-laws (or, where applicable, limited liability company operating agreement) of such entity, as amended or amended and restated through the Closing Date, and  (iii) incumbency and signatures of officers of such Rawhide Entity who executed any of the Loan Documents.

*Loan and Security Agreement*

(e)    ***Officer's Certificates***.    One or more certificates of officers of the Rawhide Entities as to:

    (i)    the accuracy of the representations and warranties set forth in **Article 5** (*Representations and Warranties*) below;

    (ii)    compliance with the covenants set forth in **Section 7.1** (*Financial Covenants*) below (both immediately prior to, and after giving effect to, the execution and delivery of the Loan Documents, the making of the Loan pursuant to **Section 2.1(a)** (*The Loan*) above and the other transactions contemplated to occur on the Closing Date; and

    (iii)    the satisfaction of the conditions set forth in this **Article 4**.

(f)    ***Financial Statements***.    (i) The Audited Financial Statements of the Borrowers for the Fiscal Year ended December 31, 2017 and (ii) the unaudited Financial Statements of the Rawhide Entities for the Fiscal Quarter ended September 30, 2018.

(g)    ***Insurance***.    All certificates of insurance and copies of insurance policies required hereunder.

(h)    ***Legal Opinions***.

    (i)    *Pepper Hamilton LLP*.    One or more legal opinions of Pepper Hamilton LLP, special counsel to the Rawhide Entities, as to (A) corporate authority, (B) due authorization, execution, delivery and enforceability of the Loan Documents, (C) no conflicts with law, court orders, Organizational Documents or listed material contracts, (D) validity and perfection of the Agent's security interest in the Collateral and (E) valid issuance of the Warrants.

    (ii)    *Holley Driggs*.    A legal opinion of Holley, Driggs, Walch, Fine, Puzey, Stein & Thompson, special Nevada counsel to the Rawhide Entities, as to (A) Real Property matters and (B) titled assets that are included in the Collateral.

(i)    ***KYC, AML, Etc.***    Upon the reasonable request of the Agent or any Lender made at least **ten** days prior to the Closing Date, the documentation and other information so requested in connection with applicable "know your customer" and anti-money-laundering rules and regulations, including the PATRIOT Act, in each case at least **three** Business Days prior to the Closing Date.

(j)    ***Other Documents***.    Such other documents as the Agent may reasonably request.

**Section 4.2**    **Payment of Fees and Expenses**.    The Agent shall have received the Origination Fee and reimbursement of the Agent's and the Lenders' current expenses reimbursable pursuant to this Agreement and the Fee Letter, which amounts may be deducted from the amount advanced in respect of the Loan on the Closing Date.

**Section 4.3**    **Compliance**.    All representations and warranties set forth in **Article 5** (*Representations and Warranties*) below shall be true and correct in all material respects as of the Closing Date (or, to the extent that such representations and warranties speak as of an earlier date, such earlier date), and the Borrowers shall be in compliance with all the terms and provisions set forth herein

and in each other Loan Document on its part to be observed or performed on or before the Closing Date.

**Section 4.4**     **No Default**.    As of the Closing Date,  (a) no fact or condition exists that could (or could, with the passage of time, the giving of notice, or both) constitute an Event of Default and (b) no event that has had or could reasonably be expected to have a Material Adverse Effect has occurred and is continuing.

**Section 4.5**     **Post-Closing Obligations**.

(a)     ***Certain Extensions of Time***.    The Agent and the Lenders agree to the following limited extensions of time for performance of certain of the Borrowers' obligations under **Section 3.5(b)** (*Specific Obligations*) above:

(i)     *Certificated Vehicles*.    The Borrowers shall have up to **60** days following the Closing Date to comply with their obligations to record the Agent's Lien under **Section 3.5(b)(ii)** (*Certificated Vehicles*) above, **provided** that the Borrowers shall have submitted to the NVDMV, or other relevant authority, a duly-endored certificate of title, application and any other documentation, with respect to each Certificated Vehicle owned by any Borrower (other than a Certificated Vehicle subject to an exclusion under **Section 3.5(b)(ii)(A)** or **3.5(b)(ii)(B)** above), sufficient to effect the recordation of the Agent's Lien thereon, within **ten** Business Days following the Closing Date, and shall continue to use commercially-reasonable efforts to cause the recordation and delivery required under such **Section 3.5(b)(ii)** to be made as soon as reasonably practicable following the Closing Date.

(ii)    *Initial Account Control Agreement*.    The Borrowers shall have up to **10** Business Days following the Closing Date to comply with their obligation under **Section 3.5(b)(iii)** (*Initial Account Control Agreement*) above, **provided** that the Borrowers shall continue to use commercially-reasonable efforts to cause the Initial Account Control Agreement to be executed, and delivered to the Agent, as soon as reasonably practicable following the Closing Date.

(iii)   *EM Gold Certificate*.    The Borrowers shall have up to **30** days following the Closing Date to comply with their obligation under **Section 3.5(b)(iv)** (*EM Gold Certificate*) above, **provided** that the Borrowers shall continue to use commercially-reasonable efforts to cause the certificate or certificates representing the EmGold shares to be delivered to the Agent, along with the requisite transfer powers, as soon as reasonably practicable following the Closing Date.

*Loan and Security Agreement*

(b)     **_Consequences of Failure_**.    A failure by the Borrowers to comply to timely comply with their obligations under **Section 3.5(b)** (*Specific Obligations*) above, as modified under **Section 4.5(a)** (*Certain Extensions of Time*) above (except as the time periods for compliance may have been extended in writing by the Agent, in its reasonable discretion), shall constitute an immediate Event of Default (to which the grace period set forth in **Section 9.1(c)** (*Breach of Agreement*) below shall not apply).

# ARTICLE 5
# REPRESENTATIONS AND WARRANTIES

To and for the benefit of the Secured Parties, each Rawhide Entity hereby represents and warrants (which representations and warranties shall survive the execution and delivery of this Agreement), as of the Closing Date, as follows:

**Section 5.1     Organization, Etc..**    (a)(i) each of Rawhide Mining and the Parent is a limited liability company duly formed, legally existing and in good standing under the laws of the State of Delaware,  (ii) each other Borrower is duly formed, legally existing and in good standing under the laws of its jurisdiction of organization,  (b) each Rawhide Entity  (i) has all requisite power and authority and all requisite governmental licenses, authorizations, consents and approvals to  (A) own or lease its assets and carry on its business and  (B) execute, deliver and perform its obligations under the Loan Documents to which it is a party, and  (ii) is duly qualified as a foreign entity, and is licensed and in good standing, in all jurisdictions in which  (A) the nature of its business or location of its properties require such qualification or licensing, or  (B) the failure to be qualified or licensed could reasonably be expected to have a Material Adverse Effect, and  (c) as of the date hereof, the present name, former names (if any), locations, place of formation, tax identification number, organizational identification number and other information, with respect to each Rawhide Entity, are correctly set forth in **Exhibit B** (*Borrower Information*).

**Section 5.2     Collateral**.    Each Borrower (a) owns its interest in the Collateral free of all Liens (except for (i) Permitted Liens and (ii) with respect to Real Property, (A) subject to (1) the paramount title of the United States to unpatented mineral claims and (2) matters that do not materially interfere with the current, intended or proposed use of such Real Property) and (b) has the power and authority to grant to the Agent a Lien in the Collateral as security for the Secured Obligations.

**Section 5.3     Commercial Tort Claims.**    No Borrower holds any Commercial Tort Claims other than those identified in **Schedule 5.3** (*Commercial Tort Claims*) to this Agreement.

**Section 5.4     Consents.**    (a) Each Rawhide Entity's execution, delivery and performance of this Agreement, and all other Loan Documents to which it is a party,  (i) have been duly authorized by all necessary limited liability company, corporate or other action of such Rawhide Entity,  (ii) will not result in the creation or imposition of any Lien upon the Collateral, other than Permitted Liens and the Liens created by this Agreement and the other Loan Documents,  (iii) do not violate any provisions of  (A) such Rawhide Entity's Organizational Documents,  (B) any law, regulation, order, injunction, judgment, decree or writ to which such Rawhide Entity is subject or  (C) any material contract or material agreement or require the consent or approval of any other Person which has not already been obtained, except (in the case of the foregoing **clauses (a)(iii)(A)**, **(a)(iii)(B)** and **(a)(iii)(C)**) where such violation could not

reasonably be expected to result in a Material Adverse Effect, and (b) the individual or individuals executing the Loan Documents on behalf of the Rawhide Entities are duly authorized to do so.

**Section 5.5** **Governmental Authorization; Other Consents.**   No approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with the execution, delivery or performance by, or enforcement against, any Rawhide Entity of this Agreement or any other Loan Document, except for (a) such approvals, consents, exemptions, authorizations, actions or notices that have been duly obtained, taken or made and in full force and effect, or  (b) where the failure to obtain such approvals, consents, exemptions, authorizations or take such actions could not reasonably be expected to result in a Material Adverse Effect.

**Section 5.6** **Financial Statements; No Material Adverse Effect.**

(a)  ***Audited Financial Statements.***   The Audited Financial Statements for the Fiscal Year ended December 31, 2017 were prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein, and do or will fairly present in all material respects the financial condition of the Borrowers as of the date thereof and their results of operations and cash flows for the period covered thereby in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein.

(b)  ***Unaudited Financial Statements.***   The unaudited consolidated balance sheet of the Borrowers and the related consolidated statements of income or operations, shareholders' equity and cash flows for the month ended on November 30, 2018 were prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein, and do or will fairly present in all material respects the financial condition of the Borrowers as of the date thereof and their results of operations and cash flows for the period covered thereby, subject to the absence of notes and to normal year-end audit adjustments.

(c)  ***No Material Adverse Effect.***   No event that has had or could reasonably be expected to have a Material Adverse Effect has occurred since December 31, 2017.   No Rawhide Entity is aware of any event likely to occur that is reasonably expected to result in a Material Adverse Effect.

**Section 5.7** **Actions Before Governmental Authorities.**   There are no actions, suits or proceedings at law or in equity or by or before any Governmental Authority now pending or, to the knowledge of any Rawhide Entity, threatened in writing against or affecting any Rawhide Entity or its properties, that is reasonably expected to result in a Material Adverse Effect.

**Section 5.8** **Litigation.**   There are no actions, suits, proceedings, claims, disputes or investigations pending or, to the knowledge of any Rawhide Entity, threatened, at law, in equity, in arbitration or before any Governmental Authority, by or against any Rawhide Entity, or against any of their properties or revenues, that  (a) could reasonably be expected to be adversely determined, and, if so determined, either individually or in the aggregate could reasonably be expected to have a Material Adverse Effect or  (b) purport to affect or pertain to this Agreement or any other Loan Document or any of the transactions contemplated hereby.

*Loan and Security Agreement*

**Section 5.9**     **Laws, Etc.**

(a)     ***No Violation, Etc.***    No Rawhide Entity is  (i) in violation of any law, rule or regulation, or in default with respect to any judgment, writ, injunction or decree of any Governmental Authority, where such violation or default is reasonably expected to result in a Material Adverse Effect or  (ii) in default in any manner under any provision of any agreement or instrument evidencing material Indebtedness, or any other material agreement to which it is a party or by which it is bound.

(b)     ***Investment Company Act, Margin Regulations, Etc.***    (i) No Rawhide Entity is an "investment company" or a company "controlled" by an "investment company" under the Investment Company Act of 1940, as amended, (ii)(A) no Rawhide Entity is engaged as one of its important activities in extending credit for "margin stock" (under Regulations X, T and U of the Federal Reserve Board of Governors), and  (B) not more than **25.00%** of the value of the assets of the Rawhide Entities, on a consolidated basis, consists of such margin stock, (iii) each Rawhide Entity has complied in all material respects with the Federal Fair Labor Standards Act, (iv) no Rawhide Entity is a "holding company" or an "affiliate" of a "holding company" or a "subsidiary company" of a "holding company" as each term is defined and used in the Public Utility Holding Company Act of 2005,  (v) the properties and assets of the Rawhide Entities have not been used by any Rawhide Entity (or, to the knowledge of any Rawhide Entity, by previous Persons), in disposing, producing, storing, treating, or transporting any hazardous substance, other than in material compliance with applicable laws, and  (vi) each Rawhide Entity has obtained all consents, approvals and authorizations of, made all declarations or filings with, and given all notices to, all Governmental Authorities that are necessary to continue their respective businesses as currently conducted.

(c)     ***Sanctions.***

(i)     No Rawhide Entity or Affiliate thereof, or any of their respective agents acting or benefiting in any capacity in connection with the transactions contemplated by this Agreement, is (A) in violation of any Anti-Terrorism Law, (B) engaging in or conspiring to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law, or  (C) a Blocked Person.

(ii)     No Rawhide Entity or Affiliate thereof, or any of their respective agents acting or benefiting in any capacity in connection with the transactions contemplated by this Agreement, (A) conducts any business or engages in making or receiving any contribution of funds, goods or services to or for the benefit of any Blocked Person, or  (B) deals in, or otherwise engages in any transaction relating to, any property or interest in property blocked pursuant to Executive Order No. 13224, any similar executive order or other Anti-Terrorism Law.

(iii)     None of the funds to be provided under this Agreement will be used, directly or indirectly,  (A) for any activities in violation of any applicable anti-money laundering, economic sanctions and anti-bribery laws and regulations laws and regulations or (B) for any payment to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official

capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended.

Section 5.10  **Information Correct and Current**.  No information, report, financial statement, exhibit or schedule furnished, by, or on behalf of, any Rawhide Entity to the Agent in connection with any Loan Document or included therein or delivered pursuant thereto contained, or, when taken as a whole, contains or will contain any material misstatement of fact or, when taken together with all other such information or documents, omitted, omits or will omit to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were, are or will be made, not materially misleading at the time such statement was made or deemed made. Additionally, any and all financial or business projections provided by, or on behalf of, any Rawhide Entity to the Agent, whether prior to, on or after the Closing Date, shall be  (i) provided in good faith and based on the most current data and information available to the Rawhide-Related Persons, and  (ii) the most current of such projections provided to the Parent Management Committee (it being understood for purposes of this **Section 5.10** only that such projections are subject to significant uncertainties and contingencies, many of which are beyond the control of the Rawhide Entities, that no assurance is given that any particular projections will be realized, and that actual results may differ from the projected results).

Section 5.11  **Tax Matters**.  Except for those being contested in good faith with adequate reserves under GAAP,  (a) each Borrower has filed all U.S. federal and other material State, local and non-U.S. Tax returns that it is required to file,  (b) each Borrower has duly paid or fully reserved for all Taxes or installments thereof (including any interest or penalties) as and when due, which have or may become due, and  (c) each Borrower has paid or fully reserved for any Tax assessment received by such Borrower, if any (including any Taxes being contested in good faith and by appropriate proceedings).

Section 5.12  **Real Property**.  (a) **Schedule 5.12** (*Real Property*) sets forth a complete and correct listing of all Borrower Real Property, and  (b) the Borrowers have good record and marketable title in fee simple to, or valid leasehold interests in, all Real Property used in the ordinary course of the Rawhide Mining Business, except for such defects in title that, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

Section 5.13  **Royalties**.  (a) **Schedule 5.13** (*Existing Royalties*) sets forth a complete and correct listing of all Royalties material to the Rawhide Mining Business (the "**Existing Royalties**"),  (b) the Borrowers have delivered to the Agent true, correct and complete copies of all material agreements or other documents relating to the Existing Royalties, and  (c) except as identified in such **Schedule 5.13** there are no other material agreements, documents or understandings with respect to any Royalty of any type or kind whatsoever (other than a Royalty in a nominal or *de minimis* amount).

Section 5.14  **Certificated Vehicles**.  (a) **Schedule 5.14** (*Certificated Vehicles*) sets forth a complete listing of the Certificated Vehicles of the Borrowers and  (b) the certificates of title with respect to the **three** vehicles as to which "LOST" is specified in the column headed *Title* in such **Schedule 5.14** have been lost or destroyed.

*Loan and Security Agreement*

**Section 5.15    Intellectual Property.**    **Schedule 5.15** (*Intellectual Property*) sets forth all of the Intellectual Property of the Borrowers that is material to the Rawhide Mining Business.   The Borrowers are the sole owner of, or otherwise has the right to use, the Intellectual Property of the Borrowers that is material to the Rawhide Mining Business (as currently conducted and proposed to be conducted).

**Section 5.16    Environmental Matters.**

(a)    Except as set forth in **Schedule 5.16** (*Environmental Matters*):

(i)    the Borrower Real Property is free of the presence of any Hazardous Materials except for such presence (A) that could not reasonably be expected to adversely impact the value or marketability of such Real Property for the current and intended uses of the exploration and mining of gold and silver, (B) that is not in material breach of Environmental Laws or any Environmental Permit, and (C) that would not result in Environmental Liabilities of the Borrowers (other than Reclamation Obligations) that could reasonably be expected to exceed, individually or in the aggregate, **USD 250,000**;

(ii)    no Borrower has caused or suffered to occur any material Release of Hazardous Materials on, at, in, under, above, to, from or about any of the Borrower Real Property;

(iii)    the Borrowers are, and have been in material compliance with, all Environmental Laws;

(iv)    the Borrowers have obtained, and are in material compliance with, all Environmental Permits required by Environmental Laws for the operations of their respective businesses as presently conducted or as proposed to be conducted, and all such Environmental Permits are valid, uncontested and in good standing;

(v)    no Borrower is aware of any facts, circumstances or conditions, including any Releases of Hazardous Materials, that are likely to result in any Environmental Liabilities of the Borrowers (other than Reclamation Obligations) that could reasonably be expected to exceed, individually or in the aggregate, **USD 250,000**;

(vi)    to the best of the Borrowers' knowledge, after due inquiry, there is no litigation arising under or related to any Environmental Laws, Environmental Permits or Hazardous Materials;

(vii)    no Borrower has knowledge of, nor has any Borrower received notice of, any actual, pending or threatened investigations, claims, orders, suits, actions or proceedings regarding the breach of any Environmental Laws or the provisions of any Environmental Permits; and

(viii)    the Borrowers have provided to the Agent copies of all existing environmental reports, reviews and site assessments and all written information pertaining to

actual or potential Environmental Liabilities, in each case relating to any Borrower or Subsidiary, which is in the possession of the Borrowers and their Subsidiaries or of which the Borrowers and their Subsidiaries have knowledge.

(b)    Each Borrower hereby acknowledges and agrees that the neither the Agent nor any Lender (i) is now, and has ever been, in control of any of the Real Property or any Borrower's or Subsidiary's affairs, and  (ii) has the capacity through the provisions of the Loan Documents or otherwise to influence any Borrower's or Subsidiary's conduct with respect to the ownership, operation or management of any of the Borrower Real Property or compliance with Environmental Laws or Environmental Permits (other than as may occur as a result of an exercise of remedies by the Agent during the continuance of an Event of Default).

**Section 5.17    Financial Accounts.    Exhibit C** (*Deposit Accounts and Investment Accounts*) is a true, correct and complete list of  (a) all banks and other financial institutions at which any Borrower maintains Deposit Accounts and  (b) all institutions at which any Borrower maintains an account holding Investment Property, and such **Exhibit C** correctly identifies the name, address and telephone number of each bank or other institution, the name in which the account is held, a description of the purpose of the account, and the complete account number therefor.

**Section 5.18    Employee Loans.**    Other than to the extent constituting Permitted Investments, no Borrower has any outstanding loan to any employee, officer or director of any Borrower, nor has any Borrower guaranteed the payment of any loan made to an employee, officer or director of any Borrower by a third party.

**Section 5.19    Capitalization, Affiliates, Etc.**

(a)    Rawhide Mining's capitalization as of the Closing Date is set forth in **Schedule 5.19** (*Capitalization and Affiliates*) to this Agreement.

(b)    Except as set forth in **Schedule 5.19** (*Capitalization and Affiliates*) to this Agreement, no Borrower owns any Equity Interests or securities of any Person, other than Cash Equivalents.

**Section 5.20    Solvency.**    Each Rawhide Entity is Solvent.

**Section 5.21    ERISA.**    No Rawhide Entity or ERISA Affiliate maintains, makes contributions to, or has any obligations with respect to any Plan or Multiemployer Plan.   No Rawhide Entity is a "benefit plan investor" as defined in section 3(42) of ERISA.

# ARTICLE 6
## INSURANCE; INDEMNIFICATION

**Section 6.1    Coverage.**    The Borrowers shall cause to be carried and maintained commercial general liability insurance, on an occurrence form, against risks customarily insured against in the Borrowers' line of business. Such risks shall include the risks of bodily injury, including death, property damage, personal injury, advertising injury, and contractual liability per the terms of the indemnification agreement found in **Section 6.3** (*Indemnity*) below.   The Borrowers must maintain a

minimum of **USD 2,000,000** of commercial general liability insurance for each occurrence (which coverage may be provided in part by an umbrella policy so long as the primary commercial general liability insurance is in an amount per occurrence at least equal to the greater of **USD 1,000,000** and any threshold amount before the umbrella coverage is applicable). The Borrowers currently maintain, and, jointly and severally, promise to maintain, a minimum of **USD 2,000,000** of directors' and officers' insurance for each occurrence and **USD 5,000,000** in the aggregate.   So long as there are any Secured Obligations (other than inchoate indemnity obligations) outstanding, the Borrowers shall also cause to be carried and maintained insurance upon the Collateral, insuring against all risks of physical loss or damage howsoever caused, in an amount not less than the full replacement cost of the Collateral; **provided** that such insurance may be subject to standard exceptions and deductibles.

