# Exhibit 6

EXECUTION VERSION

# FORBEARANCE AGREEMENT

This FORBEARANCE AGREEMENT (the "Forbearance Agreement") is entered into as of September 15, 2023, among (a) RAWHIDE MINING LLC, a Delaware limited liability company ("Rawhide"), (b) the other "Rawhide Subsidiaries" from time to time party thereto (such Rawhide Subsidiaries, collectively, and together with Rawhide, the "Borrowers"), (c) RAWHIDE ACQUISITION HOLDINGS LLC, a Delaware limited liability company (the "Parent," and, together with Borrower, individually and in their respective capacities under the Loan Documents (as defined herein), collectively, the "Rawhide Entities," and each, a "Rawhide Entity"), (d) SILVERVIEW CREDIT OPPORTUNITIES AIV LP ("Silverview") and CEOF HOLDINGS LP ("CEOF"), each a "Lender" and collectively, "Lenders" under the Loan Agreement (as defined herein), (e) EMX USA SERVICES CORP. ("Equity Lender"), and (f) SILVERVIEW CREDIT PARTNERS, LP (f/k/a Silverpeak Credit Partners, LP) as the "Agent" under Loan Agreement (together with its successors and assigns, in such capacity, the "Agent"; and the Agent, together with Silverview, collectively, the "Silverview Parties"; and the Silverview Parties, together with CEOF and Equity Lender, collectively, the "Lender Parties," and each, a "Lender Party"; and the Lender Parties, together with the Rawhide Entities, collectively, the "Parties," and each, a "Party").

## RECITALS

A.   WHEREAS, the Borrowers, the Parent, the Lenders, and the Agent entered into that certain Loan and Security Agreement, dated as of January 3, 2019, pursuant to which the Lenders agreed to provide certain extensions of credit, loans and other financial accommodations to the Borrowers (as amended, restated, supplemented or otherwise modified from time to time, the "Loan Agreement"), as amended by (i) that certain Amendment No. 1 to Loan and Security Agreement, dated as of October 31, 2019, (ii) that certain Amendment No. 2 to Loan and Security Agreement, dated as of March 12, 2021, (iii) that certain Third Amendment to Loan and Security Agreement, dated as of February 20, 2023, pursuant to which the existing Lenders made a term loan to the Borrowers in the aggregate original principal amount of $18,450,000 and the Equity Lender made a term loan to the Borrowers in the aggregate original principal amount of $150,000, on the terms set forth therein, and (iv) that certain Amendment No. 4 to the Loan and Security Agreement, dated as of March 6, 2023, pursuant to which the Equity Lender made the New Equity Holder Loan (as defined therein) in the aggregate original principal amount of $600,000, on the terms set forth therein;

B.   WHEREAS, pursuant to the Loan Agreement and the other Loan Documents (as defined in the Loan Agreement), the Lender Parties have a first priority lien on and security interest in the Collateral (as defined in the Loan Agreement);

C.   WHEREAS, the Agent delivered to the Borrower that certain letter captioned Reservation of Rights, dated as of March 17, 2022 (the "Reservation of Rights Letter");

D.   WHEREAS, the Agent delivered to the Borrower that certain notice of acceleration dated as of March 24, 2022 (the "Notice of Acceleration"), pursuant to which the Agent notified the Borrower that all of the Secured Obligations are immediately due and payable (including, from and after March 15, 2022, default interest pursuant to section 21.3 of the Loan Agreement) and demanded immediate payment in the amount of $15,813.577.68;

1

E.  WHEREAS, on July 19, 2022, the Agent, the Lenders, and the Rawhide Parties entered into that certain Forbearance Agreement (the "<u>2022 Forbearance Agreement</u>"). Under the Forbearance Agreement, the Lenders agreed to forbear temporarily from exercising any default-related rights and remedies under the Loan Documents.

F.  WHEREAS, the 2022 Forbearance Agreement expired by its terms on December 31, 2022.

G.  WHEREAS, the Specified Defaults (as defined below) currently exist under the terms of the Loan Documents; and

H.  WHEREAS, the Rawhide Entities have requested that the Lender Parties forbear temporarily from exercising their default-related rights and remedies under the Loan Documents, and the Lender Parties are willing to do so under the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the promises herein contained, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by the Parties hereto, the Parties hereto hereby agree as follows:

1. **Definitions**. Capitalized terms used in this Forbearance Agreement and not otherwise defined herein shall have the meanings ascribed to such terms in the Loan Agreement.