Section 6.2    **Certificates**.   Borrowers shall deliver to the Agent certificates of insurance that evidence the Borrowers' compliance with their insurance obligations in **Section 6.1** (*Coverage*) above and the obligations contained in this **Section 6.2**.   The Borrowers' insurance certificate shall identify the Agent is an additional insured for commercial general liability, a loss payee for all risk property damage insurance, subject to the insurer's approval, and a loss payee for property insurance and additional insured for liability insurance for any future insurance that the Borrowers may acquire from such insurer.   Attached to the certificates of insurance will be additional insured endorsements for liability and lender's loss payable endorsements for all risk property damage insurance.   All certificates of insurance will provide for a minimum of **30** days' advance written notice to the Agent of cancellation (other than cancellation for non-payment of premiums, for which **10** days' advance written notice shall be sufficient) or any other change adverse to the Agent's interests.   Any failure of the Agent to scrutinize such insurance certificates for compliance is not a waiver of any of the Agent's rights, all of which are reserved.   The Borrowers shall provide the Agent with copies of each insurance policy, and, upon entering or amending any insurance policy required hereunder, the Borrowers shall provide the Agent with copies of such policies and shall promptly deliver to the Agent updated insurance certificates with respect to such policies.   Notwithstanding the foregoing part of this **Section 6.2**, the requirements under this **Section 6.2** shall not apply to any property insurance policy, if, and to the extent that, and for so long as,  (i) such property insurance covers Excluded Assets and  (ii) the terms of any Permitted Indebtedness secured by a Permitted Lien on such Excluded Assets would prevent, prohibit or render impracticable compliance with the terms of this **Section 6.2**, as to the coverage of such Excluded Assets under such policy.

Section 6.3    **Indemnity**.   The Borrowers, jointly and severally, promise to indemnify and hold the Agent, the Lenders and their officers, directors, employees, agents, in-house attorneys, representatives and   equity holders (each, an "**Indemnified Person**") harmless from and against any and all claims, costs, expenses, damages and liabilities (including such claims, costs, expenses, damages and liabilities based on liability in tort, including strict liability in tort), including reasonable out-of-pocket attorneys' fees and disbursements and other reasonable out-of-pocket costs of investigation or defense (including those incurred upon any appeal) (collectively, "**Liabilities**"), that may be instituted or asserted against or incurred by such Indemnified Person as the result of credit having been extended, suspended or terminated under this Agreement and the other Loan Documents or the administration of such credit, or in connection with or arising out of the transactions contemplated hereunder and thereunder, or any actions or failures to act in connection therewith, or arising out of the disposition or utilization of the Collateral, excluding in all cases Liabilities to the extent resulting solely from  (a) any

Indemnified Person's gross negligence, willful misconduct or material breach of its obligations under any Loan Document or  (b) from disputes, claims, demands, actions, judgments or suits not arising from any act or omission by any Borrower or Affiliate thereof brought by an indemnified person against any other indemnified person (other than disputes, claims, demands, actions, judgments or suits involving claims against the Agent in its capacity as such).    In no event shall the Borrowers or any Indemnified Person be liable on any theory of liability for any special, indirect, consequential or punitive damages (including any loss of profits, business or anticipated savings).    This **Section 6.3** shall survive the repayment of indebtedness under, and otherwise shall survive the expiration or other termination of, this Agreement. This **Section 6.3** shall not apply with respect to Taxes other than any Taxes that represent Liabilities arising from any non-Tax claim.

# ARTICLE 7
# AFFIRMATIVE COVENANTS

Section 7.1    **Financial Covenants**.

(a)    ***Total Leverage Ratio***.    The Borrowers shall not permit the Total Leverage Ratio, as of the end of any of the 12-Month periods specified in the table immediately below, to be greater than the ratio set forth opposite such date, under the heading *Maximum Total Leverage Ratio*, in the table immediately below.

| 12-Month Period Ending | Maximum Total Leverage Ratio |
|---|---|
| March 31, 2020 | **4.00:1.00** |
| March 31, 2021 | **3.00:1.00** |
| March 31, 2022 and March 31 of each succeeding calendar year | **2.50:1.00** |

(b)    ***Consolidated Cash Interest Coverage Ratio***.    The Borrowers shall not permit the Consolidated Cash Interest Coverage Ratio, as of the end of any of the 12-Month periods specified in the table immediately below, to be less than the ratio set forth opposite such period, under the heading *Maximum Consolidated Cash Interest Coverage Ratio*, in the table immediately below.

| 12-Month Period Ending | Maximum Consolidated Cash Interest Coverage Ratio |
|---|---|
| March 31, 2020 | **1.50:1.00** |
| March 31, 2021 | **1.75:1.00** |
| March 31, 2022 and each 12-month period thereafter | **2.00:1:00** |

*Loan and Security Agreement*

(c)    *__Liquidity.__*    The Borrowers shall not permit the Consolidated Cash Balance, as of any of the dates specified in the table immediately below, to be less than the amount set forth opposite such date, under the heading *Minimum Consolidated Cash Balance*, in the table immediately below.

| As of | Minimum Consolidated Cash Balance |
|---|---|
| June 30, 2020 | **USD 2,000,000** |
| December 31, 2020 | **USD 2,500,000** |
| June 30, 2021 | **USD 3,500,000** |
| December 31, 2021 | **USD 4,000,000** |
| June 30, 2022, and every December 31 and June 30 occurring thereafter | **USD 5,000,000** |

(d)    *__Certain Definitions.__*    As used in this **Section 7.1** and elsewhere in this Agreement:

(i)    *Consolidated Cash Balance*.    "**Consolidated Cash Balance**" means the total amount of all unrestricted cash and Cash Equivalents of the Borrowers.

(ii)    *Consolidated Cash Interest Coverage Ratio*.    "**Consolidated Cash Interest Coverage Ratio**" means, with respect to any Fiscal Year, the ratio of:

(A)    Consolidated EBITDA; **TO**

(B)    Consolidated Interest Expense.

(iii)    *Consolidated EBITDA*.    "**Consolidated EBITDA**" means, with respect to any Fiscal Year or Fiscal Quarter, as applicable:

(A)    Consolidated Net Income for such period; **PLUS**

(B)    without duplication, and to the extent deducted in determining Consolidated Net Income for such period, the sum of  (1) interest expense **PLUS** (2) provision for taxes based on income **PLUS** (3) depreciation expense **PLUS** (4) amortization expense **PLUS** (5) unusual or non-recurring charges, expenses or losses (**provided**, **however**, **that**, the cumulative aggregate amount of the unusual or non-recurring charges, expenses or losses that are added back, pursuant to this **clause (B)(5)**, during (and with respect to) any 12-Month period, in determining Consolidated EBITDA, shall not exceed **10.00%** of Consolidated Net Income with respect to such 12-Month period (as determined, for the avoidance of doubt, without taking into account any exercise of the Equity Cure Right pursuant to **Section 9.2(a)** (*Equity Cure Right*) below)), **PLUS** (6) other non-cash charges, expenses or losses (excluding any such non-cash charge to the extent it represents an accrual or reserve for potential cash charge in any future period or amortization of a prepaid cash charge that was paid in a prior period) **PLUS** (7) the amount of any Reef Management Fees that are payable to Reef Capital Group, to the extent accrued and included in the calculation of Consolidated Net Income, not to

*Loan and Security Agreement*

exceed **USD 300,000**, in the aggregate, during any Fiscal Year, **PLUS** (8) unrealized gains and losses in respect of Permitted Swap Contracts **PLUS** (9) the amount of fees, costs and expenses that are covered by insurance or indemnity; **MINUS**

(C)    to the extent included in determining Consolidated Net Income for such period, the sum of (1) unusual or non-recurring gains and non-cash income **PLUS** (2) any other noncash income or gains increasing Consolidated Net Income for such period (excluding any such non-cash gain to the extent it represents the reversal of an accrual or reserve for potential cash charge in any prior period) **PLUS** (3) any gains realized from the disposition of property outside of the ordinary course of business, all as determined on a consolidated basis.

(iv)    *Consolidated Interest Expense*.    "**Consolidated Interest Expense**" means, for any period, total interest expense (including that attributable to Capitalized Leases) net of total interest income of the Borrowers on a consolidated basis for such period with respect to all outstanding Indebtedness of the Borrowers.

(v)    *Consolidated Net Income*.    "**Consolidated Net Income**" means, for any period, the consolidated net income (or loss) of the Borrowers on a consolidated basis; **provided**, that there shall be excluded from Consolidated Net Income:

(A)    any income (or loss) of Western Exploration;

(B)    the income (or deficit) of any Person accrued prior to the date it becomes a Borrower or is merged into or consolidated with any Borrower; and

(C)    the income (or deficit) of any Person (other than a Borrower) in which any Borrower has an ownership interest, except to the extent that any such income is actually received by a Borrower in the form of dividends or similar distributions.

(vi)    *Excluded Indebtedness*.    "**Excluded Indebtedness**" means trade credit, accounts payable, performance bonds, deposits and advances from customs and indebtedness as a result of endorsing negotiable instruments and guaranties in respect thereof entered into in the ordinary course of the Rawhide Mining Business.

(vii)    *Total Leverage Ratio*.    "**Total Leverage Ratio**" means, with respect to any Fiscal Year or Fiscal Quarter, as applicable, the ratio of:

(A)    Total Net Debt; **TO**

(B)    Consolidated EBITDA.

*Loan and Security Agreement*

(viii)    *Total Net Debt*.    "**Total Net Debt**" means, at any time:

(A)    the aggregate principal amount of all:

(1)    Indebtedness of any Borrower for borrowed money (other than Excluded Indebtedness) outstanding on such date, in an amount that would be reflected on a balance sheet prepared as of such date on a consolidated basis in accordance with GAAP (but excluding the effects of any discounting of Indebtedness resulting from the application of purchase accounting);

(2)    purchase-money indebtedness; and

(3)    debt obligations evidenced by promissory notes, bonds, debentures, loan agreements or similar instruments, and debt obligations evidenced by promissory notes, bonds, debentures, loan agreements or similar instruments;

**MINUS**

(B)    the total amount of all unrestricted cash and Cash Equivalents on the consolidated balance sheet of the Borrowers;

**provided**, **however**, **that**, Indebtedness permitted by **paragraph (d)** or **(e)** of the definition of Permitted Indebtedness, and Reclamation Obligations, shall not be taken into account in determining the amount under **paragraph (A)** of this definition.

Section 7.2    **Reporting**.    The Borrowers shall furnish to the Agent the following financial statements, reports and other documents (the "**Financial Statements**"), at the times, and in the manner, specified below:

(a)    *Unaudited Financial Statements*.    As soon as practicable (and in no event later than **45** days) after the end of the first three Fiscal Quarters of each Fiscal Year, and as soon as practicable (and in no event later than **60** days) after the end of the last Fiscal Quarter of each Fiscal Year, year-to-date financial statements of Rawhide Mining and its Subsidiaries (prepared on a consolidated basis) as of the end of such Fiscal Quarter or Fiscal Year, as the case may be, including balance sheet and related statements of income and cash flows, accompanied by a report detailing any material contingencies (including the commencement of any material litigation by or against any Borrower) or any other occurrence that could reasonably be expected to have a Material Adverse Effect, and certified by Rawhide Mining's Chief Executive Officer or Chief Financial Officer to the effect that they have been prepared in accordance with GAAP (subject, as to interim statements, to lack of footnotes and year-end adjustments).

(b)    *Annual Audited Financial Statements*.    As soon as practicable (and in no event later than **120** days) after the end of each Fiscal Year, commencing with the Fiscal Year ending December 31, 2018, unqualified (other than any qualification resulting from any upcoming payment in full of the Loan) Audited Financial Statements of Rawhide Mining and its Subsidiaries, as of the end of such Fiscal Year (prepared on a consolidated basis), including balance sheet and related statements of income and cash

flows, and setting forth in comparative form the corresponding figures for the preceding Fiscal Year, certified by a firm of independent certified public accountants selected by Rawhide Mining and reasonably acceptable to the Agent, accompanied by any management report from such accountants.

(c)   ***Compliance Certificate***.   Contemporaneously with each delivery of financial statements pursuant to **Section 7.2(a)** (*Unaudited Financial Statements*) above, commencing with such financial statements for the Fiscal Quarter ending December 31, 2020, a certificate (each, a "**Compliance Certificate**") in the form of **Exhibit D** (*Form of Compliance Certificate*) to this Agreement.

(d)   ***Monthly Mine Production Report***.   On the **tenth** Business Day of each Month (commencing in January 2019), a Monthly Mine Production Report in the form of **Exhibit E** (*Form of Mine Production Report*) to this Agreement.

(e)   ***Financial Plan***.   On or prior to the **90th** day of each Fiscal Year, a consolidated plan and financial forecast for such Fiscal Year, prepared on a monthly or quarterly basis, and otherwise in form and substance reasonably acceptable to the Agent, which shall include, *inter alia*:

(i)   a forecasted consolidated balance sheet and forecasted consolidated statements of income and cash flows of the Borrowers for such Fiscal Year; and

(ii)   a forecasted consolidated statements of income and cash flows of the Borrowers for each month or each Fiscal Quarter, as applicable, of such Fiscal Year.

(f)   ***Swaps***.

(i)   *Swap Contracts*.   Within **two** Business Days following the execution thereof, true and complete copies of any Swap Contract, or amendment thereto, entered into by, or with respect to, any Borrower.

(ii)   *Position Reporting*.   By not later than the **tenth** Business Day after the last day of the first and third Fiscal Quarter of each Fiscal Year, a report with regard to the Swap Obligations of the Borrowers, in such form, and containing such information, as may be reasonably requested by the Agent.

(g)   ***Required Filings***.   Promptly after the sending or filing thereof, as the case may be, copies of (i) any proxy statements, financial statements or reports that any Rawhide Entity has made available to holders of debt or the Parent's equity securities in respect of the Borrowers and (ii) any regular, periodic and special reports or registration statements that any Rawhide Entity files, in respect of the Borrowers, with (A) the Securities and Exchange Commission, (B) any Governmental Authority that may be substituted therefor, or  (C) any national securities exchange.

(h)   ***Additional Reports***.   Promptly following request therefor, copies of any detailed audit reports, management letters or recommendations submitted to the board of directors (or the audit committee of the board of directors) of any Borrower by independent accountants in connection with the accounts or books of any Borrower or any Subsidiary, or any audit of any of them as the Agent or any Lender (through the Agent) may from time to time reasonably request.

*Loan and Security Agreement*

(i)     ***Certain AML Events.***   Immediate notice if any Rawhide Entity has knowledge that any Rawhide Entity, or any Affiliate of any Rawhide Entity, is listed on the OFAC Lists or  (i) is convicted on, (ii) pleads *nolo contendere* to,  (iii) is indicted on, or  (iv) is arraigned and held over on charges involving money laundering or predicate crimes to money laundering.

**Section 7.3     Fiscal Years.**   The fiscal year of the Borrowers shall end on December 31.

**Section 7.4     Notices.**   The Rawhide Entities shall promptly notify the Agent and each Lender upon acquiring notice or knowledge of:

(a)     the occurrence of any Default or Event of Default;

(b)     the filing or commencement of any action, suit, investigation or proceeding by or before any arbitrator or Governmental Authority against or affecting any Rawhide Entity, including pursuant to any applicable Environmental Laws, that could reasonably be expected to be adversely determined, and, if so determined, could reasonably be expected to have a Material Adverse Effect;

(c)     the occurrence of any ERISA Event that, either individually or together with any other ERISA Events, could reasonably be expected to have a Material Adverse Effect;

(d)     notice of any action arising under any Environmental Law or of any noncompliance by any Rawhide Entity with any Environmental Law or any permit, approval, license or other authorization required thereunder that, if adversely determined, could reasonably be expected to have a Material Adverse Effect;

(e)     any material change in accounting or financial reporting practices by any Rawhide Entity, except in accordance with GAAP; and

(f)     any other matter or development that has had or could reasonably be expected to have a Material Adverse Effect.

**Section 7.5     Preservation of Existence, Etc.**   Each Rawhide Entity shall (and shall cause each other Rawhide Entity to), (a) preserve, renew and maintain in full force and effect its legal existence and good standing under the laws of the jurisdiction of its organization (except as expressly permitted under **Section 8.6(b)** (*Permitted Fundamental Changes*) below),  (b) take all reasonable action to maintain all rights, licenses, permits, privileges and franchises necessary or desirable in the normal conduct of its business, except to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect, and (c) preserve or renew all of its registered patents, trademarks, trade names and service marks, the non-preservation of which could reasonably be expected to have a Material Adverse Effect.

**Section 7.6     Maintenance of Properties.**   Each Rawhide Entity shall (and shall cause each other Rawhide Entity to),  (a) maintain, preserve and protect all of its properties and equipment necessary in the operation of its business in good working order and condition (ordinary wear and tear excepted) and  (b) make all necessary repairs thereto and renewals and replacements thereof, except (in the case of the foregoing **clauses (a)** and **(b)**) to the extent that the failure to do so could not reasonably be expected to have a Material Adverse Effect.

**Section 7.7      Payment of Obligations.**  Each Rawhide Entity shall (and shall cause each other Rawhide Entity to) pay, discharge or otherwise satisfy as the same shall become due and payable, all of its obligations and liabilities, including Tax liabilities, unless the same are being contested in good faith by appropriate proceedings diligently conducted and adequate reserves in accordance with GAAP are being maintained by such Rawhide Entity, except to the extent that the failure to do so could not reasonably be expected to have a Material Adverse Effect.

**Section 7.8      Inspection Rights.**  Each Rawhide Entity shall (and shall cause each other Rawhide Entity to) permit any representative that the Agent or any Lender authorizes, including its attorneys and accountants, during normal business hours and upon not less than **two** Business Days' notice, to inspect the Collateral and examine and make copies and abstracts of the books of account and records of the Rawhide Entities, and to discuss its affairs, finances and accounts with directors, officers, and independent public accountants, all at reasonable times and upon reasonable notice during normal business hours; **provided**, **however**, **that**, so long as no Event of Default has occurred and is continuing, such examinations shall be limited to no more often than **twice** per Fiscal Year.   In addition, any such representative shall have the right to meet with management and officers of the Rawhide Entities to discuss such books of account and records.

**Section 7.9      Further Assurances.**

(a)      *Generally*.    Each Rawhide Entity shall (and shall cause each other Rawhide Entity to):

    (i)      prepare, execute, deliver and file, upon the reasonable request of the Agent, any financing statements, security agreements, collateral assignments, notices, control agreements, certificates of title, real property filings, filings with the U.S. Patent and Trademark Office or U.S. Copyright Office, stock certificates and accompanying stock powers or other documents to perfect or give the highest priority to the Agent's Lien on the Collateral (in each case, other than with respect to Excluded Assets, and subject to Permitted Liens);

    (ii)      from time to time procure any instruments or documents as may be reasonably requested by the Agent, and take all further action that may be necessary, or that the Agent may reasonably request, to perfect and protect the Liens granted hereby and thereby (in each case, other than with respect to Excluded Assets, and subject to Permitted Liens); and

    (iii)      protect and defend the Borrowers' title to the Collateral and the Agent's Lien thereon against all Persons claiming any interest adverse to any Borrower or the Agent other than Permitted Liens.

(b)      *Pledge of Equity Interests*.    Without limiting the generality of **Section 7.9(a)** (*Generally*) above, the applicable Borrower or Borrowers shall, within **15** days following the formation or acquisition of a Rawhide Subsidiary, enter into a pledge and security agreement, or the equivalent, in favor of, and in form and substance reasonably satisfactory to, the Agent, with respect to the Equity Interests of such Rawhide Subsidiary, which agreement shall grant to the Agent the rights set forth in the Equity Pledge Agreement, or the equivalent thereof, as applicable, *mutatis mutandis*, to such Equity Interests.

(c)  _**Authorization**_.  Each Borrower hereby authorizes the Agent (or its designee) to execute and deliver on behalf of such Borrower and to file such financing statements (including an indication that the financing statement covers "all assets or all personal property" of such Borrower in accordance with Section 9-504 of the UCC), collateral assignments, notices, control agreements, security agreements and other documents without the signature of such Borrower either in the Agent's name or in the name of the Agent as agent and attorney-in-fact for such Borrower.

**Section 7.10**    **Collateral**.    Each Borrower shall at all times keep the Collateral free and clear from any legal process or Liens whatsoever (except for Permitted Liens), and shall give the Agent prompt written notice of any legal process affecting the Collateral or any Liens thereon, provided however, that the Collateral may be subject to Permitted Liens.    No Borrower shall enter into or suffer to exist or become effective any agreement that prohibits or limits the right or ability of any Borrower to create, incur, assume or suffer to exist any Lien (in each case, other than with respect to Excluded Assets, and subject to Permitted Liens) upon any of its property or assets, whether now owned or hereafter acquired.    Each Borrower shall protect and defend its title to its assets from and against all Persons claiming any interest adverse to any Borrower (in each case, other than with respect to Excluded Assets, and subject to Permitted Liens), and the Borrowers shall give the Agent prompt written notice of any legal process affecting any Borrower's material assets.

**Section 7.11**    **Commercial Tort Claims**.    If any Borrower shall at any time hold or acquire a Commercial Tort Claim, the Rawhide Entities shall promptly (and in any event within **30** days following any Rawhide Entity obtaining knowledge thereof) notify the Agent in a writing signed by such Borrower and containing the details thereof, which writing shall be deemed to supplement **Schedule 5.3** (*Commercial Tort Claims*) to this Agreement.

**Section 7.12**    **Taxes**.    The Borrowers, jointly and severally, promise to pay when due all U.S. federal and other material Taxes, fees or other charges of any nature whatsoever (together with any related interest or penalties) now or hereafter imposed or assessed against any Borrower, the Agent, the Lenders or the Collateral or upon any Borrower's ownership, possession, use, operation or disposition thereof or upon any Borrower's rents, receipts or earnings arising therefrom.    The Borrowers shall file, on or before the due date therefor, all personal property tax returns in respect of the Collateral.    Notwithstanding the foregoing, the Borrowers may contest, in good faith and by appropriate proceedings, taxes for which the Borrowers maintain adequate reserves therefor in accordance with GAAP (and the same shall not be deemed to constitute a violation of this **Section 7.12** (*Taxes*) above).