2. **Incorporation of Recitals**. The recitals set forth above constitute an integral part of this Forbearance Agreement, evidencing the intent of the parties in executing this Forbearance Agreement, and describing the circumstances surrounding its execution. Accordingly, said recitals are, by express reference, made a part of the covenants hereof, and this Forbearance Agreement shall be construed in light thereof.

3. **Acknowledgement of Obligations**. The Rawhide Entities hereby acknowledge and agree that: (a) the Borrowers are indebted to the Agent and Lenders in the amount of no less than $20,517,613.39 as of September 11, 2023, together with interest, fees (including, without limitation, reasonable attorneys' fees), costs, expenses and other charges now or hereafter payable by the Borrowers to the Agent and Lenders, without offset, recoupment, defense or counterclaim of any kind, nature or description whatsoever (the "<u>Outstanding Amount</u>"); (b) the Lender Parties have a valid and perfected senior lien on, and security interest in, the Collateral (as that term is defined in the Loan Agreement), and the Equity Lender has a valid and perfected senior lien on, and security interest in, the Eligible Equity Holder Note Equipment (as that term is defined in the Loan Agreement); (c) the Loan Documents are each valid and enforceable in accordance with their respective terms by the Lender Parties against the Borrowers without recoupment, offset, defense or counterclaim of any kind, nature or description whatsoever; (d) default interest is due and payable from and after March 15, 2022, and continues to accrue, including, without limitation, during the Forbearance Period (as defined below), notwithstanding anything to the contrary herein; and (e) except as modified by the Forbearance Agreement, the Loan Documents constitute the sole and entire agreement between the parties with respect to the Term Loan and the related Loan Documents or agreements, and there are no other oral or written covenants, promises, agreements or understandings regarding the Loan, the Secured Obligations, the Loan Agreement and the related Loan Documents or agreements.

EXECUTION VERSION

4. **Acknowledgment of Events of Default**. The Rawhide Entities hereby acknowledge and agree that (i) Events of Default under the Loan Documents have occurred and are continuing in respect of the failure of the Borrowers to make the cash payment of interest and principal due on March 15, 2022, the Borrowers' failure to pay the full amount of the Secured Obligations following acceleration of the Term Loan, and the Borrowers' failure to comply with the financial covenants set forth in section 7.1 of the Loan Agreement (collectively the "Specified Defaults"); (ii) the Specified Defaults are not subject to cure, and each entitles the Lender Parties to immediately exercise their rights and remedies under the Loan Documents; (iii) the Lender Parties have not waived, presently do not intend to waive, and may never waive, the Specified Defaults; and (iv) except as set forth herein, neither the terms of this Forbearance Agreement, nor the transactions contemplated hereby, shall be deemed to constitute any such waiver.

5. **Forbearance**.