**Section 7.13**    **Deposit Accounts**.    Except with respect to any Excluded Assets, no Borrower shall maintain any Deposit Account, or any account holding Investment Property, other than an account as to which  (a) the Agent shall have received prior written notice, setting forth the information included in **Exhibit C** (*Deposit Accounts and Investment Accounts*) to this Agreement (which notice shall be deemed to supplement such **Exhibit C**), and  (b) the Agent, the Borrower and the institution at which such account is established and maintained shall have entered into an account control agreement in form and substance satisfactory to the Agent.    To the extent that any such account control agreement grants to the Agent or the Lenders authorization to give instructions with respect to any Deposit Accounts or other account of any Rawhide Entity, the Agent and Lenders hereby agree that neither the

*Loan and Security Agreement*

Agent, nor any Lender, shall exercise such authority unless, at the time of such exercise, an Event of Default shall have occurred and be continuing.

### Section 7.14    Ownership and Subsidiaries.

(a)    *Joinder of Subsidiaries*.    The Borrowers shall notify the Agent of each Rawhide Subsidiary formed or acquired subsequent to the Closing Date and, within **15** days of formation or acquisition, shall cause such Rawhide Subsidiary to execute and deliver to the Agent a Joinder Agreement.

(b)    *No CFCs*.    At no time shall any Borrower cause or permit:

(i)    any Borrower to form, or acquire any Equity Interests in, a CFC; or

(ii)    any Rawhide Subsidiary to constitute a CFC.

(c)    *Ownership of Rawhide Mining*.    Parent shall remain, at all times, the direct, legal and beneficial owner of **100.00%** of the outstanding Equity Interests of Rawhide Mining.

(d)    *Rawhide Subsidiaries*.    (i) At no time shall any Rawhide Subsidiary be formed, acquired or permitted to exist, unless it is a Wholly-Owned Subsidiary of Rawhide Mining, and  (ii) each Rawhide Subsidiary shall remain, at all times, a Wholly-Owned Subsidiary of Rawhide Mining.

### Section 7.15    Use of Proceeds.    Each Borrower agrees that  (a) the proceeds of the Loan shall be used solely  (i) to pay related fees and expenses in connection with this Agreement and  (ii) for working capital and general corporate purposes, and  (b) the proceeds of the Loan will not be used in violation of Anti-Corruption Laws or applicable Sanctions.

### Section 7.16    Compliance with Laws.

(a)    Each Borrower shall maintain, and shall cause its Subsidiaries to maintain, compliance in all material respects with all applicable laws, rules or regulations (including any law, rule or regulation with respect to the making or brokering of loans or financial accommodations), and shall, or cause its Subsidiaries to, obtain and maintain all required governmental authorizations, approvals, licenses, franchises, permits or registrations reasonably necessary in connection with the conduct of the Rawhide Mining Business, except where the failure to maintain any foreign qualification in any State could not reasonably be expected to have a Material Adverse Effect.

(b)    No Borrower or Subsidiary shall, nor shall any Borrower or any Subsidiary permit any Affiliate to,  (i) directly or indirectly, knowingly enter into any documents, instruments, agreements or contracts with any Person listed on the OFAC Lists, (ii) conduct any business or engage in any transaction or dealing with any Blocked Person, including, without limitation, the making or receiving of any contribution of funds, goods or services to or for the benefit of any Blocked Person,  (iii) deal in, or otherwise engage in any transaction relating to, any property or interests in property blocked pursuant to Executive Order No. 13224 or any similar executive order or other Anti-Terrorism Law, or  (iv) engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or

*Loan and Security Agreement*

avoiding, or attempts to violate, any of the prohibitions set forth in Executive Order No. 13224 or other Anti-Terrorism Law.

(c)    (i) The Rawhide Entities have implemented and maintain in effect policies and procedures designed to ensure compliance by the Rawhide Entities, their respective Affiliates and the directors, officers, employees and agents of the foregoing with Anti-Corruption Laws and applicable Sanctions, and (ii) the Rawhide Entities, and, to the knowledge of the Rawhide Entities, their respective officers and employees, are in compliance with Anti-Corruption Laws and applicable Sanctions in all material respects.

(d)    None of the Borrowers, any of its Subsidiaries or any of their respective directors, officers or employees, or to the knowledge of the Borrowers, any agent for the Borrowers or its Subsidiaries that will act in any capacity in connection with or benefit from the credit facility established hereby, is a Sanctioned Person. None of the Loan, use of proceeds or other transaction contemplated by this Agreement will violate Anti-Corruption Laws or applicable Sanctions.

**Section 7.17    Environmental Matters.**    Except to the extent that the failure to do so could not reasonably be expected to have a Material Adverse Effect, each Rawhide Entity shall (and shall cause each other Rawhide Entity to) (a) comply, in all material respects, with all Environmental Laws, (b) obtain, maintain in full force and effect and comply (in all material respects) with any permits, licenses or approvals required for the facilities or operations of the Rawhide Mining Business or any Rawhide Entity, and (c) conduct and complete any investigation, study, sampling or testing, and undertake any corrective, cleanup, removal, response, remedial or other action required by Environmental Law to identify, report, remove and clean up all Hazardous Materials present or released at, on, in, under or from any of the facilities or Real Property of any Rawhide Entity.

**Section 7.18    Intellectual Property.**

(a)    Each Rawhide Entity shall (i) reasonably protect, defend and maintain the validity and enforceability of its Intellectual Property, (ii) promptly advise the Agent in writing of material infringements of its Intellectual Property and (iii) not allow any Intellectual Property material to the Rawhide Mining Business to be abandoned, forfeited or dedicated to the public without the Agent's prior written consent (such consent not to be unreasonably withheld).

(b)    If any Borrower (i) obtains any Patent, registered Trademark, registered Copyright, registered mask work, or any pending application for any of the foregoing, whether as owner, licensee or otherwise, or (ii) applies for any Patent or the registration of any Trademark, then such Borrower shall, within **30** days thereof, provide written notice thereof to the Agent and shall execute such intellectual property security agreements and other documents and take such other actions as the Agent may request in its good faith business judgment to perfect and maintain a first priority perfected security interest in favor of the Agent in such property.

(c)    If any Borrower decides to register any Copyrights or mask works in the United States Copyright Office, such Borrower shall (i) provide the Agent with at least **30** days prior written notice of such Borrower's intent to register such Copyrights or mask works together with a copy of the application it intends to file with the United States Copyright Office (excluding exhibits thereto), (ii) execute an

intellectual property security agreement and such other documents and take such other actions as the Agent may request in its good faith business judgment to perfect and maintain a first priority perfected security interest in favor of the Agent in the Copyrights or mask works intended to be registered with the United States Copyright Office and (iii) record such intellectual property security agreement with the United States Copyright Office contemporaneously with filing the Copyright or mask work application(s) with the United States Copyright Office.

(d)    Each Borrower shall promptly provide to the Agent copies of all applications that it files for Patents or for the registration of Trademarks, Copyrights or mask works, together with evidence of the recording of the intellectual property security agreement required for the Agent to perfect and maintain a first priority perfected security interest in such property (which shall be held as Confidential information until the applications that it files for Patents or for the Registration of Trademarks, Copyrights or mask works become publicly available).

**Section 7.19    Books and Records.**    Each Rawhide Entity shall (and shall cause each other Rawhide Entity to) maintain proper books of record and account, in which full, true and correct entries in conformity with GAAP consistently applied shall be made of all financial transactions and matters involving the assets and business of such Rawhide Entity.

**Section 7.20    Transactions with Affiliates or Other Related Persons.**    No Borrower shall itself, or permit any of its Subsidiaries to, directly or indirectly, enter into or permit to exist any transaction of any kind with any Affiliate of any Borrower or Subsidiary thereof or any Other Related Person with respect thereto on terms that are less favorable to such Borrower or such Subsidiary, as the case may be, than those that might be obtained in an arm's length transaction from a Person who is not an Affiliate of such Borrower or such Subsidiary or an Other Related Person with respect thereto.

**Section 7.21    Material Contracts.**    All material contracts of the Borrowers are identified on **Schedule 7.21** (*Material Contracts*).    Except as to any restrictions described in such **Schedule 7.21**, no material contract of any Borrower prohibits the pledge, encumbrance or assignment thereof by such Borrower.

**Section 7.22    Royalties.**

(a)    ***Grant of Royalties.***    No Royalty (other than Permitted Royalty) shall be granted, or otherwise exist, at any time.

(b)    ***Obligation to Notify Agent.***    On or prior to the grant, amendment or modification of any Royalty or Lien relating thereto, the Rawhide Entities shall deliver, or cause to be delivered, to the Agent, written notice thereof (accompanied by a true and complete copies of the agreements and other documents pursuant to which such Royalty, and any related Liens, are to granted, amended or modified).

(c)    ***Modification of Royalties.***

(i)    *Existing Royalties.*    No term or provision of any Existing Royalty or Lien relating thereto (or of any agreement or document identified, or required to be identified, in **Schedule 5.13** (*Existing Royalties*) that relates to any Existing Royalty), shall be amended or modified (nor shall any Lien

relating thereto be granted), at any time on or after the Closing Date, except with the prior written consent of the Agent (such consent not to be unreasonably withheld or delayed).

(ii) *Other Permitted Royalties*.    No term or provision of any Permitted Royalty that was granted on or prior to Closing Date (other than a Permitted Royalty the grant of which did not require the Agent's consent under **paragraph (b)(ii)** or **(c)** of the definition thereof) shall be amended or modified, at any time, without the prior written consent of the Agent and the Required Lenders, **it being understood that**:

(A) in the case of a Permitted Royalty granted to any Rawhide-Related Person, the Agent and the Required Lenders shall be entitled to grant or withhold any such consent in their sole and absolute discretion; and

(B) in the case of any other Permitted Royalty, such consent shall not be unreasonably withheld or delayed.

# ARTICLE 8
# NEGATIVE COVENANTS

### Section 8.1    Restricted Transfers.

(a) ***General Restriction***.    Except as expressly permitted under **Section 8.1(b)** (*Restricted Distributions*), **8.1(c)** (*Tax Distributions*), **8.1(d)** (*Accrued Management Fee Distributions*), **8.1(e)** (*Reimbursement and Indemnification of Reef Capital Group*), **8.1(f)** (*Intercompany Distributions*) and **8.1(g)** (*Certain Payments to Officers and Directors*) below, no Borrower shall make, or permit to be made, and the Parent shall not permit any Borrower to make, any Restricted Transfer.

(b) ***Restricted Distributions***.    Notwithstanding **Section 8.1(a)** (*General Restriction*) above, Rawhide Mining may make Restricted Transfers, in the form of dividends or distributions to the holders of its Equity Interests; **provided**, **that**:

(i) *No Default*.    Both immediately prior to, and after giving effect to, any such Restricted Transfer, no Default or Event of Default shall have occurred and be continuing; and

(ii) *Leverage*.    At the time that such Restricted Transfer is made, the ratio of:

| Total Net Debt | **TO** | Consolidated EBITDA for the most recent **12**-month period reported in the Borrowers' quarterly or annual Financial Statements |

is less than **2.00:1.00**.

(c) ***Tax Distributions***.    Notwithstanding **Section 8.1(a)** (*General Restriction*) above, and without regard to the limitations in **clauses (i)** (*No Default*) and **(ii)** (*Leverage*) of **Section 8.1(b)** (*Restricted Distributions*) above, Rawhide Mining may make Restricted Transfers, in the form of dividends or distributions to the Parent, to fund amounts currently payable to any U.S. federal, State or

local (or any applicable non-U.S.) taxing authority in respect of the income tax liability of the direct or indirect holders of the Rawhide Entities' Equity Interests which arises from, or is attributable to, the income or activities of the Rawhide Entities (any such Restricted Distribution, a "**Tax Distribution**"); **provided**, **however**, **that**:

    (i)    *Annual Limit*.   The aggregate amount of such Tax Distributions made during, or with respect to, any Fiscal Quarter or Fiscal Year shall not exceed **50.00%** of the Borrowers' estimated aggregate taxable income for such Fiscal Quarter or Fiscal Year, as the case may be (with respect to any such period, "**Borrower Taxable Income**");

    (ii)    *Liquidity*.   No Tax Distribution shall be made unless both immediately prior to, and after giving effect to, such Tax Distribution, the Consolidated Cash Balance would not be less than **USD 2,000,000**; and

    (iii)    *Adjustments*.   In the event that the Borrower Taxable Income used in determining the amount of the Tax Distributions made in respect of any Fiscal Quarter or Fiscal Year shall be subsequently adjusted (or prove to have been incorrect), then the amount of such adjustment (or discrepancy) shall be applied to adjust the maximum amount of the Tax Distributions that may be made for the immediately subsequent period (or periods) until such adjustment shall have been applied in full.

    (d)    ***Accrued Management Fee Distributions***.   Notwithstanding **Section 8.1(a)** (*General Restriction*) above, Rawhide Mining may make Restricted Transfers (in addition to those permitted under **Sections 8.1(b)** (*Restricted Distributions*) and **8.1(c)** (*Tax Distributions*) above) to fund the payment to Reef Capital Group of any unpaid Reef Management Fees owed from time to time to Reef Capital Group (any such Restricted Transfers, "**Accrued Management Fee Distributions**"), **subject**, **however**, to the following conditions:

    (i)    With respect to any accrued and unpaid Reef Management Fees for the period ending on December 31, 2018 (which the Parties acknowledge and agree shall be equal to, and shall not exceed, **USD 1,100,000**) (the "**Pre-Closing Reef Fees**"), up to **USD 800,000** of such Pre-Closing Reef Fees may be paid by the Borrowers at any time, including upon the closing of the transactions contemplated by this Agreement, and **USD 300,000** of such Pre-Closing Reef Fees may only be paid on and after the date on which the Financial Statements and Compliance Certificate with respect to the Fiscal Quarter ended June 30, 2020 shall have been delivered;

    (ii)    with respect to any accrued and unpaid Reef Management Fees for periods ending after December 31, 2018 (the "**Post-Closing Reef Fees**"), the aggregate amount of Accrued Management Fee Distributions on account of such Post-Closing Reef Fees shall not exceed **USD 300,000** during any calendar year (the "**Annual Cap**"), PLUS, to the extent that the amount of any Accrued Management Fee Distributions made in any prior calendar year(s) was less than the Annual Cap in such prior calendar year(s) (such amount(s) being referred to herein as the "**Annual Surplus**"), such Annual Surplus may be carried over into subsequent calendar year(s) to increase the Annual Cap in such subsequent calendar year(s) by the amount of the Annual Surplus; and

*Loan and Security Agreement*

(iii)     Notwithstanding anything to the contrary elsewhere in this **Section 8.1(d)**, in no event shall an Accrued Management Fee Distribution be made unless, both immediately prior to, and after giving effect to, such Accrued Management Fee Distribution, no Default or Event of Default shall have occurred and be continuing.

(e)     ***Reimbursement and Indemnification of Reef Capital Group.***     Rawhide Mining may, at any time, make Restricted Transfers to fund Reef Indemnity Amounts and Reef Expense Amounts from time to time payable by the Parent under the Reef Management Agreement.

(f)     ***Intercompany Distributions.***     Any Borrower may make Restricted Transfers to any other Borrower.

(g)     ***Certain Payments to Officers and Directors.***     Subject, for the avoidance of doubt, to the rights of the Secured Parties under **Article 10** (*Remedies*) below, but without regard to the restrictions and limitations set forth in the foregoing provisions of this **Section 8.1**, the Borrowers may, at any time (including, without limitation, during the continuance of a Default or Event of Default) make payments to officers and directors of the Rawhide Entities for reimbursement of reasonable out-of-pocket expenses, and for any indemnification obligations, owed to such officers and directors, in such capacities (other than any such indemnification obligations that are owed by the Parent to its officers or directors, except to the extent that such indemnification obligations arise out of the businesses and activities of the Borrowers or the conduct of the Rawhide Mining Business).

Section 8.2     **Additional Indebtedness.**     No Borrower shall create, incur, assume, guarantee or be or remain liable with respect to any Indebtedness (other than Permitted Indebtedness), unless:

(i)     no Default or Event of Default shall have occurred and be continuing;

(ii)     such Indebtedness constitutes Subordinated Indebtedness; and

(iii)     after adjusting Total Net Debt *pro forma* to reflect such additional Indebtedness, the ratio of:

Total Net Debt     **TO**     Consolidated EBITDA for the most recent **12**-month period reported in the Borrowers' quarterly or annual Financial Statements

would be less than **3.50:1.00**.

Section 8.3     **Liens.**     No Borrower shall create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired, other than Permitted Liens.

Section 8.4     **Swap Obligations.**     No Borrower shall enter into any Swap Contract other than (or incur any Swap Obligations other than pursuant to) a Permitted Swap Contract.

*Loan and Security Agreement*

**Section 8.5**     **Dispositions.**     No Borrower shall make, or enter into any agreement to make, any Disposition, except:

(a)     Dispositions of worn-out, obsolete or surplus Equipment, whether now owned or hereafter acquired, at fair market value in the ordinary course of the Rawhide Mining Business;

(b)     Sales, transfers or other Dispositions of Inventory in the ordinary course of the Rawhide Mining Business;

(c)     Dispositions of Equipment or Real Property to the extent that (i) such property is exchanged for credit against the purchase price of similar replacement property or (ii) reasonably promptly (but in no event later than **180** days) after the receipt of the proceeds of any such Disposition, the Borrowers shall have applied (or entered into one or more binding agreements to apply) such proceeds to the purchase price of replacement property;

(d)     Dispositions to another Borrower;

(e)     Dispositions permitted by **Section 8.6** (*Fundamental Changes*) below;

(f)     The discount, write-off or Disposition of accounts receivable overdue by more than **90** days or the sale of any such accounts receivable for the purpose of collection to any collection agency, in each case in the ordinary course of the Rawhide Mining Business;

(g)     Restricted Transfers permitted by **Section 8.1** (*Restricted Transfers*) above; and

(h)     Dispositions not otherwise permitted under this **Section 8.5** (**provided** that the aggregate book value of all property Disposed of pursuant to this **paragraph (h)** in any Fiscal Year shall not exceed **USD 500,000**).

**Section 8.6**     **Fundamental Changes.**

(a)     ***General Restriction.***     Except as otherwise expressly provided in **Section 8.6(b)** (*Permitted Fundamental Changes*) below, no Rawhide Entity shall (i) merge, dissolve, liquidate, consolidate with or into any other Person or  (ii) Dispose of (whether in one transaction or in a series of transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to or in favor of any other Person.

(b)     ***Permitted Fundamental Changes.***     Notwithstanding **Section 8.6(a)** (*General Restriction*) above (but subject to the other provisions of this Agreement), provided that no Default or Event of Default shall have occurred and be continuing or would result from such transaction:

(i)     any Rawhide Subsidiary may:

(A)     merge or consolidate with, or liquidate or dissolve into, Rawhide Mining or another Rawhide Subsidiary; or

(B)     merge or consolidate with, or Dispose of its assets to, any other Person, solely to effect Dispositions permitted by **paragraph (a)**, **(b)**, **(c)**, **(f)**, **(g)** or **(h)** of **Section 8.5** (*Dispositions*) above; and

*Loan and Security Agreement*

(ii)    any Borrower may Dispose of its assets to another Borrower.

**Section 8.7    Accounting Policies.**    No Rawhide Entity shall (without the prior written consent of the Agent), make any change in its  (a) accounting policies or reporting practices, except as required by GAAP, or  (b) fiscal years or fiscal quarters.

**Section 8.8    Investments.**    No Borrower shall, directly or indirectly, acquire, own or make any Investment other than a Permitted Investment.

**Section 8.9    ERISA.**    No Rawhide Entity or ERISA Affiliate shall have any liability under, or with respect to, Title IV of ERISA.

**Section 8.10    Certain Restrictive Agreements.**    No Borrower shall enter into any Contractual Obligation (other than this Agreement or any other Loan Document) that, directly or indirectly,  (a) limits the ability of  (i) any Subsidiary to pay dividends to any Borrower or to otherwise transfer property to any Borrower,  (ii) any Subsidiary to guarantee Indebtedness of the any Borrower or (iii) any Borrower or any Subsidiary to create, incur, assume or suffer to exist Liens (other than Permitted Liens) on property of such Person (other than Excluded Assets) to secure the Secured Obligations; or  (b) requires the grant of a Lien to secure an obligation of such Person if a Lien is granted to secure the Secured Obligations.

**Section 8.11    Corporate Changes.**

(a)    No Rawhide Entity shall change its corporate name, legal form or jurisdiction of formation without **25** days' prior written notice to the Agent.

(b)    No Rawhide Entity shall relocate its chief executive office or its principal place of business unless (i) it provides written notice to the Agent as promptly or practical thereafter and (ii) such relocation shall be within the continental United States.

(c)    No Borrower shall relocate any item of Collateral (other than (v) the relocation of Inventory to and from refineries or other to processors in the ordinary course of the Rawhide Mining Business, (w) with respect to Permitted Liens on Collateral or Collateral on which there is a Permitted Lien, (x) sales of Inventory in the ordinary course of the Rawhide Mining Business, (y) relocations of Rawhide Mining Equipment having an aggregate value of up to **USD 500,000**, and (z) relocations of Collateral from a location described on **Exhibit B** (*Borrower Information*) to another location described on such **Exhibit B**) unless  (i) it provides written notice as promptly or practical thereafter to the Agent, (ii) if immediately prior to relocation the Collateral is in the United States, such relocation is within the continental United States, and  (iii) if such relocation is to a third party bailee, and such Collateral has a value, individually or in the aggregate, in excess of **USD 250,000**, it has delivered a bailee agreement in form and substance reasonably acceptable to the Agent.

**Section 8.12    Conduct of Business.**    (a) No Borrower shall engage in any business other than the Rawhide Mining Business and (b) no part of the Rawhide Mining Business (including any expansion thereof) shall be conducted other than through a Borrower.