(a) Forbearance. In reliance upon the representations, warranties and covenants of the Rawhide Entities contained in this Forbearance Agreement, and subject to the terms and the conditions of this Forbearance Agreement, the Lender Parties agree to forbear from exercising their default-related rights and remedies under the Loan Documents solely in respect of the Specified Defaults for the period (the "Forbearance Period") commencing on the date hereof and ending on the earliest to occur of: (i) 11:59 p.m. eastern time on October 2, 2023 (the "Outside Forbearance Expiration Date"); *provided, however*, the Outside Forbearance Expiration Date shall be extended to 11:59 p.m. eastern time on October 28, 2023 if, on or before October 2, 2023, the Rawhide Entities receive a letter of intent that contemplates a closing on or before 11:59 p.m. on October 26, 2023, and either (a) provides for the payment in full of the Secured Obligations in cash at closing or (b) is on terms otherwise acceptable to the Agent and Lenders in their sole and absolute discretion (the "Acceptable LOI"); (ii) the occurrence or existence of any breach of any representation, warranty, covenant or other agreement by the Rawhide Entities contained in this Forbearance Agreement without regard to any cure or grace period that may otherwise be applicable to such breach under the Loan Agreement (and notwithstanding anything to the contrary in the Loan Agreement); (iii) the occurrence of any Forbearance Event of Default (as defined below); or (iv) the occurrence or existence of any Default or Event of Default under the Loan Documents, other than any of the Specified Defaults. Strict performance of the terms of this Forbearance Agreement is required. Substantial performance of the terms of this Forbearance Agreement in good faith and without willful failure shall not be deemed sufficient performance. Strict performance shall be deemed the essence of this Forbearance Agreement and shall be deemed contracted for by the parties hereto. All breaches of this Agreement and all Forbearance Events of Defaults shall constitute additional immediate Events of Default under the Loan Agreement. Upon the expiration or termination of the Forbearance Period, the agreement of the Lender Parties to forbear shall automatically terminate and shall be of no force and effect, it being expressly agreed that the effect of such termination will be to permit the Lender Parties to immediately exercise any one or more of their default-related rights and remedies under the Loan Documents, without (x) notice to the Borrowers, (y) the passage of time, or (z) forbearance of any kind. Notwithstanding the foregoing, (i) each Loan Party shall comply with all limitations, restrictions or prohibitions that would otherwise be effective or applicable under the Loan Agreement or any of the other Loan Documents during the continuance of any Event of Default

3

EXECUTION VERSION

(including any Specified Defaults), including, without limitation, any limitations, restrictions or prohibitions against taking or permitting to exist certain actions including incurring certain debt, making certain dispositions, making certain investments, paying management, consulting or other similar fees, paying any earn- outs in connection with, or making, Permitted Investments, Permitted Royalties or making certain distributions or other Restricted Distributions or Restricted Transfers pursuant to certain terms and conditions set forth in the Loan Documents (including sections 8.1-8.5 and 8.8 of the Loan Agreement).

(b) <u>No Waivers; Reservation of Rights</u>. The Lender Parties have not waived, are not by this Forbearance Agreement waiving, and have no intention of waiving, any Event of Default under one or more of the Loan Documents (including the Specified Defaults) which has occurred, or which may occur at any time on or after the date hereof. Further, the Lender Parties have not agreed to forbear with respect to any of their rights or remedies concerning any Default, Event of Default, or Forbearance Event of Default other than the Specified Defaults. Except as expressly set forth in this Forbearance Agreement, (i) the Lender Parties reserve the right, in their sole discretion, to exercise any or all of their rights and remedies under the Loan Documents as a result of any Default or Event of Default under any one or more of the Loan Documents, other than the Specified Defaults solely during the Forbearance Period; (ii) the Lender Parties have not waived any of such rights or remedies; and (iii) neither this Forbearance Agreement, nor any delay by the Agent or any of the Lender Parties in exercising any such rights or remedies, shall be construed as a waiver by the Agent or any Lender Party of any such rights or remedies.

6. **Conditions of Effectiveness**. This Forbearance Agreement shall become effective at such time as all of the following conditions precedent have been satisfied as determined by the Agent and each Lender (such date, the "<u>Effective Date</u>"):

(a) This Forbearance Agreement shall have been executed by the Borrowers, the Parent, and the Lender Parties, and such fully executed Forbearance Agreement shall have been delivered to the Agent.

(b) The Rawhide Entities shall have retained a Chief Restructuring Officer acceptable to the Agent and Lenders ("<u>CRO</u>") during the Forbearance Period. The Rawhide Entities agree that the CRO, in its capacity as CRO, will operate independently of Lender Parties, and that employment of the CRO does not create any form of agency relationship, joint venture relationship, or partnership between Lender Parties and the CRO, or the Rawhide Entities and the Lender Parties.

(i) The CRO shall oversee the Rawhide Entities' businesses and assets and shall negotiate and consummate a sale of all or substantially all of the Rawhide Entities' businesses and assets (the "<u>Strategic Process</u>") on terms acceptable to the Lender Parties.

(ii) The CRO shall be authorized to sell non-essential Collateral (as that term is defined in the Loan Agreement), such as vehicles and other equipment, in CRO's reasonable business judgment prior to consummation of the Strategic Process,

4

EXECUTION VERSION

subject to the Lenders' approval in their sole and absolute discretion. The proceeds of such sales, net of any reasonable commissions and necessary closing costs, shall be paid to Agent and applied to the Outstanding Amount pursuant to the Loan Documents.