*Loan and Security Agreement*

# ARTICLE 9
## EVENTS OF DEFAULT

**Section 9.1      Events of Default**.  The occurrence of any one or more of the following events shall be an "**Event of Default**":

(a)      ***Failure to Pay***.   Any Borrower fails to pay any amount due under this Agreement or any other Loan Document on the due date for such payment; **provided**, **however**, **that**, an Event of Default shall not occur on account of a failure to pay due solely to an administrative or operational error of the Agent, the Lenders or such Borrower's bank if such Borrower  (i) had the funds to make such payment when due and  (ii) makes such payment not later than the close of business (New York time) on  (A) in the case of an error on the part of such Borrower's bank, the **third** Business Day following the day on which any Borrower acquires knowledge of such failure to pay, or  (B) in the case of an error on the part of the Agent or the Lenders, the later to occur of  (1) the **third** Business Day following the day on which any Borrower acquires knowledge of such failure and  (2) the Business Day immediately following the day on which such error shall have been resolved, with notice to the Borrowers, in a manner sufficient to allow such payment to be made; **OR**

(b)      ***Breach of Certain Covenants***.   Any Borrower fails to observe, or otherwise breaches, any of the covenants and agreements set forth in:

> (i)      **Article 6** (*Insurance; Indemnification*) or **8** (*Negative Covenants*) above;

> (ii)      **Section 7.1** (*Financial Covenants*) above (subject to **Section 9.2** (*Equity Cure*) below);

> (iii)      **Section 7.2** (*Reporting*) above;

> (iv)      **clause (a)** of **7.5** (*Preservation of Existence, Etc.*) above;

> (v)      **Section 7.10** (*Collateral*) above; or

> (vi)      **Section 7.14** (*Ownership and Subsidiaries*) above; **OR**

(c)      ***Breach of Agreement***.   Any Rawhide Entity breaches or defaults in the performance of any covenant or Secured Obligation under this Agreement or any other Loan Document (other than a covenant or agreement that is (x) set forth in **Section 9.1(b)** (*Breach of Certain Covenants*) above or (y) otherwise specifically addressed by an Event of Default other than this **Section 9.1(c)**), and such default continues for more than **15** days after the earlier of the date on which  (i) the Agent or the Lenders has given notice of such default to the Borrowers, and (ii) any Rawhide Entity has actual knowledge of such default; **OR**

(d)      ***Representations***.   Any representation or warranty made by any Rawhide Entity in any Loan Document shall have been false or misleading in any material respect when made or when deemed made; **OR**

*Loan and Security Agreement*

(e)    ___*Insolvency*___.

(i)    Any Rawhide Entity shall  (A) make an assignment for the benefit of creditors,  (B) be unable to pay its debts as they become due or shall become insolvent, (C) file a voluntary petition in bankruptcy,  (D) file any petition, answer, or document seeking for itself any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any present or future statute, law or regulation pertinent to such circumstances, or (E) seek or consent to or acquiesce in the appointment of any trustee, receiver, or liquidator of such Rawhide Entity or of all or any substantial part of the assets or property of such Rawhide Entity; __OR__

(ii)    Any Rawhide Entity, or its directors or majority shareholders (or the equivalent), shall take any action initiating any of the actions described in __clauses (i)(A)__ through __(i)(E)__ of this __Section 9.1(e)__; __OR__

(iii)    (A) __45__ days shall have expired after the commencement of an involuntary action against any Rawhide Entity seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any present or future statute, law or regulation, without such action being dismissed or all orders or proceedings thereunder affecting the operations or the business of such Rawhide Entity being stayed; __OR__  (B) a stay of any such order or proceedings shall thereafter be set aside and the action setting it aside shall not be timely appealed; __OR__  (C) any Rawhide Entity shall file any answer admitting or not contesting the material allegations of a petition filed against such Rawhide Entity in any such proceedings; or (D) the court in which such proceedings are pending shall enter a decree or order granting the relief sought in any such proceedings; __OR__

(iv)    __45__ days shall have expired after the appointment, without the consent or acquiescence of such Rawhide Entity, of any trustee, receiver or liquidator of such Rawhide Entity or of all or any substantial part of the properties of such Rawhide Entity without such appointment being vacated; __OR__

(f)    ___*Cessation of Business*___.    The Borrowers shall permanently cease conducting the Rawhide Mining Business; __OR__

(g)    ___*Attachments; Judgments*___.    (i) Any portion of any Borrower's assets is attached or seized, or a levy is filed against any such assets, or a judgment (or judgments) is (or are) entered for the payment of money (not covered by independent third-party insurance or third-party indemnity as to which liability has not been rejected by such insurance carrier or other third party), individually or in the aggregate, of at least __USD 500,000__, and such judgment remains unsatisfied, unvacated or unstayed for a period of __45__ days after the entry thereof, __OR__  (ii) any Borrower is enjoined or in any way prevented by court order from conducting any part of its business; __OR__

(h)    ___*Other Obligations*___.    Any Borrower shall fail to  (i) make any payment when due (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) in respect of any Indebtedness (other than Indebtedness under the Loan Documents) having an aggregate principal amount of more than __USD 500,000__, in each case beyond the applicable grace period with respect

thereto, if any, **OR** (ii) observe or perform any other agreement or condition relating to any such Indebtedness or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event occurs, the effect of which default or other event is to cause, or to permit the holder or holders or beneficiary or beneficiaries of such Indebtedness (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required, such Indebtedness to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity; **provided**, **however**, **that**, (A) this **Section 9.1(h)** shall not apply to secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness, if such sale or transfer is permitted hereunder and under the documents providing for such Indebtedness and such Indebtedness is repaid when required under the documents providing for such documents and (B) the events described in the foregoing **clauses (i)** and **(ii)** of this **Section 9.1(h)** shall not give rise to any Default or Event of Default if the nonpayment or nonperformance, as applicable, is the result of a dispute being contested in good faith by appropriate proceedings; **OR**

(i)    ***Change in Control***.    A Change in Control shall occur without the prior consent of the Agent.

### Section 9.2    Equity Cure.

(a)    ***Equity Cure Right***.    In the event that the Borrowers shall fail to comply with one or more of the Financial Covenants with respect to any 12-Month period (in the case of **Section 7.1(a)** (*Total Leverage Ratio*) or **(b)** (*Consolidated Cash Interest Coverage Ratio*) above) or measurement date (in the case of **Section 7.1(c)** (*Liquidity*) above (any such failure, a "**Financial Covenant Breach**"), then, until the **15**[th] calendar day after delivery of the Financial Statements and Compliance Certificate with respect to such 12-Month period or measurement date (the "**Equity Cure Deadline**"), Parent shall have the right (subject to the other provisions of this **Section 9.2**) to cure such Financial Covenant Breach (the "**Equity Cure Right**"), by receiving cash equity contributions ("**Equity Cure Contributions**") funded by one or more holders of Equity Interests of the Parent with proceeds of common equity in an aggregate amount equal to, but not greater than, the amount that would be necessary and sufficient, when applied in the manner described in **Section 9.2(b)** (*Determination of Equity Cure Amount*) below, and otherwise on terms and conditions reasonably acceptable to the Agent and the Required Lenders, to cure such Financial Covenant Breach (the "**Equity Cure Amount**").

(b)    ***Determination of Equity Cure Amount***.    Solely for purposes of determining the Equity Cure Amount, pursuant to **Section 9.2(a)** (*Equity Cure Right*) above, with respect to any Financial Covenant Breach and the related 12-Month period or measurement date:

(i)    Consolidated EBITDA as of the end of and for the relevant 12-Month period (or for the period to, but excluding, the next succeeding measurement date, as applicable) shall be deemed to have been increased by the aggregate amount of such Equity Cure Contributions; and

(ii)    the Consolidated Cash Balance as of the relevant measurement date (or for the period to, but excluding, the next succeeding measurement date, as applicable) shall give effect to the proceeds of such Equity Cure Contributions.

(c)    ***Conditions to Equity Cure***.    No exercise (or purported exercise) of the Equity Cure Right pursuant to this **Section 9.2** shall be effective unless:

(i)    *Equity Cure Contributions*.    On or prior to the Equity Cure Deadline,  (A) The Equity Cure Contributions shall have been made,  (B) the proceeds thereof (in an aggregate amount equal to the Equity Cure Amount) shall have been deposited into a Deposit Account of one or more of the Borrowers which is not an Excluded Account, and (C) the Agent shall have received evidence reasonably satisfactory to it that such deposit shall have been made;

(ii)    *No Other Default*.    No Default or Event of Default shall have occurred and be continuing (other than a Default or Event of Default arising from the Financial Covenant Breach to be cured); and

(iii)    *Notice to Agent; Commitments*.    By not later than the **fifth** Business Day following the date on which the Financial Statements and Compliance Certificate relating to the applicable 12-Month period or measurement date, as the case may be, are required to be delivered pursuant to **Section 7.2** (*Reporting*) above (the "**Equity Cure Notice Deadline**"), the Borrowers shall have delivered to the Agent notice in writing (an "**Equity Cure Notice**") of its intention to exercise its Equity Cure Right with respect to such 12-Month period or measurement date (which determination and notice shall be irrevocable), accompanied by:

(A)    a statement of the Equity Cure Amount and a reasonably-detailed calculation thereof; and

(B)    binding and irrevocable commitments to make such Equity Cure Contributions (in an aggregate amount equal to the Equity Cure Amount), on or prior to the Equity Cure Deadline, from one or more holders of Equity Interests of the Parent.

(d)    ***Limitations on Exercise of Equity Cure Right***.    Notwithstanding anything herein to the contrary, in no event shall the Borrowers be permitted to exercise the Equity Cure Right under this **Section 9.2**:

(i)    more than **five** times, in the aggregate, during the term of this Agreement;

(ii)    more than **twice** during any period of **five** consecutive Fiscal Quarters.

(e)    ***Suspension of Remedies Pending Equity Cure***.    Notwithstanding anything in **Section 10** (*Remedies*) below to the contrary, solely as to any Financial Covenant Breach as to which the Equity Cure Right is capable of being exercised in a manner consistent with **Section 9.2(d)** (*Limitations on Exercise of Equity Cure Right*) above and the other provisions of this **Section 9.2**, neither the Agent nor any Lender

may exercise any rights or remedies under such **Section 10** (or any default-related rights or remedies under any other Loan Document), on the basis of such Financial Covenant Breach, during the period prior to the Equity Cure Notice Deadline and, if an Equity Cure Notice, together with the other documents referred to in **clauses (A)** and **(B)** of **Section 9.2(c)(iii)** (*Notice to Agent; Commitments*) above, shall have been delivered in accordance with such **Section 9.2(c)(iii)**, thereafter, unless and until (i)(A) the Equity Cure Deadline shall have passed, and  (B) such Financial Covenant Breach shall not have been cured pursuant to the foregoing provisions of this **Section 9.2**, or  (ii) an Event of Default (other than an Event of Default arising from such Financial Covenant Breach) shall have occurred and be continuing.

(f)      ***Effect of Equity Cure Limited.***      Equity Cure Contributions received by the Borrowers in accordance with **Section 9.2(c)** (*Conditions to Equity Cure*) above shall be added to the Consolidated EBITDA or Consolidated Cash Balance (or both), as the case may be, for the 12-Month period or measurement date, as the case may be, to which the applicable Financial Covenant Breach relates. Such Equity Cure Contributions shall be used solely for the purpose of recalculating compliance with the Financial Covenants which are the subject of such Financial Covenant Breach and shall be disregarded in calculating Consolidated EBITDA, and in any other calculation, for all other purposes (including, without limitation, any determination pursuant to **Section 8.1(b)(ii)** (*Leverage*) or **8.1(c)(ii)** (*Liquidity*) above, with respect to any Restricted Distribution, or pursuant to **Section 8.2** (*Additional Indebtedness*) above, with respect to any Indebtedness) under this Agreement or under any other Loan Document.

# ARTICLE 10
# REMEDIES

**Section 10.1      General.**   Upon and during the continuance of any one or more Events of Default,  (a) the Agent may (and, at the direction of the Required Lenders, shall) accelerate and demand payment of all or any part of the Secured Obligations together with a Prepayment Charge and declare them to be immediately due and payable (provided, that upon the occurrence of an Event of Default of the type described in **Section 9.1(e)** (*Insolvency*) above, all of the Secured Obligations shall automatically be accelerated and made due and payable, in each case without any further notice or act),  (b) the Agent may, at its option, sign and file in any Borrower's name any and all collateral assignments, notices, control agreements (except with respect to Excluded Assets), security agreements and other documents it deems necessary or appropriate to perfect or protect the repayment of the Secured Obligations, and (c) the Agent may notify any of the Borrowers' account debtors to make payment directly to the Agent, compromise the amount of any such account on the Borrowers' behalf and endorse the Agent's name without recourse on any such payment for deposit directly to the Agent's account.   The Agent may (and, at the direction of the Required Lenders, shall) exercise all rights and remedies with respect to the Collateral under the Loan Documents or otherwise available to it under the UCC and other applicable law, including the right to release, hold, sell, lease, liquidate, collect, realize upon, or otherwise dispose of all or any part of the Collateral and the right to occupy, utilize, process and commingle the Collateral. All the Agent's rights and remedies shall be cumulative and not exclusive.

**Section 10.2      Collection; Foreclosure.**   Upon the occurrence and during the continuance of any Event of Default, the Agent may (and, at the direction of the Required Lenders, shall), at any time, or from time to time, apply, collect, liquidate, sell in one or more sales, lease or otherwise dispose of,

any or all of the Collateral, in its then condition or following any commercially reasonable preparation or processing, in such order as the Agent may elect.   Any such sale may be made either at public or private sale at its place of business or elsewhere.    Each Borrower agrees that any such public or private sale may occur upon **10** calendar days' prior written notice to the Borrowers.    The Agent may require the Borrowers to assemble the Collateral and make it available to the Agent at a place designated by the Agent that is reasonably convenient to the Agent and the Borrowers.   The proceeds of any sale, disposition or other realization upon all or any part of the Collateral shall be applied by the Agent in the following order of priorities:

<u>FIRST</u>:          to the Agent and the Lenders in an amount sufficient to pay in full the Agent's and the Lenders' reasonable costs and professionals' and advisors' fees and expenses as described in **Section 11.11** (*Fees and Expenses*) below;

<u>SECOND</u>:      to the Lenders in an amount equal to the then unpaid amount of the Secured Obligations (including principal, interest, and the Default Rate interest), in such order and priority as the Agent may choose in its sole discretion; and

<u>THIRD</u>:          after the full and final payment in Cash Equivalents of all of the Secured Obligations (other than inchoate obligations), to any creditor holding a junior Lien on the Collateral, or to the Borrowers or their representatives or as a court of competent jurisdiction may direct.

The Agent shall be deemed to have acted reasonably in the custody, preservation and disposition of any of the Collateral if it complies with the obligations of a secured party under the UCC.

Section 10.3     **No Waiver**.   The Agent shall be under no obligation to marshal any of the Collateral for the benefit of any Borrower or any other Person, and each Borrower expressly waives all rights, if any, to require the Agent to marshal any Collateral.

Section 10.4     **Cumulative Remedies**.   The rights, powers and remedies of the Agent hereunder shall be in addition to all rights, powers and remedies given by statute or rule of law and are cumulative. The exercise of any one or more of the rights, powers and remedies provided herein shall not be construed as a waiver of or election of remedies with respect to any other rights, powers and remedies of the Agent.

Section 10.5     **Power of Attorney**.

(a)      *Appointment*.   Each Borrower hereby constitutes and appoints the Agent (and all officers, employees or agents designated by the Agent) as its true and lawful attorney in fact (with full power of substitution) in its name, place and stead and at its expense, in connection with the enforcement of the rights and remedies provided for in this **Article 10**, including to (i) give any necessary receipts or acquittance for amounts collected or received hereunder,  (ii) make all necessary transfers of the Collateral in connection with any sale or other disposition made pursuant hereto, (iii) execute and deliver for value all necessary or appropriate bills of sale, assignments and other instruments in connection with any such sale or other disposition, such Borrower thereby ratifying and confirming all that such attorney (or any substitute) shall lawfully do hereunder and pursuant hereto

and  (iv) sign any agreements, orders or other documents in connection with, or pursuant to, any Loan Document.   Nevertheless, if so requested by the Agent, directly or through a purchaser of any of the Collateral, each Borrower shall ratify and confirm any such sale or other disposition that is made in accordance with this **Article 10** by executing and delivering to the Agent or such purchaser all proper bills of sale, assignments, releases and other instruments as may be reasonably designated in any such request.   The power of attorney granted pursuant to this **Section 10.5(a)** shall be coupled with an interest.

(b)    ***Delivery of Power of Attorney.***   On or prior to the Closing Date, each Borrower shall duly execute and deliver, to and in favor of the Agent, a power of attorney in the form attached as **Exhibit G** (*Form of Power of Attorney*) to this Agreement (the "**Power of Attorney**").

# ARTICLE 11
# MISCELLANEOUS

**Section 11.1    Severability.**   Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under such law, such provision shall be ineffective only to the extent and duration of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

*Loan and Security Agreement*

**Section 11.2**    **Notices**.    Except as otherwise provided herein, any notice, demand, request, consent, approval, declaration, service of process or other communication (including the delivery of Financial Statements) that is required, contemplated, or permitted under the Loan Documents or with respect to the subject matter hereof shall be in writing, and shall be deemed to have been validly served, given, delivered, and received upon the earlier of (i) the day of transmission by electronic mail or hand delivery or delivery by an overnight express service or overnight mail delivery service and (ii) the **third** calendar day after deposit in the United States mails, with proper first class postage prepaid, in each case addressed to the party to be notified as follows:

*If to the Agent:*

**Silverpeak Credit Partners, LP**
40 West 57th Street - 29th Floor
New York, NY 10019
Email:        trading@Silverpeak.com
Telephone:  +1 212 716 2000

*If to any Rawhide Entity:*

*Addressed to such Rawhide Entity at:*

143 Keddie St.
Fallon, NV 89406
Attention:   Don Deines
Email:        don.deines@rawhidemine.com
Telephone: +1 775 945 1015 (x 108)

*with a copy (which copy shall not constitute notice) to:*

**Coral Reef Capital LLC**
45 Rockefeller Center, Suite 2300
New York, NY 10111
Attention:   Marceau Schlumberger
Email:        marceau@coralreefcap.com
Telephone:  +1 646 599 9677
*or*
Attention:   John Rogers
Email:        john@coralreefcap.com
Telephone:  +1 646 973 1574

*If to the Lenders:*

**Silverpeak Credit Opportunities AIV LP**
c/o Silverpeak Credit Partners, LP
40 West 57th Street - 29th Floor
New York, NY 10019
Email:        trading@Silverpeak.com
Telephone:  +1 212 716 2000

*and*

**CEOF Holdings LP**
c/o Corbin Capital Partners, L.P.
590 Madison Avenue, 31st Floor
New York, New York 10022
Attention:   General Counsel
Email:        fof-ops@corbincapital.com
Telephone:  +1 212 634 7373
Facsimile:   +1 212 634 7399

or to such other address as each party may designate for itself by like notice.

**Section 11.3**    **Entire Agreement; Amendments**.

(a)    ***Entire Agreement***.    This Agreement and the other Loan Documents constitute the entire agreement and understanding of the parties hereto in respect of the subject matter hereof and thereof, and supersede and replace in their entirety any prior proposals, term sheets, non-disclosure or

confidentiality agreements, letters, negotiations or other documents or agreements, whether written or oral, with respect to the subject matter hereof or thereof (including the Letter of Interest and the Term Sheet attached as **Exhibit A** (*Term Sheet*) thereto).

(b)    ***Amendments and Waivers***.    Neither this Agreement, any other Loan Document, nor any terms hereof or thereof may be amended, supplemented or modified except in accordance with the provisions of this **Section 11.3(b)**.    The Required Lenders and the Borrowers party to the relevant Loan Document may, or, with the written consent of the Required Lenders, the Agent and the Borrowers party to the relevant Loan Document may, from time to time, (i) enter into written amendments, supplements or modifications hereto and to the other Loan Documents for the purpose of adding any provisions to this Agreement or the other Loan Documents or changing in any manner the rights of the Lenders or of the Borrowers hereunder or thereunder or (ii) waive, or consent to, on such terms and conditions as the Required Lenders or the Agent, as the case may be, may specify in such instrument, any of the requirements of this Agreement or the other Loan Documents (or any deviations therefrom, with respect to any waiver or consent) or any default or Event of Default and its consequences; **provided**, **however**, **that**, no such waiver and no such amendment, supplement or modification shall (A) forgive the principal amount or extend the Scheduled Maturity Date of the Loan, extend the scheduled date of any amortization payment in respect of the Loan, or reduce the stated rate of any interest or fee payable hereunder), in each case without the written consent of each Lender directly affected thereby, (B) eliminate or reduce the voting rights of any Lender under this **Section 11.3(b)** without the written consent of such Lender, (C) reduce any percentage specified in the definition of Required Lenders, consent to the assignment or transfer by any Borrower of any of its rights and obligations under this Agreement and the other Loan Documents, release all or substantially all of the Collateral or release any Borrower from its obligations under the Loan Documents, in each case without the written consent of all Lenders, (D) amend **Section 2.6** (*Pro Rata Treatment*) above without the consent of each Lender or  (E) amend, modify or waive any provision of **Section 11.18** (*Agency*) below without the written consent of the Agent.   Any such waiver or consent, and any such amendment, supplement or modification, shall apply equally to each Lender and shall be binding upon the Borrowers, the Lenders, the Agent and all future holders of the Loan (or any portion thereof).

Section 11.4    **No Strict Construction**.    The Parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provisions of this Agreement.