(iii)    Neither the Parent's board, nor any manager, management committee, or similar supervisory body or other person acting or purporting to act on behalf of any of the Rawhide Entities, may approve, suspend, or cancel the Strategic Process, nor any sale pursuant thereto, without CRO's prior written approval.

(iv)    CRO shall be involved in all aspects of the Strategic Process, including all substantive discussions and correspondence with any interested parties.

(v)    The Rawhide Entities, jointly and severally, promise to indemnify and hold the Agent, the Lenders, the Equity Lender, and their respective officers, directors, employees, agents, attorneys, representatives and equity holders (each, an "Indemnified Person") harmless from and against any and all claims, costs, expenses, damages and liabilities (including such claims, costs, expenses, damages and liabilities based on liability in tort, including strict liability in tort), including reasonable out-of-pocket attorneys' fees and disbursements and other reasonable out-of-pocket costs of investigation or defense (including those incurred upon any appeal) (collectively, "Liabilities"), that may be instituted or asserted against or incurred by such Indemnified Person as the result of (i) the Borrowers' retention of the CRO or (ii) any actions, inactions, or omissions by the CRO on behalf of the Rawhide Entities.

(c)    The Lenders shall have caused to be paid the $110,429.95 payoff amount for the premium financing for the Rawhide Entities' existing directors and officers liability insurance policy (the "D&O Insurance Payment").

(i)    Not as a condition of effectiveness of this Forbearance Agreement, but as a separate obligation hereunder, the Lenders agree that, subject to the Subsequent Insurance Payments Cap (as defined below), the Lenders shall cause to be paid the insurance premiums required from time to time to renew or extend the existing directors and officers liability insurance policy, or to obtain tail coverage, that provides coverage to the Managers (as defined below) through February 22, 2026 (the "Subsequent D&O Obligation").

(ii)    The Subsequent D&O Obligation shall be limited to payments by the Lenders of up to $250,000 in the aggregate (the "Subsequent Insurance Payments Cap"). For the avoidance of doubt, the Subsequent Insurance Payments Cap sets the aggregate maximum amount of the Subsequent D&O Obligation. The Lenders shall not be obligated to fund or cause to be paid any amounts in excess of the Subsequent Insurance Payments Cap, and nor shall the Lenders be required to fund or cause to be paid the maximum amount of Subsequent Insurance Payments Cap to the extent the insurance premiums necessary to obtain the coverage contemplated by the foregoing Section 6(c)(i) are less than $250,000 in the aggregate. To the extent the total amount of premiums required to obtain such coverage exceeds the Subsequent Insurance

5

EXECUTION VERSION

Payments Cap, nothing herein shall preclude any of the Managers or any other party from paying the difference between the Subsequent Insurance Payments Cap and the total amount of such premiums. In the event none of the Managers or any third party timely pays such deficiency and, as a result of such unpaid deficiency, coverage is denied, canceled, or lapses prior to February 26, 2026, the Lenders will be deemed to have satisfied the Subsequent D&O Obligation and shall have no further obligations under this Section 6(c).

(iii)    The following current or former managers, directors, and/or officers of the Rawhide Entities are referred to herein collectively as the "**Managers**," and each a "**Manager**": Don Deines, Wayne Hubert, Stabro Kasaneva, Darcy Marud, Nicolas Schlumberger, Marceau Schlumberger, Jeffrey S. Stein, and Michael Winn.

(iv)    The Rawhide Entities hereby acknowledge and agree that the amounts paid for the D&O Insurance Payment and the Future D&O Obligation, and any other payments funded or made in connection with this Section 6(c), shall be considered additional protective advances under the Loan Documents and shall be added to the balance of the Outstanding Amount. The Rawhide Entities further acknowledge and agree that such payments do not create any form of agency relationship, joint venture relationship, or partnership between (i) the Agent or the Lenders, and (ii) any of the Borrowers, the Managers, or the Rawhide Parties, and that by making such payments, the Lenders are protecting their own interests as creditors of the Rawhide Parties.