Section 11.5    **No Waiver.**    The powers conferred upon the Agent and the Lenders by this Agreement are solely to protect its rights hereunder and under the other Loan Documents and its interest in the Collateral and shall not impose any duty upon the Agent or the Lenders to exercise any such powers. No omission or delay by the Agent or the Lenders at any time to enforce any right or remedy reserved to it, or to require performance of any of the terms, covenants or provisions hereof by the Borrowers at any time designated, shall be a waiver of any such right or remedy to which the Agent or the Lenders are entitled, nor shall it in any way affect the right of the Agent or the Lenders to enforce such provisions thereafter.

**Section 11.6**     <u>Survival</u>.   All agreements, representations and warranties contained in this Agreement and the other Loan Documents or in any document delivered pursuant hereto or thereto shall be for the benefit of the Agent and the Lenders and shall survive the execution and delivery of this Agreement.   **Section 6.3** (*Indemnity*) above and **Section 11.15** (*Revival of Secured Obligations*) below shall survive the termination of this Agreement.

**Section 11.7**     <u>Successors and Assigns</u>.

(a)     The provisions of this Agreement and the other Loan Documents shall inure to the benefit of and be binding on the Borrowers and their permitted successors and assigns (if any).

(b)     No Borrower shall assign its obligations under this Agreement or any of the other Loan Documents without the express prior written consent of the Agent and the Required Lenders, and any such attempted assignment shall be null and void *ab initio* and of no effect.

(c)     Each Lender may  (i) assign or otherwise transfer its rights hereunder and under the other Loan Documents; **provided**, **however**, **that**, as long as no Event of Default has occurred and is continuing, no Lender may assign or otherwise transfer its rights hereunder or under the Loan Documents to any Person without the prior written consent of the Borrowers (such consent not to be unreasonably withheld, conditioned or delayed), it being acknowledged that, in all cases, any transfer to an Affiliate of any Lender or the Agent shall be allowed without the consent of the Borrowers and (ii) subject to, and in accordance with, **Section 11.14** (*Participations*) below, and with the consent of the Borrowers (such consent not to be unreasonably withheld, conditioned or delayed), sell participation interests in the Loan (and such Lender's related rights under this Agreement) to any Person (other than a Borrower or an Affiliate thereof).

(d)     Without limiting, in any respect, the rights of the Agent under **Section 11.18(i)** below, the Agent may, with notice to Rawhide Mining and the prior written consent of the Required Lenders, assign or otherwise transfer its rights and obligations as the administrative agent and collateral agent hereunder and under the other Loan Documents, and all of such rights and obligations as the administrative agent and collateral agent shall inure to the benefit of the Agent's successors and assigns; **provided**, that as long as no Event of Default has occurred and is continuing, the Agent may so assign its rights and obligations to a Person other than an Affiliate thereof only with the consent of Rawhide Mining, such consent not to be unreasonably withheld, conditioned or delayed.

**Section 11.8**     <u>Governing Law</u>.   This Agreement and the other Loan Documents have been negotiated and delivered to the Agent and the Lenders in the State of New York, and shall have been accepted by the Agent and the Lenders in the State of New York.   Payment to the Agent and the Lenders by the Borrowers of the Secured Obligations is due in the State of New York.   **THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS (OTHER THAN AS EXPRESSLY SET FORTH IN OTHER LOAN DOCUMENTS) SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK, EXCLUDING CONFLICTS OF LAWS PRINCIPLES THAT WOULD CAUSE APPLICATION OF LAWS OF ANY OTHER JURISDICTION.**

*Loan and Security Agreement*

### Section 11.9    Consent to Jurisdiction and Venue.

(a)    Each Borrower hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of any New York State court or Federal court of the United States sitting in New York City, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement or the other Loan Documents, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such Federal court.    Each Party agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.    Nothing in this Agreement shall affect any right that the Agent or any Lender may otherwise have to bring any action or proceeding relating to this Agreement or the other Loan Documents against any Borrower or its properties in the courts of any jurisdiction.

(b)    Each Borrower hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or the other Loan Documents in any New York State or Federal court.    Each Party irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(c)    Each Party irrevocably consents to service of process in the manner provided for notices in **Section 11.2** (*Notices*) above.    Nothing in this Agreement will affect the right of any Party to serve process in any other manner permitted by law.

### Section 11.10    Mutual Waiver of Jury Trial / Judicial Reference.

(a)    Because disputes arising in connection with complex financial transactions are most quickly and economically resolved by an experienced and expert Person and the Parties wish applicable State and federal laws to apply (rather than arbitration rules), the Parties desire that their disputes be resolved by a judge applying such applicable laws.    **EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS, INCLUDING WITHOUT LIMITATION ANY CAUSE OF ACTION, CLAIM, CROSS-CLAIM, COUNTERCLAIM, THIRD PARTY CLAIM OR ANY OTHER CLAIM (COLLECTIVELY, "CLAIMS") ASSERTED BY ANY BORROWER AGAINST THE AGENT, THE LENDERS OR THEIR RESPECTIVE ASSIGNEES OR BY THE AGENT, THE LENDERS OR THEIR RESPECTIVE ASSIGNEES AGAINST ANY BORROWER.    EACH PARTY (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 11.10.**

*Loan and Security Agreement*

(b)    This waiver extends to all such Claims, including Claims that involve Persons other than the Agent, the Borrowers and the Lenders; Claims that arise out of or are in any way connected to the relationship among the Borrowers, the Agent and the Lenders; and any Claims for damages, breach of contract, tort, specific performance, or any equitable or legal relief of any kind, arising out of this Agreement or any other Loan Document.

### Section 11.11    **Fees and Expenses**.

(a)    *Closing*.    The Borrowers, jointly and severally, promise to pay the Agent's and the Lenders' reasonable out-of-pocket fees and expenses (including reasonable out-of-pocket fees and expenses of counsel and any consultants) incurred in connection with the (i) negotiating, structuring, documenting and entering into the arrangements described herein and (ii) performing due diligence with respect to the Company, its relevant affiliates and their respective businesses and assets (all of the foregoing, "**Closing Costs**"); **provided**, **however**, **that**, Agent's and Lender's reimbursement for Closing Costs pursuant to this **Section 11.11(a)** shall not exceed **USD 400,000** in the aggregate.    Fees and expenses payable pursuant to this **Section 11.11(a)** shall first be applied against the **USD 125,000** deposit previously paid pursuant to **Section 1(a)** (*Deposit*) of the Letter of Interest, until such amount has been reduced to zero (any additional or remaining amounts being payable in cash).

(b)    *Post-Closing*.    In addition, the Borrowers, jointly and severally, promise to, promise to pay any and all reasonable out-of-pocket fees and expenses incurred by the Agent and the Lenders after the Closing Date (to the extent such fees and expenses are not Closing Costs covered by **Section 11.11(a)** (*Closing*) above) in connection with, or related to, (i) the Loan, (ii) the administration, collection, or enforcement of the Loan, (iii) the amendment or modification of the Loan Documents; (iv) any waiver, consent, release, or termination under the Loan Documents; (v) the protection, preservation, audit, field exam, sale, lease, liquidation, or disposition of Collateral or the exercise of remedies with respect to the Collateral; (vi) any legal, litigation, administrative, arbitration, or out of court proceeding in connection with or related to any Borrower or the Collateral, and any appeal or review thereof; and (vii) any bankruptcy, restructuring, reorganization, assignment for the benefit of creditors, workout, foreclosure, or other action related to any Borrower, the Collateral, the Loan Documents, including representing the Agent or the Lenders in any adversary proceeding or contested matter commenced or continued by or on behalf of any Borrower's estate, and any appeal or review thereof.

### Section 11.12    **Confidentiality**.    The Agent and the Lenders acknowledge that certain items of Collateral and information provided to the Agent and the Lenders by the Borrowers are confidential and proprietary information of the Borrowers, and unless such information (x) is marked as non-confidential at the time of disclosure, or (y) would not reasonably be understood to be confidential (the "**Confidential Information**"); **provided**, **however**, **that**, all information received pursuant to **Section 7.8** (*Inspection Rights*) above shall be deemed to be Confidential Information.    Accordingly, the Agent and the Lenders agree that any Confidential Information it may obtain in the course of acquiring, administering, or perfecting the Loan or Agent's security interest in the Collateral, including obtained pursuant to a Loan Document, shall not be disclosed to any other Person or entity in any manner whatsoever, in whole or in part, without the prior written consent of the Borrowers, except that the Agent and the Lenders may each disclose any such information:

(a)    to its own partners, agents, trustees, administrators, managers, service providers, directors, officers, employees, accountants, counsel and other professional advisors and to its Affiliates, equity owners and investors if the Agent or any such Lender in its sole discretion determines that any such party should have access to such information in connection with such party's responsibilities in connection with the Loan or this Agreement or its own governing documents; provided that such recipient of such Confidential Information either (i) agrees to be bound by the confidentiality provisions of this paragraph or (ii) is otherwise subject to confidentiality restrictions that reasonably protect against the disclosure of Confidential Information;

(b)    if such information is generally available to the public other than in violation of this Agreement or through an improper disclosure;

(c)    if required in any report, statement or testimony submitted to any Governmental Authority having or claiming to have jurisdiction over the Agent or any such Lender, and the Agent shall have notified the Borrowers in advance of such disclosure;

(d)    if required in response to any summons or subpoena or in connection with any litigation, to the extent permitted or deemed advisable by the Agent's or any such Lender's counsel, and the Agent shall have notified the Borrowers in advance of such disclosure;

(e)    to comply with any legal requirement or law applicable to the Agent or any such Lender, and the Agent shall have notified the Borrowers in advance of such disclosure;

(f)    to the extent reasonably necessary in connection with the exercise of any right or remedy under any Loan Document, including the Agent's sale, lease, or other disposition of Collateral after default;

(g)    to any participant or assignee of the Agent or any such Lender or any prospective such participant or assignee (**provided** that such participant or assignee or prospective participant or assignee agrees in writing to be bound by this **Section 11.12** prior to disclosure); or

(h)    otherwise with the prior consent of the Borrowers;

**provided**, **however**, **that**, that any disclosure made in violation of this Agreement shall not affect the obligations of any Borrower or any guarantor under this Agreement or the other Loan Documents.    The Agent's and the Lenders' obligations under this **Section 11.12** shall supersede all of their respective obligations under any nondisclosure agreement with any Borrower, Reef Capital or any Affiliate of the foregoing existing prior to the Closing Date.

### Section 11.13   Assignment of Rights.

(a)    ***Assignment.***    Each Borrower acknowledges and understands that the Agent or the Lenders may, subject to **Section 11.7** (*Successors and Assigns*) above, sell and assign all or part of its interest hereunder and under the Loan Documents to any Person or entity (an "**Assignee**").    After such assignment the term "the Agent" or "the Lenders" as used in the Loan Documents shall mean and include such Assignee, and such Assignee shall be vested with all rights, powers and remedies of the

*Loan and Security Agreement*

Agent and the Lenders hereunder with respect to the interest so assigned.    No such assignment by the Agent or the Lenders shall relieve any Borrower of any of its obligations hereunder.

(b)    **_Register_**.    The Agent, acting for this purpose as an agent of the Borrowers, shall maintain at one of its offices records of the name and address of, and the commitments of and the principal amount (and stated interest) of the Loan owing to, each Lender from time to time (the "**Register**"). The entries in the Register shall be conclusive, absent manifest error.    The Register shall be available for inspection by the Borrowers or any Lender (but only with respect to any entry relating to such Lender's commitments or Advances) at any reasonable time and from time to time upon reasonable prior notice.    No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this **Section 11.13(b)**.

(c)    **_Registered Form_**.    This **Section 11.13**, and **Section 11.14** (*Participations*) below, shall be construed so that the Loan is, at all times, maintained in "registered form," within the meaning of sections 163(f), 871(h)(2) and 881(c)(2) of the Code and any related regulations (and any successor provisions).

## Section 11.14    Participations.

(a)    **_Generally_**.    To the extent that any Lender sells participations to any Person (each, a "**Participant**") in accordance with **clause (ii)** of **Section 11.7(c)** above,  (i) such Lender's obligations under this Agreement shall remain unchanged,  (ii) such Lender shall remain solely responsible to the other Parties for the performance of such obligations, and  (iii) the Borrowers, the Agent and Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.

(b)    **_Participation Agreements_**.    Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; **provided**, **however**, **that**, such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver in the nature described in **clauses (A)** through **(E)** of the proviso to **Section 11.3(b)** (*Amendments and Waivers*) above.

(c)    **_Benefit of Certain Provisions_**.    Each Rawhide Entity agrees that each participant shall be entitled to the benefits of **Sections 2.7** (*Reserve Requirements; Increased Costs*) and **2.8** (*Taxes*) above (subject to the requirements and limitations therein, including the requirements under **Section 2.8(f)** above (it being understood that the documentation required under such **Section 2.8(f)** shall be delivered to the participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to **Sections 11.7** (*Successors and Assigns*) and **11.13** (*Assignment of Rights*) above, **provided** that such Participant (i) agrees to be subject to the provisions of **Section 2.9** (*Duty to Mitigate*) above as if it were an assignee under **Sections 11.7** (*Successors and Assigns*) and **11.13** (*Assignment of Rights*) above; and (ii) shall not be entitled to receive any greater payment under **Sections 2.7** (*Reserve Requirements; Increased Costs*) and **2.8** (*Taxes*) above, with respect to any participation, than the participating Lender would have been entitled to receive, except to the extent that such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation.    Any Lender that sells a participation in the Loan (or

any portion thereof) shall, at the Borrowers' request and expense, use reasonable efforts to cooperate with the Borrower to effectuate the provisions of **Section 2.9(a)** above with respect to the Participant (or proposed Participant) under such participation.

(a)     ***Participant Register.***     Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrowers, maintain a register on which it enters the name and address of each participant and the principal amounts (and stated interest) of each participant's interest in the Loan or other obligations under this Agreement or any other Loan Document (the "**Participant Register**"); **provided**, that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any participant or any information relating to a participant's interest in the Loan) to any Person except to the extent that such disclosure is necessary to establish that such Loan is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.   For the avoidance of doubt, the Agent (in its capacity as Agent) shall have no responsibility for maintaining any Participant Register.

**Section 11.15   Revival of Secured Obligations.**   This Agreement and the Loan Documents shall remain in full force and effect and continue to be effective if any petition is filed by or against any Borrower for liquidation or reorganization, if any Borrower becomes insolvent or makes an assignment for the benefit of creditors, if a receiver or trustee is appointed for all or any significant part of any Borrower's assets, or if any payment or transfer of Collateral is recovered from the Agent or the Lenders. The Loan Documents and the Secured Obligations and Collateral security shall continue to be effective, or shall be revived or reinstated, as the case may be, if at any time payment and performance of the Secured Obligations or any transfer of Collateral to the Agent, or any part thereof is rescinded, avoided or avoidable, reduced in amount, or must otherwise be restored or returned by, or is recovered from, the Agent, the Lenders or by any obligee of the Secured Obligations, whether as a "voidable preference," "fraudulent conveyance," or otherwise, all as though such payment, performance, or transfer of Collateral had not been made. In the event that any payment, or any part thereof, is rescinded, reduced, avoided, avoidable, restored, returned, or recovered, the Loan Documents and the Secured Obligations shall be deemed, without any further action or documentation, to have been revived and reinstated except to the extent of the full, final, and indefeasible payment to the Agent or the Lenders in cash.

**Section 11.16   Counterparts.**   This Agreement, and any amendments, waivers, consents or supplements hereto, may be executed in any number of counterparts, and by different parties hereto in separate counterparts, each of which when so delivered shall be deemed an original, but all of which counterparts shall constitute but one and the same instrument.

**Section 11.17   No Third-Party Beneficiaries.**   No provisions of the Loan Documents are intended, nor will be interpreted, to provide or create any third-party beneficiary rights or any other rights of any kind in any Person other than the Agent, the Lenders and the Borrowers unless specifically provided otherwise herein, and, except as otherwise so provided, all provisions of the Loan Documents will be personal and solely among the Agent, the Lenders and the Borrowers.

*Loan and Security Agreement*

### Section 11.18   Agency.

(a)    The Lenders hereby irrevocably appoint Silverpeak Credit Partners, LP to act on their behalf as the Agent hereunder and under the other Loan Documents and authorize the Agent to take such actions on their behalf and to exercise such powers as are delegated to the Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto.

(b)    The Lenders agree to indemnify the Agent in its capacity as such (to the extent not reimbursed by the Borrowers and without limiting the obligation of the Borrowers to do so), according to its respective Advance percentages (based upon the total outstanding Advances) in effect on the date on which indemnification is sought under this **Section 11.18**, from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever that may at any time be imposed on, incurred by or asserted against the Agent in any way relating to or arising out of, this Agreement, any of the other Loan Documents or any documents contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby or any action taken or omitted by the Agent under or in connection with any of the foregoing, in each case, except to the extent such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements result from the Agent's own gross negligence or willful misconduct.   The agreements in this **Section 11.18** shall survive the payment of the Loan and all other amounts payable hereunder.

(c)    The Person serving as the Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Agent and the term "Lender" shall, unless otherwise expressly indicated or unless the context otherwise requires, include each such Person serving as the Agent hereunder in its individual capacity.

(d)    The Agent shall have no duties or obligations except those expressly set forth herein and in the other Loan Documents. Without limiting the generality of the foregoing, the Agent shall not:

(i)    be subject to any fiduciary or other implied duties, regardless of whether any default or any Event of Default has occurred and is continuing;

(ii)    have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Agent is required to exercise as directed in writing by the Lenders; **provided** that the Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Agent to liability or that is contrary to any Loan Document or applicable law; and

(iii)    except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and the Agent shall not be liable for the failure to disclose, any information relating to any Borrower or Affiliate thereof that is communicated to or obtained by any Person serving as the Agent or any of its Affiliates in any capacity.

(e)    The Agent shall not be liable for any action taken or not taken by it  (i) with the consent or at the request of the Lenders or as the Agent shall believe in good faith shall be necessary, under the circumstances or  (ii) in the absence of its own gross negligence or willful misconduct.

*Loan and Security Agreement*

(f)      The Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any default or Event of Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document or (v) the satisfaction of any condition set forth in **Article 4** (*Conditions Precedent to Loan*) above or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Agent.

(g)      The Agent may rely, and shall be fully protected in acting, or refraining to act, upon, any resolution, statement, certificate, instrument, opinion, report, notice, request, consent, order, bond or other paper or document that it has no reason to believe to be other than genuine and to have been signed or presented by the proper party or parties or, in the case of cables, telecopies and telexes, to have been sent by the proper party or parties. In the absence of its gross negligence or willful misconduct, the Agent may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon any certificates or opinions furnished to the Agent and conforming to the requirements of this Agreement or any of the other Loan Documents.   The Agent may consult with counsel, and any opinion or legal advice of such counsel shall be full and complete authorization and protection in respect of any action taken, not taken or suffered by the Agent hereunder or under any Loan Documents in accordance therewith. The Agent shall have the right at any time to seek instructions concerning the administration of the Collateral from any court of competent jurisdiction. The Agent shall not be under any obligation to exercise any of the rights or powers granted to the Agent by this Agreement and the other Loan Documents at the request or direction of the Lenders unless the Agent shall have been provided by the Lenders with adequate security and indemnity against the costs, expenses and liabilities that may be incurred by it in compliance with such request or direction.

(h)      Each Lender acknowledges that it has, independently and without reliance upon the Agent or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.   Each Lender also acknowledges that it will, independently and without reliance upon the Agent or any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.   Without limiting the foregoing, the Agent shall, within a reasonable period following receipt thereof, furnish to each Lender any and all Financial Statements, period reports and other written documents required to be delivered on specified dates, or at regular intervals, by any Rawhide Entity to the Agent pursuant to the requirements set forth in this Agreement or any other Loan Document.

(i)      The Agent may, at any time, give notice of its resignation to the Lenders and the Borrowers. Upon receipt of any such notice of resignation, the Required Lenders shall have the right, in consultation with the Borrowers, to appoint a successor, which (except as may be otherwise agreed by the Required Lenders and the Borrowers) shall be a bank with an office in New York, New York, or an Affiliate of any such bank with an office in New York, New York.   If no such successor shall have been so appointed by

the Required Lenders and shall have accepted such appointment within **30** days after the retiring Agent gives notice of its resignation (or such earlier day as shall be agreed by the Required Lenders) (as may be extended in accordance with this section, the "**Resignation Effective Date**"), then the retiring Agent may (but shall not be obligated to), upon consultation with, and **five** Business Days' written notice to, the Lenders and the Borrowers, appoint a successor Agent meeting the qualifications set forth above unless the Required Lenders (acting in consultation with the Borrowers) object in writing to such appointment within such **five**-Business Day notice period, in which case the Resignation Effective Date shall automatically be extended until the first Business Day on which the Required Lenders (acting in consultation with the Borrowers) either appoint a successor Agent or fail to object to the Agent's appointment of a successor Agent (or such earlier date as may be designated by the Agent, upon not less than **10** days' prior written notice to the Lenders and the Borrowers).   With effect from the Resignation Effective Date, (i) the retiring Agent shall be discharged from its duties and obligations under this Agreement and the other Loan Documents and  (ii) except for any accrued and unpaid fees, expenses or indemnity payments owed to the retiring Agent, all payments, communications and determinations provided to be made by, to or through the Agent shall instead be made by or to each Lender directly, until such time, if any, as the Required Lenders appoint a successor Agent as provided for above.   Upon the acceptance of a successor's appointment as Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring Agent (other than any rights to indemnity payments owed to the retiring agent), and the retiring Agent shall be discharged from all of its duties and obligations under this Agreement and the other Loan Documents.   The fees payable by the Borrowers to a successor Agent shall be the same as those payable to its predecessor unless otherwise mutually agreed between the Borrowers and such successor.   After the retiring or removed Agent's resignation or removal under this Agreement and the other Loan Documents, the provisions of this **Section 11.18** shall continue in effect for the benefit of such retiring or removed Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while such retiring or removed Agent was acting as Agent.    For the avoidance of doubt, the provisions of this **Section 11.18(i)** shall not apply with respect to, or limit, the right of the Agent to transfer its rights and obligations, in such capacity, to an Affiliate of the Agent, in the manner permitted under **Section 11.7** (*Successors and Assigns*) above.