7.    **Rawhide Entities' Covenants**. To induce the Lender Parties to enter into this Agreement, the Rawhide Entities hereby covenant and agree with the Lender Parties as follows:

(a)    On a monthly basis, beginning on the tenth business day of the first month following the Effective Date, and on a continuing basis no later than the twentieth business day of each following month, the Rawhide Entities shall provide the Agent with a reconciliation of monthly actual expenses versus monthly budgeted expenses. Such reconciliation shall be in form and substance satisfactory to the Agent and each Lender in their respective sole discretion.

(b)    On a bi-weekly basis, beginning on the first Monday following the Effective Date, and on a continuing basis no later than the Monday of each following week, the Rawhide Entities shall provide the following information to the Agent: (i) the prior week's cash payments and receipts; (ii) the current week's forecast of gold production and cash payments and receipts; (iii) a rolling two week cash flow forecast to be approved, in writing, in advance, by the Agent and each Lender (the "**Two Week Budget**"); (iv) a detailed accounting by vendor of any expenditures from the Working Capital Funding; (v) all site operational management reports made in the ordinary course of business; and (vi) a written account of the status of any and all correspondence, discussion, or negotiations with respect to any financing opportunities, or prospective purchasers or investors in connection with the Strategic Process including, but not limited to: (a) a list of entities contacted; (b) any response from those entities; (c) a list of entities that have executed non-disclosure agreements; (d) a list of entities that received a Sale Book and have access to the Data Room (as such terms are defined below); and (e) copies of

6

EXECUTION VERSION

all documents related to the Strategic Process provided by any Loan Party or Investment Banker to any Person. Such reporting shall be in form and substance satisfactory to the Agent and each Lender in their respective sole discretion.

(c) Without limiting any other provisions of the Loan Agreement or this Forbearance Agreement, the Rawhide Entities shall not make any payments or distributions of any kind to owners of equity in any of the Rawhide Entities or any creditors of any of the Rawhide Entities unless such payments are (i) consented to in writing by the Agent; or (ii) in respect of payments to creditors made in the ordinary course of business in accordance with the Two Week Budget then in effect. For the avoidance of doubt, in the event that a Two Week Budget is not approved by the Agent and each Lender, the prior Two Week Budget shall continue in full force and effect for the purposes of this section 7(c).

(d) The Rawhide Entities shall promptly, and in any event no later than 24 hours following receipt, deliver to the Agent any and all offers, term sheets, indications of interest, letters of intent, other proposals and any definitive purchase documentation they receive, in each case in connection with the Strategic Process or any other sale, financing or other transaction involving the Loan Parties or their assets and/or businesses.

(e) The Rawhide Entities shall fully cooperate with the CRO in connection with (i) a review of the operations and finances of the Rawhide Entities and (ii) the Strategic Process.

(f) On a weekly basis, beginning on the first Wednesday following the Effective Date, and on a continuing basis no later than the Wednesday of each following week, the Rawhide Entities shall cause the CRO to host weekly calls or meetings with the Agent and the Lenders (and their counsel) to update the Agent and Lenders on the status of the Strategic Process.

(g) The Rawhide Entities shall, and shall cause CRO to, (A) consult with the Agent and the Lenders regarding the Strategic Process at times and with detail requested by the Agent or any Lender (including, without limitation, communications outside the presence of any representatives of any Loan Party or any affiliate thereof); and (B) disclose fully and promptly to the Agent, Lenders and their respective advisors all material developments in with respect to the Strategic Process.

(h) The Rawhide Entities shall comply with all covenants including reporting obligations set forth in the Loan Documents.

(i) Notwithstanding the foregoing, nothing in this Forbearance Agreement constitutes or shall be deemed to constitute any consent by any Lender Party to any sale or any waiver of any of the rights and remedies of any Lender Party with respect thereto.

8. **Representations and Warranties**. To induce the Lender Parties to enter into this Agreement, the Rawhide Entities hereby represent and warrant to the Lender Parties that:

EXECUTION VERSION

(a) <u>Organization</u>. Each Rawhide Entity is a limited liability company duly organized, existing and in good standing under the laws of the State of Delaware with full and adequate corporate power to carry on and conduct its business as presently conducted. Each Borrower is duly licensed or qualified in all foreign jurisdictions wherein the nature of its activities requires such qualification or licensing.