(j)    As consideration for its services hereunder, the Agent shall be entitled to receive the Administration Fee, payable as provided in the Fee Letter.

### Section 11.19   **Certain ERISA Matters**.

(a)    Each Lender (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Agent and its Affiliates, and not, for the avoidance of doubt, to or for the benefit of any Borrower or Affiliate thereof, that at least one of the following is and will be true:

(i)    such Lender is not using "plan assets" (within the meaning of 29 CFR § 2510.3-101, as modified by Section 3(42) of ERISA) of one or more Plans in connection with the Loan;

(ii) the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to such Lender's entrance into, participation in, administration of and performance of the Loan and this Agreement;

(iii) (A) such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the Loan and this Agreement, (C) the entrance into, participation in, administration of and performance of the Loan and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14 and (D) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Loan and this Agreement; or

(iv) such other representation, warranty and covenant as may be agreed in writing between the Agent, in its sole discretion, and such Lender.

(b)    In addition, unless **paragraph (i)** of **Section 11.19(a)** above is true with respect to a Lender, or such Lender has not provided another representation, warranty and covenant as provided in sub-**paragraph (iv)** of such **Section 11.19(a)**, such Lender further (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (x) covenants, from the date such Person became a Lender party hereto to the date such Lender ceases being a Lender party hereto, for the benefit of, the Agent and its Affiliates (and not, for the avoidance of doubt, to or for the benefit of the any Borrower or Affiliate thereof) that:

(i) none of the Agent or any of its Affiliates is a fiduciary with respect to the assets of such Lender (including in connection with the reservation or exercise of any rights by the Agent under this Agreement, any Loan Document or any documents related to hereto or thereto);

(ii) the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Loan and this Agreement is independent (within the meaning of 29 CFR § 2510.3-21) and is a bank, an insurance carrier, an investment adviser, a broker-dealer or other person that holds, or has under management or control, total assets of at least **USD 50,000,000**, in each case as described in 29 CFR § 2510.3-21(c)(1)(i)(A)-(E);

(iii) the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Loan

and this Agreement is capable of evaluating investment risks independently, both in general and with regard to particular transactions and investment strategies (including in respect of the Secured Obligations);

(iv)    the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Loan and this Agreement is a fiduciary under ERISA or the Code, or both, with respect to the Loan and this Agreement and is responsible for exercising independent judgment in evaluating the transactions hereunder; and

(v)    no fee or other compensation is being paid directly to the Agent or any of its Affiliates for investment advice (as opposed to other services) in connection with the Loan or this Agreement.

(c)    The Agent hereby informs the Lenders that each such Person is not undertaking to provide impartial investment advice, or to give advice in a fiduciary capacity, in connection with the transactions contemplated hereby, and that such Person has a financial interest in the transactions contemplated hereby in that such Person or an Affiliate thereof (i) may receive interest or other payments with respect to the Loan and this Agreement, (ii) may recognize a gain if it extended the Loan for an amount less than the amount being paid for an interest in the Loan by such Lender or (iii) may receive fees or other payments in connection with the transactions contemplated hereby, the Loan Documents or otherwise, including structuring fees, commitment fees, arrangement fees, facility fees, upfront fees, underwriting fees, ticking fees, agency fees, administrative agent or collateral agent fees, utilization fees, minimum usage fees, letter of credit fees, fronting fees, deal-away or alternate transaction fees, amendment fees, processing fees, term out premiums, banker's acceptance fees, breakage or other early termination fees or fees similar to the foregoing.

**Section 11.20   Publicity.**   None of the parties hereto nor any of its respective member businesses and Affiliates shall, without the other parties' prior written consent, publicize or use (a) the other party's name (including a brief description of the relationship among the parties hereto), logo or hyperlink to such other parties' web site, separately or together, in written and oral presentations, advertising, promotional and marketing materials, client lists, public relations materials or on its web site (together, the "**Publicity Materials**"); (b) the names of officers of such other parties in the Publicity Materials; and (c) such other parties' name, trademarks, service marks in any news or press release concerning such party; **provided**, **however**, **that**, notwithstanding anything to the contrary herein, no such consent shall be required (i) to the extent necessary to comply with the requests of any regulators, legal requirements or laws applicable to such party, pursuant to any listing agreement with any national securities exchange (so long as such party provides prior notice to the other party hereto to the extent reasonably practicable) and (ii) to comply with **Section 11.12** (*Confidentiality*) above.

**Section 11.21   Joint and Several Liability; Rawhide Mining as Agent for Borrowers.**
The Borrowers shall be jointly and severally liable for all obligations of the Borrowers (or any Borrower). Each Borrower hereby irrevocably appoints Rawhide Mining as its representative and agent for all purposes of this Agreement, with full authority to bind such Borrower in full, and the Agent and Lenders shall be entitled to rely on all actions, authorizations and consents by Rawhide Mining (including without limitation execution of any amendments hereto or to any other Loan Document) as binding upon each

such Borrower, and any notice to, or other communication with, any Borrower shall be sufficiently delivered and made if delivered or made to Rawhide Mining.   Any reference to "Borrowers" in any representation, covenant or other provision of this Agreement shall be deemed to be a representation, covenant or other provision applicable to each Borrower, or of the Borrowers, taken as a whole, as the context requires.

**[SIGNATURE PAGES FOLLOW]**

*Loan and Security Agreement*

**IN WITNESS WHEREOF**, the Borrowers, the Agent and the Lenders have duly executed and delivered this Loan and Security Agreement as of the day and year first above written.

<div style="margin-left: 40%;">

**RAWHIDE MINING LLC**
As a Borrower

By: _____

      Name:    Donald M. Deines
      Title:     President & Chief Executive Officer

</div>

**RAWHIDE ACQUISITION HOLDING LLC**
As Parent

By:

Name:    Donald M. Deines
Title:    President & Chief Executive Officer

**SILVERPEAK CREDIT OPPORTUNITIES AIV LP**
As a Lender

By:    Silverpeak Credit Opportunities Cayman GP LP, its
       General Partner

       By:    SP CO GP Ltd, its General Partner

              By: _____
                  Name:    Vaibhav Kumar
                  Title:   Portfolio Manager

**CEOF HOLDINGS LP**
As a Lender

By:    Corbin Capital Partners, L.P., its investment manager

By:    _____
       Name:    Daniel Friedman
       Title:    General Counsel

**SILVERPEAK CREDIT PARTNERS, LP**
As Agent

By: _____

    Name:    Vaibhav Kumar
    Title:    Portfolio Manager

EXHIBIT A

## Form of Note

---

## RAWHIDE MINING LLC

## SECURED TERM PROMISSORY NOTE

**THIS NOTE CONTAINS ORIGINAL ISSUE DISCOUNT, AS DEFINED IN SECTION 1273 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED.  PLEASE CONTACT DON DEINES, PRESIDENT AND CHIEF EXECUTIVE OFFICER OF THE BORROWER, AT PHONE NUMBER (775) 945-1015, EXT. 108, FOR THE ISSUE DATE OF THE NOTE, THE ORIGINAL ISSUE DISCOUNT IN THE NOTE AND THE YIELD TO MATURITY.**

**USD** _____                                 Closing Date:    January 3, 2019

                                                    Scheduled Maturity Date:   January 3, 2023

        **FOR VALUE RECEIVED**, **RAWHIDE MINING LLC**, a Delaware limited liability company [and _____, a _____] [(the "**Borrower**")] [(collectively, the "**Borrowers**," and each, a "**Borrower**")], hereby [jointly and severally] promise[s] to pay to _____, a _____ (the "**Lender**"), at _____*<Address>*_____ or such other place of payment as the Lender, as the holder of this Secured Term Promissory Note (this "**Promissory Note**") may specify from time to time in writing, in lawful money of the United States of America, the principal amount of _____ **UNITED STATES DOLLARS** (**USD** _____), or such other principal amount as the Lender has advanced to the Borrower[s], together with interest, at the Interest Rate specified in the Fee Letter referred to in the Loan Agreement, computed daily based on the actual number of days elapsed, payable on each Payment Date in an amount accrued during the preceding Accrual Period and not previously paid, as set forth in **Section 2.1(b)** (*Interest*) of the Loan Agreement.

        This Promissory Note is a Note referred to in, and is executed and delivered in connection with, that certain Loan and Security Agreement, dated as of January 3, 2019 (as amended, restated, supplemented or otherwise modified from time to time, in accordance with its terms, the "**Loan Agreement**"), by and among the Borrower[s], the other "Rawhide Subsidiaries" from time to time party thereto, Rawhide Acquisition Holding LLC, a Delaware limited liability company, the several financial institutions or entities from time to time party thereto, as "Lenders" thereunder, and Silverpeak Credit Partners, LP, a Delaware limited partnership, as "Agent" thereunder (the "**Agent**"), and is entitled to the benefit and security of the Loan Agreement and the other Loan Documents (as defined in the Loan Agreement), to which reference is made for a statement of all of the terms and conditions thereof.   In the event of a conflict between the terms set forth in this Promissory Note, and the terms set forth in the Loan Agreement, the terms set forth in the Loan Agreement shall prevail.   All payments shall be made in accordance with the Loan Agreement.   All terms defined in the Loan Agreement shall have the same definitions when used herein, unless otherwise defined herein.   An Event of Default under the Loan Agreement shall constitute a default under this Promissory Note.

[The][Each] Borrower waives presentment and demand for payment, notice of dishonor, protest and notice of protest under the UCC or any applicable law.   The Borrower[s] agree[s] to make all payments under this Promissory Note without setoff, recoupment or deduction and regardless of any counterclaim or defense.   This Promissory Note has been negotiated and delivered to the Lender, and is payable, in the State of New York.   This Promissory Note shall be governed by and construed and enforced in accordance with, the laws of the State of New York, excluding any conflicts of law rules or principles that would cause the application of the laws of any other jurisdiction.

**[SIGNATURE PAGE FOLLOWS]**

**IN WITNESS WHEREOF**, the [the][each] Borrower has caused this Promissory Note to be duly executed by an authorized person.

**RAWHIDE MINING LLC**
As a Borrower

By: _____

    Name:

    Title:

[_____*<BORROWER NAME>*_____
As a Borrower

By: _____

    Name:

    Title:    ]

**EXHIBIT B**

## Borrower Information

1.  The Borrower represents and warrants to the Agent that the Borrower's current name and organizational status as of the Closing Date is as follows:

> Name:      Rawhide Mining LLC
>
> Type of organization:      Limited Liability Company
>
> State of organization:      Delaware
>
> Organization file number:  2193564
>
> The Borrower's fiscal year ends on December 31
>
> The Borrower's federal employer tax identification number is: 52-1626623

2.  The Borrower represents and warrants to the Agent that for five years prior to the Closing Date, the Borrower has not done business under any other name or organization or form.

3.  The Borrower represents and warrants to the Agent that its chief executive office is located at:

> 143 Keddie St
> Fallon, NV 89406

**EXHIBIT C**

## Deposit Accounts and Investment Accounts

| | Institution Name and Address and Telephone Number | Account Number | Purpose of Account | Name of Account Owner |
|---|---|---|---|---|
| (1) | US Bank National Association 2197 Vasey Road Fallon, NV 89406-7870 (775) 428-0680 (877) 428-8070 | 153758236498 | Checking - General | Rawhide Mining LLC |
| (2) | US Bank National Association 2197 Vasey Road Fallon, NV 89406-7870 (775) 428-0680 (877) 428-8070 | 153753861829 | Checking - Payroll | Rawhide Mining LLC |
| (3) | Texas Capital Bank N.A. 2350 Lakeside Blvd., Suite 800 Richardson, TX 75082 | 201002246 | Cash collateral for performance bond | Rawhide Mining LLC |

Exhibit C-1

EXHIBIT D

## Form of Compliance Certificate

Silverpeak Credit Partners, LP (as the "**Agent**")
40 West 57th Street - 29th Floor
New York, NY 10019

Reference is made to that certain Loan and Security Agreement, dated as of January 3, 2019 (as amended, restated, supplemented or otherwise modified from time to time, the "**Loan Agreement**"), among Rawhide Mining LLC, a Delaware limited liability company ("**Rawhide Mining**"), the Rawhide Subsidiaries from time to time party thereto (such Rawhide Subsidiaries, collectively, and together with Rawhide Mining, the "**Borrowers**," and each, a "**Borrower**"), Rawhide Acquisition Holding LLC, a Delaware limited liability company, the several financial institutions or entities from time to time party thereto as lenders (collectively, the "**Lenders**") and Silverpeak Credit Partners, LP, as the "Agent" for the Lenders thereunder (the "**Agent**").   Capitalized terms used but not defined herein have the meanings specified in the Loan Agreement.

The undersigned is an Officer of Rawhide Mining, knowledgeable of all of the Borrower's financial matters, and is authorized to provide certification of information regarding the Borrower; hereby certifies, in such capacity, that in accordance with the terms and conditions of the Loan Agreement, the Borrower is in compliance for the period ending [●] of all covenants, conditions and terms and hereby reaffirms that all representations and warranties contained therein are true and correct on and as of the date of this Compliance Certificate with the same effect as though made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date, after giving effect in all cases to any standard(s) of materiality contained in the Loan Agreement as to such representations and warranties.   Attached are the required documents supporting the above certification.   The undersigned further certifies that these are prepared in accordance with GAAP (except for the absence of footnotes with respect to unaudited financial statement and subject to normal year-end adjustments) and are consistent from one period to the next except as explained below.

| REPORTING REQUIREMENT | REQUIRED | CHECK IF ATTACHED |
|---|---|---|
| Quarterly Unaudited Financial Statements | Quarterly within 45 days | |
| Annual Unaudited Financial Statements | FYE within 60 days | |
| Audited Financial Statements | FYE within 120 days | |

The undersigned hereby also confirms [there has been no change in the depository accounts or securities accounts owned by the Borrower or its Subsidiaries from those previously disclosed to the Agent] [the below disclosed accounts represent all depository accounts and securities accounts presently open in the name of the Borrower or the Borrower's Subsidiaries, as applicable].

| | | Depository AC # | Financial Institution | Account Type (Depository / Securities) | Last Month Ending Account Balance | Purpose of Account |
|---|---|---|---|---|---|---|
| Rawhide Mining Name/Address: | | | | | | |
| | 1 | | | | | |
| | 2 | | | | | |
| | 3 | | | | | |
| | 4 | | | | | |
| | 5 | | | | | |
| | 6 | | | | | |
| | 7 | | | | | |
| | | | | | | |
| THE OTHER BORROWER ENTITIES: Name/Address | | | | | | |
| | 1 | | | | | |
| | 2 | | | | | |
| | 3 | | | | | |
| | 4 | | | | | |
| | 5 | | | | | |
| | 6 | | | | | |
| | 7 | | | | | |
| | | | | | | |

Very Truly Yours,

Rawhide Mining LLC

By:        _____

Name:      _____

Its:       _____

*Loan and Security Agreement*
*Form of Compliance Certificate*

EXHIBIT E

## Form of Mine Production Report

**Rawhide Mining LLC**
**Monthly Production Report**
**February 2019**

|  | Month | | YTD | |
|---|---|---|---|---|
|  | **Actual** | **Budget** | **Actual** | **Budget** |
| Gold Equivalent Ounces to Press | 1,607 | 1,607 | 2,698 | 2,698 |
| Gold Equivalent Ounces Shipped | 1,400 | 1,400 | 2,950 | 2,950 |
| Ore Tons Mined (wet) | 151,903 | 151,903 | 259,060 | 259,060 |
| Waste Tons Mined | 200,918 | 200,918 | 200,918 | 200,918 |
| Total Tons Mined | 352,821 | 352,821 | 581,517 | 581,517 |
| Tons Crushed and Stacked (dry) | 141,513 | 141,513 | 241,340 | 241,340 |
| Gold Equivalent Ounces Placed | 2,337 | 2,337 | 4,101 | 4,101 |
| Personnel on payroll (end of month) | 63 | 63 | | |

No health, safety or environmental incidents during January 2012.

*Loan and Security Agreement*
*Form of Mine Production Report*

**EXHIBIT F**

## Form of Joinder Agreement

This **JOINDER AGREEMENT** (the "**Joinder Agreement**") is made and dated as of [●], and is entered into by and between [●], a [●] (the "**Subsidiary**"), and **SILVERPEAK CREDIT PARTNERS, LP**, a Delaware limited partnership, as Agent (the "**Agent**").

### Preliminary Statements

A.   Rawhide Mining LLC ("**Rawhide Mining**") and its Rawhide Subsidiaries from time to time parties thereto, as borrowers (collectively, the "**Borrowers**"), and Rawhide Acquisition Holding LLC have entered into that certain Loan and Security Agreement dated January 3, 2019, with the several financial institutions or entities from time to time party thereto as lender (the "**Lenders**") and the Agent, as such agreement may be amended (the "**Loan Agreement**"), together with the other agreements executed and delivered in connection therewith.

B.   The Subsidiary acknowledges and agrees that it will benefit both directly and indirectly from the Borrower's execution of the Loan Agreement and the other agreements executed and delivered in connection therewith.

**NOW**, **THEREFORE**, the Subsidiary and the Agent agree as follows:

1.   The recitals set forth above are incorporated into and made part of this Joinder Agreement. Capitalized terms used but not defined in this Joinder Agreement have the meanings specified in the Loan Agreement.

2.   By signing this Joinder Agreement, the Subsidiary shall be bound by the terms and conditions of the Loan Agreement as a Borrower (as defined in the Loan Agreement) under the Loan Agreement (and, collectively with the other Borrowers, as the Borrower), *mutatis mutandis*; **provided**, **however**, **that**, (a) with respect to (i) **clause (a)** of **Section 5.1** (*Organization, Etc.*) of the Loan Agreement, the Subsidiary represents that it is an entity duly organized, legally existing and in good standing under the laws of [●], (b) neither the Agent nor the Lenders shall have any duties, responsibilities or obligations to the Subsidiary arising under or related to the Loan Agreement or the other Loan Documents, (c) if the Subsidiary is covered by Rawhide Mining's insurance, the Subsidiary shall not be required to maintain separate insurance or separately comply with the provisions of **Section 6.1** (*Coverage*) or **6.2** (*Certificates*) of the Loan Agreement, and (d) for so long as the Borrower otherwise satisfies the requirements of **Section 7.2** (*Reporting*) of the Loan Agreement, as to such Subsidiary, on a consolidated basis, the Subsidiary shall not be obligated to provide the Agent with separate Financial Statements.

3.   To the extent that the Agent or the Lenders have any duties, responsibilities or obligations arising under or related to the Loan Agreement or the other Loan Documents, the Agent shall interact with Rawhide Mining, in its capacity as agent for the benefit of the Borrower Entities pursuant to

**Section 11.21** (*Joint and Several Liability; Rawhide Mining as Agent for Borrowers*) of the Loan Agreement, including, without limitation, as to:

(a)    the Agent's providing notice to the Borrower in accordance with the Loan Agreement or as otherwise agreed among the Borrower, the Agent and the Lenders shall be deemed provided to the Subsidiary;

(b)    a Lender's providing an Advance to Rawhide Mining shall be deemed an Advance to the Subsidiary; and

(c)    the Subsidiary shall have no right to make any demand on any Lender.

4.    The Subsidiary agrees not to certificate its Equity Interests without the Agent's prior written consent, which consent may be conditioned on the delivery of such Equity Interests to the Agent in order to perfect the Agent's security interest in such Equity Interests.

5.    The Subsidiary acknowledges that it benefits, both directly and indirectly, from the Loan Agreement, and hereby waives, for itself and on behalf on any and all successors in interest (including without limitation any assignee for the benefit of creditors, receiver, bankruptcy trustee or itself as debtor-in-possession under any bankruptcy proceeding) to the fullest extent provided by law, any and all claims, rights or defenses to the enforcement of this Joinder Agreement on the basis that  (a) it failed to receive adequate consideration for the execution and delivery of this Joinder Agreement or  (b) its obligations under this Joinder Agreement are avoidable as a fraudulent conveyance.

6.    As security for the prompt, complete and indefeasible payment when due (whether on the payment dates or otherwise) of all the Secured Obligations, the Subsidiary grants to the Agent (for the benefit of the Secured Parties) a security interest in all of the Subsidiary's right, title, and interest in and to the Collateral.

**[SIGNATURE PAGES FOLLOW]**

[SIGNATURE PAGE TO JOINDER AGREEMENT]

SUBSIDIARY:

_____.

By:
Name:
Title:

Address:


Telephone: _____
email: _____

AGENT:


Silverpeak Credit Partners, LP

By:_____
Name:_____
Title: _____

Address:

*Loan and Security Agreement*
*Form of Joinder Agreement*

**EXHIBIT G**

_____

### Form of Power of Attorney

_____

## POWER OF ATTORNEY

<u>*<Date>*</u>

This **POWER OF ATTORNEY** is executed and delivered by _____*<Grantor Name>*_____, a _____ (the "**Grantor**"), to **SILVERPEAK CREDIT PARTNERS, LP**, a Delaware limited partnership, and its successors and assigns, as the "Agent" (in such capacity, the "**Agent**") under the Loan and Security Agreement, dated as of January 3, 2019 (as amended, restated, supplemented or otherwise modified from time to time, the "**Loan and Security Agreement**"), among Rawhide Mining LLC, a Delaware limited liability company ("**Rawhide Mining**"), the other "Rawhide Subsidiaries" from time to time party thereto (such Rawhide Subsidiaries, collectively, and together with Rawhide Mining, the "**Borrowers**," and each, a "**Borrower**"), the several financial institutions or entities from time to time party thereto, as "Lenders" thereunder, and the Agent.   The Grantor is a Borrower under the Loan and Security Agreement.   Capitalized terms used but not defined herein shall have the meanings assigned to such terms under the Loan and Security Agreement.