(b) <u>Authorization; Due Execution</u>. The Rawhide Entities are duly authorized to execute and deliver this Forbearance Agreement and to perform their respective obligations hereunder. Each of the Rawhide Entities has duly executed and delivered this Forbearance Agreement and each other Loan Document to which they are a party.

(c) <u>Validity and Binding Effect</u>. This Forbearance Agreement and the Loan Documents are legal, valid, and binding obligations of each Rawhide Entity, enforceable against each such Rawhide Entity in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, or other similar laws of general application affecting the enforcement of creditors' rights or by general principles of equity limiting the availability of equitable remedies.

(d) <u>No Consents or Approvals</u>. No consent, approval, authorization, or order of, or filing, registration or qualification with, any Governmental Authority is required in connection with the execution, delivery or performance by such Rawhide Entity of this Forbearance Agreement (other than such as has been met or obtained and are in full force and effect).

(e) <u>Confirmation of Representations in Loan Agreement</u>. Each of the representations and warranties set forth in Article 5 of the Loan Agreement is true and correct, in all respects, as though made on and as of the Effective Date.

(f) <u>No Other Defaults</u>. No Default or Event of Default, other than the Specified Defaults, has occurred as of the Effective Date.

9. **Events of Default**. The occurrence of any one or more of the following shall be an event of default ("<u>Forbearance Event of Default</u>") under this Forbearance Agreement:

(a) Any Rawhide Entity fails to perform any covenant set forth in section 7 hereof.

(b) Any reporting delivered by the Rawhide Entities shall contain a material misstatement of any of the information set forth therein.

(c) Any representation or warranty set forth in section 8 hereof is untrue.

(d) The occurrence of any Default or Event of Default, other than: (i) the Specified Events of Defaults; or (ii) any Default or Event of Default relating to section 7.1(c) of the Loan Agreement for the period measured as of October 2, 2023.

(e) The failure of the Strategic Process to produce one or more prospective bidders for an acceptable transaction, as reasonably determined by the CRO, by October 2, 2023.

8

EXECUTION VERSION

   (f)  A sale consistent with the Acceptable LOI fails to close by October 26, 2023.

   (g)  The termination or resignation of the CRO.

  10.  **Release**. The Rawhide Entities hereby release, acquit, and forever discharge the Lender Parties and each and every past and present subsidiary, affiliate, officer, director, agent, servant, employee, representative, and attorney of the Lender Parties, from any and all claims, causes of action, suits, debts, liens, obligations, liabilities, demands, losses, defenses, costs and expenses (including attorneys' fees) of any kind, character, or nature whatsoever, known or unknown, fixed or contingent, which any of the Rawhide Entities may now have or claim to have now or which may hereafter arise out of or be connected with (a) any act of commission or omission of the Agent or Lender Parties occurring prior to the date of this Forbearance Agreement or (b) any instrument executed prior to the date of this Forbearance Agreement including, without limitation, any claims, liabilities or obligations relating to the Loan Documents.

  11.  **No Claim/No Defaults**. The Rawhide Entities each hereby expressly acknowledge and agree that that it currently possesses no claim or defense against any Lender Party nor any of their respective designees, affiliates, agents, employees, officers, directors, consultants, successors, assigns, and representatives (collectively, "Lender Related Parties," and each, a "Lender Related Party") in connection with the Loan Documents, including, but not limited to, set-off, estoppel, waiver, duress, impracticability, mistake, ambiguity, cancellation of instruments, rescission or excuse of performance. The Rawhide Entities each hereby expressly agree that they shall not assert (including, without limitation, by bringing any action, lawsuit or proceeding) any claims (including, without limitation, any "lender liability" claims) against any Lender Party or any of the Lender Related Parties based on, arising out of or in connection with this Forbearance Agreement. The Rawhide Entities each hereby acknowledge and agree that there are no defaults, events of defaults or breaches by any Lender Party under any of the Loan Documents, which now exist or, following notice and an opportunity to cure, will ripen into a default, event of default or breach by any Lender Party under any of the Loan Documents.