No person to whom this Power of Attorney is presented, as authority for the Agent to take any action or actions contemplated hereby, shall inquire into or seek confirmation from the Grantor or any other Person as to the authority of the Agent to take any action described below, or as to the existence of or fulfillment of any condition to this Power of Attorney, which is intended to grant to the Agent unconditionally the authority to take and perform the actions contemplated herein, and the Grantor irrevocably waives any right to commence any suit or action, in law or equity, against any person or entity that acts in reliance upon or acknowledges the authority granted under this Power of Attorney. The Power of Attorney granted hereby is coupled with an interest and may not be revoked or canceled by the Grantor until all obligations of the Grantor under the Loan Documents have been indefeasibly paid in full and the Agent has provided its written consent thereto (which consent shall not be unreasonably withheld or delayed).

The Grantor hereby irrevocably constitutes and appoints the Agent (and its officers, employees, agents or designees) as the Grantor's true and lawful attorney in fact (with full power of substitution), in its name, place and stead, and at its expense, in connection with the enforcement of the rights and remedies provided for in **Article 10** (*Remedies*) of the Loan and Security Agreement and the other rights and remedies afforded to the Agent and the other Secured Parties under the Loan Documents following an "Event of Default" under the Loan and Security Agreement, with full irrevocable power and authority, in the Grantor's place and stead, at the Grantor's expense, and in the Grantor's name or in the Agent's own name, from time to time in the Agent's discretion, to take any and all appropriate actions, and to execute and deliver any and all documents and instruments that may be necessary or desirable to exercise the rights of the Grantor under the Collateral and the Loan Documents, and, without limiting the generality of the foregoing, hereby grants to Agent the power and right, on its behalf, without notice to or assent by it, to  (i) give any necessary receipts or acquittance for amounts collected or received

hereunder, (ii) make all necessary transfers of the Collateral in connection with any sale or other disposition made pursuant to such **Article 10**, (iii) execute and deliver for value all necessary or appropriate bills of sale, assignments and other instruments in connection with any such sale or other disposition, the Grantor thereby ratifying and confirming all that the Agent, or its officers, employees, agents, designees or substitutes shall lawfully do under this Power of Attorney and pursuant hereto and (iv) sign any agreements, orders or other documents in connection with, or pursuant to, any Loan Document, all as fully and effectively as the Grantor might do.   The Grantor hereby ratifies, to the extent permitted by law, all that said attorneys shall lawfully do or cause to be done by virtue hereof.

**[SIGNATURE PAGE FOLLOWS]**

**IN WITNESS WHEREOF**, this Power of Attorney is executed by the Grantor, and the Grantor has caused its seal to be affixed as of the date first written above.

<div align="center">

*<GRANTOR NAME>*
</div>

As Grantor

By: _____

      Name:     *<Signatory Name>*

      Title:     *<Signatory Title>*

STATE OF _____ )

                                 )

COUNTY OF _____ )

On this _____ day of _____, _____, before me, the undersigned, a Notary Public in and for said state, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the person, or the entity upon behalf of which the person acted, executed the instrument.

_____
Notary Public

*Loan and Security Agreement*
*Form of Power of Attorney*

**EXHIBIT H**

## Form of Initial Account Control Agreement

*(Please see attached)*



## ACCOUNT CONTROL AGREEMENT

This ACCOUNT CONTROL AGREEMENT (this "Agreement") is dated as of _____, 2019, and entered into by and among RAWHIDE MINING LLC ("Company"), SILVERPEAK CREDIT PARTNERS, LP, as agent for the Lenders under the Loan Agreement identified below (together with its successors and assigns, in such capacity, "Agent") and U.S. BANK NATIONAL ASSOCIATION ("Depositary Bank").

WHEREAS, pursuant to the Loan and Security Agreement, dated as of January 3, 2019 (as amended, restated, supplemented or otherwise modified from time to time, the "Loan Agreement"), among Company, the "Rawhide Subsidiaries" from time to time party thereto, Rawhide Acquisition Holding LLC, the "Lenders" from time to time party thereto (collectively, the "Lenders") and Agent, the Lenders have agreed to provide a term loan to Company, subject to the terms and conditions set forth therein; and

WHEREAS, in order to secure the obligations of Company to the Lenders and Agent under the Loan Agreement and certain related documents, Company has granted to Agent a security interest in, *inter alia*, the Deposit Account referred to herein, all sums now or hereafter on deposit in or payable or withdrawable therefrom and all proceeds of the foregoing.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Company, Agent and Depositary Bank agree as follows:

1.    **Deposit Account**.    Pursuant to certain agreements between Company and Agent, Company has granted to Agent a security interest in all rights of Company with respect to account number 153758236498 (such account, together with all substitutions and replacements therefor, the "Deposit Account") located at Depositary Bank and subject to the terms of the Deposit Agreements (as hereinafter defined).  The terms and conditions of this Account Control Agreement (this "Agreement") are in addition to any deposit account agreements and other related agreements that Company has with Depositary Bank, including without limitation all agreements concerning banking products and services, treasury management documentation, account booklets containing the terms and conditions of the Deposit Account, signature cards, fee schedules, disclosures, specification sheets and change of terms notices (collectively, the "Deposit Agreements").  The provisions of this Agreement shall supersede the provisions of the Deposit Agreements only to the extent the provisions herein are inconsistent with the Deposit Agreements, and in all other respects, the Deposit Agreements shall remain in full force and effect.  All items deposited into the Deposit Account shall be processed according to the provisions of the Deposit Agreements, as amended by this Agreement.  The Deposit Account shall be maintained at all times as a deposit account (within the meaning of the New York Uniform Commercial Code).

2.    **Security Interest**.  Company has granted to Agent a security interest in, among other property, the Deposit Account and all credits or proceeds thereto and all monies, checks and other instruments held or deposited therein (all of which shall be included in the definition of the "Deposit Account"). Company represents and warrants that it has the legal right to pledge the Deposit Account to Agent, that the funds in the Deposit Account are not held for the benefit of a third party, and that that there are no perfected liens or encumbrances with respect to the Deposit Account.  Company covenants with Agent that it shall not enter into any acknowledgment or agreement that gives any other person or entity except Agent control over, or any other security interest, lien or title in, the Deposit Account.

3.    **Control**.  In order to provide Agent with control over the Deposit Account, Company agrees that Depositary Bank shall comply with any and all orders, notices, requests and other instructions originated by Agent directing disposition of the funds in the Deposit Account without any further consent from Company, even if such instructions are contrary to any of Company's instructions or demands or result in

*Loan and Security Agreement*
*Form of Initial Account Control Agreement*

Depositary Bank dishonoring items which may be presented for payment.  Company agrees that instructions from Agent may include the giving of stop payment orders for any items presented to the Deposit Account, instructions to transfer funds to or for the benefit of Agent or any other person or entity, and instructions to close the Deposit Account.

4.      **Access to Deposit Account**.   The Deposit Account shall be under the control of Agent; provided, that unless and until Depositary Bank receives Agent's written notice that Company's access to the funds in the Deposit Account is terminated, Depositary Bank shall honor Company's instructions, notices and directions with respect to the transfer or withdrawal of funds from the Deposit Account, including paying or transferring the funds to Company or any other person or entity.  Notwithstanding the preceding sentence, Depositary Bank shall at all times retain the sum of $5,000.00 to cover any Fees, Returned Items and Overdrafts (as those terms are defined below).

Upon receipt of a written notice from Agent instructing Depositary Bank to terminate Company's access to funds in the Deposit Account, Depositary Bank shall transfer all  funds (subject to Depositary Bank's funds availability policy) in the Deposit Account to a designated account in accordance with Agent's written instructions.  Agent shall promptly contact Depositary Bank to confirm Depositary Bank's receipt of   Agent's written instructions.  Any written notice sent pursuant to this Section 4 and confirmed to have been received after Depositary Bank's business hours shall not be deemed sent until the next business day.  Depositary Bank shall have a reasonable time to act on Agents' written notice.

The Depository Bank has not entered into any other agreement with any person or entity (other than the Company) permitting such person to direct dispositions from the Deposit Account.

5.      **Subordination by Depositary Bank**.  Company and Depositary Bank acknowledge notice of and recognize Agent's continuing security interest in the Deposit Account and in all items deposited in the Deposit Account and in the proceeds thereof.  Depositary Bank hereby waives, and subordinates to the indefeasible payment, performance and satisfaction of Company's obligations under the Loan Agreement and the other "Loan Documents" referred to therein, any statutory, contractual or other right, claim, offset, lien, security interest or encumbrance resulting from any transaction which involves the Deposit Account. Notwithstanding the preceding sentence, nothing herein constitutes a waiver of, and Depositary Bank expressly reserves all of its present and future rights with respect to: (i) fees and expenses ("Fees") related to the Deposit Account;  (ii) any checks, ACH entries, wire transfers, merchant card transactions, or other paper or electronic items which were deposited or credited to the Deposit Account that are returned, reversed, refunded, adjusted or charged back for insufficient funds or for any other reason ("Returned Items"); (iii)  obligations and liabilities connected with the Deposit Account that arise out of any treasury management services provided by Depositary Bank, its subsidiaries or affiliates, including but not limited to, ACH, merchant card, zero balance account, sweeps, controlled disbursement or payroll ("Overdrafts").  Depositary Bank may charge the Deposit Account or other accounts of Company maintained at Depositary Bank to cover Fees, Returned Items or Overdrafts.  If there are insufficient funds in the Deposit Account or any of Company's other accounts to cover the Fees, Returned Items and Overdrafts, Company agrees to immediately reimburse Depositary Bank for the amount of such shortfall. If Company fails to pay the amount demanded by Depositary Bank within nine (9) days, Agent agrees to reimburse Depositary Bank within nine (9) days of demand thereof by Depositary Bank for any Returned Items and Overdrafts to the extent (i) Agent received payment in respect thereof pursuant to Section 4 and (ii) such demand is received within thirty (30) days of Depositary Bank's receipt of such Returned Item or such Overdraft having been processed by Depositary Bank.

6.      **Indemnity**.  Company agrees to defend, indemnify and hold Depositary Bank and its directors, officers, employees, attorneys, successors and assigns (collectively "Depositary Bank") harmless from and against any and all claims, losses, liabilities, costs, damages and expenses, including, without limitation, reasonable legal and accounting fees (collectively, "Claims"), arising out of or in any way related to this Agreement, excepting only liability arising out of Depositary Bank's gross negligence or willful misconduct.  Without regard to Company's indemnification obligations to Depositary Bank, Agent agrees to defend, indemnify hold Depositary Bank harmless from and against any and all Claims arising out of Depositary Bank's compliance with Agent's instructions.  Agent's obligations to Depositary Bank hereunder shall in no way operate to release Company from its obligations to Agent and shall not impair

any rights or remedies of Agent to collect any such amounts from Company.  IN NO EVENT WILL DEPOSITARY BANK BE LIABLE FOR ANY INDIRECT DAMAGES, LOST PROFITS, SPECIAL, PUNITIVE, OR CONSEQUENTIAL DAMAGES WHICH ARISE OUT OF OR IN CONNECTION WITH THE SERVICES CONTEMPLATED BY THIS AGREEMENT EVEN IF DEPOSITARY BANK HAS BEEN INFORMED OF THE POSSIBILITY OF SUCH DAMAGES.

7.      **Depositary's Bank's Responsibility**.  The duties of Depositary Bank are strictly limited to those set forth in this Agreement and Depositary Bank is not acting as a fiduciary for any party hereto. Depositary Bank shall be protected in relying on any form of instruction, notice, or other communication purporting to be from an authorized representative of Agent which Depositary Bank, in good faith, believes to be genuine and what it purports to be.  Depositary Bank shall have no duty to inquire as to the genuineness, validity, or enforceability of any such instruction, notice or communication even if Company notifies Depositary Bank that Agent is not legally entitled to originate any such instruction, notice or communication.  The Deposit Account and all actions and undertakings by Depositary Bank shall be subject to all rules and regulations relating to the Deposit Account and to applicable law.  If requested by Agent, Company authorizes Depositary Bank to provide to Agent a copy of the Deposit Account statement.

8.      **Termination**.  This Agreement shall not be terminable by Company so long as any obligations of Company to Agent are outstanding and unpaid.  This Agreement may be terminated by Depositary Bank upon sixty (60) days' prior written notice to all parties; provided, however that Depositary Bank may terminate this Agreement upon ten (10) days' prior written notice in the event Agent fails to make payments to Depositary Bank in accordance with Section 5 above and the Agent fails to remedy such failure by the end of such ten (10)-day period.  This Agreement may be terminated by Agent in a writing sent to Depositary Bank in which Agent releases Depositary Bank from any further obligation to comply with instructions originated by Agent with respect to the Deposit Account.  Any available funds remaining in the Deposit Account upon termination or deposited in thereafter shall be transferred in accordance with the provisions of Section 4 above after deduction for any amounts otherwise reimbursable to Depositary Bank as provided hereunder.  Termination shall not affect the rights and obligations of any party hereto with respect to any period prior to such termination.

9.      **Legal Process and Insolvency**.  In the event Depositary Bank receives any form of legal process concerning the Deposit Account, including, without limitation, court orders, levies, garnishments, attachments, and writs of execution, or in the event Depositary Bank learns of any insolvency proceeding concerning Company, including, without limitation, bankruptcy, receivership, and assignment for the benefit of creditors, Depositary Bank will respond to such legal process or knowledge of insolvency in the normal course or as required by law.

10.     **Governing Law**.  This Agreement shall be governed by and construed in accordance with the laws of the State of New York.  For purposes of Section 9-304 of the Uniform Commercial Code, the State of New York shall be deemed to be the jurisdiction of Depositary Bank.

11.     **Notices**.  Except as otherwise provided in this Agreement, all notices and other communications required under this Agreement shall be in writing and may be personally served or sent by facsimile, overnight courier, or registered/certified United States Mail, and shall be deemed given when delivered in person, or received by facsimile, courier or United States Mail at the address specified below.  Any party may change its address for notices hereunder by notice to all other parties given in accordance with this Section 11.

Company:          Rawhide Mining LLC
                  143 Keddie St.
                  Fallon, NV 89406
                  Attention:    Don Deines
                  Email:        don.deines@rawhidemine.com
                  Telephone:    +1 775 945 1015 (x 108)

Agent:                       Silverpeak Credit Partners, LP
                             40 West 57th Street - 29th Floor
                             New York, NY 10019
                             Email:        trading@Silverpeak.com
                             Telephone:    +1 212 716 2000

Depositary Bank:             U.S. Bank National Association

                             _____

                             Attn:_____
                             Facsimile:_____
                             Telephone:_____

12.    **Miscellaneous**.  This Agreement shall bind and benefit the parties and their respective successors and assigns.  This Agreement may be amended only with the prior written consent of all parties hereto.  None of the terms of this Agreement may be waived except as Depositary Bank may consent thereto in writing.  No delay on the part of Depositary Bank in exercising any right, power or privilege hereunder shall operate as a waiver hereof, nor shall any single or partial exercise of any right, power or privilege hereunder preclude other or further exercise thereof or the exercise of any right, power or privilege.  The rights and remedies specified herein are cumulative and are not exclusive of any rights or remedies which Depositary Bank would otherwise have.

13.    **Counterparts**.  This Agreement may be executed in any number of counterparts and by the different parties hereto in separate counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument.  Any counterpart delivered by facsimile, PDF, or other electronic means shall have the same import and effect as original counterparts and shall be valid, enforceable and binding for the purposes of this Agreement.

14.    **Jury Trial Waiver**.  COMPANY, AGENT AND DEPOSITARY BANK EACH HEREBY WAIVES ALL RIGHTS TO TRIAL BY JURY IN ANY JUDICIAL PROCEEDING ARISING OUT OF, OR RELATING TO, THIS AGREEMENT OR SERVICES RENDERED IN CONNECTION WITH THIS AGREEMENT.


RAWHIDE MINING LLC
COMPANY

By: _____
Name: _____
Title: _____


SILVERPEAK CREDIT PARTNERS, LP
AGENT

By: _____
Name: _____
Title: _____


U.S. BANK NATIONAL ASSOCIATION
DEPOSITARY BANK

By: _____
Name: _____
Title: _____


Exhibit H-5

**ANNEX I**

## Existing Permitted Indebtedness

| | | Closing Date Balance |
|---|---|---|
| 1. | Toyota Financial Services auto loans secured by (i) 2017 Toyota Van and (ii) Toyota Tundra ............................................................... | USD 38,442 |
| 2. | Kimball Equipment Co. equipment loan........................................................ | USD 231,283 |
| | **TOTAL:** | **USD 269,725** |

ANNEX II

**Existing Permitted Investments**

Rawhide Mining owns **1,734,285.7** shares of common stock in Emgold Mining Corporation, a British Columbia company ("**EmGold**"), which, as of the Closing Date,  (i) represent approximately **5.60%** of the undiluted shares of EmGold and  (ii) have an aggregate fair market value of approximately **USD 84,349**.

**ANNEX III**

## Rawhide Mining Subsidiaries

None.

<div align="right">

**SCHEDULE 2.1**

</div>

<div align="center">

**Advance Amounts; Wire Instructions**

</div>

---

<div align="center">

**<u>Advance Amounts</u>**

</div>

| Lender | Advance Amount |
|---|---|
| Silverpeak Credit Opportunities AIV LP ................... | USD 10,055,500 |
| CEOF Holdings LP ....................................................... | USD 8,044,500 |

<div align="center">

**<u>Wire Instructions</u>**

*(To be separately provided)*

</div>

**SCHEDULE 5.3**

## Commercial Tort Claims

None.

SCHEDULE 5.12

## Real Property

1.    **Owned Fee Property**

See Exhibit A-1 attached hereto and incorporated herein by this reference.

2.    **Owned Unpatented Mining Claims**

| Claim Name | BLM Serial No. | Claim Name | BLM Serial No. |
|---|---|---|---|
| COORS # 5A | NMC97384 | DZ No.20 | NMC1010401 |
| COORS # 6A | NMC97385 | DZ No.21 | NMC1010402 |
| COORS # 7A | NMC97386 | DZ No.22 | NMC1010403 |
| COORS # 16A | NMC97395 | DZ No.23 | NMC1010404 |
| COORS # 23A | NMC97402 | DZ No.24 | NMC986592 |
| COORS # 24A | NMC97403 | DZ No.25 | NMC986593 |
| DIVIDE No. 5FA | NMC645684 | DZ No.26 | NMC986595 |
| DIVIDE 5B | NMC645670 | DZ No.27 | NMC986596 |
| DZ No.1 | NMC881619 | DZ No.28 | NMC986597 |
| DZ No.2 | NMC881620 | DZ No.29 | NMC986598 |
| DZ No.3 | NMC881621 | DZ No.30 | NMC986599 |
| DZ No.4 | NMC986594 | DZ No.31 | NMC986600 |
| DZ No.5 | NMC986577 | DZ No.32 | NMC986601 |
| DZ No.6 | NMC986578 | DZ No.33 | NMC986602 |
| DZ No.7 | NMC986579 | DZ No.34 | NMC986603 |
| DZ No.8 | NMC986580 | DZ No.35 | NMC986604 |
| DZ No.9 | NMC986581 | DZ No.36 | NMC986605 |
| DZ No.10 | NMC986582 | DZ No.37 | NMC986606 |
| DZ No.11 | NMC986583 | DZ No.38 | NMC986607 |
| DZ No.12 | NMC986584 | DZ No.39 | NMC986608 |
| DZ No.13 | NMC986585 | ENTITY # 1A | NMC570416 |
| DZ No.14 | NMC986586 | HILL # 22A | NMC97410 |
| DZ No.15 | NMC986587 | KDK # 5A | NMC824128 |
| DZ No.16 | NMC986588 | KDK # 6A | NMC824129 |
| DZ No.17 | NMC986589 | KDK # 7A | NMC824130 |
| DZ No.18 | NMC986590 | KDK # 10 | NMC824133 |
| DZ No.19 | NMC986591 | KDK # 11 | NMC824134 |

| Claim Name | BLM Serial No. | Claim Name | BLM Serial No. |
|---|---|---|---|
| KDK # 12 | NMC824135 | RH # 345 | NMC574088 |
| KDK # 13 | NMC824136 | RH # 346 | NMC574089 |
| KDK # 14 | NMC824137 | RH # 347 | NMC364963 |
| KDK # 15 | NMC824138 | RH # 348 | NMC364964 |
| KDK # 16 | NMC824139 | RH # 446 | NMC365041 |
| KDK # 17 | NMC824140 | SRG # 29A | NMC819914 |
| KDK # 18 | NMC824141 | SRG # 31A | NMC819915 |
| KDK # 19 | NMC824142 | SRG # 41A | NMC819922 |
| KDK # 20 | NMC824143 | SRG # 43A | NMC819923 |
| KDK # 21 | NMC824144 | SRG # 45A | NMC819924 |
| KDK # 22 | NMC824145 | SRG # 47A | NMC819925 |
| KDK # 23 | NMC824146 | SRG # 49A | NMC819926 |
| KDK # 24 | NMC824147 | SRG # 51A | NMC819927 |
| KDK # 25 | NMC824148 | SRG # 53A | NMC819928 |
| KDK # 27 | NMC824150 | SRG # 55A | NMC819929 |
| KDK # 37 | NMC824160 | SRG # 57A | NMC819930 |
| KDK # 38 | NMC824161 | SRG # 58 | NMC819931 |
| KDK # 39 | NMC824162 | SRG # 59 | NMC819932 |
| KDK # 40 | NMC824163 | SRG # 60 | NMC819933 |
| KDK # 41 | NMC824164 | SRG # 61 | NMC819934 |
| KDK # 42 | NMC824165 | SRG # 75 | NMC819948 |
| KDK # 43 | NMC824166 | SRG # 76 | NMC819949 |
| KDK # 44 | NMC824167 | SRG # 77 | NMC819950 |
| KDK # 45 | NMC824168 | SRG # 78 | NMC819951 |
| NUC # 1A | NMC908354 | SRG # 79 | NMC819952 |
| NUC # 2A | NMC908355 | WS # 11A | NMC337870 |
| NUC # 3A | NMC908356 | WS # 13A | NMC337872 |
| NUC # 4A | NMC908357 | WS # 15A | NMC337874 |
| RH # 222 | NMC248811 | WS # 17A | NMC337876 |
| RH # 223 | NMC248812 | WS # 19A | NMC337878 |
| RH # 224 | NMC248813 | WS # 71A | NMC337928 |
| RH # 225 | NMC248814 | WS # 73A | NMC337929 |
| RH # 341A | NMC364957 | WS # 74A | NMC337930 |
| RH # 342A | NMC364958 | WS # 75A | NMC337931 |
| RH # 343A | NMC364959 | WS # 76A | NMC337932 |
| RH # 344 | NMC574087 | SOB 1 | NMC1061306 |