  12.  **Debtor/Creditor Relationship**. The relationship between the Rawhide Entities and the Lender Parties is solely that of a debtor and creditor, each as further set forth in the respective Loan Documents, and the Lender Parties do not have any fiduciary or other special relationship with the Rawhide Entities, and no term or condition of this Agreement or of the Loan Documents shall be construed so as to deem the relationship between the Rawhide Entities, on one hand, and the Lender Parties, on the other hand, to be other than that of Borrower or Parent (as applicable) and Lender and Agent, in each case, as further set forth in the Loan Documents. The Parties acknowledge and agree that the relationship between the Rawhide Entities and the Lender Parties arose entirely pursuant to and in accordance with the Loan Documents.

  13.  **Notices**. All notices required under this Forbearance Agreement shall be in writing and shall be transmitted in the manner and to the addresses required by the Loan Documents, and if to Agent or any of the Lenders, by email to agent@silverviewcredit.com with copy to Bryce Suzuki as counsel for the Lenders at bsuzuki@swlaw.com, or to such other addresses as the Agent, the Lenders, the Equity Lender, or the Rawhide Entities may specify from time to time in writing.

9

EXECUTION VERSION

14. **Opportunity to Consult with Attorney**. The Rawhide Entities hereby confirm that they have each had the opportunity to consult with an attorney of their choosing regarding the meaning, consequences, and effect of this Forbearance Agreement, and acknowledge that they understand the meaning, legal consequences, and effect of this Forbearance Agreement. The Rawhide Entities hereby confirm that they have entered into this Forbearance Agreement voluntarily, with full knowledge of its significance and that this Forbearance Agreement is in all respects complete and final.

15. **Miscellaneous**.

(a) The Borrowers hereby agree to pay all of the Agent's and Lenders' costs and expenses, including, without limitation, attorneys' and any consultants' fees and expenses, related to this Forbearance Agreement and any related transactions upon the earlier of: (i) the termination of this Forbearance Agreement and (ii) the closing of a sale consistent with an Acceptable LOI.

(b) The Borrowers shall pay all of CRO's fees, costs, and expenses in accordance with the engagement letter between the Rawhide Entities and CRO.

(c) This Forbearance Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which shall together constitute but one and the same document.

(d) This Forbearance Agreement shall be binding on the Rawhide Entities and their respective representatives, successors and assigns, and shall inure to the benefit of the Lender Parties and their successors and assigns.

(e) This Forbearance Agreement is made and entered into solely for the benefit of the Parties hereto. There are no third-party beneficiaries, express or implied, of this Forbearance Agreement. No provision of this Forbearance Agreement shall be deemed to confer any benefit, claim, remedy, liability, reimbursement, cause of action, nor any direct, indirect, or derivative right, nor any other rights, upon any other person other than the Parties hereto. Notwithstanding the foregoing, the Managers shall be deemed to be third-party beneficiaries only of Section 6(c)(i)-(ii) of this Forbearance Agreement.

(f) Section captions and headings used in this Forbearance Agreement are for convenience only and are not part of, and shall not affect the construction of, this Forbearance Agreement.

(g) This Forbearance Agreement is a contract made under and governed by the laws of the State of New York, without regard to conflict of laws principles. Whenever possible, each provision of this Forbearance Agreement shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Forbearance Agreement shall be prohibited by, or be invalid under such law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Forbearance Agreement.

EXECUTION VERSION

(h)     Each Borrower hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of any New York State court or Federal court of the United States sitting in New York City, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Forbearance Agreement or the other Loan Documents, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such Federal court. Each Party agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Forbearance Agreement shall affect any right that the Agent or any Lender may otherwise have to bring any action or proceeding relating to this Agreement or the other Loan Documents against any Borrower or its properties in the courts of any jurisdiction.

(i)     Each Borrower hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Forbearance Agreement or the other Loan Documents in any New York State or Federal court. Each Party irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(j)     **EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS FORBEARANCE AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS, INCLUDING WITHOUT LIMITATION ANY CAUSE OF ACTION, CLAIM, CROSS-CLAIM, COUNTERCLAIM, THIRD PARTY CLAIM OR ANY OTHER CLAIM (COLLECTIVELY, "CLAIMS") ASSERTED BY ANY BORROWER AGAINST THE AGENT, THE LENDERS OR THEIR RESPECTIVE ASSIGNEES OR BY THE AGENT, THE LENDERS OR THEIR RESPECTIVE ASSIGNEES AGAINST ANY BORROWER. EACH PARTY (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.**

(k)     This Forbearance Agreement represents the complete agreement among the parties regarding the subject matter hereof and supersedes any prior or contemporaneous agreements or understandings, oral or written regarding said subject matter.