*Loan and Security Agreement*
*Real Property*

| Claim Name | BLM Serial No. | Claim Name | BLM Serial No. |
|---|---|---|---|
| SOB 2 | NMC1061307 | Roundup #9 | NMC1103895 |
| SOB 3 | NMC1061308 | Roundup #10 | NMC1103896 |
| SOB 4 | NMC1061309 | Roundup #11 | NMC1103897 |
| SOB 5 | NMC1061310 | Roundup Frac #1 | NMC1103898 |
| SOB 6 | NMC1061311 | Roundup Frac #2 | NMC1103899 |
| SOB 7 | NMC1061312 | Roundup Frac #3 | NMC1103900 |
| SOB 8 | NMC1061313 | Roundup Frac #4 | NMC1103901 |
| SOB 9 | NMC1061314 | LPB #1 | NMC1109954 |
| SOB 10 | NMC1061315 | MS 70 | NMC570419 |
| SOB 11 | NMC1061316 | MS 71 | NMC570420 |
| SOB 12 | NMC1061317 | MS 72 | NMC570421 |
| SOB 13 | NMC1061318 | MS 73 | NMC570422 |
| SOB 14 | NMC1061319 | MS 74 | NMC570423 |
| SOB 15 | NMC1061320 | MS 75 | NMC570424 |
| SOB 16 | NMC1061321 | MS 76 | NMC570425 |
| SOB 17 | NMC1061322 | MS 77 | NMC570426 |
| SOB 18 | NMC1061323 | MS 78 | NMC570427 |
| SOB 19 | NMC1061324 | MS 79 | NMC570428 |
| SOB 20 | NMC1061325 | MS 80 | NMC570429 |
| SOB 21 | NMC1061326 | MS 81 | NMC570430 |
| SOB 22 | NMC1061327 | MS 82 | NMC570431 |
| SOB 23 | NMC1061328 | MS 83 | NMC570432 |
| SOB 24 | NMC1061329 | MS 84 | NMC570433 |
| SOB 25 | NMC1061330 | MS 85 | NMC570434 |
| SOB 26 | NMC1061331 | MS 86 | NMC570435 |
| SOB 27 | NMC1061332 | MS 87 | NMC570436 |
| SOB 28 | NMC1061333 | MS 88 | NMC570437 |
| Lariat Claim No 1 | NMC 1069327 | MS 89 | NMC570438 |
| Roundup #1 | NMC1103887 | MS 90 | NMC570439 |
| Roundup #2 | NMC1103888 | MS 91 | NMC570440 |
| Roundup #3 | NMC1103889 | MS 92 | NMC570441 |
| Roundup #4 | NMC1103890 | MS 93 | NMC570442 |
| Roundup #5 | NMC1103891 | MS 94 | NMC570443 |
| Roundup #6 | NMC1103892 | MS 95 | NMC570444 |
| Roundup #7 | NMC1103893 | MS 96 | NMC570445 |
| Roundup #8 | NMC1103894 | MS 97 | NMC570446 |

*Loan and Security Agreement*
*Real Property*

| Claim Name | BLM Serial No. | Claim Name | BLM Serial No. |
|---|---|---|---|
| MS 98 | NMC570447 | MS 134 | NMC570483 |
| MS 99 | NMC570448 | MS 135 | NMC570484 |
| MS 100 | NMC570449 | MS 136 | NMC570485 |
| MS 101 | NMC570450 | MS 137 | NMC570486 |
| MS 102 | NMC570451 | MS 138 | NMC570487 |
| MS 103 | NMC570452 | MS 139 | NMC570488 |
| MS 104 | NMC570453 | MS 140 | NMC570489 |
| MS 105 | NMC570454 | MS 141 | NMC570490 |
| MS 106 | NMC570455 | MS 142 | NMC570491 |
| MS 107 | NMC570456 | MS 143 | NMC570492 |
| MS 108 | NMC570457 | MS 144 | NMC570493 |
| MS 109 | NMC570458 | MS 145 | NMC570494 |
| MS 110 | NMC570459 | MS 146 | NMC570495 |
| MS 111 | NMC570460 | MS 147 | NMC570496 |
| MS 112 | NMC570461 | MS 148 | NMC570497 |
| MS 113 | NMC570462 | MS 149 | NMC570498 |
| MS 114 | NMC570463 | MS 150 | NMC570499 |
| MS 115 | NMC570464 | MS 152 | NMC570501 |
| MS 116 | NMC570465 | MS 153 | NMC570502 |
| MS 117 | NMC570466 | MS 154 | NMC570503 |
| MS 118 | NMC570467 | MS 155 | NMC570504 |
| MS 119 | NMC570468 | MS 156 | NMC570505 |
| MS 120 | NMC570469 | MS 157 | NMC570506 |
| MS 121 | NMC570470 | MS 158 | NMC570507 |
| MS 122 | NMC570471 | MS 159 | NMC570508 |
| MS 123 | NMC570472 | MS 175 | NMC570524 |
| MS 124 | NMC570473 | MS 176 | NMC570525 |
| MS 125 | NMC570474 | MS 177 | NMC570526 |
| MS 126 | NMC570475 | RH #194 | NMC248783 |
| MS 127 | NMC570476 | RH NO 195A | NMC248784 |
| MS 128 | NMC570477 | RH #196 | NMC248785 |
| MS 129 | NMC570478 | RH #198 | NMC248787 |
| MS 130 | NMC570479 | RH NO 197BA | NMC645682 |
| MS 131 | NMC570480 | HIM #1 | NMC709944 |
| MS 132 | NMC570481 | HIM #2 | NMC709945 |
| MS 133 | NMC570482 | HIM #7 | NMC709950 |

| Claim Name | BLM Serial No. | Claim Name | BLM Serial No. |
|---|---|---|---|
| HIM #8 | NMC709951 | BLACK EAGLE 10 | NMC825678 |
| HIM #9 | NMC709952 | RE 1 | NMC832165 |
| HIM #10 | NMC709953 | RE 2 | NMC832166 |
| HIM #13 | NMC709956 | RE 3 | NMC832167 |
| HIM #14 | NMC709957 | RE 4 | NMC832168 |
| HIM #15 | NMC709958 | RE 5 | NMC832169 |
| HIM #16 | NMC709959 | RE 6 | NMC832170 |
| HIM #19 | NMC709962 | RE 7 | NMC832171 |
| HIM #21 | NMC709964 | REGENT 12 | NMC860858 |
| ME #1A | NMC709978 | REGENT 13 | NMC860859 |
| ME #2A | NMC709979 | REGENT 14 | NMC860860 |
| ME #3A | NMC709980 | REGENT 15 | NMC860861 |
| ME #4A | NMC709981 | REGENT 16 | NMC860862 |
| ME #5A | NMC709982 | REGENT 17 | NMC860863 |
| ME #6A | NMC709983 | REGENT 18 | NMC860864 |
| ME #7A | NMC709984 | REGENT 19 | NMC860865 |
| ME #8A | NMC709985 | REGENT 20 | NMC860866 |
| REGENT 1 | NMC712871 | REGENT 21 | NMC860867 |
| REGENT 2 | NMC712872 | REGENT 22 | NMC860868 |
| REGENT 3 | NMC712873 | REGENT 23 | NMC860869 |
| REGENT 4 | NMC712874 | REGENT 24 | NMC860870 |
| REGENT 5 | NMC712875 | REGENT 25 | NMC860871 |
| REGENT 6 | NMC712876 | REGENT 26 | NMC860872 |
| REGENT 7 | NMC712877 | REGENT 27 | NMC860873 |
| REGENT 8 | NMC712878 | REGENT 28 | NMC860874 |
| REGENT 9 | NMC712879 | REGENT 29 | NMC860875 |
| REGENT #15 | NMC717579 | Rfrac 3 | NMC897673 |
| DAWN NO 2A | NMC723713 | R #10 | NMC897687 |
| DAWN NO 3A | NMC723714 | R #11 | NMC897688 |
| DAWN NO 4 | NMC723715 | R #12 | NMC897689 |
| DAWN NO 13 | NMC723724 | R #13 | NMC897690 |
| DAWN NO 17 | NMC723728 | R #14 | NMC897691 |
| DAWN NO 18 | NMC729836 | R #15 | NMC897692 |
| BLACK EAGLE 7 | NMC825675 | R #16 | NMC897693 |
| BLACK EAGLE 8 | NMC825676 | R #17 | NMC897694 |
| BLACK EAGLE 9 | NMC825677 | R #18 | NMC897695 |

| Claim Name | BLM Serial No. | Claim Name | BLM Serial No. |
|---|---|---|---|
| R #19 | NMC897696 | RPT-104 | NMC1046482 |
| R #20 | NMC897697 | RPT-105 | NMC1046483 |
| R #21 | NMC897698 | RPT-106 | NMC1046484 |
| R #22A | NMC897699 | RPT-107 | NMC1046485 |
| R #23 | NMC897700 | RPT-112 | NMC1046490 |
| R #24 | NMC897701 | RPT-113 | NMC1046491 |
| R #25 | NMC897702 | RPT-114 | NMC1046492 |
| R #26 | NMC897703 | RPT-115 | NMC1046493 |
| R #27 | NMC897704 | RPT-116 | NMC1046494 |
| R #28 | NMC897705 | RPT-117 | NMC1046495 |
| R #29 | NMC897706 | RPT-118 | NMC1046496 |
| R #30 | NMC897707 | RPT-120 | NMC1046497 |
| R #31 | NMC897708 | RPT-122 | NMC1046498 |
| R #32 | NMC897709 | RPT-124 | NMC1046499 |
| RPT-21 | NMC1046399 | RPT-125 | NMC1046500 |
| RPT-23 | NMC1046401 | RPT-126 | NMC1046501 |
| RPT-24 | NMC1046402 | RPT-128 | NMC1046503 |
| RPT-26 | NMC1046404 | RPT-129 | NMC1046504 |
| RPT-27 | NMC1046405 | RPT-130 | NMC1046505 |
| RPT-76 | NMC1046454 | RPT-131 | NMC1046506 |
| RPT-78 | NMC1046456 | RPT-132 | NMC1046507 |
| RPT-80 | NMC1046458 | RPT-133 | NMC1046508 |
| RPT-82 | NMC1046460 | RPT-134 | NMC1046509 |
| RPT-84 | NMC1046462 | RPT-139 | NMC1046514 |
| RPT-86 | NMC1046464 | RPT-140 | NMC1046515 |
| RPT-88 | NMC1046466 | RPT-141 | NMC1046516 |
| RPT-90 | NMC1046468 | RPT-142 | NMC1046517 |
| RPT-92 | NMC1046470 | RPT-143 | NMC1046518 |
| RPT-94 | NMC1046472 | RPT-144 | NMC1046519 |
| RPT-95 | NMC1046473 | RPT-145 | NMC1046520 |
| RPT-96 | NMC1046474 | RPT-146 | NMC1046521 |
| RPT-97 | NMC1046475 | RPT-147 | NMC1046522 |
| RPT-98 | NMC1046476 | RPT-148 | NMC1046523 |
| RPT-99 | NMC1046477 | RPT-149 | NMC1046524 |
| RPT-102 | NMC1046480 | RPT-150 | NMC1046525 |
| RPT-103 | NMC1046481 | RPT-151 | NMC1046526 |

*Loan and Security Agreement*
*Real Property*

| Claim Name | BLM Serial No. | | Claim Name | BLM Serial No. |
|---|---|---|---|---|
| RPT-152 | NMC1046527 | | RPT-77 | NMC1046455 |
| RPT-153 | NMC1046528 | | RPT-79 | NMC1046457 |
| RPT-154 | NMC1046529 | | RPT-81 | NMC1046459 |
| RPT-155 | NMC1046530 | | RPT-83 | NMC1046461 |
| RPT-156 | NMC1046531 | | RPT-85 | NMC1046463 |
| RPT-108 | NMC1046486 | | RPT-87 | NMC1046465 |
| RPT-109 | NMC1046487 | | RPT-89 | NMC1046467 |
| RPT-110 | NMC1046488 | | RPT-91 | NMC1046469 |
| RPT-111 | NMC1046489 | | RPT-93 | NMC1046471 |
| RPT-135 | NMC1046510 | | Valley Girl #1 | NMC1180303 |
| RPT-136 | NMC1046511 | | Valley Girl #2 | NMC1180304 |
| RPT-137 | NMC1046512 | | | |
| RPT-138 | NMC1046513 | | | |

3.    **Leased Real Property**

**(a)    *Leased Fee Property***

See Exhibit B-1, attached hereto and incorporated herein by this reference.

**(b)** *Leased Unpatented Mining Claims*

| Claim Name | BLM Serial No. | Claim Name | BLM Serial No. |
|---|---|---|---|
| THEM-1 | NMC709986 | BLACK EAGLE 12 | NMC1040713 |
| THEM-2 | NMC709987 | BLACK EAGLE 13 | NMC1040714 |
| HER-1 | NMC709988 | BLACK EAGLE 14 | NMC1040715 |
| HER-2 | NMC709989 | BLACK EAGLE 15 | NMC1040716 |
| HER-3 | NMC709990 | BLACK EAGLE 16 | NMC1040717 |
| HER-4 | NMC709991 | EMG #1 | NMC1180294 |
| HER-5 | NMC709992 | EMG #2 | NMC1180295 |
| HER-6 | NMC709993 | EMG #3 | NMC1180296 |
| HER-7 | NMC709994 | EMG #4 | NMC1180297 |
| HER-8 | NMC709995 | EMG #5 | NMC1180298 |
| HER-9 | NMC709996 | EMG #6 | NMC1180299 |
| HER-13 | NMC709997 | EMG #7 | NMC1180300 |
| HER-14 | NMC709998 | EMG #8 | NMC1180301 |
| HER-15 | NMC709999 | EMG #9 | NMC1180302 |
| HER-16 | NMC710000 | | |
| HER-17 | NMC710001 | | |
| HER-18 | NMC710002 | | |
| HER-19 | NMC710003 | | |
| HER-22 | NMC710004 | | |
| HER-25 | NMC710007 | | |
| HER B | NMC716510 | | |
| HER D | NMC716512 | | |
| HER E | NMC716513 | | |
| HER-26 | NMC716521 | | |
| HER-27 | NMC716522 | | |
| HER-28 | NMC716523 | | |
| HER-29 | NMC716524 | | |
| HER-30 | NMC716525 | | |
| HER-31 | NMC716526 | | |
| BLACK EAGLE-3 | NMC825671 | | |
| BLACK EAGLE-4 | NMC825672 | | |
| BLACK EAGLE-5 | NMC825673 | | |
| BLACK EAGLE-6 | NMC825674 | | |
| BLACK EAGLE 11 | NMC1040712 | | |

**SCHEDULE 5.13**

## Existing Royalties

1.    The Royalty granted pursuant to the **Schedule 2** of the Purchase Agreement, dated June 8, 2013, by and between Pilot Gold (USA) Inc. (n/k/a Liberty Gold Corp.) and Rawhide Mining.

2.    The Royalty granted pursuant to the Mining Lease, dated as of June 25, 2010, by and between Waste Solutions and Recycling LLC, a Delaware limited liability company, and Rawhide Mining.

3.    The Royalty granted pursuant to the Mineral Lease and Option Agreement, dated June 1, 2013, between EMGOLD (U.S.) Corporation, a Nevada corporation, and Rawhide Mining, as heretofore amended.

*Loan and Security Agreement*
*Existing Royalties*

**SCHEDULE 5.14**

## Certificated Vehicles

| Equip # | Year | Make / Model / Details | VIN # | Title |
|---------|------|------------------------|-------|-------|
| ER01 | 1999 | HALCO ERT TRAILER | 46YCP132XX1058896 | |
| LV43 | 1994 | FORD F350 4X4 Flatbed | 1FDKF38MOREA19689 | |
| LV53 | 1994 | FORD F350 4X4 Flatbed | 2FTHF36HIRCA42909 | |
| LV59 | 1997 | FORD F250 4X4 | 3FTHF26H7VMA01273 | |
| LV62 | 1997 | FORD EXPEDITION | 1FMFU18L6VLA30270 | LOST |
| LV63 | 1997 | FORD F250 4X4 | 3FTHF26H3VMA01254 | |
| LV69 | 2001 | FORD F350 4X4 CREW CAB | 3FTSW31S31MA65321 | |
| LV70 | 2002 | FORD F250 4X4 Super CAB | 1FTNX21S52EC41779 | |
| LV71 | 2003 | FORD F150 4X4 SUPER CAB | 2FTPX18L83CA73208 | |
| LV72 | 2002 | CHEVY K2500HD 4X4 UTIL TRK | 1GCHK29182E257109 | |
| LV77 | 2004 | FORD F350 AMBULANCE | 1FDWF36P14EC14689 | |
| LV78 | 2011 | TOYOTA TUNDRA 4X4 DOUBLE CAB | 5TFUM5F16BX016409 | |
| LV80 | 2012 | TOYOTA TUNDRA 4X4 DOUBLE CAB | 5TFUY5F19CX235211 | |
| LV81 | 2012 | TOYOTA TUNDRA 4X4 CREW MAX | 5TFDY5F15CX235996 | |
| LV82 | 2013 | TOYOTA TUNDRA 4X4 CREW MAX | 5TFDW5F19DX276591 | |
| LV85 | 2013 | FORD F250 4X4 SINGLE CAB | 1FTBF2B63DEA50808 | |
| LV86 | 2013 | FORD F250 4X4 SINGLE CAB | 1FTBF2B65DEA50809 | |
| LV87 | 2006 | CHEVY K2500HD 4X4 UTIL TRK | 1GCHK24U86E124017 | |
| LV88 | 2013 | GMC SIERRA K3500 1 TON 4X4 TRUCK | 1GD322CG8DF185540 | |
| LV89 | 2013 | TOYOTA TUNDRA 4X4 DOUBLE CAB | 5TFUW5F18DX303246 | |
| LV92 | 2014 | TOYOTA TUNDRA 4X4 | 5TFUW5F16EX345514 | |
| LV93 | 2014 | FORD F250 CREW CAB 4X4 | 1FT7W2B68EEA22249 | LOST |
| LV94 | 2014 | TOYOTA TUNDRA SINGLE CAB 4X4 | 5TFPW5F15EX373995 | |
| LV95 | 2014 | TOYOTA TUNDRA SINGLE CAB 4X4 | 5TFPW5F10EX374374 | |
| LV96 | 2011 | FORD F350 CREW CAB 4X4 | 1FD8W3H68BEA03886 | LOST |
| LV97 | 2012 | GMC SIERRA K2500 3/4 TON 4X4 TRUCK | 1GT120CG6CF203886 | |
| LV98 | 2016 | TOYOTA TUNDRA 4X4 CREW MAX | 5TFDW5F19GX532829 | Financed |
| LV100 | 2017 | TOYOTA SIENNA XLE | 5TDYZ3DC2HS827537 | Financed |
| DT01 | 2012 | SNAKE RIVER DUMP TRAILER | 5PTBD1226C1016342 | |

**SCHEDULE 5.15**

## Intellectual Property

None.

**SCHEDULE 5.16**

**Environmental Matters**

4.    In 2008, Rawhide Mining experienced an accidental release of process solution from the leachpad.    A spill report was filed with the State of Nevada at that time.

5.    In 2015, Rawhide Mining experienced an accidental release of process solution from the leachpad.    A spill report was filed with the State of Nevada at that time.

**SCHEDULE 5.19**

## Capitalization and Affiliates

Rawhide Mining owns **1,734,285.7** shares of common stock in Emgold Mining Corporation, a British Columbia company ("**EmGold**"), which, as of the Closing Date, (i) represent approximately **5.60%** of the undiluted shares of EmGold and (ii) have an aggregate fair market value of approximately **USD 84,349**.

SCHEDULE 7.21

## Material Contracts

1.  Sodium Cyanide Purchase Agreement effective November 5, 2010 between Rawhide Mining LLC and Cyanco Company, LLC, as amended by (i) First Amendment dated October 14, 2015, (ii) Second Amendment dated March 14, 2018, and (iii) Third Amendment dated April 23, 2018

    *Restriction*:    Prior written consent required for an assignment of the agreement which consent shall not be unreasonably withheld

2.  Mining Lease, dated June 25, 2010, by and between Waste Solutions and Recycling LLC, a Delaware limited liability company and Kennecott Rawhide Mining Company LLC (n/k/a Rawhide Mining LLC), a Delaware limited liability company

    *Restriction*:    Prior written consent required for an assignment of the agreement; encumbrance is permitted

3.  Mineral Lease and Option Agreement, dated June 1, 2013, by and between Emgold (U.S.) Corporation, a Nevada corporation and Rawhide Mining LLC

    *Restriction*:    None

4.  Purchase Agreement dated January 8, 2013 by and between Pilot Gold (USA) Inc., a Delaware corporation and Rawhide Mining LLC

    *Restriction*:    None

5.  Security Agreement and Promissory Note, dated (or to be dated) on or around January 4, 2019, between Caterpillar Financial Services Corporation and Rawhide Mining

    *Restriction*:    Assignment of the agreement is prohibited