4881-9030-4126.7

**EXECUTION VERSION**

(l) This Forbearance Agreement shall be construed without regard to any presumption or other rule requiring construction against the party that drafted, or caused to be drafted, the Forbearance Agreement.

(m) All Parties acknowledge and agree that Agent shall, promptly following receipt, distribute to each Lender any and all information and documents received by Agent or its advisors from the Loan Parties or their advisors pursuant to this Agreement and the other Loan Documents.

(n) The Rawhide Entities, as debtors, grantors, pledgors, guarantors, assignors, or in other similar capacities in which such parties grant liens or security interests in their properties or otherwise act as accommodation parties or guarantors, as the case may be, under the Loan Documents, hereby ratify and reaffirm all of their payment and performance obligations and obligations to indemnify, contingent or otherwise, under each of such Loan Documents to which it is a party, and ratify and reaffirm their grants of hypothecs, liens on or security interests in their properties pursuant to such Loan Documents to which they are a party, respectively, as security for the Obligations under or with respect to the Loan Agreement, and confirm and agree that such liens and security interests hereafter secure all of the Secured Obligations, including, without limitation, all additional Secured Obligations hereafter arising or incurred pursuant to or in connection with this Agreement, the Loan Agreement or any other Loan Document.

\*     \*     \*

**[SIGNATURE PAGES FOLLOW]**

12

4881-9030-4126.7

EXECUTION VERSION

**IN WITNESS WHEREOF**, this Agreement has been entered into as of the date first above written.

RAWHIDE ENTITIES:

RAWHIDE MINING LLC, a Delaware limited liability company

By: _____
Its: Marceau Schlumberger, Member

RAWHIDE ACQUISITION HOLDINGS, LLC, a Delaware limited liability company

By: _____
Its: Marceau Schlumberger, Member

13

4881-9030-4126.7

**EXECUTION VERSION**

  **IN WITNESS WHEREOF**, this Agreement has been entered into as of the date first above written.

| | |
|---|---|
| LENDERS: | SILVERVIEW CREDIT OPPORTUNITIES AIV LP, a Delaware Limited Partnership<br><br>By: */s/ signature/*<br>Its: Partner<br><br><br>CEOF HOLDINGS LP, a Delaware Limited Partnership<br><br>By: _____<br>Its: _____ |
| EQUITY LENDER: | EMX USA SERVICES CORP.<br><br>By: _____<br>Its: _____ |
| AGENT: | SILVERVIEW CREDIT PARTNERS LP, a Delaware Limited Partnership<br><br>By: */s/ signature/*<br>Its: Partner |

**EXECUTION VERSION**

**IN WITNESS WHEREOF**, this Agreement has been entered into as of the date first above written.

LENDERS:    SILVERVIEW CREDIT OPPORTUNITIES AIV LP, a Delaware Limited Partnership

By: _____
Its: _____

CEOF HOLDINGS LP, a Delaware Limited Partnership
By: Corbin Capital Partners, L.P., its Investment Manager

By: *[signature]*
    DocuSigned by: EC77AC48D9C844B...
Its: General Counsel

EQUITY LENDER:    EMX USA SERVICES CORP.

By: _____
Its: _____

AGENT:    SILVERVIEW CREDIT PARTNERS LP, a Delaware Limited Partnership

By: _____
Its: _____

14

**EXECUTION VERSION**

**IN WITNESS WHEREOF**, this Agreement has been entered into as of the date first above written.

LENDERS:	SILVERVIEW CREDIT OPPORTUNITIES AIV LP, a Delaware Limited Partnership

By: _____
Its: _____

CEOF HOLDINGS LP, a Delaware Limited Partnership

By: _____
Its: _____

EQUITY LENDER:	EMX USA SERVICES CORP.

By: _____/s/_____
Its:   CFO, Douglas Reed

AGENT:	SILVERVIEW CREDIT PARTNERS LP, a Delaware Limited Partnership

By: _____
Its: _____

14